UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


EMILE MAZLOUM                    :
                                 :
            Plaintiff            :
                                 :
    vs.                          :  Civil Action No.
                                 :  1:06:CV 00002
                                 :  (JDB)
DISTRICT OF COLUMBIA,            :
    et al.                       :
                                 :
            Defendants :


                    Washington, D.C.

                    Tuesday, August 8, 2006


Videotaped Deposition of:


                    ANTHONY RAMIREZ

called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices
of Katten Muchin Rosenman, LLP, 1025 Thomas
Jefferson Street, N.W., East Lobby, Suite 700,
Washington, D.C. 20007-5201, before Renee A.
Feder, CSR, a Notary Public in and for the
District of Columbia, beginning at 9:30 a.m.,
when were present on behalf of the respective
parties:

Page 146

1  A. Officer Schneider and Modlin had
2  gone back inside. Officer Phillips and I --
3  Q. Was it cold? Is that why they
4  went back inside?
5  A. No. They went back inside to look
6  for Officer Modlin's cell phone that he had
7  dropped.
8  Q. Okay. So it was you and Phillips?
9  A. Right.
10 Q. And the two of you spoke to Allman
11 together?
12 A. That is right.
13 Q. What did you tell him?
14 A. It was primarily Phillips relating
15 what he had seen. Because he was the one who
16 had seen the assault.
17 Q. What did he tell Lt. Allman?
18 A. That he and Officer Modlin had
19 observed Mr. Mazloum and two of his associates
20 beating a security personnel at the club.
21 Q. Okay. This was all in your
22 hearing?

Page 147

1  A. Right.
2  Q. Is that it?
3  A. He asked what else had happened.
4  He asked me what I saw and I told him I had
5  observed Modlin and Phillips in need of
6  assistance. I came over, rendered it,
7  handcuffed, and they walked him outside. That
8  was the end of my participation up to that
9  point.
10 Q. Was that the end of the
11 conversation with Lt. Allman?
12 A. Generally speaking, yes.
13 Q. Had you known Lt. Allman before?
14 A. Professional relationship, yes.
15 Q. You never went drinking with him?
16 A. No.
17 Q. You never went to a club with him?
18 A. No.
19 Q. All right. Then what happened?
20 A. Lt. Allman had told us that --
21 that was all he would need of us. Officers
22 Acosta and Smith had arrived on the scene and

Page 148

1  taken him into custody.
2  Q. So this conversation with Lt.
3  Allman occurred before or after Acosta and
4  Smith?
5  A. Simultaneously.
6  Q. Did you have any conversations
7  with Allman and Smith?
8  A. No. Allman I did, but not Smith.
9  Q. I don't mean Allman. I mean
10 Acosta.
11 A. No.
12 Q. You had no discussion at all with
13 Acosta and Smith?
14 A. I believe Officer Smith handed me
15 my handcuffs back.
16 Q. Did you know Acosta and Smith?
17 A. I know who they are.
18 Q. So you recognize them. And they,
19 even though you were out of uniform, they
20 recognized you?
21 A. Correct.
22 Q. As an off duty officer?

Page 149

1  A. I had a badge hanging around my
2  neck.
3  Q. When did you put the badge around
4  your neck?
5  A. When I began making my way through
6  the crowd.
7  Q. So did you have any conversation
8  with Smith or did he just take off the
9  handcuffs and give them to you?
10 A. No. Lt. Allman relayed all the
11 information to Smith and Acosta. He handed me
12 my handcuffs back and Lt. Allman just told us
13 to go.
14 Q. Did you hear any conversation
15 between Allman and Acosta and Smith?
16 A. No.
17 Q. So, Allman had some conversation
18 with Acosta and Smith, you don't know what.
19 And Acosta or Smith then removed your
20 handcuffs and gave them back to you and put on
21 his own?
22 A. Right. Well, it is done not in

Page 166

1  I stayed around for a little while.
2  Lt. Taylor had advised me that he was making a
3  complaint. Lt. Allman had told me that he
4  wasn't sure why Smith and Acosta had not
5  affected an arrest that night but he would get
6  to the bottom of it. He had told me -- I let
7  him know I thought he should be arrested. He
8  said, no, just let it go for now. If we need
9  to get a warrant, we will get one later.
10      Q.   When Lt. Taylor told you he was
11  there to file a complaint against you, did you
12  tell Lt. Taylor you had taken down all of his
13  personal information?
14      A.   I don't know. I don't remember if
15  I did or not.
16      Q.   If you had known, if he had told
17  you at the outset that he was there to file a
18  complaint against you before you started
19  taking personal information, would you have
20  continued to take his personal information?
21      A.   Sure.
22           MR. BRUCKHEIM: Objection. That

Page 167

1  calls for speculation. But you can speculate.
2           BY MR. KAPLAN:
3      Q.   Your answer is yes?
4      A.   Police officers -- it is yes. But
5  I would like to add to that. Can I?
6      Q.   Yes.
7      A.   It is standard for citizens to
8  make complaints against police officers when
9  they are arrested or when they are not. It
10  just comes with the job. And I am not going
11  to allow the possibility of a citizen making a
12  complaint, whether it is true or not, to
13  affect my decisions on how I policed.
14      Q.   Now, before you left the police
15  station, did you call anyone other than
16  Lt, Allman?
17      A.   I had called -- no. In the
18  station, no.
19      Q.   When you left the station, you had
20  a partner. Right?
21      A.   That day, no.
22      Q.   You were just in your cruiser

Page 168

1  alone?
2      A.   No. When I affected the arrest I
3  had a ride-along, who was a kid. I think he
4  was probably 17, 18 years old, that was doing
5  some type of Eagle Scout observation ride, or
6  whatever. When I had gone into the station to
7  affect the arrest, they can go for about four
8  hours, so when we processed the arrest, I let
9  him observe. And then, when I went back out
10  on the street, I went back on the street
11  myself.
12      Q.   When you went back on the street
13  did you make any calls to any of your fellow
14  officers or anyone else?
15      A.   Yes. I called Officer Modlin.
16      Q.   What conversation did you have
17  with him?
18      A.   I had told him what had occurred.
19  I told him that Smith and Acosta had not
20  affected an arrest. And I said we need to
21  talk to Acosta and see why he didn't do that.
22  And so he did a three-way call with Officer

Page 169

1  Acosta.
2      Q.   Smith conferenced -- I mean Modlin
3  conferenced in Smith and Acosta?
4      A.   Yes. No, Acosta. Not Smith and
5  Acosta. Just Acosta.
6      Q.   Modlin conferenced in Acosta. So
7  you and Acosta and Modlin --
8      A.   Right, were on a three-way call.
9      Q.   What did Acosta say?
10      A.   Acosta was asked why he didn't
11  arrest Mr. Mazloum. He told me, in effect,
12  and this isn't his exact words but something
13  to the effect, dude, I am sorry, if anything
14  comes down, just give them my name.
15      Q.   Is there anything else or is that
16  it?
17      A.   That was it, pretty much.
18      Q.   Did you call anyone else?
19      A.   I talked to Officer Schneider.
20      Q.   You called Schneider?
21      A.   I called Schneider.
22      Q.   What did he have to say?

Page 174

1  Q. Did you have some discussions with
2  Mr. Persons after that during the evening?
3  A. No.
4  Q. So, why were you concerned about
5  Mike Persons?
6  A. Well, it had been relayed to me by
7  Modlin and Phillips that he had been a victim
8  of a crime. I wanted to know for myself why
9  your client had not been arrested because my
10 of own personal curiosity. So I exercised my
11 freewill to call him up and see what was going
12 on.
13 Q. Did you think that Mr. Persons
14 were going to know why Mr. Mazloum was not
15 arrested?
16 A. I had no idea.
17 Q. So you called -- you were trying
18 to call Mr. Persons?
19 A. Right. Well, I called John. And
20 let him know that Mr. Mazloum --
21 Q. That is John Fiorito?
22 A. John Fiorito.

Page 175

1  Q. Were you on a first name basis
2  with him?
3  A. That is his name.
4  Q. I know. Were you on a first name
5  basis? You didn't call him Mr. Fiorito? You
6  called him John.
7  A. I never really thought about it.
8  Q. Did you refer to him as John or
9  Mr. Fiorito?
10 A. Both.
11 Q. Well, you only -- how many times
12 before this event had you met him?
13 A. Two, three times.
14 Q. And each time it was in connection
15 with someone being tossed out of FUR?
16 A. Yes.
17 Q. And he was always there on the
18 scene when that happened?
19 A. Not always.
20 Q. Two or three times?
21 A. I couldn't tell you.
22 Q. At first he was Mr. Fiorito and

Page 176

1  then he became John? Is that it?
2  A. I will call you Warren. Maybe I
3  am disrespectful, but I will call people by
4  their first names when I feel it fit.
5  Q. Was it your habit to call him
6  John?
7  A. I don't know. It couldn't be a
8  habit. I didn't know him that well.
9  Q. But you weren't interested in
10 talking to him, you were interested in talking
11 to Persons?
12 A. Both. I wanted to find out what
13 happened.
14 Q. Hadn't Lt. Allman told you what
15 happened?
16 A. Lt. Allman had told me that he had
17 instructed Smith and Acosta to arrest
18 Mr. Mazloum, that is the most that I knew.
19 Q. Did Smith deny that?
20 A. I don't know what Smith had said.
21 I have never spoken to him about the
22 situation.

Page 177

1  Q. I thought you were in a conference
2  call with Smith.
3  A. That was Acosta.
4  Q. I am sorry. Did Acosta deny that?
5  A. Acosta said something to the
6  effect, dude, I am sorry, if my name comes up,
7  just give him my name. I don't know what that
8  means.
9  Q. So you called Modlin and you
10 called Fiorito's phone number?
11 A. Yes.
12 Q. John. And you called John?
13 A. I called John.
14 Q. And tell me the conversation with
15 John.
16 A. The best I can recall, I informed
17 him that Mr. Mazloum, you know -- I told him
18 the situation as I just related to you. He
19 had come into the station, had not been placed
20 under arrest. I wanted to know if he knew why
21 he had not been placed under arrest because he
22 had remained outside when Officer Phillips and

Page 178

1  I had returned inside the club. He didn't
2  relay any information to me. I asked him if
3  Mike Persons knew. And he told me --
4     Q.  Wait a minute. Before we get to
5  Mike Persons, you said he didn't relay any
6  information to you. Did he say he didn't want
7  to discuss it?
8     A.  No, I mean, we really didn't know
9  what Smith and Acosta had done, or why they
10 didn't do what they should have done.
11    Q.  What did John say about what he
12 observed or what he thought should have been
13 done?
14    A.  I don't remember. You need to ask
15 John.
16    Q.  All right. Well, at some point we
17 will.
18    A.  Good.
19    Q.  So what do you recall in the
20 conversation with John?
21    A.  Just relaying that Mr. Mazloum was
22 in the station making a complaint.

Page 179

1     Q.  And nothing else?
2     A.  That is it.
3     Q.  Okay. And he said what to that?
4     A.  Oh. Okay. I mean, I don't
5  remember the very details. It was just a
6  conversation that we had.
7     Q.  How long did this conversation
8  last?
9     A.  A minute, maybe two.
10    Q.  So, you told him that Mr. Mazloum
11 had come -- had made a complaint, had
12 apparently not been arrested. He said he was
13 surprised to hear that. And that was the end
14 of the conversation?
15    A.  To the best of my recollection,
16 yes.
17    Q.  Anything discussed in that -- who
18 did you speak to next?
19    A.  I believe I tried to get a hold of
20 Officer Phillips. I don't remember being able
21 to reach him. I believe that is it.
22    Q.  When you spoke to John, was there

Page 180

1  some mention about the security cameras?
2     A.  No.
3     Q.  Did you know there were security
4  cameras in the club?
5     A.  I never really thought about it.
6     Q.  Inside and outside the club?
7     A.  Never thought about it.
8     Q.  Never noticed them?
9     A.  Never thought about it.
10    Q.  Do you know now that there is
11 security cameras in and outside of the club?
12    A.  Yes. You just told me.
13    Q.  Before I just told you, you didn't
14 know?
15    A.  No.
16    Q.  Did you have any -- did you have
17 any other conversations that day with anyone
18 about this incident?
19    A.  I ended up getting to talk to Mike
20 Persons.
21    Q.  How did you get his number?
22    A.  He was actually -- when I talked

Page 181

1  to John, he told me he was there. And I went
2  there to talk to him.
3     Q.  You went there? You went to the
4  club?
5     A.  Uh-huh. Sure did.
6     Q.  Was this part of your -- this
7  wasn't part of your assigned duties to go
8  there that day, were they?
9     A.  No, but as a police officer, as
10 long as I stay in the First District, you can
11 go wherever you want.
12    Q.  I see. You are not supposed to
13 stay in your PSA?
14    A.  I am just supposed to answer runs
15 in that PSA.
16    Q.  You went to see Persons. What was
17 your purpose in going to see Persons?
18    A.  To make sure he was okay, and to
19 find out why -- if he knew why Mr. Mazloum had
20 not been arrested for assaulting him.
21    Q.  You were concerned that he might
22 be physically injured? Is that it?

Page 182

1    A.  Sure.
2    Q.  You wanted to be sure that he was
3  getting proper medical care?
4    A.  I didn't know.  I wanted to know
5  why Mr. Mazloum had not been arrested for
6  assaulting him.
7    Q.  So you went to see Persons.  What
8  conversation did you have with him?
9    A.  I asked him what had happened
10 after we went inside the club.  And he told me
11 his version.
12   Q.  What did he tell you?
13   A.  He told me that Officer Smith had
14 told him that if he wanted to press charges
15 against Mr. Mazloum, that he, himself, would
16 have to be arrested, talking about
17 Mr. Persons.  And that is why he did not want
18 to press charges on Mr. Mazloum and that is
19 why they let him go.
20   Q.  Did he tell you anything else in
21 that conversation?
22   A.  No.  That is about it.

Page 183

1    Q.  Did you say anything else in that
2  conversation?
3    A.  No.
4    Q.  When he told you that explanation,
5  what did you say?
6    A.  Something to the effect of that is
7  bullshit.  He should have been arrested.
8  Mr. Persons was upset that Mr. Mazloum did not
9  get arrested for assaulting him.
10   Q.  Persons was upset by it?
11   A.  Sure.
12   Q.  Did you ever talk to Officer Smith
13 to see if, indeed, that is what he told him?
14   A.  No.
15   Q.  Were you curious or concerned why
16 Officer Smith would say any such thing as
17 that?
18   A.  It always concerns me when an
19 officer doesn't do what I think he is supposed
20 to do.
21   Q.  But it didn't concern you enough
22 to pick up the phone and call Officer Smith?

Page 184

1    A.  I didn't know Officer Smith well
2  enough.  Modlin and Acosta were friends.  I
3  don't know Smith.  There is no reason.  There
4  are lieutenants for that.
5    Q.  When all of this -- all of this
6  was on March 12th.  Right?
7    A.  Yes.
8    Q.  Did you talk to anyone else on
9  March 12th?
10   A.  Not that I can recall.
11       MR. KAPLAN:  This might be a good
12 time to break for lunch.
13       MR. BRUCKHEIM:  All right.
14       VIDEOGRAPHER:  Going off the
15 record at 12:58.
16       (The luncheon recess was taken.)
17   A-F-T-E-R-N-O-O-N    S-E-S-S-I-O-N
18       VIDEOGRAPHER:  We are back on the
19 record at 1:54.
20       MR. KAPLAN:  Before we resume,
21 Ms. Phillips, I will renew my question earlier
22 this morning.  I asked you to produce the

Page 185

1  remaining documents, the post incident
2  documents, from Mr. Ramirez's personnel file,
3  and you had not responded at that time.  And
4  do you care to respond now?
5        MS. PHILLIPS:  Yes.  And I repeat
6  the response that I gave you when we consulted
7  prior to this deposition at the beginning and
8  I consulted again with counsel for Officer
9  Ramirez.  And we will not be producing those
10 documents pursuant to the objections that I
11 told you that we raised.
12       MR. KAPLAN:  Okay.
13       Pursuant to what -- what
14 objections would those be?
15       MS. PHILLIPS:  Post incident and
16 relevance.
17       MR. KAPLAN:  Post incident is the
18 basis for the objection?
19       MS. PHILLIPS:  And relevance.
20       MR. KAPLAN:  Are you aware of any
21 authority that supports not producing
22 documents at deposition on relevance?

Page 190

1  pending criminal charges against my client.
2  For that reason he is not going to answer the
3  questions about anything potentially related
4  to that incident.
5       And my relevance objection is
6  still there, as well.
7       BY MR. KAPLAN:
8     Q.   You told us before the break,
9  Mr. Ramirez, about certain conversations which
10 you had with the various police officers out
11 in the street after you came out of the club
12 and during the approximately five minutes, I
13 think you said, before the -- was it five
14 minutes before the uniformed officers arrived?
15    **A.   My perception was it was very**
16 **quick.  Like less than a minute that the**
17 **patrolmen came up.**
18    Q.   30 seconds sticks in my mind?
19    **A.   Yes.**
20    Q.   Approximately 30 second period.
21        Have you now -- and you have told
22 us about the conversation with Lt. Allman and

Page 191

1  I think there was another conversation with
2  Office Schneider.
3       Have you now told us about all of
4  the conversations you had with other police
5  officers or anyone else while you were out in
6  the street during that approximately 30 second
7  period?
8     **A.   I answered your question about**
9  **what officers I had spoken with.  The other**
10 **individual I had spoken with was an employee**
11 **that had come out to render assistance to**
12 **Mr. Mazloum.**
13    Q.   What employee was that?
14    **A.   I believe his name was John**
15 **Christopher.  I am not sure of his exact name.**
16    Q.   What was his job?
17    **A.   I believe he was a bouncer there,**
18 **a security personnel.**
19    Q.   Who summoned him?
20    **A.   I have no idea.**
21    Q.   What conversation did you have
22 with him?

Page 192

1     **A.   He had some towels to render first**
2  **aid to Mr. Mazloum who was bleeding.  And**
3  **Mr. Mazloum had just jumped off the curb, had**
4  **been screaming racial slurs, had been yelling**
5  **and screaming, and I did not feel comfortable**
6  **with Mr. Christopher approaching him.  So I**
7  **told Mr. Christopher that as a first**
8  **responder, that is what we are trained to do.**
9  **And it doesn't matter if Mr. Mazloum has just**
10 **committed a crime, he still needed to have**
11 **some first aid rendered.  So I proceeded to**
12 **give him, applied some direct pressure to the**
13 **scratches and cuts on his face.**
14    Q.   Any other conversation with
15 Mr. Christopher?
16    **A.   No.  I didn't have a conversation**
17 **with him other than to tell him I will take**
18 **the towels and I will take care of it.**
19    Q.   Did you, when you found out that
20 Officer Smith had refused to take a complaint
21 from Mr. Persons without arresting him, did
22 you report that to anyone?

Page 193

1     **A.   I didn't find out until the next**
2  **day, and I reported it to Lt. Allman.**
3     Q.   And what did Lt. Allman say?
4     **A.   He had told me, as far as he knew,**
5  **he had instructed those two gentlemen to make**
6  **the arrest.**
7     Q.   And when you told him what Smith
8  said, what did he say?
9     **A.   I never talked to Smith.**
10    Q.   But you had heard from Persons
11 what Smith said?
12    **A.   Right.**
13    Q.   And did you report that back to
14 Lt. Allman?
15    **A.   Lt. Allman had already told me he**
16 **had given orders to Smith and Acosta to make**
17 **the arrest.**
18    Q.   The answer is my question is no?
19        MR. BRUCKHEIM:  Counsel --
20        THE WITNESS:  He did not inform
21 me --
22        BY MR. KAPLAN:

Page 194

1  Q. The question is, did you report
2  back to Lt. Allman what you had learned?
3  A. I may have. I don't remember.
4  Q. Now, when you saw Mr. Persons the
5  next day, when you went to the club to talk to
6  Mr. Persons, what was his appearance?
7  A. Normal.
8  Q. Had there been any other occasions
9  when you were involved with some violence of
10 some sort in which there was -- in which there
11 was a victim of violence and you, the
12 following day, went to check up on the
13 condition of the person out of concern for
14 their physical condition?
15     MR. BRUCKHEIM: Objection as to
16 relevance.
17     But you can answer.
18     THE WITNESS: I considered myself
19 to be a very active officer in my PSA and I
20 regularly checked up on people.
21     BY MR. KAPLAN:
22  Q. Was it your usual practice when

Page 195

1  there was, when you encountered a fight, let's
2  say, broke up a fight, and perhaps arrested
3  someone, that the next day you would go to see
4  the victim to check on their condition?
5  A. There is a difference between
6  mutual combat and a felonous assault. So to
7  answer your question, I would most definitely
8  check up on a victim of felonous assault as
9  opposed to someone who was just involved in
10 mutual combat in a nightclub or any other
11 venue.
12  Q. What is the basis for that
13 difference?
14  A. Mutual combat. You have two grown
15 men that are choosing to behave badly. And
16 you have the other incident where a person is
17 a victim of an attack. It is a big
18 difference.
19  Q. But they could both suffer the
20 same kinds of injuries. Right?
21  A. I don't know what Mr. Person's
22 injuries were. He could very well have

Page 196

1  nonvisible injuries.
2  Q. Okay. You spoke about a
3  conversation with Officer Modlin from the
4  station before Modlin conferenced in Officer
5  Acosta. And you told us what you said to
6  Officer Modlin. But what did he say to you?
7  A. Without quoting him, which I
8  can't, he said something to the effect, you
9  know, that is bullshit, we thought that
10 Mr. Mazloum had been placed under arrest. And
11 it was a shock to everybody involved when we
12 learned that he had not.
13  Q. Now, at some point, I guess when
14 you were out, maybe it was out in the street,
15 you learned that not only was Mr. Mazloum
16 assaulting -- Mr. Persons, was he the bouncer?
17  A. I believe that is the word for
18 him.
19  Q. That not only was Mr. Mazloum
20 assaulting the bouncer, you were told two
21 other persons along with Mr. Mazloum were
22 engaged in that assault. Correct?

Page 197

1  A. Yes.
2  Q. Did you ever make an attempt to
3  arrest them?
4  A. I didn't know who they were. I
5  never saw them.
6  Q. Did any of the other officers make
7  any attempt to arrest them?
8  A. In a dynamic situation like that
9  you want to apprehend the most violent person.
10 In that case it was, apparently, your client.
11  Q. The question is, did anyone make
12 any attempt, to your knowledge, to arrest the
13 other people?
14  A. I can't answer for anybody else.
15  Q. Were you aware that the other
16 people were out there on the sidewalk when you
17 were out there waiting for the police?
18  A. I was not.
19  Q. Did any of the other officers talk
20 about whether or not the other two should have
21 been arrested?
22  A. Not to me.