**CD 1 – Track 1**

| | |
|---|---|
| Judge: | For the record, in State of Arizona v. Anthony J. Ramirez, in Case No. 20059036831. This is the time set for trial in this matter. Both parties have announced Ready and does the State wish to make an opening statement? |
| State: | State waives, Your Honor. |
| Judge: | Does Defense wish to make an opening statement? |
| Defense: | Waive, Your Honor. |
| Judge: | Call your first witness. |
| State: | The State calls Kelly Wink. |
| Judge: | Come forward. Raise your right hand and be sworn. Do you solemnly swear or affirm that the testimony you are about to give in this trial will be the truth, the whole truth and nothing but the truth. |
| Kelly Wink: | Yes, Your Honor. |
| Judge: | Have a seat there in the witness stand. Proceed. |
| State: | Thank you, Judge. Good morning, Kelly. Will you please state your name. Spell your last name for the record. |
| Kelly Wink: | Kelly Marie Wink, W-i-n-k. |
| State: | Okay, and how do you know Anthony Ramirez? |
| Kelly Wink: | He was my husband. |
| State: | Okay. Is he in the courtroom today? |
| Kelly Wink: | Yes, Ma'am. |
| State: | Okay, please just describe what he is wearing for the court. |
| Kelly Wink: | A dark suit and a light tie, gold. |
| State: | Okay. On March 10, 2005, where were you? |
| Kelly Wink: | At home. |
| State: | Okay. And where is home? |
| Kelly Wink: | Arbor 2 Key, Phoenix, Arizona. |

State:            Okay. On March 10, 2005 did you get some messages from your husband, Mr. Ramirez?

Kelly Wink:       Yes, Ma'am.

State:            Okay. Prior to trial, and at my request, did you listen to a tape of those messages?

Kelly Wink:       Yes, Ma'am.

State:            Okay. I'm going to show you the tape. May I approach the witness, Your Honor?

Judge:            You may approach.

State:            Do you recognize that tape?

Kelly Wink:       Yes, Ma'am.

State:            Okay. Is that the tape you listened to …

Kelly Wink:       Yes, Ma'am.

State:            … prior to trial? When you listened to that tape, did you recognize the voices on it?

Kelly Wink:       Yes, Ma'am.

State:            Okay. And actually it's just one voice. I'm sorry.

Kelly Wink:       Yes.

State:            Who's voice was it?

Kelly Wink:       Anthony Ramirez.

State:            How do you know it was Mr. Ramirez's voice?

Kelly Wink:       Well, I was married to him for thirteen years. I recognized his voice.

State:            Okay. So safe to say, you know what he sounds like.

Kelly Wink:       Right, that's him.

State:            Okay. Um, did you, well, what phone was those messages left on?

Kelly Wink:       On my cell phone.

State:            Okay. And what's that, what was that cell phone number, if you recall?

2

| | |
|---|---|
| Kelly Wink: | (602) 751-8188. |
| State: | Okay. Now when you get messages on your cell phone, um, does it time stamp or give you any indication as to when those messages came in. |
| Kelly Wink: | Yes, Ma'am. |
| State: | What does it do? |
| Kelly Wink: | It just, when you, when you dial the voicemail it tells you what time the voice or the message was received. |
| State: | Okay. Does it also give you the date. |
| Kelly Wink: | Yes, Ma'am. |
| State: | Okay. When you got those messages what did you do with them? |
| Kelly Wink: | Um, every message that I'd received from him I, um, well besides listening to them and saving them, I also forwarded a copy to my best friends Kelly Benowski. |
| State: | Why did you feel the need to do that. |
| Kelly Wink: | My phone was actually under my husband, Anthony's account and he, in the past, had turned off my phone at time or deleted my messages. So he was continually getting into my phone and I wanted to have a record of the calls. |
| State: | Okay, did you actually besides forward them to Kelly, your, the other Kelly, did you also make a recording of them? |
| Kelly Wink: | Yes, Ma'am. |
| State: | Okay, how did you do that? |
| Kelly Wink: | I just held my cell phone up to a little tape recorder I have and recorded it from there. |
| State: | Okay. Did, eventually did you turn those recordings over to the police? |
| Kelly Wink: | Actually, Kelly Benowski did. She had kept it for me. I wanted her to have a copy … |
| State: | Okay. |
| Kelly Wink: | … In case anything ever happened to me. So Detective Porter asked for it and I was out of town so Kelly drove it over. |

3

State:          So you weren't the one who actually give 'em …

Kelly Wink:     No, Ma'am.

State:          … turned 'em over to the police?   Okay.   They weren't turned over to police till August of 2005?  Right.

Kelly Wink:     Yes, Ma'am.

State:          Why is that?

Kelly Wink:     To be honest with you, once I filed my report, I guess Detective Porter has to take them in a certain order, and he didn't get to my report, actually, I called him, he was still working on the month before, when I called him then he found out about the tape and he asked for a copy.

State:          Okay.  Let's talk about what you do for a living.

Kelly Wink:     I'm a flight attendant.

State:          Okay, for which airline.

Kelly Wink:     Southwest Airlines.

State:          Okay, so you are, is it fair to say that your in and out of town a lot?

Kelly Wink:     Yes, Ma'am.

State:          Okay, how do you know, if you recall, how do you know you were home on March 10, 2005?

Kelly Wink:     I called Southwest after I turned over the tape, the police asked me where I was, and to be honest with you, um, I didn't have a copy of my schedule that far back, so I called Southwest and they pulled up my schedule and gave me a copy to show that I was in Phoenix at the time.

State:          Okay.   All right, you said that your cell phone account was on your husbands …

Kelly Wink:     Yes, Ma'am.

State:          … account.  Do you know if he had any other phone numbers on that account besides yours?

Kelly Wink:     I don't.

State:          Okay.  At this time Judge the State would move to admit State's 1.  The audio tape, Judge.

4

Judge:        Any objection?

Defense:      Are we going to play it in Court?

State:        We are?

Defense:      Judge, I would just, let me double check, uh, what we talked about on Friday.

State:        The first two are not there, but then the rest are.

Defense:      Okay. Judge, some of the messages on there have some very, um, safe to say racist comments. I talked to the prosecutor about keeping those out, since there were other messages that she could use. And if she chooses to play those, then I would move for a mistrial at this point, because the only reason, it could be argued the only reason she is playing those messages is to inflame the Court. Um, that's it Judge.

Judge:        And I can appreciate your concern, but I am going to allow counsel to play the tape, since this Court is the trior of fact as well as the arbiter of the law and more than capable of setting aside those things that are irrelevant, and deciding the issues that have been presented to this Court.

Defense:      Understood, Judge.

Judge:        Proceed.

State:        Judge, do you mind if I approach put it, it's hard to hear.

Judge:        Okay, and counsel if you need to come forward so you can hear it as well, feel free.

Defense:      Okay.

State:        Should we play it next to a microphone since this is being audil, uh, recorded audio tape, right?

Judge:        Yes, I have the microphone here, you just can't see it.

State:        Okay.

Judge:        If it makes you feel better, here it is.

State:        Oh, I just didn't know.

Tape:         Next message, received March 10th at 8:45 am, (inaudible);

              Next message, received March 10th at 8:46 am, (inaudible);

Next message, received March 10th at 8:47 am, (inaudible);

Next message, received March 10th at 8:48 am, (inaudible);

Next message, received March 10th at 8:48 am, (inaudible);

Next message, received March 10th at 8:49 am, (inaudible);

Next message, received March 10th at 8:50 am, (inaudible);

Message saved, Next message received …

| | |
|---|---|
| State: | Kelly, um, after you heard that series of messages, um, how did it make you feel? |
| Kelly Wink: | Obviously, very afraid. |
| State: | Okay. |
| Kelly Wink: | Especially for my kids. |
| State: | And why is that? |
| Kelly Wink: | Because he threatened them and … |
| State: | Okay, is this the first time he ever left you messages? |
| Kelly Wink: | No, Ma'am. |
| State: | Last time he ever left you messages like that? |
| Kelly Wink: | No, Ma'am. |
| State: | Okay. I have nothing further, Judge. |
| Judge: | Cross examination? |
| Defense: | Thank you, Judge. It's Kelly Wink now, right? |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | Okay, Ms. Wink, um, you filed for divorce on March 31st of 2005, is that correct? |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | And, in fact, I believe that now the divorce is final, is that correct? |
| Kelly Wink: | Yes, Ma'am. |

6

Defense:    And it became final after a hearing was conducted just last month in Superior Court, correct?

Kelly Wink:    Yes, Ma'am.

Defense:    And you testified during that trial, correct?

Kelly Wink:    Yes, Ma'am.

Defense:    When you filed this police report or made this complaint for these allegations, uh, it was basically just after you filed for divorce, is that correct?

Kelly Wink:    No, it was two months later.

Defense:    The first time that you had mentioned the tapes to Detective, I think it was Porter, was in August of 2005, correct?

Kelly Wink:    To be honest with you, I'm not aware of what date that we spoke, but on our first conversation, yes.

Defense:    Uh, when you filed this complaint, um, or made this police report, were you aware that a conviction could effect my client's chances in the custody trial?

Kelly Wink:    Um, to be honest with you, it never occurred to me at the time.

Defense:    So when you filed the complaint you weren't thinking about whether, it would help you get full custody or joint custody or anything like that?

Kelly Wink:    Absolutely not.

Defense:    But you didn't want him to have custody, right?

Kelly Wink:    As things progressed and he got more violent, no Ma'am.

Defense:    Do you recall all the different dates that you filed police reports in 2005?

Kelly Wink:    No, Ma'am.

Defense:    Would anything refresh your recollection?

Kelly Wink:    Well, I'm confused, file police reports against Anthony?

Defense:    Correct.

Kelly Wink:    I know there was one on May 24th.

Defense:    Does May 25th sound more accurate.

7

| | |
|---|---|
| Kelly Wink: | No, It might be right.  I know there was one in May. |
| Defense: | On May 25th of 2005, when you filed that police report, you didn't mention any incident that occurred on March 10th of 2005, correct? |
| Kelly Wink: | No, because that's not why, that's not the incident that I had called them about. |
| Defense: | Okay.  You filed an Order of Protection on June 27th of 2005, correct? |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | And you did not make a mention of the allegations that occurred on March 10th of 2005, correct? |
| Kelly Wink: | No, Ma'am. |
| Defense: | And then, I believe that it was approximately August 22nd of 2005, after you spoke with Detective Porter that you sent him or that the tape was delivered to him.  Is that correct? |
| Kelly Wink: | That sounds about right. |
| Defense: | And you stated that Kelly Benowski had delivered that tape to him? |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | You also sent a letter to Detective Revera in the Washington, DC area on about August 19th of 2005, is that correct. |
| Kelly Wink: | I don't know dates, but if that's when it was, then that would be about right. |
| Defense: | When you sent that letter to Detective Revera do you recall what was in that letter?  All the documents that you did send to him? |
| Kelly Wink: | No, Ma'am. |
| Defense: | Do you recall receiving a statement from Kelly Benowski? |
| Kelly Wink: | Yes, you did, I did forward that, yes, Ma'am. |
| Defense: | Did you receive a statement from Kelly Solomon as well? |
| Kelly Wink: | Yes I did. |
| Defense: | And did you sent that to Detective Revera as well? |
| Kelly Wink: | I'm not sure, to be honest with you. |

8

| Defense: | How about Detective Porter? |
|---|---|
| Kelly Wink: | Yes, I think I did. |
| Defense: | Now, in your letter to De..., well Detective Revera and subsequently to Detective Porter, you had mentioned that Kelly Solomon was a co-worker, is that correct? |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | And she was with you in early March on an overnight, is that correct? |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | Um, I'm sure your aware of what I'm getting at here.  On March 2nd of 2005, do you know where you were? |
| Kelly Wink: | I was in Burbank, California, if I recall. |
| Defense: | And do you know when you returned? |
| Kelly Wink: | I don't. |
| Defense: | Would it, uh, well, you said it, was it an over night? |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | So at the earliest, you would have returned the next day. |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | March 3rd.  And, um, you had stated that you contacted Southwest Airlines and determined that you were, in fact, in Phoenix on March 10th of 2005. |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | In your letter to the officers, of one or both, you stated that Kelly Solomon was a witness to these messages.  Is that correct? |
| Kelly Wink: | To some messages, yes. |
| Defense: | And, are those the messages that are contained on this tape? |
| Kelly Wink: | Not the messages from March 10th, no Ma'am. |
| Defense: | How do you know? |
| Kelly Wink: | Because they are time stamped March 10th. |

9

Defense:            Okay, and are you sure that that's the date the messages came in?

Kelly Wink:        As far as I know, yes Ma'am. That that's when they were on my ema…, that's when they were left on my voice mail.

Defense:            When you were asked that question in your custody trial, didn't you say that you didn't know what day those messages came in?

Kelly Wink:        I said, when the detective asked me, I had to go back and look. I did not pay attention to the date.

Defense:            And didn't you testify that that was the date that the police officer told you the messages came in?

Kelly Wink:        They looked at the tape. Yes. When I gave it to them. I did not pay attention to the date when I recorded them.

Defense:            But you did say that you forwarded those messages to Kelly Benowski?

Kelly Wink:        Uh-huh.

Judge:              Is that a yes or a no?

Kelly Wink:        Yes, Ma'am. Sorry.

Defense:            And, when you, were you the one that actually recorded those messages?

Kelly Wink:        Yes, Ma'am.

Defense:            The messages that you recorded onto a tape. Was that the tape that was physically delivered to the detective?

Kelly Wink:        Yes, Ma'am.

Defense:            There was no other tape made of those messages?

Kelly Wink:        No, I only had one tape that I made from my phone and Detective Porter made a copy of it.

Defense:            So that tape that you used to make the messages, after you made the messages, what did you do with that tape?

Kelly Wink:        I gave it to Kelly to keep for me.

Defense:            The whole time?

Kelly Wink:        Yes, Ma'am. I don't keep track of things. I tend to loose them, so I figured she would be safer.

Defense:        Did you ever put it in a safe deposit box?

Kelly Wink:     No.  There was another tape that I did have in the safe deposit box.

Defense:        So Kelly Benowski holds onto the tape from when you recorded the messages until August of, well, August 2005.

Kelly Wink:     Yes, Ma'am.

Defense:        And, did you ever touch the tape again before Kelly gave it to the Detective?

Kelly Wink:     No, because I was on a trip when he asked for it, so she physically drove it to Detective Porter.

Defense:        So it was in her possession that entire time?

Kelly Wink:     Yes, Ma'am.

Defense:        When you recorded those messages, were you by yourself or was anybody else with you?

Kelly Wink:     My daughter was with me.  But she's, she was little and I did it in another room.  So I was just in my home.

Defense:        Now the time stamp on there states, um, the dates, I believe, have both the month, the date and the year, is that correct?

Kelly Wink:     The month, the date and, I don't, does it say the year, I don't know Ma'am, I know it said March 10th and the time, but I don't know that it said the year.

Defense:        Okay.  After you forwarded the messages to Kelly Benowski, did you ever listen to those messages again?

Kelly Wink:     On my phone?

Defense:        Correct.

Kelly Wink:     Uh, when I recorded them, yes.  But then they automatically, I, uh, he, the phone became my son's so I had to erase everything.

Defense:        Do you recall when you actually recorded the messages?

Kelly Wink:     I don't, Ma'am.

Defense:        Did you ever listen to those messages off of Kelly Benowski's phone?

Kelly Wink:     No, Ma'am.

Defense:            Do you, have, you obviously forwarded a lot of messages to Kelly, …

Kelly Wink:         Yes, Ma'am.

Defense:            … per your testimony.  I'm sorry, we were talking over each other.

Kelly Wink:         Yes, Ma'am.

Defense:            Have you ever listened to a message after it was forwarded?

Kelly Wink:         No. Ma'am.

Defense:            So your not aware that the original time stamp is erased once you forward a message?

Kelly Wink:         No, Ma'am.

Defense:            Um, on March 10th of 2005, do you know where Anthony was?

Kelly Wink:         No I don't, Ma'am.

Defense:            Do you know if he was in Phoenix?

Kelly Wink:         He wasn't in Phoenix.

Defense:            Were you living together, at that time?

Kelly Wink:         Yes, Ma'am.

Defense:            But he wasn't at home with you?

Kelly Wink:         No, Ma'am.

Defense:            Was he in DC?

Kelly Wink:         I don't know, Ma'am.

Defense:            What about on March 2nd of 2005?  When you were on your over night?

Kelly Wink:         I don't know where he was.

Defense:            Do you know where the children were?

Kelly Wink:         This far, this long ago, no Ma'am, I don't recall if they were with a nanny or or, I don't.

Defense:            But they wouldn't have been with Mr. Ramirez?

Kelly Wink:         I don't know.

12

Defense:    Back in 2005, do you recall about how long you had had the Sprint cell phone?

Kelly Wink:    I don't, Ma'am.

Defense:    Now, in your letter to Detective or Officer … (Whisper: Is it Detective or Officer?  Male Voice: Agent Revera.)  Agent.  In your letter to Agent Revera, your referring to messages that your co-worker had heard, which I'm assuming was Kelly Solomon?

Kelly Wink:    Yes, Ma'am.

Defense:    And, um, your referring to the messages that we just heard on the tape. Are you telling us today that those are two different sets of messages?

Kelly Wink:    Yes, Ma'am.  She had heard messages of Jason threatening to call the FAA and she had seen text messages that he kept sending over my cell phone.  Um, that she had listened, that she had seen while we were there together.

Defense:    Same thing with Detective Porter?

Kelly Wink:    I'm sorry, I don't understand?

Defense:    Your referring to several different sets of messages?

Kelly Wink:    Or I got messages on a daily basis, yes Ma'am.

Defense:    Now is it your testimony that you actually received these messages on March 10th 2005, according to the time stamps that were on the tape.

Kelly Wink:    Yes, Ma'am.

Defense:    Do you recall what you were doing between 8:45 am and 8:49 am of March 10, 2005?

Kelly Wink:    I don't, Ma'am.

Defense:    Is it possible you were accessing your voice mail at that time?

Kelly Wink:    I think I had to have, to have listened to the messages.

Defense:    So if the messages came in at those times and you were listening to your voice mail, how could the times be the same?

Kelly Wink:    Once your in your voice mail, phone calls come in but they go directly to your voice mail.  Just like if your on another phone call.

Defense:    So, when did you forward those messages?

13

| | |
|---|---|
| Kelly Wink: | I don't recall when I forwarded them, Ma'am. |
| Defense: | (Long pause, then whispering)  Just one moment, Judge.  (Whispering, long pause)  Ms. Wink, I want to go back to the letter that you had sent to Agent Revera, to approximately August 19th of 2005.  We had talked about the messages and Kelly Solomon and what she heard and what she didn't hear.  In this letter, you said to Agent Revera that you had included transcripts of the messages you received in March of Anthony threatening to kill my children and myself, as well as a witness statement from a co-worker who was witness to these calls.  Does that sound familiar? |
| Kelly Wink: | Yes, Ma'am. |
| Defense: | So in this, your talking about you gave a transcript of messages you received and that your co-worker had heard these messages.   Is that incorrect? |
| Kelly Wink: | No, that's correct.  I think, two of the messages on that, that we didn't hear today weren't time stamped for March 10th. |
| Defense: | So you were referring to just some of those messages. |
| Kelly Wink: | Right, I just, I taped them all on one tape.  Everything I had on my phone just went onto one recording. |
| Defense: | But you did tell the Officer, or Agent Revera, you didn't specifically say which messages your co-worker had heard. |
| Kelly Wink: | No, I don't. |
| Defense: | That's all that I have, Judge. |
| State: | Okay, then again, just briefly.  You were asked about the time stamp on your phone. |
| Kelly Wink: | Yes, Ma'am. |
| State: | Do you have any knowledge or ability to change that when you're listening to your messages. |
| Kelly Wink: | No, Ma'am. |
| State: | Okay.  I have nothing further. |
| Judge: | You may step down. |
| Kelly Wink: | Thank you. |
| State: | The State will call Kelly Benowski. |

14

| | |
|---|---|
| Judge: | Come forward. Raise your right hand and be sworn. Come forward. Do you solemnly swear or affirm that the testimony you are about to give in this trial will be the truth, the whole truth and nothing but the truth. |
| Kelly Benowski: | I do. |
| Judge: | Have a seat there on the witness stand. Proceed. |
| State: | Thank you, Judge. Ms. Benowski. Will you please state your name. Spell your last name for the record. |
| Kelly Benowski: | Kelly Benowski. B, as in boy, o-n-o-w-s-k-i. |
| State: | Okay. Is it okay if I call you Kelly? |
| Kelly Benowski: | Yes, it is. |
| State: | Are you a little nervous? |
| Kelly Benowski: | Yes, I am. |
| State: | Have you ever testified in Court? |
| Kelly Benowski: | No. |
| State: | Okay. You know Kelly Wink, correct? |
| Kelly Benowski: | Yes, I do. |
| State: | She's the one seated to my left, correct? |
| Kelly Benowski: | Yes, she is. |
| State: | You guys are friends? |
| Kelly Benowski: | Yes. |
| State: | Very good friends, fair to say. |
| Kelly Benowski: | Very good friends. |
| State: | How do you know each other? Just briefly. |
| Kelly Benowski: | Uh, we met when our children were in school and then I was there the day that her daughter was born. |
| State: | You also know her ex-husband, Anthony Ramirez, correct? |
| Kelly Benowski: | Yes, I do. |

15

State:               And is he in the courtroom today?

Kelly Benowski:     Yes, he is.

State:               Just describe what he's wearing, please, for us.

Kelly Benowski:     A dark suit, with a silver tie.

State:               Okay.  Um, you had occasion, obviously, to talk to him numerous times.

Kelly Benowski:     Yes, I did.

State:               You received some tapes from Ms. Wink, correct?

Kelly Benowski:     Yes, I did.

State:               And they were messages that Mr. Ramirez had left her?

Kelly Benowski:     Yes, they were.

State:               Did you ever listen to them?

Kelly Benowski:     Yes, I did.

State:               Okay.  How did you receive them?

Kelly Benowski:     Well, at first, um, I had, um, the messages were forwarded to my phone.

State:               Okay.

Kelly Benowski:     So that I could hear them and keep them safe.

State:               Okay.

Kelly Benowski:     And then, um, Kelly made a tape of those messages and I took that tape.  I had that tape as safekeeping.

State:               Okay.  Why the need for all this safekeeping?

Kelly Benowski:     Because Kelly feared for her life and Jason, um, Anthony, I'm used to him as Jason.  Jason had control of her phone, and so he would often either turn her phone off or erase messages that were on there and she wanted me to have it, so in case anything happened to her or her children, I could take it to the police.  So that someone would know what had happened to her.

State:               You have been very afraid for Ms. Wink, haven't you?

Kelly Benowski:     Extremely.

16

| | |
|---|---|
| State: | Why? |
| Kelly Benowski: | Because I, um, I not only knew about the threats that Kelly would receive, I also, for lack of a better word, rescued Kelly and her children on Thanksgiving evening, I believe it was two years ago, when, um … |
| Defense: | Judge, I'm going to object as irrelevant, we're getting way away from the incident in question. |
| Judge: | Sustained. |
| State: | Did you ever make a copy of the messages from your telephone? |
| Kelly Benowski: | No. |
| State: | So the tapes that you gave over to Detective Porter, you didn't make them or create them. |
| Kelly Benowski: | No, those were the tapes that Kelly had given me to keep safe. |
| State: | Okay. Let me backup, you keep calling Mr. Ramirez "Jason", why? |
| Kelly B: | That's the only way I ever knew him … |
| State: | Okay |
| Kelly B: | … until recently, he changed how he was called. |
| State: | Okay. Um but we're still taking about the person . . |
| Kelly B: | Right there. |
| State: | … seated to the right. Okay |
| Kelly Benowski: | Correct. |
| State: | Did you ever talk to Mr. Ramirez about the messages that you heard – that were left on March 10, 2005. |
| Kelly Benowski: | Yes, I did. |
| State: | Okay. Did you basically confront him about it? |
| Kelly Benowski: | Yes, I did. |
| State: | How did that happen? |
| Kelly Benowski: | Um, Jason and I were having a discussion because he wanted to know why Kelly was going to pursue an order of protection against him and I said |

17

that she was horribly afraid of him and he said, "Well I don't understand why." And I said to him, Jason, I heard the tape. I heard your threaten to kill her and those children and he, in the conversation, said "Well, you know, I said those things, but I was just really mad at her and sometimes you say things when you are really mad.

State:  I have nothing further, Judge.

Judge:  Inaudible. [30:05]

Thank you, Judge.

Defense:  After your received the messages from Kelly Wink did you save those messages on your phone or did your erase them?

Kelly Benowski:  I saved them for a while but then my service, it automatically erases your messages, um, and, and, and so they eventually became … I have, I don't have that service anymore.

Defense:  Do you know about how long you had those messages saved on your phone.

Kelly Benowski:  I don't.

Defense:  Do you know when you actually received those messages?

Kelly Benowski:  I don't.

Defense:  When, who was your provider then?

Kelly Benowski:  Sprint.

Defense:  Did you ever receive forwarded messages prior to that? Prior to these messages you received from Ms. Wink.

Kelly Benowski:  Probably.

Defense:  Did you ever forward messages when you were with Sprint?

Kelly Benowski:  I don't believe so. I'm not sure I know how.

Defense:  Were you aware that once a message is forwarded that it takes on the date that the message was forwarded and not the original time stamp?

Kelly Benowski:  I would have no idea about that.

Defense:  When you received the tape from Ms. Wink, what did you do with that tape?

18

Kelly Benowski:    I put it away in a safe place.

Defense:    Where was that?

Kelly Benowski:    It was in my jewelry box in my house.

Defense:    Were you the only one that had access to that?

Kelly Benowski:    Yes.

Defense:    Was it a locked jewelry box?

Kelly Benowski:    Yes.

Defense:    So you keep it locked other than when you are physically going into your jewelry box.

Kelly Benowski:    Yes. I did not want my children to get in there.

Defense:    And where do you keep the key? Where did you keep the key at the time?

Kelly Benowski:    I don't, I don't recall.

Defense:    But it is a key?

Kelly Benowski:    Yes

Defense:    And did you ever explain to Ms. Wink where you kept the tape?

Kelly Benowski:    No.

Defense:    Did you ever tell anybody that the tape was there?

Kelly Benowski:    No.

Defense:    How did it come to be that you were the one that would deliver it to Detective Porter?

Kelly Benowski:    Cause I was … Ms. Wink was … she was on the flight and Detective Porter needed that information to go forward with an investigation and so I told Kelly that I would take it for her.

Defense:    Did you take it that same day?

Kelly Benowski:    I don't know if I took it the same day I told her I would take it or if I took it the next day. I'm not sure.

Defense:    Do you recall where you physically took the tape?

19

| | |
|---|---|
| Kelly Benowski: | Uh, downtown, um, to I'm not sure what the name of the building is. I, I'm not sure what ... I just know that I took it to the domestic violence ... I'm not sure where it was, I just know that I took it to a building and I took it to Detective Porter's office and I waited and then I handed it to him. |
| Defense: | Was it your understanding it was a police station or the office of Detective Porter? |
| Kelly Benowski: | No. I don't think it was a police station. It was his office. |
| Defense: | And you actually, physically handed the tape to Detective Porter himself. |
| Kelly Benowski: | Yes I did. |
| Defense: | Did you have any conversation with Detective Porter during that exchange? |
| Kelly Benowski: | Yes I did. |
| Defense: | What was that conversation? As best you can recall. |
| Kelly Benowski: | I asked him to do his very best to protect my friend and her children because I feared for their lives. |
| Defense: | I know that this is hard and I appreciate the fact that you came today and are testifying. I can understand, uh, the emotions that go with this. Obviously you feel very strongly about this case. Is that correct? |
| Kelly Benowski: | Yes. |
| Defense: | Um, when you first met Kelly and Anthony, were you aware of any of the problems that they were having in their marriage? Or did you come to learn of them over time? |
| Kelly Benowski: | Oh, well, I mean ... Kelly didn't say, "Hello, I'm Kelly and I'm being abused by my husband. No, it took time and it took her to build trust with me. |
| Defense: | Uh, today, how do you feel about Anthony? |
| Kelly Benowski: | I ... |
| Defense: | You don't have to be politically correct. |
| Kelly Benowski: | I wish that he would get the help that he needs to become a better person for his children and I, I despise the things he has done to his children and to Kelly and to me. |
| Defense: | Do you like him? |

20

| | |
|---|---|
| Kelly Benowski: | No ma'am. I do not. |
| Defense: | In March of 2005 to August of 2005, did you feel the same? |
| Kelly Benowski: | You know, I, I, I tried to facilitate, um, I tried to be an advocate for the children. I tried to be a go-between between Kelly and Jason. I, I, I don't know what I felt for him then. I was afraid of him. |
| Defense: | Do you recall writing a statement for Kelly that was submitted to Detective Porter? |
| Kelly Benowski: | Yes I do. |
| Defense: | Are you aware that that same statement was submitted to Agent Rivera in the D.C. area? |
| Kelly Benowski: | I believe that it may have been forwarded. Yes. |
| Defense: | It was a pretty long statement, wouldn't you agree? |
| Kelly Benowski: | It was very long. |
| Defense: | I'm just going to ask you a question about this statement as it relates to these allegations that we are here on today. I'm not going to get into the rest. |
| Kelly Benowski: | Okay. |
| Defense: | In that statement you wrote that during the first week of March, Kelly forwarded to my cell phone several messages that she had received on her cell phone from Jason in which he threatened to kill her and kill their children if she did not take him back. Those messages have been forwarded to Kelly's attorney. Do you recall writing that? |
| Kelly Benowski: | Yes I do. |
| Defense: | Other than the part that says "during the first week of March," do you have any idea when those messages were actually forwarded to you? |
| Kelly Benowski: | You know what, I don't. |
| Defense: | And then, do you recall being interviewed, uh, by an agent from D.C. regarding these allegations? |
| Kelly Benowski: | Yes. |
| Defense: | And do you recall that you said to him the same thing that was in your statement? |

21

Kelly Benowski:     You know what, I, I, first of all, it wasn't a him.  It was a her.

Defense:            Was that Agent West?

Kelly Benowski:     It's a her.

Defense:            Okay.

Kelly Benowski:     And I don't remember exactly what I said.

Defense:            In your statement, you are aware that randomly throughout it you put in other dates.

Kelly Benowski:     Approximate dates.  I tried, there were certain dates that definitely stuck out in my head.  Thanksgiving being one of them.  Others were approximations because honestly this happened all the time and I didn't keep a journal as to the exact dates, so when I wrote the letter I tried to go back and recreate time, but the only date that really stuck out in my head was probably Thanksgiving and there may have been one other time.

Defense:            In, in the statement that you had given to Kelly which was forwarded to Detective Porter and the agent in D.C., did you try to be as accurate as you possibly could?

Kelly Benowski:     I tried to give them a general picture of the terror that Kelly and I had lived for the past three years, or however many years it was at that point. And it was more … I wanted to make sure that I remembered incidents, so there was a timeline in my head, but, again, I didn't journal things.  I didn't have exact dates, so in going back you ask me, I estimated the time.

Defense:            So if there is actual specific dates in here, those would have been estimations as best you could recall?

Kelly Benowski:     Except for Thanksgiving.  Thanksgiving is a pretty, uh, …

Defense:            That's a pretty easy date to remember.

Kelly Benowski:     That's a pretty easy date to remember and I don't know that I'll ever forget that Thanksgiving, so.

Defense:            And you understood that this statement you were writing was important.

Kelly Benowski:     Yes.  I understood that it was important.

Defense:            It was important to you also.

Kelly Benowski:     It was.

Defense:            Because it was your way of trying to help your friend.

| | |
|---|---|
| Kelly Benowski: | It was my way of keeping those children and Kelly safe. |
| Defense: | Thank you, Judge.  That's all I have. |
| Judge: | Redirect? |
| State: | No redirect, Judge. |
| Judge: | You may step down. |
| Kelly Benowski: | Okay. |
| State: | Calls Detective Porter |
| Judge: | Raise your right hand to be sworn.  Do you solemnly swear or affirm that the testimony you are about to give in this trial will be the truth, the whole truth and nothing but the truth. |
| Porter: | I do. |
| Judge: | Have a seat.  Your witness. |
| State: | Good morning Detective Porter.  Will you state your name?  Spell your last name for the record with any identifying serial number. |
| Porter: | My name is Wayne Porter. P-o-r-t-e-r.  My serial number is 6579. |
| State: | Okay and you are a Phoenix police officer, correct? |
| Porter: | I am. |
| State: | Okay.  What are you current duties? |
| Porter: | I'm a detective, currently assigned to the Family Investigations Bureau. |
| State: | Okay, so are you at the FAC, the Family Advocacy Center? |
| Porter: | Yes I am. |
| State: | Okay, and where is that located? |
| Porter: | 2120 North Central. |
| State: | You investigated this case regarding Anthony Ramirez, correct? |
| Porter: | Yes. |
| State: | Okay.  Did you have an occasion to talk to him on the phone about the messages he left on March 10, 2005? |

| | |
|---|---|
| Porter: | I did. |
| State: | Okay, and he was out of state at the time, could you recall? |
| Porter: | I believe so.  I'm not sure if he told me where he was, but I assumed he was. |
| State: | Okay.  Um, during that interview, did you ever ask him … Well, initially, did you ever ask him, "Did he leave the messages?" |
| Porter: | I think I asked him if he remembered leaving the messages and um … |
| State: | Okay, and what was his initial response, if you recall.  And if you need a copy of your report we can do that, too. |
| Porter: | Yeah, it was, I mean, I talked to him for a while.  I don't remember exactly what his response was, but it was something to the effect that he wasn't sure, or he didn't know. |
| State: | Okay.  If you refresh your memory as to how he responded. |
| Porter: | It would be in my police report. |
| State: | Okay.  Which one [inaudible] October 5th.  I'm just going to give him the [inaudible] just to refresh his memory [inaudible].  For the record, I'm showing defense counsel's States 2.  May I approach this witness, Judge. |
| Judge: | You may. |
| State: | Detective Porter, I am showing you what's been marked as States 2 for identification.  Do you recognize that? |
| Porter: | I do. |
| State: | And what do you recognize that to be? |
| Porter: | The first it starts off with the original report that I received. |
| State: | And if you could just flip to your supplement, please.  And, I'm sorry, when you are done refreshing your memory, if you'll look up so I'll know I can ask you questions.  Thank you. |
| Porter: | It looks like initially my question …or my explanation to him was that I had received some information about a time frame that had to do with March and looks like I initially asked him about the physical altercations that happened in that month and he told me it didn't happen.  And he was giving me some background on the events leading up to it. |
| State: | And then does he eventually … you press him further on the issue. |

24

| | |
|---|---|
| Porter: | Yeah. About the message specific that was later on. |
| State: | And then what does he tell you? |
| Porter: | It looks like when I asked him about the voice messages left on Kelly's phone on March 10th, he told me he was in civil disturbance training all day. |
| State: | Okay. So at any point does he, does he go from, "He didn't do it, to he doesn't know if he did it?" If you recall? |
| Porter: | When I asked him again about the messages on the 10th specifically, he answered, "To my knowledge, no." and then he followed that up by saying he wasn't sure. |
| State: | He wasn't sure if he left the messages. |
| Porter: | Right. |
| State: | Okay. Um, you told him that you, in fact, had listened to the messages, correct? |
| Porter: | Yes. |
| State: | And you told him that talking to him on the phone now, and compared to listening to the messages, it sounded a lot like him. Didn't you? |
| Porter: | Yes. |
| State: | Did he say anything to that when you confronted him with that? |
| Porter: | You know, I don't remember what his exact response was to that. I didn't note that in my supplement. I, I remember asking him that, but I don't remember exactly what his response was. |
| State: | Okay, alright. I have nothing further, Judge. |
| Judge: | Cross-examination. |
| Defense: | Thank you, Judge. Detective, uh, you first became involved in this case – and I'm going to use case meaning all the allegations that are involved between these two individuals. Uh, back in August of 2005, is that when you had your first contact with the case? |
| Porter: | No, actually the case itself was … The original report was generated in May of '05. My first real involvement was talking to Ms. Wink the first time and that was in August. |

25

Defense: On your supplement dated August 22, 2005, without getting into really anything other than the dates, I mean, if you could go ahead and turn to that page, August 22 of '05 of your supplement.

Porter: Supplement #1, the first supplement, up in the top right corner?

Defense: Yes, it has a #1.

Porter: Yes.

Defense: Okay. It looks like you, just going through it quickly, you did something on August 3rd of '05 and made a notation. Correct?

Porter: Correct. That was when I received a voice message.

Defense: That was from Ms. Ramirez?

Porter: Yes.

Defense: Or, I'm sorry, Ms. Wink.

Porter: Yes.

Defense: And then on August 10th of 2005, you did a little bit more work on the case.

Porter: I actually talked to her. Right.

Defense: On August 17th of 2005, uh, you received a call from Internal Affairs.

Porter: Yes.

Defense: Okay. And on August 18th of 2005, you received a records request.

Porter: Yes.

Defense: From it looks like the Metropolitan Police Department.

Porter: Correct.

Defense: And then on August 19th, you sent a copy of this report to the Metropolitan Police Department.

Porter: Correct.

Defense: And then August 22, '05 is when you received the letter from Ms. Wink.

Porter: Yes.

26

| | |
|---|---|
| Defense: | Is that when you first heard about the messages that were left on her voice mail? |
| Porter: | I believe so. I was trying to think of exactly what the nature of our conversation was when I first talked to her on the phone. I'm not, I don't remember if she mentioned the messages then or not, I just told her that I need any and all evidence and that was her response to that request was on the 22nd of August. |
| Defense: | So when this investigation first started, was it based on the voice messages that we are here about today? |
| Porter: | No. It actually had to do with an email or something. |
| Defense: | And then you received a tape from Kelly Benowski the next day, which was August 23. |
| Porter: | Correct. |
| Defense: | Do you recall the conversation you had with Kelly Benowski? |
| Porter: | Not specifically. Uh, I remember her coming in. It was in the lobby of the Family Advocacy Center that I met with her. She told me who she was and that, uh, she was there to give me a tape of some voice messages. |
| Defense: | And did she actually give you a tape? |
| Porter: | Yes. |
| Defense: | What did you do with that tape? |
| Porter: | I believe I took it back to my cubicle – my office area. |
| Defense: | Did you listen to it? |
| Porter: | Yes. |
| Defense: | What did you – did you process it as evidence? Did you keep it locked up somewhere? Did you make copies? What did you actually do with the tape after you listened to it? |
| Porter: | Uh, after I listened to the tape, um, I made a – it was on a micro-cassette, I believe, I think I transferred it from that to a full sized tape, um, and then impounded the micro-cassette as evidence there at FAC and, uh, retained a copy of the full size cassette. |
| Defense: | And what did you do with that full sized cassette tape after you made it? Did you give it to anybody? Did you keep it locked up? Did you submit it to the state? |

27

| | |
|---|---|
| Porter: | The copy that I made? |
| Defense: | Correct. |
| Porter: | I believe I submitted a copy of it with, to the city prosecutor's office and I don't remember now if I gave one back to Kelly or not. I don't remember. |
| Defense: | So besides the copy you had for yourself, you made another copy for the state. |
| Porter: | Or it was the copy that I made for myself that I gave to the state. I don't remember retaining any copies of it. |
| Defense: | So you don't have any copy other than the micro-cassette, which is probably still impounded as evidence. |
| Porter: | No, I don't believe so. No. |
| Defense: | Uh, did the State talk to you about redacting that tape at all? |
| Porter: | I'm not sure I understand. |
| Defense: | Did you redact the tape at all? |
| Porter: | Uh, no, I'm not, again, redact, I'm not sure what you mean by that, but no, I ... |
| Defense: | After you gave the tape to the State and submitted your report to the State to see if they were going to press charges, |
| Porter: | Right. |
| Defense: | Did you have any other involvement with the tape that you gave to the State. |
| Porter: | I don't remember doing anything with it after that. |
| Defense: | Did you have any further involvement in this case at all after that date? |
| Porter: | Aside from phone calls? |
| Defense: | Correct. |
| Porter: | Oh, actually there was one other thing, um ... |
| Defense: | Regarding these allegations? |
| Porter: | Well, it was actually a question by the reviewing attorney. They wanted to clarify where Ms. Wink was when she received these calls. That was a |

request sent to me by the city prosecutor's office and it just so happened that she called right about the time that I got that and was able to clarify that with her.

Defense:        Now, did you determine what date these messages, uh, what date these messages were?

Porter:         I'm sorry, could you repeat the question?

Defense:        Did you determine what date these messages were?

Porter:         Aside from listening to the tape? No.

Defense:        So from the tape you put in your report that they occurred on March 10th of 2005.

Porter:         Yes.

Defense:        Did you do any further investigation as to whether that was the date that messages were forwarded or that was the original time stamp or anything like that?

Porter:         No.

Defense:        Did you ever contact Sprint to find out if, in fact, that is an actual time stamp from Sprint?

Porter:         No.

Defense:        When you were speaking with Mr. Ramirez regarding these allegations, um, you had told us approximately what was said between the two of you, how was Mr. Ramirez's demeanor on the phone?

Porter:         Uh, he was calm and polite, cooperative.

Defense:        Did he sound upset at all?

Porter:         No.

Defense:        Did he sound angry at all?

Porter:         No.

Defense:        Did he tell you where he was on March 10th, of 2005.

Porter:         It's in the report, but I believe it was Maryland, if I remember correctly.

Defense:        Did anybody confirm that?

29

Porter:        No.

Defense:       Did you ask anybody to confirm that?

Porter:        No.

Defense:       You had stated that the first time that a complaint was made in this case was approximately May 25th of 2005, is that correct?

Porter:        That when the original report was generated, yes.

Defense:       And then I think you said that you basically touched the case some time in August of 2005.

Porter:        That's when I received the first call from Kelly.

Defense:       Uh, did you ask any questions or wonder why, uh, a report wasn't filed until May, until May if the supposed threats had happened in March of 2005.

Porter:        I did actually ask Kelly about that and she told me that there had been a lot of instances that took place and that they had not been reported to the police and that she was afraid of what might happen if she were to call the police and file the report.

Defense:       I think that's all I have, Judge.

Judge:         Redirect.

State:         Thank you, Judge. Um, you said that you clarified where Ms. Wink was for the reviewing attorney. Do you recall what that clarification was?

Porter:        Yes. There was a question as to where she was when she received those calls on her voice mail, on her cell phone.

State:         Okay, and what was the clarification. What did you find out?

Porter:        Um, at first she told me that she wasn't sure. She thought she was here but she'd have to check her schedule with Southwest and she did that called me back and told me that, uh, uh, she was on leave, she wasn't working. She was here in Phoenix the majority of March.

State:         Okay. Um, defense counsel asked you that you put March 10th in your report as the date that these phone calls happened. Is that because you heard the time stamp?

Porter:        That's what I was hearing from the messages, yes.

State:         Okay. I'm assuming you've heard other tapes before, correct?

30

| | |
|---|---|
| Porter: | Yes. |
| State: | Okay. Any reason for you to think that this time stamp that you had heard on these calls was fabricated? |
| Porter: | No. In fact, since you brought that up, I've listened to dates before where the automated recording tells you when the message was received. In fact, just recently a couple of weeks ago, I heard one that said message saved on such and such a date and time. |
| State: | Okay. |
| Porter: | That wasn't the case in this one. It was March and then gave the date and the time. |
| State: | Okay. So, my question to you was, "Any reason to think it was fabricated or not? The real date?" |
| Porter: | No. I have no reason to think that. |
| State: | Nothing further, Judge. |
| Judge: | You may step down. |
| Porter: | Thank. |
| State: | Judge, the State rests at this time. |
| Judge: | Then the State has rested, the Defense may pursue. |
| Defense: | Judge, at this time I'd make a Motion under Rule 20 that there has not been substantial evidence to warrant a conviction. You've heard the testimony. I won't go through every single point, but we make that motion. |
| Judge: | Does the State wish to respond for the record? |
| State: | Sure Judge. In the light most able to the State which is required under Rule 20, you have heard substantial evidence for it to go further, Judge. Um, the allegation made is March 10th, 2005, this court was able to hear all the messages, the time stamp is very clear. You heard Detective Porter state that it has been his experience, he has heard different tapes, there is no reason for him to think that this was fabricated, um, the tapes are clearly harassing, Judge, and no doubt about it, uh, so we would ask you to deny the Rule 20 motion. |
| Judge: | And then a reply. |
| Defense: | No, Judge. |

31

| | |
|---|---|
| Judge: | I'm obliged to interpret and listen to all the evidence that's being produced thus far and after doing so and viewing that evidence in the light most favorable to the State as is required under Rule 20, the court does find that there is substantial evidence that could warrant a conviction, therefore, the defendant's motion for judgment of acquittal is denied.  Defense may proceed. |
| Defense: | Thank you Judge.  Defense calls Anthony Ramirez. |
| Judge: | Please come forward.  Raise your right hand and be sworn in.  Do you solemnly swear or affirm that the testimony that you are about to give in this trial will be the truth, the whole truth and nothing but the truth. |
| Mr. Ramirez: | Yes. |
| Judge: | Then have a seat there on the witness stand.  Proceed Counsel. |
| Defense: | Anthony, can you please state you full name and spell your last name for the record. |
| Mr. Ramirez: | Anthony Jason Ramirez.  R-a-m-i-r-e-z. |
| Defense: | Where do you currently reside? |
| Mr. Ramirez: | 11459 South Benning, Phoenix, Arizona. |
| Defense: | Back in March of 2005, where were you living? |
| Mr. Ramirez: | Washington, D.C. |
| Defense: | Was that your permanent address? |
| Mr. Ramirez: | Um, I was coming back and forth.  I worked in Washington and I would commute back home every week. |
| Defense: | So on the weekends you would come back to Phoenix to see Kelly and the kids. |
| Mr. Ramirez: | Yes. |
| Defense: | And then during the week you would go back to D.C. to work. |
| Mr. Ramirez: | That's correct. |
| Defense: | At that time, what was your job. |
| Mr. Ramirez: | I was a police officer with the Metropolitan Police Department. |
| Defense: | And what do you do now? |

32

| | |
|---|---|
| Mr. Ramirez: | I am an executive recruiter. |
| Defense: | Back on, let's go back to March of 2005. Uh, March 10th of 2005, do you recall where you were? |
| Mr. Ramirez: | Yes, I was in Washington, D.C. |
| Defense: | What were you doing in Washington, D.C. on that date if you recall? |
| Mr. Ramirez: | Um, well it was a work day, but prior to work, I had been in the gym at the police academy. |
| Defense: | Why do you remember this? |
| Mr. Ramirez: | It was just a regular occurrence. It was just something that I did on a daily basis during the week. |
| Defense: | And after these allegations came back, or came down, did you turn around and go back and figure out what you were doing on that day? |
| Mr. Ramirez: | Um, it was pretty easy to figure out. |
| Defense: | Was anybody with you on that day? |
| Mr. Ramirez: | Yes. |
| Defense: | Who? |
| Mr. Ramirez: | Officer Thadeaus Madlin and Officer Lewis Schneider, two co-workers of mine. |
| Defense: | And they were with you at the gym that day? |
| Mr. Ramirez: | Yes. |
| Defense: | And when did you, when did you meet up with those officers? What time of day? |
| Mr. Ramirez: | Uh, it was approximately 8:00 a.m. eastern time. |
| Defense: | And at that date, do you recall what the time difference was between Washington and Phoenix? |
| Mr. Ramirez: | Uh, two hours. |
| Defense: | Okay, so eight a.m. would have been six a.m. here in Phoenix. |
| Mr. Ramirez: | Yes. |

33

| | |
|---|---|
| Defense: | Is that a yes? |
| Mr. Ramirez: | Yes. |
| Defense: | I think we talked over each other there for a minute.  Now, how long were you with them on that date? |
| Mr. Ramirez: | Till approximately noon. |
| Defense: | And then what did you do after that? |
| Mr. Ramirez: | Um, prepared to go to work and then started my shift. |
| Defense: | When did you start your shift? |
| Mr. Ramirez: | Two o'clock. |
| Defense: | Between noon and two p.m. what did you do? |
| Mr. Ramirez: | Just grabbed a bite to eat, you know, showered from the gym and went to roll call. |
| Defense: | Were you with Officer Maudlin and Officer Schneider consistently throughout that day when you started your shift? |
| Mr. Ramirez: | Yes. |
| Defense: | And, uh, you had heard, you heard all the testimony today, correct? |
| Mr. Ramirez: | Yes. |
| Defense: | You heard the messages that were played? |
| Mr. Ramirez: | Yes. |
| Defense: | Did you leave those messages on March 10th of 2005? |
| Mr. Ramirez: | I did not. |
| Defense: | When did you leave those messages? |
| Mr. Ramirez: | March 2nd. |
| Defense: | What makes you think you left those on March 2nd of 2005? |
| Mr. Ramirez: | Well, I remember the date, um, I remember doing it.  Kelly was on a trip in Burbank, California and, you know, our marriage was falling apart, uh, we just, uh, were fighting quite a bit.  I remember, she was at a bar this |

34

night. She went out with her co-workers and I just was not in a good place. Um, I remember leaving those messages on that night.

| | |
|---|---|
| Defense: | Were you drunk? |
| Mr. Ramirez: | I'd been drinking. |
| Defense: | Were you drunk? |
| Mr. Ramirez: | Um, yes. |
| Defense: | Were you on drugs? |
| Mr. Ramirez: | No. |
| Defense: | But you, you were at least, for a lack of a better term, sober enough to remember the messages you left. |
| Mr. Ramirez: | Yes. |
| Defense: | And when you were speaking to Detective Porter about these messages, you heard him testify that you said that you didn't know or something to that effect regarding leaving the message. Did you hear that? |
| Mr. Ramirez: | Right. I did. |
| Defense: | At the time you were taking to him, did you know in your mind that it was actually March 2nd of 2005 you left those messages? |
| Mr. Ramirez: | I did, and ... |
| Defense: | Go ahead. |
| Mr. Ramirez: | I knew and it had even become more solidified by the time I got to talking to him because Kelly had actually filed an Order of Protection in which she listed messages being left on March 2nd. |
| Defense: | That, um, in that Order of Protection, you, you were served a copy of that? |
| Mr. Ramirez: | On August 31st. |
| Defense: | Uh, was there any mention of anything happening on March 10th? |
| Mr. Ramirez: | No. |
| Defense: | Uh, but there was a mention of messages being left on March 2nd? |
| Mr. Ramirez: | Yes. |

WAS01_41673831_1_298500_61189 10/18/2006 12:21 PM

Defense:        Uh, you, you recall leaving those messages, you said. Do you recall what time of day you left those messages?

Mr. Ramirez:    It was at night, um. Flight attendants, and I did the job as well for several years, so I know what goes on. When they get in off of their trips, they go and grab a bite, go get beer. They do whatever they want. Um, Kelly had gone and had a habit of going to bars and drinking. Kelly and I've ...

State:          Judge, I'm going to object to relevance.

Judge:          Sustained.

Defense:        Uh, let's, lets narrow that more. Um, how do you know that you left those messages in the night time hours regardless of what Kelly, what you think Kelly was doing.

Mr. Ramirez:    I know that they were out. Kelly and I spoke, we were speaking then. I know that she was out to dinner with her crew members. I know that she was doing that. It's at least that's what she told me.

Defense:        Now, was there anything in the messages themselves that when you look back at it also tells you that you left these messages that night?

Mr. Ramirez:    The context of my message as I read it in the transcript, um, that provided is that it's at night. I mean, I'm talking about her being at a nightclub. I'm talking about her being, you know, I'm talking about her hotel room, being with, uh, as silly as it was, you know, this, thinking that she was in a pilot's room, in another hotel room. Uh, it was very clear to me that she was out of town.

Defense:        Safe to say that you were upset that night.

Mr. Ramirez:    Yeah, I was.

Defense:        Do you feel remorseful for leaving, uh, those types of messages?

Mr. Ramirez:    I think that's too light of a word, uh, you know, I am very ashamed for what I've done. My last year and the behavior that I've exhibited during my marriage to my wife is … I don't have an excuse for it. Um, the ... it destroyed my family with everything that went on as far as, you know, the way I handled things with Kelly. And, so, yeah, I'm very regretful.

Defense:        So you admit that you left those messages.

Mr. Ramirez:    I did.

Defense:        But your testimony is that they were left on March 2nd 2005 when she was in Burbank.

| | |
|---|---|
| Mr. Ramirez: | That's correct. |
| Defense: | When you called and left these messages, was anybody with you? |
| Mr. Ramirez: | No. |
| Defense: | You were by yourself? |
| Mr. Ramirez: | Yeah. |
| Defense: | Did you ever intend to act on the threats that were contained in those messages? |
| Mr. Ramirez: | Absolutely not. |
| Defense: | You were just really mad? |
| Mr. Ramirez: | I was. |
| Defense: | Have you, um, ever forwarded messages. Well, let me back up. Did you have Sprint back in March of 2005? |
| Mr. Ramirez: | Yes. |
| Defense: | Do you have Sprint now? |
| Mr. Ramirez: | Yes. I do. |
| Defense: | Uh, have you ever forwarded messages, uh, that you've received to somebody else? |
| Mr. Ramirez: | Yes. |
| Defense: | Do you know what happens, based on your experience, with the original time stamp? |
| Mr. Ramirez: | It changes. |
| Defense: | What do you mean, it changes? |
| Mr. Ramirez: | Um, if you, if a message is left on my phone, say, last week, if I was to forward to, if I was to forward that today, the time stamp on that person's phone who it was forwarded to, that time, that message would now be time stamped on that person's phone at the time that it was transferred, if that makes sense. |
| Defense: | Okay. So, if you received a message from somebody yesterday and you forwarded that message to say, John, uh, when you listen to that message |

|  |  |
|---|---|
|  | on John's phone, would it have the original time stamp that you received the message or would it have the time stamp that it was forwarded? |
| Mr. Ramirez: | It would have the time stamp on John's phone at the time that it was forwarded. |
| Defense: | Did you receive a message from me yesterday on your cell phone? |
| Mr. Ramirez: | I did. |
| Defense: | Did you recall what that, approximately what that message said? |
| Mr. Ramirez: | Um, you announced yourself. You said that you were leaving a message yesterday's date and the time, which was approximately in the six o'clock hour p.m. |
| Defense: | Did you listen to that message last night? |
| Mr. Ramirez: | I did. |
| Defense: | And did the message come through clearly? |
| Mr. Ramirez: | It did. |
| Defense: | When we met this morning, did you forward that message to my cell phone? |
| Mr. Ramirez: | I did. |
| Defense: | Um, Judge. I would like to play that message as to demonstrative evidence to show that the time stamp that occurred was, or that's showing up on my phone was the time that it was forwarded to me this morning, per his testimony, and not the time that he originally received the message. |
| Judge: | And the purpose for that would be what? |
| Defense: | We've been trying to show that a time stamp does not necessarily mean when a message was received. It could also mean that's when a message was forwarded. And we're stating one of our arguments is that he left those messages on March 2nd, 2005 when he was in D.C. Ms. Wink was in California and the time stamp that was recorded was, in fact, the date that those messages were forwarded. |
| State: | Judge, I'm going to object as irrelevant what happens on his phone, um, we have no idea if he has a different phone versus she had on March 10th. There's just too many what if's for her to be trying to say, well his phone did it, so automatically her phone did it. Not to mention, she said she recorded him directly off her phone, so it's irrelevant. |

38

| | |
|---|---|
| Defense: | Judge, again, it's demonstrative the evidence, just as if I was drawing a picture to show that there is a possibility that this happened. My client has already testified that he still has the Sprint service. I also have the Sprint service. Not that that makes any difference, but if they are allowed to present their case and talk about the time stamps and recording, we should be able to at least demonstrate how a time stamp could change. |
| Judge: | Counsel, are you making yourself a witness in this case to verify what's on your phone? |
| Defense: | No Judge. It's strictly demonstrative evidence. I'm not testifying to anything. I'm simply playing a message that he forwarded. |
| Judge: | No. I'm not going to allow it. |
| Defense: | Anthony, when you forwarded that message, uh, the time stamp changed, is that right? |
| Mr. Ramirez: | That's correct. |
| Defense: | In your experience, when you forwarded messages before, the original time stamp disappears, is that correct? |
| Mr. Ramirez: | That's correct. |
| Defense: | How long have you had Sprint? |
| Mr. Ramirez: | Uh, three years. |
| Defense: | And has that always been your knowledge that that's what happens? |
| Mr. Ramirez: | Yes. |
| Defense: | And because you have forwarded messages before. |
| Mr. Ramirez: | That's correct. On Sprint and Kelly's telephone number. I own both accounts. They are both Sprint accounts. And it's not the phone that leaves the messages, it's the service. |
| State: | Objection, it's not the question before him. |
| Judge: | Sustained. |
| Defense: | Did you receive the petition for divorce that was filed in the family matter between you and Ms. Wink? |
| Mr. Ramirez: | Did I receive it? |
| Defense: | Yes. |

39

| | |
|---|---|
| Mr. Ramirez: | Yes |
| Defense: | Yes. Did you receive a copy. Were you served with it. |
| Mr. Ramirez: | Yes. |
| Defense: | Was there any indication in there about messages that were left on March 10th of 2005. |
| Mr. Ramirez: | No. |
| Defense: | Was there any indication of anything that, uh, or any type of messages that were left in March. |
| Mr. Ramirez: | No. |
| Defense: | Do you ever remember speaking to Kelly Benowski about those messages? |
| Mr. Ramirez: | No, I do not. |
| Defense: | Were you aware that those had been forwarded to her? |
| Mr. Ramirez: | Um, only after reading her letter. |
| Defense: | And that was the letter that was submitted to Detective Porter? |
| Mr. Ramirez: | Yes. |
| Defense: | And Agent Rivera? |
| Mr. Ramirez: | Correct. |
| Defense: | That's all that I have Judge. |
| Judge: | Cross examine _____. |
| State: | Thank you, Judge. You told Detective Porter, uh, that, uh, when you spoke to him you were on medical leave from the Washington P.D.? |
| Mr. Ramirez: | That's correct. |
| State: | What were you on medical leave for? |
| Mr. Ramirez: | I was on ... I wasn't on for myself. I was granted family medical leave act to come back and be with my children. Um, as you were told earlier, Kelly and I were going through a divorce. The children were not adjusting well to it at all and I was requested by their physician, Dr. Neil Aaron and |

40

given, granted medical, family medical leave act so that I could transition back to the, to Phoenix so that I could be with my kids.

| | |
|---|---|
| State: | And you are no longer a police officer with the Washington P.D., correct? |
| Mr. Ramirez: | That's correct. |
| State: | Okay. What happened? Why aren't you an officer any more? |
| Mr. Ramirez: | I moved back … |
| Defense: | Objection. Irrelevant. |
| Judge: | Relevance counselor? |
| State: | Judge, he keeps talking about how he wants to be such a great dad and came back to be near his children and I just wanted to know what happened, basically why he quit his job. |
| Judge: | On the relevance, he spoke the answer to that question. Question's withdrawn. |
| State: | You were contacted by Detective Porter, correct, from the Phoenix Police Department? |
| Mr. Ramirez: | I was. |
| State: | Okay. And you could've speak to him, correct? |
| Mr. Ramirez: | That's correct. |
| State: | Okay. When you spoke to him, he asked you if you left any messages for Kelly and you told him it didn't happen. |
| Mr. Ramirez: | It didn't happen on March 10th. |
| State: | Okay. Um, you don't recall saying it just didn't happen? |
| Mr. Ramirez: | No, I recall that, but when I said that, I was using it in the terms of it didn't happen on March 10th. |
| State: | Okay, now if I played, uh, where you talked to him about it didn't happen, would that refresh your memory. |
| Mr. Ramirez: | Sure. |
| State: | Let's have this marked as States #2 first. If I recall correctly, and I may be wrong, he said did you leave any messages and you said it didn't happen. |

41

| | |
|---|---|
| Defense: | Judge, I'm going to object at this point because he did state that he said that, but it was because he was referring to March 10th, so if he's admitting he said it, why do we need to play the tape. |
| State: | Because, Judge, I, well I could be wrong ... I'll move on ... |
| Judge: | Well, I didn't rule on the objection. I was going to give you an opportunity to respond, but if you wish to move on, go right ahead. |
| State: | I'll move on Judge. And then he, he follows you, follows up with, um, you are asked again, if you've called and messages on the morning of the 10th and you said, uh, no and then |

**CD 2 – Track 1**

| | |
|---|---|
| State: | So it went from it didn't happen to no, I don't know? Yes or no? |
| Mr. Ramirez: | I'll answer yes, but there is more to that, so I need to clarify. |
| State: | Exactly, and your attorney will have a chance to redirect on that. Today you told us you were in D.C. all day on March 10th, 2005, right? |
| Mr. Ramirez: | That is correct. |
| State: | So you were training in the morning? |
| Mr. Ramirez: | Yes. |
| State: | Okay, and then you were on your regular shift? |
| Mr. Ramirez: | Correct. |
| State: | Okay, but you told Officer Porter you were in Maryland? |
| Mr. Ramirez: | Right. |
| State: | So you weren't in DC. |
| Mr. Ramirez: | No, DC is, I'm not sure you're familiar with the geography of the area? |
| State: | I am in fact familiar with the geography of D.C. |
| Mr. Ramirez: | Okay, there were points in time, our training facility moved from the Police Academy, there is also a training facility at the Federal Law Enforcement Training Center... |
| State: | Right |

42

| | |
|---|---|
| Mr. Ramirez: | In Shelton Head, Maryland. |
| State: | Okay, so were you in DC or were you in Maryland? |
| Mr. Ramirez: | On March 2nd, I was in Washington, D.C. |
| State: | On March 10th where were you? |
| Mr. Ramirez: | Washington, D.C. |
| State: | Okay, but you told the officer you were in Maryland? |
| Mr. Ramirez: | I probably had driven to Maryland 3 or 4 times during that day. |
| State: | Okay, so today you are in DC on March 10th?  Today your answer is you were in DC. |
| Mr. Ramirez: | Yes. |
| State: | But when you talked to Officer Porter, your answer was you were in Maryland. |
| Mr. Ramirez: | I was speaking to Detective Porter on the telephone about 6 months after an event. |
| State: | Okay, so, is the answer yes or no? |
| Mr. Ramirez: | The answer is yes, I was both in Maryland and DC. |
| State: | Okay.  When he asked you, um, that your voice is very familiar because.... |
| Mr. Ramirez: | Um hum. |
| State: | because he listened to the tapes and is familiar to speaking with you, you don't give him an answer, right?  As to why, the taped voice sounds exactly like the voice that he is talking to? |
| Mr. Ramirez: | That is me on that tape Ma'am, I just left the messages when my wife was in Burbank. |
| State: | Okay, so today you admit that those messages were you, but when you talked to Detective Porter you denied it. |
| Mr. Ramirez: | I said it didn't, I denied to the best of my knowledge, that it was on March 10th because it didn't happen on March 10th. |
| State: | Uh isn't it true that when he pressed you for the 3rd time if you left any messages, you said honestly, I don't remember that? |

| Mr. Ramirez: | The context that that answer came from counselor was, Kelly and I at the time were going through our divorce, we were speaking on a regular basis. |
|---|---|
| State: | Mr. Ramirez it is a yes or no question?  Did you say that? |
| Mr. Ramirez: | Yes. |
| State: | Okay.  He also presses you on the fact he says uh, he heard the messages and they were disturbing, and you don't say you didn't leave them, instead you say there's a lot of disturbing things that were said between you and Kelly.  Correct? |
| Mr. Ramirez: | Back and forth, yes. |
| State: | Okay.  He again pressed you, are you confident that you didn't leave those messages on March 10th and you answered, uh, I looked at my day planner and you said you were in training, so no you didn't leave those messages. |
| Mr. Ramirez: | It is impossible that those messages were left on March 10th. |
| State: | Okay, so did you say that or not... |
| | _____ (Inaudible). |
| State: | to Detective Porter? |
| Mr. Ramirez: | Did I say? |
| State: | What I just said to you, that you were confident that you didn't leave them because you looked at your day planner and it said you were in training all day. |
| Mr. Ramirez: | That is correct. |
| State: | Okay.  You said on direct, um, that you never spoke to Kelly Benowski about any of the message that you left for Ms. Wink. |
| Mr. Ramirez: | I have not spoken with her about anything like that. |
| State: | Okay.  So today she just made up the story about that. |
| Mr. Ramirez: | My custody battle, Ma'am, has been going on, there's been a lot of things that have been said. |
| State: | So it your opinion that she just made that up today? |
| Mr. Ramirez: | Yes. |

| | |
|---|---|
| State: | Okay. Um, you also said on direct that there was no allegation of domestic violence on your divorce papers, correct? |
| Mr. Ramirez: | That's correct. |
| State: | And isn't that the reason, the reason for that is because you pretty much threatened Ms. Wink that you would kill her if she did that? |
| Mr. Ramirez: | That's not true. |
| State: | Okay. In fact, you threatened her that you would kill her if she basically cost you your job in D.C.? |
| Mr. Ramirez: | I never did that. |
| State: | Okay. So today you admit that you did in fact leave messages on March 2nd, 2005? |
| Defense: | Objection, asked and answered. |
| Judge: | Sustained. |
| State: | The messages you admit to making, um, weren't played today, were they? |
| Defense: | Objection, irrelevant. |
| Judge: | Overruled. |
| Mr. Ramirez: | I don't understand what you're saying. |
| State: | Well, today we played only the messages that were timed stamped, correct? |
| Mr. Ramirez: | That is correct. |
| State: | You didn't hear two messages on that tape before the time stamped ones, correct? |
| Mr. Ramirez: | That is correct. |
| State: | Those two messages that you didn't hear were the ones that you left on March 2nd, 2005, correct? |
| Defense: | Objection, Judge. Those messages were not played pursuant to an agreement between counsel and myself and, and we should be not getting into those if those weren't played and those aren't being offered as evidence. |

| | |
|---|---|
| State: | Judge, they've opened the door. They're saying that he left messages on March 2nd not March 10th, we have time stamped ones; we did not play those ones because they were not time stamped. |
| Judge: | I (inaudible) overruled the objection. |
| State: | The two that you didn't hear today, those are the ones that you left on March 2nd, correct? |
| Mr. Ramirez: | That's not right, it's not correct. All of those messages were left on March 2nd. |
| State: | And on the messages, the two messages you didn't hear, that's when you tell her that she is out at the club? |
| Mr. Ramirez: | No, I need to hear them again or see the transcripts, but all the messages occurred at night. |
| State: | Okay. Nothing further. |
| Judge: | Redirect. |
| Defense: | Uh, the conversation that you had with Detective Porter that Counsel was asking you about, can you clarify the context. You kept wanting to clarify that context, but weren't allowed to, so could you please do that now. |
| Mr. Ramirez: | Kelly and I were on a speaking basis when she filed for divorce on March 31. The divorce hadn't gone south. It hadn't turned into this bitter custody battle. I did talk to her multiple times. Everyday from... until May. And I talked to her about the kids, about school, this once particular night, she had been out drinking I had gotten. |
| Defense: | So what does that have to do with your conversation with Detective Porter? |
| Mr. Ramirez: | That when I said yeah, when I mentioned, did you talk to her on March 10th, well yeah, I did but I didn't threaten her. I didn't leave any messages for her, but I talked to her on a daily basis because she'd have to come and pick me up at the airport. We were, this was a, we were just separated, we were getting divorced but it was still amicable. And so, you know, that's not the only time that I talked to her. You know it's, this is some, I had a relationship with her, we were married. |
| Defense: | There were questions that you had told Detective Porter, that no, you didn't leave those messages on March 10th and then, I don't know. Can you clarify, why you went from no to I don't know? |

46

| | |
|---|---|
| Mr. Ramirez: | Because I did leave messages on Kelly's phone everyday.  Very benign, hey, can you have the kids call me, what time are you going to pick me up at the airport?  There were a lot of messages that were left and 99.9% of them were just two people communicating back and forth. |
| Defense: | So you did leave messages on March 10th, but then the messages that were played here today, it is your testimony that they were left on March 2nd. |
| Mr. Ramirez: | That is correct, I remember that. |
| Defense: | And that's what you're getting at when you are talking about this conversation with Detective Porter. |
| Mr. Ramirez: | That is correct. |
| Defense: | Did you lie to Detective Porter when you said you were in Maryland and not in D.C.? |
| Mr. Ramirez: | In that geographic area, I mean, you are going back and forth.  Our training facility is in Washington, D.C., I literally can run, when I go on a run at the academy I run into Maryland.  It's right there, I mean its... |
| Defense: | So did you think of them as one in the same? |
| Mr. Ramirez: | It was irrelevant it just wasn't even something that I... |
| Defense: | Nothing further Judge. |
| Judge: | You may step down. |
| Mr. Ramirez: | Thank you, Your Honor. |
| State: | I would like to call Officer Schneider to the stand, please. |
| Judge: | Come forward and raise your right hand and be sworn.  Do you solemnly swear or affirm that the testimony you are about to give in this trial will be the truth, the whole truth and nothing but the truth? |
| Officer Schneider: | I do. |
| Judge: | Have a seat in the witness stand. |
| Defense: | Could you please state your full name and spell your last name for the record? |
| Officer Schneider: | My name is uh Lewis Schneider.  Last name is S-c-h-n-e-i-d-e-r. |
| Defense: | And where do you currently live? |

47

Officer Schneider:    In Washington, D.C.

Defense:    And how long have you lived there?

Officer Schneider:    5 years.

Defense:    How do you know Anthony Ramirez?

Officer Schneider:    I used to work with him, when he lived in D.C.

Defense:    Was that at the police department?

Office Schneider:    Yes, at the Metropolitan Police Department.

Defense:    And why did you come here today?

Officer Schneider:    I came here, um, on behalf of Anthony asked me to come out to give testimony on several dates that happened last year.

Defense:    Okay, I'm going to refer you to March 2nd of 2005. Are you familiar with that date?

Officer Schneider:    Yes, I am.

Defense:    And are you familiar with the fact that that is an issue that's in this case today?

Officer Schneider:    Yes.

Defense:    Were you with Mr. ... were you with Anthony on that date?

Officer Schneider:    Yes, I was.

Defense:    Do you know when you first met up with Anthony?

Officer Schneider:    I met up with him about 6:00 in the morning. We had training at the training academy that day for our CDU Unit, and, uh, we met around 6:00 since training was from 6 to 2 that day.

Defense:    What is CDU training, briefly?

Officer Schneider:    Civil Disturbance Unit, for when we have protests in D.C. It's when our platoons are operated in order to do crowd control and stuff like that. We have training that's mandatory once a year to get recertified.

Defense:    So that was from 6:00 am to 2:00 pm, D.C. time?

Officer Schneider:    Yes.

Defense:            Is that Maryland?

Officer Schneider:  No, D.C.

Defense:            Both.  Was Anthony in your presence that entire time?

Officer Schneider:  Yes, cause he was actually in my platoon, so we were together the whole day.

Defense:            Were there any bathroom breaks?

Officer Schneider:  Yeah, there were several, throughout, but we are always together, we didn't even take them all the time because we were trying to get through the training to get it done.

Defense:            During the time that you were with him, did you ever hear him make any phone calls that you recall?

Officer Schneider:  No.

Defense:            Was Officer Modlin with you also?

Officer Schneider:  Yes, he was too.

Defense:            Okay.  Um, now lets go to March 10th of 2005.  Do you recall that day?

Officer Schneider:  Yes.

Defense:            Were you with Mr. Ramirez on that day?

Officer Schneider:  Yes I was.

Defense:            How do you remember?

Officer Schneider:  Because it was my day off, back then I was off on Wednesdays and Thursdays and we met up at the police academy, which we used to go work out in, at the gym there.  Around between around 8:00 in the morning we met and we were there for several hours, 'til probably around 12 or 1 by the time I left, and, uh, went home.

Defense:            Okay, that sounds like a ridiculous amount of time to hang out at the gym, about 4 or 5 hours?  Was that typical?

Officer Schneider:  Yeah, I mean I would go there, sometimes I would go there before work, I'd hang out, I'd work out a little bit, um, I played basketball, we did a few pickup games of basketball, and then by the time you get done doing that, people at work at the academy that I would know, I'd stop and see them and talk to them, and then you shower and then leave.

WAS01_41673831_1_298500_61189 10/18/2006 12:21 PM

Defense:              Okay. So on March 10th, you were with Anthony from about 8 in the morning until 1 in the afternoon.

Officer Schneider:    Between 8 and it might have been 12:00. I really don't remember exactly, but I know it was in the afternoon because I left and went home.

Defense:              Did you ever see him make any phone calls?

Officer Schneider:    No.

Defense:              Did you hear him make any phone calls?

Officer Schneider:    No.

Defense:              Did you hear him talk about making any phone calls?

Officer Schneider:    No, not at all.

Defense:              Um, did you have your own locker there?

Officer Schneider     Yes, I had my own locker.

Defense:              Did Anthony?

Officer Schneider:    No, I believed him and Modlin, they usually rode together there, so I think they shared a locker.

Defense:              Um, did you have any conversations with Anthony on March 10th of 2005 that you recall regarding his ex-wife, Ms. Wink?

Officer Schneider:    No, he very rarely even talked about her, so I just remember I met her one time and that was it and he didn't really say much about her.

Defense:              And, um, after you left the gym at approximately 12 or 1, did you see Anthony the rest of the day?

Officer Schneider:    No, I did not.

Defense:              That's all I have Judge.

Judge:                Cross-examination.

State:                So, I'm sorry, its Officer Schneider?

Officer Schneider:    Yes.

State:                Okay. So you were _____ (inaudible) with Mr. Ramirez from 8 am to noon.

| | |
|---|---|
| Officer Schneider: | Yeah, approximately around that time, yes. |
| State: | Okay, was it day light savings time then? |
| Officer Schneider: | It was back in March so yes I believe it'd be back an hour, fall back, yeah. |
| State: | Okay. So if it is 8:45 here then it's 10:45 there, is that correct? |
| Officer Schneider: | If it's 8, if it's, I don't recall, If you guys think it is a 2 hour difference during that time, so if it was 8:00 here, it was probably 6:00 in the morning here, or I mean you go two hours back. |
| State: | Okay. |
| Officer Schneider: | Because we are two hours ahead of you, like now we are 3 hours ahead. |
| State: | Okay, I'm going the other way. |
| Officer Schneider: | Okay. |
| Defense: | So if it's 8 am here, it's 10 am there? |
| Officer Schneider: | Correct. |
| State: | Okay. Alright, um so you say you were with him...Well this happened on March 10, 2005 is a year and ½ ago approximately correct? |
| Officer Schneider: | Um hum. |
| State: | How is it that you have such a clear recollection of what happened? |
| Officer Schneider: | Because I know my days off... |
| State: | Okay. |
| Officer Schneider: | and what I usually do on my days off... |
| State: | Okay. |
| Officer Schneider: | is usually the same, so. |
| State: | And this was not a day off. |
| Officer Schneider: | This was... |
| State: | Oh, it was a day off. |
| Officer Schneider: | This was a day off. |

| | |
|---|---|
| Officer Schneider: | It was back then I was off Wednesday and Thursday. |
| State: | Okay. |
| Officer Schneider: | What happened was we had training the week before so I know with the CDU training that I was in. |
| State: | Okay, so is it your testimony today that you had your eyes on Mr. Ramirez for basically 6 hours straight and you never took your eyes off of him? |
| Officer Schneider: | On which date? |
| State: | March 10th, 2005, sorry. |
| Officer Schneider: | I was only with him 4 hours, so.. |
| State: | Okay. |
| Officer Schneider: | So... |
| State: | Is it your testimony that you had your eyes on him for 4 hours straight, you never took your eyes off of him. |
| Officer Schneider: | Yeah, I was there, saw him yes. |
| State: | Okay, well that's not my question. My question to you is different. If you saw him that is different. But you kept a visual on him for 4 consistent hours, you never took your eyes off of him, not even once? Is that your testimony? |
| Officer Schneider: | Yes, I saw him, I was there. |
| State: | I understand that, but my question to you is... I understand that you saw him, but for 4 hours straight, you never took your eyes off of him, you just basically maintained staring at him seeing exactly where he was for all of that 4 hours? |
| Officer Schneider: | No. |
| State: | Okay, thank you, nothing further Judge. |
| Defense: | Nothing further Judge. |
| Judge: | You may step down. |
| Officer Schneider: | Alright. |
| State: | Judge, the State calls Officer Modlin. |

| | |
|---|---|
| Court Clerk: | Come forward sir. |
| Officer Modlin: | Good morning Ma'am. |
| Court Clerk: | Good morning, raise your right hand and be sworn. Do you solemnly swear or affirm that the testimony you are about to give in this trial will be the truth, the whole truth and nothing but the truth. |
| Officer Modlin: | I do. |
| Court Clerk: | Have a seat there on the witness stand. |
| Defense: | Could you please state your name for the record and spell your last name? |
| Officer Modlin: | Thadeus M. Modlin, Jr., my last name is spelled M-o-d-l-i-n. |
| Defense: | And where do you currently live? |
| Officer Modlin: | Washington, D.C. |
| Defense: | And what is your occupation? |
| Officer Modlin: | Police Officer. |
| Defense: | With what department? |
| Officer Modlin: | Metropolitan Police Department. |
| Defense: | And how long have you been an officer? |
| Officer Modlin: | 6 years. |
| Defense: | With that same department? |
| Officer Modlin: | Yes Ma'am. |
| Defense: | How do you know Anthony? |
| Officer Modlin: | Uh, we were co-workers and uh close friends during his time in D.C. |
| Defense: | Are you still friends? |
| Officer Modlin: | Oh yes. |
| Defense: | Um, I'm going to take you back to March of 2005. On March 2nd, 2005 were you with Anthony? |
| Officer Modlin: | Yes Ma'am I was. |

| | |
|---|---|
| Defense: | Do, how, what were you doing? |
| Officer Modlin: | Um, if I'm not mistaken, March the 2nd we were in CDU training, which is Civil Disturbance Unit Trauma, at the police academy in Washington. |
| Defense: | Did that start some time in the morning? |
| Officer Modlin: | Uh, we were all supposed to be there at 6 am. |
| Defense: | And about how long did that training last? |
| Officer Modlin: | Uh, the entire day.  We ended getting out at like 14:00 hours. |
| Defense: | So that's 2:00? |
| Officer Modlin: | Yes. |
| Defense: | Um, did you ever see Mr. Ramirez or Anthony make any phone calls? |
| Officer Modlin: | Uh, no Ma'am. |
| Defense: | Did you see him with his cell phone at all during that time in training? |
| Officer Modlin: | Uh, not during the time that we were together and we were together the entire time because we were on the same squad. |
| Defense: | Um, did you have any conversations with him that day that you remember about his now ex-wife? |
| Officer Modlin: | Uh, no, no Ma'am. |
| Defense: | Did you ever hear him make any phone calls? |
| Officer Modlin: | No, I didn't see him or hear him make any phone calls while he was in my presence. |
| Defense: | Now I am going to take you to March 10th of 2005 did you see Mr. Ramirez, Anthony on that day? |
| Officer Modlin: | Uh, Yes. |
| Defense: | Uh, how, what were you doing? |
| Office Modlin: | Since the time that uh me and Anthony met, we Krav trained together, Krav Maga train which is pretty much Israeli defense form and uh typically 3 of 4 days out of the week when we were at, while he was in D.C. we'd uh get together at the academy before work and uh, train and lift weights and just hang out around the academy. |

WAS01_41673831_1_298500_61189 10/18/2006 12:21 PM

Defense:            Do you know what time you met up with him on March 10th?

Officer Modlin:     Um, I would have to say at around, roughly 7:30, 7:45.

Defense:            And do you know how long you were with him that day?

Officer Modlin:     Um, I'd say I think we were there into well afternoon, it was like maybe about 12:30 almost 1:00 when we left the academy.

Defense:            During that time you were with him did you see him make any phone calls?

Officer Modlin:     No Ma'am

Defense::           Did you see him with his cell phone?

Officer Modlin:     Um, well actually he couldn't have had his cell phone because we both shared a locker, and the locker I had the key to the lock.

Defense:            So that day everything was put into your locker?

Officer Modlin:     Yes, it was.

Defense:            Did he ever come to you to ask to get his, to get anything out of the locker?

Officer Modlin:     No Ma'am, not until we left the um academy.

Defense:            And that was about 1 in the afternoon?

Officer Modlin:     Yes.

Defense:            Uh, did you hear him make any phone calls that day?

Officer Modlin:     Um, no Ma'am, I didn't.

Defense:            Did you have any conversations with him about Ms. Wink.

Officer Modlin:     Um, no Ma'am.

Defense:            That is all I have Judge.

Judge:              Cross-examination.

State:              Thank you Judge.   Um on March 2nd, 2005 you said you had CDU training?

Officer Modlin:     Yes.

55

| | |
|---|---|
| State: | Okay, and then March 10th, 2005, I'm sorry I missed it, you said you had physical training? |
| Officer Modlin: | No, it wasn't physical training, it is just something that myself and Officer Ramirez typically did on our own time. |
| State: | Okay, so like basically working out, is that fair to say? |
| Officer Modlin: | You could say working out, lifting weights and also Krav training. |
| State: | I'm sorry, what? |
| Officer Modlin: | Krav Maga training. |
| State: | Okay, so if Officer Ramirez um would have said that  he had CDU training on March 10th, 2005 he would be wrong. |
| Officer Modlin: | If he said he had CDU training on March 10th? |
| State: | Right. |
| Officer Modlin: | Uh, we didn't haven't have CDU on March 10th. |
| State: | So you had it on the 2nd. |
| Officer Modlin: | Yes. |
| State: | Okay.  Um, and you said you were with him on March 10th, to clarify from what time to what time? |
| Officer Modlin: | Uh roughly 7ish to maybe, like I said 12:45, 1:00. |
| State: | 7 a.m. |
| Officer Modlin: | Yes. |
| State: | Until around noonish? |
| Officer Modlin: | Yes. |
| State: | Okay, and you said Krav training? |
| Officer Modlin: | Krav Maga. |
| State: | What is that, I'm sorry? |
| Officer Modlin: | Uh, it's Israeli defense force combat training.  We uh, they implemented on our department as far as uh, just self-defense for officers and things |

State:              Okay.

Officer Modlin:     of that sort, and um, Officer, well Mr. Ramirez has more experience in that he was helping with the moves and everything.

State:              Okay, so do you recall everything uh you did from 7 am to noon?

Officer Modlin:     Uh, pretty much.

State:              Okay. Take me through a timeline, what did you do at 7 am.

Officer Modlin:     At 7 am we got there, I talked to a couple of the instructors that uh actually do the physical training and um NPD we have known them for years so I shot the bull with them, and at that point I met with uh well then Officer Ramirez and we talked for a while so I...

State:              Okay.

Officer Modlin:     and changed up in the locker.

State:              Okay, so at what time did you meet up with him exactly then?

Officer Modlin:     Uh, I couldn't give you an exact time. It has been over a year.

State:              Okay, what did you do at 7:16 a.m.?

Officer Modlin:     7:16 a.m.? I could not give you an exact time, exact moment what I did at that point.

State:              Okay. So it is safe to say you're generalizing what you did from 7:00 a.m. to noon. Is that fair to say?

Officer Modlin:     Yeah, it's fair to say that.

State:              Okay because you're not going to remember every specific minute of that time.

Officer Modlin:     Correct.

State:              Okay. Um, just because you didn't see him make a phone call does it mean that he couldn't have? If you didn't see him?

Officer Modlin:     Well...

State:              literally see him.

Officer Modlin:     Well are we talking about the 10th? Well I know this much. After we changed our clothes in it was not possible that he could have made a phone call because his telephone was locked in my locker.

WAS01_41673831_1_298500_61189 10/18/2006 12:21 PM

| | |
|---|---|
| State: | And after you changed your clothes, which is what time? |
| Officer Modlin: | That would have been in between, I say we hit the mats at like maybe 7:45 or 8:00 o'clock.  So two minutes to change up, roughly 7:30. |
| State: | Okay.  So if it's I get so confused, if it's about 8 o'clock there, it's 6 o'clock here.  Is that right? |
| Officer Modlin: | Uh, beats me, honestly. |
| State: | Okay.  Alright.  Well let's talk about March 2nd now because I'm confused too with the time difference.  March 2nd, 2005 you said that you never saw him making phone calls March 2 either.  Correct? |
| Officer Modlin: | That is correct. |
| State: | So he was to say that you did make a phone call on March 2nd, 2005 you just didn't see him. |
| Officer Modlin: | That is correct. |
| State: | Okay, we have nothing further here. |
| Defense: | And on March 2nd, 2005 you were with him from the morning until the afternoon correct? |
| Officer Modlin: | Yes, Ma'am. |
| Defense: | You weren't with him at night? |
| Officer Modlin: | No, Ma'am, I was not. |
| Defense: | Thank you, nothing further Judge. |
| Judge: | You may step down. |
| Officer Modlin: | Thank you. |
| Defense: | Defense rests Judge. |
| Judge: | Defense has rested, does the State have any other _____ (inaudible)? |
| State: | No, Judge. |
| Judge: | Then the court will hear your _____ (inaudible). |
| State: | Judge, basically this case comes down to credibility, who does this court um basically believe.  Uh, you have the messages that are obviously transparent.  You have uh Ms. Wink telling you that it happened on March |

58

10th, 2005. She actually was very honest with the officer as you heard it. She initially when she was asked, she basically said "I'm not exactly sure when it happened. It happened so much. Let me pull up my schedule and let you know." She went through the time to do that. Uh, she told this court when she did go back and find out where she was when it happened. She was in fact in Phoenix and um knew that it happened in Phoenix on March 10th, 2005. You heard that as Detective Porter say that he has listened to tapes before. He had heard different time stamps. There was no reason for him to think that time stamp was fabricated. Ms. Wink was asked on the stand um "are you able to fabricate that, do you know how to do that?" She said, "No, it is what it is. It's on my phone. That's what comes up when I get a message." Um, she has no reason basically Judge to fabricate what happened. The divorce is over, uh there is nothing for her to gain. Mr. Ramirez, on the other hand, has a lot of reasons to fabricate. Um, he has been nothing but inconsistent. Uh, he told officer Porter, I'm sorry Detective Porter, let me correct myself, on the phone, uh first he says it didn't happen. Then he goes on to say well that he doesn't know when it happened. And then he goes on to say that well he has no knowledge of it uh if it happened. But yet today, he did in fact do it but not in the day in question. It was March 2nd, 2005. Um, just as a die note , I do believe the rules state that the evidence does have to conform to the testimony um, but he has always been inconsistent, Judge. Uh, he tells Officer Porter, Detective Porter, I'm sorry I keep saying Officer, Detective Porter he's the one who's that he was in Washington, D.C. in training but uh today he tells the court that he was in D.C. in training but when he talks to Detective Porter he is in Maryland. Uh he was in training but he was wrong about that as well. He was actually, uh I'm we are not going to understand this martial art thing physically training. Uh his story is nothing but inconsistent because he doesn't want to be held accountable for this, Judge. For the horrible harassing things that he says on his ex-wife's messages. Uh he has done nothing but harass this woman many times but especially on March 10th, Judge, and you heard the messages and they are very profane, very um harassing with no doubt the intent to terrify, intimidate and threaten her on March 10th, 2005 Judge.

Judge:        Ms. _____.

Defense:      Thank you Judge. Judge, the complaint in this matter specifically refers to March 10 of 2005. And that's where most of the testimony has been coming from regarding the state's side. Um she had mentioned that even if the evidence conforms to that date, let's say if the date is changed to March 2nd, 2005, which is our position. Uh, he was not here, and either was Ms. Ramirez. The testimony was that both on March 10th and on March 2nd of 2005, Mr. Ramirez was in Maryland or D.C. He wasn't in the state of Arizona and the court's aware that under 13-2916 at least one of the individuals has to be in the state of Arizona when they received the phone calls. Uh, the testimony from Ms. Ramirez, sorry from Ms. Wink

states that she was in fact in Phoenix on March 10 but that she was in California on March 2nd. Our position is that the messages were left on March 2nd. My client took responsibility for the messages. Um he said he was remorseful. He is not trying to shirk his responsibility. He admitted it. Uh he said that he was sorry and that it was a very terrible thing to do, however he states that even in his conversation with Detective Porter, these messages were left on March 2nd. Being left on March 2nd does not fulfill the complaint or the requirements under the statute and thus the court would have no jurisdiction in that case. Now, on March 2nd, we um well on March, go back to March 10th , because they're saying March 10th we are saying March 2nd. On March 10th  the testimony was that Mr. Ramirez was with his fellow officers. They did not see him make any phone calls during that day. Um of course their eyes are not glued on him 24/7, however you can judge their credibility, their motive and their intent to testify here today and the court of course can drive some conclusions regarding that. My client also testified that yes, he called on March 10th and he probably left messages but it wasn't the messages that were presented to the court. My client also testified and tried to explain what happens when a message is forwarded and what happens with the original time stamp. Ms. Ramirez, Ms. Wink did testify that she did forward those messages to Ms. Bonowski. She also testified that she recorded those messages after she heard them. So it is a, it raises a reasonable doubt as to whether those messages were in fact actually left on March 10th, 2005 or if that was after they were forwarded or after they were saved. Uh testimony has come up that it is possible that those were recorded after they were forwarded or after they were saved. Regarding the tape that um Ms. Wink recorded and gave to her friend Ms. Bonowski, um we don't know when the tape was actually made. Ms Bonowski says that she kept them in her jewelry box. We don't know what happened to the tape, if anybody touched it during that time. We don't know anything about that tape from March until August of 2005. Now um, Ms. um Wink also filed different forms of paper work: an order of protection, the petition for divorce. She refers to incidents that occurred between um my client and Ms. Wink, but there's no, but there's been no testimony that she ever referred to messages that were left on March 10th. There were references to messages that were left on March 2nd which is my client's position that that's when those messages were left. Um in fact Detective Porter doesn't even hear anything regarding these March 10th messages until August 22nd of 2005 or the exact date was not brought up, it was in August of 2005. There, Kelly Bonowski is not sure when those messages were received, and she's not sure when those messages were forwarded. Basically we have some questions when those messages were left and when they were forwarded and when they were recorded. Because we don't even know whether the time stamp which the testimony showed that could come from when it was forwarded. Because we know that they were forwarded. When I ask Ms. Wink about her testimony, in the

custody trial, she said that she didn't know what date she made the tape, and she did not know what date the messages were left. In fact it was the officer that told her what the date was. Uh when it gets to judging the credibility as counsel had referred to regarding these witnesses, it is very clear that Kelly Bonowski is not a fan of my client. She does not like him um for whatever reasons she has when she testified to. Very legitimate, very understandable. But she is here testifying today against my client and she does not like him. Um as for Ms. Wink, maybe today she no longer has the motive of my client not getting custody of their children, but when the police reports were filed, when new order of protection was filed, that did not mention the messages, when the petition for divorce was filed, they did not mention the messages and until last month she had every motive to um fabricate or change the dates or something to that effect because there was a custody battle. So to state that she has no motive or she had no motive, I think, is a stretch. My client um has already lost custody. Um of course, his motive and his intent is to be found not guilty for this because those messages were left on a different date when she was in California and he was in D.C. He has already accepted responsibility for the messages and then asked for Officer Schneider and Officer Modlin, of course, they are friends just like Ms. Bonowski is, and so you just need to judge their credibility of course based on that. And then when it comes to the actual messages, according to the time stamp that was presented to the court, those all took place between approximately 8:45 and 8:50 in the morning. If that was really the time that those messages were left, and the date, the content of the messages does not match. The content of those messages refers to a hotel room, refers to night time things. As my client said that he made those messages on March 2nd in the night time which corresponds with the content of those messages. Uh it doesn't seem logical to leave those messages in the morning when he is referring to the night time or what she is going to be doing at night. Uh so based on the statutes and the testimony and the possibility of it being recorded after it was forwarded, um the content of the messages based on the time when it was supposed to be received, um the tape uh being out of the control of Ms. Wink or the detective for five months, the credibility issues and that the whereabouts of my client and Ms. Wink both on March 2nd and March 10th, it um is the defendant's position that the messages were in fact left on March 2nd, that when the messages were left or when they were received, Ms. Wink was in California working, and my client was either in D.C. or Maryland and therefore under the statutes and the complaint he should be found not guilty for this. Thank you Judge.

| Judge: | Thank you, Ms. _____. |
|---|---|
| State | What a coincidence that he admits to leaving the messages on March 2 when neither of them are here, judge. That is awfully, awfully lucky and coincidental, that this court would have jurisdiction, it is basically a ploy |

to apprehend to escape responsibility and he has never taken responsibility for these messages until today sitting in that chair. He never admitted leaving any messages to Detective Porter ever. He danced around, I don't know, I don't remember, it didn't happen, but today all of a sudden he has this amazing clear recollection of what happened, and by the way, it did not happen on the date alleged. A year and a half later he all of a sudden remembered, oh yea, he left those horrible messages but on March 10 rather than March 2. The defense counsel talked about these messages being left between 8:45 and 8:50 and the content don't make sense. It basically they happened in the morning, Judge, and she, he is referring to her being out all night and her being in a hotel room and it makes absolute sense that he'd leave them in the morning because he hadn't been able to talk to her all night. So he basically leaves those messages because he is angry because he hasn't talked to her and he refers to her doing things the night before and you obviously heard the messages, Judge. They brought these officers today to talk about how he was in this physical training or whatever it was on March 10, but interestingly, Judge, that never came up to Detective Porter. Never did he say when he was talking to Detective Porter, hey, I know I didn't leave these messages on March 10, and you know how I know because we were in this training and I have these two officers, that you can talk to, that will verify everything I say. It didn't happen until today when all of a sudden it is March 2, 2005. Defense Counsel talked to you about the time stamp and how if you forwarded or if you do this or that, but, Judge, there is no evidence in front of this court to say that that happens or doesn't happen. The only evidence that this court has is the time stamp on those tapes, Judge. Um, again they talked about August 2005 as the first time Detective Porter hears about these messages and you heard from Ms. Wink, it was basically she was scared, Judge, he had threatened her and she was scared. They want you to believe that Kelly Benowski came just to fabricate some story. She has no motive for that, Judge. She is here, you can obviously could see her credibility, she was clearly shaken, she is afraid for her friend, and she told you that he admitted to making those messages, Judge. He's done his best to get out of this, to not be held accountable and the State asked that this court doesn't back .. found him accountable and find him guilty.

Judge:    The court is prepared to rule. The court has listened to the tape as both parties are well aware, also considered all of the rest of the evidence that's been presented very, very carefully, and uh, after doing so, the court does find that the State has met it's burden, beyond a reasonable doubt. One of the things that the court wants to note, is that the court has found Ms. Wink's testimony to be very credible in terms of what she did with that tape and when she did it. She didn't try to make up dates about when the calls came in. She said she didn't even pay attention to the date on that tape. That it is what it is. She simply recorded the message from her phone. Ms. Wink, I do, the court does not see, except for the criminal matter why Ms. Wink would have any reason to fabricate a date. That is a

very sophisticated legal argument that this court has not been presented any evidence that Ms. Wink has been engaged in. The court could certainly see why Ms. Wink may have in accessing the credibility of witnesses made up things that the defendant, that attributed to the defendant, that did not occurred, but that's not what happened. The defendant admitted to making those statements here in court. He wasn't sure when he spoke with the detective, but when he testified today, he admitted to making those statements. Ms. Wink testified that she heard them, she forwarded them, she forwarded them to her friend and then also recorded them from her phone, and that the friend then, locked up overnight. There is no question about the content of the messages. The only issue before this court is not whether or not these messages were left on or about March 10 and the court does believe, after listening to all of the evidence, accessing the credibility of the witnesses, that, in fact, those messages were left on March 10, and they were left in the early morning hours as indicated on the time stamp and of the date stamp on those messages and that those messages clearly were intended to terrify, intimidate and threaten and harass, Ms. Wink. They certainly included lewd and profane language, and they threatened to inflict physical harm not only on Ms. Wink, but, on her children. Not just her children, her children and the defendant's children. And that they defendant threatened to kill all of them, and the court finds that that is reprehensible. I also find it that the State has may its burden beyond the reasonable doubt. Is the client prepared for sentencing?

| | |
|---|---|
| Defense: | Yes, judge. |
| Judge: | Come forward. Mr. Ramirez, the court has found you guilty of the crime of domestic violence, the use of the telephone to threaten, intimidate and harass. Accordingly, the Court is entering a judgment of guilty for this offense, and Ms. _____ does Ms. Wink wish to address the court? |
| State: | Judge, she does not wish to address the court. |
| Judge: | I will hear from the State. |
| State: | Thank you, judge. I am going to speak basically on behalf of Ms. Wink. I have been in contact with her numerous times throughout the course of this case, Judge. It is clear to the State that Ms. Wink is very fearful of this defendant, Judge. This has been a non-stop thing. He calls her, he threatens her. It's ridiculous, I mean, you heard the messages, Judge, he threatens to kill not only her, but his own kids. He clearly needs to be held responsible, Judge, and the only way the State thinks that it is going to become clear to him that this kind of behavior is not appropriate and that he is to leave her alone, is to give him six months in jail, Judge. So that's my recommendation. 180 flat, three years probation and that he attends |

|         |         |
|---------|---------|
|         | domestic violence counseling, and that he has absolutely no contact with Ms. Wink. |
| Judge: | Ms. Lindstrom. |
| Defense: | Judge, my client would like to address the Court first. |
| Mr. Ramirez: | Your honor, I'd, first of all to apologize for taking up your time and for your time. Apologize to my wife for this ordeal that we've been going through, um, for the last year and a half. My wife and I had a very rocky marriage for years leading up to this and my behavior is inexcusable and I have already addressed this. I've attended anger management counseling in October of last year in an effort to deal with the anger, the issues that Kelly and I had with one another. I have not spoken a word to Kelly in over, almost a year now. Unless it had something with my kids. Now that our divorce is final, I'd just like to close this chapter and just move forward and raise our children together. I have been held responsible by superior court and family court and do have visitation with my children and unsupervised, but I did lose custody of them. The message has been driven home, loud and clear, and I would like to assure the court and Kelly, you know, that that type of behavior will never exhibit itself again. That's all. |
| Defense: | Judge, can I _____. |
| Judge: | In a moment. Madam prosecutor? |
| State: | Yes, Judge. |
| Judge: | Um, has, does the State have any information that Ms. Wink has had contact from Mr. Ramirez within the last year? |
| State: | Yes, Judge. Ms. Wink will tell you that she has, in fact, had contact with him in the last year. |
| Judge: | And other than for the purposes of arranging visitation and those sorts of things? |
| State: | (whispering) No, it's just about the kids. |
| Judge: | Thank you. Go ahead Ms. Lindstrom. |
| Defense: | To follow up on what has been settled _____, my client did admit that he left those messages, there was some difference in the dates, he has apologized to both his ex-wife and to the Court regarding those messages. He understands that his conduct was completely unacceptable. He has taken the responsibility of going to the classes. I believe there were, weren't there also parenting classes. |

64

| | |
|---|---|
| Mr. Ramirez: | Yes. |
| Ms. Simpson: | And anger management classes. This did occur over, well, about a year and a half ago. As you heard from both sides, the contact between them has been limited to the children, which is a good thing. There is a divorce decree from the Superior Court that just gives him visitation, so the State's request that he never contact Ms. Wink again, that's just not possible. There's got to be some level of communication regarding visitation. However, it should be limited to only visitation and matters regarding the children which, I believe that my client is accepting of. As for jail time, the state is requesting the six-month. It doesn't seem necessary in this case. If he was a continuing threat or danger to Ms. Wink or the children, then perhaps that would be a different story, however, there's been no evidence or any statements made that he is a continuing threat, or that he's done anything since March of 2005 regarding this. In fact, the Superior Court found that it was able to give my client visitation. Surely if there was a continued threat of harm to either Ms. Wink of the children, that would not have been done. If the court is inclined to give any type of jail time we respectfully request that that would be a deferred jail sentence with perhaps some additional requirements, such as any further counseling, programs that need to be necessary, any community service programs that may fulfill his obligations to the court and, you know, anything else regarding that. |
| Judge: | The clients' visit are supervised? |
| Mr. Ramirez: | Unsupervised, I have them ... |
| Judge: | They are unsupervised or supervised. |
| Mr. Ramirez: | They are unsupervised. |
| Judge: | Unsupervised, all right. |
| Mr. Ramirez: | I have every other weekend and one day during the week on a weekday. |
| Judge: | Go ahead Ms. Lindstrom. |
| State: | Judge, that's all. |
| Judge: | I need just a moment to finish reading the dictum in that statement and I take it that both parties have an opportunity to look at that packet of materials. |
| State: | The State has, Judge, yes. |
| Judge: | Ms. Lindstrom? |

| | |
|---|---|
| Defense: | I have not. |
| Judge: | The State, the defendant has not been provided a copy of it. |
| State: | They have, in fact, been provided a copy everything that the State has. Yes. |
| Judge: | Okay. I'll give to you and let you read it. I'm going to go off the record. I will call the ten o'clock docket because it is quite lengthy. |
| Judge: | (inaudible)  The State of Arizona v. Anthony J. Ramirez.  Now the Court has received the dictum and tax statement back from the defendant and anything else? |
| Defense: | Judge, I would just like to add that I have seen all of those documents and that dictum, _____ statement.  When you had said that it made me think maybe there was something new that had been submitted, like the pre-sentence report and Superior Court, so that's why I said that, no I have not seen because I did not know what you were referring to. |
| Judge: | Okay, no, I've not ordered a pre-sentence record in this case.  I think that this court has enough information from the evidence produced at trial to impose an appropriate sentence without the need for pre-sentence report. |
| Defense: | Understood, judge. |
| Judge: | The Court is prepared to inflict sentence at this time?  Mr. Ramirez, as sentence for this offense, the Court is going to defer the imposition of sentence.  I am going to place you on the three years summary probation.  It's unsupervised, the terms and conditions are pretty straight forward.  You shall at all times remain a law abiding citizen, notify the court immediately writing of any change of address or telephone number, do not harm, threaten, or harass Ms. Wink.  You shall have no contact with Ms. Wink whatsoever, except, about the children, for purposes of visitation.  Do you understand that? |
| Mr. Ramirez: | I do. |
| Judge: | Okay, and you shall attend a domestic violence counsel program and successfully complete that program as directed by the substance abuse schooling office.  There is a $85 fee for the substance abuse schooling office services that must also be paid.  The court is also going to order that you serve 180 days in jail, to be suspended, if you successfully complete your counseling and all of the other terms and conditions of probation.  So, at least for the next three years you have 180 days jail hanging over your head.  You certainly have within your control the means and ability |

66

|  |  |
|---|---|
| | to never have to do a day of that jail. But do understand, that if the Court does have to address the issue of jail, the Court will order that the jail be served in flat time no two-for-one. Do you understand, sir? |
| Mr. Ramirez: | Yes, Ma'am. |
| Judge: | I think that this sentence certainly gives you the opportunity to continue making the positive strives that you are making in restoring relationships that you may have but destroyed with your children, and also, just to be a better person and learn ways to conduct yourself in accordance with the requirements of the law. Even if you choose not to be a better person, alright, but also the court believes that this sentence will provide some protection for Ms. Wink, in that the Court has ordered that you not have contact with her, except, to discuss the children regarding visitation issues. Go ahead. |
| Mr. Ramirez: | Your Honor, the sentence of the Superior Court, the Family Court, has given, Kelly needs to consult with me regarding well being care, health care and other matters pertaining to them other than just visitation. So … |
| Judge: | Right. I am not ordering Kelly not to contact you. If she's under a Court Order that says she needs to communicate with you about certain things, then she is still under that Superior Court Order. This, by the Court saying that you not contact her, that does not mean that she is absolved from any responsibility under Superior Court Order, but you are limited to contacting her only regarding the children about visitation. Do you understand that? |
| Mr. Ramirez: | Yes, Ma'am. |
| Judge: | So, if there's other issues, talk to you attorney. You are not prohibited from contacting Ms. Wink through an attorney. You are nor permitted from contacting Ms. Wink with permission of the court. So, if you need to contact her from some reason, and my Orders seem to tell you that you can't, get in touch with your attorney. She knows how to get you back into Court and say, Judge, he has to be able to talk to her about X. |
| Mr. Ramirez: | I was just … |
| Judge: | And I am not unreasonable on that regard. Okay. All right. Is there some other issue that you need to address? |
| Mr. Ramirez: | No. |
| Judge: | Okay. Does that work for you? |
| Mr. Ramirez: | It definitely does. Yes, Ma'am. |

| | |
|---|---|
| Judge: | And now we need to clear this up, because the violation of probation is going to result in you doing 180 days in jail, so if you have questions, let's ask them now. |
| Mr. Ramirez: | Okay, I was just talking about, should I give you an example, you know, she, I went last week with my son to a football game. Contacted her by email, to, only allowed to contact her by email, to take Jack, on her night, to a football game. That's not about visitation, that's about spending time with the kids and stuff like that. Now since it is an e-mail … |
| Judge: | Okay, and and … |
| Mr. Ramirez: | … and stuff like that. |
| Judge: | Okay, the Superior Court Order is email only? |
| State: | Correct, Judge. |
| Judge: | Okay, then let me make the, I am going to change what my Order is on this. |
| State: | Then Judge, just to clarify, it's pure e-mail, it doesn't include text messages or through the phone, it's just strictly e-mail. |
| Judge: | Okay, what I've done is, I have changed that condition of probation to read that you shall have not contact whatsoever with Ms. Wink, except about the children through e-mail only. So that leaves it open for you to have these discussions with her about the care and concerns that you may have about your children. |
| Mr. Ramirez: | Thank you, your Honor. |
| Judge: | All right. Okay. Anything else? |
| Mr. Ramirez: | No. |
| Defense: | No, judge. |
| Judge: | Now sir, you have 14 calendar days from today's date to appeal the judgment and the sentence that this Court has just imposed. Now, the court will be giving you a written notice of your right to appeal before you leave today and I'm certain if you have questions that your attorney can answer those questions for you. Do you have any questions of the Court before you off the record? |
| Mr. Ramirez: | No, your Honor. |
| Judge: | Then we will go off the record. |

**CD 2 – Track 2**

Judge:  State of Arizona v. Anthony J. Ramirez, in December 2005 in Case #1036831 and the court set this matter for a sentence review so that the court could prepare an amended judgment and sentence order for the defendant that included the victims name in this case as is required in domestic violence cases, I neglected to do that when we were here before Mr. Ramirez, so having made the finding that this was a crime of domestic violence is declined by statute I need to prepare the paperwork to reflect that.

Ramirez:  Okay.

Defense:  So nothing else is going to change Judge?

Judge:  Not a thing, not one single thing, alright.

Defense:  So do we just wait for the copy?

Judge:  It's going to take me just a couple of moments to fill out the paperwork and its going to look just like the other one with the exception of the name of the victim will be added which is Kelly Wink, correct?

Defense:  Correct.

Judge:  And that's the only difference other than the I'm going to check a box that says amended.