UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM                        :
                                     :
            Plaintiff   :
                                     :
    vs.                              :   Civil Action No.
                                     :   1:06:CV 00002
DISTRICT OF COLUMBIA,                :   (JDB)
    et al.                           :
                                     :
            Defendants :

                        Washington, D.C.
                        December 18, 2006


Deposition of:

    LIEUTENANT FRANCIS MICHAEL ALLMAN,
called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices
of Katten Muchin Rosenman, LLP, 1025 Thomas
Jefferson Street, N.W., East Lobby, Suite 700,
Washington, D.C., before Lynell C.S. Abbott, a
Notary Public in and for the District of
Columbia, beginning at 9:44 a.m., when were
present on behalf of the respective parties:

Page 34

1  other than the night in question, do you
2  recall ever making the decision somebody
3  needed to be arrested who had been at FUR?
4      A    I can't say for sure. I'm sure it
5  happened. It's not an unusual occurrence for
6  somebody to start a fight and not stop
7  fighting when the police tell them to stop
8  fighting. That's not unusual. But I can't
9  remember any, a specific date or time.
10     Q    When you say not unusual, you mean
11 not unusual at FUR or generally?
12     A    Not unusual anywhere really.
13     Q    Any night club.
14     A    Right.
15     Q    Now, the times that you had been a
16 patron at FUR, did you have to pay a cover to
17 get in?
18     A    No.
19     Q    Because you know the owners.
20 Right?
21     A    Yeah.
22     Q    And they can do that for people

Feder Reporting Company
(202) 863-0000

Page 35

1  that they know.
2      A    They can comp anybody they want
3  to.
4      Q    Do they have a metal detector to
5  get into the night club?
6      A    Mmm-hmm.
7           MS. PHILLIPS:  Objection as to
8  time.
9           THE WITNESS:  To my recollection,
10 they've always had metal detectors.
11          BY MR. CORCORAN:
12     Q    Before and after the incident.
13     A    I think they had them before and
14 after and during. That's my guess.
15     Q    Did you ever have to pass through
16 the metal detector when you went there as a
17 patron?
18     A    Everybody passes through the metal
19 detector.
20     Q    Did you ever bring your service
21 weapon with you into the night club?
22     A    On duty I did. When I was off

Feder Reporting Company
(202) 863-0000

Page 36

1  duty, the couple times that I might have been
2  there off duty, probably not because when they
3  changed that rule, when Ramsey changed the
4  rule that you didn't have to carry your gun at
5  all times in the District of Columbia, I
6  seldom carried my gun off duty.
7      Q    What about handcuffs, do you ever
8  carry them off duty?
9      A    No, I don't.
10     Q    Why not?
11     A    That's something a rookie would
12 do.
13     Q    Why do you say that?
14     A    The possibility that they might
15 run into something and be a hero and have the
16 tools there to do what they need to do. But
17 when you have 27 years on, you don't look to
18 arrest people. You don't look to -- you just
19 want to be left alone.
20     Q    Makes sense to me.
21     A    All right.
22     Q    Now, but let me ask you this

Feder Reporting Company
(202) 863-0000

Page 37

1  question: If you know, does the MPD have any
2  policies about officers off duty and drinking?
3      A    That's what I just alluded to.
4  There was Chief Ramsey who changed -- the rule
5  before Chief Ramsey was that you must carry
6  your service weapons at all times in the
7  District of Columbia. There were several
8  unfortunate shootings back around six or seven
9  years ago.
10          I'm very bad chronologically. So
11 whenever I say a time frame, I'm just as
12 likely to be right as wrong. But Ramsey
13 changed the policy because there were several
14 incidents where there were shootings and
15 alcohol became a question. And they revised
16 the General Order saying that if you
17 anticipate that you're going to drink
18 alcoholic beverages, you do not carry your
19 service weapon.
20     Q    You don't know exactly when that
21 happened, though.
22     A    No. I don't remember.

Feder Reporting Company
(202) 863-0000

Page 38

1  Q  What about the General Order, do
2  you know the number of it?
3  A  No, I don't.
4  Q  Does the District have any other
5  policies -- MPD, I should say -- have any
6  other policies about what off-duty officers
7  should do if they are drinking and they see
8  something that requires police action?
9  A  Well, officers are not allowed to
10 be under the influence of alcoholic beverages
11 whether on or off duty.  That's the policy.
12 Q  They can't at all be?
13 A  You're not allowed to be under the
14 influence of alcoholic beverages at any time.
15 Q  So if an officer is out somewhere
16 in the city in the District and is under the
17 influence, in your experience what's the
18 sensible thing for them to do if they see
19 something going on that would require police
20 involvement?
21     MS. PHILLIPS:  Objection.  You may
22 answer.

Feder Reporting Company
(202) 863-0000

Page 39

1     THE WITNESS:  You say if they've
2  been drinking.  I mean it depends on the level
3  of their intoxication.  If they're at a club
4  sipping on a cocktail and not under the
5  influence and they see an incident that
6  requires police intervention, sure, they can,
7  it would not be inappropriate for them to
8  intervene.
9     BY MR. CORCORAN:
10 Q  But what if they'd had enough to
11 be intoxicated?
12 A  Then they shouldn't do it.
13 Q  What should they do?
14 A  Well, like I said, they shouldn't
15 be intoxicated.
16 Q  But what's the purpose of that
17 policy?  Do you know?  I mean why would the
18 MPD have a policy or why does it have a policy
19 telling police officers they should never be
20 intoxicated off duty?
21 A  There are situations when the
22 issue of alcohol arises and if there's any

Feder Reporting Company
(202) 863-0000

Page 40

1  indication at all they they've been drinking,
2  they can discipline them for it.
3  Q  But do you have any sense of the
4  purpose behind a rule like that?
5     MS. PHILLIPS:  Objection to the
6  extent it calls for speculation.  But you may
7  answer.
8     BY MR. CORCORAN:
9  Q  What does that prevent from
10 happening?
11 A  I think the rule changed, the
12 initial rule changed that you can't carry your
13 gun or when you are required to carry your gun
14 at all times, I think they changed that
15 because of several incidents that occurred
16 around ABC establishments, you know.  I think
17 that's why they changed it, to discourage that
18 kind of event from happening.
19 Q  Well, is it that there's a
20 possibility that the police officer might make
21 an error in judgment and misrespond to a
22 situation?

Feder Reporting Company
(202) 863-0000

Page 41

1     MS. PHILLIPS:  Objection, but you
2  may answer.
3     THE WITNESS:  I'm sure that's one
4  of the rationale for formulating that policy,
5  yes.
6     BY MR. CORCORAN:
7  Q  Do you think that policy
8  personally makes sense to you, based on your
9  experience?
10 A  I think that every situation is
11 different.  And I think that you should be
12 able to analyze an incident and not be
13 encumbered by draconian policies and a lot of
14 Catch-22's where you can never be right.  But
15 the Police Department likes to create
16 situations like that.
17 Q  Now, you've already testified
18 about your relationship with FUR and with
19 Mr. Fiorito and Mr. Romeo.  Are there any
20 other people associated with FUR that you
21 would consider friends?
22 A  They are the only two, really.  I

Feder Reporting Company
(202) 863-0000

Page 66

1  Q  Do you know anything about his
2  divorce?
3      MR. BRUCKHEIM: Objection.
4      THE WITNESS: I only know from
5  when I came to talk to Ms. Phillips a couple
6  weeks ago, they mentioned something about he
7  had some --
8      MS. PHILLIPS: No.
9      BY MR. CORCORAN:
10 Q  I have no interest in knowing what
11 your attorney has told you about the case.
12 A  Yeah, well, I didn't know. I did
13 become aware that something happened with his
14 marriage but I was unaware of it before a
15 couple weeks ago.
16 Q  But other than conversations with
17 counsel, did you have any knowledge about a
18 criminal proceeding involving Ramirez in
19 Arizona?
20 A  No.
21 Q  When you saw him going into the
22 night club, did you know he had handcuffs with

Feder Reporting Company
(202) 863-0000

Page 67

1  him?
2  A  No.
3  Q  Could you see them on his body?
4  A  I don't recall seeing them.
5  Q  You have knowledge about the metal
6  detector at FUR. Right?
7  A  Yeah.
8  Q  Did you have knowledge at the time
9  about the metal detector?
10 A  I knew it was there. But I can
11 tell you that in my retirement I'm authorized
12 to carry a gun anywhere in the country, and I
13 do carry a gun. And I walked through the
14 metal detector and it won't go off. I mean,
15 you know.
16 Q  The metal detector at FUR.
17 A  Because I get there beforehand.
18 Q  Before the club is open.
19 A  They have to turn them on and tune
20 them. So I don't think that they work 100
21 percent of the time.
22 Q  Well, would the metal detector

Feder Reporting Company
(202) 863-0000

Page 68

1  have detected the handcuffs that Officer
2  Ramirez came in with?
3  A  They should have.
4  Q  Do you think it was appropriate
5  for him to bring handcuffs into the night
6  club?
7      MS. PHILLIPS: Objection.
8      MR. BRUCKHEIM: Objection.
9      THE WITNESS: It's not a violation
10 of any rule.
11     BY MR. CORCORAN:
12 Q  Today as a security advisor of the
13 night club, would you want or care if off-duty
14 officers bring handcuffs into the night club?
15     MR. BRUCKHEIM: Objection.
16     THE WITNESS: No, I wouldn't care.
17     BY MR. CORCORAN:
18 Q  Why not?
19 A  Because it's just a matter -- it's
20 just a piece of equipment. Handcuffs don't
21 handcuff people. People handcuff people.
22 Q  But as you have already testified,

Feder Reporting Company
(202) 863-0000

Page 69

1  you know, based on your experience as a police
2  officer, you would see no reason to carry
3  handcuffs with you when you're off duty.
4  Right?
5      MS. PHILLIPS: Objection;
6  misstates his previous testimony. But you may
7  answer.
8      THE WITNESS: There are some guys
9  that carry the whole, everything around. They
10 carry paperwork around with them in case they
11 run into something. I mean it's just a matter
12 of your approach and your level of dedication,
13 I guess. But I certainly wouldn't.
14     BY MR. CORCORAN:
15 Q  You described it, did you not, as
16 something a rookie would do, right?
17 A  Yeah.
18 Q  What does that mean when you say
19 that?
20 A  It means that they have energy and
21 they think that they are really making a
22 difference and catch bad guys and all that

Feder Reporting Company
(202) 863-0000

Page 70

1  kind of stuff, which as we all know can only
2  cause you trouble.
3      Q    In your experience if you are off
4  duty it's better to call the uniformed
5  officers and let them do the police job. Is
6  that fair to say?
7      A    Yep.
8      Q    You see a problem.
9      A    Yep. Unless it's an emergency
10 situation.
11     Q    Now, as of the night in question
12 and you're talking to Ramirez and he's going
13 to the night club -- let me preface my next
14 series of questions by saying, you know,
15 please describe to the extent your
16 recollection permits all the details you can
17 think of so we make sure we get a full record
18 of your testimony and we don't have to call
19 you in again to bug you.
20          As of the night in question, you
21 see Ramirez going into the night club. You
22 weren't particularly good friends with any of

Page 71

1  these off-duty officers. Correct?
2      A    No.
3      Q    You just knew them casually.
4      A    I knew them, worked with them.
5      Q    Were you at that point, though,
6  good friends with John Fiorito?
7      A    Yeah.
8      Q    He's a very good friend by
9  comparison. Right?
10         MS. PHILLIPS: Objection.
11         THE WITNESS: By comparison, yeah.
12         BY MR. CORCORAN:
13     Q    What about Michael Romeo, same
14 thing?
15     A    Less so than John. John is more
16 of a friend than Michael is.
17     Q    When you saw Ramirez going into
18 the night club, did you have at that point any
19 conversations with John Fiorito?
20     A    I might have been talking to
21 Fiorito when I saw Ramirez.
22     Q    So Fiorito came outside the night

Page 72

1  club to see you.
2      A    He was standing outside the night
3  club.
4      Q    He saw you pull up and he came
5  over and you were in uniform. Right?
6      A    Right. I was in a marked police
7  car in uniform.
8      Q    During that night on the night of
9  March 11th or the early morning of the 12th,
10 at any point did you go in the night club?
11     A    I don't think I did.
12     Q    You were always outside the whole
13 time.
14     A    I think I was.
15     Q    Now, after the time that you saw
16 Ramirez going in, when was the next time that
17 you had occasion to do anything relating to
18 the night club?
19     A    When I came back.
20     Q    And why did you come back?
21     A    John called me and said, "Can you
22 come back?" or "Can you swing by the night

Page 73

1  club? We have a problem," or "We have an
2  incident," or we have something. "We have an
3  incident." He asked me to come back and I
4  said okay.
5      Q    Now, what did he tell you besides
6  we have an incident?
7      A    That's all.
8      Q    He didn't say anything specific
9  about it?
10     A    Not on the initial conversation.
11     Q    How did he reach you?
12     A    Cell phone.
13     Q    And he has your cell phone because
14 he's a friend of yours?
15     A    Yeah, and I answer telephones for
16 enemies too, sometimes.
17     Q    Now, had there ever been another
18 occasion before this night when he had called
19 you to come do something in the night club
20 because of a problem?
21     A    I don't remember -- perhaps. It
22 wasn't an unusual thing. You know, he said,