## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EMILE MAZLOUM,**<br>4910 Ravensworth Road<br>Alexandria, Virginia 22003<br><br><br>       **Plaintiff,**<br><br><br>    **v.**<br><br><br>**DISTRICT OF COLUMBIA,**<br>**Serve:** District of Columbia Mayor<br>Office of the Secretary<br>Gladys Herring<br>John A. Wilson Building<br>Suite 419<br>350 Pennsylvania Avenue NW<br>Washington, D.C. 20004<br><br>District of Columbia Attorney General<br>Darlene Fields<br>441 Fourth Street N.W.<br>6th Floor South<br>Washington, D.C. 20001<br><br><br>**ANTHONY RAMIREZ,**<br>Badge No. 2038<br>c/o D.C. Metropolitan Police Department<br>First District Station<br>415 4th St. S.W.<br>Washington, D.C.  20024<br><br><br>**NIGHT AND DAY MANAGEMENT, LLC,**<br>**d/b/a FUR NIGHTCLUB,**<br>33 Patterson Street, N.E.<br>Washington, D.C. 20002<br><br>Registered Agent:<br>Simon M. Osnos<br>2440 Virginia Ave., NW<br>#D-1304 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Civil Action No. 1:06 CV 00002 (JDB)**

**Jury Trial Demanded**

Washington, D.C.  20037                                              )
                                                                     )
**MICHAEL REHMAN, a/k/a "MIKE**                                      )
**ROMEO",**                                                          )
12001 Galena Road                                                    )
Rockville, Maryland  20852                                           )
                                                                     )
                                                                     )
**MICHAEL PERSONS,**                                                 )
2602 Brinkley Road                                                   )
#410                                                                 )
Fort Washington, Maryland 20744                                      )
                                                                     )
                                                                     )
**THADDEUS MODLIN,**                                                 )
c/o D.C. Metropolitan Police Department                              )
First District Station                                               )
415 4th St. S.W.                                                )
Washington, D.C.  20024                                              )
                                                                     )
                                                                     )
**RICHMOND PHILLIPS,**                                               )
c/o D.C. Metropolitan Police Department                              )
First District Station                                               )
415 4th St. S.W.                                                )
Washington, D.C.  20024                                              )
                                                                     )
                                                                     )
**LOUIS SCHNEIDER,**                                                 )
c/o D.C. Metropolitan Police Department                              )
First District Station                                               )
415 4th St. S.W.                                                )
Washington, D.C.  20024                                              )
                                                                     )
                                                                     )
**JOSE ACOSTA,**                                                     )
c/o D.C. Metropolitan Police Department                              )
First District Station                                               )
415 4th St. S.W.                                                )
Washington, D.C.  20024                                              )
                                                                     )
**DAVID SMITH**                                                      )
c/o D.C. Metropolitan Police Department                              )
First District Station                                               )
415 4th St. S.W.                                                )
Washington, D.C.  20024                                              )

```
                                         )
and                                      )
                                         )
JOHN FIORITO,                            )
2701 Calvert Street N.W.                 )
Apt. #702                                )
Washington, D.C. 20008,                  )
                                         )
                    Defendants.          )
                                         )
_____ )
```

## SECOND AMENDED COMPLAINT

Plaintiff Emile Mazloum hereby alleges as follows:

### NATURE OF THE CASE

1.    This is an action arising under the Constitution and the civil rights laws of the United States, 42 U.S.C. §§ 1981 and 1983, the District of Columbia's Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.* (the "DCHRA"), as well as the common law of assault and battery, reckless/negligent spoliation of evidence, aiding and abetting the spoliation of evidence, and liability premised on the doctrine of *respondeat superior.*

2.    As alleged in greater detail below, on the night of March 11-12, 2005 plaintiff Emile Mazloum, a person of Arabian ethnicity, was the victim of a vicious beating perpetrated by off-duty D.C. Metropolitan Police Department officers in conjunction with Michael Persons, a member of the security detail at the FUR Nightclub in Washington, D.C. (the "Nightclub"). Police officers Anthony Ramirez and one or more other officers who happened to be patrons of the Nightclub at the same time Mazloum was in attendance (Officers Thaddeus Modlin, Richmond Phillips, and Louis Schneider), took it upon themselves to arrest and eject Mazloum after interceding in a dispute that was initiated by Mr. Persons.  In so doing, they employed excessive and unnecessary force, while identifying themselves as police officers, thus invoking their official authority as justification for the beating to which Mazloum was subjected.  In the

process, Mazloum's Lebanese national origin, race and perceived religion were also disparaged, as he was the recipient of verbal epithets accusing him of being an "Al Qaeda."

3.      Thereafter, when it became evident that Mazloum had in fact done nothing warranting the assault just delivered against him, the MPD and its officers, with the complicity of uniformed officers Jose Acosta, Joseph Smith, and the Nightclub and several of its employees, acted to cover up the incident—refusing Mazloum's reasonable efforts to file a complaint, destroying critical evidence, and ultimately threatening Mazloum and his friends with retaliation should they endeavor to exercise their rights in connection with this incident.

4.      As a result of the above, Mazloum has suffered serious physical and emotional injuries, has incurred medical expense and loss of earnings, and his constitutional, statutory and common law rights have been violated.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 1367.

6.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because it is between citizens of different states, and because the matter in controversy exceeds the sum of $75,000.

7.      Venue is proper in this Court under 28 U.S.C. § 1391, because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district. For the same reason, the court has personal jurisdiction over the Defendants.

## THE PARTIES

8.    Emile Mazloum is an individual residing at 4910 Ravensworth Road, Annandale, Virginia 22003.  Mazloum is a Lebanese citizen of the Arab race and is a legal permanent resident of the United States.

9.    The District of Columbia is a municipal corporation.  The D.C. Metropolitan Police Department (the "MPD") is a department of the District of Columbia.

10.    Defendant Night and Day Management, LLC ("N & D"), d/b/a Fur Nightclub (hereinafter referred as "Fur Nightclub" or "the Nightclub") is a limited liability company incorporated under the laws of the District of Columbia since 2002.  N & D owns and operates the FUR Nightclub, which is located at 33 Patterson Street, N.E. in the District of Columbia.

11.    Defendants Anthony Ramirez, Thaddeus Modlin, Richmond Phillips, and Louis Schneider are officers of the MPD who were acting in an off-duty capacity at FUR Nightclub in the early morning hours of March 12, 2005.

12.    Defendant Michael Persons was at all relevant times employed as part of club security, or a "bouncer," at Fur Nightclub.

13.    Defendant Officers Jose Acosta and David Smith are officers of the MPD who comprised a squad car team at all times relevant hereto.

14.    Defendants Michael Rehman a/k/a "Mike Romeo" and John Fiorito are, upon information and belief, managers of FUR Nightclub.  At all times relevant hereto, they acted within the scope of their employment.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### *Events at FUR Nightclub on the night of March 11-12, 2005*

15.    On March 11, 2005 at around 10:00 p.m., Plaintiff Mazloum traveled from his home in Northern Virginia to the Nightclub in the District of Columbia.  Mazloum had been a patron at the Nightclub on several prior occasions without incident.  The Nightclub is managed on-site and owned by Defendants Rehman ("Mike Romeo") and John Fiorito.  Defendant Fiorito is a former MPD officer and continues to maintain close relations with individual officers presently employed by the MPD, with whom he interacts through the "Club Zone" police detail provided by MPD to participating nightclubs in D.C.

16.    Accompanying Mazloum to the Nightclub were his friends Marwan Abi-Aad and Imad Alkadi, both of whom worked at the Nightclub for a party promoter known as "Masoud A."  As party promoters, they receive remuneration for encouraging individuals to patronize the Nightclub.  Although neither Alkadi nor Abi-Aad worked as "bouncers" at the Nightclub, they provided some security-like functions when working at the Nightclub, such as (i) monitoring access to the entrance of the Nightclub, and (ii) limiting access to certain portions of the Nightclub, such as a stage area located just off the main dance floor.

17.    On the night of March 11-12, 2005, there were several hundred people in attendance to dance and see a fashion show on a stage in one of the Nightclub's rooms.  Access to the stage was via a staircase that was manned at the top and bottom by individuals such as Messrs. Abi-Aad and Alkadi, who (pursuant to their duties that evening assisting "Masoud A") opened and closed a chain rope to let people access the stairs.  Upon information and belief, on the night in question Mr. Persons was primarily serving his security functions from on the stage.

6

*The Assault by the Off-Duty Police Officers*

18.     During the course of the evening, Mazloum went on and off the stage more than once.

19.     At some point in the early morning hours of March 12th, Mazloum was again on the stage but determined that he wished to depart the stage.  Accordingly, he waited at the top of the stairs while people came up, since there was limited room for him to move.  However, as he began to go down the stairs, one of the uniformed security guards manning the stage (Mr. Persons) grabbed him from behind.  Mazloum had difficulty determining who had grabbed him, and tried to turn around to see.

20.     At that time, Mazloum's friends, Mr. Alkadi and Abi-Aad, were manning the stage as part of their party promoter duties for "Masoud A."  Both saw the Nightclub bouncer (Michael Persons) grab Mazloum.

21.     Mr. Alkadi tried to intercede on Mazloum's behalf and told Defendant Persons to release Mazloum.  In the course of so acting, Mr. Alkadi became entangled between Mazloum and Persons, and all three individuals fell to the floor.

22.     At this point, some combination of Defendants Modlin, Phillips, Schneider and Ramirez – all off-duty MPD officers who were also club patrons present at the Nightclub that evening - interceded in the incident.  All of the officers were seen holding cups and were, upon information and belief, drinking alcoholic beverages at the time they intervened.

23.     None of the off-duty officers made any attempt to determine what had happened before they physically became involved in the incident.  They merely assumed that Mazloum was to blame and/or dangerous, thereby compounding the impropriety of what Mr. Persons had initiated.

24.     After falling to the floor, Mr. Alkadi managed to get up as the off-duty officers began to physically involve themselves in the matter.  Their focus was Mazloum.

25.     Mr. Alkadi attempted to intervene again while this was occurring, but Defendant Ramirez yelled at him "Back off!  We're police officers!" and both Ramirez and one of the other off-duty officers/Defendants present pulled out their police badges and showed them to Mr. Alkadi.  Mr. Alkadi had seen these individuals drinking at the Nightclub that evening before the assault incident.

26.     While Mazloum was inside the Nightclub, he was struck by some or all of the off-duty officers in the course of their involvement, including being struck in the face by Defendant Ramirez specifically.  As a result of these initial assaults, Mazloum began to bleed from his face and nose.  All of his protests that he had done nothing wrong were ignored.

27.     At some point in the course of leading Mazloum out of the Nightclub, Ramirez produced a set of handcuffs and used them to secure at least one of Mazloum's arms behind his back.  At no point during this process did the officers involve attempt to ascertain what had actually happened, to separate Mazloum from Persons, but instead assumed that Mazloum was responsible.

28.     Thereafter, Ramirez, together with Persons and one or more of the other off-duty officer/Defendants present, proceeded to drag Mazloum, who was still handcuffed, out of the room in the Nightclub containing the stage, up the stairs and out of the building onto the street.  Mr. Alkadi could not immediately accompany them, because he first needed to find somebody to cover his security position, which took several minutes.

29.     Once Ramirez, Persons, and one or more of the other off-duty officer/Defendants present had forcibly removed Mazloum from the Nightclub, they dropped him in the street on his

back, causing his head to strike the street. At this point, Mazloum continued to bleed profusely, with blood pouring from his nose. Mazloum attempted to talk to Defendant Ramirez, informing him that he had done nothing wrong , and asking him why they were assaulting him. In response, Ramirez said "Shut up, you fucking Al-Qaeda," and kicked Mazloum. (Ramirez had in fact issued the same slur to Mazloum inside the Nightclub as well). Mazloum informed him in response several times that he was in fact Catholic and not Muslim, despite his Lebanese ethnicity. Again, none of the off-duty officers made any attempt to ascertain whether in fact Mazloum was anything close to a security risk warranting arrest.

30.    When Mr. Alkadi came out of the Nightclub, he witnessed Defendant Ramirez kicking and beating Mazloum further while Mazloum lay on the ground.

31.    As a result of the assault perpetrated by Ramirez, Persons, Modlin, Phillips, and Schneider, Mazloum's shirt was torn and up around his neck and his bare skin was exposed to the cold ground on a night when the temperature was barely above freezing. He remained handcuffed. All requests by Mazloum that he be released, or even permitted to cover himself against the cold, were rejected by calls for him to "shut up." At one point, Mazloum tried to stand up from the ground, but Defendant Ramirez grabbed him by his hair and threw him back, slamming Mazloum's head against the ground.

*The arrival of the uniformed police officers: the cover-up begins.*

32.    Eventually, an MPD squad car appeared on the scene, in response to a telephone call placed by Defendant Fiorito to acting Watch Officer, Lieutenant Frank Allman. Allman and Fiorito were friends, and Fiorito felt comfortable enough in his relationship with Allman to place the call on Allman's private cell phone.

33.     Allman was the first uniformed officer on the scene.  He interviewed Ramirez and Fiorito and quickly ascertained what had happened – that the off-duty officers had acted inappropriately against an innocent civilian.  In order to protect the officers involved as well as his friends at the Nightclub, Allman put into motion a plan to cover up what had occurred.

34.     Two uniformed DC police officers (Defendants Acosta and Smith) got out of the squad car while Mazloum was sitting on the ground.  Acosta and Smith were "filled in" by Allman about what had happened, and also spoke privately to Defendant Ramirez – all before they ever tried to determine what Mazloum had, or had not, done.

35.     Thereafter, one of the uniformed officer/Defendants present gave his handcuffs to Defendant Ramirez, who then cuffed Mazloum with the new set, removing his own.  Ramirez walked off to consult in private with some of the additional MPD officers who had just arrived, as did Defendant Persons.

36.     Mr. Alkadi overheard Defendant Persons saying that his hand was hurt, and he wanted to go to the police station to file a complaint against Mazloum.  The uniformed police officer told him in response that this would be a mistake because of Mazloum's battered appearance, and suggested that a complaint might trigger an investigation of the whole situation.

37.     After talking with Defendants Ramirez and Persons, the uniformed police officers Acosta and Smith came back, picked Mazloum up and took him aside.  One of the uniformed officers started asking him questions and requested some form of identification, which Mazloum supplied.  Mazloum also attempted to explain the entire incident from the start.  The questioning officer observed that Mazloum appeared hurt and was bleeding, but did not ask if Mazloum was ok.

38.    While Mazloum was being questioned, Mr. Alkadi approached the police officer who was talking to Mazloum. The police officer asked him to take Mazloum home or to the hospital. He thereupon removed the handcuffs from Mazloum and returned to Mazloum his identification documents.

39.    In response, Mazloum insisted that he wanted to file a complaint against the individuals who had assaulted him (whom Mazloum did not know at the time to be off-duty police officers). The uniformed officer told Mazloum that if he wanted to file a complaint, he would have to go to the police station, and if he wanted to be taken to the police station, he would have to be arrested.

40.    Acosta and Smith thereafter determined that they had no cause to arrest Mazloum. They reached this determination after speaking with Mazloum and Defendant Persons, whose story about what had occurred inside the Nightclub did not sound credible to them. Based upon the above, and in conjunction with their goal (as directed by Officer Allman) of containing the situation so that Mazloum's allegations against Ramirez and the other off-duty officers did not see the light of day, Acosta and Smith decided the "best" course of action (from the MPD's point of view) was simply to release Mazloum.

41.    When Mazloum indicated that he still wished to make a report, and was prepared to be arrested if that was necessary, the uniformed police officers refused to take him to the station, or to take any complaint from him, and told him simply to go home. When Mazloum then got into the back seat of the police cruiser in order to be arrested and taken to the station, so that he could file his complaint, he was physically removed by Officers Acosta and Smith and placed inside his own car.

42.    Mazloum thereafter went back to his apartment in Virginia with Mr. Alkadi, and subsequently drove himself to the Inova Alexandria Hospital to obtain treatment for his serious injuries.  Mazloum had a broken nose, bloody left eye, scrapes on his face and ears, swelling on the left side of his neck where he was grabbed, and an assortment of cuts, deep bruises and bumps on his head.  His torso and legs were bruised, and his left knee was swollen from where he had been kicked.  His wrists were also cut and abraded from where he had been handcuffed. He has continued to have back pain intermittently since the incident.

43.    Because of the severity of his injuries and his overall appearance, the admitting physicians at the Inova Emergency Room recommended that he immediately contact the police. Accordingly, two officers from the Alexandria Police Department came to the hospital to speak to Mazloum about what had happened.

44.    After the Alexandria police officers interviewed Mazloum, they called the D.C. Metropolitan Police Department to request that D.C. officers come to the hospital to take a report, but no one was sent.  The Alexandria officers recommended to Mazloum that he photograph his injuries and then go to the D.C. Police department later that day to file a report (as he had attempted to do when leaving the Nightclub that morning, before being rebuffed).

### *The Police Report*

45.    On the afternoon of Saturday, March 12, 2005, Mazloum, accompanied by Mr. Alkadi and Mr. Abi-Aad, traveled to the 1st District Department in D.C. to formally file a complaint about the incident.  As they were entering the building, they recognized Defendant Ramirez, who was at this time in uniform, who was leaving the building.  They followed him out and asked him for his name and badge number.  In response, Defendant Ramirez said something

along the lines of "Didn't you get locked up last night?" Informed of Mazloum's intent to file a complaint, Ramirez accompanied them back into the police station.

46.     Once inside, Defendant Ramirez (although he had only moments before acknowledged his involvement in the prior evening's assault incident) began questioning Mazloum about his address, social security number, and other personal information, as well as about the events at the Nightclub. He also had discussions privately with his supervisor, Lt. Pamela Taylor, who later completed the interview of Mazloum.

47.     In the course of the interview at the police station, both Mr. Abi-Aad and Mr. Alkadi along with Mazloum were questioned, and both provided written statements to the police. A photograph was also taken of Mazloum. Eventually, Mazloum was informed where he should fax his detailed statement (which he later did) and all three left the station.

48.     Once Mazloum arrived at the station, he set into motion a course of events which occurred without his knowledge. Ramirez placed several frantic cell phone calls to Modlin and Fiorito to discuss what had happened (and, more importantly, what they could do to evade getting into further trouble.). Officer Allman was also notified that Mazloum had filed a complaint. Calls were additionally placed, by both Allman and Ramirez, to Acosta, to find out what had happened. Ramirez had been hopeful that Acosta and Smith would have arrested Mazloum, and was disappointed this had not occurred.

49.     Since the time Mazloum attempted to initiate his complaint with the MPD about the conduct of Defendant Ramirez on March 12, 2005, no criminal or administrative proceedings been commenced against any of the officers. In 2006, several months after the filing of the original complaint in this action, and after receiving a declination to prosecute from the U.S. Attorney for the District of Columbia, the MPD conducted its own investigation of the incident

and decided not to proceed with any disciplinary action against any of the individual officers involved.

> ### *Efforts to Thwart Mazloum's Ability to Secure Justice for the Wrongs Done to Him; the Destruction of Critical Evidence.*

50.     As noted above, after Mazloum, Mr. Abi-Aad and Mr. Alkadi left the police station, after filing the complaint against Defendant Ramirez, Ramirez notified Acosta, Allman, Modlin, and Fiorito about what had transpired.

51.     Later that evening, Mr. Alkadi was contacted by his employer, "Masoud A.", and asked questions about what happened the night before. "Masoud A." was upset by the fact that he had not been consulted before Mazloum and his friends filed the police complaint. "Masoud A." told Mr. Alkadi that "John" (Defendant Fiorito) and "Mike Romeo" (Defendant Rehman) were very upset, and wanted to discuss the incident with Mr. Alkadi that night at the Nightclub.

52.     Accordingly, Mr. Alkadi returned to the Nightclub to meet with Defendants Rehman and Fiorito. Upon his arrival, he was escorted into an office that also appeared to double as a security center, since it featured a number of video monitors which were displaying live feed from cameras positioned throughout the Nightclub as well as outside of the building. Also present were David McLeod, who Mr. Alkadi understood to be the head of security, as well as Defendant Persons.

53.     Defendant Fiorito appeared to be very angry throughout the meeting and attempted to downplay the assault Mazloum had suffered. At one point, he specifically warned Mr. Alkadi to "tell your friend [Mazloum] he is going to get burned if he continues with making a claim or filing a lawsuit." Fiorito went on to say that Mazloum had initiated the altercation by punching officer Ramirez. Mr. Alkadi responded that Mazloum had been handcuffed and hence could not possibly have punched officer Ramirez or anyone else, adding that the security camera

videotapes of the incident from the night before (presumably taken with the video monitoring system contained in the Nightclub office) would reveal that Mazloum had been beaten while he was incapacitated by the handcuffs. Fiorito responded by saying that "everything is gone" as far as the film from the security cameras was concerned, and reiterated his threat to Mr. Alkadi that Mazloum would be "burned" if he pursued the investigation further.

54.     All actions on the part of Defendants Ramirez, Modlin, Phillips, Schneider, Acosta and Smith described herein were within the scope of their employment, or in the alternative, were ratified by their employer, Defendant District of Columbia.

55.     All actions on the part of Defendants Persons, Rehman, and Fiorito described herein were within the scope of their employment, or in the alternative, were ratified by their employer, Night and Day Management, LLC.

56.     The actions of all of the individual Defendants described in this complaint were willful, wanton and in reckless disregard of plaintiff's civil, statutory and constitutional rights, thereby entitling plaintiff to an award of punitive damages.


## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983
### (as against Defendants Ramirez, Modlin, Phillips and Schneider)

57.     The allegations of paragraphs 1 - 56 are incorporated herein by reference.

58.     The U.S. Constitution secures to Plaintiff Mazloum the right to due process and equal protection, and to be free of wrongful arrest or the application of unauthorized, unwarranted, and excessive force by a police officer, pursuant to the Fourth Amendment. These rights were all violated, as set forth above.

59.    Defendants Ramirez, Modlin, Phillips and Schneider of the MPD improperly and without probable cause or other justification wrongfully arrested, detained, and severely assaulted Mazloum on March 12, 2005 at the Nightclub.  This assault was characterized by repeated blows, delivered by kicks and punches, to Mazloum's body.  In addition, Mazloum was handcuffed and forcibly removed from the Nightclub, then forced to remain outside the Nightclub for an extended period of time without a shirt in frigid temperatures before being released.

60.    Defendants Ramirez, Modlin, Phillips and Schneider invoked the authority of the MPD, expressly identifying themselves as MPD officers to justify their conduct, displaying their badges and using their MPD handcuffs to detain Mazloum.

61.    The conduct of Defendants Ramirez, Modlin, Phillips and Schneider was not privileged or justified, and was not objectively reasonable.  By interjecting themselves and immediately arresting, then assaulting and beating, Mazloum, they took no time to ascertain the circumstances in order to determine if such force was called for.  In fact, as the subsequent conduct of the uniformed MPD officers (who released Mazloum) indicated, the situation was not even close to dangerous for anyone except Mazloum.  Accordingly, Defendants Ramirez, Modlin, Phillips and Schneider,, in using excessive and unnecessary force, could not have reasonably believed that their conduct comported with constitutional requirements .

62.    In light of the above, Defendants Ramirez, Modlin, Phillips and Schneider acted under color of law in depriving Mazloum of his constitutional right to be free from wrongful arrest and from excessive and unwarranted police force.

63.    As a result of the above-stated facts, Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, incurred medical expense and

loss of earnings, and the deprivation of his statutory and constitutional rights, specifically including his rights under the Fourth Amendment.

## COUNT II – Assault and Battery
### (as against Defendants Ramirez, Persons, Modlin, Phillips, Schneider, District of Columbia, and FUR Nightclub)

64.     The allegations of paragraphs 1-63 are incorporated herein by reference.

65.     Defendants Ramirez, Persons, Modlin, Phillips and Schneider unlawfully and intentionally had the intent to commit an act of assault and battery against Mazloum on March 11-12, 2005 at the Nightclub.

66.     Defendants Ramirez, Persons, Modlin, Phillips and Schneider unlawfully and intentionally struck, beat and kicked Mazloum severely on March 11-12, 2005 at the Nightclub, causing him severe bodily injury.

67.     Defendants Ramirez, Persons, Modlin, Phillips and Schneider were aware and had knowledge of the fact that serious bodily harm was a likely result of their beating of Mazloum.

68.     The conduct of Ramirez, Persons, Modlin, Phillips and Schneider in striking, beating or kicking Mazloum was not justified or privileged.  Mazloum engaged in no conduct that would justify assaulting him.  Defendants Ramirez, Modlin, Phillips and Schneider, without provocation, interjected themselves into Persons's efforts to remove Mazloum from the internal stage at the Nightclub.  They used excessive and unnecessary force in interjecting themselves into the situation and subsequently beating and kicking Mazloum after he had been hand-cuffed. This is confirmed by the fact that the subsequently arriving MPD uniformed officers promptly released Mazloum after their on-site investigation revealed no basis for detaining or arresting him.

69.     The beating of Mazloum was unauthorized and unwanted, and not otherwise consented to by Mazloum.

70.     Defendants Ramirez, Modlin, Phillips and Schneider are also specifically liable under D.C. Code § 5-123.02, which provides that the use by an officer of unnecessary and wanton severity in arresting or imprisoning a person constitutes assault and battery as a matter of law.

71.     Defendants District of Columbia and FUR Nightclub, respectively, are responsible under the doctrines of *respondeat superior* and ratification for the tortious conduct of their respective employees (Defendants Ramirez, Modlin, Phillips, and Schneider for the District, and Persons for FUR Nightclub).  Defendants Ramirez, Modlin, Phillips and Schneider held themselves out to be police officers in interjecting themselves into the situation, and in fact referenced their status as police officers as justification therefore, making their conduct also within the scope of their employment.  Defendant Persons held himself out and was acting as security for the FUR Nightclub when he beat Mazloum.

72.     As a result of the above-stated facts, Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, and the deprivation of his common law rights.


## COUNT III – RACIAL DISCRIMINATION (42 U.S.C. § 1981)
### (as against Defendants District of Columbia, Ramirez, Modlin, Philips and Schneider)

73.     The allegations of paragraphs 1-72 are incorporated herein by reference.

74.     Plaintiff Emile Mazloum, Lebanese, is a person of Arab ethnicity , and therefore a member of a protected class.

75.     Defendants discriminated against plaintiff on account of his ethnic identity. Plaintiff was arrested, beaten and ejected from the Nightclub in part or in whole because of his ethnic heritage.  White patrons of the Nightclub are not treated in a similar fashion.

76.     As a result of the above-stated facts, Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, and has incurred medical expense and loss of earnings, along with the deprivation of his constitutional and statutory rights.

### COUNT IV – D.C. Human Rights Act (D.C. Code §§ 2-1401.01 *et seq.*)
### (as against all Defendants )

77.     The allegations of paragraphs 1-76 are incorporated herein by reference.

78.     The DCHRA makes it unlawful to deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation wholly or partially for a discriminatory reason based on actual or perceived race, religion, national origin, or personal appearance.  D.C. Code § 2-1402.31.

79.     The DCHRA also prohibits any interference, coercion, or retaliation in connection with a person's (i) exercise or enjoyment of any DCHRA right, or (ii) effort to oppose any practice made unlawful under the DCHRA.  D.C. Code § 2-1402.61.

80.     In singling out Mazloum for removal from the Nightclub, and then assaulting him without real danger or provocation, Defendants Ramirez, Modlin, Phillips and Schneider clearly discriminated against him on the basis of his race, appearance, perceived religion and national origin.  Mazloum, who is Middle-Eastern in appearance, was presumed to be a dangerous Arab Muslim (an "Al Qaeda") and for this reason was forcibly ejected from the Nightclub and beaten by Defendants Ramirez,  Modlin, Phillips and Schneider..  Indeed, these individual Defendants'

pretext for attacking Mazloum was revealed when, outside of the Nightclub, Defendant Ramirez angrily called Mazloum "a fucking Al-Qaeda."

81.    In addition, Defendants Ramirez, Fiorito and Rehman retaliated against Mazloum once they learned of his intent to initiate a formal police investigation into the propriety of Defendant Ramirez's conduct.    These Defendants became aware of Mazloum's efforts to vindicate his rights (i) based upon Mazloum's initial unsuccessful efforts on the night of March 11-12 to file a formal police report with Defendants Acosta and Smith, and (ii) after Defendant Ramirez encountered Mazloum on March 12, 2005 at the police precinct station where Mazloum was filing his complaint, and subsequently informed Defendant Fiorito by cell phone call that Mazloum had visited the station to complain.

82.    Mazloum's efforts to file a complaint and thus initiate an investigation through the MPD's complaint process were protected activity as a matter of D.C. law.

83.    Mazloum both directly and indirectly suffered adverse action after he was finally able to initiate his complaint of police misconduct.    His friend and witness, Mr. Alkadi, was warned not to proceed.    In addition, Defendants Rehman and Fiorito, upon information and belief, knew or had reason to believe and did believe that Mazloum had filed a complaint alleging that he had been unjustifiably beaten because of his ethnicity.    Accordingly, they took the extraordinary step of destroying the crucial videotaped evidence of the beating Mazloum experienced in order to protect Fur Nightclub and the individual Defendants from any complaint or legal action which Mazloum might initiate.

84.    As a result of the above-stated facts, Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, and has incurred medical expense and loss of earnings, along with the deprivation of his statutory rights.

## COUNT V – Reckless/Negligent Spoliation of Evidence
### (as against Defendants Rehman, the Nightclub, and Fiorito )

85.    The allegations of paragraphs 1-84 are incorporated herein by reference.

86.    Defendants Rehman and Fiorito were aware as of March 12, 2005 that Mazloum had a potential civil claim against, at a minimum, the Nightclub, Persons, Modlin, Phillips, Schneider and Ramirez based upon the beating of Mazloum that occurred at the Nightclub on March 11-12, 2005.

87.    Defendants Rehman and Fiorito had a legal duty to preserve any evidence relevant to Mazloum's potential claim.

88.    Upon information and belief, Defendants Rehman and Fiorito oversaw, authorized, and/or participated in the destruction of videotape evidence from security camera monitors mounted inside and outside the Nightclub that would have shown Mazloum being kicked and beaten.

89.    Because of the destruction of the videotaped evidence, Mazloum's ability to prove the allegations of his civil claim has been significantly impaired, as the videotape would have constituted incontrovertible proof of what had occurred both within and outside of the Nightclub. As a result of the destruction of such evidence, Mazloum can only rely on the testimony of eye witnesses and can expect opposing witnesses to present contrary testimony.  There is thus a proximate relationship between the destruction of this videotaped evidence and the significant impairment of Mazloum's ability to prove his case.

90.    Absent the destruction of the evidence, there would have been a significantly greater significant possibility of success on Mazloum's claims, as he could have more easily corroborated his own testimony and that of his witnesses with incontrovertible documentary proof of what occurred at the Nightclub.

91.     The Nightclub is liable for the tortious conduct of its agents Rehman and Fiorito under a theory of *respondeat superior.*

92.     As a result of the above-stated facts, Mazloum has suffered extensive damages, including but not limited to the diminution of his ability to prove his claims.

## COUNT VI – Aiding and Abetting Spoliation of Evidence
### (as against Defendant Ramirez)

93.     The allegations of paragraphs 1-92 are incorporated herein by reference.

94.     Defendants Rehman, Fiorito, Ramirez, and the MPD were aware as of March 12, 2005 that Mazloum had a potential civil claim against the Nightclub, as well as a number of other individuals, based upon the beating of Mazloum that occurred at the Nightclub on March 11-12, 2005. Accordingly, they improperly and illegally destroyed videotape evidence from security camera monitors stationed throughout the Nightclub that would have shown Mazloum being kicked and beaten.

95.     Defendant Ramirez assisted in the destruction of the videotaped evidence by alerting Defendants Rehman and Fiorito in advance that Mazloum had filed a complaint based upon the illegal beating he had received from Ramirez on March 11, 2005. This information "tipped off" Defendants Rehman and Fiorito to the need to destroy the evidence in question. Defendant Ramirez knowingly informed Defendants Rehman, FUR Nightclub, and Fiorito of Mazloum's complaint for the purpose of assisting in the destruction of this evidence, and knew, or should have known, that the destruction was illegal.

96.     Accordingly, Defendant Ramirez knowingly and substantially assisted the destruction of the videotaped evidence.

97.    As a result of the above stated facts, Mazloum has suffered extensive damages, including but not limited to the diminution of his ability to prove his claims.

**WHEREFORE**, Plaintiff Emile Mazloum prays for judgment as follows:

a.   An award of compensatory damages against all Defendants commensurate with the damages and injuries Mazloum has suffered as a result of the Defendants' collective and separate misconduct;

b.   An award of punitive damages against all Defendants other than the District of Columbia to punish them and deter them and others from engaging in similar behavior;

c.   An award of Plaintiff's reasonable attorneys' fees and costs of suit incurred in this action, to the extent available under applicable law;

d.   An order directing the District of Columbia to proceed expeditiously with disciplinary action against Defendants Ramirez, Modlin, Phillips, Schneider, Acosta, and Smith;

e.   An order directing the District of Columbia to require the Metropolitan Police Department to enforce all now-existing rules and regulations relating to the use of force; and

f.   For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff makes demand for a trial by jury.

Respectfully submitted;

Dated:  May 18, 2006

/s/_____
Brian H. Corcoran (Bar No. 456976)
Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW
Suite 700 East Lobby
Washington, D.C.  20007
Ph: (202) 625-3500
Fax: (202) 298-7570
Brian.Corcoran@kattenlaw.com

Susan Huhta (Bar No.453478 )
Warren R. Kaplan (Bar No. 034470)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, D.C.  20036
Ph: (202) 319-1000
Fax: (202) 319-1010
Sue_Huhta@washlaw.org
Warren_Kaplan@washlaw.org

Attorneys for Plaintiff
Emile Mazloum