# Exhibit 3

```
00001
 1
 1        UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF COLUMBIA
 2
 3
 3   EMILE MAZLOUM            :
 4                            :
 4          Plaintiff :
 5                            :
 5     vs.          : Civil Action No.
 6                  : 1:06:CV 00002
 6                  : (JDB)
 7   DISTRICT OF COLUMBIA,    :
 7    et al.                  :
 8                            :
 8          Defendants :
 9
 9           Washington, D.C.
10           Tuesday, October 3, 2006
10
11   Deposition of:
11
12          THADDEUS M. MODLIN, JR.
13   called for oral examination by counsel for
14   Plaintiff, pursuant to notice, at the offices
15   of Katten Muchin Rosenman, LLP, 1025 Thomas
16   Jefferson Street, N.W., East Lobby, Suite 700,
17   Washington, D.C. 20007-5201, before Renee A.
18   Feder, CSR, a Notary Public in and for the
19   District of Columbia, beginning at 9:40 a.m.,
20   when were present on behalf of the respective
21   parties:
22
```

00096
1         (Discussion off the record.)
2         BY MR. CORCORAN
3     Q.   So you didn't see any reason to
4  get involved in their discussion?
5     A.   No, not at that time.
6     Q.   And there was no physical
7  involvement in their discussion, they were
8  just --
9     A.   It was, like I said, a lot of hand
10 gestures and things at that time. So I didn't
11 deem it necessary for me to interlope into
12 their conversation.
13    Q.   If you recall, how much time
14 passed from when you first saw them having a
15 discussion and then when you saw the
16 altercation at issue in this lawsuit?
17    A.   Roughly, a minute, two minutes.
18    Q.   What did you first see?
19    A.   Well, actually, at first I didn't
20 see anything. I felt a female, like, fall
21 into me and almost fall off of the stage. And
22 at that time I looked over and I saw both of

```
00097
 1  them involved in a physical altercation. And
 2  then two more individuals jumped on to the
 3  bouncer. And at that time I saw him fall
 4  backwards. And then that is when the feet and
 5  hands started coming into play and it became a
 6  felony. So I had no choice but to get
 7  involved. And I tapped Officer Phillips and
 8  told him to hold my drink. He looked at me as
 9  if I was silly because he is police also. So
10  we both sat our drinks down and went over and
11  attempted to break the fight up and grab the
12  most aggressive person at that time.
13       Q.   Why did he look at you silly?
14  What do you mean?
15       A.   Because, I mean, he is a police
16  officer. He is not going to sit there and
17  watch me try to break up a fight without him
18  getting involved also.
19       Q.   He was sort of thinking you are
20  being dumb, let me help you?
21       A.   Yes. Yes.
22       Q.   Now, you said you saw the bouncer
```

```
00101
 1     Q.   You did?
 2     A.   Yes.
 3     Q.   Were there any other people who
 4  saw this that were standing around you?
 5     A.   I don't know. I didn't go around
 6  asking them.
 7     Q.   What did you do when you first
 8  intervened?
 9     A.   I went towards the first, the most
10  aggressive person which happened to be the
11  plaintiff. And I just grabbed him by the arm
12  and Officer Phillips grabbed his other arm.
13  And at the same time Officer Phillips pulled
14  his badge from around his neck and told him to
15  calm down. And that is when the other two
16  guys like melted into the crowd that were
17  still up on the stage.
18     Q.   How did you know the plaintiff was
19  the most aggressive individual?
20     A.   Because he was the one that I
21  initially saw get into the altercation with,
22  the verbal altercation, what I assume was a
```

```
00102
 1   verbal altercation with the bouncer.
 2       Q.   So, you assumed from having seen
 3   him before that he was likely the problem?
 4       A.   No. Including, included within
 5   that, when the initial fight occurred, when
 6   they first started throwing punches before the
 7   other two people jumped into it, they were the
 8   ones fighting and the bouncer was on the
 9   ground. So I grabbed the person that was on
10   top.
11       Q.   The other two persons had fallen
12   to the ground?
13       A.   No, the bouncer, he was on the
14   ground. So I grabbed the guy who was on top
15   of the bouncer which happened to be the
16   plaintiff.
17       Q.   How was he on top? Had he fallen
18   onto him?
19       A.   No, he hadn't fallen onto him. He
20   was standing on top of him throwing punches
21   and kicking.
22       Q.   He was standing directly over him?
```

```
00110
 1   and working with him over the past couple of
 2   years, I don't think that.
 3       Q.   Now, going back to what we were
 4   talking about before the incident on the
 5   stage.
 6       A.   Okay.
 7       Q.   The bouncer, when you decided to
 8   intervene, did you think the bouncer looked
 9   like he needed your help?
10       A.   I decided to intervene because at
11   the point where kicking came into the equation
12   it then became an aggravated assault and I had
13   no choice but to intervene.
14       Q.   Who was kicking the bouncer?
15       A.   The plaintiff.
16       Q.   Anyone else?
17       A.   And also, I guess, the other two
18   guys. I saw lots of feet flying. But I
19   specifically remember seeing the plaintiff
20   kick him.
21       Q.   You remember the other two as well
22   kicking the bouncer?
```

```
00126
 1  He would have had to be arrested, be it by us
 2  or, as our general orders say, by on duty
 3  officers.
 4       Q.   Is there a general order that
 5  specifically says that if you make physical
 6  contact with a citizen because you think they
 7  have done something wrong they automatically
 8  must be arrested?
 9       A.   There is no general order that
10  says that. Me, myself, when I see an assault
11  and I have one of the primary aggressors, they
12  are going to get arrested.
13       Q.   That is your view?
14       A.   Yes.
15       Q.   So you waved the other bouncers
16  off?
17       A.   Yes.
18       Q.   And the other bouncers, did you
19  recognize any of them?
20       A.   No, sir.
21       Q.   You didn't know any of them?
22       A.   I wasn't paying attention to
```

```
00127
 1   faces. I was trying to make it through the
 2   crowd. It was a large crowd that night.
 3        Q.   One more question about the
 4   bouncer you said was Michael, the guy who was
 5   getting allegedly assaulted. Had you seen him
 6   before that night?
 7        A.   No.
 8        Q.   That was the first time you ever
 9   saw him?
10        A.   That was the first time he ever
11   brought attention to himself, that brought him
12   to my attention.
13        Q.   You are walking the plaintiff out.
14   And what happens next?
15        A.   As I said before, when we were
16   walking him out people were trying to get to
17   him. The bouncers, when they saw we weren't
18   going to relinquish control of him, they
19   started to spread the crowd apart. When we
20   got to the steps that led from the main dance
21   floor onto the walkway that leads out of the
22   nightclub, Mr. Mazloum began to become
```

```
00130
 1  get involved?
 2      A.  As I had him pinned on the steps I
 3  don't even remember how it went, Tony saw we
 4  were leading him out of the club, it came to
 5  his attention, but as he ran over, Mr. Mazloum
 6  was still trying to get up and still throwing
 7  punches backwards and things of that sort.
 8  And that is when Tony came up and produced a
 9  pair of handcuffs.  And, actually, I was happy
10  that he did because this guy was extremely
11  violent.
12      Q.  That is Officer Ramirez?
13      A.  Yes.
14      Q.  What about Officer Schneider, did
15  he come over at this point?
16      A.  I still didn't see Schneider at
17  that point.
18      Q.  Do you recall how big the
19  plaintiff was?
20      A.  I want to say maybe 5' 11".  Maybe
21  175, 180.
22      Q.  And you are taller than 5' 11"?
```

```
00140
 1   the nightclub that you didn't feel like he was
 2   going so far as trying to assault you or one
 3   of your fellow officers. Correct?
 4       A.   I mean by the time we got to the
 5   steps I totally realized this guy was indeed
 6   inebriated, to say the least. When we got to
 7   the steps and he became violent and combative,
 8   when he fell down on the steps, I just pinned
 9   him down.
10       Q.   And you had him then?
11       A.   I felt like I had him. We still
12   couldn't get his hands, once Ramirez got
13   there, to put the handcuffs on him.
14       Q.   So your are testifying that he was
15   handcuffed immediately before being taken up
16   the steps and out of the nightclub. Correct?
17       A.   No, I am testifying that once,
18   once he fell forward on the steps and once I
19   pinned him down, Officer Ramirez came and
20   produced a pair of handcuffs. We got one of
21   the cuffs on his right arm, at which time when
22   we were trying to get the cuff on his left
```

00141
1  arm, all the while leaning up against the
2  steps he was still fighting us. So we all --
3  one person, and Phillips, myself, Ramirez, and
4  Schneider, by the time had come over, we all
5  picked him up at four points and sat him on
6  the dance floor and then had to struggle to
7  get the last cuff on. After we got the last
8  cuff on, we picked him up and walked up the
9  steps and walked out of the club.
10     Q.  That is unusual in your experience
11  to handcuff someone in a nightclub. Correct?
12     A.  Nothing is unusual when he comes
13  to being a police officer.
14     Q.  Did you ever have anything like
15  that happen before?
16     A.  While on duty or off duty?
17     Q.  While you are off duty?
18     A.  While I am off duty I never had to
19  intercede with anything while I was off duty
20  in a nightclub setting.
21     Q.  Had you ever heard of anybody, any
22  of your fellow officers interceding in an

```
00142
 1  incident like this where it led to handcuffing
 2  an individual and taking him out?
 3          MR. BRUCKHEIM: Objection.
 4          You can answer.
 5          MS. PHILLIPS: Objection. Calls
 6  for speculation.
 7          THE WITNESS: Not that I remember.
 8          BY MR. CORCORAN
 9      Q.   And he hadn't produced a weapon.
10  Right?
11      A.   No.
12      Q.   Not at that point. He hadn't done
13  anything truly dangerous. Right?
14      A.   Well, actually, he had done
15  something truly dangerous, aggravated assault,
16  or, if you want to call it ADW shou (phonetic)
17  foot which is kicking someone with a cloven
18  foot.
19      Q.   You had seen him attack the
20  bouncer. But that was all, right?
21      A.   Yes. Yes.
22      Q.   This is the only incident in which
```

```
00238
 1  slur.  If we use that word amongst ourselves,
 2  I don't consider that a racial slur.
 3      Q.  Is Officer Phillips an African
 4  American?
 5      A.  Yes, he is.
 6      Q.  If he used the N word, for
 7  example, you wouldn't consider it a slur?
 8      A.  No.
 9      Q.  Did you ever hear him slur people
10  of other races?
11      A.  No, sir.
12      Q.  How about Officer Schneider?
13      A.  No, sir.
14      Q.  He never used the N word to you?
15      A.  No, sir.
16      Q.  And you never heard him say it to
17  anyone else?
18      A.  No.
19      Q.  Did you ever hear anyone use the
20  term Al-Qaeda to somebody in the Middle East?
21      A.  No.  And, honestly, I wouldn't
22  have stood for that anyway.  I am Muslim, so
```

```
00239
 1   to me that is totally disrespectful.  Post
 2   9/11 the way it is right now it is hard enough
 3   being Muslim, but being Arab descent or Middle
 4   Eastern descent it is even worse.
 5       Q.   So you agree then that if a police
 6   officer were to use the term Al-Qaeda to a
 7   Muslim person in the course of detaining them,
 8   that that would be inappropriate?
 9       A.   I would think it is totally
10   inappropriate and I think it is egregiously
11   wrong to do even it.
12       Q.   And you never heard any of the
13   officers you were with use that term to the
14   plaintiff in this case?
15       A.   No, sir, I didn't.
16       Q.   But you also admitted you were not
17   outside for a good portion of the night.
18   Correct?
19       A.   That is correct.
20       Q.   You don't know what was said
21   during that period?
22       A.   As to anything that was said
```