```
00001
 1
 1      UNITED STATES DISTRICT COURT
 2      FOR THE DISTRICT OF COLUMBIA
 2
 3
 3  EMILE MAZLOUM            :
 4                           :
 4         Plaintiff  :
 5                           :
 5    vs.            : Civil Action No.
 6                   : 1:06:CV 00002
 6                   : (JDB)
 7  DISTRICT OF COLUMBIA,    :
 7   et al.                  :
 8                           :
 8         Defendants :
 9
 9             Washington, D.C.
10             Wednesday, November 29, 2006
10
11  Deposition of:
11
12          OFFICER JOSE ACOSTA
13  called for oral examination by counsel for
14  Plaintiff, pursuant to notice, at the offices
15  of Katten Muchin Rosenman, LLP, 1025 Thomas
16  Jefferson Street, N.W., East Lobby, Suite 700,
17  Washington, D.C. 20007-5201, before Renee A.
18  Feder, CSR, a Notary Public in and for the
19  District of Columbia, beginning at 10:32 a.m.,
20  when were present on behalf of the respective
21  parties:
22
```

```
00061
 1      Q.   That is the level of trouble which
 2   you have gotten into, which is not very much.
 3   Is that fair to say?
 4      A.   He got a 750, I think.
 5      Q.   What is a 750?
 6      A.   It is one level down from an
 7   official reprimand.  It is a sheet of paper.
 8      Q.   Do you know if he has ever been
 9   arrested?
10      A.   He never told me he has.
11      Q.   You have no other knowledge of it?
12      A.   I have no knowledge of it.
13      Q.   Now, the night in question,
14   March 11, 2005, when did you first, when do
15   you first recall being asked to come to the
16   scene?
17      A.   We were never asked to come to the
18   scene.
19      Q.   You were dispatched to the scene.
20   Is that fair to say?
21      A.   No.  We heard a call for
22   assistance come out.  We went.
```

00062
1    Q.   Why did you choose to go?
2    A.   Call for assistance.  It is just
3  our beat.  We want to help out.
4    Q.   Do you recall what time the call
5  for assistance came to you over your radio?
6    A.   I don't know the exact time.  It
7  was after 1:00.
8    Q.   Do you recall who the call came
9  from?
10   A.   It came from Cruiser 100,
11 Lieutenant Allman.
12   Q.   Did they specifically identify FUR
13 as the place you were going?
14   A.   I think he gave the location which
15 is the only thing on that block at that time,
16 so it is FUR.
17   Q.   What time did you arrive on the
18 scene?
19   A.   A couple of minutes later.  It
20 didn't take us long to get there.
21   Q.   A little bit after 1:00 o'clock?
22   A.   Yes.

```
00063
 1      Q.   I want to ask you more question.
 2   As we go through this, please give as much
 3   detail as you can so we make sure we
 4   understand and get everything on the record
 5   everything you know about the incident.
 6           What first happened when you
 7   arrived on the scene?  What did you do?
 8      A.   We walked up to Lieutenant Allman
 9   and asked him what was going on.
10      Q.   You saw Lieutenant Allman at the
11   scene?
12      A.   Yes.
13      Q.   Who is Lieutenant Allman?
14      A.   He is a lieutenant on MPD.  He was
15   acting watch commander that night.
16      Q.   And he was there already?
17      A.   He was there already.
18      Q.   Did you know he was going to be
19   there before you pulled up?
20      A.   I knew because he said he needed
21   assistance and he was there.
22      Q.   So the call came from him?
```

```
00064
 1      A.   He came over the air and asked for
 2   assistance, yes.
 3      Q.   Why would it be the case that he
 4   would be there?
 5      A.   He is the watch commander.  It is
 6   his district, his particular PSA.  I don't
 7   know why he would be there.  He can be
 8   anywhere.  He could be doing his duties.
 9      Q.   He held rank over you.  Correct?
10      A.   Yes.
11      Q.   And over pretty much everybody
12   that was on duty that night.  Is that fair to
13   say?
14      A.   Yes.
15      Q.   Is it normal for a lieutenant like
16   Lieutenant Allman to go on to the scene of an
17   incident?
18      A.   Yes, he has to.
19      Q.   He is required to?
20      A.   He is required to.
21      Q.   So any time there is an incident
22   in any nightclub he would likely have to go to
```

```
00065
 1   the scene?
 2       A.   Yes.
 3       Q.   Now, who else did you see outside
 4   as you were approaching Lieutenant Allman
 5   besides him?  Did you recognize anybody?
 6       A.   I saw a couple of the other
 7   officers.  I saw Officer Abbington, Officer
 8   Green.  There were a couple of people there.
 9   There were a couple of officers there.
10   Immediately that is who we saw when we got on
11   the scene.
12       Q.   Did you see any of the off duty
13   officers at the time who are named in this
14   lawsuit?
15       A.   Not immediately.
16       Q.   So when you got out of the car at
17   first you didn't see any of them?
18       A.   No.
19       Q.   Did you see the plaintiff, Emile
20   Mazloum?
21       A.   The street was filled with people.
22   And we made our line, because of the call for
```

00066
1   assistance, we went directly to Lieutenant
2   Allman to see if he was okay.  I wasn't
3   concerned with anything else.
4       Q.   Because you didn't know what was
5   going on when you pulled up?
6       A.   Yes.
7       Q.   What did Lieutenant Allman first
8   tell you?
9       A.   He looked at us and said here is
10  your disorderly.  And he put out his hand.  He
11  made a motion.  And that is when Officer
12  Ramirez came forward and we first saw him.
13      Q.   Where was Officer Ramirez standing
14  when you first saw him?
15      A.   He was in the street.
16      Q.   Did he have his hand or was he in
17  any way touching the plaintiff in this
18  lawsuit?
19      A.   I don't think he was touching him
20  at that time.
21      Q.   Was he standing next to him?
22      A.   I think he was standing behind

```
00067
 1  him.
 2      Q.  And what was the plaintiff doing?
 3      A.  The plaintiff was in handcuffs.
 4      Q.  Was he sitting or standing?
 5      A.  He was sitting down.
 6      Q.  And what was your first impression
 7  when you saw him?
 8      A.  Nothing really.  Here is your
 9  disorderly.  Made a motion to Ramirez.  I saw
10  Ramirez.  He was on the ground.
11      Q.  Did Lieutenant Allman walk away?
12      A.  No, he stayed there.
13      Q.  What did you do now?
14      A.  I asked Lieutenant Allman what had
15  happened.  He said he had gotten disorderly
16  inside the club.  That is about it.  And at
17  that point Officer Smith went to go to take
18  the cuffs off of Mazloum, take the cuffs of
19  Mazloum, exchanged cuffs with Ramirez.  That
20  is about it.  That is what happened at that
21  moment out there, yes.
22      Q.  So, all Lieutenant Allman said is
```

```
00068
 1  here is your disorderly, he had gotten
 2  disorderly in the club?
 3      A.  Yes.
 4      Q.  He didn't say anything else about
 5  what had happened or what the problem was?
 6      A.  No, he didn't.
 7      Q.  Now, when you saw that the
 8  plaintiff was handcuffed, did you understand
 9  that those handcuffs were the property of
10  Officer Ramirez?
11      A.  Actually, I didn't know whose
12  property they were.  I just saw Officer Smith
13  taking those handcuffs off and putting his on.
14      Q.  Did you know why he was doing
15  that?
16      A.  Just because -- we knew they were
17  off duty.  So handcuffs are a police issued
18  item.  If you lose them or they become
19  misplaced, you can get in trouble for it.  So
20  we wanted to switch cuffs up just so Officer
21  Ramirez wouldn't have to go to the station or
22  we wouldn't be responsible for those cuffs.
```

```
00076
 1   observing us.
 2       Q.   When he told you here is your
 3   disorderly, did you understand that to be an
 4   order to you to arrest the plaintiff?
 5       A.   No.
 6       Q.   How did you interpret what he was
 7   saying to you?
 8       A.   He is a disorderly.
 9       Q.   Meaning what?
10       A.   Meaning he had done something in
11   the club.  Just being loud.  I really didn't
12   know.  All he said was disorderly, here is
13   your disorderly.  He pointed.  That drew my
14   attention to Officer Ramirez.  At which time
15   Officer Smith exchanged cuffs.
16       Q.   And because he was identified as a
17   disorderly, what did you think you needed then
18   to do as a police officer?
19       A.   I initiated an investigation.  I
20   just wanted to know what had happened.  I
21   began to speak to him.
22       Q.   Because you didn't have enough
```

```
00077
 1  information at that point to determine whether
 2  you needed to arrest him or not.  Is that fair
 3  to say?
 4      A.  I didn't know anything that had
 5  gone on at that point.
 6      Q.  So you had to find out?
 7      A.  I had to find out.
 8      Q.  And that is what you would usually
 9  do under those circumstances, wouldn't you?
10      A.  Yes, start a basic investigation.
11  Just to see what the circumstances were that
12  had taken place, if he needed anything, if
13  anything -- just basically what had occurred.
14      Q.  And that is, in fact, why you were
15  called to the scene, isn't it?
16          MR. SCHIFFERLE:  Objection to
17  form.
18          THE WITNESS:  No, I wasn't called
19  to the scene.  I came --
20          BY MR. CORCORAN
21      Q.  The police were called to the
22  scene?
```

```
00093
 1   incident.  Apart from a lookout for a black
 2   male.  He said he just wanted to go home.  So
 3   I asked him several times.  Every time it was
 4   like, no, I just want to go home.
 5       Q.   Let me ask you a question based on
 6   some stuff you were testifying about earlier.
 7   Did you ever have any conversations with
 8   Officer Ramirez about why he had handcuffs on
 9   him?
10       A.   No.
11       Q.   At the time that you were talking
12   to the plaintiff that you are testifying to
13   now, had you had any verbal conversations with
14   Officer Ramirez about what the plaintiff had
15   done or why he was there?
16       A.   No.
17       Q.   Was Ramirez standing there while
18   this was going on, while you were talking to
19   the plaintiff?
20       A.   No.
21       Q.   Where had he gone?
22       A.   Officer Ramirez was excused by
```

```
   00094
 1  Lieutenant Allman.  Once I took Mazloum the
 2  paces away from Lieutenant Allman, Lieutenant
 3  Allman excused Officer Ramirez.
 4       Q.   Did you think that was
 5  appropriate?
 6            MS. PHILLIPS:  Objection.
 7            MR. BRUCKHEIM:  Join.
 8            THE WITNESS:  I can't speak of
 9  that.  He is the lieutenant.  It is his say.
10  He is the MPD official on the scene.
11            BY MR. CORCORAN
12       Q.   You have no opinion whether that
13  was appropriate or not?
14       A.   I have no opinion.
15       Q.   Let me ask you this.  If you had
16  been in the nightclub off duty and had seen an
17  incident and had intervened and removed a
18  patron, would you have thought it was
19  appropriate for you to leave the scene once
20  the person was outside?
21            MR. SCHIFFERLE:  Objection to
22  form.
```