```
00001
 1
 1      UNITED STATES DISTRICT COURT
 2      FOR THE DISTRICT OF COLUMBIA
 2
 3
 3   EMILE MAZLOUM            :
 4                            :
 4        Plaintiff  :
 5                            :
 5     vs.          : Civil Action No.
 6                  : 1:06:CV 00002
 6                  : (JDB)
 7   DISTRICT OF COLUMBIA,    :
 7    et al.                  :
 8                            :
 8        Defendants :
 9
 9           Washington, D.C.
10           Wednesday, November 29, 2006
10
11   Deposition of:
11
12           OFFICER DAVID SMITH
13   called for oral examination by counsel for
14   Plaintiff, pursuant to notice, at the offices
15   of Katten Muchin Rosenman, LLP, 1025 Thomas
16   Jefferson Street, N.W., East Lobby, Suite 700,
17   Washington, D.C. 20007-5201, before Renee A.
18   Feder, CSR, a Notary Public in and for the
19   District of Columbia, beginning at 2:53 p.m.,
20   when were present on behalf of the respective
21   parties:
22
```

```
00041
 1     A.   We don't talk about off duty
 2  incidents, sir.
 3     Q.   Have you ever heard about any
 4  complaints or disciplinary actions taken
 5  against Officer Acosta?
 6     A.   No.
 7     Q.   And do you know if he has ever
 8  been arrested?
 9     A.   No.
10     Q.   Now, going back to the evening of
11  March 11, when did you first learn that there
12  was a problem at the FUR Nightclub?  How did
13  it come about that you learned that?
14     A.   There was a radio transmission
15  given out over the air by then Cruiser 100.
16     Q.   Do you recall what the substance
17  of the transmission was?
18     A.   I can't recall exactly but it took
19  the form of send me somebody to assist me.
20     Q.   Who was the "me"?
21     A.   Cruiser 100.
22     Q.   Who was Cruiser 100, to your
```

```
00042
 1   knowledge?
 2       A.   That evening it was Lieutenant
 3   Allman.
 4       Q.   Lieutenant Frank Allman?
 5       A.   That is correct.
 6       Q.   Who is he?
 7       A.   He is a lieutenant.
 8       Q.   Is he still a lieutenant today?
 9       A.   I don't know.
10       Q.   He was a lieutenant in what
11   particular precinct or division of the MPD?
12       A.   He was assigned to 1D.
13       Q.   That is the same one you are
14   assigned to?
15       A.   Yes, I am assigned to 1D.
16       Q.   And he is a superior officer?
17       A.   He is a lieutenant, yes.
18       Q.   The transmission that came over,
19   was it being relayed from him or was it
20   directly from him?
21       A.   Explain relayed?
22       Q.   Was it a dispatcher telling you
```

```
00043
 1  please give Lieutenant Allman assistance?
 2      A.  No.  He put out a general call for
 3  assistance over the air.
 4      Q.  In his voice?
 5      A.  Yes.
 6      Q.  You heard him say that?
 7      A.  Yes.
 8      Q.  You heard his voice.
 9          And all he said is I need
10  assistance?
11      A.  Sir, I can't remember exactly what
12  was said.
13      Q.  Do you remember any aspect of it
14  at all?  Do you have any knowledge of what you
15  were going to the nightclub to do?
16      A.  He said send me some units to
17  assist me.  So I can't make an assumption
18  about what was going on at the nightclub at
19  the time.
20      Q.  You didn't know?
21      A.  That is correct.
22      Q.  Is it common in your work to get
```

```
00052
 1      Q.   So you pulled into there and
 2   parked it and then got out.  Right?
 3      A.   Yes.
 4      Q.   So you were walking toward the
 5   front of the nightclub.  Right?
 6      A.   Yes.
 7      Q.   And it is fair to say that the
 8   entrance to the nightclub faces north?
 9      A.   To the best of my recollection,
10   yes.
11      Q.   It is on the south side of the
12   street.  Right?
13      A.   Yes.
14      Q.   So you, as you are walking south
15   towards the entrance, see Ramirez coming --
16   was he coming down the steps of the front of
17   the nightclub?
18      A.   I can't recall, sir.
19      Q.   But he was coming from the
20   entrance?
21      A.   Yes.
22      Q.   Did he say anything to you?
```

```
00053
 1      A.   I asked him what was going on.  He
 2   said let me see your cuffs, Smithy.  Then he
 3   transferred custody to me.  And then he walked
 4   away.
 5      Q.   Is that the only conversation you
 6   had with him the entire night?
 7      A.   That is all.
 8      Q.   You never saw him again that
 9   night?
10      A.   That is all.
11      Q.   Did you put your handcuffs on the
12   plaintiff at that point?
13      A.   Yes.
14      Q.   Why did you do that?
15      A.   Because, sir, victims fight just
16   like suspects fight.
17      Q.   What does that mean?
18      A.   Victims will oftentimes be
19   disoriented because they are not sure what is
20   going on, who they are with, or why they are
21   in custody.  So it is simply a defensive
22   measure for the police so we don't have to
```

```
00054
 1  fight victims just like we fight suspects.
 2      Q.  So putting handcuffs on, in other
 3  words, is not an indication that you believed
 4  he had done anything wrong.  Is that fair to
 5  say?
 6      A.  That is correct.
 7      Q.  You just didn't know.  Right?  At
 8  that point you had no idea who he was or what
 9  had happened.  Right?
10      A.  That is correct.
11      Q.  You had to find out.  That is part
12  of your job.  Correct?
13      A.  Correct.
14      Q.  So did it surprise you that the
15  individual was already handcuffed?
16      A.  No.
17      Q.  Did you have any thought at all
18  about why he was handcuffed at that point?
19      A.  It is not my job to think, sir.
20      Q.  You were just reacting to the
21  situation based on your training?
22      A.  Yes.
```

```
00055
 1     Q.   Now, why was it necessary to
 2  switch handcuffs?
 3     A.   Because the on duty officers are
 4  supposed to relieve the off duty officers on
 5  the scene.
 6     Q.   Any time an off duty officer is
 7  involved in an incident?
 8     A.   Technically, according to general
 9  orders, they are supposed to remain on the
10  scene to provide on duty officers with the
11  correct information about how to classify
12  reports, and also arrest any subjects, if
13  necessary.
14     Q.   The entire time?
15     A.   They are supposed to, yes, sir.
16     Q.   Did that happen in this case?
17     A.   I don't know.
18     Q.   Why do you say you don't know?
19     A.   Just because I didn't see somebody
20  doesn't mean they are not there, sir.
21     Q.   Did he remain with you at any
22  time?
```

```
00056
 1     A.  No.
 2     Q.  So, as far as you and Officer
 3  Acosta were concerned, he was not present when
 4  you were investigating what had occurred?
 5     A.  That is correct.
 6     Q.  Now, you understood that the
 7  handcuffs that you were taking off the
 8  plaintiff belonged to Officer Acosta or were
 9  issued to him -- sorry, Officer Ramirez?
10     A.  I don't know whose handcuffs they
11  were, sir.
12     Q.  But you simply returned them to
13  Officer Ramirez, whosever they were?
14     A.  That is correct.
15     Q.  And he took them and walked away.
16         Do you know if the police
17  department has any policy about carrying
18  handcuffs when off duty?
19     A.  It is not a requirement.
20     Q.  Is there any policy against
21  carrying handcuffs when a police officer is
22  off duty?
```

```
00061
 1  you.  He brings the plaintiff towards you.  He
 2  says something about switching the cuffs and
 3  you are doing that.  At this point have you
 4  had any discussions at all about what is going
 5  on with Lieutenant Allman?
 6      A.  No.
 7      Q.  To your knowledge, has Officer
 8  Acosta had any discussions with Lieutenant
 9  Allman?
10      A.  I can't recall if he had or not,
11  sir.
12      Q.  At this point do you recall where
13  Lieutenant Allman was?
14      A.  He was on the other side of the
15  street near his cruiser.
16      Q.  So he is not standing with you
17  next to the plaintiff?
18      A.  No.
19      Q.  And, subsequently, when you begin
20  to speak to the plaintiff, is he standing
21  there?
22      A.  No.
```

```
00062
 1     Q.   He is not there at all.  Who is
 2  there when you were speaking to the plaintiff?
 3     A.   Myself and Officer Acosta.
 4     Q.   Did you participate equally in
 5  that conversation?
 6     A.   We did.
 7     Q.   And you were both together the
 8  whole time when you had that conversation?
 9     A.   I can't recall where his proximity
10  to me was.  I know I initially spoke to
11  Mr. Mazloum.
12     Q.   Please describe for me that
13  discussion.
14     A.   I asked him what had occurred.  He
15  mumbled a lot.  He couldn't speak properly and
16  he was slurring his speech.  He reeked of
17  alcohol.  And then he stated to me, I am
18  sorry, I am sorry.  Once again, this is to the
19  best of my recollection.  I asked him what had
20  happened.  He said that some black guys had
21  beat him up.  I said, okay, what would you
22  like me to do, sir.  He told me he wanted me
```

```
00063
 1   to go into the club and arrest them.  I said I
 2   would be happy to do so, but you would have to
 3   provide me some more information other than
 4   some black guys.  He said he could not do so.
 5   I explained to him without more of a
 6   description I could not in good faith make any
 7   arrest.
 8           Then he changed his story and said
 9   he had fallen off the stage and that he was
10   sorry.  And then he kept repeating he was
11   sorry.
12       Q.   And that is the full substance of
13   the conversation you had with him?
14       A.   To the best of my recollection.
15       Q.   Now, as you were speaking to him,
16   it was during the course of this conversation
17   that you concluded that he was probably Middle
18   Eastern?
19       A.   Yes, sir.
20       Q.   Could you understand everything he
21   was saying?
22       A.   He mumbled a lot.  I couldn't
```

```
00103
 1      Q.   By the time you talked to the
 2   bouncer you had already determined that the
 3   plaintiff had probably not done anything
 4   wrong.  Right?
 5      A.   I can only go by what the
 6   plaintiff had told me.
 7      Q.   You had been given no reason to
 8   suspect him as a perpetrator of any kind at
 9   this point.  Correct?
10      A.   We had no contradicting
11   information as to the plaintiff's statement.
12      Q.   Are there any other things about
13   the bouncer's story to you that didn't make
14   sense to you or suspicious?
15      A.   The length of time, what he had
16   stated, and his general demeanor.
17      Q.   What was his demeanor?
18      A.   He didn't look like he was upset,
19   that he had been in a fight with the
20   plaintiff.
21      Q.   Did he mention anything about
22   other police officers being involved?
```