**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EMILE MAZLOUM,

                Plaintiff,

v.

DISTRICT OF COLUMBIA *et al.*,

                Defendants.

Civil Action No. 1:06 CV 00002
(JDB)

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**
**OF DEFENDANTS NIGHT AND DAY MANAGEMENT, LLC,**
**MICHAEL REHMAN, JOHN FIORITO, AND MICHAEL PERSONS**

Thomas S. Schaufelberger
Paul A. Fitzsimmons
SAUL EWING LLP
2600 Virginia Avenue, N.W.
The Watergate—Suite 1000
Washington, D.C. 20037
Telephone: (202) 333-8800

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES                                                              iv

I.      STATEMENT OF MATERIAL FACTS
        AS TO WHICH THERE IS NO GENUINE DISPUTE                                    3

        A.      Altercations On March 12, 2005                                     3

        B.      Post-Incident Events                                              4

                1.      FUR learned of Plaintiff's police misconduct complaint    4

                2.      Recording from FUR's video surveillance system disclosed
                        and examined                                              5

                3.      FUR's video recording automatically overwritten, as FUR
                        received no request—from either MPD or Mazloum—that
                        it be specially preserved                                 6

        C.      Plaintiff Ultimately Filed Suit Claiming Injuries Involving The Events
                Of March 12, 2005                                                 8

II.     SUMMARY JUDGMENT STANDARD                                                 9

III.    ARGUMENT                                                                 11

        A.      Plaintiff's Count V Spoliation Claim Fails Because Plaintiff Cannot
                Establish Various Required Elements Of That Cause Of Action,
                Including Most Particularly Any "Significant Impairment In The
                Ability To Prove His Action" As A Result Of The Missing Evidence  11

                1.      Plaintiff cannot establish that FUR was aware of any civil
                        action, still less any potential civil action against FUR itself  11

                2.      FUR had no legal or contractual duty to preserve the video
                        recording                                                12

                3.      FUR did not destroy any video recording                  14

                4.      Plaintiff cannot establish any "significant impairment" in
                        the ability to prove any of his tort claims due to the
                        unavailability of the video recording                    15

                5.      Because there is no "significant impairment" to Plaintiff's
                        case, Plaintiff cannot establish a proximate relationship
                        between an impairment and the unavailability of the video
                        recording                                                18

                6.      Plaintiff cannot establish that he would have a significant
                        possibility of success in this action if the video recordings
                        at FUR's front door were available                        18

7.  Plaintiff cannot establish that he has suffered damages due
    to the unavailability of the video recording                            18

8.  For these numerous reasons, Plaintiff's spoliation claim
    fails as a matter of law                                                19

B.  Plaintiff's Count IV D.C. Human Rights Act Claim Fails Because The
    FUR Defendants Never Took Any Statutorily Proscribed "Adverse
    Action" Concerning This Event And Because They Did Not Destroy
    Any Crucial Video Recordings Of This Event                              19

C.  Plaintiff's Count II Assault And Battery Claim Against Mr. Persons
    And FUR Fails Because, As A Matter Of Law, Mr. Persons Acted In
    Self-Defense Against Plaintiff's Attacks                                21

    1.  Only for instances of assault and battery that occurred up to
        Mr. Persons' last physical contact with Plaintiff—i.e., at the
        point off-duty MPD officers handcuffed Plaintiff—could
        FUR and Mr. Persons face potential liability                        21

    2.  As a matter of law, Mr. Persons permissibly acted in
        self-defense against Plaintiff's attacks upon him                   22

    3.  Mr. Persons has testified to a credible version of events
        regarding his acting in self-defense against Plaintiff's
        attacks upon him                                                    23

    4.  Plaintiff has, conversely, testified to a "too incredible"
        version of events regarding the start of the fight between
        him and Mr. Persons                                                 26

    5.  Plaintiff's "too incredible" claim of these events should
        result, under Rule 56, in his assault and battery against
        Mr. Persons and FUR being summarily dismissed                       29

IV.  CONCLUSION                                                             31

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ............. 9

*Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986) ........................ 9

*Guardian Life Ins. Co. of America v. Madole*, 48 F.Supp.2d 26 (D.D.C. 1999) ........................ 10

*Holmes v. Amerex Rent-a-Car*, 180 F.3d 294, 297 (D.C. Cir. 1999).................... 11, 12, 13, 14, 18

*Johnson v. Jackson*, 178 A.2d 327 (D.C. 1962)......................................................................... 22

*Vale v. Bonnett*, 191 F.2d 334 (D.C. Cir. 1951) ............................................................. 9, 22, 29


**STATUTES**

Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.* ........................................................... 19, 20


**RULES**

Fed.R.Civ.P. Rule 56 ................................................................................. 9, 10, 22, 29

**MEMORANDUM IN SUPPORT OF**
**MOTION  FOR SUMMARY JUDGMENT**
**OF DEFENDANTS NIGHT AND DAY MANAGEMENT, LLC,**
**MICHAEL REHMAN, JOHN FIORITO, AND MICHAEL PERSONS**

Defendants Night & Day Management, LLC t/a The Fur Factory ("N&D" or "FUR"),

Michael Rehman ("Rehman"), John Fiorito ("Fiorito"), and Michael Persons ("Persons") (these

four defendants, or any group of them, are sometimes referred to herein as "FUR Defendants"),

by and through counsel, respectfully submit the following in support of their Motion for

Summary Judgment as to the Second Amended Complaint of Plaintiff Emile Mazloum.

This lawsuit involves altercations that occurred during the early morning of Saturday,

March 12, 2005 at or near FUR Nightclub, one of the largest and most popular nightclubs in the

District of Columbia.  These altercations began inside the club as Plaintiff Emile Mazloum was

leaving the stage area within FUR and continued as Plaintiff was led out of the club in handcuffs

by off-duty Metropolitan Police Department (MPD) officers who were, at the time, patrons of the

club.  Ultimately, District police officers who had formally responded to FUR's call to MPD

elected to release Plaintiff outside of the club.

As a result of these altercations and subsequent related events, Plaintiff filed suit asserting

a variety of federal statutory and common law claims against:  the District of Columbia (the

"District"); several MPD officers; FUR; Michael Rehman, the founder and Manager of FUR;

John Fiorito, FUR's lighting and sound technician; and Michael Persons, a member of FUR's

security staff.

Against the FUR Defendants, Plaintiff has asserted:  (1) a spoliation of evidence claim

against Mr. Rehman, Mr. Fiorito, and FUR due to the unavailability, at the time Plaintiff filed his

first Complaint herein, of FUR's video surveillance recording from the early morning of March

12, 2005; (2) a District of Columbia Human Rights Act claim against the FUR Defendants for allegedly retaliating after Plaintiff filed a police misconduct report; and (3) an assault and battery claim against Mr. Persons and FUR.

For reasons set forth more fully below, Plaintiff cannot prevail on his spoliation of evidence claim against Mr. Rehman, Mr. Fiorito, and/or FUR as Plaintiff is unable to establish various required elements of this cause of action. Further, Plaintiff cannot prevail on his Human Rights Act claim against the FUR Defendants because he cannot establish that any adverse action was taken by these Defendants after he filed his police misconduct complaint. Finally, Plaintiff cannot prevail on his assault and battery claim against Mr. Persons and FUR in that, as a matter of law, Mr. Persons used reasonable force in self-defense against Plaintiff's assaults and batteries.

As a result, this Court should grant the FUR Defendants summary judgment as to all claims asserted against them herein.

I.    **STATEMENT OF MATERIAL FACTS**
      **AS TO WHICH THERE IS NO GENUINE DISPUTE**

   A.    **Altercations On March 12, 2005**

   During the early morning of March 12, 2005, two "sets" of altercations allegedly took place involving Plaintiff, FUR security employee Mr. Persons, and several Metropolitan Police Department (MPD) officers.

   The first such set of altercations allegedly began as Plaintiff was leaving the stage area of FUR and ended when MPD Officers Anthony Ramirez, Thaddeus Modlin, Richmond Phillips and Louis Schneider—who were patrons of the club and who had become involved to try to control the situation—placed Plaintiff in handcuffs.  (*See* November 17, 2006 Deposition of Michael Andre Persons ("Persons Dep.," attached hereto as "Exhibit 1") at 101-04, and *see* January 29-30, 2007 Deposition of Emile Mazloum ("Mazloum Dep.," attached hereto as "Exhibit 2") at 99-112.)

   The second set of altercations allegedly began when Plaintiff was being escorted out of the club by MPD Officers Ramirez, Modlin, Phillips, and Schneider and ended when Officers Jose Acosta and David Smith, who had formally responded to the situation, released Plaintiff outside the club.  (*See* Persons Dep. at 104-05 and Mazloum Dep. 113-39).  This second set of altercations involved only Plaintiff and the off-duty MPD officers; no FUR employee had physical contact with Plaintiff during this period.  (*See* Persons Dep. at 104.)

### B.    Post-Incident Events

#### 1.    FUR learned of Plaintiff's police misconduct complaint

During the afternoon of March 12, 2005, Plaintiff lodged a police misconduct report at

the MPD station.  (August 8, 2006 Deposition of Anthony Ramirez ("Ramirez Dep.," attached

hereto as "Exhibit 3") at 160-61.)  On that same evening, Officer Ramirez telephoned Mr. Fiorito

to tell him Plaintiff had filed a police misconduct complaint regarding the incident.  (Ramirez

Dep. at 317; October 25, 2006 Deposition of John Fiorito ("Fiorito Dep.," attached hereto as

"Exhibit 6") at 117.)  FUR was not informed, however, that Plaintiff planned any civil action as a

result of the events of the early morning of March 12, 2005.  (May 30, 2007 Certificate of Diego

Sequeira ("Sequeira Cert.," attached hereto as "Exhibit 10") at ¶ 3.)

In that phone conversation, Mr. Fiorito told Officer Ramirez that the MPD was welcome

to come to FUR to look around, to view the recording from FUR's video surveillance system,

and to burn the recordings onto disk.  (Ramirez Dep. at 317.)  However, no one from MPD ever

came to FUR to view or burn the video recordings from the evening of March 12, 2005.

(Sequeira Cert. at ¶ 4.)

Also on the evening of March 12, 2005, Imad Alkadi, a friend of Plaintiff, met with

Messrs. Rehman and Fiorito at FUR.  (February 26, 2007 Deposition of Imad Alkadi

("Alkadi Dep.," attached hereto as "Exhibit 4") at 380-81.)  In that meeting, Mr. Fiorito informed

Mr. Alkadi that MPD could file suit against Plaintiff if the allegations in his police misconduct

complaint were false:

> Q.    Did John Fiorito ever tell you that you'd better be prepared to follow through with
> what you told law enforcement because if they found out you were lying you
> could possibly be charged with making false statements?
> A.    He actually told me that my friend will, not me.  He said, "Your friend, he will be,
> you know, sued for giving false information," not to me, but my friend.

(*Id*. at 389.)  Mr. Alkadi was not, however, uncomfortable speaking with Mr. Fiorito, and Mr. Fiorito never insulted or intimidated him.  (*Id*. at 390.)

### 2.    Recording from FUR's video surveillance system disclosed and examined

After the call by Officer Ramirez, Mr. Fiorito and Mr. Rehman asked David McLeod, FUR's Security Manager, to view the March 12, 2005 early morning video recordings from the cameras at the club's front door.  (February 27, 2007 Deposition of David McLeod ("McLeod Dep.," attached hereto as "Exhibit 5") at 159-60.)  The video surveillance system captured images of Plaintiff from only two vantage points:  as he was led out of the front door of the club by several police officers and as he was led down the outside steps in front of that door with those same officers still around him.  (*Id*. at 160-61.)  That video footage—in total, at most, thirty seconds in length (*id*. at 161)—showed Mr. McLeod walking out of the club on his own with officers holding him by the arms (*id*.).  Other than that physical contact, the video recording did not show, according to Mr. McLeod (*id*. at 162), the use of any physical contact against Plaintiff, an account which squares with Plaintiff's own testimony as to what had occurred at that point:

> Q.    Sir, the [FBI] report continues[:]  "Mazloum was dragged up the stairs
>        through the Tunnel and out the front of the club."
>        Sir, did you give that information to the FBI?
> A.    Not exactly.
> Q.    How is that statement incorrect?
> A     When you say that they dragged me up the stairs and the hallway and all
>        the way outside --
> Q.    That's incorrect?
> A.    That's incorrect.
> Q.    Okay.  What was correct about how you got out of the club?
>        MR. CORCORAN:  Objection; asked and answered.

THE WITNESS:  They hold me with my two arms, they dragged me on the steps,[1] and then I walk outside.

BY MR. FITZSIMMONS

Q.    Okay.  When you got out the front door of the FUR Night Club, there were steps that led down to the sidewalk.  Is that correct?

A.    I think so.

Q.    The men still had you by each arm at that point?

A.    I think so.

Q.    But all three of you were walking?

A.    Yes, sir.

Q.    … From the time you exited FUR's main front door to the time that you got to the sidewalk in front of that front door, was anyone hitting you?

MR. CORCORAN:  Objection; asked and answered yesterday.

THE WITNESS:   No, sir.

Q.    At that same period of time was anyone assaulting you other than in the sense that they had you by the arms and were leading you?

A.    No, sir.

(Mazloum Dep. at 368-70.)

### 3.    FUR's video recording automatically overwritten, as FUR received no request—from either MPD or Mazloum—that it be specially preserved

The video recordings at FUR are digitally saved on a computer and are automatically overwritten three days later, after which point they are unrecoverable.  (McLeod Dep. at 72.)  In this manner, the video recording at issue herein from the early morning of March 12, 2005 was ultimately overwritten.  FUR has saved video recordings only three times:  twice when the video captured bartenders stealing and once when the MPD requested that Mr. McLeod save a video recording of a murder that occurred outside FUR.  (*Id*. at 79-81.)

---

[1] As Plaintiff's other testimony quoted above demonstrates, "the steps" to which Plaintiff was referring at this point are what he had earlier termed "the stairs," i.e., the large staircase leading from the main dance floor up to "the tunnel," a long hallway/passageway running from the front door area into the main dance floor area.

The Court will note that the other group of steps which play prominently in this series of events is a smaller group of steps which run from that main dance floor up to the top of the stage area, itself roughly four feet above the main dance floor.

Although, on Sunday, March 13, 2005, Plaintiff learned from his friend Imad Alkadi that

FUR had a video recording system (Mazloum Dep. at 308-10), Plaintiff never contacted FUR to

request that the video recording be preserved (*id*. at 312).  Likewise, Plaintiff did not ask MPD to

obtain the video recording from FUR:

> Q.     … Did you contact Lieutenant Allman and tell him that there were
>          videotapes that the police should be obtaining from FUR?
> A.     No, sir.
> …
> Q.     … Did you talk with anyone at the Metropolitan Police Department after
>          you had spoken with Mr. Alkadi about these videotapes and tell anyone at
>          the Metropolitan Police Department, "As far as videotapes you should get
>          them"?
> A.     No, sir.
> Q.     Did you talk with anyone outside of the Metropolitan Police Department
>          about trying to obtain these tapes?
>          MR. CORCORAN:  I caution the witness not to disclose attorney-client
>          communications on this topic.
>          THE WITNESS:  No, sir.

(*Id*. at 311-12.)

Neither Mr. Rehman, founder and Manager of FUR, Mr. Fiorito, nor anyone else at FUR

ever asked Diego Sequeira, the Operations Manager of FUR, or Mr. McLeod—the only two FUR

employees with the four digit pin code to access the video recordings—to destroy any video

recording of the night of March 11-12, 2007:

> Q.     Did Michael Rehman ever ask you to destroy footage of what happened
>          that night?
> A.     No.  You can't destroy it anyway.  But no.
> Q.     Did John Fiorito ever ask you to destroy any footage from that night?
> A.     No.
> Q.     Did anyone ever ask you to destroy any footage from that night?
> A.     No.

(McLeod Dep. at 164-65; Sequeira Cert. at ¶¶ 8-9.)

**C.    Plaintiff Ultimately Filed Suit Claiming Injuries Involving The Events Of March 12, 2005**

In January 2006, Plaintiff filed suit against the District of Columbia, several MPD officers, and the FUR Defendants asserting a variety of federal statutory and common law claims regarding the incidents at issue.  As concerns the FUR Defendants, Plaintiff has asserted: (1) a reckless/negligent spoliation of evidence claim against Mr. Rehman, Mr. Fiorito, and FUR based on the unavailability of FUR video surveillance recordings from the early morning of March 12, 2005 (Second Amended Compl. at ¶¶ 85-92); (2) a D.C. Human Rights Act claim against the FUR Defendants for allegedly retaliating against Plaintiff after he filed his police misconduct report (*id.* at ¶¶ 77-84); and (3) an assault and battery claim against Mr. Persons and FUR (*id.* at ¶¶ 64-72).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. Rule 56(c).  The legal standard regarding a Rule 56 motion is whether there is any "'genuine issue as to any material fact [and whether] the moving party is entitled to judgment as a matter of law.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Rule 56(c)).  Facts are deemed "material" if a dispute over them "might affect the outcome of the suit under the governing law."  *Id*. at 248, 106 S.Ct. at 2510.

A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  Thus, even if an ostensible issue exists as to material facts, summary judgment is still proper if "the evidence on one or the other hand is too incredible to be accepted by reasonable minds."  *Vale v. Bonnett*, 191 F.2d 334, 336 (D.C. Cir. 1951).

The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *See id*. at 256, 106 S.Ct. at 2514.  Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).

Furthermore, when a summary judgment motion is supported as required by Rule 56, "'an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response … must set forth specific facts showing that there is a genuine

issue for trial'" in order to survive summary judgment.  *Guardian Life Ins. Co. of America v. Madole*, 48 F.Supp.2d 26, 29 (D.D.C. 1999), *quoting* Rule 56(e).

III.   **ARGUMENT**

    A.   **Plaintiff's Count V Spoliation Claim Fails Because Plaintiff Cannot Establish Various Required Elements Of That Cause Of Action, Including Most Particularly Any "Significant Impairment In The Ability To Prove His Action" As A Result Of The Missing Evidence**

In order to prevail on a reckless or negligent spoliation claim, a plaintiff must establish:

(1) the existence of a potential civil action; (2) a legal or contractual duty to preserve evidence which is relevant to that action; (3) destruction of that evidence by the duty-bound defendant; (4) significant impairment in the ability to prove the potential civil action; (5) a proximate relationship between the impairment of the underlying suit and the unavailability of the destroyed evidence; (6) a significant possibility of success of the potential civil action if the evidence were available; and (7) damages adjusted for the estimated likelihood of success in the potential civil action.

*Holmes v. Amerex Rent-a-Car*, 180 F.3d 294, 297 (D.C. Cir. 1999).

Here, Plaintiff's reckless or negligent spoliation claim fails because he cannot establish various of these spoliation tort elements.  Indeed, as detailed below, it appears that Plaintiff can establish none of those elements.

    1.   **Plaintiff cannot establish that FUR was aware of any civil action, still less any potential civil action against FUR itself**

Plaintiff cannot establish that Mr. Rehman, Mr. Fiorito, or FUR were aware of the existence any civil action by Plaintiff as a result of the events of the early morning of March 12, 2005 when the video recording was overwritten.  Plaintiff did not file his Complaint naming FUR as a defendant until more than six months later, on January 4, 2006, which first informed Mr. Rehman, Mr. Fiorito, and FUR of Plaintiff's claims against them.  However, by that time, the video recording at issue had been automatically overwritten months earlier.

FUR became aware of a March 12, 2005 police misconduct complaint that Plaintiff lodged because, that same evening, Officer Ramirez phoned Mr. Fiorito to tell him about that complaint.  (Fiorito Dep. at 117; Ramirez Dep. at 163, 177-79.)  However, information that

Plaintiff had lodged a police misconduct complaint did not place FUR on notice that Plaintiff planned to initiate any civil action as a result of the events of the early morning of March 12, 2005. Further, knowledge of this police misconduct complaint did not place FUR on notice that Plaintiff planned to initiate any civil action against it as a result of the events of the early morning of March 12, 2005 at FUR. For these reasons, Plaintiff's spoliation claim fails.

> **2.    FUR had no legal or contractual duty to preserve the video recording**

As Mr. Rehman, Mr. Fiorito, and FUR had no knowledge that Plaintiff planned to initiate a civil action against them as a result of the events of the early morning of March 12, 2005, they had no legal or contractual duty to preserve the video recording.

Moreover, even assuming *arguendo* that the FUR Defendants' knowledge of Plaintiff's police misconduct complaint against itself placed FUR on notice of the existence of a potential suit *by Plaintiff against MPD Officers*, Plaintiff cannot establish that FUR had either a legal or a contractual duty to preserve evidence supposedly relevant thereto. A non-party to a suit has "no general duty in the common law to preserve evidence," and, "[a]bsent some special relationship or duty rising by reason of an agreement, contract, statute, or other special circumstance, the general rule is that there is no duty to preserve possible evidence for another party to aid that other party in some future legal action against a third party." *Holmes*, 710 A.2d at 849, *citing Koplin v. Rosel Well Perforators*, 734 P.2d 1177, 1179 (Kan. 1987). Because it knew of only Plaintiff's formal police complaint against Officer Ramirez, FUR had no duty to preserve possible evidence as to any such theoretical third-party action.

Likewise, FUR had no contractual duty to preserve the video recording. Although Plaintiff learned on Sunday, March 13, 2005, from his friend Imad Alkadi, that FUR had a video

recording system (Mazloum Dep. at 307-308),[2] Plaintiff failed—in two ways—to make any efforts to have the video recording preserved for any potential suit.  First, Plaintiff failed to contact FUR to request that they preserve the video recordings from the night of March 11-12, 2005.  (*Id.* at 311-12.)  *Cf. Holmes*, 180 F.3d at 296 (contractual duty to preserve evidence imposed when plaintiff asked company to hold relevant evidence and company agreed to do so).  Second, Plaintiff did not request that the MPD obtain the video recording from FUR:

> Q.     … Did you contact Lieutenant Allman and tell him that there were
>        videotapes that the police should be obtaining from FUR?
> A.     No, sir.
> …
> Q.     … Did you talk with anyone at the Metropolitan Police Department after
>        you had spoken with Mr. Alkadi about these videotapes and tell anyone at
>        the Metropolitan Police Department, "As far as videotapes you should get
>        them"?
> A.     No, sir.
> Q.     Did you talk with anyone outside of the Metropolitan Police Department
>        about trying to obtain these tapes?
>        MR. CORCORAN:  I caution the witness not to disclose attorney-client
>        communications on this topic.
>        THE WITNESS:  No, sir.

(Mazloum Dep. at 311-12.)  Thus, in point of fact, Plaintiff's own lack of diligence caused the video surveillance recording from the early morning of March 12, 2005 not to be preserved.

(The FUR Defendants would also note that, when Mr. Fiorito learned from Officer Ramirez that a police misconduct report had been filed against the Officer, Mr. Fiorito in fact extended an invitation to the MPD to come down to FUR to view the video recordings of March 12, 2005 and to burn them onto a disk.  (Ramirez Dep. at 317.)  However, MPD did not

---

[2] *See* Mazloum Dep. at 304-07, describing how Plaintiff became aware that Mr. Alkadi met with Messrs. Rehman and Fiorito "[t]he day after when we went to the police station and filed a complaint" (*id.* at 307).

take Mr. Fiorito up on his offer.  (*Id.*; Sequeira Cert. at ¶ 4.)  Thus, FUR was in no way trying to "hide the ball" from anyone.)

Therefore, because Plaintiff cannot establish that Mr. Rehman, Mr. Fiorito, or FUR were aware of a suit or a potential suit against any or all of them, they had no duty under the law to preserve any video recording concerning this incident.  Even assuming *arguendo* that Plaintiff's police misconduct complaint against Officer Ramirez placed FUR on notice of the existence of a potential suit by Plaintiff *against that police officer and/or the District*, FUR had no legal or contractual duty—concerning that potential action between parties unrelated to FUR—to preserve any video recording from the night of March 11-12, 2005.  *Holmes*, 710 A.2d at 849 ("[a]bsent some special relationship or duty rising by reason of an agreement, contract, statute, or other special circumstance, the general rule is that there is no duty to preserve possible evidence for another party to aid that other party in some future legal action against a third party").  Therefore, Plaintiff's spoliation claim fails even without reference to the other elements of this cause of action.

### 3.    FUR did not destroy any video recording

Plaintiff cannot establish that FUR destroyed the video recording of the night of March 11-12, 2005 as that recording was, in fact, merely overwritten in the normal course of business.  Video recordings at FUR are digitally saved on a computer and are automatically overwritten three days later, after which point they are unrecoverable.  (McLeod Dep. at 72.)  FUR has to date saved video recordings only three times:  twice when the video captured bartenders stealing and once when the MPD requested that Mr. McLeod save a video recording of a murder happening outside FUR.  (*Id.* at 79-81.)

Neither Mr. Fiorito, Mr. Rehman, nor anyone else at FUR asked Mr. McLeod or Mr. Sequeira—the latter two being the only FUR employees with the four digit pin code to access FUR's video surveillance recordings—to destroy the video recording of the night of March 11-12, 2005. (*Id*. at 164-65; Sequeira Cert. at ¶¶ 8-9.)

Thus, contrary to Plaintiff's allegation that FUR "destroyed" the video recording at issue, neither Mr. Fiorito, Mr. Rehman, nor anyone else at FUR authorized or participated in any destruction of any such video recording. Instead, and particularly as neither Plaintiff nor MPD ever timely requested that FUR save the video recording (*see supra* at 6-7), FUR had no reason to deviate from its normal business practice of allowing such video recordings to be automatically overwritten by the controlling computer after three days.

Because FUR did not destroy the video recording, Plaintiff's spoliation claim fails without reference to the other elements of this cause of action.

> **4.     Plaintiff cannot establish any "significant impairment" in the ability to prove any of his tort claims due to the unavailability of the video recording**

The video recording in question did not in fact capture footage that would in fact assist Plaintiff in establishing his claims, and Plaintiff therefore cannot establish a significant impairment in his ability to prove his claims due to the unavailability of that recording. For this reason as well, his spoliation claim must fail.

As FUR's various security cameras are used primarily as a theft deterrent,[3] the video surveillance system that evening captured images of Plaintiff from only two vantage points:

---

[3] The video surveillance cameras inside FUR are aimed at cash registers, the back door entrance, and the front door entrance. (McLeod Dep. at 44-45, 77; Sequeira Cert. at ¶ 6.) There is no

(footnote continued …)

inside the front door, as he was being led out of the club by several police officers and outside

that same door, as he was led down the steps in front of that door with those same officers still

around him.  (McLeod Dep. at 160-61.)  That video footage—in total, at most, thirty seconds in

length (McLeod Dep. at 161)—merely showed Mr. McLeod walking out of the building on his

own with officers holding him by the arms.  (*Id*. at 161.)  Other than that physical contact, the

video recording did not show the use of any physical contact against Plaintiff, according to FUR

Security Manager McLeod (*id*. at 162), and that account squares with Plaintiff's own testimony

as to what occurred at that point:

> Q.   Sir, the [FBI] report continues[:]  "Mazloum was dragged up the stairs
>       through the Tunnel and out the front of the club."
>       Sir, did you give that information to the FBI?
> A.   Not exactly.
> Q.   How is that statement incorrect?
> A.   When you say that they dragged me up the stairs and the hallway and all
>       the way outside --
> Q.   That's incorrect?
> A.   That's incorrect.
> Q.   Okay.  What was correct about how you got out of the club?
>       MR. CORCORAN:  Objection; asked and answered.
>       THE WITNESS:  They hold me with my two arms, they dragged me on
>       the steps,[4] and then I walk outside.
>       BY MR. FITZSIMMONS
> Q.   Okay.  When you got out the front door of the FUR Night Club, there were
>       steps that led down to the sidewalk.  Is that correct?
> A.   I think so.

---

(... footnote continued)
camera aimed at the stage area, where the altercation began, or the "tunnel" staircase, where
Plaintiff was handcuffed.  (*Id*. at 53-54; Sequeira Cert. at ¶ 7.)

[4] As Plaintiff's other testimony quoted above demonstrates, "the steps" to which Plaintiff was
referring at this point are what he had earlier termed "the stairs," i.e., the large staircase leading
from the main dance floor up to "the tunnel," a long hallway/passageway running from the front
door area into the main dance floor area.

The Court will note that the other group of stairs or steps which play prominently in this
series of events is a smaller group of stairs or steps which run from that main dance floor up to
the top of the stage area, itself roughly four feet above the main dance floor.

> Q.    The men still had you by each arm at that point?
> A.    I think so.
> Q.    But all three of you were walking?
> A.    Yes, sir.
> Q.    … From the time you exited FUR's main front door to the time that you got to the sidewalk in front of that front door, was anyone hitting you?
>        MR. CORCORAN:  Objection; asked and answered yesterday.
>        THE WITNESS:  No, sir.
> Q.    At that same period of time was anyone assaulting you other than in the sense that they had you by the arms and were leading you?
> A.    No, sir.

(Mazloum Dep. at 368-70.)

Thus, even had this video recording been preserved and ultimately presented as evidence, Plaintiff would not have had a "significant possibility" of success in proving his claims due to its availability because (a) the recording merely showed Plaintiff, near the front entrance of FUR, being led out of the Nightclub by several off-duty MPD officers (McLeod Dep. at 160-62), and (b) Plaintiff does not even himself claim to have been physically brutalized during the period where he was at the front entrance of the club (and, thus, in the view of two cameras) but instead claims that he was merely being walked out of the club by these men (Mazloum Dep. at 368-70). With no dispute between or among the parties as to what the overwritten FUR security video recording would have shown the trier, no spoliation tort can succeed.

In sum, because the video recording did not capture any footage that would assist the Plaintiff in any material way in establishing his claim, it is correspondingly correct that Plaintiff cannot establish any significant impairment to his proving his claim as a result of the absence of the recording.  Therefore, Plaintiff's spoliation claim fails even without reference to the other elements of this cause of action.

**5.     Because there is no "significant impairment" to Plaintiff's case, Plaintiff cannot establish a proximate relationship between an impairment and the unavailability of the video recording**

Plaintiff did not suffer any "significant impairment" to his case due to the unavailability of the video recording at issue, and Plaintiff cannot therefore, *a fortiori*, establish any proximate relationship between such an impairment and that unavailability.

**6.     Plaintiff cannot establish that he would have a significant possibility of success in this action if the video recordings at FUR's front door were available**

Plaintiff cannot establish that he would have a significant possibility of success if the FUR video recording from the night of March 11-12, 2005 were available as that recording could not have shown the use of physical force against Plaintiff because, even by his own testimony, none was occurring in front of any recording cameras.  (*See* Mazloum Dep. at 368-70.)  The recording instead merely showed Plaintiff near the front entrance of FUR as he was being led out of the club by several off-duty MPD officers.  (McLeod Dep. at 160-61.)

Therefore, because Plaintiff cannot establish that he would have had a "significant possibility" of success in his tort claims had the video recording at issue been available, *see Holmes*, 180 F.3d at 297 (plaintiff must show a "significant possibility" of success, rather than just a "reasonable probability" of success, based on missing evidence), Plaintiff's spoliation claim fails.

**7.     Plaintiff cannot establish that he has suffered damages due to the unavailability of the video recording**

Because Plaintiff cannot establish that he would have had a significant possibility of success if the video recording were available, Plaintiff has suffered no damages as a result of the

unavailability of this evidence.  Therefore, Plaintiff's spoliation claim fails based on this factor alone.

### 8. For these numerous reasons, Plaintiff's spoliation claim fails as a matter of law

As detailed above, Plaintiff cannot make out any of the elements of the tort of spoliation under District of Columbia law.  Because his spoliation claim in fact fails where he is unable to meet his burden of proof as to any one of these seven elements, the FUR Defendants are thus, for manifold reasons, entitled to summary judgment on this Count V claim.

### B. Plaintiff's Count IV D.C. Human Rights Act Claim Fails Because The FUR Defendants Never Took Any Statutorily Proscribed "Adverse Action" Concerning This Event And Because They Did Not Destroy Any Crucial Video Recordings Of This Event

Although Plaintiff attempts to assert a claim against Mr. Fiorito, Mr. Rehman, and FUR based upon the District of Columbia's Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.*, Plaintiff cannot in fact establish that they, or any one of them, retaliated in any way against Plaintiff after learning that he had filed a police misconduct complaint against Officer Ramirez.[5] Specifically in this regard, Plaintiff alleges that Mr. Mazloum suffered "adverse action" because "[(i) h]is friend and witness, Mr. Alkadi, was warned not to proceed …. [and (ii)] Defendants Romeo and Fiorito … took the extraordinary step of destroying the crucial videotaped evidence of the beating Mazloum experienced in order to protect Fur Nightclub and the individual Defendants from any complaint or legal action which Mazloum might initiate."  (Second Amended Compl. at ¶ 83.)

---

[5] The FUR Defendants would note that, whereas this Count IV is stated to have been asserted "(as against all Defendants)" (Second Amended Complaint at 19), that Count IV in fact makes no reference at all to Mr. Persons.  Thus, this cause of action must necessarily fail as to him.

In fact, however, regarding that first allegation, no one at FUR warned Mr. Alkadi not to proceed with the police investigation.  Instead, Mr. Alkadi was merely told that Plaintiff could be charged with giving false information:

> Q.     Did John Fiorito ever tell you that you'd better be prepared to follow through with what you told law enforcement because if they found out you were lying you could possibly be charged with making false statements?
>
> A.     He actually told me that my friend will, not me.  He said, "Your friend, he will be, you know, sued for giving false information," not to me, but my friend.

(Alkadi Dep. at 389.)  During that meeting, Mr. Alkadi was not uncomfortable speaking with Mr. Fiorito, who never insulted or intimidated him.  (*Id*. at 390.)

As a matter of law, telling Mr. Alkadi that Plaintiff could be charged for providing false information does not constitute an adverse action but, instead, constitutes merely a statement of fact:  it is unarguable that Plaintiff could indeed have been charged with the criminal offense of providing false information had the police established that Plaintiff's misconduct allegations were false.

Regarding the second allegation—spoliation—neither Mr. Rehman nor Mr. Fiorito destroyed "crucial videotaped evidence" (*see supra* at 7).  Thus, as detailed above, Plaintiff cannot make out a *prima facie* case of spoliation of evidence, and he cannot establish that these Defendants retaliated by not preserving the video recording at issue.

Therefore, because Plaintiff cannot establish that FUR or anyone associated with it retaliated—either by "warn[ing]" his friend not to proceed regarding this police complaint or by destroying evidence—these FUR Defendants are entitled to summary judgment in their favor on Plaintiff's D.C. Human Rights Act Claim.

**C.    Plaintiff's Count II Assault And Battery Claim Against Mr. Persons And FUR Fails Because, As A Matter Of Law, Mr. Persons Acted In Self-Defense Against Plaintiff's Attacks**

    **1.    Only for instances of assault and battery that occurred up to Mr. Persons' last physical contact with Plaintiff—i.e., at the point off-duty MPD officers handcuffed Plaintiff—could FUR and Mr. Persons face potential liability**

Plaintiff's alleged instances of assault and battery can be broken down into two basic time frames, and, as a matter of law, FUR could theoretically face liability only for such instances during the first such period.

The first time frame during which any assault and battery allegedly occurred (a) began on the stage area of FUR as Plaintiff was exiting the stage area and (b) ended when MPD Officers, who were patrons of the club at that time and who had become involved to try to control the situation, placed Plaintiff in handcuffs. (*See* Persons Dep. at 101-04; Mazloum Dep. at 99-112.)

The second time frame during which alleged instances of assault and battery occurred (a) began with that handcuffing of Plaintiff and the off-duty officers then leading him up a large staircase to the "Tunnel" and then out of the club and (b) ending when Plaintiff was released by the police outside the club. This second period involved, however, only Plaintiff and several off-duty MPD officers in the sense that no FUR employee had physical contact with Plaintiff during this period. (*See* Persons Dep. at 104.) As Plaintiff's Second Amended Complaint rightly acknowledges, FUR could not be held legally responsible for any assault and battery liability, if any, of the police officer defendants herein:

> Defendants District of Columbia and FUR Nightclub, respectively, are responsible under the doctrines of *respondeat superior* and ratification for the tortious conduct of their respective employees (Defendants Ramirez, Modlin, Phillips, and Schneider for the District, and Persons for FUR Nightclub).

(Second Amended Complaint at ¶ 71.)

**2.      As a matter of law, Mr. Persons permissibly acted in
self-defense against Plaintiff's attacks upon him**

Regarding the alleged instances of assault and battery during that first above-described

time frame, the Court should grant Mr. Persons and FUR summary judgment because, as a matter

of law, Mr. Persons reasonably acted in self-defense against Plaintiff.  *E.g.*, *Johnson v. Jackson*,

178 A.2d 327, 328 (D.C. 1962):

> A man is justified in using reasonable force to repel an actual assault, or if he
> reasonably believes he is in danger of bodily harm.  This is the essence of the
> law of self-defense.  [Citations omitted.]

Generally, summary judgment is appropriate where "there is no genuine issue as to any

material fact and … the moving party is entitled to judgment as a matter of law."  Rule 56(c).

However, even where, ostensibly, an issue exists as to material facts, summary judgment is still

proper if "the evidence on one or the other hand is too incredible to be accepted by reasonable

minds."  *Vale*, 191 F.2d at 336.  In other words, no *genuine* issue of fact is presented where one

party's story is credible and the other's is incredible.

Here, although Mr. Persons and Plaintiff have indeed provided directly conflicting

testimony regarding how the physical altercation began between them, the false conflict in that

testimony does not preclude the Court from granting summary judgment on Plaintiff's assault

and battery count against Mr. Persons and FUR:  Mr. Person's version of the events is entirely

credible whereas Plaintiff's version of the pertinent facts is literally "too incredible to be

accepted by reasonable minds."  *Vale*, 191 F.2d at 336.

3. **Mr. Persons has testified to a credible version of events regarding his acting in self-defense against Plaintiff's attacks upon him**

Mr. Persons testified that, on three separate occasions, he asked that Plaintiff leave the stage area and that, each time, Plaintiff was angered by that request. (Persons Dep. at 98-99.) After Mr. Persons first requested that Plaintiff leave the stage area, Plaintiff made a "nasty comment" in response. (*Id*. at 99-100.)[6] The second time, Plaintiff was agitated and used profanity towards Mr. Persons. (*Id*. at 100.) The third time, Plaintiff was likewise very agitated and again used profanity towards Mr. Persons. (*Id*. at 100-01.)

That third and last time, Mr. Persons was escorting Plaintiff across the stage and then down the stage steps leading to the main dance floor, at which point Plaintiff stopped moving, turned around to Mr. Persons, and raised his hands against Mr. Persons. (*Id*. at 101.) Reasonably believing that Plaintiff was about to strike him due to the agitation Plaintiff had expressed coupled with his aggressive hand movements, Mr. Persons grabbed Plaintiff's hands in self-defense and told him to calm down. (*Id*. at 101-102.)

Mr. Persons nonetheless let go of Plaintiff on the urging of Plaintiff's friends (*id*. at 101-02), whom Persons understood to be employed by an outside promoter ("Massoud A.") at the club (*id*. at 90-93). However, Plaintiff then immediately lunged at Mr. Persons, and Mr. Persons, again acting in self-defense, pulled Plaintiff back up the steps to the corner of the

---

[6] As part of his efforts to qualify for the Baltimore Ravens football team (*see* Persons at 47-49), Mr. Persons had leg-pressed 2000 pounds earlier that day at his gym (*id*. at 77). Because, in part, of the soreness he was feeling that night therefrom, he did not at this first contact with Plaintiff follow his usual practice of throwing a customer out of the club for violating its rules (*id*. at 74), such as climbing onto the stage from the stage front. *Cf.* Mazloum Dep. at 92-94 (admitting that he had climbed onto the stage rather using the monitored stage steps).

stage; Plaintiff then swung at Mr. Persons, who responded in kind.  (*Id*. at 101-02).  At that point,

one or more of Plaintiff's friends entered this tussle, grabbing Mr. Persons and causing at least

some of them to fall to the stage floor.  (*Id*. at 102.)  By that time, off-duty police officers who

had already been on the stage "ran over" to where the fight was occurring, identified themselves

as "MPD Police," and attempted to control the situation.  (*Id*. at 102-03.)

The testimony of Defendant Officer Thaddeus Modlin—himself a Muslim

(October 3, 2006 Deposition of Thaddeus Modlin ("Modlin Dep.," attached hereto as

"Exhibit 7") at 238-39), the FUR Defendants would herein note in light of Plaintiff's various

allegations in this litigation of racial or religious discrimination—corroborated Mr. Person's

description of the off-duty MPD Officers' initial involvement in this situation.  Officer Modlin's

testimony also described an intense "verbal altercation," "yelling," and "a lot of[ pre-fight] hand

gestures" between Plaintiff and Mr. Persons before their fight began (*id*. at 94-96).  Ultimately,

Officer Modlin became involved in their fight when he felt a female on the stage fall into him

and then almost fall of the stage (*id*. at 96), causing him then to see (*id*. at 96-97) that Plaintiff

and Mr. Persons were

> involved in a physical altercation.  And then two more individuals jumped on to
> the bouncer.  And at that time I saw him fall backwards.  And then that is when
> the feet and hands started coming into play and it became a felony.  So I had no
> choice but to get involved.

Officer Modlin further detailed how he saw Plaintiff and Plaintiff's two friends battering

Mr. Persons on the stage:

> [MR. CORCORAN:]
> Q.    And you said that you saw the plaintiff doing something to the bouncer.
>        What did you see him do?
> A.    I saw him throwing punches and kicks.
> Q.    Did any of these connect?
> A.    Yes.

Q.     Where were they connecting on the bouncer?

A.     I saw one punch hit his face.  And I saw, when he fall backwards, I saw him kick in the, like, shin area.

Q.     You said there were two other individuals involved?

A.     Yes.

Q.     Had you seen them before that night?

A.     No, sir.

Q.     What did they look like?  Who were they?

A.     They both looked like -- well, all three of them looked like they were from the Middle East descent.  But I had never seen them before.

Q.     What were they doing?

A.     They were participating in the assault.

Q.     How?

A.     Punches and kicks.

Q.     And they were connecting as well?

A.     Yes.

Q.     And what was the bouncer doing? Trying to defend himself?

A.     Yes.

Q.     And this is all on the stage?

A.     Yes, it is.

Q.     Did you see the bouncer hit anybody in response?

A.     I saw the bouncer connect with the plaintiff, like, maybe once or twice, before he fell backwards.  And after that, when he fell backwards, I guess he was at a disadvantage and that is when we interceded. We intervened.

(*Id.* at 98-100.)

With Plaintiff still swinging and kicking wildly, several off-duty officers—defendants herein—grabbed Plaintiff as best they were able and struggled, with some assistance from Mr. Persons, to get Plaintiff down the stage steps and across the main dance floor to the staircase leading to the Tunnel area, at which point the officers were finally able to cuff Plaintiff.  (Persons Dep. at 103-04.)  "[O]nce the police cuffed [Plaintiff], [Mr. Persons] let him go."  (*Id*. at 104.)  The officers then walked Plaintiff up the staircase leading to the Tunnel, and Mr. Persons "stayed behind them."  (*Id*.)

Although he heard Plaintiff cursing at Defendant Officer Ramirez outside the club, Mr. Persons was at that point primarily involved with deciding whether he would himself press

charges against Plaintiff and with treating, by means of an MPD icepack, the injury he himself suffered to his bicep.  (*Id*. at 105-06.)

In sum, nothing whatsoever regarding Mr. Persons' version of the goings-on that evening is inherently implausible, still less is it beyond belief.  To the contrary, these various facts strongly support Mr. Persons' account of self-defense against this out-of-control customer.

> **4.  Plaintiff has, conversely, testified to a "too incredible" version of events regarding the start of the fight between him and Mr. Persons**

Plaintiff's sworn account of how this incident began claimed, as an initial matter, that Plaintiff was on the stage area of FUR *only a single time that night* (Mazloum Dep. at 316-17 ("I'm very sure.")), having on that one occasion climbed up the front of the stage rather than using the stage steps (*id*. at 252, 334).[7]  Plaintiff further testified that, while on the stage that one and only time, *no one* informed him to get off of it.  (*Id*. at 99.)

---

[7] However, even Plaintiff's friend Imad Alkadi contradicted Plaintiff on this point by testifying (Alkadi Dep. at 335-37) that Plaintiff twice went onto the stage that evening via the stage steps:

> Q.  Did [Mr. Mazloum] go up the stairs to get onto the stage on the occasions that he went onto the stage?
> A.  Every time I saw him he was going up the stairs.
> Q.  How many -- I'm sorry.  Go ahead if you're not finished.
> A.  I was going to ask you that.  I saw him twice, like I said earlier.  I saw him twice going up.  I mean the first time he went there and the second, I mean he went inside, came out from the stairs, and the second time the same thing.
> Q.  Were you at the bottom of the stairs at the chain when that was occurring?
> A.  No.  I was on the top.  Marwan was in the bottom. …
> Q.  Did you see Marwan raise the chain to let Mr. Mazloum up?
> A.  Yeah.
> Q.  How many times?
> A.  Twice.
> Q.  Do you know what approximate times?

(footnote continued …)

Plaintiff also swore under oath that he was neither out of control nor drunk that night (*id*. at 323)[8] and that, while on the stage *but before* their first physical contact, he had had no exchange of words with Mr. Persons (*id*. at 98-101, 252, 317-19).

Notwithstanding the absence of prior interaction with Mr. Persons, Plaintiff also claimed that—*as he was leaving the stage area, entirely of his own volition, and after he descended*

---

(... footnote continued)

> A.   The first time he got in and then he left.  Then he came back in like 30 minutes and got back on again.  So it was like he maybe -- I mean he went inside the first time.
> He, you know, was roaming and maybe he didn't find anybody, he didn't find any girl that he likes or whatever.  He went and roamed in the club and came back again to the stage.  That's what I'm guessing.

[8] Various witnesses testified to the contrary that Plaintiff was intoxicated that evening.  *E.g.*, Modlin Dep. at 246-47:  "He was definitely intoxicated by an alcoholic beverage because I could smell it coming from his pores and his breath.  And he may also have been high on some type of narcotic."

*This view regarding Plaintiff's evident intoxication was not limited to the participants to this incidents.*  Following a call to the City of Alexandria, Virginia Police Department, Officer Humberto Trapero responded at Alexandria Inova Hospital and met sometime "pretty late" in the early morning hours of March 12, 2005 with Plaintiff.  (February 23, 2007 Deposition of Humberto Trapero ("Trapero Dep.," attached hereto as "Exhibit 8") at 1-11.)  Officer Trapero— who had considerable training for and experience with detecting chemical intoxication (*id*. at 18-21)—"tried to make sense of what [Plaintiff] was telling [him].  But it was really hard due to [Plaintiff's] level of intoxication."  (*Id*. at 17.)  Describing an "even stronger smell[ of alcoholic beverage"] every time that he spoke" (*id*. at 21), Officer Trapero also remembered "something that [Plaintiff] mentioned, he mentioned something like 'I've had too many drinks'" (*id*. at 22).

On cross-examination by Plaintiff's counsel, Officer Trapero described (*id*. at 35) various aspects of Plaintiff's appearance and demeanor which led him to the conclusion that Plaintiff was intoxicated, even an hour or more after the events at FUR had taken place:

> A.   Well, like I said, the smells I'd given [sic], strong smell of alcoholic beverage coming from his breath.  I did observe some red, bloodshot eyes.  They were glassy as well.  He was agitated.  He was excited, agitated and he kept on repeating the same thing, that he was attacked, attacked, attacked.  I asked him to calm down.  He kept on saying it.  He appeared very agitated, yes.

*several steps from the stage to get to the main dance floor*—someone (whom Plaintiff said he later identified as Mr. Persons) unexpectedly "grabbed" him from behind, by wrapping his arms around Plaintiff, and proceeded to push him onto the main dance floor.  (*Id*. at 98-101, 252.)

Mr. Persons and FUR respectfully submit that Plaintiff's version of the events is too incredible to believe.  Specifically, it simply beggars belief that a FUR security member monitoring this stage would *attack a customer from behind and out of the blue* (i) while, according to Plaintiff's own testimony (Mazloum Dep. at 98-101), that customer was in the process of removing himself from that stage by walking down the stage steps and (ii) without having had, according to Plaintiff's testimony (*id*.), any interaction whatsoever with that customer whereas, moments earlier, they both were standing on the stage.  To suggest that an attack such as testified to by Plaintiff would be merely "unusual" or "unorthodox" would not even be close to correct.  In point of fact, Plaintiff's description of these events is unintentionally ridiculous, not least against the backdrop of credible testimony such as that of Officer Modlin (quoted *supra* at 24-25) regarding Plaintiff's actions before the fight broke out between Plaintiff and Mr. Persons.

Indeed, specifically regarding the very beginning of this alleged attack by Mr. Persons upon Plaintiff, even Plaintiff's own friend Marwan Abi-Aad observed to the contrary that, while descending the stage steps just before this fight broke out, Mr. Persons had his hands *not wrapped around Plaintiff* (Mazloum Dep. at 100-01) but, rather, merely on Plaintiff's shoulders in the process of escorting him off of the stage:

> Q.    How did Mr. Persons use his arms and his hands as far as you could see?
> A.    In the beginning it was like he put his hands on his shoulders like.
> *Q.    Did it appear to you that Mr. Persons was trying to push Emile down the stairs?*
> *A.    Not pushing-pushing.  To rush him, like --*

> Q.    *Like he was trying to escort him out of the bar?*
> MR. CYNAMON:  Objection.  Go ahead.  You can answer.
> *THE WITNESS:  Out of the stage.*
> BY MR. FITZSIMMONS:
> Q.    Okay, all right.  Both of his hands you say were up at his shoulders?
> A.    Yes.
> Q.    Are you sure one wasn't at his waist and one on his shoulder?
> A.    No, both.
> Q.    Both on his shoulders.
> A.    Both.
> Q.    You're sure?
> A.    Yeah.

(February 12, 2007 Deposition of Marwan Abi-Aad Dep. at 157-58 (emphases added).)

In sum, notwithstanding Plaintiff's highly different version of how this tussle started, no jury should be permitted to speculate that Mr. Abi-Aad—a friend of Plaintiff's who was himself at the top of the stage steps in question (*id*. at 138-40), who was particularly watching these two men descend those steps (*id*. at 151-53, 157-58), and who has given unchallenged testimony that he was not drinking at the club that evening (*id*. at 29)—might somehow have testified incorrectly, under oath, about his having witnessed *the very same thing* that Defendant Persons testified occurred (*see* Persons Dep. at 101):  *viz.*, that Mr. Persons was merely escorting Plaintiff down the steps from the stage when this fight broke out.

> **5.    Plaintiff's "too incredible" claim of these events should result, under Rule 56, in his assault and battery against Mr. Persons and FUR being summarily dismissed**

As detailed above, Plaintiff's version of the facts is just "too incredible to be accepted by reasonable minds" (*Vale*, 191 F.2d at 336), and, thus, this Court should grant Mr. Persons and

FUR summary judgment on Plaintiff's assault and battery count because Mr. Persons' acting in self-defense here was both reasonable and legally privileged.[9]

It might further be appropriately noted—as the *credible* version of how this fight broke out amply suggests—that what much or all of this case is actually about is how the public actions of a physically out-of-control man unfortunately escalated late one night to the point of substantial police involvement and how, upon sober reflection, that man resolved to try to cash in against, *inter alia*, FUR and Michael Persons based on a rather minor brawl which he had himself instigated. Plaintiff's instant civil action has been a substantial and unwarranted burden on the time and energies of the FUR Defendants, and, based on Plaintiff's literally unbelievable story concerning his interaction that evening with Mr. Persons, his assault and battery claim against them ought not to be permitted to persist.

---

[9] Of course, a finding by this Court in favor of Mr. Persons and FUR as to Plaintiff's assault and battery count (Count II) would not, in and of itself, obviate any other of Plaintiff's stated causes of action.

IV.    CONCLUSION

For the reasons stated above,  Defendants Night & Day Management, LLC, Michael

Rehman, John Fiorito, and Michael Persons ask that this Court grant them summary judgment on

all claims against them herein.

Respectfully submitted,

/s/ Paul A. Fitzsimmons
_____
Thomas S. Schaufelberger, Bar No. 371934
Paul A. Fitzsimmons, Bar No. 444829
SAUL EWING LLP
2600 Virginia Avenue, N.W.
The Watergate—Suite 1000
Washington, D.C.  20037
Telephone: (202) 333-8800

Counsel for
Defendants Night & Day Management, LLC,
Michael Rehman, John Fiorito, and
Michael Persons