# EXHIBIT 5

Page 1

1            UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLUMBIA
2
3
3    EMILE MAZLOUM                    :
4                                     :
4                    Plaintiff  :
5                                     :
5        vs.                          :    Civil Action No.
6                                     :    1:06:CV 00002
6                                     :    (JDB)
7    DISTRICT OF COLUMBIA,            :
7      et al.                         :
8                                     :
8                    Defendants  :
9
9                    Washington, D.C.
10                   Tuesday, February 27, 2007
10
11   Deposition of:
11
12       NIGHT and DAY MANAGEMENT, LLC
12          DESIGNATED REPRESENTATIVE
13               DAVID McLEOD
14   called for oral examination by counsel for
15   Plaintiff, pursuant to notice, at the offices
16   of Katten Muchin Rosenman, LLP, 1025 Thomas
17   Jefferson Street, N.W., East Lobby, Suite 700,
18   Washington, D.C. 20007-5201, before Renee A.
19   Feder, CSR, a Notary Public in and for the
20   District of Columbia, beginning at 1:47 p.m.,
21   when were present on behalf of the respective
22   parties:

1        A.     Background checks, police

2   clearance.

3        Q.     Who is in charge?

4        A.     I am.

5        Q.     What kind of background check?

6        A.     We do a background check, meaning

7   we have a company that checks -- that does

8   thorough background checks, makes sure you

9   have no felonies.  We do a police clearance

10  through Maryland, Virginia and D.C.  Meaning

11  if anything comes back stating you have been

12  in any misdemeanor, any assault charge, any

13  felonies, you cannot work at FUR nightclub.

14       Q.     Did you do those kind of checks

15  for Mr. Persons?

16       A.     Sure enough did.

17       Q.     All --

18       A.     Any employee at FUR nightclub.

19       Q.     Checks were all negative for

20  Mr. Persons?

21       A.     Yes, they were.

22       Q.     Topic 11 is the security system in

1  place at FUR as of March 11th including but

2  not limited to the video surveillance system

3  that is in place at such time.

4          A.    The video consist of a theft

5  thing.  We have all video cameras at all

6  registers, back door entrance, front door

7  entrance.  It is more used for theft than

8  anything.

9          Q.    How many cameras?

10         A.    Roughly, I am thinking maybe about

11  24.

12         Q.    Who installed them?

13         A.    I have no idea.

14         Q.    Ever hear of a company call JB

15  Security?

16         A.    I know JB.  I didn't know that is

17  what he called the company, JB Security.

18         Q.    What is JB's name, actually?

19         A.    I have no idea.  I call him JB.

20         Q.    Do you know where his place of

21  business is?

22         A.    I have no idea.

Page 53

1              (Document referred to marked

2    Deposition Exhibit No. 1 for identification

3    and subsequently attached to the deposition.)

4              BY MR. KAPLAN

5        Q.    Have there been any other changes

6    other than the two that you just added, which

7    you just explained, in the number of video

8    surveillance cameras or the location of video

9    surveillance cameras since March 11, 2005?

10       A.    No.

11       Q.    Item Number 12 is the video and/or

12   still images captured by such surveillance

13   system including but not limited to all

14   cameras trained anywhere inside or outside of

15   FUR on the night of March 11th including any

16   video or still images of the altercation?

17       A.    None of the altercations was on

18   the cameras because the cameras are not in

19   those directions.  The cameras are on

20   registers.

21       Q.    How do you know that there are no

22   or were now video camera film of the

Page 54

1    altercation?

2        A.    Okay.  They said the altercation

3    happened on the stage.  I don't have a camera

4    going towards the stage at all.

5        Q.    Okay.  But you understand that the

6    altercation didn't take place only on the

7    stage?  You are aware of that.  Right?

8        A.    Okay.  No, I am not aware of that.

9    They told me it happened on the stage.

10       Q.    Who told you that?

11       A.    Mike Persons.

12       Q.    So, Mike Persons told you that it

13   occurred on the stage.  There were no cameras

14   pointed on the stage.  So that was the end of

15   the inquiry.  Is that it?

16       A.    I can't see nothing -- I can't see

17   what I can't see.  I don't have cameras

18   pointed that way so why would I look.

19       Q.    On the night of the altercation,

20   how did you first become aware that there had

21   been an altercation?

22       A.    I came outside.  Your client was

1    the same conversation?

2        A.    I am trying to think if both of

3    them were together.  They could have been

4    together.  I can't recall.

5        Q.    What was the system for

6    preservation of what was caught in the

7    cameras, if you wanted to preserve something?

8        A.    If I wanted to preserve something?

9        Q.    Yes.

10       A.    I could burn it.

11       Q.    How would you do that?

12       A.    It is a computer -- it is

13   computerized.  The same way you want to

14   download a file, I download what I need to

15   burn.

16       Q.    If you didn't download and burn

17   something, what would happen?

18       A.    It falls off.

19       Q.    It falls off?

20       A.    Meaning it disappears.  It just

21   erases within three days.

22       Q.    Does everyone know that -- well,

Page 77

1    still look at him and tell him you can't see

2    nothing on the cameras because the cameras are

3    not pointed in that direction, the cameras are

.4   pointed to the registers, bartenders.

5          Q.    When you spoke to Mr. Fiorito, you

6    told him the same thing?

7          A.    The same thing.

8          Q.    Did Mr. Fiorito tell you, David, I

9    know that the incident started on the stage,

10   but it kind of continued across the room, up

11   the steps to the tunnel, and through the

12   tunnel to the outside?  Did he tell you that?

13         A.    No.

14         Q.    He never told you that?

15         A.    He never told me that.

16         Q.    There is a camera that shows the

17   steps up to the tunnel.  Is there not?

18         A.    No, there are not.

19         Q.    There isn't any?

20         A.    There is no camera that shows the

21   steps going up to the tunnel.

22         Q.    There is a camera that shows the

```
 1              THE WITNESS:  Yes.

 2              BY MR. KAPLAN

 3         Q.    Have you ever had occasion to

 4    download and burn something off of the camera?

 5         A.    I burned bartenders stealing.

 6         Q.    And you saved it on a disc?

 7         A.    Yes.

 8         Q.    How many times have you done that?

 9         A.    Twice.

10         Q.    Anything else?

11         A.    That is it.

12              Oh, back it up.  I also downloaded

13    a murder that happened across the street for

14    MPD, that happened right in front -- this is

15    the front entrance of the door of the club.

16    It happened right there in front of the club.

17         Q.    On the same side of the street?

18         A.    On the same side of the street of

19    the club.

20         Q.    When did this murder take place?

21         A.    I can't really speak on it because

22    I am going to court for that because I am the
```

Page 80

1    one who burned the CD for them for that.

2         Q.    I am not going to ask you for the

3    details.  Just when did it happened.

4         A.    It happened early -- I am going to

5    say maybe August.

6         Q.    This past August?

7         A.    Yes.

8         Q.    Am impatient customer couldn't get

9    into the door?

10        A.    No.  The club wasn't even open.

11   The cameras run all the time and it was a

12   murder right in front of the club, maybe

13   12:00 that day, and they needed -- it just got

14   captured on the camera and they needed me to

15   burn that for them.

16        Q.    Did the police came around and

17   ask --

18        A.    If anyone saw the murder.  And

19   then they asked do we have a camera.

20        Q.    When the police officers who came

21   to FUR on the morning of March 12th, the

22   uniformed officers, did they ask you or, to

Page 81

1    your knowledge, did they ask anyone that any

2    of this was captured on video camera

3    surveillance?

4        A.    They asked me did I see anything,

5    I said no, because I didn't see anything.

6        Q.    Did they ask you if the cameras

7    might have shown something?

8        A.    I can't recall.  But if they did,

9    I would have told them no.

10        Q.    When you saw the officers, you

11    wouldn't have told them no because you didn't

12    know what had happened or and where it

13    happened.  Right?

14        A.    Are you talking about the murder?

15    Or you are talking about this case.

16        Q.    No, I am talking about this case.

17        A.    You are talking about this case?

18        Q.    Yes.

19        A.    When the officers, if the officers

20    asked me, I would say, no, I didn't see none

21    of this.  If the officer asked me did the

22    cameras catch anything, I would say no,

Page 159

1          corresponding with the incident that we are

2          dealing with here?

3                    A.    Did I review that tape?

4                    Q.    Yes.

5                    A.    Yes, I have seen it.

6                    Q.    Okay.  How did it come about that

7          you reviewed that type?

8                    A.    The next day I looked at them

9          coming out of the club.

10                   Q.    Okay.  How did it come about that

11         you decided to look at this tape?

12                   A.    I mean, we discussed to look at

13         the tape because of the simple fact -- I

14         gradually looked at the tape of people coming

15         out of the club.  In other words, I review

16         tapes, anyway.

17                   Q.    You say "we discussed."  Who did

18         you discuss this with, reviewing the tape?

19                   A.    Mr. Romeo.

20                   Q.    Are you certain it was Mr. Romeo?

21                   A.    Yes.  He asked me to look at the

22         tape.

1          Q.    Did Mr. Fiorito ask you to look at

2     the tape?

3          A.    They both was there.

4          Q.    They both was there.  When did

5     they ask you to review the tape?

6          A.    The next day.

7          Q.    And when did you actually review

8     the tape?

9          A.    Saturday.

10          Q.    What did you see when you reviewed

11     the tape?

12          A.    I seen the patron coming out, four

13     guys around him, walking down the steps.

14          Q.    Did you see this group from any

15     other vantage?

16          A.    You also see them walking out of

17     the club from the camera that is pointed

18     directly toward the front door.

19          Q.    Who did you see exactly in this

20     tape?

21          A.    Well, I saw the Spanish cop, I saw

22     the -- it is the Spanish cop.  There is

1      Modlin.  It a white cop that I don't know.

2      And it is another cop, a black cop, a black

3      cop that I don't know.  I guess that is

4      Phillips.  I assume, I don't know.  And your

5      patron, the patron is in the middle of these

6      four cops.

7           Q.    How long in hours or minutes or

8      seconds did these people appear on the OC

9      camera screen?

10          A.    Second.  Seconds.

11          Q.    How many seconds?

12          A.    I am going to say maybe 30

13     seconds, if that is the most, walking.  You

14     see them walking, and walking down.

15          Q.    You are talking about both

16     cameras, you see them for 30 seconds?

17          A.    Yes, both cameras.  You see them

18     walk out and walk down.

19          Q.    You say walked out.  Did you see

20     Mr. Mazloum getting dragged out?

21          A.    No.  He walked out on his own

22     recognizance.

Page 162

1          Q.     You can tell that from looking at

2     the tape?

3          A.     Yes.  You can tell that by looking

4     at the tape.  You can see him walking out with

5     four guys around him.  He gets to the steps.

6     You can see him walking down the steps with

7     four guys around him.

8          Q.     Did you make any kind of report to

9     Mr. Fiorito about what you looked at after you

10    looked at this tape?

11         A.     I let him know he walked out.

12    That is the only report I can give him.

13         Q.     Did you report to him that you saw

14    cops beating Mr. Mazloum as he was walking

15    down the stairs?

16         A.     No, I never saw that.

17         Q.     Other than these guys walking down

18    the stairs, was there anything happening?

19         A.     No, they walked him out.

20         Q.     By what means did you review this

21    tape for this purpose?  How did you do it?

22         A.     What do you mean?  Well, you

Page 164

1          Q.     You mean into the monitors?

2          A.     Into the monitors.

3          Q.     What kind of code?

4          A.     It is a four digit pin code.

5          Q.     Who has the four digit pin code at

6    FUR?

7          A.     Myself and Diego.

8          Q.     Does Michael Rehman have it?

9          A.     No.

10          Q.     Does John Fiorito have it?

11          A.     No.

12          Q.     Does anyone else have it besides

13    you and Diego?

14          A.     No, Diego and myself.

15          Q.     Did you ever tell it to anybody

16    else?

17          A.     No.

18          Q.     Did Michael Rehman ever ask you to

19    destroy any footage of what happened that

20    night?

21          A.     No.  You can't destroy it anyway.

22    But no.

1          Q.    Did John Fiorito ever ask you to

2     destroy any footage from that night?

3          A.    No.

4          Q.    Did anyone ever ask you to destroy

5     any footage from that night?

6          A.    No.

7          Q.    Did you ever report to anybody

8     that you had seen something on the tape that

9     suggested to you that it needed to be saved as

10    evidence?

11         A.    No.

12              MR. FITZSIMMONS:    I have no

13    further questions.

14    EXAMINATION BY COUNSEL FOR DEFENDANTS ACOSTA AND

15                     SMITH

16              BY MR. SCHIFFERLE

17         Q.    Mr. McLeod, my name is Carl

18    Schifferle.  I am the attorney who is

19    representing two officers, Officer Acosta and

20    Officer Smith.

21              It is my understanding that you

22    know Officer Jose Acosta?