# EXHIBIT 7

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 2
 3
 3  EMILE MAZLOUM              :
 4                             :
 4            Plaintiff        :
 5                             :
 5     vs.                     :  Civil Action No.
 6                             :  1:06:CV 00002
 6                             :  (JDB)
 7  DISTRICT OF COLUMBIA,      :
 7     et al.                  :
 8                             :
 8            Defendants :
 9
 9                        Washington, D.C.
10                        Tuesday, October 3, 2006
10
11  Deposition of:
11
12            THADDEUS M. MODLIN, JR.
13  called for oral examination by counsel for
14  Plaintiff, pursuant to notice, at the offices
15  of Katten Muchin Rosenman, LLP, 1025 Thomas
16  Jefferson Street, N.W., East Lobby, Suite 700,
17  Washington, D.C. 20007-5201, before Renee A.
18  Feder, CSR, a Notary Public in and for the
19  District of Columbia, beginning at 9:40 a.m.,
20  when were present on behalf of the respective
21  parties:
22
```

```
 1  through the crowd.
 2       Q.    Holding your drink, you had to
 3  protect it?
 4       A.    Sort of.  Typical.  Typical
 5  nightclub drink juggling.
 6       Q.    You got back on the stage.  You
 7  found Officer Phillips?
 8       A.    Yes.
 9       Q.    And then what happened next?
10       A.    Me and Phillips just sat there and
11  were checking out the women in the club.  And
12  just talked to each other.  And at that time
13  out of my peripheral vision I saw one of the
14  bouncers and I guess the plaintiff having a
15  verbal altercation.  At that time I really
16  wasn't even paying attention to it.  You know,
17  that is their job.  They are bouncers.  That
18  is what they do.
19       Q.    That wasn't why you were at the
20  nightclub that night?
21       A.    No.  No.
22       Q.    And this is, the person who was
```

1  having the altercation, this is the individual
2  you identified as Michael?
3      A.   Yes.
4      Q.   And he was on the stage?
5      A.   Yes.
6      Q.   And you just saw them talking?
7      A.   It looked like they were having --
8  a lot of hand gestures and a lot of -- it
9  looked like yelling.  At that point I just
10 went back talking to Phillips and never paid
11 attention again until it got into actual
12 fighting.
13     Q.   They weren't fighting at that
14 time?
15     A.   No, sir.
16     Q.   And you didn't see any reason to
17 involve yourself in it?
18     A.   No, sir.
19          MR. CORCORAN:  Let's take about
20 five minutes.
21          MS. PHILLIPS:  Do you want to take
22 it at 11:00 o'clock?

1               (Discussion off the record.)

2           BY MR. CORCORAN

3       Q.    So you didn't see any reason to
4  get involved in their discussion?

5       A.    No, not at that time.

6       Q.    And there was no physical
7  involvement in their discussion, they were
8  just --

9       A.    It was, like I said, a lot of hand
10 gestures and things at that time.  So I didn't
11 deem it necessary for me to interlope into
12 their conversation.

13      Q.    If you recall, how much time
14 passed from when you first saw them having a
15 discussion and then when you saw the
16 altercation at issue in this lawsuit?

17      A.    Roughly, a minute, two minutes.

18      Q.    What did you first see?

19      A.    Well, actually, at first I didn't
20 see anything.  I felt a female, like, fall
21 into me and almost fall off of the stage.  And
22 at that time I looked over and I saw both of

1   them involved in a physical altercation. And
2   then two more individuals jumped on to the
3   bouncer. And at that time I saw him fall
4   backwards. And then that is when the feet and
5   hands started coming into play and it became a
6   felony. So I had no choice but to get
7   involved. And I tapped Officer Phillips and
8   told him to hold my drink. He looked at me as
9   if I was silly because he is police also. So
10  we both sat our drinks down and went over and
11  attempted to break the fight up and grab the
12  most aggressive person at that time.
13       Q.   Why did he look at you silly?
14  What do you mean?
15       A.   Because, I mean, he is a police
16  officer. He is not going to sit there and
17  watch me try to break up a fight without him
18  getting involved also.
19       Q.   He was sort of thinking you are
20  being dumb, let me help you?
21       A.   Yes. Yes.
22       Q.   Now, you said you saw the bouncer

```
 1  fall?
 2       A.    Yes.  He fell back on to his hand
 3  like this, (Indicating.)  At which time I saw
 4  the plaintiff and his other friends continue
 5  to throw punches and start to kick him.
 6       Q.    Did he fall on the stage?
 7       A.    Yes.
 8       Q.    This is all on top of the stage?
 9       A.    Yes, this is all on the stage.
10       Q.    And did people clear away?
11       A.    As I said, an Asian female almost
12  fell off of the stage.  And I guess people
13  started to make way as they saw a fistfight
14  occurring.
15       Q.    And you said that you saw the
16  plaintiff doing something to the bouncer.
17  What did you see him do?
18       A.    I saw him throwing punches and
19  kicks.
20       Q.    Did any of these connect?
21       A.    Yes.
22       Q.    Where were they connecting on the
```

```
 1   bouncer?
 2        A.    I saw one punch hit his face.  And
 3   I saw, when he fall backwards, I saw him kick
 4   in the, like, shin area.
 5        Q.    You said there were two other
 6   individuals involved?
 7        A.    Yes.
 8        Q.    Had you seen them before that
 9   night?
10        A.    No, sir.
11        Q.    What did they look like?  Who were
12   they?
13        A.    They both looked like -- well, all
14   three of them looked like they were from the
15   Middle East descent.  But I had never seen
16   them before.
17        Q.    What were they doing?
18        A.    They were participating in the
19   assault.
20        Q.    How?
21        A.    Punches and kicks.
22        Q.    And they were connecting as well?
```

```
 1        A.    Yes.
 2        Q.    And what was the bouncer doing?
 3   Trying to defend himself?
 4        A.    Yes.
 5        Q.    And this is all on the stage?
 6        A.    Yes, it is.
 7        Q.    Did you see the bouncer hit
 8   anybody in response?
 9        A.    I saw the bouncer connect with the
10   plaintiff, like, maybe once or twice, before
11   he fell backwards.  And after that, when he
12   fell backwards, I guess he was at a
13   disadvantage and that is when we interceded.
14   We intervened.
15        Q.    Did you see the bouncer hit any of
16   the other guys that were involved in this
17   fight, according to you?
18        A.    I don't remember.
19        Q.    Did Officer Phillips also see, if
20   you know, did he also see the other two
21   individuals hit the bouncer?
22        A.    I don't know.
```

1   slur.  If we use that word amongst ourselves,
2   I don't consider that a racial slur.
3         Q.   Is Officer Phillips an African
4   American?
5         A.   Yes, he is.
6         Q.   If he used the N word, for
7   example, you wouldn't consider it a slur?
8         A.   No.
9         Q.   Did you ever hear him slur people
10  of other races?
11        A.   No, sir.
12        Q.   How about Officer Schneider?
13        A.   No, sir.
14        Q.   He never used the N word to you?
15        A.   No, sir.
16        Q.   And you never heard him say it to
17  anyone else?
18        A.   No.
19        Q.   Did you ever hear anyone use the
20  term Al-Qaeda to somebody in the Middle East?
21        A.   No.  And, honestly, I wouldn't
22  have stood for that anyway.  I am Muslim, so

1  to me that is totally disrespectful.  Post
2  9/11 the way it is right now it is hard enough
3  being Muslim, but being Arab descent or Middle
4  Eastern descent it is even worse.
5       Q.    So you agree then that if a police
6  officer were to use the term Al-Qaeda to a
7  Muslim person in the course of detaining them,
8  that that would be inappropriate?
9       A.    I would think it is totally
10 inappropriate and I think it is egregiously
11 wrong to do even it.
12      Q.    And you never heard any of the
13 officers you were with use that term to the
14 plaintiff in this case?
15      A.    No, sir, I didn't.
16      Q.    But you also admitted you were not
17 outside for a good portion of the night.
18 Correct?
19      A.    That is correct.
20      Q.    You don't know what was said
21 during that period?
22      A.    As to anything that was said

```
 1    conjecture.  He was just extremely combative
 2    and strong.  I am 6' 4", and I weigh 240 but I
 3    still couldn't get his left, his left arm
 4    around behind his back.
 5         Q.   Have you had any experience with
 6    people who are on drugs that make them wild
 7    and combative?
 8         A.   Yes.
 9         Q.   What kind of experience have you
10    had in that regard?
11         A.   I have had numerous incidents
12    where we have gotten into physical
13    altercations with subjects that were high on
14    PCP, cocaine, things of that sort that are
15    totally oblivious to any type of restraint
16    holds.
17         Q.   What has been your observations in
18    those situations about their strength?
19         A.   Their strength is like, I would
20    say, magnified.
21         Q.   Did you have any suspicions that
22    night in that regard regarding Mr. Mazloum?
```

1     A.    Yes, I did.

2     Q.    What was that?

3     A.    He was definitely intoxicated by
4  an alcoholic beverage because I could smell it
5  coming from his pores and his breath. And he
6  may also have been high on some type of
7  narcotic.

8     Q.    And you don't have anything
9  against Muslim people?

10    A.    No. No. None. That would be
11 sort of like self hate.

12    Q.    You wouldn't?

13    A.    No.

14          MR. FITZSIMMONS: I think that is
15 all I have.

16          Thank you very much.

17          MS. PHILLIPS: No questions.

18          MR. BRUCKHEIM: I have no
19 questions either.

20          MR. CORCORAN: Thank you very
21 much, officer.

22          MR. BRUCKHEIM: Mr. Modlin, you