# EXHIBIT 8

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM                    :
                                 :
            Plaintiff            :
                                 :
    vs.                          :  Civil Action No.
                                 :  1:06:CV 00002
DISTRICT OF COLUMBIA,            :  (JDB)
    et al.                       :
                                 :
            Defendants           :

                 Washington, D.C.
                 February 23, 2007

Deposition of:

        HUMBERTO ALEXANDER TRAPERO,

called for oral examination by counsel for
Defendants, pursuant to notice, held at the
Office of the Attorney General, Government of
the District of Columbia, 441 4th Street,
N.W., 6th Floor South, Washington, D.C.,
beginning at 10:18 a.m., before Lynell C.S.
Abbott, a Notary Public in and for the
District of Columbia, when were present on
behalf of the respective parties:

Page 2

On behalf of the Plaintiff:

BY: JOHN A. ROSANS, ESQ.
    Katten Muchin Rosenman, LLP
    1025 Thomas Jefferson Street, N.W.
    East Lobby, Suite 700
    Washington, D.C. 20007
    (202)625-3620

On behalf of Defendants Night and Day Management, LLC, Rehman, Fiorito and Persons:

BY: SUCHI BATRA, ESQ.
    Saul Ewing, LLP
    2600 Virginia Avenue, N.W.
    Suite 1000, The Watergate
    Washington, D.C. 20037
    (202)333-8800

On behalf of Defendants Ramirez, Modlin, Phillips and Schneider:

BY: MICHAEL P. BRUCKHEIM, ESQ.
BY: LETICIA L. VALDES, ESQ.
    Office of the Attorney General
    Government of District of Columbia
    441 4th Street, N.W. 6th Floor South
    Washington, D.C. 20001
    (202)442-9845

On behalf of Defendant District of Columbia:

BY: DAVID A. JACKSON, ESQ.
    Office of the Attorney General
    Government of District of Columbia
    441 4th Street, N.W. 6th Floor South
    Washington, D.C. 20001
    (202)724-6519

Feder Reporting Company
(202) 863-0000

Page 3

On behalf of Defendants Acosta and Smith:

BY: CARL SCHIFFERLE, ESQ.
    Office of the Attorney General
    Government of District of Columbia
    441 4th Street, N.W. 6th Floor South
    Washington, D.C. 20001
    (202)442-9845

Also Present: Chris Wiener, Intern
    +++
    CONTENTS

WITNESS: HUMBERTO ALEXANDRER TRAPERO

EXAMINATION BY:            PAGE:
    MR. BRUCKHEIM           4
    MR. SCHIFFERLE          30
    MR. ROSANS              31

    EXHIBITS
DEPOSITION NO.   MARKED FOR IDENTIFICATION
    1  Copy of photograph         11

Feder Reporting Company
(202) 863-0000

Page 4

Whereupon,
    HUMBERTO ALEXANDER TRAPERO
was called for examination and, having first duly sworn (or affirmed), was examined and testified as follows:
    EXAMINATION BY COUNSEL FOR DEFENDANTS RAMIREZ, MODLIN, PHILLIPS AND SCHNEIDER
        BY MR. BRUCKHEIM:
    Q   Good morning.
    A   **Good morning.**
    Q   Could you please state your name for the record and spell your last name.
    A   **Okay. First name is Humberto. Middle name, Alexander. Last name is Trapero, T-r-a-p-e-r-o.**
    Q   And where are you employed?
    A   **At City of Alexandria Police Department.**
    Q   How long have you been employed there?
    A   **Over five years now.**

Feder Reporting Company
(202) 863-0000

Page 5

    Q   Are you employed as an officer?
    A   **Yes.**
    Q   Could you please provide your business address for the record?
    A   **It's 2003 Mill Road, Alexandria, Virginia, 22314.**
    Q   Officer Trapero, have you ever been deposed in a civil case before?
    A   **No.**
    Q   I'm going to give you a couple guidelines for how things will proceed today.
    A   **Okay.**
    Q   First of all, for the record, my name is Michael Bruckheim. I represent four defendants in this action. I represent Officers Ramirez, Modlin, Schneider and Phillips in this lawsuit. They are known as the off-duty officers.
        I am going to be asking you a series of questions. You will be giving answers under oath. For purposes of simplicity and for the court reporter's ease,

Feder Reporting Company
(202) 863-0000

Page 6

1  I would ask that you wait until I finish
2  asking a question before you give an answer.
3  And then by the same token, I will wait until
4  you finish answering before I ask another
5  question.
6         If you do not understand a
7  question, please say so and I'll try to
8  rephrase it so that you can understand it.  If
9  you need to take a break at any time just let
10 us know and we can do that.
11        From time to time you may hear
12 other attorneys here make objections on the
13 record, which we are allowed to do.  I can say
14 that you will be asked to answer all of the
15 questions.  So if an attorney makes an
16 objection, I would ask that you just wait
17 until the attorney finishes speaking to put
18 their objection on the record.  And then the
19 usual response after that will be "You can
20 answer."  They basically just preserve the
21 objection for the record for this.
22    A   Okay.

Feder Reporting Company
(202) 863-0000

Page 7

1     Q   In the course of your job as an
2  officer, have you ever testified at trial?
3     A   Yes.
4     Q   These are for criminal trials?
5     A   Yes.
6     Q   Can you recall how many times
7  you've had to do that since you've been an
8  officer?
9     A   Several.
10    Q   More than ten?
11    A   More than ten.
12    Q   I am here to ask you some
13 questions about what happened in the early
14 morning hours of March 12th, 2005.  Do you
15 recall receiving a call or a request to report
16 to the Alexandria Hospital?
17    A   Yes.  I was sent there by a call,
18 yes.
19    Q   When you say you were sent by a
20 call, was that a call you received from
21 dispatch?
22    A   Yes.

Feder Reporting Company
(202) 863-0000

Page 8

1     Q   Do you recall what dispatch told
2  you in that call that they made to you?
3     A   No.
4     Q   They did say, however, to report
5  to Alexandria Inova Hospital.
6     A   Right, yes.
7     Q   Were you told to look for someone
8  in particular when you got to the hospital?
9     A   Yes.
10    Q   Do you recall what you were told?
11    A   As far as I can remember, it's
12 been a while now, but as far as I can
13 remember, they told me that the subject who
14 came from D.C. was in Room so and so, which I
15 don't recall the room number, and that's what
16 I responded to.
17    Q   When you arrived at the hospital
18 did you respond to that room?
19    A   Yes.
20    Q   To the best that you can recall,
21 what time did you arrive at the hospital?
22    A   I do not recall that.

Feder Reporting Company
(202) 863-0000

Page 9

1     Q   Can you recall if it was later
2  than 2:00 a.m.?
3     A   I know it was pretty late, yes.
4     Q   Late in terms of night but early
5  in terms of morning?
6     A   Right, yeah.  After midnight but
7  before my end of shift, which is about 7:30 in
8  the morning.
9     Q   How long had you been on your
10 shift before you received that call to go to
11 the hospital?
12    A   We start working at 8:30 in the
13 evening.  And the shift goes until 8:00
14 o'clock in the morning.  But at 7:30 in the
15 morning we get called back to headquarters to
16 do our final paperwork.
17    Q   You stated that when you arrived
18 at the hospital you reported to the room that
19 you were instructed to report to.
20    A   (Nodding.)
21    Q   Who did you see when you got to
22 that room?

Feder Reporting Company
(202) 863-0000

Page 10

1    A    Okay. I met this white male lying
2  on a stretcher. And I do not recall his name.
3  And you know, like I said, I just met him
4  right there.
5    Q    Was he the only person in the
6  room?
7    A    Yes, sir.
8    Q    At any time during your encounter
9  with him did you learn his name to be Emile
10 Mazloum?
11   A    I do not recall his name.
12   Q    Would you remember what he looked
13 like?
14   A    If I see him again, probably I
15 would. Like I said, again, you know, it was a
16 while back. And I am not required to fill out
17 a report for an offense that didn't happen in
18 our jurisdiction. Therefore, I didn't fill
19 out a report for that.
20   Q    Okay.
21   A    So I have to go by memory now.
22        MR. BRUCKHEIM: Let me have this

Feder Reporting Company
(202) 863-0000

Page 11

1  marked as Trapero 1.
2        (Document referred to marked
3  Deposition Exhibit No. 1 for identification
4  and subsequently retained by counsel.)
5        BY MR. BRUCKHEIM:
6    Q    Officer, I'm going to show you
7  what has been marked as Trapero Exhibit 1.
8  That's a photograph.
9    A    Yes.
10   Q    I would ask if you recognize that
11 photograph as the individual who you saw in
12 the room?
13   A    Yes.
14   Q    Thank you. When you went into the
15 room did you speak to this individual?
16   A    Yes.
17   Q    Did you ask him what had happened?
18   A    Yes.
19   Q    And what did he tell you?
20   A    Okay. He told me that he was in a
21 club in D.C., I don't recall the name of the
22 club. And he said, he did tell me that he had

Feder Reporting Company
(202) 863-0000

Page 12

1  a couple alcoholic beverages. I don't recall
2  exactly specifically what he told me that he
3  had had that evening. He did say that he went
4  up on a stage where some females were dancing
5  on. And he did tell me that he believed that
6  that was only for females.
7        So he got on the stage and the
8  next thing that he knows these, I guess,
9  security guards, I don't recall exactly what
10 he said when he was telling me exactly on that
11 point of the story, but he told me that he was
12 escorted out of the bar. When he was escorted
13 out of the bar through the rear gate, if I'm
14 not mistaken, or the back door, he told me
15 that somehow a discussion began and the next
16 thing he remembered he was on the ground and
17 he was being kicked at several times.
18       Of course, he requested to call
19 the police. He said, you know, they were
20 yelling at him. I do not recall exactly what
21 they were yelling at him. He also said that
22 two uniformed police officers from D.C.

Feder Reporting Company
(202) 863-0000

Page 13

1  arrived in a D.C. police cruiser. He said he
2  requested to talk to the officer. He noticed
3  that these security guards, which he later
4  told me that he knew they were D.C. police
5  officers, plain clothes that normally work
6  that extra duty detail, he said that he
7  observed the off-duty police officer going to
8  talk to the uniformed police officers.
9        They talked and then he noticed
10 that the uniformed police officers got back in
11 their cruisers. And at that point he went to
12 talk to them. They didn't want to talk to
13 him. He said he demanded a police report to
14 be taken. They said that they weren't
15 going -- the officers, the uniformed officers
16 said that they were not going to take any.
17       He said that he jumped on the back
18 of the cruiser, this gentleman here, he said
19 that he opened the door and he jumped on the
20 back of the cruiser and he demanded to be
21 either arrested or a police report to be
22 taken. He then said the police officers came

Feder Reporting Company
(202) 863-0000

Page 14

1 out of the front seat and they dragged him out
2 of the back seat and they, you know, threw him
3 back on the sidewalk.
4     And he said that he attempted to
5 go back to the cruiser and talk to a
6 supervisor and demand a report and so on, he
7 wanted to be arrested so he can go to the
8 police station. They said that they were not
9 going to arrest him. They said that they were
10 not going to take a police report. And then
11 they took off.
12   Q  Did he tell you anything about
13 what the security guards or the off duty
14 police officers may have said to him during
15 this incident?
16   A  No. I don't recall anything of
17 that.
18   Q  Did he describe anything that the
19 security officers or the off-duty police
20 officers did to him in terms of attacking him
21 or touching him? I know you testified that he
22 said that he had been kicked.

Feder Reporting Company
(202) 863-0000

Page 15

1   A  Right.
2   Q  Did he say anything else more
3 specific in terms of what they may have done
4 to him?
5   A  No. I don't recall anything of
6 that sort. What I can remember is that he
7 said he was pushed to the ground and he was
8 kicked several times while on the ground.
9   Q  Did you take any notes while he --
10   A  I filled out, well, we call it --
11 as a matter of fact, I have something here if
12 you guys want to take a look at it. We call
13 it a 15-A card which is normally an
14 information, basically a personal information
15 from people that we encounter and that we are
16 not going to take a report. So, you know,
17 basically this is what we normally do with
18 these people.
19     And this is what I filled out from
20 him, one of these 15-A cards. And right here
21 on the back we basically put a small little
22 narrative about what he told you or what was

Feder Reporting Company
(202) 863-0000

Page 16

1 the incident about, of course, if it's not a
2 criminal incident that occurred in our city.
3 Otherwise, we'll take a report.
4   Q  Would you still have a copy of
5 that card that you filled out?
6   A  Headquarters should have it, yes.
7 I don't. We normally turn those in at the end
8 of the shift every day.
9   Q  Okay.
10     MR. JACKSON: Just for the record,
11 the card that you were just showing us,
12 Officer, that is not the card that would be
13 associated with the person who was talking to
14 you in the hospital. Is that correct?
15     THE WITNESS: It should be.
16     MR. JACKSON: No, the one that you
17 have here.
18     THE WITNESS: Oh, no. The one I
19 have in my pocket is blank. I am just showing
20 you a sample.
21     BY MR. BRUCKHEIM:
22   Q  When the individual was speaking

Feder Reporting Company
(202) 863-0000

Page 17

1 to you in this room and telling you what had
2 happened, were you able to make any
3 observations about his physical appearance?
4   A  Yes.
5   Q  What do you recall?
6   A  I do recall that he had a swollen
7 left eye and a busted lip. His shirt was
8 ripped. I remember, also, that he had a
9 strong smell of alcoholic beverage on his
10 person. He did admit to me that he drank, you
11 know, some alcoholic beverages back in the
12 bar.
13     I noticed, also, that he had an
14 accent. I do, too. So he did tell me that he
15 was from some, I think it was some Eastern
16 country in Europe but I can't remember the
17 name of it. When he was talking to me, of
18 course, he was agitated and he was excited. I
19 tried to make sense of what he was telling me.
20 But it was really hard due to his level of
21 intoxication.
22   Q  You say due to his level of

Feder Reporting Company
(202) 863-0000

Page 18

1  intoxication.
2     A   Right.
3     Q   Let me ask you this: Prior to
4  this date and in your experience as an
5  Alexandria police officer --
6     A   Yes.
7     Q   -- have you had any training with
8  respect to anything related to identifying
9  individuals who are intoxicated or any
10 training with respect to performing tests on
11 individuals who may be suspected of driving
12 while intoxicated?
13    A   Yes.
14    Q   Could you describe what training
15 that you've had?
16    A   Well, to begin with, I'm an Intox.
17 operator. I went down to Richmond for a full
18 week and I was trained on physical behaviors,
19 physical appearance of the subjects,
20 including, you know, glassy eyes, red,
21 bloodshot eyes and so on, pale face, red face,
22 and so on. I've been trained on field

Feder Reporting Company
(202) 863-0000

Page 19

1  sobriety tests at the police academy. I've
2  been at the DWI Virginia Beach conference
3  which lasted about four days, which I went
4  through several classes about anything related
5  to alcohol, subjects driving while
6  intoxicated, and so on. And, of course, my
7  five years of training, on-hands training.
8     Q   This training that you just
9  described, is this training that you had prior
10 to March 12th, 2005?
11    A   Are you talking about the Intox.
12 operator?
13    Q   Yes, everything that you just
14 described to me.
15    A   Well, I've been in Richmond,
16 Virginia two years ago, this March it's going
17 to be two years ago. So I don't know. I
18 don't remember exactly when I encountered this
19 gentleman, so.
20    Q   I was asking about March 12th.
21    A   March 12th.
22    Q   Do you remember what training you

Feder Reporting Company
(202) 863-0000

Page 20

1  may have had prior to March 12th, 2005?
2     A   I believe I went to a DWI
3  conference in Virginia Beach and, of course,
4  the Police Academy and on-hands training. I
5  don't know if this helps, but I'm one of the
6  highest DWI in my department. I'm the second
7  highest, as a matter of fact. So I have a lot
8  of on-hands experience about DWIs and
9  intoxicated subjects.
10    Q   To the best that you can recall or
11 guess, how many arrests did you make that
12 involved suspected intoxicated individuals
13 before March 12th, 2005?
14    A   Okay. Are you talking about
15 driving while intoxicated or just any
16 intoxicated subject on the street?
17    Q   I'm talking about any case where
18 you made an arrest that involved an individual
19 who you suspected was under the influence of
20 alcohol, be it driving or any other encounter
21 on the street.
22    A   I can give you an estimate but

Feder Reporting Company
(202) 863-0000

Page 21

1  it's truly hard for me to give you an exact
2  number. Before March 12, 2005, you said,
3  right?
4     Q   Before March 12th, 2005.
5     A   I would say 60, 70 people.
6     Q   You had testified that it was a
7  little difficult to understand what he was
8  saying to you because of his level of
9  intoxication.
10    A   Yes.
11    Q   Did you believe him to be
12 intoxicated while he was speaking to you?
13    A   Yes.
14    Q   And what about his mannerisms or
15 his condition led you to form that opinion?
16    A   Well, to begin with, the strong
17 smell of alcoholic beverage from his person.
18 Every time he did talk to me I could smell it
19 stronger, even a stronger smell every time
20 that he spoke. I remember seeing bloodshot
21 eyes on him. Based on the condition of his
22 face, it was really hard for me to determine

Feder Reporting Company
(202) 863-0000

Page 22

1  due to the injuries that he had. I couldn't
2  really determine if that was maybe because of
3  his injuries or, you know, because of his
4  condition.
5       And he was lying down on the
6  stretcher, like I said. So I didn't really
7  see him standing up, which a lot of times
8  helps me to believe that the person is
9  intoxicated. But in this case he was never
10 standing up. That's it.
11    Q    You testified that he had told you
12 that he had had some drinks at the club.
13    A    Yes.
14    Q    Did he ever say that he was drunk?
15    A    I remember something that he
16 mentioned, he mentioned something like "I've
17 had too many drinks." But he didn't, per se,
18 say, "I'm drunk."
19    Q    Did he, per se, say that he was
20 intoxicated?
21    A    No.
22    Q    After he told you what had

Feder Reporting Company
(202) 863-0000

Page 23

1  happened, what happened next?
2     A    Okay. He did tell me that there
3  was another gentleman at the lobby that was
4  the one who actually drove him to Alexandria
5  Hospital. And I went and talked to him.
6     Q    Do you remember the name of this
7  gentleman?
8     A    No. I remember that he did tell
9  me that he was a bouncer, though, there at the
10 same club.
11    Q    Did you speak to this gentleman?
12    A    Yes.
13    Q    And what did this gentleman tell
14 you?
15    A    Okay. The gentleman said he
16 didn't really see the whole incident starting
17 from the inside of the club, but he said that
18 he saw the incident on the rear of the club.
19       He did say, he did tell me that
20 the officers, that he knew the officers, plain
21 clothes officers that work in there all the
22 time, he said that he knew them because, I

Feder Reporting Company
(202) 863-0000

Page 24

1  guess, they're colleagues, they work together
2  at the club.
3        He did tell me that he observed
4  when the officers were kicking him on the
5  ground, he did say that. He did observe when
6  the two uniformed officers came right there to
7  the club, but he didn't hear exactly what was
8  talked about.
9     Q    Did he identify himself as a
10 friend of the first individual you spoke to?
11    A    He said that he'd seen him at the
12 club before but not -- because I asked him, as
13 a matter of fact, I asked that question. He
14 said, "I have seen him there before" and
15 they've talked on a couple of occasions, but
16 they weren't really friends or anything like
17 that. I mean they just knew because of the
18 club environment, I guess.
19    Q    Can you recall what this
20 individual looked like? By this individual, I
21 mean the one who was identified to you as the
22 bouncer.

Feder Reporting Company
(202) 863-0000

Page 25

1     A    If I see him again probably I
2  could identify him, yes.
3     Q    Can you recall if he was
4  African-American, white?
5     A    No. He was white, not a North
6  American white like, you know, Caucasian. He
7  wasn't a native American. That's what I can
8  recall, yes.
9     Q    Did he speak with an accent?
10    A    Slight accent, yes.
11    Q    Did he tell you anything with
12 respect to how much the first individual had
13 had to drink at the club?
14    A    No. I don't recall that.
15    Q    Did you speak to anybody else at
16 the hospital after you spoke to the bouncer
17 individual?
18    A    I talked to my sergeant. I called
19 my sergeant at the scene because the
20 allegation that this gentleman was making
21 involved other police officers. So my
22 sergeant responded to the scene, yes.

Feder Reporting Company
(202) 863-0000

Page 26

1   Q   And what happened after that?
2   A   My sergeant got in touch with the
3   shift supervisor here in D.C., I guess, for
4   the District where the club was at or
5   something of that sort. And I don't know
6   exactly what they talked in between
7   themselves. That's something that you're
8   going to have to ask her. But I remember my
9   sergeant told me that they were not going to
10  respond to the Alexandria Hospital. And I
11  also remember that my sergeant said that the
12  sergeant told her that they were going to
13  handle it.
14  Q   Okay. After your sergeant spoke
15  to you, did you go back in and tell
16  Mr. Mazloum what had transpired?
17  A   Yeah. What I told him, I went
18  back to him and I told him that he needed to,
19  maybe the next day or if he wanted to go
20  today, the same night if he wanted to go, he
21  needed to go back to D.C. and go to a I guess
22  a police district they call it? I don't even

Feder Reporting Company
(202) 863-0000

Page 27

1   know how they call it here in D.C., and report
2   this incident, you know, to a law enforcement
3   officer so they can go here and do a report or
4   if he wanted to he can go and talk to the
5   supervisor about it.
6   Q   Did he say anything else to you at
7   that point?
8   A   I don't recall. I don't recall.
9   Q   After you told him that, did you
10  leave the hospital?
11  A   Yes.
12  Q   How much time did you spend at the
13  hospital, if you can recall, from the moment
14  you got there to the moment that you left?
15  A   Like I said, I cannot give you an
16  exact time, you know, time frame. But I'm
17  pretty sure I spent a good hour, hour and a
18  half there, because I had to wait for my
19  sergeant and I talked to two individuals and
20  stuff like that.
21          I do recall that the bouncer said,
22  because I asked the bouncer why did he bring

Feder Reporting Company
(202) 863-0000

Page 28

1   this gentleman to Alexandria, why didn't he
2   bring him to another hospital in D.C., you
3   know, which would be closer, of course. And
4   the bouncer said he lived in Alexandria and
5   that was the only hospital that he knew.
6   That's why he brought him there to Alexandria.
7   Q   Going back to the last time that
8   you spoke with Mr. Mazloum when you told him,
9   when you passed along the information that
10  your sergeant had given to you --
11  A   Now, Mr. Mazloum is the victim,
12  right?
13  Q   Yes.
14  A   Okay.
15  Q   When you gave him that
16  information, did you still detect an odor of
17  alcohol about him at that point before you
18  left?
19  A   Yes.
20  Q   Did you detect an odor of alcohol
21  on his breath at that point before you
22  departed the hospital?

Feder Reporting Company
(202) 863-0000

Page 29

1   A   Yes.
2   Q   Do you know Anthony Ramirez?
3   A   By name, you mean?
4   Q   Well, I'll ask it another way. Do
5   you know a D.C. police officer or at the time
6   did you know a D.C. police officer named
7   Anthony Ramirez?
8   A   No.
9   Q   Do you know a D.C. police officer
10  named Thaddeus Modlin?
11  A   No.
12  Q   Do you know a D.C. police officer
13  named Louis Schneider?
14  A   No.
15  Q   Dow know a D.C. police officer
16  named Richmond Phillips?
17  A   No.
18  Q   At the time that you responded to
19  the hospital were you friends with or did you
20  know any D.C. police officers?
21  A   Yes. I got a couple friends in
22  D.C., yes.

Feder Reporting Company
(202) 863-0000

Page 30

1  Q  Who work for the Police
2  Department?
3  A  Yes.
4  Q  But you didn't know those four --
5  A  No.
6  Q  -- individuals.
7  A  No, no, I do not.
8      MR. BRUCKHEIM: I do not have any
9  more questions. Thank you very much.
10 Everybody else may have. Everybody gets a
11 shot, basically. I was just the first one.
12 EXAMINATION FOR DEFENDANTS ACOSTA AND SMITH
13     BY MR. SCHIFFERLE:
14 Q  Well, I just have one, I think.
15 Officer Trapero, again, my name is Carl
16 Schifferle. I'm the attorney who is
17 representing the two uniformed officers who
18 are Officers Acosta and Smith. Just one
19 thing.
20     I believe you testified that you
21 noticed a strong smell of alcohol from
22 Mr. Mazloum or the patient when he spoke to

Feder Reporting Company
(202) 863-0000

Page 31

1  you. Is that right?
2  A  Yes, a stronger, yes, every time
3  that he spoke, yes.
4  Q  And the smell of alcohol was
5  coming from the individual's breath. Is that
6  correct?
7  A  Yeah. At the beginning before he
8  opened his mouth I could smell the alcohol
9  from his person. When he talked to me, it was
10 stronger smell from his breath, yes.
11     MR. SCHIFFERLE: Okay. That's
12 all. Thank you.
13 EXAMINATION BY COUNSEL FOR PLAINTIFF
14     BY MR. ROSANS:
15 Q  Officer, my name is John Rosans.
16 I represent Mr. Mazloum, the Plaintiff in this
17 matter.
18     Did you administer a breathalyzer
19 test to Mr. Mazloum at any point in the
20 hospital?
21 A  No.
22 Q  Did you administer any other sort

Feder Reporting Company
(202) 863-0000

Page 32

1  of field sobriety test to him while in the
2  hospital?
3  A  No.
4  Q  Do you know if the hospital tested
5  Mr. Mazloum's blood alcohol content?
6  A  I do not know that.
7  Q  So you're not aware of any test
8  results that would indicate Mr. Mazloum's
9  blood alcohol level at that time.
10 A  No, I'm not aware of any.
11 Q  Did Mr. Mazloum ever say that he
12 was ever put to the ground somehow inside the
13 club?
14 A  No. I don't recall that.
15 Q  You don't recall that?
16 A  No.
17 Q  Did the bouncer who drove him to
18 the hospital, did he ever mention anything
19 about Mr. Mazloum being on the ground inside
20 the club?
21 A  No. I don't recall that.
22 Q  When you say that you could smell

Feder Reporting Company
(202) 863-0000

Page 33

1  alcohol on his person, does this include his
2  clothing?
3  A  I could not tell you exactly where
4  the smell was coming from, but it was coming
5  from his body. You know what I'm saying? I'm
6  not sure if his clothing or his person or, you
7  know.
8  Q  Would you say that that smell from
9  his person might be consistent with lying on
10 the ground in alcohol?
11     MR. BRUCKHEIM: Objection,
12 speculation. You can answer.
13     THE WITNESS: It could be, yeah,
14 sure.
15     BY MR. ROSANS:
16 Q  But you cannot definitively say
17 one way or the other what Mr. Mazloum's blood
18 alcohol level was at the time you visited him.
19 A  No.
20 Q  Do you know how much time elapsed
21 between the time Mr. Mazloum left the club and
22 the time you saw him in the hospital?

Feder Reporting Company
(202) 863-0000

Page 34

```
 1    A    No, I don't know that.
 2    Q    Just so I'm clear on your
 3  testimony, Mr. Mazloum never said that he was
 4  drunk. Correct?
 5    A    He never said that he was drunk.
 6    Q    Okay. And did the bouncer
 7  associate who drove him to the hospital, did
 8  he ever say that Mr. Mazloum was drunk?
 9    A    No.
10    Q    Did you speak with anyone at the
11  hospital staff about Mr. Mazloum?
12    A    I don't recall that.
13    Q    If you could, could you repeat for
14  me some of the characteristics --
15    A    Who?
16    Q    Some of the characteristics you
17  described when you said you thought he was
18  intoxicated, what led you to that conclusion?
19    A    My training and experience.
20    Q    What specifically about
21  Mr. Mazloum's appearance, demeanor, would you
22  say led you to that conclusion?
```
Feder Reporting Company
(202) 863-0000

Page 35

```
 1    A    Well, like I said, the smells I'd
 2  given, strong smell of alcoholic beverage from
 3  his person. Every time that he spoke I could
 4  smell a stronger smell of alcoholic beverage
 5  coming from his breath. I did observe some
 6  red, bloodshot eyes. They were glassy as
 7  well. He was agitated. He was excited,
 8  agitated and he kept on repeating the same
 9  thing, that he was attacked, attacked,
10  attacked. I asked him to calm down. He kept
11  on saying it. He appeared very agitated, yes.
12    Q    Would you say that some of these
13  conditions you are describing, the bloodshot
14  eyes, the agitation, could be consistent with
15  a physical assault as well?
16         MR. JACKSON: Objection.
17         THE WITNESS: No, I wouldn't say
18  that. I mean based on my experience, I did
19  have several people that were assaulted and
20  were not intoxicated and they didn't smell
21  like that.
22         BY MR. ROSANS:
```
Feder Reporting Company
(202) 863-0000

Page 36

```
 1    Q    Okay. But aside from the smell,
 2  would bloodshot eyes ever be consistent with a
 3  physical assault?
 4    A    It could. If he was assaulted on
 5  both eyes, yes, he could have both eyes red,
 6  yes.
 7    Q    And would someone's agitation as
 8  you described it possibly be consistent with a
 9  physical assault?
10    A    It could be, yes.
11    Q    When you said that Mr. Mazloum
12  never stood up, that he was always lying down
13  on a stretcher --
14    A    Right.
15    Q    Is that correct, am I --
16    A    Yes, yes.
17    Q    Did you ask him why he wasn't
18  getting up?
19    A    No, I didn't ask him that.
20    Q    Is it possible that he wasn't
21  getting up because of some other physical
22  injuries?
```
Feder Reporting Company
(202) 863-0000

Page 37

```
 1         MR. BRUCKHEIM: Objection. You
 2  can answer.
 3         THE WITNESS: I am not a doctor.
 4  I cannot tell you that.
 5         BY MR. ROSANS:
 6    Q    At the end of your meeting with
 7  Mr. Mazloum, you did say that he should go
 8  file some sort of complaint with the D.C.
 9  police. Correct?
10    A    No. I told him that he needs to
11  go back to D.C. and go to the District
12  wherever the incident happened and fill out a
13  report or attempt to talk to a supervisor. I
14  didn't mention anything about complaint.
15    Q    Okay. Why did you suggest that he
16  go fill out a report?
17    A    Why? Because obviously there was
18  something that happened. He had some physical
19  injuries. In my city we always take report
20  for that.
21    Q    So based on your observations
22  there were obvious physical injuries --
```
Feder Reporting Company
(202) 863-0000

Page 38

```
 1    A   Yes.
 2    Q   -- that necessitated him to go
 3  fill out a report, you believe.
 4    A   I believe, yes.
 5    Q   And other than the physical
 6  injuries you mentioned -- which I believe you
 7  said a split lip?
 8    A   Yes.
 9    Q   I believe you said he had a
10  swollen left eye, correct?
11    A   Yes.
12    Q   You said his shirt was ripped. Is
13  that correct?
14    A   Yes.
15    Q   What other, if you recall,
16  physical injuries did you see, if any?
17    A   I don't recall anything else.
18    Q   Do you recall if he had any
19  scrapes on his face or ears?
20    A   No, I don't recall that.
21    Q   Do you recall any swelling of the
22  neck?
```

Feder Reporting Company
(202) 863-0000

Page 39

```
 1    A   No, I don't recall that.
 2    Q   So you don't remember either way?
 3    A   I couldn't remember, no.
 4    Q   Did you examine Mr. Mazloum
 5  physically at all, like below the waist to see
 6  if he had any injuries?
 7    A   No.
 8    Q   So everything you've described so
 9  far was just based on your visual --
10    A   Yes.
11    Q   -- examination while he was lying
12  down on a stretcher. Correct?
13    A   Yes.
14    Q   This 15-A form you spoke of, you
15  said we can get this from Alexandria Police
16  Headquarters?
17    A   I don't know if they can give it
18  to you. But I'm pretty sure if you guys send
19  a court order or something they might be able
20  to because they have some personal
21  information.
22         MR. ROSANS: Okay. That's all the
```

Feder Reporting Company
(202) 863-0000

Page 40

```
 1  questions I have right now. Thank you,
 2  Officer.
 3         THE WITNESS: You're welcome.
 4         MR. JACKSON: Officer Trapero, my
 5  name is David Jackson, I represent the
 6  District of Columbia. And I don't have any
 7  questions for you.
 8         MS. BATRA: I don't have any
 9  questions.
10         MR. BRUCKHEIM: Okay. We have no
11  follow up, so we're done.
12         THE WITNESS: Great.
13         MR. BRUCKHEIM: Officer Trapero,
14  you have the option of reviewing the
15  transcript of this deposition simply to ensure
16  that your testimony was accurately taken down.
17  That's what's known as reading the deposition.
18  You get a copy of it, you read through it,
19  make sure it's accurate, notify the court
20  reporter of any corrections and then sign off
21  on it. You have the option of doing that.
22         You don't have to do that. If you
```

Feder Reporting Company
(202) 863-0000

Page 41

```
 1  want to waive it, you can waive it and the
 2  transcript will simply be the transcript as it
 3  is. So it's entirely up to you. If you do
 4  request to read it, I would get a copy of the
 5  deposition and forward it to you at your
 6  address and you'd have to forward it back to
 7  me after reading it. So whatever you want to
 8  do, I'll leave it up to you.
 9         THE WITNESS: That's fine.
10         MR. BRUCKHEIM: You'll waive?
11         THE WITNESS: Yes, I waive.
12         (By stipulation of counsel, and
13  agreement of the witness, reading and
14  signature waived.)
15         (Whereupon, at 10:55 a.m., the
16  deposition was concluded.)
17                + + +
```

Feder Reporting Company
(202) 863-0000