UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
EMILE MAZLOUM,                      )
                                    )
            Plaintiff,              )      Civil Action No. 1:06 CV 00002
                                    )      (JDB)
      v.                            )
                                    )
DISTRICT OF COLUMBIA, *et al.*,     )
                                    )
            Defendants.             )
_____)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS ACOSTA AND SMITH'S
<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Emile Mazloum ("Mazloum"), by his undersigned counsel, hereby states the following in response to Defendants Jose Acosta (hereinafter "Acosta") and David Smith's (hereinafter "Smith") Renewed Motion for Summary Judgment.

**<u>PRELIMINARY STATEMENT</u>**

Twice previously, this Court has denied motions filed by Defendants Acosta and Smith seeking dismissal of plaintiff's D.C. Human Rights Act claim, D.C. Code §§ 2-1401.01 *et seq.* (the "DCHRA"). Relying on the old saw "the third time's the charm," Acosta and Smith ask for the same relief yet again. They do so despite the fact that the discovery record (which was not as developed at the time of their prior motions) now provides even stronger support for this Court's prior conclusions that sufficient facts exist in support of Mazloum's claims against them. As such, this Court should waste little time denying this latest futile attempt by these defendants.

1

The only difference between Acosta and Smith's Renewed Motion for Summary Judgment and the prior versions is their assertion that now, having completed discovery, it is "really" evident that no genuine issues of material fact remain regarding the plaintiff's DCHRA claim. The factual record, however, speaks otherwise. In fact, discovery has revealed *substantial* additional evidence supporting each element of Mazloum's claim that Defendants Acosta and Smith interfered with his exercise of a protected activity.

In particular, discovery shows that Acosta and Smith denied Mazloum's repeated requests to create a contemporaneous and accurate report of - and initiate a police investigation into - his discriminatory removal from FUR Nightclub and subsequent beating by off-duty Metropolitan Police Department ("MPD") officers on the evening of March 11-12, 2005. Defendants Acosta and Smith's deliberate refusal to accept Mazloum's complaint or conduct an investigation into the discriminatory conduct of their fellow MPD officers - an act they admit they could have readily performed - materially prejudiced the plaintiff in his ability to document and support his claims that he had been assaulted. Acosta and Smith were well aware from their separate conversations with Ramirez and Mazloum of the circumstances under which Mazloum was assaulted, including the Plaintiff's allegations of discrimination inherent in his numerous requests to file a complaint. Both Acosta and Smith continually thwarted Mazloum's efforts, thereby depriving him of an adequate opportunity to describe his assailants' racially-motivated attack and attempting to shield their fellow officers from accountability. The many factual contradictions involved in this incident require resolution by a jury. This claim must be tried.

**STATEMENT OF FACTS**

Plaintiff incorporates by reference (i) his Counter- Counter-Statement of Facts, filed concurrently with this memorandum (the "Counter-Statement"), and (ii) the evidence and exhibits

attached previously to Mazloum's oppositions to Acosta and Smith's prior dispositive motions (Docket Nos. 50 and 83, respectively).

Discovery has revealed the following additional points relevant to Acosta and Smith's renewed motion (and, more to the point, further supportive of Mazloum's DCHRA claim against them):

- Lieutenant Frank Allman, the acting chief of the watch for their district on March 11-12 and thus Defendants Acosta and Smith's commanding officer, is a personal friend of Defendant John Fiorito, a co-owner of FUR and former MPD Officer. Allman was the first to arrive at the scene that night because Defendant Fiorito called him personally on Allman's cell phone (Counter-Statement ¶¶ 5, 34);

- After arriving on the scene outside the FUR Nightclub, but before speaking with the plaintiff, Defendants Acosta and Smith spoke to Lt. Allman, who had already spoken with Defendant Fiorito (Counter-Statement ¶ 35);

- Acosta and Smith spoke to several of the individuals involved in the altercation, including Defendant Ramirez, one of the primary aggressors. This fact has been corroborated both by eyewitnesses (such as third party Imad Alkadi) and participants to the Altercation (Counter-Statement ¶¶ 35-36);

- Acosta and Smith also interviewed Defendant Persons, the FUR security employee, as well as Mazloum (Counter-Statement ¶¶ 37-39);

- Smith and Acosta made no effort to enter the Nightclub to interview additional witnesses – although they could have (Counter-Statement ¶ 40);

- Smith did take down Mazloum's address and basic information – a fact corroborating (i) Mazloum's allegation that he urged them to investigate, and (ii) the concept that they were equipped to conduct more of an investigation than they in fact performed (Counter-Statement ¶ 38);

- Other MPD officers have admitted that patrolling MPD officers maintain certain forms in their patrol cars and thus have the capacity in the field to take extensive reports from complaining citizens – not compel those same citizens to travel to police precinct headquarters to make complaints (Counter-Statement ¶ 42);

- Smith has admitted that Mazloum appeared to him to have been a "victim" (Counter-Statement ¶ 41);

- Smith also admitted that, unlike Mazloum, Defendant Persons did not appear injured, and that Smith did not find Persons' version of events (in which he claimed to have

been the victim of an assault) to be credible – thus providing him with further evidence that Mazloum's protestations warranted investigation (Counter-Statement ¶¶ 39, 41);

- Smith admits that he found it peculiar that none of the other off-duty officers involved in the altercation remained outside to speak with uniformed officers (which they would have done if they were truly subduing an individual who had assaulted a police officer, as certain of the off-duty officers have alleged Mazloum to have done) (Counter-Statement ¶ 40);

- Smith and Acosta claim Lt. Allman never told them to arrest Mazloum – whereas Allman claims he did so instruct them and that their conduct that night was insubordinate. (Allman's testimony generally lined up with that of the other off-duty officers, all of whom claim their conduct was justified because Mazloum "assaulted" Persons and MPD officers). (Counter-Statement ¶¶ 41, 46) If Smith and Acosta are believed, an inference could be drawn that they were aware from the start that Mazloum was a victim of an incident that FUR, Allman, and other off-duty officers wanted to cover up – a cover-up in which they participated by refusing Mazloum's requests;

- Smith and Acosta have testified further that Allman was aware that Mazloum was released that night, therefore tacitly approving their conduct – whereas Allman denies that, providing even more evidence that their release of Mazloum was thought initially by all to be the easiest way to "dispose" of the matter (Counter-Statement ¶ 45);

- Acosta, Smith, and other third parties heard Mazloum crying out that he had done nothing wrong and that he was the victim of injustice (Counter-Statement ¶¶ 31, 37);

- Smith and Acosta deny Mazloum's allegation that he was informed that he could only make a statement at the police station – even though defendant Persons has affirmatively testified that he was told that he himself would need to be arrested if he wished to complain of Mazloum's alleged assault (Counter-Statement ¶ 42);

- Acosta and Smith's allegations that they could not make sense of what Mazloum was telling them about what had befallen him are contradicted not only by Mazloum's own testimony but by third parties on the scene, who said they understood what Mazloum was saying, and the fact that Smith was able to take down his address and personal information (Counter-Statement ¶¶ 38, 67);

- Mazloum also unquestionably indicated to Acosta and Smith that a "big black guy" had assaulted him – a description consistent with both Defendants Persons and Modlin (whom Mazloum did not know at the time to be an MPD officer). Nevertheless, and despite speaking with Ramirez, Acosta and Smith took no efforts to locate, let alone interview, Defendant Modlin (Counter-Statement ¶ 37);

4

- Ramirez and Modlin made a series of frantic phone calls the next day to parties with knowledge of the incident, including Acosta. While Ramirez and Modlin claim that they asked Acosta why he failed to arrest Mazloum and that he essentially apologized for this omission, Acosta denied this to be the case and generally remembered little about the substance of the call. This discrepancy is revealing, as it allows a further inference that Acosta shared the other officers' desire to cover-up the incident and that the officers directly involved in the battery later realized they would have been better off had Mazloum been arrested (and thereby potentially dissuaded from pursuing his claim) (Counter-Statement ¶¶ 49, 52).

## ARGUMENT

### I. Standard of Review

As Plaintiff has recited to the Court twice before, entry of summary judgment is proper only where the non-movant can offer no evidence upon which a jury could reasonably find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Although there must be more than a "scintilla" of evidence offered in support of the non-movant's claim, the evidence need only be sufficient to establish the existence of material triable facts. *Id.* at 249–50; *see also id.* at 252. In reviewing Defendants Acosta and Smith's Renewed Motion for Summary Judgment, this Court must assume the truth of Mazloum's factual allegations and draw all evidentiary inferences in his favor. *Id.* at 255. The Court must also "eschew making credibility determinations or weighing the evidence." *U.S. v. Project on Gov't Oversight,* 454 F.3d 306, 308 (D.C. Cir. 2006)(citations omitted).

In this case alleging unlawful discrimination,[1] "summary judgment should be approached with special caution," given the challenges of proving intent and other matters peculiar to such cases. *Regan v. Grill Concepts-D.C., Inc.,* 338 F. Supp. 2d 131, 133 (D.D.C. 2004) (denying summary judgment on a DCHRA-based claim). Furthermore, the level of proof required of a plaintiff claiming discrimination is less at the summary judgment stage than at trial. *See, e.g., Dey v. Colt*

---

[1] When evaluating claims under the DCHRA, the Court may look to cases construing comparable provisions of federal discrimination statutes, such as Title VII. *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n.17 (D.C. 1993).

*Constr. & Dev. Co.,* 28 F.3d 1446, 1458 (7th Cir. 1994) (Title VII plaintiff "need not prove by a preponderance of the evidence at the summary judgment stage" that defendant was aware of complaints, but instead need only "produce evidence that would support an inference" of such awareness). The same is true in the context of resolving claims relating to police misconduct. *See, e.g.,* Wright, Miller & Kane, *Federal Practice and Procedure* § 2732.2 (3d ed. 1998).

This Court must be specially wary of making fact determinations that hinge upon credibility determinations. As noted in *Carter-Obayuwana v. Howard University*, 764 A.2d 779 (D.C. 2001), "[T]hese issues can only be sorted out at trial. There, cross-examination and other tools of the search for truth should enable the court and jury to separate the wheat from the chaff and reach a just result." *Id.* at 793 (concluding that there was sufficient evidence for the plaintiff's claims regarding her reduction in salary to be presented to the jury, even though the court concedes that she may be unable to establish the requisite causal nexus at trial). Where resolution of fact issues hinges on sifting through conflicting testimony, summary judgment is not appropriate. *Rogers Corp. v. Envtl. Prot. Agency*, 275 F.3d 1096, 1103 (D.C. Cir. 2002) ("[s]ummary judgment is inappropriate when contradictory inferences may be drawn from the evidence"); *see also Nilson v. Historic Inns Group Ltd.*, 903 F Supp. 905, 909 (D. Md. 1995) (it is improper to invoke summary judgment where the depositions of principal witnesses "present conflicting versions of the facts which require credibility determinations"); *see also Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) ("summary judgment is not a procedure for resolving a swearing contest").

II.   **The "Law of the Case" Doctrine Prohibits Relitigation of this Court's Prior Denial of Acosta and Smith's Earlier Summary Judgment Motion.**

As already noted, this is the *third* dispositive motion offered by Acosta and Smith in which

they challenge Plaintiff's DCHRA claim. In each prior instance, this Court declined their request to dismiss the claim. As such (and as the Court admonished counsel for Acosta and Smith at the parties' April 2007 status conference), this Court need not entertain their latest request for dispositive relief – at least not to the extent Acosta and Smith's motion fails to expand on the existing record in a material sense.

"'Law-of-the-case doctrine' refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided (i.e. established as the law of the case) by that court or a higher one in earlier phases." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739(D.C. Cir. 1995) (distinguishing law of the case from waiver). *Moore's Federal Practice* observes that "[a] denial of summary judgment is generally treated as 'law of the case.' Consequently, after denial of summary judgment, courts generally refuse to hear or quickly deny a second or repeated summary judgment motion raising the same issues presented in the first motion." 11 James Wm. Moore et al., *Moore's Federal Practice*, § 56.10[7] (3d ed. 2006). While a "party may renew its motion for summary judgment as long as it is supported by new material, [] issues decided in [the] first decision comprise [the] 'law of the case' and may not be revisited." Moore et al.*,* § 56.10[7] n.108 (quoting *Wechsler v. Hunt Health Sys., Ltd.*, 198 F. Supp. 2d 508, 514 (S.D.N.Y. 2002)) (internal quotation marks omitted). *See also In re Foxmeyer Corp.*, 286 B.R. 546, 557 (D. Del. 2002) (holding that "a denial of a summary judgment motion constitutes law of the case . . . with respect to the substance of that which is actually decided, which . . . [is] that a genuine dispute issue exists with respect to a particular fact, that such fact is material to a resolution of the claim in question, and/or that a legal issue cannot be resolved until more facts are determined"). Sequential motions, such as the one presently before the Court, which are not based upon newly-discovered evidence, are ripe for dismissal under the "law of the case" rule. *See Talarico v. Marathon Shoe Co.,* 221 F. Supp. 2d 35, 39 (D. Me. 2002) (denying second motion for summary

judgment because it "sheds no light on any factual issue with respect to which the court sought illumination . . . and adds nothing of substance to the mix previously before the court"); *see also Kurth v. Dobricky*, 487 A.2d 200, 222 (D.C. 1985) (reversing grant of a renewed motion for summary judgment "because the two motions were virtually identical, the amplified record in support of the second motion contained no meaningful new information, and there had been no intervening change in substantive law").

Acosta and Smith's renewed motion offers no arguments or evidence that were not presented in their last motion. Testimony adduced in discovery is consistent with the affidavit, statements, and other evidence that were presented by Plaintiff to the Court in opposition to Acosta and Smith's prior summary judgment motion. There was also a substantial time lag between when their second motion was fully briefed (October of 2006) and decided (April of 2007). Had Acosta and Smith believed that the developing discovery record added new factual bases for their motion that they could not have presented in the prior iteration of the motion, it behooved them to file a supplemental pleading some time in that five-month interval, pointing out the ways in which recent deposition testimony strengthened their argument. They did not – thus underscoring the extent to which the existing record is completely consistent with the more limited factual record presented in the Fall of 2006 to the Court. As such, the Court's April 2007 decision denying their motion should be treated as "law of the case" and the renewed motion should be summarily denied.

**III.    More Than Sufficient Evidence Exists in the Discovery Record in
          <u>Support of Plaintiff's DCHRA Claim Against Acosta and Smith.</u>**

Under the DCHRA, "[i]t shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, . . . any right granted or protected under this chapter." D.C. Code § 2-

1402.61(a). As this Court has stated, a plaintiff can establish a prima facie case of interference by offering evidence that "(1) he engaged in protected activity under the DCHRA, or opposed practices made unlawful under the DCHRA; (2) he was subjected to adverse action; and (3) there is a causal nexus between the two." *Mazloum v. District of Columbia*, Civil Case No. 06-0002 (JDB), Mem. Op. of April 17, 2007, at 3 ("Mem. Op. of April 17, 2007"); *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 13 (D.D.C. 2006) (citing *Carter-Obayuwana*, 764 A.2d at 790).

Ignoring the procedural deficiencies of Acosta and Smith's renewed motion, it is readily evident at the close of discovery facts exist in support of all three elements of his claim under the DCHRA. As with many other issues in this case, contradictory evidence also exists, and the trier of the facts will need to make credibility determinations. In addition to the record's previously-noted differences between the plaintiff's and defendants' versions of the events in question, there are numerous inconsistencies and conflicts in the testimony of parties and witnesses, underscoring genuine issues of material fact that can only be resolved by a jury.

    A.    <u>Plaintiff made numerous, unsuccessful attempts to file a complaint of discrimination</u>.

Defendants Acosta and Smith continue to allege that Mazloum failed to engage in a protected activity, because he did not explicitly *tell* Acosta and Smith that the report he was requesting included a claim of unlawful discrimination. Acosta and Smith's Renewed Mot. for Summ. J., at 6 ("Acosta/Smith Mot."). However, this Court has repeatedly ruled that "the communication of a complaint of unlawful discrimination . . . may be *inferred* or *implied* from the surrounding facts." Mem. Op. of April 17, 2007, at 4; *Mazloum*, 442 F. Supp. 2d at 13 (quoting *Carter-Obayuwana*, 764 A.2d at 791) (emphasis in original).

Here, there is ample direct evidence from which a jury could infer that Plaintiff made numerous requests to Defendants Acosta and Smith to file a complaint against his attackers. In particular, discovery indicates that on several occasions, while removing Mazloum from the

9

nightclub and later outside in the street, Ramirez referred to the plaintiff as a "terrorist" and "Al-Qaeda." Counter-Statement ¶¶ 26, 31–32. In response, Mazloum voiced his opposition to Defendant Ramirez's discriminatory remarks and conduct, avowing that he "is not a terrorist" and had done nothing wrong. Counter-Statement ¶¶ 30–31[2] Defendant Smith deduced that the plaintiff was Middle Eastern, based on the plaintiff's appearance and accent. Counter-Statement ¶ 38.

More broadly, Mazloum has consistently testified that he was attempting to convey to them what aspects of the beating he understood to be the case, but was cut off or ignored. Counter-Statement ¶¶ 37-38, 42. The plaintiff testified that he indicated to Acosta and Smith that Ramirez and the other off-duty officers (together with FUR employee Michael Persons) had assaulted him and that he wanted Acosta and Smith to arrest his attackers. Counter-Statement ¶ 37. In fact, the plaintiff explicitly stated that he needed a police report to document his assault by the individuals (whom at that point he did not realize were police officers) he had pointed out to them. *Id.* When told that he would only be allowed to file a report if arrested and taken to the station, the plaintiff even asked Defendants Acosta and Smith to arrest him. Counter-Statement ¶¶ 42-43, 46. Yet when the plaintiff expressed this willingness, and even attempted to get in their cruiser to be taken to the station, they forcibly removed him from the vehicle and informed him simply to leave. Counter-Statement ¶ 43. Because Acosta and Smith deny Mazloum's assertions, a jury – not this Court – must evaluate who is telling the truth and who is not.

There is also ample circumstantial evidence supporting an inference that Acosta and Smith understood that Mazloum wished to complain about the discriminatory conduct he had encountered. Acosta and Smith were observed to converse quietly and privately with Defendant Ramirez, the

---

[2] Interestingly, many witnesses recall hearing Mazloum (as he himself admits) shout names at Ramirez such as "El Salvador," thus indicating an awareness that Mazloum was protesting Ramirez's words and conduct directly. *See, e.g.*, (Counter-Statement ¶ 32)**.** They conveniently do not remember epithets hurled at Mazloum – even though a reasonable inference can be drawn, based on the evidence in the discovery record (and Mazloum has so testified), that Mazloum

person alleged directly to have called Mazloum a "fucking Al-Qaeda." Counter-Statement ¶ 36. It is reasonable to infer that Ramirez, whose virulent racist bias had just manifested itself in the form of racist epithets and physically violent acts, shared, or displayed, his animus toward Mazloum with his colleagues Acosta and Smith. As a result, they knew, even without having to hear it from Mazloum, that the beating inflicted upon Mazloum was the product of unlawful discrimination.

In addition, Acosta and Smith spoke to Lt. Allman, and there are significant discrepancies between Allman's version of events (that Mazloum should have been arrested and that he so directed Acosta and Smith) and their own (that they were never so told). Counter-Statement ¶¶ 35, 46.[3] From the above, a reasonable inference could be drawn that Acosta and Smith knew – from the start – about Mazloum's beating at the hands of the off-duty officers, as well as the "Al-Qaeda" comment. When the officers eventually approached the plaintiff to "investigate," Defendant Smith admits he considered the plaintiff to be a victim, and that the recitation of events from other involved individuals, such as Defendant Persons, was not credible. Counter-Statement ¶¶ 39, 41. Both Defendants Acosta and Smith concluded ultimately there was no basis for his arrest – further underscoring that the circumstances that had resulted in his facially evident beating were suspicious. Counter-Statement ¶ 41) And there is no doubt (as corroborated by other witnesses) that Acosta and Smith could have easily taken a report at the scene – but refused to do so.

---

cursed at Ramirez only in reaction to the curses hurled at him first.

3 Plaintiff's theory, based upon these contradictory facts, is that in fact Acosta and Smith are (at least on this issue) being honest – they were never told to arrest Mazloum, as it was apparent to Allman ( a biased individual whose testimony was found suspect by a subsequent MPD investigation and whom, not coincidentally, now works at FUR in a security position) that there was no basis to do so. Rather, the MPD's initial approach to the incident was to attempt to cover it up, by sending Mazloum away and hoping he dropped the issue. Only when Mazloum actually complained the following day did Allman and the off-duty officers directly involved in the assault begin to allege that Mazloum was improperly released and had assaulted an MPD officer within the Nightclub. Had this been suspected the night before, it seems far more likely Acosta and Smith would have made greater efforts to investigate, or might have actually arrested Mazloum.

Viewed together, and drawing all inferences in favor of the plaintiff, this evidence is sufficient to support a reasonable inference that the plaintiff's repeated efforts to register a police complaint rises to the level of a protected activity – namely, the attempt to document and seek redress for the defendants' discriminatory conduct.

B. Smith and Acosta's refusal to make an arrest or to take Mazloum's complaint adversely affected the Plaintiff's opposition to unlawful discrimination.

Defendants Acosta and Smith's failure to properly investigate and then report the Defendants' discriminatory language and conduct adversely affected Mazloum's ability to make and – importantly, for purposes of this motion – support his claim of unlawful discrimination. This element of Plaintiff's DCHRA claim is amply supported by both direct testimony, reasonable circumstantial inferences, and the fact that critical evidence – including security camera recordings and neutral eyewitnesses who could have corroborated Mazloum's testimony – was lost as a direct result of the MPD's failure to conduct a complete investigation.

Acosta and Smith concede that no report was taken at the scene of the incident – even though it could easily have been done, as other MPD witnesses acknowledged. Counter-Statement ¶ 42. Defendants Acosta and Smith have also fully admitted that they denied the Plaintiff's repeated requests to file a complaint at the scene or be taken to the station to do so, despite their conclusions that the plaintiff was an innocent victim. Counter-Statement ¶¶ 41-42. They failed to take written statements or record any facts about the altercation other than cursory personal information about Mazloum. *Id.* They never entered the Nightclub or made efforts to speak with other off-duty officers involved – a fact which Smith himself has acknowledged resulted in a lack of data about what had actually occurred. Counter-Statement ¶ 40. In fact, one witness, John Fiorito, expressed his surprise at Acosta and Smith's deliberate refusal to investigate, as they had dismissed him and told him to go back inside the nightclub instead of taking his statement. Counter-Statement ¶ 38.

The failure to conduct an investigation – at least by taking a report from Mazloum at the scene of the incident – has adversely affected Mazloum's ability to prove his claims. None of the off-duty officers involved other than Ramirez were questioned that early morning. No third-party witnesses were located. Moreover, potentially useful video evidence was allowed to "disappear." Both direct and circumstantial evidence suggests that the FUR Nightclub's video camera system may have recorded significant portions of Mazloum's battery, as he was led from the stage inside of FUR to the outside front of the Nightclub. Counter-Statement ¶¶ 53-56. Plaintiff's own investigation of the Nightclub premises, as well as admissions of FUR personnel such as its head of security, has revealed that Mazloum's handcuffed walk outside the club as he was led by the off-duty officers, plus subsequent sitting on the curb (where he was beaten further) would have been captured by the video – and could have been "saved" to a CD-ROM disk by the Nightclub. *Id.* The failure of Acosta and Smith to take a full report and conduct a more thorough investigation gave the Nightclub time to review the video itself – then, as Plaintiff alleges (and as must be assumed true for purposes of summary judgment) destroy it. Such evidence is now irretrievably gone.

Despite the above, Defendants nevertheless argue that Mazloum was not adversely affected by their refusal to take his report at the scene, since, in fact, he was able to file a report at the station the next day. Acosta/Smith Mot., at 8. In support of their contention, they cite *Burlington Northern & Santa Fe Ry. Co. v. White*, __U.S. ___, 126 S.Ct. 2405 (2006). Defendants correctly observe that in *White,* the Supreme Court adopted the D.C. Circuit's "materially adverse" standard for the adverse action element of a ***retaliation*** claim (not precisely the same as Plaintiff's ***interference*** claim herein), requiring a plaintiff to show that the defendant's actions were not only adverse but "might well have dissuaded a reasonable [plaintiff] from making or supporting a charge of discrimination." Acosta/Smith Mot., at 8 (quoting *White*, 126 S.Ct. at 2415). However, application of that standard herein (and keeping in mind the need to accept the Plaintiff's allegations as true for purposes of

13

summary judgment) leads to the conclusion that sufficient fact questions exist with respect to this claim to render summary judgment inappropriate.

The determination of whether a challenged action is "materially adverse" requires application of an objective test which considers whether a reasonable plaintiff (as opposed to the plaintiff himself) would have been dissuaded from pursuing a legal right. *White*, 126 S.Ct. at 2415. It is a "fact-intensive" inquiry dependent upon "all the [relevant] circumstances." *Id.* at 2417. Mazloum meets that test. Mazloum, a man of Lebanese descent, had just been beaten and dragged outside a nightclub by five men, one of whom called him "Al-Qaeda" and a "terrorist." Upon their arrival, Acosta and Smith whispered and huddled with the very men who had just attacked the plaintiff, instead of talking to him or assisting him. Acosta and Smith then denied the plaintiff's repeated requests to file a report, arrest his attackers, or at least be taken to the station, forcibly removing him from their cruiser and telling him to "just go home." And Acosta and Smith appear to have been given some sort of initial direction from an officer complicit in the overall "cover up" – Lt. Allman – to send Mazloum home, in the hope that the incident would completely go away.

The harm to Mazloum from Acosta and Smith's interference is two-fold. First, Acosta and Smith were in the unique position of retaliating against the plaintiff's allegations of their colleagues' discriminatory conduct. Second, and more importantly, as police officers they controlled the plaintiff's access to the documentation he needed on the scene to support his claim. They had the capacity to identify and interview witnesses on the scene, when their recollections of what had occurred were most fresh. Their obstructive conduct was thus not only designed to discourage Mazloum from pursuing his claim (by falsely informing him that he could only pursue his claim if he were arrested), but also to squelch Mazloum's ability to initiate an on-site investigation that would generate usable evidence in support of his allegations. To a "reasonable" plaintiff in Mazloum's

shoes, all of the above would undoubtedly constitute interference in his efforts to investigate the incident, and might well have deterred such a plaintiff from pursuing the matter at all.

Notably, the Supreme Court in *White* specifically rejected the argument Acosta and Smith advance – that a plaintiff's subsequent redressing of discriminatory conduct inexorably leads to the conclusion that the complained-of conduct was not itself "materially adverse." There, an employer argued that a plaintiff/employee had not been adversely affected by her thirty-seven-day suspension without pay because she was eventually reinstated and received back pay. *White,* 126 S.Ct. at 2417. Taking note of the fact that Congress had amended Title VII to allow compensatory and punitive damages and "help make victims whole," the Supreme Court reasoned that it "would undermine the significance of that . . . judgment were [it] to conclude that [defendants] could avoid liability in these circumstances" simply because the Plaintiff later rectified the discriminatory conduct at issue. *Id.*[4]

At bottom, Mazloum was harmed by Acosta and Smith's inaction. Their inaction "interfered" with Mazloum's ability to establish facts relevant to what had happened, as well as to him personally, which the DCHRA exists to address.[5] Some evidence and information that might have been unearthed at the time of the incident may now be irretrievably gone. Acosta and Smith should not be permitted to escape their wrongful conduct – especially when that same conduct bears on Plaintiff's ultimate ability to prove a necessary element of his claim. *See Sullivan v. Murphy,* 478 F.2d 938, 970 (C.A.D.C. 1973)("[i]t is a well-settled legal doctrine that in situations in which the

---

4 The short duration of the delay Mazloum experienced in his effort to initiate an investigation does not minimize the adverse impact of Acosta and Smith's conduct. Precious time and potential evidence was lost in just that period of time. In fact, the whole thrust of their "release" of Mazloum (from a seizure he should have never experienced to begin with) was aimed at getting him to see the wisdom of just walking away from the incident. These factors objectively would have encouraged a reasonable plaintiff in Mazloum's shoes to drop his complaint.

5 If in the future defendants in Acosta and Smith's position of authority can deny and oppose a plaintiff's efforts to report discrimination, knowing that they will defeat any claims of retaliation simply because the plaintiff is able to file a complaint eventually, then the remedial purposes of statutes like the DCHRA are defeated. Such defendants would have nothing to lose, as either they will be successful in dissuading the plaintiff from opposing discrimination, or they can claim (as Acosta and Smith do here) that their actions were ultimately not materially adverse.

defendant has by his own actions so muddled the evidence that it is impossible for the plaintiffs to adduce those particular facts that would normally be pleaded in support of his action, the burden of proof is shifted from plaintiff to defendant to come forward with the pertinent evidence").

      C.      Smith and Acosta were aware of defendants' discriminatory conduct
             and plaintiff's opposition to it, establishing the requisite causal nexus.

This Court has previously held that the Plaintiff must establish a causal nexus between his protected activity and the adverse action by showing that the Defendants Acosta and Smith had some "awareness" that Mazloum was voicing his complaint about the off-duty officers' discriminatory conduct. Mem Op. of April 17, 2007, at 3; *Mazloum*, 442 F. Supp. 2d at 12 (citing *Carter-Obayuwana*, 764 A.2d at 790). However, this awareness may be established by circumstantial evidence. *See Dey*, 28 F.3d at 1458–59; *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993)(defendant's awareness of the making of a protected statement, such as a complaint of discrimination, may be established by circumstantial evidence). In particular, "The causal connection may be established by showing that the [defendant] had knowledge of the [plaintiff's] protected activity, and that the adverse personnel action took place shortly after that activity." *Carter-Obayuwana*, 764 A.2d at 793 (quoting *Arthur Young & Co.*, 631 A.2d at 368) (internal quotation marks omitted). Such "temporal proximity," combined with circumstantial evidence of defendants' awareness of plaintiff's opposition to defendants' discriminatory conduct, "is enough to survive summary judgment." *Id*. (quoting *Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 4 (D.D.C. 1989)).

In its Opinion Denying Defendants Acosta and Smith's Second Motion for Summary Judgment, this Court outlined evidence in the record – established well prior to the close of discovery - supporting its conclusion that a genuine issue of material fact remains regarding "whether Acosta and Smith were on notice that plaintiff's request to file a complaint was in

16

opposition to discriminatory conduct." Mem. Op. of April 17, 2007, at 4. Since then, there has been no evidence developed that contradicts or weakens those evidentiary items – nor, tellingly, have Acosta and Smith marshaled any such evidence in their third summary judgment brief. Rather, discovery has only bulwarked prior direct and circumstantial proof that Defendants Acosta and Smith were well aware of Defendant Ramirez's recent discriminatory conduct and the plaintiff's voiced opposition to it.

Defendants Acosta and Smith arrived shortly after Ramirez had assaulted and uttered racial slurs toward the plaintiff. Defendants Acosta and Smith then conferred in private with one or more of the off-duty defendants, including Ramirez, giving them the opportunity to learn of Ramirez's recently uttered discriminatory comments and the plaintiff's voiced opposition. Counter-Statement ¶ 35-36. In particular, there is evidence that the officers "whispered" or "huddled" with Ramirez, Lieutenant Allman, and some or all of the other off-duty officer defendants before even approaching the plaintiff. *Id.* Acosta and Smith also spoke to Defendant Persons and found his version of events not credible. Counter-Statement ¶ 39. Shortly thereafter, Defendants released the plaintiff (for unclear and conflicting reasons) and refused to file a report or take him to the station, telling him that he just needed to go home. At this point, Acosta and Smith knew something Mazloum did not know: that the men who had assaulted and beaten him were off-duty police officers. They have testified, moreover, that they were never instructed to arrest Mazloum, nor did they see a reason to do so – further suggestive of the fact that they knew Mazloum was innocent and that the best means of preventing him from bringing to light what had happened to him was to simply release him. The subsequent frantic phone calls between the off-duty officers involved in the altercation and Defendant Acosta the next day only underscore the extent to which it appears all MPD defendants realized, after the fact, that their efforts at covering up the incident had failed. Counter-Statement ¶¶ 49, 52.

17

All of the above is sufficient evidence to support an inference that Acosta and Smith were told about Ramirez's discriminatory conduct and thus were aware that the plaintiff's "repeated requests to file a complaint on the heels of the incident encompassed a claim that Ramirez's conduct was discriminatory," establishing the required causal nexus. Mem. Op. of April 17, 2007, at 5.

In evaluating the above, it is important to keep in mind that the Court cannot make credibility determinations on summary judgment. Thus, merely because Acosta and Smith deny having discussed such matters with Ramirez does not conclusively mean that, absent "smoking gun" evidence that contradicts their statements, they should prevail on this point. Indeed, facts already exist suggestive of potential bias on the part of these particular defendants, and not merely because they are parties. The evidence indicates that Acosta and Smith's testimony that they were never ordered to arrest Mazloum is disputed by many of the other officer/defendants in this case. Counter-Statement ¶ 46. Moreover, Acosta was phoned by Ramirez after the latter became aware that Mazloum would be pressing an investigation of the incident; according to Ramirez, Acosta essentially apologized for his conduct. Counter-Statement ¶ 52. These facts, and many others, suggest that Acosta and Smith's testimony cannot be taken at face value, and therefore it is in the province of a jury to decide what of their testimony to believe.

## CONCLUSION

Construing this evidence in the light most favorable to the plaintiff – as this Court must do in evaluating Acosta and Smith's summary judgment motion – it is readily evident that there remain a myriad of genuine issues of triable fact regarding the plaintiff's claim that these defendants knowingly and materially obstructed the plaintiff's requests that they document or collect evidence of the off-duty officers' recent discriminatory conduct. For the foregoing reasons, the Court should deny Defendants Acosta and Smith's Renewed Motion for Summary Judgment.

Respectfully submitted,

Dated: June 29, 2007

/s/
Brian H. Corcoran (Bar No. 456976)
Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW
Suite 700 East Lobby
Washington, D.C. 20007
Ph: (202) 625-3500
Fax: (202) 298-7570
Brian.Corcoran@kattenlaw.com

Susan Huhta (Bar No. 453478)
Warren R. Kaplan (Bar No. 034470)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, D.C. 20036
Ph: (202) 319-1000
Fax: (202) 319-1010
Warren_Kaplan@washlaw.org

Attorneys for Plaintiff
Emile Mazloum