## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                  )
EMILE MAZLOUM,              )
                                  )
                Plaintiff,     )     Civil Action No. 1:06 CV 00002
                                  )     (JDB)
          v.                 )
                                  )
DISTRICT OF COLUMBIA, *et al.*,   )
                                  )
                Defendants.   )
_____)

## PLAINTIFF'S BRIEF IN OPPOSITION TO THE
## FUR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Emile Mazloum ("Mazloum"), by his undersigned counsel, for his response to

Defendants Night and Day Management, LLC ("FUR"), Michael Rehman, John Fiorito, and Michael

Persons (collectively, the "FUR Defendants") Motion for Summary Judgment, hereby states as

follows:

### PRELIMINARY STATEMENT

The term "too incredible," lifted from a case fifty years old and invoked by the FUR

Defendants to characterize Mazloum's honest rendition of the disputed events, is more accurately

applied to Defendants' seeming lack of comprehension of the Rule 56 summary judgment standard.

It is black letter law that this Court ***cannot*** at the summary judgment stage resolve factual disputes

between the Plaintiff's and the FUR Defendants' conflicting versions as to what occurred.  Where

corroboration for both versions exists, this Court's analysis ends, and trial begins.  *U.S. v. Project on

Gov't Oversight,* 454 F.3d 306, 308 (D.C. Cir. 2006)("[w]here, as here, [a] case turns on

controverted facts and the credibility of witnesses, the case is peculiarly one for the jury").

It is readily evident that trial of the claims against the FUR Defendants will be necessary. First, there is zero basis for dismissal of Plaintiff's battery claim against Defendant Michael Persons (and, via the doctrine of *respondeat superior*, FUR itself).  This claim revolves around the fundamental issue in dispute in this case – whether Mazloum was beaten by the Off-Duty Officers and Mr. Persons, the FUR security employee/bouncer who first made physical contact with the Plaintiff on March 12, 2005 – and that issue is far from resolved in favor of any of the Defendants. Indeed, there is disagreement the size of the Grand Canyon between the Plaintiff's version of events (that he was improperly identified, first by Persons and then by the Off-Duty Officers present at the time, as someone who was misbehaving, and thus was beaten for no good reason then released once it was blatantly obvious that he had not committed a crime) and that of the FUR Defendants, who self-servingly attempt to portray Mazloum as an inebriated trouble-maker who struck first and in fact should have been arrested.  Such a cavernous dispute can only be resolved by a jury.

The FUR Defendants also challenge Plaintiff's ability to establish his spoliation of evidence claim, but fail in those efforts as well.  It is undisputed that the FUR Defendants had actual knowledge of the incident between Plaintiff and the off-duty officers at the nightclub on March 11, 2005, and that they learned (in the late afternoon of the same day) that Plaintiff had lodged a formal police misconduct complaint.  Further, there is record evidence to support a finding that in response to this knowledge, the FUR Defendants viewed the video surveillance record as picked up by the Nightclub's camera system, determined that the video record exposed them and/or the off duty officers to liability in a potential future lawsuit, and in response destroyed the video evidence which, in myriad ways, would have powerfully assisted Plaintiff in the prosecution of this case.

The same is true of Plaintiff's DC Human Rights Act claim.  Too many disputed issues of fact on the elements of that claim exist to make summary judgment appropriate.

## STATEMENT OF FACTS

Plaintiff incorporates by reference his Omnibus Counter-Statement of Facts, filed concurrently with this memorandum (the "Counter-Statement").

Discovery has revealed the following additional points relevant to the FUR Defendants' Motion:

- Plaintiff consumed no more than two drinks before his arrival at the Nightclub on March 11, 2005, and had no more than three drinks the entire night (Counter-Statement at ¶ 2);

- After dancing on stage just off the main dance floor inside of FUR for a period of time, Mazloum turned to exit the stage area and felt someone grab him from behind. Although Mazloum could not see who had grabbed him, Messrs. Alkadi and Abi-Aad witnessed Persons grab Mazloum (Counter-Statement at ¶¶ 7-8);

- Persons has admitted striking Mazloum sometime after he first made physical contact with him (Counter-Statement at ¶ 15);

- Persons, as well as FUR's security manager, David McLeod, have admitted that Persons did not act in accordance with Nightclub policy, which required bouncers/security personnel to engage a second security employee before attempting to remove an allegedly unruly patron (Counter-Statement at ¶ 12);

- To the extent Mazloum struggled with Persons after being seized, he did so only because he did not see who had grabbed him and thus did not know that Nightclub security personnel were responsible (Counter-Statement at ¶¶ 9, 14, 16);

- In the course of his struggle with Persons, Mazloum was forced to the ground, and believes his nose was broken at that time (Counter-Statement at ¶¶ 14, 21);

- Mazloum was held down as he tried to get up. The efforts of Mr. Alkadi to intercede on his behalf were ignored by Persons (Counter-Statement at ¶ 18);

- After a brief struggle, several off-duty Metropolitan Police Department officers, who were also patrons at the Nightclub, jumped in to assist the security guard in subduing Mazloum. The off-duty MPD officers proceeded to drag Mazloum in the direction of the nightclub exit. As they approached the stairs leading towards the tunnel to exit the club, the officers handcuffed Mazloum. After he was handcuffed, Officer Ramirez hit Mazloum in the face and shouted at him, "shut up, you f*cking al Qaeda." Mazloum was dragged out of the club and eventually dropped on the ground directly across the street from the Nightclub (Counter-Statement at ¶¶ 14-18, 24-33);

- The Nightclub possesses a security camera system that feeds images to a central computer

unit. These recordings are digitally saved on a computer's hard drive and are automatically overwritten three days later. It is possible to save the recorded images (before they are overwritten by the computer) to a CD-ROM disk (Counter-Statement at ¶¶ 53-54);

• Some of the cameras that are part of this system would have captured images of Mazloum at certain stages of his "journey" as he was led out of the Nightclub, as well as his eventual destination, on the curb on the side of Patterson Street, N.E., opposite the Nightclub entrance (Counter-Statement at ¶¶ 55-56);

• Once outside the club, Mazloum was continually verbally and physically abused by the off-duty officers and club security for about 10-15 minutes until uniformed police officers arrived on the scene. The officers took Mazloum to the side and he told them what had happened. After listening to Mr. Mazloum, the uniformed officers removed the handcuffs and told him to go home. Mazloum informed one of the uniformed officers that he wanted to make a complaint of the incident, but the officer informed him that he would have to go to the police station in order to file a report. Mazloum was never charged with anything, and neither FUR nor any of the off-duty officers lodged a complaint against him or requested that he be charged (Counter-Statement at ¶¶ 30-42);

• The uniformed officers charged with responding to the incident, Acosta and Smith, specifically spoke to Persons. They found his "story" about what had happened between him and Mazloum not to be credible. They also have testified that they found it strange that no witnesses came forward to corroborate claims that Mazloum and his unidentified friends had instigated the incident by assaulting the bouncer (Counter-Statement at ¶¶ 39-40);

• Mazloum went to the hospital in the early hours of March 12, 2005, where he was treated for his injuries (Counter-Statement at ¶ 44);

• After being discharged from the hospital earlier, in the late afternoon of March 12th, Mazloum went to the First District precinct headquarters to file a complaint based upon the unjustified beating he had received in the early hours of the same day. There, as he entered the police station, he ran into Defendant Ramirez and recognized him as one of the off-duty officers who had physically assaulted him (Counter-Statement at ¶ 48);

• Shortly thereafter that same day, March 12th, Mr. Ramirez telephoned Defendant Fiorito at FUR and informed him that Mazloum had filed a police misconduct complaint regarding the earlier incident at FUR. (Ramirez Dep. at 317.) He also placed calls to some of the other off-duty officers involved in the altercation, as well as the uniformed officers who had released Mazloum (Counter-Statement at ¶¶ 49, 52);

• Ramirez has testified that Fiorito immediately acknowledged the potential significance of the FUR surveillance videotapes by inviting Ramirez or another MPD representative to come to FUR to view the video recordings and to burn them onto a disk if they so chose (Counter-Statement at ¶ 49);

• Shortly after receiving the call from Mr. Ramirez, Mr. Fiorito allegedly instructed FUR's

security manager, Mr. McLeod, to view the March 12, 2005 early morning video recordings to see if he could pull up a record of anything relevant to the incident (Counter-Statement at ¶ 65);

- McLeod is the only witness who admits to having reviewed FUR's video feed from the early hours of March 12th. McLeod admits that Mazloum and the off-duty officers appeared on the video. Specifically, Mr. McLeod testified that the video cameras near the front entrance of FUR showed the officers leading Mazloum out of the club (Counter-Statement at ¶ 66);

- The Plaintiff's own inspection of the Nightclub premises confirms that the video monitoring system would have, at a minimum, captured images of Mazloum (i) as he was walked, in handcuffs, through a "tunnel" leading from the staircase from the dance floor to the front of the Nightclub, (ii) to the front of the interior of the Nightclub, and then (iii) in front of the Nightclub across the narrow street, where Mazloum was ultimately forced to sit upon a curb by Ramirez and where testimony shows Ramirez subjected Mazloum to additional acts of battery (Counter-Statement at ¶¶ 55-56);

- Later the same evening, Mr. Alkadi received a telephone call from a club promoter for whom he worked, who told him that Defendant Fiorito wanted to speak with him regarding the police complaint he and Mazloum had filed earlier that day. Mr. Alkadi was directed to report to FUR immediately. Mr. Alkadi complied and went to FUR, where he met with Defendants Fiorito and Rehman, along with Mr. McLeod and Persons in a small room (Counter-Statement at ¶¶ 59-60);

- "Masoud A," the party promoter who phoned Alkadi and ordered him to revisit FUR on the evening of March 12th, has testified that Fiorito sounded extremely angry on the call in which he demanded to see Alkadi (Counter-Statement at ¶ 59);

- Upon entering the security room in the front of FUR, Mr. Alkadi noticed that the room contained multiple security monitors. Mr. Alkadi observed that the cameras covered about 40 areas in the club including areas located between the stage to the area and outside of the Nightclub (Counter-Statement at ¶ 60);

- FUR video surveillance records have been used and saved by FUR in the past (Counter-Statement at ¶¶ 53, 58; *see also* FUR Defs' Mot. at 6);

- During their Saturday evening meeting, Defendant Fiorito threatened Mr. Alkadi that the nightclub could file suit against Mazloum if the allegations in his police misconduct complaint were false, and that Mr. Alkadi had involved himself in a "big problem." He informed Mr. Alkadi that he was not permitted to come to FUR anymore. He told him that his friend, Mazloum, was "going to get burned" if he persisted in following through with filing his police complaint (Counter-Statement at ¶ 62);

- Mr. Alkadi looked at the security camera images displayed on the computer monitors in the room and suggested that the FUR surveillance recordings must have captured the incident. Defendant Fiorito responded that "everything [was] gone." Mr. Alkadi understood this to

mean that the video surveillance record had already been erased or destroyed. This conversation occurred two and one-half days before the FUR defendants contend that the surveillance equipment would have automatically overwritten the images (Counter-Statement at ¶¶ 54, 63-64);

- FUR's director of security, McLeod, has provided contradictory testimony as to whether FUR did or did not view the video of the incidents of March 12th, and what those images showed. In the course of a single deposition, McLeod testified that (i) he did not view the tapes, (ii) he did view the tapes, (iii) the tapes did not show Mazloum at all, (iv) the tapes did show Mazloum but were otherwise inconclusive, (v) the tapes did not show Mazloum at his final "destination" after being handcuffed, across the street from the Nightclub, (vi) the tapes did show the same but were, again, inconclusive (Counter-Statement at ¶¶ 65-66).

## ARGUMENT

### I.    Applicable Summary Judgment Standard.

Entry of summary judgment is proper where the non-movant can offer no evidence upon which a jury could reasonably find in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). The evidence offered in support of the non-movant's claim must be more than a "scintilla" but need only be sufficient to establish the existence of material triable facts. *Id.* at 249-50; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). In reviewing the FUR Defendants' motion, this Court must assume the truth of Mazloum's factual allegations and must draw all evidentiary inferences in his favor. *Anderson*, 477 U.S. at 255. Because motions for summary judgment, like those for directed verdicts, deprive plaintiff of a determination of the facts by a jury, they should be granted sparingly. *Farner v. Paccar, Inc.,* 562 F.2d 518, 522 (8th Cir. 1977).

The Court's role in reviewing summary judgment motions is circumspect. In particular, the Court must "eschew making credibility determinations or weighing the evidence." *U.S. v. Project on Gov't Oversight,* 454 F.3d at 308  This Court must be specially wary of making fact determinations that hinge upon witness credibility. As noted in *Carter-Obayuwana v. Howard University*, 764 A.2d 779 (D.C. 2001), "[T]hese issues can only be sorted out at trial. There, cross-

examination and other tools of the search for truth should enable the court and jury to separate the wheat from the chaff and reach a just result." *Id.* at 793 (concluding that there was sufficient evidence for the plaintiff's claims regarding her reduction in salary to be presented to the jury, even though the court concedes that she may be unable to establish the requisite causal nexus at trial). Where resolution of fact issues requires the sifting and balancing of conflicting testimony, summary judgment is not appropriate. *Rogers Corp. v. Envtl. Prot. Agency*, 275 F.3d 1096, 1103 (D.C. Cir. 2002) ("[s]ummary judgment is inappropriate when contradictory inferences may be drawn from the evidence"); *see also Nilson v. Historic Inns Group Ltd.*, 903 F Supp. 905, 909 (D. Md. 1995)(it is improper to invoke summary judgment where the depositions of principal witnesses "present conflicting versions of the facts which require credibility determinations"); *see also Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) ("summary judgment is not a procedure for resolving a swearing contest")

In cases like this one[1], where claims of discrimination and Title VII-like violations are alleged, "summary judgment should be approached with special caution" given the inherent difficulties of proving intent and other matters peculiar to such cases. *Regan v. Grill Concepts-D.C., Inc.,* 338 F. Supp. 2d 131, 133 (D.D.C. 2004)(denying summary judgment on DCHRA-based claim). And it is important to emphasize as well that the level of proof required of such a discrimination claimant is less at the summary judgment stage than at trial. *See, e.g., Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1458 (7th Cir. 1994)(Title VII plaintiff "need not prove by a preponderance of the evidence at the summary judgment stage" that defendant was aware of

---

[1] It is reasonable to consider cases construing the federal discrimination statutes, like Title VII, when evaluating claims asserted under the DCHRA, given the substantial similarity of those two statutes. *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n.17 (D.C. 1993).

complaints, but instead need only "produce evidence that would support an inference" of such awareness).

II.    **Dismissal of The Assault and Battery Claim Against Mr. Persons and FUR is Not Warranted Because of the Existence of Numerous Fact Questions Relating to The Elements of the Claim**

   A.    The FUR Defendants Mischaracterize the Law Pertaining to Mazloum's Claim.

In seeking dismissal of Mazloum's assault and battery claim, the FUR Defendants strain to twist what is a very simple claim into something baroque, relying on musty case law to upend the normal presumptions on summary judgment favoring the nonmovant. The Court should not accept the Fur Defendants' invitation to travel down such a misguided path.

Under applicable D.C. common law, an assault is "an intentional and unlawful attempt or threat either by words or acts, to do physical harm to the plaintiff." *Smith v. District of Columbia*, 822 A.2d 778, 787 (D.C. 2005) (quoting *Etherege v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993)). A battery is "an intentional act that causes a harmful or offensive bodily contact." *Id.* The FUR Defendants cannot, and do not, contest that Mazloum has adequately pled a cause of action for battery. However, they nevertheless argue that dismissal of the claim is appropriate because, in their self-serving estimation, the description of events as told by the primary FUR defendant and alleged batterer, Michael Persons, should be believed, whereas Mazloum should not because his contrary version of events is "too incredible." FUR Defendants' Mot. at 22.

In support of their argument that governing summary judgment jurisprudence should be ignored, the FUR Defendants have relied heavily on a case decided over fifty-five years ago, *Vale v. Bonnett*, 191 F.2d 334, (C.A.D.C. 1951). Putting aside its low precedential, or even factual, value

herein,[2] that single case cannot be relied upon to overturn the fundamental, broadly-accepted rule in the federal courts that, on summary judgment, all evidence must be construed in the light most favorable to the non-moving party, and all inferences drawn in his favor. *See* pp. 6-7, *supra*.

Here, there is unquestionably a dispute between the Plaintiff's version of events, as described by Plaintiff and several other first-hand eyewitnesses, and that described by Defendant Persons and certain other Defendants. For now, the Plaintiff's version is the one that must be credited.[3] In order to determine whose version is "too incredible," a jury will have to make many credibility determinations, evaluating each witness as he testifies and weighing whether their words should be given credence. It is axiomatic that this is a function for the jury – not the Court. *Anderson*, 477 U.S. at 255 ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whe[n] he [or she] is ruling on a motion for summary judgment").

B.  The Evidence Shows Defendant Persons Initiated a Battery Against Mazloum.

There is ample credible evidence in the discovery record to suggest that Mr. Mazloum was the victim of an unprovoked assault and battery by Mr. Persons (who is employed by FUR, and was undeniably acting within the scope of his employment). Mr. Persons, and consequently FUR, are liable for the beating.

As Mr. Mazloum attempted to descend the stairs from the stage to the main dance floor, Mr. Persons approached him from behind, wrapped his arms around Mr. Mazloum, and began choking

---

2 The last time any court in the United States discussed, cited, or mentioned the *Vale* case as valuable precedent was in 1985. Moreover, its holding actually favors the Plaintiff. In *Vale*, a plaintiff pedestrian sued for personal injuries sustained while walking on a public sidewalk, where an extension ladder being used for the purpose of repairing a store sign belonging to the defendant fell on the plaintiff. The D.C. Circuit ultimately held that there were material disputed factual issues that could not be resolved prior to trial. In any event, the *Vale* decision does not specify or provide any guidelines as to what might constitute a "too incredible" version of events.

3 Plaintiff will show at trial that Mr. Persons is far from credible. Indeed, on-the-scene witnesses, such as Defendant Officer Smith reached the same conclusion after talking with Persons. Counter-Statement ¶ 39.

him. Counter-Statement ¶¶ 7-8.  Contrary to Mr. Persons' testimony, Mr. Mazloum stated that he did

not know and was not made aware, prior to being grabbed, that Mr. Persons believed he had violated

either some FUR policy about who could be on stage (a nonexistent policy, as it turns out), nor had

he been warned to leave the stage "several times."  Counter-Statement ¶ 9-10.

Mr. Persons had no basis for making a physical, surprise attack on Mr. Mazloum.  There is

no evidence that Mr. Mazloum had done anything disruptive or that his behavior would otherwise

justify his forcible removal from the Nightclub. Counter-Statement ¶¶ 9, 11.  Both Imad Alkadi and

Marwan Abi-Aad, who witnessed the incident, deny that Mazloum initiated the incident and both

corroborate Mazloum's assertion that he was grabbed from behind and subsequently struck as well

by Persons.   Counter-Statement ¶ 8, 14, 17.   Moreover, Mr. Persons ignored Mr. Alkadi's

protestations to him that Mazloum was not a threat and should be released.  Counter-Statement ¶ 18.

 Mr. Mazloum's conduct was innocent while Mr. Persons' conduct was unprovoked and out of

proportion to Mazloum's unsubstantiated "misconduct."

There is no dispute about the fact that Mazloum was injured as a result of his contact with

Persons, suffering a broken bloody nose shortly after being grabbed and then thrown to the floor of

the stage.  Counter-Statement at ¶¶ 21, 44.  Only Mazloum found it necessary that night to go to the

hospital, whereas Persons, who claimed also injury to his arm, was able to "treat" it with ice.

Counter-Statement ¶ 44.  Notably, Co-Defendants Acosta and Smith, who interviewed Persons after

the incident, did not find his claims of injury credible, and it can be inferred (and must be, on

summary judgment) that Persons misrepresented the extent of his injuries out of concern that he was

going to be held liable for what he had done to Mazloum.  Counter-Statement ¶ 39.

Mr. Persons' conduct was also noncompliant with official Nightclub policy regarding

handling of patrons.  FUR policy prohibits striking patrons – but Persons admits to doing just that.

Counter-Statement ¶¶ 13, 15.  Persons also admitted that he did not attempt to find another member

of Nightclub security before engaging with Mr. Mazloum – even though that is also required by the Nightclub before a patron is ejected. Counter-Statement ¶ 12. Furthermore, Mr. Persons specifically admitted to discussing with David McLeod, head of security, the mistakes he had made on March 12, 2005, from which it can be inferred that he was aware he had acted inappropriately. *Id.* Mr. McLeod for his part has acknowledged Persons did not comply with FUR policy on these points. *Id.*

Officers Jose Acosta and David Smith, who responded to FUR and assessed the scene of the incident, both concluded that Mr. Mazloum was not at fault. Counter-Statement ¶ 41. Based on Mr. Persons' demeanor and lack of any sign of injuries, Officer Acosta did not believe Mr. Persons' story that Mr. Mazloum had assaulted anyone. Counter-Statement ¶ 39. Officer Smith confirmed that Mr. Persons looked fine and was not injured at all, despite Mr. Persons' claim to the contrary. *Id.* Officer Smith also testified that, in his opinion, Mr. Mazloum was the apparent victim. Counter-Statement ¶ 41.[4] Accordingly, Officers Acosta and Smith ultimately released Mr. Mazloum upon determining that there was no valid basis on which to arrest him. Counter-Statement ¶ 41. Both officers have testified that their decision to release Mr. Mazloum was consistent with the directive of Officer Allman, the first officer to respond to the incident. Counter-Statement ¶¶ 35, 42.

In summary, credible evidence from Mr. Mazloum, Mr. Alkadi, Mr. Abi-Aad, and Officers Acosta and Smith all suggest that not only was Mr. Mazloum *not* the aggressor, but that he was the

---

4  In a lengthy footnote, the FUR Defendants present evidence intended to suggest that Mazloum was intoxicated, if not high on narcotics, in an effort to discredit his testimony to the contrary. FUR Defendants' Mot. At 27 n.8. Ignoring for a moment the plain fact that it must be assumed for now that Mazloum's version of events (in which he admits to having two or three drinks in total) is correct, it is also hardly the case that *all* witnesses will contradict Mazloum on this point at trial. Certainly Messrs. Alkadi and Abi-Aad, both of whom were present with Mazloum at the start and end of the night, and both of whom deny he was drunk, will offer testimony bearing on this point. In contrast, the FUR Defendants (and their allies, the Off-Duty Officers) all suggest self-servingly that Mazloum was very intoxicated – a favorable assertion for them to make, since it would seem to justify their otherwise overreaching and illegal conduct. Once again, this presents a credibility issue that cannot be resolved on summary judgment.

Indeed, it is not even the case, as the FUR Defendants argue, that third parties agree Mazloum was definitely drunk. Officer Humberto Alexander Trapero agreed, on cross-examination, that Mazloum's symptoms (i.e., bloodshot eyes and agitation) that Officer Trapero witnessed in the Alexandria INOVA hospital were consistent with being assaulted. Counter-Statement ¶ 69.

victim of an unprovoked assault and battery by Mr. Persons. Plaintiff's evidence is in direct conflict with defendants' self-serving assertions and therefore genuine issues of material fact exist as to whether Mr. Persons, and as a consequence FUR, are potentially liable for the plaintiff's assault and battery claim. Accordingly, the FUR Defendants have not met their burden of proof on summary judgment, and they are not entitled to judgment as a matter of law.

C.     Persons' Self-Defense Argument is Not Amenable to Resolution
        On Summary Judgment.

Persons asserts that any battery he may have committed against Mazloum was justifiable "self-defense." FUR Defendants' Mot. at 22. This presents an affirmative defense which, if disputed, is properly for the jury to consider. 6 Am. Jur. 2d *Assault and Battery* § 129 (2007); *see also People v. George,* 540 N.W.2d 487, 488 (Mich. 1995)(proof of self-defense requires an honest and reasonable belief that the defendant's life was in imminent danger or that there was a threat of serious bodily harm). Given the myriad questions of fact swirling around Persons's interaction with Mazloum (including but not limited to questions about who initiated the altercation, whether Mazloum struck Persons at all, *etc.*), it is impossible to dismiss the battery claim simply on the strength of Persons's self-serving explanation for why he admittedly struck Mazloum. Nor should Persons's account be given any weight in comparison to Mazloum's more credible, corroborated assertions that Persons initiated contact with him first. Certainly Persons cannot at this stage show that he feared for his life, or that he did not have any other means of self-protection available (for example, by involving another member of FUR security, as Nightclub policy directs).

## III.    **Sufficient Facts Exist in Support of Plaintiff's Spoliation Claim.**

The FUR Defendants ask for summary judgment on Plaintiff's spoliation claim by employing a "kitchen sink" approach, challenging Plaintiff's ability, under any reasonable view of the facts, to

establish **any** of the required elements of the claim.[5]  The FUR Defendants are wrong.  In fact, with respect to each element of the cause of action of spoliation, there exists sufficient record evidence from which a reasonable jury could find in Plaintiff's favor.  For this reason, the FUR Defendants' motion for summary judgment on Plaintiff's spoliation claim should be denied.

A.    <u>Legal Standard</u>

The District of Columbia recognizes the tort of reckless or negligent spoliation.  *See Holmes v. Amerex Rent-a-Car*, 710 A.2d 846 (D.C. 1998).  The elements of such a claim are as follows:

> (a)    the existence of a potential civil action;
>
> (b)    a legal or contractual duty to preserve evidence that is relevant to that action;
>
> (c)    destruction of that evidence by a duty-bound defendant;
>
> (d)    significant impairment in the ability to prove the potential civil action;
>
> (e)    a proximate cause between the impairment of the underlying suit and the unavailability of the destroyed evidence;
>
> (f)    a significant possibility of success of the potential civil action if the evidence were available; and
>
> (g)    damages adjusted for the estimated likelihood of success in the potential civil action.

*Holmes*, 710 A.2d at 854.  The overarching inquiry in a spoliation analysis, like any negligence analysis, is whether a plaintiff can show that (1) the spoliating defendant breached a legally cognizable duty to the plaintiff, and (2) that the breach was the proximate and legal cause of ascertainable damages to the plaintiff.  *See Powell By and Through Ricks v. District of Columbia*,

---

5  In addressing spoliation as a cause of action, Plaintiff does not waive his right to seek at trial an adverse inference against the FUR defendants and the MPD defendants, in its other causes of actions against said parties, that the destroyed video evidence would have been helpful to the Plaintiff but was destroyed by the FUR Defendants for that reason. *Battocchi v. Washington Hosp. Ctr.*, 581 A.2d 759, 766-67 (D.C. 1990); *Williams v. Washington Hosp. Ctr.*, 601 A.2d

634 A.2d 403, 406 (D.C. 1993) (citing *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984)).  In developing this tort, the *Holmes* court builds upon previous existing caselaw permitting the adverse inference when a party fails to preserve evidence within their exclusive control, acknowledging that a plaintiff has a legally protectable interest in the preservation of evidence required for recovery in a civil case.  *See Holmes*, 710 A.2d at 848.  If a duty is owed, the plaintiff should be able to rely on traditional negligence remedies.  4-40 BUSINESS TORTS § 40.02 (2005).

As a general matter, courts are reluctant to grant summary judgment on spoliation claims, given their fact sensitive nature.  *See, e.g., Pirocchi v. Liberty Mut. Ins. Co.*, 365 F. Supp. 277, 282 (E.D. Pa. 1973) (in negligence cases, a full exposition of the facts is generally required to make a determination that conduct under a particular set of circumstances resulted in a breach of duty).

B.     The FUR Defendants Were Aware of the
       Existence of a Potential Civil Action.

The FUR Defendants argue that Plaintiff cannot satisfy the first element of the *Holmes* test (the existence of a potential legal action) because he had not yet filed his lawsuit at the time they destroyed the surveillance evidence.  FUR Defendants' Mot.. at 11.  This argument is misplaced, however, because Plaintiff does not have to show the existence of a civil action prior to the destruction of evidence.   Rather, as *Holmes* makes clear, the Defendants simply had to have knowledge of the existence of a "*potential* civil action."  710 A.2d at 854 (emphasis added); *see also Smith v. Atkinson*, 771 So.2d 429, 433 (Ala. 2000) (third party defendant in a spoliation case must have actual knowledge of a "pending or potential" lawsuit).

Here, there is ample evidence from which a reasonable jury could find that the FUR Defendants had knowledge of Plaintiff's potential claims and potential lawsuit against them and the off-duty officers of the MPD.  FUR was "ground zero" for the incident; its own security guard was

28, 31 (D.C. 1991).  This is a separate inquiry to be conducted by the court at the time of trial, and Plaintiff intends to

the initiator of the incident.  Counter-Statement ¶¶ 8, 14-16.  It is undisputed that within less than 24 hours of the incident, Defendant Ramirez had telephoned Defendant Fiorito and informed him that Plaintiff had filed a complaint alleging police misconduct at FUR.  Counter-Statement ¶ 49.  By this time, Defendant Ramirez had seen, and interacted with, Mazloum at the very moment he came to the precinct station - specifically for the purpose of making a complaint.  Counter-Statement ¶ 48.  A jury could infer that he told Fiorito about Mazloum and his injuries.  During that same call, there was discussion of the surveillance cameras, and Defendant Fiorito allegedly invited Defendant Ramirez to review the video evidence.  Counter-Statement ¶¶ 50, 58.

Police misconduct complaints like the one Plaintiff lodged are often the predicate for future lawsuits, as Defendants Ramirez and Fiorito (present or former MPD officers both) surely was aware.  A reasonable jury could infer that Ramirez telephoned Defendant Fiorito (as well as most of the other Off-Duty Officers involved in the incident) to inform him (and the FUR Defendants more broadly) of Plaintiffs' potential claims against MPD, himself and the FUR Defendants.

In fact, a reasonable jury could infer that Defendant Ramirez contacted Defendant Fiorito for the *express* purpose of making sure the video surveillance evidence was promptly destroyed.  Indeed, it is highly salient that after receiving the call from Defendant Ramirez on March 12th, Defendant Fiorito claims to have instructed FUR's Security Manager, David McLeod, to view the security camera recordings from the early morning hours of the day to see if he could pull up anything relevant to the incidents.  Counter-Statement ¶ 64.  The evidence was characterized by Fiorito as "gone" by the time of his meeting with Alkadi later that night.  Counter-Statement ¶ 63.

Finally, even if the above evidence of notice were not enough, during his subsequent meeting with Mr. Alkadi, Fiorito threatened Alkadi that the Nightclub could file suit against Mr. Mazloum if the allegations in his police misconduct complaint were false.  Counter-Statement ¶ 62.  The logical

seek this inference regardless of the disposition of its spoliation cause of action.

inference from this statement is that Mr. Fiorito contemplated that the police complaint exposed FUR to some potential liability, and that litigation of some sort could arise out of the police misconduct complaint. Simply put, a reasonable jury could infer from all of these facts that the FUR defendants had notice of Plaintiff's potential civil action at the time they destroyed the videotapes. *See Mace v. Ford Motor Co.*, No. 33080, 2007 W. Va. LEXIS 35 at *17 (W. Va. May 25, 2007) (in a spoliation case, the alleged spoliator's "precise knowledge or state of mind concerning a situation often cannot be determined by direct evidence," and plaintiff must be allowed to prove this element through the use of circumstantial evidence).

C.    Plaintiff Can Establish the Existence of a Legal
       Duty to Preserve the Video Recording.

As a general matter, in spoliation of evidence claims, a plaintiff must prove that the defendant had a "legal or contractual duty" to preserve the evidence. There is no duty to preserve evidence for another party to aid that party in some future legal action against a third party absent some "special relationship" arising by reason of an agreement, contract, statute or other "special circumstance." *Holmes*, 710 A.2d at 849 (citing *Koplin v. Rosel Well Perforators*, 734 P.2d 1177, 1179 (Kan. 1987)). Therefore, a plaintiff frequently must establish the existence of a "special relationship" that creates such a duty to preserve evidence for use in future litigation. *Holmes*, 710 A.2d at 849.

While there is no D.C. case law directly on point, there is precedent in other jurisdictions that suggests FUR should be found by the Court to possess such a duty under the circumstances. Such a "special relationship" implying a duty to preserve was found, for example, in *Callahan v. Stanley Works*, 703 A.2d 1014, 1018 (N.J. Super. Ct. Law Div. 1997). There, the plaintiff had been seriously injured at work while operating a fork lift when a pallet of storm doors fell off the lift and struck him. *Id*. 1016. Shortly after the accident, the loss prevention manager at the plaintiff's place

16

of employment placed an evidence tag on the pallet of doors and put it away because the company needed the pallet to investigate the plaintiff's workers' compensation claim and determine the cause of the accident. *Id.* Later, the pallet of doors was either lost or misplaced, thereby impairing plaintiff's ability to prove his underlying negligence claim against Stanley Works for its negligent and careless packaging and shipping of the doors. *Id.* After determining that the employer had no contractual obligation to preserve the pallet as evidence, the *Callahan* court nonetheless found "special circumstances" giving rise to a duty where "immediately after the accident, [the employer] took steps to preserve the subject pallet." *Id.* at 1018.

*Callahan* has application here. Mazloum was injured at the alleged spoliator's place of business. Shortly after the incident, the FUR Defendants acted in a manner from which a reasonable jury could conclude that they undertook a duty to preserve the evidence. Upon receiving the call from Defendant Ramirez regarding Plaintiff's filing of the police misconduct compliant as a result of the incidents that occurred at FUR, Defendant Fiorito invited Defendant Ramirez or any other MPD representative to view and copy, if necessary, the video recordings. Counter-Statement ¶ 58. This affirmative act illustrates Defendant Fiorito's willingness to preserve the video recordings until Defendant Ramirez or some other MPD representative was able to come down to FUR to view and/or copy them. Defendant Fiorito also claims he requested that the security manager at FUR view the video surveillance recordings to see if he could pull up anything relevant to the incidents. Counter-Statement ¶ 65. With these two distinct acts, Defendant Ramirez, as the defendant did in *Callahan*, acknowledged the significance of the video recordings and acted in a manner from which one could reasonably conclude he would preserve the recordings. Thus, Defendant Fiorito's actions created the existence of "special circumstances" from which a jury could reasonably conclude that the FUR Defendants undertook a duty to preserve the video recordings.

Alternatively, grounds for identifying a "special relationship" giving rise to a duty to

preserve under these circumstances could also be located in existing jurisprudence in D.C. relating to adverse inferences in the spoliation context. Before the spoliation cause of action was recognized by the D.C. Court of Appeals in the *Holmes* decision, D.C. case law held that a fact-finder may be permitted to draw an adverse inference from a party's failure to preserve evidence within his exclusive control. *Holmes,* 710 A.2d at 848 (citing, *Williams v. Washington Hosp. Ctr.,* 601 A.2d 28, 31 (D.C. 1991); *Battocchi v. Washington Hosp. Ctr.*, 581 A.2d 759, 766-67 (D.C. 1990)). These holdings do not require the party seeking the adverse inference to establish that the defendant had an actual duty to preserve, whether legal or contractual. *Battocchi*, 581 A.2d at 765-66. However, as the *Battocchi* reasoned, "a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document." *Id*. Under this theory, the fact-finder is permitted to draw an adverse inference, where destruction of evidence is beneficial to the spoliating party. *Id*. at 765.

The FUR Defendants argue that because they only knew of a "theoretical" third-party action, and because Plaintiff failed to make any efforts to contact them to have the video recording preserved, Plaintiff cannot establish that they owed a duty to preserve the evidence. In light of the above precedent the Defendants' arguments are without merit. Given the degree of notice the FUR Defendants had of Mazloum's intent to proceed with his police complaint, the fact that the police complaint arose out of circumstances that occurred on FUR premises, and the fact that the FUR Defendants took action the *same day* they learned of the complaint to meet with a future witness and coerce him to drop the matter (Mr. Alkadi), it is reasonable to conclude that the FUR Defendants deliberately destroyed the video recording because its destruction was extremely beneficial to their defense. This Court should find a duty to preserve from this "special relationship" between Plaintiff

and the FUR Defendants.[6]

D.  The FUR Defendants Destroyed the Video Surveillance Evidence.

Defendants argue that Plaintiff cannot satisfy this element because the video recording "was, in fact, merely overwritten in the normal course of business."  FUR Defendants' Mot. at 14.  Yet, whether the video recording was immediately and deliberately destroyed, or in the normal course of being overwritten, it is undisputed that the FUR Defendants were *responsible* for that destruction, despite notice of the recording's importance.

First and foremost, there is sufficient evidence in the record to support a jury finding that, rather than being overwritten in the ordinary course, the March 12th video recordings were intentionally destroyed by the FUR Defendants on that very same date, in response to learning of Plaintiff's police misconduct complaint and their potential exposure to liability.  Mr. Alkadi met with the FUR Defendants less than 24 hours after the incident and during that meeting Defendant Fiorito told him that the video recording was "gone."  Counter-Statement ¶ 63.  Defendants themselves have also admitted that the computer monitoring system does not automatically overwrite images for at least three days, and have provided other, suspicious and conflicting testimony about when and to what extent the tapes were reviewed.  Counter-Statement ¶¶ 54, 65-66. Mr. Fiorito's statement to Mr. Alkadi during their meeting on March 12, in combination with

_____

6  This Court could in fact ignore entirely the obligation to establish a duty to preserve, to the extent it finds that the FUR Defendants acted intentionally.  Several jurisdictions provide for a separate cause of action for the intentional destruction of evidence.  *See, e.g., Berge v. St. Tammany Parish*, 336 F.3d 363, 374 (5th Cir. 2003) ("The Louisiana tort of spoliation evidence provides a cause of action for an intentional destruction of evidence carried out for the purpose of depriving an opposing party of its use."); *Hannah v. Heeter*, 584 S.E.2d 560, 572 (W. Va. 2003) (Supreme Court of Appeals of West Virginia held that in a cause of action for intentional spoliation of evidence, a plaintiff must establish (1) the existence of pending or potential civil action; (2) knowledge of the spoliator of the pending or potential civil action; (3) willful destruction of the evidence; (4) the spoliated evidence was vital to a party's ability to prevail in the pending or potential civil action; (6) the party's inability to prevail in the civil action; and (7) damages.).There is nothing prohibiting this court from applying the principles used in other jurisdictions where a cause of action for intentional spoliation is recognized.  In those jurisdictions, if evidence establishes the spoliating party *knew* of the pending or potential civil action and then *willfully* destroyed the relevant evidence, the duty is assumed. Here, sufficient record evidence exists to permit a reasonable jury to conclude that the FUR Defendants had actual knowledge of the pending or potential civil action, willfully destroyed the relevant evidence, and were fully aware of the unreasonable risk of harm possible to

testimony regarding the video recording system's operation, supports an inference that the video recordings were intentionally erased, overwritten, or otherwise destroyed within the first 24 hours of the incident.

Second, even if it were undisputed (which it is not) that the FUR video surveillance evidence from March 12th had been automatically overwritten pursuant to ordinary FUR practice, the FUR Defendants still admit that they themselves did not *prevent* the images from being overwritten, and thus recklessly permitted the relevant evidence to be destroyed despite being on notice of its importance.  Under their own version of the facts, the images would have been preserved until March 15th – three days after they were on notice of Plaintiff's complaint, after they obviously recognized the potential relevance of the tapes and invited Defendant Ramirez to view and/or copy them, and after they told Mr. Alkadi that the evidence was "gone."  Thus, even under the FUR Defendants' theory of what happened to the monitor images – a hotly contested factual issue – they would not be automatically absolved of liability.  *Holmes*, 710 A.2d at 849 (permitting an independent tort action for negligent or reckless spoliation of evidence by a third party); *cf. Battocchi*, 581 A.2d at 765. (Courts permit the fact-finder to draw the adverse inference even where the destruction of evidence was not "intentional or reckless" but rather resulted from the "*failure to preserve*", so long as the evidence was under the defendant's exclusive control).

E.   Plaintiff Will Suffer Significant Impairment in his Ability
to Prove his Claims Due to Destruction of the Video Surveillance Tapes

The FUR Defendants contend that Plaintiff cannot establish the existence of a "significant impairment" based entirely on FUR's self-serving testimonial evidence from its security manager that the tapes did not contain relevant information.  *See* FUR Defendants' Mot. at 15-16.  How convenient.  Unfortunately for the FUR Defendants, the credibility of this witness (whose own

---

Mazloum as a result of the video recordings being destroyed.

testimony in his deposition changed with every tick of the clock) is so deeply in dispute that reliance on his statements about what FUR did or did not do is ill-advised. *See Johnson v. D.C. Office of Emple. Appeals*, 912 A.2d 1181, 1183 (D.C. 2006) (D.C. Court of Appeals affirmed the denial of an employee's petition for review of his termination appeal, rejecting one argument on the grounds that the decision of the Office of Employee Appeals was in fact supported by substantial evidence where the ALJ heard testimony from four witnesses including the appellant and found the testimony of the agency witnesses more credible than the "inconsistent and self-serving" testimony of the appellant).

D.C. law specific to spoliation cases makes clear that in these claims "*omnia praesumuntur contra spoliatem" (*all things are presumed against the spoliator). *See Holmes*, 710 A.2d at 848. This rule rests on the logical presumption that one would not ordinarily destroy evidence that is favorable to oneself, and acknowledges the inherent unfairness of requiring a *plaintiff* in a third-party spoliation claim to show by a preponderance of the evidence that the destruction of evidence resulted in a loss of recovery in the underlying civil suit. *Holmes*, 710 A.2d at 850. As the *Holmes* court made clear, although some proximate relationship must exist between the difficulty of success in the underlying cause of action and the unavailability of the destroyed evidence, a plaintiff satisfies the 'substantial impairment' requirement when he or she demonstrates "a ***substantial*** and ***realistic possibility*** of succeeding" if the evidence were present. *Id*. at 852 (emphasis added). A plaintiff need not cross the threshold of demonstrating that success was more likely than not. *Id*.

The video recordings at issue in this case were unique, irreplaceable images of exactly what occurred inside and outside of the Nightclub, and without them this court may not make comparisons to other pieces of available evidence. Cf. *Herbin v. Hoeffel*, 806 A.2d 186, 191-92 (D.C. 2002) (plaintiff's spoliation claim dismissed where the destroyed evidence at issue was shown to be entirely redundant to other evidence in the case). In particular (as Plaintiff's inspection of FUR and the video system revealed), the video cameras would have at least captured Mazloum at several

points as he was taken out of the Nightclub – including the curb across the street from FUR, where Mazloum has testified Ramirez struck him additional times. Counter-Statement ¶¶ 55-56. The video images thus would have shed light on the accuracy of both sides' testimony. Without them, proof of the evening's events will require reliance upon the fading memories of witnesses, all of whom have some interest in the outcome of the case. The huge disparity in the respective witnesses' testimony presents a major hurdle Mazloum must overcome if he is to persuade the jury to find in his favor. This hurdle would not exist, or would be lower, had the video evidence been preserved.

Because the video recordings would, if they existed, recap the events exactly as they occurred that night in FUR, a proximate relationship exists between their unavailability and the "significant impairment" in Mazloum's ability to prove his underlying tort claim. If the video recordings were available they would likely prove that the FUR defendants and/or the MPD did in fact commit assault and battery on Mazloum and violate the DCHRA.

F.    Plaintiff Can Establish the Fact of Damage
      Due to the Unavailability of the Video Evidence.

As Plaintiff is able to establish that he has suffered through his inability to prove his underlying tort claim as a result of the FUR Defendants destruction of the video recording, he can establish damages. This presents yet another fact question not amenable to resolution on summary judgment.

IV.   **Sufficient Evidence Exists to Support Plaintiff's DCHRA Claim
      Against the FUR Defendants.**

The DCHRA states that "[i]t shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, . . . any right granted or protected under this chapter." D.C. Code § 2-1402.61(a). As this Court has stated, a plaintiff can establish a prima facie case of retaliation or interference by alleging that "(1) he engaged in protected activity under the DCHRA, or opposed

practices made unlawful under the DCHRA; (2) he was subjected to adverse action; and (3) there is a causal nexus between the two." *Mazloum v. District of Columbia*, Civil Case No. 06-0002 (JDB), Mem. Op. of April 17, 2007 at *3 ("Mem. Op. of April 17, 2007"); *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 13 (D.D.C. 2006) (citing *Carter-Obayuwana*, 764 A.2d at 790).

The FUR Defendants challenge only the second prong of the claim, by arguing that Mazloum cannot demonstrate he suffered "adverse action" as a result of the conduct of the FUR Defendants, who are alleged to have (i) tried to intimidate Mazloum indirectly through Mr. Alkadi into dropping his complaint by warning him that Mazloum would be "burned" if he did not, and (ii) destroying any and all video evidence of the incident that FUR's security cameras might have captured. FUR Defendants' Mot. at 19. When all facts and inferences are taken in favor of the nonmovant, it is evident that sufficient facts exist in the discovery record to support this element of the claim.

In *Burlington Northern & Santa Fe Ry. Co. v. White*, __U.S. __, 126 S.Ct. 2405 (2006). the Supreme Court adopted the D.C. Circuit's "materially adverse" standard for the adverse action element of a retaliation claim, requiring a plaintiff to show that the defendant's actions were not only adverse but "might well have dissuaded a reasonable [plaintiff] from making or supporting a charge of discrimination." *White*, 126 S.Ct. at 2415. The inquiry into whether a retaliatory act is "materially adverse" requires application of an objective test which considers whether a reasonable plaintiff (as opposed to the plaintiff himself) would have been dissuaded from pursuing a legal right. *White*, 126 S.Ct. at 2415**.**

Mazloum meets that test. First, Alkadi's testimony supports the notion that he (and indirectly, Mazloum) was directly threatened and warned not to proceed with the complaint. Counter-Statement ¶¶ 62-64. In this regard, the FUR Defendants have been very self-selective in what evidence they offer the Court on what was said at the meeting between Alkadi and several FUR staffers, including Messrs. Fiorito and Persons – a meeting that Fiorito essentially, and significantly,

*demanded* that Alkadi attend.  Counter-Statement ¶ 59.  Beyond warning them not to make false statements[7], it is Alkadi's testimony, in his deposition and statements and affidavits, that he was told point blank Mazloum "would be burned" if he proceeded with the matter as well as that any video recording of the incident was "gone."  Counter-Statement ¶¶ 62-63.  Alkadi also was essentially fired from his promotion job at FUR by Fiorito as well – simply for his involvement in seeking justice for Mazloum.  Counter-Statement ¶ 64.

From this, as well as from the fact that FUR displayed no concern at all about its patron's wellbeing after his assault, it can be inferred that the FUR Defendants wanted, and were crudely attempting via the meeting, to intimidate Mazloum from proceeding with the investigation.  Such conduct is violative of the DCHRA, even if the damages Mazloum can recover at trial are nominal in light of the fact that he did proceed with this lawsuit despite FUR's efforts.

Second, as discussed at length above, both direct and circumstantial evidence exists suggesting that the FUR Nightclub's video camera system may have recorded significant portions of Mazloum's battery, as he was led from the stage inside of FUR to the sidewalk area outside of the Nightclub.  Counter-Statement ¶¶ 53-56.  The failure of Acosta and Smith to take a full report and conduct a more thorough investigation gave the Nightclub time to review the video itself – then, as Plaintiff alleges (and as must be assumed true for purposes of summary judgment) destroy it.  Such evidence, which would have been potentially dispositive of aspects of this case, is now irretrievably gone.  Thus, Mazloum experienced "adverse action" in this sense as well, since loss of the video has made it far more difficult for him to establish via independent proof that his testimony about the events at issue is accurate.

---

7 FUR centers its argument with respect to the DCHRA claim on its assertion that all Fiorito did was warn Alkadi (out of the goodness of his heart, presumably) about the danger of making false statements in a police report.  FUR Defendants' Mot. at 19-20.  While Alkadi does not dispute this was said, he *also* testified about other things said to him in the meeting.  These comments (in addition to the "warning" that Fiorito admits to having given Alkadi) when taken as

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the FUR Defendants' Motion for Summary Judgment be denied in its entirety.


Dated:  June 29, 2007

/s/
Brian H. Corcoran (Bar No. 456976)
Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW
Suite 700 East Lobby
Washington, D.C.  20007
Ph: (202) 625-3500
Fax: (202) 298-7570
Brian.Corcoran@kattenlaw.com

Susan Huhta (Bar No. 453478)
Warren R. Kaplan (Bar No. 034470)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, D.C.  20036
Ph: (202) 319-1000
Fax: (202) 319-1010
Sue_Huhta@washlaw.org
Warren_Kaplan@washlaw.org

Attorneys for Plaintiff
Emile Mazloum

---

a whole suggest generally (as a reasonable juror could find) that Fiorito's intent was to threaten Mazloum to back off of his complaint).