## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
EMILE MAZLOUM,                          )
                                        )
                    Plaintiff,          )          Civil Action No. 1:06 CV 00002
                                        )          (JDB)
            v.                          )
                                        )
DISTRICT OF COLUMBIA, *et al.*,         )
                                        )
                    Defendants.         )
_____)


## PLAINTIFF'S BRIEF IN OPPOSITION
## TO DEFENDANTS RICHMOND PHILLIPS, THADDEUS MODLIN,
## AND LOUIS SCHNEIDER'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Emile Mazloum ("Mazloum"), by his undersigned counsel, for his opposition to

Defendants Richmond Phillips, Thaddeus Modlin, and Louis Schneider's (collectively, the

"Defendants" or the "Off-Duty Officers") Motion for Summary Judgment, hereby states as

follows:

### PRELIMINARY STATEMENT

The Off-Duty Officers' motion is more significant for what is omitted than for what is

included.  In particular, it ignores the "elephant in the room" – the ample direct evidence

implicating co-defendant Ramirez in the unjustified and improper beating of Mazloum – and

asserts that there is simply insufficient evidence to support the same set of claims against *them*.

But the evidentiary record does not permit these defendants to wash their hands of the

misjudgments and misdeeds in which they played an active role on the night of March 11-12,

2005.  Such evidence squarely points to significant, if disputed fact questions: to what extent each of these three defendants also are responsible for the severe beating suffered by Mazloum.

As demonstrated in great detail below, the discovery record contains more than sufficient evidence from which the finder of fact could conclude that Mazloum is entitled to recover from Defendants for: violations of his civil rights under 42 U.S.C. § 1983 and § 1981; common law assault and battery; violations of the District of Columbia Human Rights Act ("DCHRA"); and punitive damages.  As such, the Off Duty Officers' motion merits denial.

### Statement of Facts

Mazloum incorporates herein by reference Plaintiff's Omnibus Counter-Statement of Material Facts in Dispute, filed concurrently with this memorandum.  In addition, Plaintiff notes the following factual matters which have specific relevance to the claims asserted against the Off-Duty Officers:

- All of the Off-Duty Officers have admitted they were drinking at the time they physically intervened in the altercation between Mazloum and co-defendant Michael Persons (Counter-Statement ¶ 3);

- The MPD has promulgated policies that urge off-duty officers to exercise caution when drinking and which seem designed to limit possible abuses of power by MPD officers due to intoxication (Counter-Statement ¶ 4);

- Two of the Off-Duty Officers – Modlin and Schneider – have incurred DUI charges in the past few years and resulting MPD disciplinary action against them (Counter-Statement ¶ 3);

- All of the Off-Duty Officers admit that they laid hands on, struck, grabbed, and/or "touched" Mazloum in the process of subduing and handcuffing him and removing him from the Nightclub (Counter-Statement ¶ 29);

- None of the Off-Duty Officers made any attempt to ascertain whether or not Mazloum had in fact caused any problems in FUR Nightclub before they intervened in his dispute with Persons (Counter-Statement ¶¶ 21-32);

- Co-defendant Persons indicated in his testimony that prior to the altercation with Mazloum certain of the Off-Duty Officers (most likely Modlin) had "signaled" to him

that they were available to assist Persons should he need any help with handling patrons who were behaving inappropriately (Counter-Statement ¶ 20);

- The claims of the Off-Duty Officers that they were intervening to prevent an assault upon Defendant Persons are undercut by contrary testimony by third party witnesses Imad Alkadi and Marwan Abi-Aad that Persons had initiated the altercation and had grabbed Mazloum, taking him by surprise (Counter-Statement ¶¶ 8, 11, 14);

- The claims of the Off-Duty Officers that several individuals were assaulting Persons are undercut by the fact that no effort was ever made to identify, let alone apprehend, these alleged individuals (Counter-Statement ¶ 23);

- Mazloum has testified he could not initially tell why he was grabbed or who subsequently was hitting or handcuffing him, and in fact only was informed that these were MPD officers much later in the early morning hours of March 12, 2005 (Counter-Statement ¶ 37);

- Despite their claims that Mazloum appeared to have assaulted Persons if not themselves as well, all of the Off-Duty Officers quickly returned to the inside of the Nightclub after Mazloum was led out and never once thereafter communicated with uniformed MPD officers about what they had observed – a fact one of the uniformed officers who arrived to deal with the situation, co-defendant Smith, has characterized as odd   (Counter-Statement ¶ 40);

- Defendants Modlin and Schneider acted in a suspicious manner after Mazloum was reported to have complained of his beating at the police precinct headquarters the next day, participating in phone calls with co-defendant Ramirez and the uniformed officer and co-defendant who had released Mazloum, Jose Acosta (Counter-Statement ¶¶ 49, 52).

## ARGUMENT

### I.    Standard of Review

Entry of summary judgment is proper where the non-movant can offer no evidence upon which a jury could reasonably find in his favor.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).  The evidence offered in support of the non-movant's claim must be more than a "scintilla" but need only be sufficient to establish the existence of material triable facts.  *Id.* at 249-50.  In reviewing Defendants' motion, this Court must assume the truth of Mazloum's factual allegations and must draw all evidentiary inferences in his favor.  *Anderson*, 477 U.S. at

255. The Court must also "eschew making credibility determinations or weighing the evidence." *U.S. v. Project on Gov't Oversight,* 454 F.3d 306, 308 (D.C. Cir. 2006) (citations omitted).

In cases like this one, where claims of discrimination are alleged, "summary judgment should be approached with special caution" given the inherent difficulties of proving intent and other matters peculiar to such cases. *Regan v. Grill Concepts-D.C., Inc.,* 338 F. Supp. 2d 131, 133 (D.D.C. 2004) (denying summary judgment on DCHRA-based claim). The level of proof required of such a discrimination claimant is less at the summary judgment stage than at trial. *See, e.g., Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1458 (7th Cir. 1994) (Title VII plaintiff "need not prove by a preponderance of the evidence at the summary judgment stage" that defendant was aware of complaints, but instead need only "produce evidence that would support an inference" of such awareness).[1] The same is true in the context of resolving claims relating to police misconduct. *See, e.g.,* Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2732.2 (1998).

This Court must be specially wary of making fact determinations that hinge upon credibility determinations. As noted in *Carter-Obayuwana v. Howard Univ.,* 764 A.2d 779 (D.C. 2001), "[T]hese issues can only be sorted out at trial. There, cross-examination and other tools of the search for truth should enable the court and jury to separate the wheat from the chaff and reach a just result." *Id.* at 793 (concluding that there was sufficient evidence for the plaintiff's claims regarding her reduction in salary to be presented to the jury, even though the court concedes that she may be unable to establish the requisite causal nexus at trial); *see also Housman v. Baratz,* 916 F. Supp. 23, 28-29 (D.D.C. 1996) (*quoting Tao v. Freeh,* 27 F.3d 635,

---

[1] It is reasonable to consider cases construing the federal discrimination statutes, like Title VII, when evaluating claims asserted under the DCHRA, given the substantial similarity of those two statutes. *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n.17 (D.C. 1993).

638 (D.C. Cir. 1994)).   Where resolution of fact issues hinges on sifting through conflicting testimony, summary judgment is not appropriate.  *Rogers Corp. v. Envtl. Prot. Agency*, 275 F.3d 1096, 1103 (D.C. Cir. 2002) ("[s]ummary judgment is inappropriate when contradictory inferences may be drawn from the evidence"); *see also  Nilson v. Historic Inns Group Ltd.,* 903 F Supp. 905, 909 (D. Md. 1995)(improper to invoke summary judgment where the depositions of principal witnesses "present conflicting versions of the facts which require credibility determinations"); *Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir. 1992)("summary judgment is not a procedure for resolving a swearing contest").

## II.     The Off-Duty Officers Are Not Entitled to Qualified Immunity

The Off-Duty Officers first try to argue that they are entitled to total dismissal of Mazloum's Fourth Amendment claim under 42 U.S.C. § 1983 based on a qualified immunity protection.  They assert they had "probable cause" to manhandle Mazloum as they did, because it appeared to them that he was "assaulting the bouncer."  Off-Duty Officers' Mot. At 9.  This argument fails, however, as it does not apply the applicable standard completely, while also completely ignoring highly relevant facts from the discovery record that, taken in the light most favorable to Mazloum, demonstrate objectively unreasonable police conduct flowing from ill-informed, ill-motivated decision-making.  Because the facts in this case show that the Off-Duty Officers violated Mazloum's clearly established right to be free from their use of excessive force pursuant to the Fourth Amendment, the Defendants are not entitled to qualified immunity.

### A.     Applicable Standard of Law to Claims of Qualified Immunity

"In resolving questions of qualified immunity, courts are required to resolve a threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged

show the officer's conduct violated a constitutional right?  This must be the initial inquiry." *Scott v. Harris*, ___ U.S. ___, 127 S. Ct. 1769, 1774 (2007) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151 (2001)) (internal punctuation omitted).  "If, and only if, the court finds a violation of a constitutional right, the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case." *Id.*

The threshold inquiry in resolving questions of qualified immunity is whether the Off-Duty-Officers' actions violated the Fourth Amendment.  The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated."  U.S. CONST. AMEND IV.  Under the Fourth Amendment, "the 'reasonableness' of  a particular seizure depends not only *when* it is made, but also on *how* it is carried out." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865 (1989) (citation omitted; emphasis in original).[2]  This analysis requires a determination of the relevant facts.  *Scott v. Harris*, 127 S. Ct. at 1774 ("[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.  ***In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts***." *Id.* at 1775 (emphasis added)(internal citations and punctuation omitted)).

Viewing the facts in the light most favorable to the plaintiff, the court must next determine whether the officers' actions in effecting a particular seizure were reasonable.  As the Supreme Court observed in *Graham*, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

---

[2]   The Off-Duty Officers also assert that they are not liable for a Section 1983 violation based upon the Due Process Clause of the Fourteenth Amendment.  Off-Duty Officers' Motion at 13-14.  However, Plaintiff's Second Amended Complaint no longer bases his Section 1983 claim on any Fourteenth Amendment violation, and thus this argument has been rendered moot.

motivation."  490 U.S. at 397, 109 S. Ct. 1865.[3]  This Fourth Amendment "reasonableness" standard demands a "totality of the circumstances" inquiry, which entails careful attention to the facts and circumstances of each particular case."  *Id.* at 396, 109 S. Ct. 1865 (*citing Bell v. Wolfish*, 441 U.S. 520, 559 (1979) for the proposition that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."); *see also Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (key question in evaluating claims of Fourth Amendment violations is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure.")

The *Graham* Court instructed reviewing courts to consider various factors in evaluating excessive force and unreasonable arrest claims.  The "proper application" of the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396, 109 S. Ct. 1865 (citation omitted).

Here in particular, the Off-Duty Officers particularly try to justify their conduct based upon the doctrine of "probable cause."  Probable cause has been defined as "a reasonable ground for belief of guilt . . . particularized with respect to the person to be searched or seized."  *Maryland v. Pringle,* 540 U.S. 366, 370-71 (2003).  Where pertinent facts are in dispute as to the existence of probable cause, that issue is viewed as one for the jury.  *Butera v. D.C.,* 83 F. Supp. 2d 15, 22 (D.D.C. 1999), *rev'd in part on other grounds,* 235 F.3d 637 (D.C. Cir. 2001); *Phillips*

---

[3] "Of course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." *Graham* 490 U.S. at 399, n.12, 109 S. Ct. 1865 (citation omitted).

*v. Corbin*, 132. F.3d 867, 869 (2d Cir. 1998) ("[i]t is well established that the factual question whether there was probable cause for an arrest is properly an issue for the jury").

      B.     The Evidence Supports Mazloum's Contention that the Off-Duty Officers "Hit First, Asked Questions Later" in Violation of His Fourth Amendment Rights.

Defendants' claim that they did not violate Mazloum's Fourth Amendment rights, "given the information they had," is ultimately based on a self-serving and incomplete view of the discovery record. *See* Off-Duty Officer's Mot. at 8. In fact, there is ample evidence from multiple sources – including the testimony of the Off-Duty Officers themselves – that more than suggests that they completely lacked any information to support their intervention and subsequent behavior after putting down their beers.[4] Their uninformed, split second determination that Mazloum (an individual smaller in stature than any of the Off-Duty Officers, as well as co-defendants Ramirez and Persons) was a "threat" simply lacks credibility. Under the proper objective standard articulated above, with the facts viewed in the light most favorable to Mazloum, there is clearly evidence in the record suggesting that the Off-Duty Officers acted unreasonably – independent of whether Ramirez also acted unreasonably, or even more unreasonably.[5]

As a preliminary matter, the three Off-Duty Officers (two of whom received DUI citations either before or after the night of March 11th) have admitted they were drinking alcohol during the night in question. Counter-Statement ¶ 3. Off-duty MPD officers who are imbibing

---

[4] Defendants' selective use of the record evidence occasionally borders on the absurd. For example, they rely on Mazloum's own testimony to support the proposition that he could not identify (from his dominated position, face down on the floor) the Defendants' respective roles in the arrest and the alleged assault and battery, yet they completely ignore his claims that it was the bouncer who accosted him and simply reiterate the self-serving, non-credible claims of Persons that Mazloum was the aggressor. *See* Off-Duty Officers' Mot. at 8-9.

[5] Notably, co-defendant Ramirez has conceded sufficient disputed fact issues exist on the Section 1983 claim asserted against him, as he does not join the other Off-Duty Officers in moving for judgment on this particular claim.

alcoholic beverages are taught and instructed to act with extra caution when they witness an occurrence that might arguably call for a police response – in particular, they are instructed to call for uniformed officers to respond. Counter-Statement ¶ 4. Instead, the Off-Duty Officers followed "rookie" urges and intervened, thereby exacerbating a situation they did not fully appreciate to begin with. Counter-Statement ¶ 6.

Such relevant evidence permits an inference that the judgment of the Off-Duty Officers was impaired from the start. Courts across the U.S. have commented on alcohol's widely-appreciated ability to impair judgment. *See, e.g., Olson v. Ford Motor Co.*, 481 F.3d 619, 629 (8th Cir. 2007) ("a person can be impaired by alcohol and show no outward signs of impairment"); *State v. Horkitz*, 115 N.H. 109 (1975) ("[i]t is . . . a commonly recognized fact that the consumption of alcohol impairs coordination, judgment, and alertness"); *Bourgeois v. State Farm Mut. Auto. Ins. Co.*, 562 So. 2d 1177, 1183 (La. App. 1990) ("it is common knowledge that even a minimal amount of alcohol may cause a functional impairment"). The D.C. MPD guidelines prohibiting intoxication by even off-duty officers, and instructing them in the proper way to behave in the event they witness an event that may call for police action, were plainly crafted with the simple goal of preventing such errors in judgment – especially important where police powers are concerned. *Cf. Speert v. Morgenthau*, 73 App. D.C. 70, 74, 16 F.2d 301 (D.C. Cir. 1940) ("valid exercise of the police power must be reasonable, not arbitrary"). Here, it is a more than reasonable inference to suggest that four off-duty officers drinking in a dark, loud nightclub might have known better than simply to intervene in a dispute without taking extra precautions against overreacting

Another factor relevant to the reasonableness analysis is the context of the dispute in question. Record evidence shows that Mazloum was voluntarily leaving the stage at the time he

was assaulted and was causing no problems in the Nightclub. Counter-Statement ¶¶ 7-9. It is his testimony, corroborated by eye-witness testimony, that he did not initiate the altercation with the bouncer (Mr. Persons) and did not strike either the bouncer or (later) the Off-Duty Officers *at any time*, intentionally or otherwise. Counter-Statement ¶¶ 11, 17. Because the facts must be taken in the light favorable to Mazloum, contrary testimony by Defendant Modlin that he "saw" Mazloum and his friends (individuals who, mysteriously, were not similarly detained) assaulting Persons must accordingly be ignored for purposes of summary judgment – as his testimony could well be false. *Cf. Anderson*, 477 U.S. at 249 ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). At this stage in the proceeding, "[t]he evidence of the non-movant [Mazloum] is to be believed." *Id.* at 255.[6]

There are other contextual factors relevant to the "totality" inquiry. Co-Defendant Persons has testified that certain of the Off-Duty officers signaled him in advance that they were prepared to "help" him with problems with patrons. Counter-Statement 20. This, plus the fact that most, if not all, of the Off-Duty officers had previous experience working "Club Zone" detail at FUR and knew many of the Nightclub's employees, suggests they almost saw

---

[6] *See also Sadler v. D'Ambrosio*, 759 F. Supp. 4, 8 (D.D.C. 1990):

> The plaintiff's version of the facts is markedly different than that of the defendants. Numerous issues of material fact exist, making summary judgment as to the Fourth Amendment claim inappropriate. The Court has strikingly different versions of what the circumstances were in which the officer was acting, creating a major obstacle to the resolution of this claim on summary judgment. Much of the resolution of the contradiction in the versions of events surrounding the arrest of Mr. Saddler will be based on the evaluation of the credibility of witnesses, something not available to the Court in the posture of a motion to dismiss, or a motion for summary judgment. The plaintiff has alleged facts that, if true, indicate that Officer D'Ambrosio's actions were objectively unreasonable and violated the plaintiff's Fourth Amendment rights. Whether or not Mr. Saddler's version will ultimately prevail is a question for another day.

themselves as unpaid security officers during that evening – despite the fact that FUR has in place its own policies for handling unruly patrons and certainly could have taken care of problems without police involvement.  Counter-Statement ¶¶ 12-13, 19.

Notably, the other two Off-Duty Officers admit they did not see the initiation of the altercation, and only intervened because they saw Modlin involved.  Counter-Statement ¶ 23.  In fact, Officer Modlin admitted that he had not witnessed how the altercation between the bouncer and Mazloum began.  *Id.*  Thus, the Off-Duty Officers (whose judgment was already impaired to some degree by their alcohol consumption) as a group involved themselves with no real prior knowledge of what was going on.  They asked no questions of any FUR personnel or Nightclub patrons – or even Mazloum and Persons – before jumping into the situation.  No one had identified Mazloum as a potential criminal either.[7]

With Mazloum down on the floor, unable to stand up with the bouncer repeatedly pushing him down, and Mazloum's nose already bloodied, the Off-Duty Officers entered the fray, grabbing Mazloum by the arms, dragging him across the floor and forcibly cuffing his hands behind his back after they wrestled him to the floor before ascending the stairs to the tunnel leading from the Nightclub.  Counter-Statement ¶¶ 27-29.  None of the officers identified himself to Mazloum as a police officer before or while they intervened.  Counter-Statement ¶ 22.  They ignored the protestations of Mr. Alkadi (the alleged co-assaulter of Persons), telling him to back off.  Counter-Statement ¶ 24.  They subsequently dragged Mazloum along the ground across the dance floor to the bottom of the staircase leading out of the club, while pushing him and hitting him in the back.  Counter-Statement ¶¶ 27-29.  Mazloum was unable to stand up and

---

[7]   At best, according to Modlin (if his testimony is credited), Persons had alluded to the fact that he was having to deal with a "problem" person – but this is a far cry from Persons informing the Off-Duty Officers that Mazloum was committing a crime warranting police involvement.

walk during this time, yet the Off-Duty Officers stepped on Mazloum's back and twisted his arms.  Counter-Statement ¶ 24.

Their subsequent behavior, when Mazloum was in custody and clearly no longer the aggressor they claim he was, is even more unreasonable.  After fellow off-duty officer Anthony Ramirez struck Mazloum while unleashing racial epithets (Counter-Statement ¶ 26), the Off-Duty Officers dragged Mazloum, who was by now handcuffed but trying with difficulty to walk, up the steps and out of the club.  Counter-Statement ¶ 29.  None of the Off-Duty Officers made any attempt to explain to Mazloum why he was being handcuffed and dragged out of the club, despite his protestations.  Counter-Statement ¶ 30.

Outside the club, the Off-Duty Officers dropped Mazloum on the ground, where in addition to cold temperatures, he endured more kicks and racial epithets from Officer Ramirez.  Counter-Statement ¶¶ 31-33.  The Off-Duty Officers did nothing to intervene, other than to slam Mazloum back to the ground when he attempted to stand up.  Counter-Statement ¶ 31.

The actions of the uniformed police officers who subsequently arrived on the scene (relevant as part of the "totality" inquiry) further demonstrate the unreasonableness of the Off-Duty Officers' conduct.  After assessing the incident, Officer Jose Acosta determined there was *no evidence* that Mazloum had done anything wrong.  Counter-Statement ¶ 41.  Officer David Smith, who responded with Officer Acosta, has admitted that Mazloum appeared the victim (and in fact, that it should be assumed this is the case when dealing with such circumstances) and that his disheveled appearance and manner were as consistent with him having been beaten as with him being intoxicated.  *Id.*.  Moreover, based in part on the bouncer's demeanor and lack of any sign of injuries, Officer Acosta determined that Persons' story that Mazloum had assaulted him to be not credible.  Counter-Statement ¶ 39.

Tellingly, despite the claims of their counsel that they had "probable cause" to arrest Mazloum based on what they saw inside the Nightclub, *not one* of the Off-Duty Officers stuck around to provide information to the uniformed police officers who responded about what had happened – contrary to MPD policy for off-duty officers. (Counter-Statement ¶¶ 4, 40. Nor were efforts made to "collar" the alleged other individuals who were supposedly also assaulting Persons (even though they cite the presence of these other "phantom assaulters" as justification for their initial act). Counter-Statement ¶ 23. Instead, the three Off-Duty Officers all scurried back inside the secure anonymity of the Nightclub never to be seen again that night, as if to avoid the repercussions of their ill-informed "split-second" decision that they now seek to cast as reasonable.

Thus, the facts and circumstances of this particular case, viewed as the Court must do in the light most favorable to Mazloum, indicate that the Off-Duty Officers did not follow protocol and intervened, after having consumed multiple drinks, in a skirmish where the bouncer was the aggressor. They man-handled Mazloum, both inside and outside the nightclub, without clearly identifying themselves to Mazloum, both before and after fellow officer Anthony Ramirez struck Mazloum and spewed epithets that he was a "fucking Al-Qaeda" and a "fucking terrorist." They permitted an innocent person to be handcuffed and dragged out of FUR as if he were a violent criminal offender – then walked away from the incident once it was evident that they were mistaken.

This recitation of facts does not display "objectively reasonable" conduct in which a reasonable officer would engage. This was not a situation where split-second judgments had to be made, where a serious crime was committed, or where a dangerous assailant was fleeing. Based on these facts, the Off-Duty Officers acted unreasonably and violated Mazloum's Fourth

Amendment rights by using excessive force.  *See DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. Cir. 1997).

The *DeGraff* case is especially instructive here.  In that case, the D.C. Circuit reversed a grant of summary judgment for two MPD officers who arrested a plaintiff for driving under the influence, then carried her down the street and handcuffed her to a mailbox.  The court determined that summary judgment on plaintiff's excessive force claims was improper because the officers were not faced with an evasive suspect, an escaping prisoner, or any evidence that they feared for their safety.  *Id.* at 302.  The district court had found the officers actions to be reasonable because the plaintiff struggled with them *after* they had begun to carry her.  *Id.*  The D.C. Circuit ruled that this was insufficient to justify the officers' actions, noting that the plaintiff's "subsequent attempts to free herself, however, are irrelevant to the question of whether the officers used excessive force in violation of the Fourth Amendment when they hoisted her off the ground and carried her bodily down the street."  *Id.* (citing *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991) (plaintiff's resistance to "being choked and beaten does not retroactively justify" officers' actions in choking and beating him)).

It is no defense to the above at the summary judgment phase for the Off-Duty Officers to assert that Mazloum *himself* cannot identify them specifically as having struck him at any particular point.  The facts – Mazloum's injuries and Defendants' admitted involvement in his "arrest" – allow a permissible inference that they did so.  *See, supra, Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. at 4, *Duval*, 925 F. Supp. at 821.  The Off-Duty Officers themselves do not dispute that each played a part in subduing Mazloum, assisting in his handcuffing, and then leading him outside of the Nightclub; all admit to "touching" and/or holding him to some degree.  (Counter-Statement ¶ 29).  They can be liable even if the evidence against co-defendant Ramirez

is more direct.[8]  Equally, the Off-Duty Officers cannot invoke Mazloum's alleged drunkenness either as justification for their conduct, since that is also a hotly disputed issue that cannot be resolved by the Court.  *See, supra, Anderson*, 477 U.S. at 255; *Housman* , 916 F. Supp. at 28-29.

In short, the Defendants' acts of interjecting themselves into a situation where Mazloum was neither evasive, escaping, or putting the officers' safety at risk, based upon limited information and without any reliable third party prompting to investigate criminal conduct, followed by their physically restraining him, handcuffing him, allowing him to be abused and struck by Ramirez, then dragging him out of the bar, provide sufficient factual bases to deny their motion for summary judgment.

C.    Mazloum's Constitutional Right Was Clearly Established

If facts in evidence show a violation of Mazloum's constitutional rights, then Mazloum must show that that right was "clearly established" at the time of the violation in order to defeat the qualified immunity defense.   "The question of whether a right is 'clearly established' involves an analysis of 'whether the Supreme Court, the District of Columbia Circuit, and, to the extent that there is consensus, other circuits have spoken clearly on the lawfulness of the conduct at issue."  *Barham v. Ramsey*, 338 F. Supp. 2d 48, 55 (D.D.C. 2004) (quoting *Butera v. District of Columbia*, 235 F.3d 637, 652 (D.C. Cir. 2001)).  "If it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted, the right is considered clearly established."  *Id.* (citations and internal punctuation omitted).

---

[8]    Alternatively, the Off-Duty Officers could be liable under Section 1983 based upon a "bystander" theory of liability.  The Off-Duty officers were present and involved in subduing Mazloum, but took no action while Officer Ramirez did, in fact, strike Mazloum.  *See Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 7 (D.D.C. 2006) ("[u]nder bystander theory of liability an officer is held responsible for a constitutional violation if he: (1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act") (*quoting Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 72 (D.D.C. 2005)).

Defendants do not even contest that the prohibition against the use of excessive force under the Fourth Amendment has been clearly established.  "[T]here is no doubt that *Graham v. Connor* . . . clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151 (2001).  While the *Saucier* Court found no case demonstrating a clearly established rule that would prohibit a military police officer from hurrying and shoving an unknown demonstrator away from a stage where the Vice President of the United States was speaking, *id.* at 208-09, 121 S. Ct. 2151, it is otherwise well-established that the unnecessary infliction of force on an arrestee in otherwise unremarkable circumstances is a Fourth Amendment violation.  *See, e.g., Masel v. Barrett*, 707 F. Supp. 4, 9 (D.D.C. 1989) (holding that a reasonable officer should have known he had a duty to protect plaintiff from assault allegedly perpetrated by other officers in his presence); *St. John v. Hickey* 411 F.3d 762, 775 (6th Cir. 2005) (holding that the right of a non-violent arrestee to be free from unnecessary pain knowingly inflicted during an arrest should be known by a reasonable officer); *Cowles v. Peterson*, 344 F. Supp. 2d 472, 483 (E.D. Va. 2004) (holding that officers were not entitled to qualified immunity defense because "[n]o objectively reasonable officer could believe" that he could strike a driver twice on the forehead with a can of mace when the driver objected to a search of his car, then throw the driver to the ground, pushing his face down and twisting his arm behind his back when the driver allegedly fled in fear of additional harm in response to being struck).

To the extent the cases cited by Defendants speak to this issue, they are inapposite to Mazloum's situation, since these cases typically involve plaintiffs that were unquestionably culpable and/or acting themselves in an "objectively unreasonable" manner.  For example, in

*Richardson v. U.S. Dept. of Interior*, 704 F. Supp. 15 (D.D.C. 1990), the plaintiff blatantly violated the clear directive of a known police officer, who witnessed firsthand plaintiff's violation (attempting to scale a locked golf course gate), and who then needed to grab plaintiff's arm as he attempted to wrench away while walking in the officer's custody. The Off-Duty Officers, by contrast, blindly jumped into a dispute after consuming some alcoholic drinks, lacking sufficient knowledge of the circumstances, without Mazloum knowing they were police officers, and with force clearly excessive in light of the threat or flight risk Mazloum posed. Mazloum for his part was in the process of *leaving* the stage – his presence upon which is claimed by defendant Persons as grounds for the altercation to begin with. Any resistance he offered to Persons's surprise grabbing of him from behind stemmed from the surprise – as the Off-Duty Officers would have learned had they intervened in a peaceful manner.

Similarly, in *Stevens v. Stover*, 727 F. Supp. 668 (D.D.C. 1990), relied upon by Defendants, the Court looked to the specific factual circumstances surrounding plaintiff's resisted arrest to determine that the arresting officer was permitted to use "some force against plaintiff in order to arrest her," and thus entitled to a qualified immunity defense. 727 F. Supp. at 671. In that case, the Court considered plaintiff's own exercise of force in resisting arrest – honking her car's horn unnecessarily, refusing to show her license and registration, and nearly striking an officer with her vehicle while attempting to flee – in holding that the arresting officer could have believed that the force he used was necessary and lawful. *Id.* Mazloum, however, did not display commensurate force or pose a similar risk. If he had, why was it that only Mazloum had to go to the hospital that evening? It was simply unnecessary for the Off-Duty

Officers, in concert with the bouncer and Officer Ramirez, to inflict the degree of physical abuse that they did upon Mazloum.[9]

III.    **Mazloum's Discrimination Claims Under 42 U.S.C. § 1981 and the DC Human Rights Act ("DCHRA") are Valid and Supported by Valid Evidence**

    A.    Claims Under 42 U.S.C. § 1981 Do Not Require Proof of Contractual Relationship Between Mazloum and the Defendants.

"In order to plead a claim of racial discrimination under Section 1981, a plaintiff must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981." *Williams v. Fed. Nat'l Mortgage Ass'n*, No. 05-1483, 2006 WL 1774252, at *4 (D.D.C. June 26, 2006).

The Off-Duty Officers argue that Mazloum's Section 1981 claim must fail without an allegation of a contractual relationship between Mazloum and the Defendants. This argument is based upon the recent U.S. Supreme Court case *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006). However, that case arose in the context of a plaintiff who alleged impairment of his Section 1981 right to "make and enforce" contracts – one of the specific enumerated protected activities in the statute. *Domino's Pizza,* 546 U.S. at 1249. The Supreme Court ruled that the plaintiff's claim warranted dismissal because he did not himself possess rights under the contract he wished to "make and enforce," but was instead only an agent of one of the contractual parties. *Id.* at 1250-51.

---

[9] Defendants also argue that Mazloum has a pending 14th Amendment Due Process claim in the Second Amended Complaint. *See* Defendants' Memo. at 13. This is inaccurate, as the Due Process aspect of his Section 1983 claim was excised from the Second Amended Complaint, rendering this argument moot. Regardless, even though the District of Columbia is not a state, the *Butera* court has held that the Due Process Clause protections of the Fifth Amendment – "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law" – apply to the District. 235 F.3d 637, 645 n.7.

While it is correct that most Section 1981 claims arise in the area of contracts (or more specifically, as employment discrimination claims), it is inaccurate to say that the statute itself, by its own terms, is so limited in scope.  As 42 U.S.C. § 1981 states:

> **All persons within the jurisdiction of the United States shall have the same right** in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, **and to the full and equal benefit of all laws** and proceedings for the security of persons and property as is enjoyed by white citizens, **and shall be subject to like punishment**, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Id.* (emphasis added)[10]; *see also Boykin v. Bloomburg Univ.,* 893 F. Supp. 400, 406 (M.D. Pa. 1995)(while Section 1981 forbids "intentional discrimination based upon race in the making and enforcement of contracts," it equally "can encompass other broader conduct based upon racial discrimination").

Thus, by its plain language, a Section 1981 claim may be maintained where there are allegations of overt acts of discrimination that interfered with a claimant's right "to the full and equal benefit of all laws and proceedings for the security of persons," coupled with some direct evidence that a defendant's conduct was motivated by racial animus.  *Evans v. McKay*, 869 F.2d 1341, 1345 (9th Cir. 1989) (holding that non-Indian plaintiffs residing within Indian reservation could maintain Section 1981 claim based on allegedly racially-motivated arrests and boycotts). There is simply no legal requirement to plead or prove an "impaired contractual relationship" if the claimant is not seeking to invoke that aspect of the statute as the basis for his claim.

Here, there is no doubt that Mazloum's Section 1981 claim has been adequately pled. The first prong is satisfied because the Supreme Court has held the persons of Arab/Middle Eastern descent may be protected from racial discrimination under Section 1981.  *St. Francis*

---

[10]  Notably, the *Domino's Pizza* decision, relied upon by Ramirez to create a bright-line requirement of proving a contractual relationship, does not quote the full text of the statute as rendered herein. *See Domino's Pizza,* 546 U.S. at 1249.

*College v. Al-Khazraji*, 481 U.S. 604, 609-13, 107 S. Ct. 2022 (1987).  The third prong is satisfied in at least two related ways.  In excessively beating Mazloum because of his perceived ethnicity and assuming, based solely or primarily upon that same perception, that Mazloum was more likely to have caused wrongdoing in the Nightclub than a white person, the Off-Duty Officers deprived Mazloum of the "full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens".  Mazloum was also deprived of his right to be "subject to like punishment, pains, [and] penalties" as a similarly-situated white person.  Mazloum was subjected to far greater abuse, both physical and verbal, than a white patron of the Nightclub would have experienced.  Both of these are enumerated, protected activities under the plain language of the statute, in addition to the contract rights focused on in *Domino's Pizza*.

All that remains to maintain a racial discrimination claim under Section 1981 is the second prong, intention to discriminate, which is discussed below in the context of Mazloum's DCHRA claim.

B.     Numerous Facts Support Mazloum's Discrimination
       Claims Under § 1981 and the DCHRA.

Mazloum's DCHRA claim asserts that under D.C. Code § 2-1402.31, the Off-Duty Officers (in beating, handcuffing, and then forcibly removing Mazloum from the FUR Nightclub, all the while hurling racial epithets at him) discriminated against him on the basis of his ethnicity.[11]  The Off-Duty Officers assert that Mazloum cannot establish that any of their alleged illegal conduct was racially motivated.  Off-Duty Officers' Mot. at 14-15.

---

[11]    This theory of recovery differs from the "retaliation/coercion" version of the claim asserted against co-defendants Acosta and Smith, as well as Ramirez.  In that version of the claim, the defendants are alleged to have obstructed and/or retaliated against Mazloum in his efforts to file a report complaining of the beating, on the basis of his Middle Eastern ethnicity.

This is incorrect.  As detailed in Section II.A, *supra*, the Off-Duty Officers were complicit in an apparently racially-motivated application of excessive force.  They also did nothing to curtail or discourage Officer Ramirez's multiple violent displays of racial animus.  Counter-Statement ¶¶20-33.  Such evidence should be sufficient to permit this question to go to a jury.

The fact that the Plaintiff must rely on inference to support this element is not fatal to the claim.  Not surprisingly, there is often no "smoking gun" proof in claims based on discrimination.  Therefore, in order to overcome a motion for summary judgment, a plaintiff need only point to "some evidence establishing a reasonable inference" that the defendants' actions were racially motivated.  *See Clifton Terrace Assoc., Ltd. v. United Tech. Corp.*, 929 F.2d 714, 722 (D.C. Cir. 1991); *see also Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1233 (C.A.D.C. 1984) (an overly strict view of the level of proof required for a Section 1981 claim violates the spirit of the statute, for if so, "[a]bsent a "smoking gun" or other direct evidence of racial animus, a court would be hard-pressed to ever discern discrimination.")  This is even more so the case where, as is true here, credibility determinations will bear heavily on whether a defendant's denial of intent to discriminate will be believed.

Similarly, that Mazloum did not know if the other Off-Duty Officers made comments as egregious as Ramirez's epithets, or otherwise accosted him due to his Arab ethnicity, is of no consequence.  To be sure, the *Courtney v. Giant Food, Inc.* case cited by Defendants does not require Mazloum to be his own best witness in this regard.  221 A.2d 92, 94 (D.C. 1966).  "The jurors would merely have . . . to weigh the evidence and determine the credibility of the various witnesses, two of their normal functions."  *Id.* (holding that weighing evidence and determining credibility of witnesses would not require jurors to "speculate" as to any elements of the case).  It

21

is within the province of the normal juror to determine if the Off-Duty Officers' own excessive force, coupled with their tacit approval of Officer Ramirez's violent behavior and blatant racial animus, is sufficient to support a finding that they too were racially-motivated in their actions. *See Fernandors*, 382 F. Supp. 2d at 72 (describing how an officer can be directly liable for a constitutional violation and also indirectly liable under the bystander theory of liability).

## IV.    There is Ample Evidence to Support Plaintiff's Common Law Assault and Battery Claims

Under applicable D.C. common law, an assault is "an intentional and unlawful attempt or threat either by words or acts, to do physical harm to the plaintiff." *Smith v. District of Columbia*, 822 A.2d 778, 787 (D.C. 2005) (quoting *Etherege v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993)). A battery is "an intentional act that causes a harmful or offensive bodily contact." *Id.* The Off-Duty Officers – in spite of their admitted involvement in subduing, handcuffing, and forcibly removing Mazloum from the Nightclub, all of which involved physical contact with the Plaintiff – ask for judgment on this claim, solely because Mazloum cannot testify that he specifically saw any of them (unlike Ramirez) strike him. Off-Duty Officers' Mot. at 15-16.

In fact, there is more than sufficient evidence in the record for a juror to reasonably find that the Off-Duty Officers committed a battery against the Plaintiff. Record proof shows that the Defendants: intervened and grabbed Mazloum's arms after he was already put on the ground by the bouncer (Counter-Statement ¶ 21); dragged Mazloum along the ground across the dance floor to the bottom of the staircase leading out of the club, pushing him and hitting him in the back in the process (Counter-Statement ¶ 24); stepped on Mazloum's back and twisted his arms (*Id.*); handcuffed him and dragged him up the steps and out of the club (Counter-Statement ¶ 29);

pushed Mazloum back to the ground after he attempted to stand up once outside (Counter-Statement ¶ 31); and generally failed to respond to his entreaties, inform him why they were brutalizing him, or intervene when Officer Ramirez taunted him with multiple blows and repeated racial slurs of "terrorist" and "Al-Qaeda" (Counter-Statement ¶¶ 26, 31-32).

The fact that Mazloum cannot himself testify that he saw each of these Off-Duty Officers strike him does not matter for purposes of summary judgment analysis.  Battery claims have been permitted to go to a jury even where the alleged perpetrator completely denies making contact with the plaintiff.  *See, e.g., Boggess v. Roper*, No. 3:04cv92, 2006 WL 2569206, at *14 (W.D.N.C. Sept. 1, 2006)(denying summary judgment on battery claim even though defendant's denials of contact with the plaintiff were supported by corroborative testimony, because Court found a jury could still believe plaintiff's account of events).  Here, the evidence is even stronger.  Mazloum has already testified that he was surprised by the entire assault and had no sense, as it was unfolding, who was attacking him.  He did not even know until after the fact that the assaulting parties were MPD officers.  Counter-Statement ¶¶ 14, 16, 22.  And of course, these Defendants *themselves* all admit that they grabbed Mazloum or made contact with him, albeit in different ways.  Counter-Statement ¶29.  Some, such as Officer Modlin, who admitted to placing Mazloum in a headlock upon intervening in the dispute with the bouncer, made very direct and pointed contact.  Counter-Statement ¶ 24.  Others, like Phillips, assisted in the handcuffing process.  Counter-Statement ¶ 27.

Such contacts are themselves actionable as battery.  Mazloum will attempt to prove at trial that these officers are not credible in their claims that they only made limited contact with Mazloum, but in fact more directly and brutally struck him as well.  The facts in evidence, the

severity of injuries suffered by Mazloum, and the overall outcome of the matter all militate in favor of letting this claim go to trial.

**V.     Plaintiff's Punitive Damages Claim is Also Supported by the Facts and Should Be Resolved  by the Finder of Fact**

"Under District of Columbia law, punitive damages are properly awarded where the act of the defendant is accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Mitchell v. DCX, Inc.*, 274 F.Supp. 2d 33, 52 (D.D.C. 2003) (internal citations and punctuation omitted).  "Proof of these elements may be inferred from the acts of the defendant and from circumstantial evidence.  The issue is ordinarily one for the trier of fact."  *Id.*

Evidence that suffices to establish an intentional violation of protected civil rights also may suffice to permit jury to award punitive damages under § 1981 or § 1983, provided the jury, in its discretionary moral judgment, finds that the conduct merits a punitive award.  *Barbour v. Merrill*, 48 F. 3d 1270, 1277 (D.C. Cir. 1995); *Jones v. Rivers*, 732 F.Supp. 176, 178 (D.D.C. 1990) (holding that punitive damages may be awarded in § 1983 actions and can be an appropriate means of punishing discriminatory conduct and deterring defendants from future racially discriminatory actions).  In other words, the "willful disregard of the plaintiff's rights" that entitles a plaintiff to punitive damages is practically intertwined with the underlying claim when it is based on an intentional civil rights violation.

Taking the facts in the light most favorable to Plaintiff, there is sufficient evidence for a jury to find that the Off-Duty Officers are liable for punitive damages.  Indeed, if co-defendant Persons were the aggressor in his altercation with Mazloum, as the weight of the evidence suggests, then the Defendants' blind, ill-advised intervention and subsequent use of excessive

force against Mazloum, as described in Sections II.A and IV, *supra*, constitute willful and egregious misconduct.  Moreover, the Defendants are officers of the law who, while off-duty and while imbibing multiple alcoholic beverages, took over what would normally be a function of the Nightclub in the detention and physical assault against a man of Lebanese heritage without so much as a warning or bona fide provocation – and despite the fact that the Nightclub itself routinely handles such matters, and could have here (Counter-Statement ¶ 12).  This conduct is not merely inadvertent or grossly negligent; it is purposeful, discriminatory, and a chilling abuse of power.  Accordingly, Plaintiff's claim for punitive damages against these Defendants must be resolved by the finder of fact.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Off-Duty Officers'

Motion for Summary Judgment be denied in its entirety.

Dated:  June 29, 2007

/s/ _____
Brian H. Corcoran (Bar No. 456976)
Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW
Suite 700 East Lobby
Washington, D.C.  20007
Ph: (202) 625-3500
Fax: (202) 298-7570
Brian.Corcoran@kattenlaw.com

Susan Huhta (Bar No. 453478)
Warren R. Kaplan (Bar No. 034470)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, D.C.  20036
Ph: (202) 319-1000
Fax: (202) 319-1010
Sue_Huhta@washlaw.org
Warren_Kaplan@washlaw.org

Attorneys for Plaintiff Emile Mazloum