UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
EMILE MAZLOUM,                     )
                                   )
          Plaintiff,               )     Civil Action No. 1:06 CV 00002
                                   )     (JDB)
     v.                            )
                                   )
DISTRICT OF COLUMBIA, *et al.*,    )
                                   )
          Defendants.              )
_____)

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT ANTHONY RAMIREZ'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Emile Mazloum ("Mazloum"), by his undersigned counsel, for his response to Defendant Anthony Ramirez's Motion for Summary Judgment, hereby states as follows:

### PRELIMINARY STATEMENT

As discovery has underscored, defendant Ramirez is the off-duty police officer who most persistently and undeniably battered Mazloum. He is the Metropolitan Police Department ("MPD") officer most directly responsible for depriving Plaintiff of his constitutional rights by grossly exceeding his police powers in "apprehending" an innocent and blameless individual. Thus, and tellingly so, Ramirez has not moved for judgment on Plaintiff's core claims against him – the 42 U.S.C. § 1983 claim, and the common law assault and battery claim. There will be a trial of those claims against Ramirez.

Ramirez otherwise seeks judgment on the other claims asserted against him[1] – the 42 U.S.C. § 1981 claim, the claim arising under the D.C. Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.* (the "DCHRA"), and the common law claim of aiding and abetting spoliation. But his arguments are unpersuasive both legally and factually, for much the same reasons set forth in Plaintiff's parallel opposition briefs to the other Defendants' Summary Judgment motions. In particular, Mazloum has adequately stated a claim under 42 U.S.C. § 1981. Mazloum's DCHRA claim is supported by material issues of fact requiring trial for their resolution, as is his claim for aiding and abetting spoliation. Trial of these claims will also be necessary.

## STATEMENT OF FACTS

Plaintiff incorporates by reference his Omnibus Counter-Statement of Facts, filed concurrently with this memorandum (the "Counter-Statement").

Discovery has revealed the following additional points specifically relevant to Ramirez's Motion:

- Ramirez does not challenge the fact that sufficient facts exist in support of Mazloum's 42 U.S.C. § 1983 and battery claims such that he could not obtain summary judgment dismissal of those claims asserted against him;

- Ramirez was heard, by both Mazloum and an other eyewitness, to call Mazloum "Al Qaeda" or "fucking Al-Qaeda" both within the confines of the Nightclub and later outside the Nightclub as well (Counter-Statement ¶¶ 26, 31-32);

- Mazloum and other witnesses have testified that Ramirez struck him both inside and outside the Nightclub, through punches and kicks, and was also the primary Off-Duty Officer responsible for handcuffing Mazloum (Counter-Statement ¶¶ 25, 31);

- Witnesses have testified that they could tell Mazloum was of Middle Eastern ethnicity (Counter-Statement ¶ 38);

---

1 Ramirez also challenges Mazloum's "Constitutional Due Process" claim (Ramirez Motion for Summary Judgment ("Ramirez Mot." at 4). However, Mazloum's Second Amended Complaint no longer asserts, as a basis for his Section 1983 claim, that Ramirez violated Mazloum's Fourteenth Amendment rights. As such, this argument has been mooted.

2

- Ramirez was the first MPD officer involved in the incident to encounter Mazloum on the afternoon of March 12th, when Mazloum traveled to the First District precinct station to make his complaint (Counter-Statement ¶ 48);

- Ramirez was aware as of March 12th – the same day of the incident – that Mazloum was filing a report against him based upon the incident (Counter-Statement ¶¶ 48-52);

- Ramirez placed multiple phone calls after Mazloum arrived at the precinct station to make his complaint, including calls to (i) John Fiorito of FUR Nightclub, (ii) co-defendant Modlin, (iii) co-defendant Schneider, and (iv) co-defendant Acosta (Counter-Statement ¶¶ 49, 52);

- Fiorito testified that, when he spoke to Ramirez by telephone the evening of March 12th, the video camera system was mentioned, and Fiorito claims he told Ramirez to inform the MPD they could come and view the recordings if they wished (Counter-Statement ¶ 58);

- Imad Alkadi was informed and/or given the strong impression by John Fiorito, after he met with Fiorito and certain other FUR personnel on the evening of March 12th, that "the tape is gone," meaning destroyed (Counter-Statement ¶ 63);

- Alkadi's meeting at FUR occurred only after Fiorito had learned that Mazloum, accompanied by Alkadi, had initiated a complaint against Ramirez stemming from the events relating to the incident (Counter-Statement ¶ 59);

- The Plaintiff's counsel conducted an inspection of FUR and its video monitoring system in the summer of 2006 (Counter-Statement ¶ 55);

- This inspection revealed that a person walking from the stage area of the Nightclub (the place the incident began), across the stage floor, up the stairs, out the front door, and then across the street to the curb opposite the FUR entrance would have been seen by the video cameras at several points along the journey, including (i) in the "tunnel" leading to the front of the Nightclub, (ii) in the lobby-foyer of the Nightclub, (iii) in the immediate outside front of the Nightclub, and (iv) across the street from the Nightclub; (Counter-Statement ¶¶ 55-56);

- FUR's head of security has corroborated the fact that the video camera system would capture parts of Mazloum's journey – in particular, across the street from the Nightclub (Counter-Statement ¶ 66);

- Ramirez stood with Mazloum at the spot across the street where the cameras would have captured his interactions with Mazloum – including his striking the Plaintiff a second time, with a kick, and shouting at him while the Plaintiff was handcuffed (Counter-Statement ¶¶ 29,31);

- FUR's head of security, David McLeod, has testified that the FUR video monitoring system retains images of what the cameras capture for three days, before it overwrites the images on the computer hard drive where images are stored (Counter-Statement ¶ 54);

- The FUR Defendants admit any images relating to the incident involving Mazloum have been destroyed;

- FUR witnesses such as McLeod have testified they looked at the images some time on March 12th (Counter-Statement ¶¶ 50, 65-66);

- McLeod provided conflicting and contradictory testimony as to whether in fact he had viewed the video images before they were destroyed, and as to what those images would show (Counter-Statement ¶ 66);

- Ramirez has admitted, as corroborated by other witnesses, that he was concerned why Mazloum was not arrested by Acosta and Smith;(Counter-Statement ¶ 52);

- The Plaintiff's counsel ran an advertisement in two local newspapers, *City Paper* and the *Washington Post Express*, looking for neutral eyewitnesses of what occurred on the night of March 11-12, 2005, but no one responded to the advertisements (Counter-Statement ¶ 68).

**ARGUMENT**

I.  **Standard of Review.**

Entry of summary judgment is proper only where the non-movant can offer no evidence upon which a jury could reasonably find in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Although there must be more than a "scintilla" of evidence offered in support of the non-movant's claim, the evidence need only be sufficient to establish the existence of material triable facts. *Id.* at 249–50; *see also id.* at 252. In reviewing Ramirez's Motion for Summary Judgment, this Court must assume the truth of Mazloum's factual allegations and draw all evidentiary inferences in his favor. *Id.* at 255. The Court must also "eschew making credibility determinations or weighing the evidence." *U.S. v. Project on Gov't Oversight,* 454 F.3d 306, 308 (D.C. Cir. 2006)(citations omitted).

In this case alleging unlawful discrimination,[2] "summary judgment should be approached with special caution," given the challenges of proving intent and other matters peculiar to such cases. *Regan v. Grill Concepts-D.C., Inc.,* 338 F. Supp. 2d 131, 133 (D.D.C. 2004) (denying summary judgment on a DCHRA-based claim). Furthermore, the level of proof required of a plaintiff claiming discrimination is less at the summary judgment stage than at trial. *See, e.g.*, *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1458 (7th Cir. 1994) (Title VII plaintiff "need not prove by a preponderance of the evidence at the summary judgment stage" that defendant was aware of complaints, but instead need only "produce evidence that would support an inference" of such awareness). The same is true in the context of resolving claims relating to police misconduct. *See, e.g.,* Wright, Miller & Kane, *Federal Practice and Procedure: Civil* § 2732.2 (3d ed. 1998).

This Court must be specially wary of making fact determinations that hinge upon credibility determinations. As noted in *Carter-Obayuwana v. Howard Univ.*, 764 A.2d 779 (D.C. 2001), "[T]hese issues can only be sorted out at trial. There, cross-examination and other tools of the search for truth should enable the court and jury to separate the wheat from the chaff and reach a just result." *Id.* at 793 (concluding that there was sufficient evidence for the plaintiff's claims regarding her reduction in salary to be presented to the jury, even though the court concedes that she may be unable to establish the requisite causal nexus at trial). Where resolution of fact issues hinges on sifting through conflicting testimony, summary judgment is not appropriate. *Rogers Corp. v. Envtl. Prot. Agency*, 275 F.3d 1096, 1103 (D.C. Cir. 2002) ("[s]ummary judgment is inappropriate when contradictory inferences may be drawn from the evidence"); *see also Nilson v. Historic Inns Group Ltd.,* 903 F Supp. 905, 909 (D. Md. 1995)(improper to invoke summary judgment where the depositions of principal witnesses "present conflicting versions of the facts which require credibility

---

[2] When evaluating claims under the DCHRA, the Court may look to cases construing comparable provisions of federal discrimination statutes, such as Title VII. *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n.17 (D.C. 1993).

5

determinations"); *Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir. 1992)("summary judgment is not a procedure for resolving a swearing contest").

## II. Mazloum's Discrimination Claim Under 42 U.S.C. § 1981 Does Not Require Proof of a Contractual Relationship Between Mazloum and Ramirez.

"In order to plead a claim of racial discrimination under Section 1981, a plaintiff must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981." *Williams v. Fed. Nat'l Mortgage Ass'n*, No. 05-1483, 2006 WL 1774252, at *4 (D.D.C. June 26, 2006).

Ramirez argues that Mazloum's Section 1981 claim must fail without an allegation of a contractual relationship between Mazloum and the Defendants. This argument is based upon the recent U.S. Supreme Court case *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006). However, that case arose in the context of a plaintiff who alleged impairment of his Section 1981 right to "make and enforce" contracts – one of the specific enumerated protected activities in the statute. *Domino's Pizza,* 546 U.S. at 1249. The Supreme Court ruled that the plaintiff's claim warranted dismissal because he did not himself possess rights under the contract he wished to "make and enforce," but was instead only an agent of one of the contractual parties. *Id.* at 1250-51.

While it is correct that most Section 1981 claims arise in the area of contracts (or more specifically, as employment discrimination claims), it is inaccurate to say that the statute itself, by its own terms, is so limited in scope. As 42 U.S.C. § 1981 states:

> **All persons within the jurisdiction of the United States shall have the same right** in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, **and to the full and equal benefit of all laws** and proceedings for the security of persons and property as is enjoyed by white citizens, **and shall be subject**

6

>    **to like punishment**, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Id.* (emphasis added)[3]; *see also Boykin v. Bloomburg Univ.,* 893 F. Supp. 400, 406 (M.D. Pa. 1995)(while Section 1981 forbids "intentional discrimination based upon race in the making and enforcement of contracts," it equally "can encompass other broader conduct based upon racial discrimination").

Thus, by its plain language, a Section 1981 claim may be maintained where there are allegations of overt acts of discrimination that interfered with a claimant's right "to the full and equal benefit of all laws and proceedings for the security of persons," coupled with some direct evidence that a defendant's conduct was motivated by racial animus. *Evans v. McKay*, 869 F.2d 1341, 1345 (9th Cir. 1989) (holding that non-Indian plaintiffs residing within Indian reservation could maintain Section 1981 claim based on allegedly racially-motivated arrests and boycotts). There is simply no legal requirement to plead or prove an "impaired contractual relationship" if the claimant is not seeking to invoke that aspect of the statute as the basis for his claim.

Here, there is no doubt that Mazloum's Section 1981 claim has been adequately pled. The first prong is satisfied because the Supreme Court has held the persons of Arab/Middle Eastern descent may be protected from racial discrimination under Section 1981. *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609-13 (1987). The third prong is satisfied in at least two related ways. In excessively beating Mazloum because of his perceived ethnicity and assuming, based solely or primarily upon that same perception, that Mazloum was more likely to have caused wrongdoing in the Nightclub than a white person, Ramirez deprived Mazloum of the "full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens". 42

---

3  Notably, the *Domino's Pizza* decision, relied upon by Ramirez to create a bright-line requirement of proving a contractual relationship, does not quote the full text of the statute as rendered herein. *See Domino's Pizza,* 546 U.S. at 1249.

7

U.S.C. § 1981.  Mazloum was also deprived of his right to be "subject to like punishment, pains, [and] penalties" as a similarly-situated white person.  *Id.*  Mazloum was subjected by Ramirez to far greater abuse, both physical and verbal, than a white patron of the Nightclub would have experienced.  Both of these are enumerated, protected activities under the plain language of the statute, in addition to the contract rights focused on in *Domino's Pizza*.

All that remains to maintain a racial discrimination claim under Section 1981 is the second prong, Ramirez's intention to discriminate – an element Ramirez does not dispute Mazloum has pled, nor could he, given the evidence of the "Al-Qaeda" comments in the record.

### III.  More Than Sufficient Evidence Exists in the Discovery Record to Sustain Plaintiff's DCHRA Claim Against Ramirez.

Mazloum's claim against Ramirez under the DCHRA has two bases.  First, Mazloum asserts that under D.C. Code § 2-1402.31, Ramirez (in beating, handcuffing, and then forcibly removing Mazloum from the FUR Nightclub, all the while hurling racial epithets at him) discriminated against him on the basis of his ethnicity.  Second, Mazloum alleges that Ramirez violated D.C. Code § 2-1402.61(a) by participating, along with certain of the FUR Defendants, in efforts to thwart or retaliate against Mazloum's initiation of a formal complaint based upon the beating he had received the night before.  There is more than sufficient evidence in the record to support both aspects of this claim.  Determination of many of these facts hinges upon credibility determinations.  In addition to the record's previously-noted differences between the plaintiff's and Ramirez's versions of the events in question, there are numerous inconsistencies and conflicts in the testimony of parties and witnesses, underscoring genuine issues of material fact that can only be resolved by a jury.

A.  Ramirez Intentionally Discriminated Against Mazloum

Ramirez challenges Mazloum's theory of recovery under DCHRA ( D.C. Code § 2-1402.31) by arguing that Mazloum cannot prove intentional discrimination. At the same time, however, he admits that the Plaintiff has testified that he was called a "fucking Al-Qaeda" at least twice on March 12, 2005, but then argues that this alone is not enough to infer intent to discriminate. Ramirez Mot. at 6.

This is utterly incorrect as a matter of law. In fact, courts counsel, in the context of discrimination claims, that plaintiffs should not be held to an absolute standard of persuasive proof, given the difficulty of finding such incontrovertible proof of discrimination. *See, e.g., Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1233 (D.C. Cir. 1984) (an overly strict view of the level of proof required for a Section 1981 claim violates the spirit of the statute, for if so, "[a]bsent a "smoking gun" or other direct evidence of racial animus, a court would be hard-pressed to ever discern discrimination"). This is even more so the case where, as is true here, credibility determinations will bear heavily on whether a defendant's denial of intent to discriminate will be believed.[4]

Here, there is more than enough evidence from which intent to discriminate could be inferred. The Plaintiff has offered evidence not only of the "Al-Qaeda" comment from the direct testimony of Mazloum, but also from corroborative testimony of individuals such as Mr. Alkadi. Counter-Statement ¶ 31. There is evidence that Ramirez hurled the epithet a second time, outside the

---

4  Many facts - independent of Ramirez's self-interested status as a defendant - suggest that Ramirez is not a credible witness. He claims Mazloum and his "friends" (Messrs. Alkadi and Abi-Aad) were assaulting the bouncer, despite the fact that the Bouncer himself does not make this claim and that no effort was made to detain these two "friends" in the manner Mazloum was subjected to. His denial of using racial epithets is undercut by eyewitnesses such as Mr. Alkadi, who corroborate Mazloum's counter-testimony. He was a FUR regular, and he as well as his co-defendants were well acquainted with FUR personnel. He was described by Lt. Allman as appearing very agitated and even "upset" after the incident. He placed numerous calls once Mazloum had come to the station – suggesting concern about the event and the liability he might face from it. Finally (and as the Court is aware) there is his criminal conviction stemming from a threatening phone call he made a day before the incident (an act which the Court acknowledged may well be admissible

9

Nightclub, thus discounting claims he might make that he could not see Mazloum clearly inside the Nightclub. Counter-Statement ¶¶ 25-26, 31-32. There is evidence that Ramirez struck Mazloum more than once as well, both inside and outside the Nightclub. *Id.* There is the violent handcuffing experienced by Mazloum before being dragged outside. Counter-Statement ¶¶ 27-29. And assertions by Ramirez that he in fact did not "know" Mazloum's ethnicity are belied by admissions from other witnesses (such as Officer Smith that Mazloum readily appeared to him to be of Middle Eastern descent. Counter-Statement ¶ 38.

      B.    Ramirez attempted to thwart Mazloum's investigation, then retaliated
           Against him once it had commenced.

The DCHRA states that "[i]t shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, . . . any right granted or protected under this chapter." D.C. Code § 2-1402.61(a). As this Court has stated, a plaintiff can establish a prima facie claim by alleging that "(1) he engaged in protected activity under the DCHRA, or opposed practices made unlawful under the DCHRA; (2) he was subjected to adverse action; and (3) there is a causal nexus between the two." *Mazloum v. District of Columbia*, Civil Case No. 06-0002 (JDB), Mem. Op. of April 17, 2007 at 3 ("Mem. Op. of April 17, 2007"); *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 13 (D.D.C. 2006) (citing *Carter-Obayuwana*, 764 A.2d at 790).

Factual support exists for all three elements of this aspect of the DCHRA claim. The first element is satisfied by the mere fact that Mazloum filed a complaint with the MPD – clearly "protected activity" as defined by the statute. Mazloum also suffered adverse action from Ramirez's conduct. His interference began moments after the incident, when he quietly spoke to Acosta and Smith – a conversation in which it is reasonable to infer he may have disclosed to them the illegal

---

to impeach Ramirez).

nature of his behavior toward Mazloum. Counter-Statement ¶ 36. Later, by "tipping off" the Nightclub and other officers of Mazloum's complaint, Ramirez created the conditions in which evidence (such as potentially critical video proof of what had occurred) could (and would) be destroyed and disparate stories about what had happened could be lined up in advance of the official police investigation – which is precisely what happened in this case. The series of phone calls exchanged between Ramirez, the Nightclub, and the other off-duty officers all permit an inference that the parties were discussing what they could do to limit their individual and collective exposure in light of Mazloum's initiation of his complaint. Indeed, to some extent it is difficult to gauge, after the fact, what total impact this conspiratorial conduct had on Mazloum's ability to obtain redress for the illegal treatment he received, making it more appropriate under the circumstances that Ramirez show that Plaintiff was *not* subject to adverse action.

As a result of the destruction of the video evidence, and the impossibility of locating neutral, nonparty eye-witnesses who might have been identified on the scene by the MPD (before such witnesses left the Nightclub), Mazloum cannot precisely measure or demonstrate the extent to which his case has been damaged by the failure to investigate. Fairness dictates that those responsible for the creation of such adverse circumstances pay the price – not Mazloum. *See Sullivan v. Murphy*, 478 F.2d 938, 970 (D.C. Cir. 1973)("[i]t is a well-settled legal doctrine that in situations in which the defendant has by his own actions so muddled the evidence that it is impossible for the plaintiffs to adduce those particular facts that would normally be pleaded in support of his action, the burden of proof is shifted from plaintiff to defendant to come forward with the pertinent evidence").

None of the above issues would require the "speculation" feared by Ramirez as to the elements of this claim. Rather, and especially in cases of race discrimination, it is the foreseeable job of the jury to sift and weigh evidence, and to listen to witnesses and gauge their credibility, in determining who is being honest and who is not. The jury can evaluate whether Ramirez's conduct

11

harmed the Plaintiff to an extent recoverable under the statute. It could even make a nominal damages award if it felt that statutory violation had not in fact resulted in great harm.

Finally, Mazloum can readily point to facts in support of the third element of his DCHRA claim, the showing of a causal nexus between his protected activity and the adverse action. Mem Op. of April 17, 2007 at *3; *Mazloum*, 442 F. Supp. 2d at 12 (citing *Carter-Obayuwana*, 764 A.2d at 790, 793)("[t]he causal connection may be established by showing that the [defendant] had knowledge of the [plaintiff's] protected activity, and that the adverse personnel action took place shortly after that activity."

Ramirez was placed on notice on *two separate occasions* of Mazloum's objections to the manner in which Ramirez and the other Off-Duty Officers had treated him. First, Ramirez was outside the Nightclub with Mazloum for a good period of time before he returned to the interior of FUR. There is ample testimony that Mazloum objected to his treatment verbally during this period. Counter-Statement ¶¶ 31-33. Second, even if Ramirez were not then on notice of Mazloum's desire to complain of the beating he received, he admits in testimony that he encountered Mazloum ***in front of the precinct station*** as Mazloum entered for the specific reason of initiating a complaint against him, and that Mazloum furthermore specifically told him why he had come there. Counter-Statement ¶ 48. This prompted Ramirez to begin the phone calls and discussions that Mazloum alleges have interfered with his ability herein to prove that he was beaten by the Off-Duty Officers.

**IV.    Mazloum's Aiding and Abetting Spoliation Claim is Supported by Material Facts.**

Ramirez devotes a throw-away last paragraph in his brief to challenge Mazloum's aiding and abetting spoliation claim. Ramirez Mot. at 6-7. However, with respect to each element of the cause of action for spoliation, there exists sufficient record evidence from which a reasonable jury could find in Plaintiff's favor.

The D.C. Court of Appeals has recognized the tort of reckless or negligent spoliation. *See Holmes v. Amerex Rent-a-Car*, 710 A.2d 846 (D.C. 1998). The elements of such a claim are as follows:

> (a)  the existence of a potential civil action;
>
> (b)  a legal or contractual duty to preserve evidence that is relevant to that action;
>
> (c)  destruction of that evidence by a duty-bound defendant;
>
> (d)  significant impairment in the ability to prove the potential civil action;
>
> (e)  a proximate cause between the impairment of the underlying suit and the unavailability of the destroyed evidence;
>
> (f)  a significant possibility of success of the potential civil action if the evidence were available; and
>
> (g)  damages adjusted for the estimated likelihood of success in the potential civil action.

*Holmes*, 710 A.2d at 854. The overarching inquiry in a spoliation analysis, like any negligence analysis, is whether a plaintiff can show that (1) the spoliating defendant breached a legally cognizable duty to the plaintiff, and (2) that the breach was the proximate and legal cause of ascertainable damages to the plaintiff. *See Powell By and Through Ricks v. District of Columbia*, 634 A.2d 403, 406 (D.C. 1993) (citing *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984)). In developing this tort, the *Holmes* court built upon previous existing caselaw permitting the adverse inference when a party fails to preserve evidence within his exclusive control, acknowledging that a plaintiff has a legally protectable interest in the preservation of evidence required for recovery in a civil case. *See Holmes*, 710 A.2d at 848. If a duty is owed, the plaintiff should be able to rely on traditional negligence remedies. 4-40 BUSINESS TORTS § 40.02 (2005). Here, Plaintiff alleges that Ramirez himself only aided and abetted the destruction of the video record of

13

the incident – which results in a slight modification of the elements set forth above, since Ramirez is not alleged to have directly destroyed any video evidence himself.

As a general matter, courts are reluctant to grant summary judgment on spoliation claims, given their fact sensitive nature. *See, e.g., Pirocchi v. Liberty Mut. Ins. Co.*, 365 F. Supp. 277, 282 (E.D. Pa. 1973) (in negligence cases, a full exposition of the facts is generally required to make a determination that conduct under a particular set of circumstances resulted in a breach of duty).

Ramirez challenges only Plaintiff's ability to prove three elements of the above claim: the existence of a duty to preserve; the destruction of the video evidence by Ramirez; and a proximate relationship between destruction and impairment of Mazloum's capacity to successfully prosecute this lawsuit. Ramirez Mot. at 7. Mazloum can offer proof in support of each of these elements.

With respect to the duty element, Plaintiff incorporates by reference the argument set forth in his memorandum in opposition to the Summary Judgment Motion of the FUR Defendants ("Opp. to FUR Mot.") at pages 17-20 (filed contemporaneously with this brief). As set forth in more detail in that memorandum, where a party is aware of the existence of potential litigation and would likely benefit from the destruction of evidence that would not be favorable to him, D.C. courts (which have yet to address the issue directly) are likely find the existence of a "special relationship" encompassing such a legal duty . Opposition to FUR Mot. at 17-20. Here, Ramirez (who ran smack-dab into Mazloum as he entered the precinct headquarters, specifically intending to file a complaint against *him*) had notice of the potential suit. His special role as a law enforcement officer, moreover, also suggests a "special relationship," as an MPD officer would know the importance of preserving relevant evidence. Thus, there is a basis for this Court to conclude that a duty exists.

Ramirez next challenges Mazloum's ability to prove he destroyed the evidence, relying primarily on the fact that Mazloum has admitted he did not have direct knowledge of what Ramirez did. Of course, this fact has no bearing on whether Ramirez *played a role* in the video record's

destruction (and there is no reason to think Mazloum would know specifically what Ramirez had done, especially since intentional destruction of evidence is an act intended to be kept from the light of day).

More importantly, however, Ramirez's arguments misconstrue the nature of the claim asserted against him. The aiding and abetting claim arises from a web of circumstantial facts which suggest Ramirez had involvement in a decision to destroy any surveillance camera video record of what had occurred. Ramirez and other witnesses admit telephone calls to FUR personnel, including John Fiorito, after Mazloum was seen at the police precinct station. Counter-Statement ¶¶ 49, 52. In that conversation, there was mention of the video surveillance cameras scattered throughout the Nightclub, and the possibility that they may have captured some portions of the incident. Counter-Statement ¶ 58. Then, a little while later that same evening, Fiorito told Mr. Alkadi that the video record was now "gone," which Alkadi construed from the context of his conversation to mean it had been destroyed. Counter-Statement ¶¶ 63-64. In fact, Fiorito's statement, if true, could *only* mean that the video record was intentionally destroyed, since the tape would not normally recycle and overwrite for at least another two days. Counter-Statement ¶ 54.

The FUR witnesses do not, of course, admit that they deliberately destroyed the video record, but that is hardly surprising and not dispositive of the issue. Plaintiff cannot be faulted for not having "smoking gun" evidence that these defendants destroyed the tape. What matters is that based on the evidence that has been elicited, a reasonable juror could infer from the deposition testimony and other admitted conduct of the parties that Ramirez was complicit in the destruction of the video record, and that is sufficient to support the element.

Finally, Ramirez argues that Plaintiff cannot show a proximate relationship between impairment of his case herein and the destruction of the video record. This element is easy to satisfy, however. As is evident from the discovery record, there are essentially no true "third party"

15

witnesses in this case. Instead, there are many direct party witnesses, only some of whom actually saw all of some of the events at issue, or direct witnesses who are aligned with the Plaintiff due to prior association or with the Defendants. Plaintiff made efforts early in the case to identify truly neutral eyewitnesses (by placing advertisements in local newspapers, for example) but could not find any even less than a year after the incident. Counter-Statement ¶ 68.

Unsurprisingly, the parties vehemently disagree as to what happened. Possession of the video record might very well have assisted Plaintiff in proving his case, as there is evidence (from Plaintiff's review of the Nightclub interior and camera system) that important segments of Mazloum's "journey" through the interior of the Nightclub to the exterior would have been captured, and presumably have shown some of the beating Mazloum alleges he suffered. Plaintiff still hopes to prevail based upon the record he has developed, but his burden has been significantly increased given the absence of the video record. The requisite proximate relationship indisputably exists, assuming – as the Court must – the veracity of the Plaintiff and his witnesses.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendant Ramirez's Motion for Summary Judgment be denied in its entirety.

Dated: June 29, 2007                    /s/_____
                                        Brian H. Corcoran (Bar No. 456976)
                                        Katten Muchin Rosenman LLP
                                        1025 Thomas Jefferson St., NW
                                        Suite 700 East Lobby
                                        Washington, D.C. 20007
                                        Ph: (202) 625-3500
                                        Fax: (202) 298-7570
                                        Brian.Corcoran@kattenlaw.com

                                        Susan Huhta (Bar No. 453478)
                                        Warren R. Kaplan (Bar No. 034470)
                                        Washington Lawyers' Committee for
                                        Civil Rights and Urban Affairs
                                        11 Dupont Circle, NW
                                        Suite 400
                                        Washington, D.C. 20036
                                        Ph: (202) 319-1000
                                        Fax: (202) 319-1010
                                        Warren_Kaplan@washlaw.org

                                        Attorneys for Plaintiff
                                        Emile Mazloum