UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMILE MAZLOUM, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DISTRICT OF COLUMBIA, *et al.*, )<br>)<br>Defendants. )<br>) | Civil Action No. 1:06 CV 00002<br>(JDB) |

**PLAINTIFF'S OMNIBUS COUNTER-STATEMENT
OF MATERIAL FACTS IN DISPUTE**

Plaintiff Emile Mazloum ("Mazloum"), by his undersigned counsel, pursuant to Rules 7.1(h) and 56.1 of the Local Rules of the United States District Court for the District of Columbia, hereby sets forth his Omnibus Counter-Statement of Material Facts as to which there exists a genuine issue necessary to be litigated. Additionally set forth are relevant facts not necessarily disputed but omitted from Defendants' Fact Statements. We believe it is appropriate for the Court to consider all of the following asserted facts, whether disputed or not disputed.

*General Relevant Facts*

1. Plaintiff Emile Mazloum is of Lebanese heritage. (Pl.'s Dep. 11)(Ex. 1).[1] He came to this country in the year 1999 (Pl.'s Dep. 12), speaks with a foreign accent (Pl.'s Dep. 10), and appears visually to be of Middle Eastern ethnicity.

2. On March 11-12, 2005, the night this incident occurred, Mazloum drank no more than two or three beers over the totality of the evening. (Pl.'s Dep. 86; Alkadi Dep. 72, 92 (Ex. 2); Abi-Aad Dep. 23, 30-31(Ex. 3)). At no point in the evening was he intoxicated. (Pl.'s Dep. 88-89; Abi-

Aad Dep. 26, 58).

3.      The four off-duty officers involved in Mazloum's beating—Messrs. Ramirez, Phillips, Schneider, and Modlin—have all admitted they were drinking during the night in question. (Ramirez Dep. 73-74 (Ex. 4); Modlin Dep. 84-86 (Ex. 5); Phillips Dep. 56-57(Ex. 6); Schneider Dep. 103 (Ex. 7)). Defendants Ramirez, Modlin, and Schneider all have prior convictions based on operating a vehicle while intoxicated, demonstrating their dangerous and irresponsible use of alcohol. (Ramirez Dep. 20-21; Modlin Dep. 12-13; Schneider Dep. 8-9). The MPD officially investigated and/or sanctioned Officers Modlin and Schneider for these DUI incidents, underscoring the extent to which it is inappropriate for MPD officers to be intoxicated. (Modlin Dep. 26; Schneider Dep. 9).

4.      Official MPD regulations governing the conduct of off-duty officers prohibit them from ever being intoxicated. (*See* General Order 1202.1, Table of Offenses and Penalties, No. 2 (Ex. 8); Allman Dep. 38 (Ex. 9)). Off-duty MPD officers who are imbibing alcoholic beverages are taught not to carry their firearm (*see* Special Order SO-04-07, § IV.G.1 (Ex. 10)) and, therefore, because unarmed and potentially impaired are instructed to act with extra caution when they witness an occurrence that might arguably call for a police response. (Allman Dep. 38-40). In particular, they are instructed to call for uniformed officers to respond. (Smith Dep. 73 (Ex. 11)). Additionally, an off-duty officer who witnesses or is involved in an incident that requires police attention are required to "take notes, if applicable, of the circumstances surrounding the incident, i.e., any look-outs, witnesses, etc., and sharing that information with appropriate responding authorities." (Special Order SO-04-07, § V.A.3). Certain deposed MPD officers confirmed awareness of this policy, and/or vouched for its appropriateness. ( *See, e.g.,* Acosta Dep. 71-74 (Ex. 12); Smith Dep. 55-56).

---

1 Plaintiff refers to Deposition Transcript pages with the designation "[witness] Dep. ___". Exhibits appended to this

5.  On the night of March 11-12, 2005, the acting officer of the watch for the First District (the MPD district with jurisdiction over FUR) and ranking MPD officer with responsibility for the precinct in which the FUR Nightclub is located was Lieutenant Frank Allman. (Allman Dep. 76; Ramirez Dep. 144; Smith Dep. 63; Acosta Dep. 64). Allman has several personal connections to FUR, having previously worked with FUR co-owner John Fiorito when Fiorito was a police officer. (Allman Dep. 13). Allman in fact counts Fiorito as a friend and assisted him with an employment problem some time before the incident. (Allman Dep. 13-17). Ironically, Allman was hired as additional security at FUR after he left the MPD in 2006 (following the incident underlying this case) and works there at the present time. (Allman Dep. 11-13).

6.  At his deposition, Allman was asked about the propriety of the MPD officer conduct at issue in this case. He admitted that it was a "rookie" urge for MPD officers to dive into every possible problem they might witness, and that more experienced officers know it is wiser to call for a uniformed response—especially when off-duty. (Allman Dep. 36, 69-70). He also underscored that off-duty officers who were drinking were supposed to let uniformed officers handle observed incidents and that this policy had a sound underlying rationale. (Allman Dep. 38-41).

*Events leading up to the Altercation*

7.  In the early hours of March 12, 2005, Mazloum had been dancing on the stage just off the main dance floor of the FUR Nightclub. He walked to the stairs that exit the stage, intending to descend. (Pl.'s Dep. 99).

8.  As Mazloum attempted to descend those stairs, Persons approached him from behind, wrapped his arms around Mazloum, and began choking him. (Pl.'s Dep. 100-01; Alkadi Dep. 115; *see also* Abi-Aad Dep. 42).

---

Counter-Statement are designated "Ex. ___."

9. Mazloum was surprised by Mr. Persons. He did not know and was not made aware, prior to being grabbed, of any FUR policy that prohibited him from being on the stage, and he had been given to believe from his friends who were working in the club that night that he was permitted to be there. (Pl.'s Dep. 100). Mazloum's conduct was accordingly innocent.

10. FUR has no clearly defined policy regarding who may be on the stage at any given time, even though unofficially the Nightclub tries to reserve the stage area for women or special patrons of the Nightclub who have "VIP" access to areas otherwise off-limits to run-of-the-mill patrons. (Persons Dep. 64-65, 131-32 (Ex. 13); McLeod Dep. 142-44 (Ex. 14); Alkadi Dep. 90-91, 98-101). On the night in question, men and non-VIP club patrons were present on the stage but were not made to leave. (Alkadi Dep. 102-03). Furthermore, Alkadi testified that Abi-Aad, who was controlling access to the stage, raised the rope to allow Mazloum onto the stage. (Alkadi Dep. 336).

11. Mr. Persons had no basis for making physical, surprise contact with Mazloum. There is no evidence that Mazloum had done anything disruptive or that would otherwise require his forcible removal from the Nightclub. (Alkadi Dep. 105-09). Mazloum denies that Persons warned him several times to leave the stage before their altercation began; at best, Persons asked Mazloum one single time to leave the stage, and Mazloum complied. (Pl.'s Dep. 94-95).

12. Mr. Persons has admitted his conduct was not in compliance with official Nightclub policy, which requires security personnel to recruit at least one other security person to assist before engaging with a patron who is allegedly engaging in improper conduct within the Nightclub. (Persons Dep. 71; FUR Employee Manual at 20-21 (Ex. 15)). He has also admitted that his conduct toward Mazloum on March 12th was influenced by the fact that he was sore at the time and wanted to go home and rest. (Persons Dep. 74, 77). Mr. Persons specifically admits that he discussed his failure to abide by FUR policy with head of security, David McLeod, from which it can be inferred

he was aware his conduct toward Mazloum was not in compliance with that policy. (Persons Dep. 74, 77; McLeod Dep. 46-49).

13. FUR's Employee Manual specifically prohibits security personnel from striking Nightclub patrons. (FUR Employee Manual at 21; McLeod Dep. 12).

14. Mazloum could not see who had grabbed him and so attempted to get loose from Mr. Persons' grip. (Pl.'s Dep. 101; Alkadi Dep. 105-06, 115; Abi-Aad Dep. 39, 44-45). Eventually Mazloum was pushed to the floor, where Persons tried to hold Mazloum down. (Pl.'s Dep. 102). As Mazloum tried to get up, Persons kept pushing him back down. (Pl.'s Dep. 103-04).

15. Persons admits striking Mazloum in the course of his contact with him. (Persons Dep. 102, 138).

16. Mazloum did not initiate the altercation with Persons and denies striking Persons (or any of the off-duty officers) at any time, intentionally or otherwise (Pl.'s Dep. 100; see also February 23, 2006 Federal Bureau of Investigation Interview of Emile Mazloum at 2 (Ex. 16)). To the extent Mazloum's struggle against being held down was violent, it was so solely because he did not know why he had been grabbed, and therefore reasonably believed he was not being restrained by law enforcement personnel but instead by private citizens. (Pl.'s Dep. 101, 104, 126-27).

17. Imad Alkadi and Marwan Abi-Aad, friends of Mazloum and witnesses to the incident, were working at the Nightclub on behalf of a party promoter and at the time of the incident were manning the stairs that led to the stage above the main dance floor. (March 24, 2005 Federal Bureau of Investigation Interview of Marwan Abi-Aad at 1 (Ex. 17); Alkadi Dep. 80). Neither saw Mazloum strike Persons, and both deny that Mazloum initiated the incident, but corroborate Mazloum's assertion that he was grabbed from behind. (Alkadi Dep. 105-06; Abi-Aad Dep. 42).

18. Persons knew Alkadi from prior times that Alkadi had worked at the Nightclub, but

he ignored Alkadi's protestations to him, once the incident had begun, that Mazloum was not a threat and should be released. (Alkadi Dep. 105-06, 109-11). As a result of Alkadi's efforts to extricate Mazloum from the grasp of Persons, all three men fell to the floor of the club (although there is some dispute as to whether they fell on the floor of the stage or the dance floor itself below). (Alkadi Dep. 110-11; Persons Dep. 136 ).

*Intervention of the Off-Duty Officers*

19.     The four off-duty officers involved in the altercation with Mazloum had been to FUR before, either in a working capacity (as part of the D.C. MPD "Club Zone" detail, in which the MPD provides police oversight of District nightclubs in exchange for a fee from club owners) and/or as private citizens/patrons. (Ramirez Dep. 53, 171-72; Modlin Dep. 36-41; Schneider Dep. 34-35; Phillips Dep. 21-23). Some of them knew the owners of the Nightclub, Messrs. Rehman and Fiorito, in some capacity as well. (Modlin Dep. 47-50; Phillips Dep. 40-42; Schneider Dep. 36-40). Several of the officers involved were admitted to the Nightclub without paying a cover charge; also, as MPD officers, they were deemed "VIPs" entitled to special treatment while at FUR. (Persons Dep. 114).

20.     Prior to the altercation, Mr. Persons admits he had an exchange with some of the off-duty officers, including someone he identified as Modlin. (Persons Dep. 114-20). He has testified they made it known to him that they were "available" in the event he needed assistance with anyone who was a problem in the Nightclub. (Persons Dep. 120).

21.     While Mazloum was down on the floor, unable to stand up because Mr. Persons kept pushing him down, the off duty officers (specifically, Officers Modlin and Phillips) approached and intervened by grabbing Mazloum's arms and otherwise separating him from Persons and Alkadi. (Pl.'s Dep. 104-05.; *cf.* Modlin Dep. 97). Mazloum already had a bloody nose at this point. (Persons Dep. 165).

22. None of the officers identified himself to Mazloum as a police officer before or while they intervened, but instead simply acted without first ascertaining what had actually occurred. (Pl.'s Dep. 113). Eyewitnesses saw some of the off-duty officers in question holding cups that may have contained alcoholic beverages shortly before they intervened. (Alkadi Dep. 228-29; Abi-Aad Dep. 23-24, 64).

23. Prior to intervening, Officer Modlin had not seen how the altercation between Persons and Mazloum began. (Modlin Dep. 96, 103). He merely inferred that Mazloum was responsible for the altercation. Certain of the off-duty officers have claimed to have seen (or heard from Modlin) that Persons was being assaulted by more than one individual (Modlin Dep. 96-99, Ramirez Dep. 114-15). However, others admitted that they only arrived after this alleged "multiple assault" had been broken up and did not see any individuals attacking Persons, let alone more than one. (Phillips Dep. 62-63; Schneider Dep. 93-94, 99-101). These alleged additional assaulters (likely Alkadi and Abi-Aad) were never detained by MPD. (Modlin Dep. 101-04; Ramirez 127, 142, 196-97).

24. Modlin initially restrained Mazloum with a special hold. (Phillips Dep. 64-65). After interceding in the altercation, the off-duty officers dragged Mazloum along the ground across the dance floor to the bottom of the staircase leading out of the club, while pushing him and hitting him in the back. (Pl.'s Dep. 107; Alkadi Dep. 135, 137). Mazloum was unable to stand up and walk during this time. (Pl.'s Dep. 107). The officers, now also including Defendants Ramirez and Schneider, also stepped on Mazloum's back and twisted his arms. (Pl.'s Dep. 111; *cf.* Schneider Dep. 97). They ordered Alkadi to "back off." (Alkadi Dep. 39-45).

25. While still inside the nightclub, Defendant Ramirez in particular was seen by Mazloum to have punched Mazloum in the face and nose, in a single glancing blow. (Pl.'s Dep. 114-15). Marwan Abi-Aad also testified that he saw one of the people who was taking Mazloum out

7

of the club beating Mazloum. (Abi-Aad Dep. 177-79). This occurred after Mazloum had been handcuffed. (Pl.'s Dep. 114-15). Mazloum did not recognize Ramirez at first to be his assailant, although afterward he realized (once he got a good look at Ramirez outside the Nightclub, and later outside the police precinct where he was making his complaint) that Ramirez had been the person who had hit him. (Pl.'s Dep. 157-58).

26. At the very moment he struck Mazloum, Ramirez told Mazloum to "Shut up, you fucking Al-Qaeda!" (Pl.'s Dep. 115-16).

*Mazloum is restrained and removed from FUR*

27. At some point within the Nightclub but before being taken out, while pinned to the ground face-first, the off-duty officers who "responded" to the altercation between Mazloum and Persons handcuffed Mazloum (Pl.'s Dep. 111-14; Ramirez Dep. 133-34; Phillips Dep. 73-74; Schneider Dep. 95-96).

28. The handcuffs used belonged to Ramirez. (Ramirez Dep. 121). Other off-duty officers involved in the beating of Mazloum did not find it necessary to carry their handcuffs while off-duty. (Modlin Dep. 55; Schneider Dep. 45). Apparently Ramirez was able to bring the handcuffs into the Nightclub despite the existence of a metal detector due to his "VIP status" as an MPD officer, since it is likely any patron carrying a weapon or other such metal item would have been prohibited from entry to the club. (Allman Dep. 35). Superior officer Allman characterized the bringing of handcuffs as unnecessary when off-duty and as evidence of Ramirez's inexperience as a police officer. (Allman Dep. 36).

29. The officers thereupon dragged Mazloum, who was now handcuffed but trying with difficulty to walk, up the steps and out of the club to the curb on the opposite side of Patterson St., N.E. in front of the Nightclub's entrance. (Pl.'s Dep. 117-18; Abi-Aad Dep. 56; Alkadi Dep. 52-55).

By this time, all of the off-duty officers admit to having made making physical contact with the Plaintiff. (Phillips Dep. 71-76; Modlin Dep. 116-18; Schneider Dep. 93-98; Ramirez Dep. 116, 120-21).

30. While he was being dragged out of the club by the off-duty officers, Mazloum repeatedly exclaimed: "What did I do? I didn't do anything." (Alkadi Dep. 125). At no point in his removal from the Nightclub was Mazloum informed of, or did he know, what he had done to justify the brutal treatment he was receiving from the MPD officers, and none has testified of any such attempt to communicate with Mazloum.

31. After the off-duty officers removed Mazloum from the club and dropped him on the ground outside, Mazloum asked: "Why are you doing that to me, I didn't do anything." (Pl.'s Dep. 122). In response, Ramirez told Mazloum to "shut up," then kicked Mazloum and again said: "Shut up, you fucking Al-Qaeda." (Pl.'s Dep. 122; *see also* Alkadi Dep. 151-53). At one point, after Mazloum attempted to stand up, Phillips and Ramirez caused Mazloum to fall hard back on the ground. (Fiorito Dep. 59-60)(Ex. 18).

32. While Mazloum was on the ground outside the club and still handcuffed, Ramirez continued to taunt Mazloum, calling him a "fucking terrorist" and repeatedly addressing him as "terrorist, Al-Qaeda." (Alkadi Dep. 151, 272, 274-75). Mazloum has admitted, in response to Ramirez's racial slurs, to having called Ramirez "El Salvador." (Pl.'s Dep. 121-122).

33. Despite the fact that it was cold outside that night and Mr. Mazloum was calling for help for somebody to pull his shirt down, nobody assisted him. (Pl.'s Dep. 127).

*Response to the Incident*

34. The first officer called to respond to the incident was Allman. He received a call on his personal cell phone from Defendant Fiorito and was asked to respond personally, which he did.

(Allman Dep. 72-74; Fiorito Dep. 58-61 (Ex. 18). Fiorito and Allman are personal friends (Allman Dep. 13-17, 42).

35. After arriving at the scene, Allman privately spoke with Ramirez, Fiorito, and Persons before calling for uniformed back-up. (Allman Dep. 77-79, 95-96). Upon the arrival of Defendants Acosta and Smith, he directed their attention to Mazloum. (Allman Dep. 109-11).

36. As soon as Officers Acosta and Smith arrived on the scene, Ramirez took them aside and was seen by eyewitnesses to be speaking quietly to them. (Alkadi Dep. 162). Acosta and Smith then had a conversation with certain of the bystanders at the scene. (Fiorito Dep. 184).

37. Mazloum told Officers Acosta and Smith that Ramirez and the other off-duty officers, together with Michael Persons, had assaulted him. (Pl.'s Dep. 135, 199; Acosta Dep. 96; Smith Dep. 62). Mazloum indicated that he wanted the people who perpetrated the assault on him to be arrested. (Smith Dep. 62-63, 123-24). Mazloum did not know at this point that the individuals who had assaulted him were in fact MPD officers, and therefore did not identify them as such to Acosta and Smith. (Pl.'s Dep. 121, 224-25). But he did try to indicate to the a "big black guy" had assaulted him – a description applicable to both Modlin and Persons. (Pl.'s Dep. 135; Smith Dep. 62-64).

38. Officer Smith inferred from Mazloum's appearance and his accent that Mazloum was Middle Eastern. (Smith Dep. 48-49). Acosta did not take a written statement from Mazloum, although he could have done so. (Acosta Dep. 106-08). Indeed, Smith took the time to write down Mazloum's name and address on a pad, but wrote no facts about the incident at all. (*See* 3/12/05 Notes (Ex. 19)). In fact, in deposition John Fiorito expressed his surprised at Acosta's and Smith's deliberate refusal to investigate, as they had dismissed him and told him to go back inside the nightclub instead of taking his statement. (FUR 30(b)(6) Dep. Feb. 23, 2007, at 68-69 (Ex. 20)).

39. Acosta and Smith also spoke to Persons in the course of their "investigation" of the

10

altercation. Based on Persons' demeanor and lack of any sign of injuries (suggesting he had not been in a fight at all), Acosta did not find credible Persons' story that Mazloum had initiated the assault. (Acosta Dep. 132-36). Similarly, Officer Smith confirmed that Persons looked fine and appeared to be uninjured, despite his claims to the contrary. (Smith Dep. 98-100). Smith did not believe Persons' allegation that Mazloum had hurt Persons' arm. (Smith Dep. 98-100).

40.     Smith and Acosta both noted that no witnesses, police or otherwise, ever came to talk to them about Mazloum's alleged improper conduct in the Nightclub toward any other MPD officers. (Acosta Dep. 114-115; Smith Dep. 103-04). Acosta specifically learned on the scene that McLeod had, in his description of events, not told other MPD officers that Mazloum had perpetrated an assault. (Acosta Dep. 133). Smith generally noted a lack of information with respect to what had occurred. (Smith Dep. 138-41). Smith and Acosta never entered the interior of the Nightclub to look for additional witnesses. (Acosta Dep. 140-41, 146-47; Smith Dep. 71, 108).

41.     Based upon his assessment of the scene of the incident, Officer Jose Acosta determined there was no evidence that Mazloum had done anything wrong. (Acosta Dep. 119). Smith has admitted that his view was that Mazloum was an apparent victim, and he admits as well that Mazloum's disheveled appearance and manner were equally consistent with him having been beaten as with being intoxicated. They therefore ultimately released Mazloum in the absence of any credible evidence upon which to base an arrest. (Smith Dep. 65-67, 92-93).

42.     Acosta and Smith subsequently told Mazloum to go home, ignoring outright his requests that they "take a report" from him (by which Mazloum has testified he meant a complaint against those who attacked him). (Pl.'s Dep. 137-38; Alkadi Dep. 141-42, 171). When Mazloum pressed his request, they told him it would only be possible for him to file a complaint if he were taken to jail. (Pl.'s Dep. 142). Persons testified to having been told something along the same lines

11

(that if he wished to make a complaint, he would have to be arrested). (Persons Dep. 105, 166-68). However, Acosta and Smith could in fact have taken down more information from Mazloum, although Acosta admitted preferring not to do so. (Phillips Dep. 143-47; Acosta Dep. 105-08).

43.    After being told he had to go to jail if his requests for a "report" were to be fulfilled, Mazloum indicated that he was in fact prepared to do so. (Pl.'s Dep. 142, 210, 225-26; Alkadi Dep. 170-71, 296-97, 299-300; Acosta Dep. 116-17, 122-23; Smith Dep. 90-91). He promptly climbed into the back seat of Acosta and Smith's police car for that purpose, but they forcibly removed him from the car, placed him in his own car, and asked Mr. Alkadi to take Mazloum home instead. (Pl.'s Dep. 142; Alkadi Dep. 171; Acosta Dep. 121-22; Smith Dep. 90).

44.    After getting home, Mazloum drove himself to Inova Alexandria Hospital in order to be treated. It is undisputed that he incurred severe injuries as a result of the altercation. *See* Inova Alexandria Hospital Discharge Instructions for Emile Mazloum (Ex. 21)). By contrast, none of the individuals involved in the altercation other than Mazloum required any medical treatment (Persons at best used ice to treat his allegedly injured bicep (Persons Dep. 105-06)). Most, if not all, of the MPD officers involved in the incident, as well as Persons, are significantly larger than Mazloum. (*See, e.g.,* Persons Dep. 68; Modlin Dep. 245-46; Acosta Dep. 86-88).

45.    Acosta testified that Allman witnessed Mazloum's efforts to get into Acosta and Smith's vehicle, and that Allman later (encountering the pair at another place in the District while on patrol) laughed with them about what they considered to be Mazloum's humorous conduct in attempting to enforce his rights. (Acosta Dep. 126-30, 142-43).

46.    Mazloum testified that he was never told he would be arrested—unless he made good on his demand to "file a report" about the altercation. (Pl.'s Dep. 141-42). Acosta and Smith have vehemently denied that they were ever instructed by Allman to arrest Mazloum; in fact, they allege

12

that Allman was aware that Mazloum was not arrested and never reacted to that fact, even though he learned of it later that very day. (Acosta Dep. 78; Smith Dep. 87-88). Allman, however, says the opposite. (Allman Dep. 114-18).

47. Allman's involvement in the altercation was investigated by the MPD in 2006. It resulted in a directive that he be disciplined—presumably due to the questionable role he played in the aftermath of the Altercation, as well as due to questions about his credibility and candor. (*See* Final Investigative Report Recommending Adverse Action for Lieutenant Francis Allman of the First District, June 15, 2006 (Ex. 22)). Allman retired from the MPD before the determination was official, however. (Allman Dep. 7). Allman is presently employed in security at, of all places, FUR Nightclub. (Allman Dep. 11-12).

*Mazloum's efforts to file a complaint and reaction of the Defendants*

48. On the afternoon of March 12th, after being released from Inova Alexandria Hospital, Mazloum went to the police station to file a complaint against the officers who had beaten him. (Pl.'s Dep. 157-58). There he happened to encounter and recognize Defendant Ramirez and was able to obtain Ramirez' name and badge number. *Id.;* Alkadi Dep. 65-67).

49. Ramirez thereafter left the police station and immediately telephoned Officer Modlin to obtain the number of John Fiorito. (Ramirez Dep. 170). Ramirez then telephoned Fiorito, who had witnessed the incident (Fiorito Dep. 47-50; Alkadi Dep. 143), and informed him that Mazloum had just come into the station and made a complaint to Lieutenant Pamela Taylor about the incident that occurred at the club the night before. (Ramirez Dep. 177-78, 316).

50. Ramirez has admitted he was upset about the fact that Lt. Taylor was calling for the mobile crime unit to investigate. (Fiorito Dep. 118-19). While very upset, Ramirez asked Fiorito about the video system, and Fiorito indicated to Ramirez that Lt. Taylor could come to the club, view

13

the security camera films, and burn a copy to disc. (Fiorito Dep. 119-21; Ramirez Dep. 317).

51.     Ramirez did not in fact relay that invitation to Lt. Taylor (Ramirez Dep. 317), and the MPD never obtained the video evidence from the night of the incident. Ramirez subsequently visited the club in person. (Ramirez Dep. 182).

52.     Ramirez also placed phone calls to several other individuals about the incident with Mazloum, including Allman, Modlin, Schneider, and later Acosta. (Ramirez Dep. 166, 169-170, 170-180; Modlin Dep. 164-66, 173; Acosta Dep. 151-64; Allman Dep. 155). None of the deponents asked about the call recall the specific details of it, but they have admitted that Ramirez was inquiring as to why Mazloum was not arrested. (Acosta Dep. 158-60). Ramirez testified that Acosta told him he was "sorry" about letting Mazloum go. (Ramirez Dep. 169).

*The FUR video camera system*

53.     The club's video surveillance system captured footage of locations inside and outside the club where the incident occurred. The system relays video images to a computer, which then displays those images on smaller subscreens on a computer monitor. It is possible to save images onto a CD-ROM disk, and in fact FUR has done that before. (McLeod Dep. 27-28, 30, 34).

54.     The computer to which the security cameras "feed" visual data temporarily stores the data on its hard drives for three days' time, before overwriting the data with new feed. (McLeod Dep. 27-28). Accordingly, any images that might have captured the Altercation would not have been overwritten until the third day following the incident (*i.e.*, March 15, 2005).

55.     Utilizing the monitors from several of the wall mounted cameras scattered throughout the club, one could view portions of a person's journey walking from the stage to the outside of the Nightclub. In particular, the club's digital video surveillance system captured, among other things, the following areas: (i) the "tunnel" leading from the stairs off the dance floor toward the front of the

nightclub; (ii) the interior front entrance of the Nightclub; (iii) the exterior front entrance of the Nightclub; and ; and (iv) the curb and opposite side of the street facing the Nightclub (*see* McLeod Dep. 110-12; Declaration of Brian H. Corcoran, dated June 29, 2007)(Ex. 23).

56. All of these locations were passed through by Mazloum, Persons, and the off-duty officers involved in the Altercation. (Pl.'s Dep. 100-09, 111, 119-30; Corcoran Decl.). Accordingly, a copy of the footage from certain of the FUR Nightclub's cameras would have captured a good portion of Mazloum's path, as he was led out in handcuffs, from the interior of the Nightclub to the front exterior, including the sidewalk area across from the front entrance where Mazloum was detained.

57. After encountering Mazloum at the police station on the afternoon of March 12, 2005, the day following the incident, Ramirez telephoned John Fiorito. (Ramirez Dep. 177). Ramirez informed Fiorito that Mazloum had just been into the station to make a complaint to Lieutenant Pamela Taylor about the incident that occurred at the club the night before. (Ramirez Dep. 177-78, 316).

58. Fiorito recognized that Ramirez was upset about the fact that Lt. Taylor was calling for the mobile crime unit to investigate. (Fiorito Dep. 118-19). While very upset, Ramirez asked Fiorito about the video system. (Fiorito Dep. 119). Despite knowing Ramirez was upset about the video evidence (Fiorito Dep. 119), and that Ramirez as well as Michael Persons were among those that had been involved in the incident (Fiorito Dep. 50-51, 79-80), Fiorito left it to Ramirez to inform Lt. Taylor that she could come to the club, view the security recordings, and burn a copy to disc (Fiorito Dep. 119-21; Ramirez Dep. 317). In fact, Ramirez never relayed that invitation to Lt. Taylor (Ramirez Dep. 317), and the MPD never obtained the video evidence of the incident.

59. Later in the evening of March 12, 2005, Imad Alkadi, who had witnessed the incident

15

the night before, went to the club and met with John Fiorito, Michael Rehman, Dave McLeod, and Michael Persons in the room where the video surveillance monitors are located. (Alkadi Dep. 398-99.) Alkadi had been asked to go back to FUR by his immediate boss, Masoud Aboughaddareh, aka "Masoud A.," who had been called by Fiorito and asked to make Alkadi available once the defendants were aware that Mazloum was pursuing a formal complaint about the incident. ("Masoud A." Dep. 45-49 (Ex. 24)). "Masoud A." characterized Fiorito as sounding upset and extremely concerned that Mazloum had initiated the police complaint ("Masoud A." Dep. 47-49, 60-63).

60. In the room in which the meeting was held, Mr. Alkadi could see that the video system monitors on the wall captured numerous locations within the club. (Alkadi Dep. 402-03).

61. During this meeting, Fiorito treated Alkadi in a disparaging and angry manner. (Alkadi Dep. 196-97).

62. Fiorito asked Mr. Alkadi if he had gone to the police station that day, which Alkadi acknowledged. (Alkadi Dep. 407). Fiorito specifically told Mr. Alkadi that Mazloum was "going to get burned" (Alkadi Dep. 409) if he pursued his complaint, warned him of the liability he would face if he made misrepresentations in a police report (thus suggesting that Alkadi was fundamentally being untruthful about what he had observed the night before), and that Mr. Alkadi should "back off and not be a witness to nothing" (Alkadi Dep. 72-75, 414).

63. When Mr. Alkadi suggested to the individuals in the room that the video system likely had captured some or all of the altercation, Fiorito first said: "I don't have it anymore. Everything is gone." (Alkadi Dep. 72-75, 147-50, 416-19.)

64. Mr. Alkadi understood that to mean that Fiorito had destroyed the video evidence of the incident. (Alkadi Dep. 418). During this same meeting, Fiorito thereafter changed his story and claimed that footage of the incident had never been captured. (Alkadi Dep. 418-19). He ultimately

informed Alkadi never to come back to work in a party promoter capacity at FUR. (Fiorito Dep. 158-61, Alkadi Dep. 75-77).

65. David McLeod, FUR's director of security, claimed in his deposition to have personally reviewed the security camera tapes pertaining to the areas of the club. (McLeod Dep. 59). This review was allegedly made within the first twenty-four hours following the incident. The results of this review were reported to FUR's senior officials Mr. Rehman and Mr. Fiorito. (McLeod Dep. 59-61, 68-69, 159-60; Fiorito Dep. 115-17, 141-58).

66. However, McLeod contradicted himself repeatedly in his deposition on issues relating to the cameras and what they did or did not pick up. Thus, he also testified that he never looked at the video record, and did not need to because he "knew" the cameras would not have captured anything (including the outside cameras), but then later admitted that the cameras would in fact pick up portions of Mazloum's "journey" from the stage to the street in front of the Nightclub. (McLeod Dep. 25-29, 31-32, 41-42, 160-62).

67. Sultan Al-Homoud, a third party present outside of the front of FUR during the incident, testified that yell for help a number of times, and that Mazloum specifically yelled his name in Arabic and asked for assistance (Sultan Dep. 11, 22-23)(Ex. 25).

68. In the winter of 2006, Mazloum's attorneys placed advertisements in local newspapers in an attempt, over six months after the incident, to identify third party witnesses who may have seen portions of the incident. No one ever came forward. (Declaration of Ricardo Moran, dated June 28, 2007)(Ex. 26).

69. The Alexandria police officer who interacted with Mazloum at the Alexandria Inova Hospital in the early hours of March 12, 2007 testified that Mazloum's appearance and manner, which others have characterized as intoxicated, could just as likely be attributed to the fact that he

had suffered serious injuries as a result of his assault. (Trapero Dep. 35-36)(Ex. 27).


Dated: June 29, 2007                                /s/ _____

Brian H. Corcoran (Bar No. 456976)
Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW
Suite 700 East Lobby
Washington, D.C. 20007
Ph: (202) 625-3500
Fax: (202) 298-7570
Brian.Corcoran@kattenlaw.com

Susan Huhta (Bar No. 453478)
Warren R. Kaplan (Bar No. 034470)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, D.C. 20036
Ph: (202) 319-1000
Fax: (202) 319-1010
Sue_Huhta@washlaw.org
Warren_Kaplan@washlaw.org

Attorneys for Plaintiff
Emile Mazloum