Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM                    :
                                 :
            Plaintiff            :
                                 :
    vs.                          : Civil Action No.
                                 : 1:06:CV 00002
                                 : (JDB)
DISTRICT OF COLUMBIA,            :
    et al.                       :
                                 :
            Defendants           :

Washington, D.C.
Tuesday, August 8, 2006

Videotaped Deposition of:

ANTHONY RAMIREZ

called for oral examination by counsel for Plaintiff, pursuant to notice, at the offices of Katten Muchin Rosenman, LLP, 1025 Thomas Jefferson Street, N.W., East Lobby, Suite 700, Washington, D.C. 20007-5201, before Renee A. Feder, CSR, a Notary Public in and for the District of Columbia, beginning at 9:30 a.m., when were present on behalf of the respective parties:

Page 18

1  of Columbia?
2  A. I had left Southwest Airlines to
3  work on my bachelor's degree. I had the two
4  companies to help support my family. I was
5  doing my studies at the same time. Put out
6  several applications to different departments.
7  District of Columbia was the first one to give
8  me an opportunity. That is how I came to be
9  with the District.
10  Q. The bachelor's degree I think you
11  said was in law enforcement?
12  A. Yes.
13  Q. And you started that while you
14  were in the glass business?
15  A. Well, I started studying criminal
16  justice back to when I first started going to
17  school, but I ended up having kids. I had to
18  delay my education.
19  Q. When did you start school, as you
20  call it?
21  A. '87.
22  Q. You started with Ottawa in '87?

Page 19

1  A. No. I started in El Paso
2  Community College. I went to the University
3  of Texas at El Paso. And Mesa Community
4  College in Mesa, Arizona. And then Ottawa.
5  Q. You attended El Paso Community
6  College from when to when?
7  A. '87 to '89.
8  Q. And Mesa, from when to when?
9  A. It was a couple of periods. 2002
10  to 2003. Then a short period time off.
11  Approximately in '99 to 2001.
12  Q. Was there another one or just
13  those two?
14  A. University of Texas, one semester.
15  '89.
16  Q. At El Paso, did you receive any
17  degree?
18  A. No.
19  Q. Any degree from Mesa?
20  A. No.
21  Q. And just one semester at Texas.
22  What was the reason that you left each of

Page 20

1  those institutions?
2  A. I left -- just moving on. I
3  didn't -- that period of my life I wasn't
4  ready to finish my education.
5  Q. I see. Have you ever been -- have
6  you ever been charged with a crime?
7  A. Uh-huh.
8  Q. When was that?
9  A. 1989.
10  MR. BRUCKHEIM: I am going to
11  object as to relevance grounds.
12  But you can answer.
13  THE WITNESS: I was driving while
14  intoxicated.
15  BY MR. KAPLAN:
16  Q. What was the disposition of that
17  charge?
18  A. Just pled nolo contendere.
19  Q. Was that in El Paso?
20  A. What is that?
21  Q. Was that in El Paso?
22  A. No, it was in Fort Collins,

Page 21

1  Colorado.
2  Q. Anything else?
3  A. The same year I was charged with
4  assault.
5  MR. BRUCKHEIM: Again, objection
6  as to relevance.
7  But you can answer.
8  BY MR. KAPLAN:
9  Q. Where was that?
10  A. El Paso, Texas.
11  Q. What was the disposition of that?
12  A. Dismissed and expunged.
13  Q. What were the circumstances of
14  that?
15  MR. BRUCKHEIM: Again, objection
16  as to relevance. It was dismissed and it was
17  expunged.
18  But you can answer.
19  BY MR. KAPLAN:
20  Q. What were the circumstances?
21  A. That I was just in the wrong place
22  at the wrong time. There was a security guard

Page 50

1   Q.   Which guys?
2   A.   There was about ten people that
3   were planning on going out that night.
4   Q.   Well, who? And how many of those
5   ten went to FUR?
6   A.   Four of us.
7   Q.   And the four were you --
8   A.   Myself, Thaddeus Modlin, Louis
9   Schneider and Richmond Phillips.
10  Q.   Were these all friends of yours?
11  A.   They were -- yes, I would call
12  them friends.
13  Q.   Did you frequently go to a
14  nightclub after work?
15  A.   No.
16  Q.   How often?
17  A.   I went out of town a lot on my
18  days off. Generally, maybe once a month,
19  maybe twice.
20  Q.   You went out of town once or
21  twice?
22  A.   No, I went to a nightclub once or

Page 51

1   twice a month.
2   Q.   You say you went out of town a lot
3   on your days off. Are we talking about going
4   back to Phoenix?
5   A.   Yes.
6   Q.   But during the week when you were
7   here working, during the workweek, that is,
8   from Wednesday until the following Tuesday,
9   would you frequently go to nightclubs and bars
10  after work?
11  A.   No.
12       MR. BRUCKHEIM: Objection.
13       But you can answer.
14       BY MR. KAPLAN:
15  Q.   And you went -- did you say once
16  or twice a month?
17  A.   Yes.
18  Q.   And did you usually go to FUR?
19  A.   No.
20  Q.   How did you decide where to go?
21  A.   Toss of a coin.
22  Q.   What would you usually do after

Page 52

1   work?
2   A.   Usually? I would go home.
3   Q.   What was it -- how did it happen
4   on this particular night you decided to go to
5   FUR?
6   A.   It was Friday night and it seemed
7   like a good idea.
8   Q.   Did Ms. Woodman go with you?
9   A.   No.
10  Q.   Katie Woodman?
11  A.   No.
12  Q.   Did you and Mr. Modlin,
13  Mr. Schneider and Mr. Phillips bring any women
14  with you?
15  A.   No.
16  Q.   By the way, were Modlin,
17  Schneider, Phillips all married?
18  A.   At the time I believe Modlin and
19  Phillips were.
20  Q.   But not Schneider?
21  A.   Correct.
22  Q.   Did you all go together in the

Page 53

1   same car?
2   A.   It is hard to recall. I believe
3   Schneider may have ridden with me.
4   Q.   What time did you and Schneider
5   get there?
6   A.   It was sometime close to midnight.
7   Q.   And they drove in your car? You
8   and he drove in your car?
9   A.   Yes.
10  Q.   Close to midnight?
11  A.   Yes.
12  Q.   And what happened when you got
13  there?
14  A.   We walked in.
15  Q.   Did you have to pay to get in?
16  A.   No.
17  Q.   How many times have you been to
18  FUR before?
19  A.   I have been there maybe four, five
20  times.
21  Q.   Were you always able to walk in
22  without paying?

Page 70

1      BY MR. KAPLAN:
2      Q.   Any time in the past two years?
3      A.   **No.**
4      Q.   When you arrived at FUR on the
5   night of March 11, what mood were you in?
6      A.   **I was in a good mood.**
7      Q.   Were you upset about anything?
8      A.   **No.**
9      Q.   Did anything happen in the past
10  few days to make you upset?
11     A.   **No.**
12         MR. KAPLAN: Well, this is a good
13  time for a break, perhaps. We have been going
14  for a couple of hours here. Let's take a
15  short break.
16         MR. BRUCKHEIM: Ten minutes?
17         MR. KAPLAN: Yes.
18         VIDEOGRAPHER: Going off the
19  record at 10:47 a.m.
20         (A recess was taken.)
21         VIDEOGRAPHER: We are back on the
22  record at 11:02 a.m.

Page 71

1      BY MR. KAPLAN:
2      Q.   Mr. Ramirez, a couple of -- I want
3   to tie up a few loose ends here.
4         Govig & Associates in Scottsdale,
5   what is the address?
6      A.   **4800 North Scottsdale Road, Suite**
7   **2800. And I am not sure what the zip code is.**
8      Q.   I was asking you about a statement
9   which Mr. Mazloum alleges that you made.
10        Have you ever called anyone an
11  al-Qaeda?
12     A.   **No.**
13     Q.   If you heard an officer referring
14  to someone, some citizen as an al-Qaeda, would
15  you consider that an ethnic slur?
16     A.   **I believe it would probably be in**
17  **the context -- it would depend on the context**
18  **in which it was said.**
19     Q.   Someone who looked Middle Eastern
20  and had a Middle Eastern accent. Would you
21  consider that an ethnic slur?
22     A.   **Sure.**

Page 72

1      Q.   And had you from time to time,
2   yourself, uttered ethnic slurs?
3         MR. BRUCKHEIM: Objection again as
4   to relevance.
5         But you can answer.
6         THE WITNESS: A few times in my
7   life.
8         BY MR. KAPLAN:
9      Q.   Have you sometimes used the word
10  nigger to refer to an African American?
11        MR. BRUCKHEIM: Again, objection
12  to relevance. It is way off track.
13        But you can answer.
14        THE WITNESS: Yes.
15        BY MR. KAPLAN:
16     Q.   When is the last time you did
17  that?
18     A.   **I don't know. The last time I**
19  **talked to Officer Modlin.**
20     Q.   And other than -- I mean in
21  talking to a white person?
22        MR. BRUCKHEIM: Objection. I am

Page 73

1   sorry. I am not sure I understand.
2         BY MR. KAPLAN:
3      Q.   Is Officer Modlin white or African
4   American?
5      A.   **He is African American.**
6      Q.   In talking to someone who is not
7   African American?
8      A.   **No.**
9      Q.   So you only use it in a joking way
10  to talk to an African American person. Is
11  that right?
12        MR. BRUCKHEIM: Objection.
13  Mischaracterizes his testimony.
14        MR. KAPLAN: Is that correct?
15        MR. BRUCKHEIM: You can answer.
16        THE WITNESS: Officer Modlin and I
17  are very close and we spar back and forth.
18        BY MR. KAPLAN:
19     Q.   Okay. At the club I asked you
20  about what you had to drink upstairs and you
21  said one beer. And then you went downstairs.
22  Did you drink downstairs also?

Page 114

1  Q. So, this was somewhere between, in
2  between the stairs that go down from the stage
3  and the stairs that go up to the tunnel?
4  A. Yes.
5  Q. Halfway in between?
6  A. Yes, roughly.
7  Q. What did you notice?
8  A. I noticed several of the patrons
9  scattering, making -- you know, clearing. And
10 I noticed Officer Modlin and Phillips
11 intervening in what appeared to be some type
12 of an attack.
13 Q. What did you do?
14 A. I made my way over there to assist
15 them.
16 Q. Dance music is still playing?
17 A. Sure.
18 Q. You made your way through the
19 crowd?
20 A. Yes.
21 Q. You are up on the stage. Did you
22 have to go from one end of the stage to the

Page 115

1  other to where the stairs are?
2  A. Yes.
3  Q. And then you went down those
4  stairs?
5  A. Yes.
6  Q. And when you saw -- when you first
7  saw Modlin and Phillips from the stage, what
8  were they doing?
9  A. It was crowded but they were
10 trying to restrain your client and two of his
11 friends who were assaulting a security guard.
12 Q. Did you know the security guard
13 who was being assaulted?
14 A. Not personally.
15 Q. By sight?
16 A. Well, I didn't see the assault,
17 sir. That is the thing.
18 Q. How did you know that they were
19 assaulting a security guard?
20 A. We had conversations afterwards.
21 Q. Okay. I am asking you now what
22 you saw.

Page 116

1  A. Okay.
2  Q. And I thought you said you saw
3  Modlin and Phillips trying to restrain
4  Mr. Mazloum and two of his friends who were
5  assaulting a security guard?
6  A. Right.
7  Q. Did you see Mr. Mazloum and his
8  two friends assaulting the security guard?
9  A. No.
10 Q. What did you see?
11 A. I saw Officer Modlin and Officer
12 Phillips trying to restrain your client.
13 Q. Where were they in terms of
14 standing up, sitting down, laying down?
15 A. They were standing, making way for
16 the tunnel to take him out.
17 Q. They were all on their feet?
18 A. (Indicating.) Uh-huh.
19 Q. Were they -- were they holding
20 Mr. Mazloum? Were they hitting him? What
21 were they doing?
22 A. Nobody hit anyone. Mr. Mazloum

Page 117

1  was out of control. And he was swinging.
2  Q. You don't know --
3     MR. BRUCKHEIM: He is answering.
4     THE WITNESS: He was swinging,
5  flailing. I am making my way through the
6  crowd. Like you stated, it was crowded. It
7  was loud. I am trying to make my way through
8  a dark crowd to get to two officers that are
9  restraining somebody that they are taking into
10 custody.
11    BY MR. KAPLAN:
12 Q. Now, you were going through the
13 crowd. And I gather while you were going
14 through the crowd, because of the crush of
15 people, you weren't able to keep Mazloum and
16 Phillips in your sight constantly. Right?
17 A. No. Well --
18 Q. Or were you?
19 A. That is hard to say. Yes, I saw
20 them. I knew which way I was going. What was
21 making it difficult to get to them is that
22 people were coming away from them and I was

Page 118

1   going to them.
2       Q.   Right. Would it be fair to say,
3   because of the number of people -- how tall
4   are you? 5 --
5       A.   10.
6       Q.   5' 10". Because of the number of
7   people, some of whom may have been taller than
8   5' 10", your view -- and because of the fact
9   they were on a lower level than you, that your
10  view of them was blocked?
11      A.   Yes. I would say at times it was
12  blocked.
13      Q.   Now, what did you see that led you
14  to think that Mr. Mazloum was out of control?
15      A.   I saw Mr. Mazloum swinging and
16  flailing and throwing punches at Officer
17  Modlin and Phillips.
18      Q.   This is while you were still on
19  the stage?
20      A.   No. This is when I am making my
21  way from the stage to them.
22      Q.   Let's talk first about while you

Page 119

1   were still on the stage. What did you see
2   Mr. Mazloum doing while you were still on the
3   stage? Anything?
4       A.   I never saw Mr. Mazloum do
5   anything.
6       Q.   What did you see them doing while
7   you were still on the stage, them being
8   Mr. Modlin and Mr. Phillips?
9       A.   Officer Modlin is probably 6' 6",
10  or 6' 7". Extremely tall. I saw a crush of
11  people coming away from the area. And I saw
12  Officer Modlin restraining, who turned out to
13  be Mr. Mazloum, and Officer Phillips was
14  helping. I was keeping my -- on the stage it
15  was about 3 and-a-half feet tall. So I had a
16  very good view of everything.
17      Q.   So, while you were on the stage
18  you didn't see Mr. Mazloum, you only saw
19  Modlin and Phillips. Correct?
20      A.   Correct.
21      Q.   Now, once you got down off of the
22  stage, when you got off the stage, you were

Page 120

1   what? 15 feet away, 20 feet?
2       A.   I don't know. From here to him,
3   (Indicating.)
4       Q.   Okay, the record shows --
5       A.   5 feet.
6       Q.   About 10 feet.
7       A.   (Indicating.)
8       Q.   So then what did you see?
9       A.   Like I said, I saw your client
10  struggling and resisting Officers Modlin and
11  Phillips.
12      Q.   What were they doing?
13      A.   They were trying to hold, keep him
14  in control. By the time I reached them they
15  had gone to the floor.
16      Q.   All three of them?
17      A.   All three of them.
18      Q.   And what did you do when you saw
19  that?
20      A.   Well, at about that time I reached
21  them. And I, myself, you know, attempted to
22  restrain Mr. Mazloum. He was grabbing and

Page 121

1   swinging and just acting like a madman. And I
2   took my handcuffs out and we attempted to, you
3   know, get them on him. I was able to get a
4   handcuff on his right hand with the help of
5   Phillips and Modlin. And at the same time,
6   while this was going on, Officer Schneider had
7   made his way over to us. And it wasn't until
8   Officer Schneider came over and all four of us
9   were holding down your client were we able to
10  get his left hand in handcuffs.
11      Q.   By the way, have you ever heard of
12  Krav Maga?
13      A.   I have.
14      Q.   What is it?
15      A.   It is defensive tactics.
16      Q.   Developed where?
17      A.   In Israel.
18      Q.   Have you ever studied Krav Maga?
19      A.   I have.
20      Q.   Where did you do that?
21      A.   In Arizona, and here in D.C.
22      Q.   And it is a -- is it like a

Page 126

1  Q. Mother fuckers. What else?
2  A. Fucking let go of me. And they
3  were out of earshot within seconds.
4  Q. Could you tell from his accent
5  that he was not a native, a native citizen of
6  this country?
7  A. No. All I knew is he was
8  involved -- he is a criminal. I didn't know
9  what his ethnicity was.
10 Q. His accent didn't indicate to you
11 that he was not a native?
12 A. No.
13 Q. How long did you stay inside?
14 A. About five minutes.
15 Q. Then what happened?
16 A. I went out front.
17 Q. Why did you stay inside five
18 minutes?
19 A. Because Mr. Mazloum in his crazed
20 fit had ripped my pants from cuff to crotch on
21 my left leg and I stayed inside to try to put
22 them back together.

Page 127

1  Q. Were you angry about that?
2  A. No.
3  Q. Now, you spoke earlier about two
4  or his friends who were supposedly along with
5  Mr. Mazloum assaulting a security guard.
6      Did you see his friends? You told
7  me about Mr. Mazloum. Did you see any of his,
8  either of his two friends involved in this?
9  A. Assaulting Mr. Persons?
10 Q. Yes.
11 A. No, I did not observe that.
12 Q. Once you got to the scene were his
13 two friends still on the scene?
14 A. No. Like I said, that story
15 involving the two friends was relayed to me by
16 Officer Modlin and Phillips outside.
17 Q. When you got to where Mr. Mazloum
18 was and the four of you were grappling with
19 him on the floor, were his two friends
20 anywhere to be seen?
21 A. I couldn't tell you. I don't know
22 who they were.

Page 128

1  Q. So you stayed inside and you, you
2  fixed your pants?
3  A. (Indicating.)
4  Q. And at some point you went
5  outside?
6  A. Yes.
7  Q. And when you got outside, what did
8  you see?
9  A. Mr. Mazloum was sitting down on
10 the curb across the street. To the best of my
11 recollection, I approached Schneider, Phillips
12 and Modlin, and asked them what happened. And
13 Modlin and Phillips told me that they had
14 observed three individuals assaulting Mike
15 Persons.
16 Q. Excuse me just a second. When you
17 went outside you saw who sitting on the curb?
18 A. Your client, Mr. Mazloum.
19 Q. Which curb?
20 A. If I am standing at the front
21 door --
22 Q. Yes.

Page 129

1  A. -- it would be immediately across
2  the street, catercorner.
3  Q. Directly across from the front
4  door?
5  A. Yes.
6  Q. And he was sitting on the curb.
7  And was anyone else sitting with him or
8  standing around?
9  A. Officers Schneider, Modlin and
10 everybody was just kind of there.
11     MR. KAPLAN: I guess this is a
12 good time. He has to change the tape.
13     VIDEOGRAPHER: Going off the
14 record at 11:57 a.m. This concludes videotape
15 Number 1.
16     (A recess was taken.)
17     VIDEOGRAPHER: This is beginning
18 of Videotape Number 2. We are back on the
19 record at 12:07 p.m.
20     MR. KAPLAN: Mr. Ramirez, before
21 we resume, I want to make a request to
22 Ms. Phillips, and I want to put on the record

Page 130

1  the discussion that we had before the
2  beginning of this deposition.
3         Two or three days ago we received
4  from counsel for the District of Columbia, in
5  response to our discovery request, the
6  personnel file of what purported to be and
7  what we were told was the personnel file for
8  Mr. Ramirez. And going through that file
9  yesterday it seemed to me that certain
10 documents that should have been there were not
11 there, such as the application for family
12 medical leave, such as Mr. Ramirez's letter of
13 resignation. And I contacted Ms. Phillips
14 office and spoke to Mr. -- help me out there.
15        MS. PHILLIPS: Becker.
16        MR. KAPLAN: Becker, thank you.
17        And I received back after a while
18 a fax. Mr. Becker said he spoke to Ms.
19 Phillips. And I received back a letter, a
20 faxed cover letter saying he was enclosing the
21 two specific documents I had requested. But
22 that all post incident documents had been

Page 131

1  withheld.
2         Before we began Ms. Phillips
3  confirmed that was correct, although the
4  request for the personnel file, of course, was
5  not limited to preincident documents. And
6  there was nothing in the original production
7  that disclosed the fact that certain
8  documents, post incident documents, were being
9  withheld. And Ms. Phillips confirmed at the
10 beginning here that, indeed, there are other
11 post incident documents that have been
12 withheld because they are post incident
13 documents.
14        I am not aware of any, of any
15 privilege for post incident documents. They
16 could certainly be relevant to any of the
17 issues on the claim or the counterclaim. This
18 is a case where there is a counterclaim, a
19 $1 million counterclaim, for defamation and
20 intentional infliction of emotional distress.
21 It is clear that the documents that were
22 withheld that we know about were certainly

Page 132

1  germane to the claim and counterclaim. And we
2  now know there are other documents that have
3  been withheld, which the exact identity of
4  which we don't know, just that we know there
5  is a category of such documents.
6         So, I am going to, in the interest
7  of hopefully avoiding having Mr. Ramirez
8  continue his deposition at another time, I am
9  going to ask counsel for the District of
10 Columbia to have those documents produced.
11 Perhaps Mr. Becker could go back over the
12 lunch break and retrieve those documents so we
13 will have them so we will be able to complete
14 this deposition today.
15        Would you like to respond?
16        MS. PHILLIPS: No. I will take it
17 up at lunch.
18        MR. KAPLAN: Okay.
19        BY MR. KAPLAN:
20    Q.   Now, Mr. Ramirez, getting back to
21 the topic that we were discussing before the
22 break, when you came over to where the

Page 133

1  officers were grappling with Mr. Mazloum, had
2  either of his wrists been cuffed at that
3  point?
4     **A.   No, I had the handcuffs.**
5     Q.   So, you proceeded to cuff one of
6  his wrists?
7     **A.   With the assistance of Phillips**
8  **and Modlin. It took all three of us.**
9     Q.   To put a handcuff on which wrist?
10    **A.   The right wrist.**
11    Q.   And what happened with his left
12 wrist?
13    **A.   Well, he was in highly -- he was**
14 **highly intoxicated, appeared to be. His**
15 **behavior was consistent with somebody who was**
16 **on drugs. He had a very abnormal strength.**
17 **And it took all three of us to keep him from**
18 **hitting us, holding down his limbs, and**
19 **keeping him from fleeing.**
20    Q.   Were the three of you able to hold
21 his limbs? Were four of you enough to hold
22 his --

Page 134

1  A. Four people were enough to
2  restrain him.
3  Q. Who was it who put the other
4  handcuff on?
5  A. All of us did. And Officer
6  Schneider is the one who actually was able to
7  get the cuff on his left wrist.
8  Q. But at all times -- is it accurate
9  to say that throughout the whole time that you
10 were there up to the point where he was in
11 handcuffs, either you or one of the other
12 officers was holding on to one arm or the
13 other?
14 A. Well, yes. And his legs and his
15 torso, and just trying to keep him from
16 leaving.
17 Q. Now, up to the point where the
18 handcuffs were put on, did you strike
19 Mr. Mazloum at all?
20 A. No.
21 Q. Did you ever touch any part of his
22 body other than his hand, his wrist to try to

Page 135

1  put the cuffs on?
2  A. No.
3  Q. Did you kick him?
4  A. No.
5  Q. Did you hit him with any part of
6  your body?
7  A. No.
8  Q. Did anyone else?
9  A. No.
10 Q. No one -- did you see how his face
11 came to be all bloody?
12 A. I did not see it.
13 Q. Now, after you -- I think we had
14 got up to the point where you came outside and
15 you saw Mr. Mazloum sitting on the side, on
16 the curb across from the front --
17 A. That is how I remember it.
18 Q. -- from the club.
19     And Officer Schneider and Modlin
20 were standing around?
21 A. Standing where?
22 Q. Around.

Page 136

1  A. Yes.
2  Q. And what about Phillips?
3  A. He was there, also.
4  Q. Was there any conversation with --
5  did anyone have any conversation with Mr. --
6  strike that.
7      At some point, the squad car came.
8  Correct?
9  A. Yes.
10 Q. How long after you got out to the
11 sidewalk did the squad car come?
12 A. 30 seconds.
13 Q. During that 30 second interval,
14 did you have any conversation with
15 Mr. Mazloum?
16 A. No.
17 Q. Did any of the police officers
18 have any conversation with him?
19 A. I wouldn't call it conversation.
20 Q. What would you call it?
21 A. Mr. Mazloum ranting and raving.
22 He was yelling and calling me -- kept calling

Page 137

1  me El Salvador. I don't know where that came
2  from. He kept telling us that he was going to
3  sue the club, sue us. He would own the club.
4  He kept telling to take the fucking handcuffs
5  off. Don't you know who I am? That is -- it
6  was ignored.
7  Q. Don't you know who I am, he said?
8  A. Something like that.
9  Q. And did someone ask you who are
10 you?
11 A. No.
12 Q. Did he say who he was?
13 A. No. He wasn't speaking
14 coherently, sir. He was ranting and raving
15 like an intoxicated madman.
16 Q. Well, okay. Anything else? Did
17 he say anything else that you recall during
18 that 30 second interval?
19 A. That is about everything he said.
20 Q. Did anyone say anything to him?
21 A. No. Actually, everything was
22 pretty much largely ignored.

Page 142

1   was taken into custody for aggravated assault
2   which is a felony in the District of Columbia.
3         BY MR. KAPLAN:
4         Q.    Aggravated assault on who?
5         A.    Mr. Persons.
6         Q.    You hadn't seen any such assault?
7         A.    No, but it was relayed to me by
8   Officers Modlin and Phillips.
9         Q.    When did that get related to you?
10        A.    When I walked outside.
11        Q.    Now, let's talk about who told you
12  about that. Modlin and Phillips?
13        A.    Yes.
14        Q.    And what did Modlin and Phillips
15  tell you?
16        A.    When I came outside after mending
17  my pants I had asked them what had happened.
18  They told me that they had observed an
19  aggravated assault, three individuals were
20  attacking Mr. Persons. They restrained the
21  most violent suspect, which happened to be
22  Mr. Mazloum.

Page 143

1         Q.    Had you known Mr. Persons before?
2         A.    No.
3         Q.    Have you seen him since?
4         A.    Since that day, yes.
5         Q.    At the club?
6         A.    Well, yes.
7         Q.    And not at the club?
8         A.    And at the station.
9         Q.    What was he doing at the station?
10        A.    Making a statement.
11        Q.    Was it Modlin or Phillips who told
12  you that they saw three individuals attacking
13  Mr. Persons?
14        A.    Both of them.
15        Q.    They were both together?
16        A.    They were both together.
17        Q.    And can you be more specific on
18  what they told you they saw?
19        A.    Yes. Sure. They told me that
20  they had observed three individuals striking
21  another, who turned out to be Mr. Persons.
22  They were kicking him, hitting him. I don't

Page 144

1   know how it started. I didn't observe it.
2   All I know is I was backing up two officers
3   who were restraining a violent felon.
4         Q.    Now, who called Lt. Allman?
5         A.    I am not sure.
6         Q.    Was he your supervising
7   lieutenant?
8         A.    He is a watch -- he at the time
9   was a watch commander on duty. He was not my
10  direct supervisor.
11        Q.    But as watch commander he was in
12  charge of the --
13        A.    The First District through that
14  shift.
15        Q.    I thought you said FUR was not in
16  the First District.
17        A.    No, I never said that. You asked
18  if it was in PSA 106. I said no.
19        Q.    Okay. Maybe I misunderstood.
20  PSA 106, is that in the First District?
21        A.    Yes.
22        Q.    And that is where you were

Page 145

1   assigned?
2         A.    That is where I was assigned.
3         Q.    But FUR is also in the First
4   District but not in PSA 106?
5         A.    That is correct.
6         Q.    What does PSA stand for?
7         A.    Patrol service area.
8         Q.    So it is in some other PSA?
9         A.    Yes.
10        Q.    Do you know what it is?
11        A.    101.
12        Q.    Who called Lt. Allman, do you
13  know?
14        A.    I don't know.
15        Q.    He came in a cruiser?
16        A.    Yes.
17        Q.    By himself?
18        A.    Yes.
19        Q.    And you spoke to him?
20        A.    Yes.
21        Q.    And what conversation did you have
22  with him?

Page 170

1  A. He was like -- he just said what?
2  I told him that Mazloum was over at the
3  station making a complaint. I told him he
4  hadn't been arrested. And we were all shocked
5  that he hadn't been arrested.
6  Q. Did Schneider have anything else
7  to say?
8  A. No.
9  Q. Did you say anything else in the
10 conversation?
11 A. No, not to Schneider.
12 Q. You told me the whole conversation
13 with Schneider that you recall?
14 A. I mean that I recall regarding the
15 incident, yes.
16 Q. Did you call anyone else?
17 A. I called -- got John Fiorito's
18 number.
19 Q. How did you get John Fiorito's
20 number?
21 A. I believe I got it from Modlin.
22 Q. Did you know John Fiorito?

Page 171

1  A. Not very well. He is an
2  acquaintance.
3  Q. How did you get acquainted with
4  him?
5  A. We used to work Club Zone.
6  Q. What is Club Zone?
7  A. It is an overtime detail that the
8  District has for nightclub areas, bar areas.
9  Q. Who pays you?
10 A. The District of Columbia.
11 Q. This is so you can work overtime?
12 A. This is so -- right, exactly.
13 Q. Does D.C. get reimbursed by the
14 club or you don't know?
15 A. I don't know.
16 Q. How many officers participate in
17 this?
18 A. It depends. On the club, I mean
19 it could be anywhere from one, to four or
20 five.
21 Q. Are you working in uniform or out
22 of uniform?

Page 172

1  A. In uniform.
2  Q. In the club or out of the club?
3  A. Out.
4  Q. Outside the club?
5  A. Correct.
6  Q. Is this considered good duty?
7  A. What do you mean by good duty?
8  Q. Is this something that officers
9  like to get?
10 A. With the pay we are receiving we
11 all like to get any kind of overtime that we
12 could.
13 Q. How long had you been working in
14 Club Zone?
15 A. It is not something that you get
16 all the time. Four or five months, but not
17 every weekend.
18 Q. Had you worked Club Zone at FUR?
19 A. Once or twice.
20 Q. But you were working outside. How
21 would you get to meet Mr. Fiorito?
22 A. Because when people would be

Page 173

1  ejected, placed under arrest or asked to
2  leave, you meet people. He was -- I thought
3  he was one of the owners of the club. I am
4  not really sure what his position was. But
5  they would say this guy needs to go for
6  whatever reason and if he didn't leave we
7  would just shoo them on their way.
8  Q. Why were you interested in getting
9  Mr. Fiorito's phone number?
10 A. I was concerned about Mike
11 Persons, to be honest with you.
12 Q. Now, I don't think you have
13 mentioned Mr. Persons at this point.
14    When did you -- on the previous
15 night or morning, I guess, when the incident
16 occurred, when you first saw the incident
17 occurring down on the floor, it was three
18 officers and Mr. Mazloum. Right?
19 A. Correct.
20 Q. Was Mr. Persons involved at that
21 point?
22 A. No.

Page 174

1  Q.  Did you have some discussions with
2  Mr. Persons after that during the evening?
3  A.  No.
4  Q.  So, why were you concerned about
5  Mike Persons?
6  A.  Well, it had been relayed to me by
7  Modlin and Phillips that he had been a victim
8  of a crime. I wanted to know for myself why
9  your client had not been arrested because my
10 of own personal curiosity. So I exercised my
11 freewill to call him up and see what was going
12 on.
13 Q.  Did you think that Mr. Persons
14 were going to know why Mr. Mazloum was not
15 arrested?
16 A.  I had no idea.
17 Q.  So you called -- you were trying
18 to call Mr. Persons?
19 A.  Right. Well, I called John. And
20 let him know that Mr. Mazloum --
21 Q.  That is John Fiorito?
22 A.  John Fiorito.

Page 175

1  Q.  Were you on a first name basis
2  with him?
3  A.  That is his name.
4  Q.  I know. Were you on a first name
5  basis? You didn't call him Mr. Fiorito? You
6  called him John.
7  A.  I never really thought about it.
8  Q.  Did you refer to him as John or
9  Mr. Fiorito?
10 A.  Both.
11 Q.  Well, you only -- how many times
12 before this event had you met him?
13 A.  Two, three times.
14 Q.  And each time it was in connection
15 with someone being tossed out of FUR?
16 A.  Yes.
17 Q.  And he was always there on the
18 scene when that happened?
19 A.  Not always.
20 Q.  Two or three times?
21 A.  I couldn't tell you.
22 Q.  At first he was Mr. Fiorito and

Page 176

1  then he became John? Is that it?
2  A.  I will call you Warren. Maybe I
3  am disrespectful, but I will call people by
4  their first names when I feel it fit.
5  Q.  Was it your habit to call him
6  John?
7  A.  I don't know. It couldn't be a
8  habit. I didn't know him that well.
9  Q.  But you weren't interested in
10 talking to him, you were interested in talking
11 to Persons?
12 A.  Both. I wanted to find out what
13 happened.
14 Q.  Hadn't Lt. Allman told you what
15 happened?
16 A.  Lt. Allman had told me that he had
17 instructed Smith and Acosta to arrest
18 Mr. Mazloum, that is the most that I knew.
19 Q.  Did Smith deny that?
20 A.  I don't know what Smith had said.
21 I have never spoken to him about the
22 situation.

Page 177

1  Q.  I thought you were in a conference
2  call with Smith.
3  A.  That was Acosta.
4  Q.  I am sorry. Did Acosta deny that?
5  A.  Acosta said something to the
6  effect, dude, I am sorry, if my name comes up,
7  just give him my name. I don't know what that
8  means.
9  Q.  So you called Modlin and you
10 called Fiorito's phone number?
11 A.  Yes.
12 Q.  John. And you called John?
13 A.  I called John.
14 Q.  And tell me the conversation with
15 John.
16 A.  The best I can recall, I informed
17 him that Mr. Mazloum, you know -- I told him
18 the situation as I just related to you. He
19 had come into the station, had not been placed
20 under arrest. I wanted to know if he knew why
21 he had not been placed under arrest because he
22 had remained outside when Officer Phillips and

Page 178

1  I had returned inside the club. He didn't
2  relay any information to me. I asked him if
3  Mike Persons knew. And he told me --
4      Q.   Wait a minute. Before we get to
5  Mike Persons, you said he didn't relay any
6  information to you. Did he say he didn't want
7  to discuss it?
8      A.   No, I mean, we really didn't know
9  what Smith and Acosta had done, or why they
10 didn't do what they should have done.
11     Q.   What did John say about what he
12 observed or what he thought should have been
13 done?
14     A.   I don't remember. You need to ask
15 John.
16     Q.   All right. Well, at some point we
17 will.
18     A.   Good.
19     Q.   So what do you recall in the
20 conversation with John?
21     A.   Just relaying that Mr. Mazloum was
22 in the station making a complaint.

Page 179

1      Q.   And nothing else?
2      A.   That is it.
3      Q.   Okay. And he said what to that?
4      A.   Oh. Okay. I mean, I don't
5  remember the very details. It was just a
6  conversation that we had.
7      Q.   How long did this conversation
8  last?
9      A.   A minute, maybe two.
10     Q.   So, you told him that Mr. Mazloum
11 had come -- had made a complaint, had
12 apparently not been arrested. He said he was
13 surprised to hear that. And that was the end
14 of the conversation?
15     A.   To the best of my recollection,
16 yes.
17     Q.   Anything discussed in that -- who
18 did you speak to next?
19     A.   I believe I tried to get a hold of
20 Officer Phillips. I don't remember being able
21 to reach him. I believe that is it.
22     Q.   When you spoke to John, was there

Page 180

1  some mention about the security cameras?
2      A.   No.
3      Q.   Did you know there were security
4  cameras in the club?
5      A.   I never really thought about it.
6      Q.   Inside and outside the club?
7      A.   Never thought about it.
8      Q.   Never noticed them?
9      A.   Never thought about it.
10     Q.   Do you know now that there is
11 security cameras in and outside of the club?
12     A.   Yes. You just told me.
13     Q.   Before I just told you, you didn't
14 know?
15     A.   No.
16     Q.   Did you have any -- did you have
17 any other conversations that day with anyone
18 about this incident?
19     A.   I ended up getting to talk to Mike
20 Persons.
21     Q.   How did you get his number?
22     A.   He was actually -- when I talked

Page 181

1  to John, he told me he was there. And I went
2  there to talk to him.
3      Q.   You went there? You went to the
4  club?
5      A.   Uh-huh. Sure did.
6      Q.   Was this part of your -- this
7  wasn't part of your assigned duties to go
8  there that day, were they?
9      A.   No, but as a police officer, as
10 long as I stay in the First District, you can
11 go wherever you want.
12     Q.   I see. You are not supposed to
13 stay in your PSA?
14     A.   I am just supposed to answer runs
15 in that PSA.
16     Q.   You went to see Persons. What was
17 your purpose in going to see Persons?
18     A.   To make sure he was okay, and to
19 find out why -- if he knew why Mr. Mazloum had
20 not been arrested for assaulting him.
21     Q.   You were concerned that he might
22 be physically injured? Is that it?

Page 182

1  A.  Sure.
2  Q.  You wanted to be sure that he was
3  getting proper medical care?
4  A.  I didn't know. I wanted to know
5  why Mr. Mazloum had not been arrested for
6  assaulting him.
7  Q.  So you went to see Persons. What
8  conversation did you have with him?
9  A.  I asked him what had happened
10 after we went inside the club. And he told me
11 his version.
12 Q.  What did he tell you?
13 A.  He told me that Officer Smith had
14 told him that if he wanted to press charges
15 against Mr. Mazloum, that he, himself, would
16 have to be arrested, talking about
17 Mr. Persons. And that is why he did not want
18 to press charges on Mr. Mazloum and that is
19 why they let him go.
20 Q.  Did he tell you anything else in
21 that conversation?
22 A.  No. That is about it.

Page 183

1  Q.  Did you say anything else in that
2  conversation?
3  A.  No.
4  Q.  When he told you that explanation,
5  what did you say?
6  A.  Something to the effect of that is
7  bullshit. He should have been arrested.
8  Mr. Persons was upset that Mr. Mazloum did not
9  get arrested for assaulting him.
10 Q.  Persons was upset by it?
11 A.  Sure.
12 Q.  Did you ever talk to Officer Smith
13 to see if, indeed, that is what he told him?
14 A.  No.
15 Q.  Were you curious or concerned why
16 Officer Smith would say any such thing as
17 that?
18 A.  It always concerns me when an
19 officer doesn't do what I think he is supposed
20 to do.
21 Q.  But it didn't concern you enough
22 to pick up the phone and call Officer Smith?

Page 184

1  A.  I didn't know Officer Smith well
2  enough. Modlin and Acosta were friends. I
3  don't know Smith. There is no reason. There
4  are lieutenants for that.
5  Q.  When all of this -- all of this
6  was on March 12th. Right?
7  A.  Yes.
8  Q.  Did you talk to anyone else on
9  March 12th?
10 A.  Not that I can recall.
11     MR. KAPLAN: This might be a good
12 time to break for lunch.
13     MR. BRUCKHEIM: All right.
14     VIDEOGRAPHER: Going off the
15 record at 12:58.
16     (The luncheon recess was taken.)
17    A-F-T-E-R-N-O-O-N    S-E-S-S-I-O-N
18     VIDEOGRAPHER: We are back on the
19 record at 1:54.
20     MR. KAPLAN: Before we resume,
21 Ms. Phillips, I will renew my question earlier
22 this morning. I asked you to produce the

Page 185

1  remaining documents, the post incident
2  documents, from Mr. Ramirez's personnel file,
3  and you had not responded at that time. And
4  do you care to respond now?
5      MS. PHILLIPS: Yes. And I repeat
6  the response that I gave you when we consulted
7  prior to this deposition at the beginning and
8  I consulted again with counsel for Officer
9  Ramirez. And we will not be producing those
10 documents pursuant to the objections that I
11 told you that we raised.
12     MR. KAPLAN: Okay.
13     Pursuant to what -- what
14 objections would those be?
15     MS. PHILLIPS: Post incident and
16 relevance.
17     MR. KAPLAN: Post incident is the
18 basis for the objection?
19     MS. PHILLIPS: And relevance.
20     MR. KAPLAN: Are you aware of any
21 authority that supports not producing
22 documents at deposition on relevance?

Page 194

1   Q.   The question is, did you report
2   back to Lt. Allman what you had learned?
3   A.   I may have. I don't remember.
4   Q.   Now, when you saw Mr. Persons the
5   next day, when you went to the club to talk to
6   Mr. Persons, what was his appearance?
7   A.   Normal.
8   Q.   Had there been any other occasions
9   when you were involved with some violence of
10  some sort in which there was -- in which there
11  was a victim of violence and you, the
12  following day, went to check up on the
13  condition of the person out of concern for
14  their physical condition?
15       MR. BRUCKHEIM: Objection as to
16  relevance.
17       But you can answer.
18       THE WITNESS: I considered myself
19  to be a very active officer in my PSA and I
20  regularly checked up on people.
21       BY MR. KAPLAN:
22  Q.   Was it your usual practice when

Page 195

1   there was, when you encountered a fight, let's
2   say, broke up a fight, and perhaps arrested
3   someone, that the next day you would go to see
4   the victim to check on their condition?
5   A.   There is a difference between
6   mutual combat and a felonious assault. So to
7   answer your question, I would most definitely
8   check up on a victim of felonious assault as
9   opposed to someone who was just involved in
10  mutual combat in a nightclub or any other
11  venue.
12  Q.   What is the basis for that
13  difference?
14  A.   Mutual combat. You have two grown
15  men that are choosing to behave badly. And
16  you have the other incident where a person is
17  a victim of an attack. It is a big
18  difference.
19  Q.   But they could both suffer the
20  same kinds of injuries. Right?
21  A.   I don't know what Mr. Person's
22  injuries were. He could very well have

Page 196

1   nonvisible injuries.
2   Q.   Okay. You spoke about a
3   conversation with Officer Modlin from the
4   station before Modlin conferenced in Officer
5   Acosta. And you told us what you said to
6   Officer Modlin. But what did he say to you?
7   A.   Without quoting him, which I
8   can't, he said something to the effect, you
9   know, that is bullshit, we thought that
10  Mr. Mazloum had been placed under arrest. And
11  it was a shock to everybody involved when we
12  learned that he had not.
13  Q.   Now, at some point, I guess when
14  you were out, maybe it was out in the street,
15  you learned that not only was Mr. Mazloum
16  assaulting -- Mr. Persons, was he the bouncer?
17  A.   I believe that is the word for
18  him.
19  Q.   That not only was Mr. Mazloum
20  assaulting the bouncer, you were told two
21  other persons along with Mr. Mazloum were
22  engaged in that assault. Correct?

Page 197

1   A.   Yes.
2   Q.   Did you ever make an attempt to
3   arrest them?
4   A.   I didn't know who they were. I
5   never saw them.
6   Q.   Did any of the other officers make
7   any attempt to arrest them?
8   A.   In a dynamic situation like that
9   you want to apprehend the most violent person.
10  In that case it was, apparently, your client.
11  Q.   The question is, did anyone make
12  any attempt, to your knowledge, to arrest the
13  other people?
14  A.   I can't answer for anybody else.
15  Q.   Were you aware that the other
16  people were out there on the sidewalk when you
17  were out there waiting for the police?
18  A.   I was not.
19  Q.   Did any of the other officers talk
20  about whether or not the other two should have
21  been arrested?
22  A.   Not to me.