Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM                  :
                               :
         Plaintiff             :
                               :
    vs.                        :  Civil Action No.
                               :  1:06:CV 00002
                               :  (JDB)
DISTRICT OF COLUMBIA,          :
  et al.                       :
                               :
         Defendants :

                Washington, D.C.
                Tuesday, October 3, 2006

Deposition of:

    THADDEUS M. MODLIN, JR.
called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices
of Katten Muchin Rosenman, LLP, 1025 Thomas
Jefferson Street, N.W., East Lobby, Suite 700,
Washington, D.C. 20007-5201, before Renee A.
Feder, CSR, a Notary Public in and for the
District of Columbia, beginning at 9:40 a.m.,
when were present on behalf of the respective
parties:

Page 10

1  time I left Morgan State and joined the police
2  department shortly thereafter. And now I am
3  in George Washington University.
4      Q.  Now, were you born in Washington,
5  D.C.?
6      A.  Yes, I was.
7      Q.  So you lived your whole life in
8  the District?
9      A.  Yes, I have.
10     Q.  What year did you graduate from
11 high school?
12     A.  1995.
13     Q.  And you immediately went to Morgan
14 State thereafter?
15     A.  Like, maybe, the year after.
16     Q.  1996?
17     A.  Yes.
18     Q.  And you left college, so you
19 didn't complete your degree at the time. Is
20 that right?
21     A.  That is correct.
22     Q.  Did you immediately apply for a

Feder Reporting Company
(202) 863-0000

Page 11

1  job at the police department?
2      A.  Yes, I did.
3      Q.  So the very same year that you
4  left?
5      A.  Yes. In 1998, yes.
6      Q.  You said you are going to George
7  Washington. What kind of degree are you
8  pursuing there?
9      A.  Police Science.
10     Q.  Is that a bachelor of science
11 degree or bachelor of arts?
12     A.  It is actually a certificate,
13 slash, associates, slash, bachelor's program.
14     Q.  How many more credit hours do you
15 need before you will get that degree?
16     A.  Roughly, five more semesters.
17     Q.  So when do you estimate you will
18 graduate?
19     A.  May of '08.
20     Q.  Have you ever been arrested,
21 Officer Modlin?
22     A.  Yes, I have.

Feder Reporting Company
(202) 863-0000

Page 12

1      Q.  When were you arrested?
2      A.  In October of last year.
3      Q.  October of 2005?
4      A.  Yes.
5      Q.  What was the basis of your arrest?
6      A.  It was a DUI arrest.
7      Q.  Where did this occur?
8          MR. BRUCKHEIM:  I am going to
9  object to this line of questioning as to
10 relevancy.
11         But you can continue to answer the
12 question.
13         THE WITNESS:  Okay. In
14 Washington, D.C.
15         BY MR. CORCORAN
16     Q.  Were any criminal charges filed as
17 a result of the arrest?
18     A.  In terms of criminal charges are
19 you speaking of the DUI?
20     Q.  Yes.
21     A.  Yes.
22     Q.  What were the results of those

Feder Reporting Company
(202) 863-0000

Page 13

1  charges being filed?
2      A.  It was disposed with a plea.
3      Q.  Can you say that again?
4      A.  A plea.
5      Q.  What was your plea?
6      A.  Guilty to operating while
7  impaired.
8      Q.  What was the penalty?
9      A.  Eleven months probation and a
10 fine.
11     Q.  Am I correct in assuming that this
12 DUI occurred while you were not on duty as a
13 police officer?
14     A.  Yes, you would be correct.
15     Q.  Was it at night or during the day?
16     A.  It was at night.
17     Q.  Was it in the District of
18 Columbia?
19     A.  Yes.
20     Q.  Did the receipt of this DUI charge
21 have any repercussions on your job as a police
22 officer?

Feder Reporting Company
(202) 863-0000

Page 26

1  BY MR. CORCORAN
2  Q.  Was the police officer who was
3  the -- strike that question. At the
4  proceedings involving this other officer where
5  you were a witness, was that officer one of
6  the defendants in this lawsuit?
7  A.  No, sir.
8  Q.  But that was the only time you
9  testified as a witness at any police
10 proceeding?
11 A.  Correct.
12 Q.  You said you were suspended as a
13 result of your DUI. Correct?
14 A.  Yes.
15 Q.  Have you ever been suspended at
16 any other time?
17 A.  Yes.
18 Q.  When were you otherwise suspended?
19     MR. BRUCKHEIM: I will object as
20 to relevance.
21     But you can answer.
22     THE WITNESS: In October of --

Feder Reporting Company
(202) 863-0000

Page 27

1  well, I can't give you the exact suspension
2  dates, but I can tell you the dates on which
3  the infraction occurred.
4     BY MR. CORCORAN
5  Q.  That is fine.
6  A.  October of 2003. And January of
7  '04.
8  Q.  And those are the only other times
9  you were suspended?
10 A.  Yes.
11 Q.  October of 2003 incident, what was
12 involved there?
13 A.  Pretty much --
14     MR. BRUCKHEIM: Same objection as
15 to relevance.
16     But you can answer.
17     THE WITNESS: Pretty much a
18 sergeant made a bad call. We had a
19 report of -- we just had a homicide three
20 blocks away from where I was situated. After
21 securing the crime scene we got a call over
22 the radio saying a suspect, an unknown

Feder Reporting Company
(202) 863-0000

Page 28

1  suspect, was seen running into a house with no
2  complaint on the call back. Meaning we didn't
3  have a viable, a viable witness. As a result,
4  we went around the corner to the house. The
5  sergeant went into the house when he shouldn't
6  have. And I pretty much said something about
7  it and was suspended for insubordination
8  because I didn't want to go into a house
9  without just cause.
10 Q.  So you are saying your suspension
11 was a result of disputing a superior officer's
12 direction to you?
13 A.  Yes. Correct.
14 Q.  Were was the officer involved?
15 A.  Who said who was the officer?
16 Q.  Who was the officer who gave you
17 the order?
18     MS. PHILLIPS: Objection. If it
19 the subject of a personnel matter in which he
20 was involved with discipline, then it is
21 privacy, the same objection that Mr. Bruckheim
22 made before.

Feder Reporting Company
(202) 863-0000

Page 29

1     MR. CORCORAN: Is this an
2  objection where you don't want him to answer
3  or just an objection?
4     MS. PHILLIPS: It is an objection
5  for the District. Only his counsel can
6  instruct him not to answer. I would recommend
7  that he not answer based on the previous
8  answer.
9     MR. BRUCKHEIM: I will instruct
10 him not to answer as well as far as the
11 identity of the officer.
12    BY MR. CORCORAN
13 Q.  Was what the order that this
14 officer gave you? What did he tell you to do?
15 A.  Pretty much to go into a home in
16 which we had no warrant to go into the house.
17 And we didn't have exigent circumstances to
18 enter because we didn't have a witness. We
19 had no witness. When we got the call, there
20 was no complaint, no call back. Meaning the
21 person failed -- didn't want to give their
22 name and didn't want to make their identity

Feder Reporting Company
(202) 863-0000

Page 34

1  A. Yes.
2  Q. Now, you are aware of the FUR
3  Nightclub. Correct?
4  A. Aware in which sense?
5  Q. You know about it. Right?
6  A. Know about it? I am not really
7  getting where you are going to that question.
8  Q. You have been to FUR Nightclub.
9  Right?
10 A. Yes.
11 Q. And you were there the night of
12 the incident?
13 A. Yes.
14 Q. Had you been to that nightclub
15 before the night of the incident ever?
16 A. Yes.
17 Q. How many times?
18 A. I would say roughly I would go
19 once, maybe twice a month.
20 Q. When did you first go there?
21 A. Maybe like two months after they
22 opened.

Feder Reporting Company
(202) 863-0000

Page 35

1  Q. When was that, do you recall?
2  A. No, I don't.
3  Q. How long? Was it a year before
4  the incident?
5  A. I can't even remember how long
6  they have been opened so I couldn't give you a
7  yes or a no on that.
8  Q. Why did you start going to this
9  nightclub?
10 A. Because the atmosphere was cool.
11 And I am not really too big on hanging out at
12 clubs because people get into fights and
13 stuff. But the things that I saw, that
14 usually never happened there.
15 Q. Who did you first go with to the
16 nightclub?
17     MR. BRUCKHEIM: I am sorry. Are
18 you talking about the very first time?
19     MR. CORCORAN: Yes, if he knows.
20     THE WITNESS: I do not remember.
21     BY MR. CORCORAN
22 Q. Did you generally go with other

Feder Reporting Company
(202) 863-0000

Page 36

1  police officers to the nightclub?
2  A. Sometimes. But a lot of the times
3  I just hung out with my friends who aren't
4  police officers.
5  Q. Your friends from D.C. growing up?
6  A. Yes, my friends from growing up.
7  Q. Did you ever have any involvement
8  at the nightclub as security?
9  A. No, sir.
10 Q. Did you ever have any involvement
11 in a special police detail to the nightclubs
12 in the District?
13 A. Yes.
14 Q. What is that detail called?
15 A. Club Zone.
16 Q. What does being involved in that
17 detail mean?
18 A. What does it entail?
19 Q. Yes.
20 A. Pretty much any incidents that
21 occur outside of the club we handle as far as
22 fistfights, things of that sort.

Feder Reporting Company
(202) 863-0000

Page 37

1  Q. How do you get involved in Club
2  Zone as a police officer?
3     MR. BRUCKHEIM: Objection to form.
4     But you may answer.
5     THE WITNESS: Pretty much. I mean
6  you just put your name on the list and, as
7  overtime is available, people are chosen.
8     BY MR. CORCORAN
9  Q. So you get paid extra, you are
10 paid overtime if you are on Club Zone. Right?
11 A. That is correct.
12 Q. Is it considered something
13 desirable to do by MPD officers?
14     MR. BRUCKHEIM: Objection.
15     You may answer.
16     MS. PHILLIPS: Join.
17     THE WITNESS: Extra money is
18 always a good thing, so I suppose it is.
19     BY MR. CORCORAN
20 Q. How many times did you do Club
21 Zone?
22     MR. BRUCKHEIM: Do you mean prior

Feder Reporting Company
(202) 863-0000

Page 38

1  to the date of the incident?
2  MR. CORCORAN: Let's start with
3  that.
4  THE WITNESS: Several times.
5  BY MR. CORCORAN
6  Q. And have you done it since the
7  incident?
8  A. No.
9  Q. Why not?
10  A. I mean because my -- all my stuff
11  has been going on with the DUI stuff.
12  Q. What does that have to do with
13  doing Club Zone?
14  A. While I was dealing with the DUI I
15  was placed on a noncontact status.
16  Q. In October of 2005?
17  A. Yes.
18  Q. What does it mean to be placed on
19  a noncontact status?
20  A. That means pretty much I was on
21  desk duty and just doing paperwork around the
22  station.

Feder Reporting Company
(202) 863-0000

Page 39

1  Q. And that has been the case since
2  your suspension?
3  A. Yes.
4  Q. So you can't do Club Zone as a
5  result?
6  A. During that time, no.
7  Q. When was the last time you did
8  Club Zone?
9  A. The exact date I can't remember.
10  I have to, like, look at my records.
11  Q. Was it after the incident at issue
12  in this lawsuit?
13  A. Yes. Yes.
14  Q. Was it in 2005 sometime?
15  A. Yes, it was.
16  Q. Do you know how many times you did
17  Club Zone after the incident at issue in this
18  lawsuit?
19  A. No.
20  Q. Now, when you do Club Zone, you
21  are in uniform. Correct?
22  A. Yes, that is correct.

Feder Reporting Company
(202) 863-0000

Page 40

1  Q. And you are in a patrol car?
2  A. Yes, that is correct.
3  Q. And are there a number of
4  nightclubs that you watch or travel passed?
5  A. No. Pretty much we are set up in
6  front of one nightclub. Each two man, or
7  three man, four man unit is set up in front of
8  one particular nightclub.
9  Q. And you just stay there all night?
10  A. Into the club, that is all, yes.
11  Q. When you have been on Club Zone
12  detail, have you ever had the occasion to deal
13  with unruly patrons?
14  A. Yes.
15  Q. Ever had to break up a fight?
16  A. Yes.
17  Q. Ever have to make any arrests?
18  A. Yes.
19  Q. Did you ever do Club Zone in front
20  of FUR?
21  A. A couple of times, but before they
22  owned FUR, the old club, Insomnia, I had done

Feder Reporting Company
(202) 863-0000

Page 41

1  a couple of times.
2  Q. Did you ever have to arrest anyone
3  when you were on Club Zone detail in front of
4  FUR?
5  A. Yes.
6  Q. Do you know when that happened?
7  A. No, sir.
8  Q. Do you know how many times you had
9  to do that?
10  A. Honestly, no.
11  Q. Did you ever -- strike that.
12  When you were on Club Zone, did
13  you -- were you expected to or ever had
14  occasion to go inside the club or did you just
15  simply remain outside the whole time?
16  A. With the exception of maybe using
17  the bathroom, no. We are not permitted to
18  venture into the club and perform in a
19  capacity inside the club.
20  Q. You are there to keep order
21  outside of the nightclub?
22  A. Yes. The only time we are

Feder Reporting Company
(202) 863-0000

Page 46

1    MR. BRUCKHEIM: You can answer, if
2 you know.
3    THE WITNESS: Pretty much, as far
4 as I know, the guy who owned or managed the
5 club, Mr. Michael Romeo, he owned Insomnia.
6    BY MR. CORCORAN
7  Q.  Where is Insomnia?
8  A.  Well, it is no longer -- it is
9 defunct. It is no longer around.
10  Q.  Where was it?
11  A.  600 block of 7 Street, Northwest.
12  Q.  Do you know when it closed?
13  A.  No, sir.
14  Q.  Did it close after FUR opened?
15  A.  I assume, I think it closed before
16 FUR opened.
17  Q.  And you had done club detail at
18 Insomnia?
19  A.  Yes.
20  Q.  And you had also been to Insomnia
21 as a patron?
22  A.  No, sir.

Feder Reporting Company
(202) 863-0000

Page 47

1  Q.  But you knew the same security
2 guys who manned the doors at both nightclubs?
3  A.  Yes.
4  Q.  Now, you indicated that you knew
5 an individual named Dave who had some security
6 job at FUR.
7    Who else do you know who works at
8 FUR?
9  A.  John and -- well, both Johns, John
10 Fiorito and -- I forget the other John's last
11 name.
12  Q.  Who is John Fiorito?
13  A.  I guess he works the lights or
14 something like that up at the club.
15  Q.  When did you first meet him?
16  A.  When I was still working at
17 Insomnia. When I was working at Insomnia
18 outside.
19  Q.  And how did you meet him? He came
20 outside of the nightclub?
21  A.  Yes. They typically used to bring
22 water out to us while we were sitting outside.

Feder Reporting Company
(202) 863-0000

Page 48

1  Q.  And they would talk to you?
2  A.  Yes.
3  Q.  Did you ever see them -- did you
4 ever Fiorito when you were at the FUR
5 Nightclub as a patron?
6  A.  Yes.
7  Q.  Would you talk to him then?
8  A.  Yes. I would just say what is up
9 to him, and he would go about his work.
10  Q.  And he knew you were a police
11 officer?
12  A.  Yes.
13  Q.  Do you know if he was a police
14 officer ever?
15  A.  As far as I know, he was.
16  Q.  Do you know when he stopped being
17 a police officer?
18  A.  That I don't know.
19  Q.  Did you ever talk to him about
20 police matters, about the job and what is up,
21 what is going on in the department?
22  A.  Yes. Yes.

Feder Reporting Company
(202) 863-0000

Page 49

1  Q.  Did he know people still who were
2 working there?
3    MR. FITZSIMMONS: Objection.
4 Foundation.
5    MS. PHILLIPS: Objection.
6    THE WITNESS: I guess so, yes. As
7 far as I know, he was employed by D.C. Police.
8    BY MR. CORCORAN
9  Q.  You also referenced someone named
10 Michael Romeo. Who is that?
11  A.  That is -- I guess he is the owner
12 of FUR Nightclub.
13  Q.  When did you first meet him?
14  A.  When he was still at Insomnia.
15  Q.  And like before, was he somebody
16 who would come outside of the nightclub and
17 talk to you when you were on club detail?
18  A.  Typically, in between bringing in
19 his VIP guests and maybe bringing us some
20 water, or something like that, yes.
21  Q.  Do you know if he was a former
22 police officer?

Feder Reporting Company
(202) 863-0000

Page 50

1   A.  No. As far as I know he never
2   was.
3   Q.  And did you ever talk to him while
4   you were a patron at FUR?
5   A.  Typically, I never really saw Mike
6   that often. A couple of times I saw him but I
7   guess he was out doing his business ownership
8   thing.
9   Q.  Now, are there any other
10  individuals associated with or employed by FUR
11  that you know?
12  A.  None that I know of.
13  Q.  Do you ever see these guys outside
14  of the nightclub capacity? Have you ever done
15  anything with John Fiorito, for example,
16  outside of FUR?
17  A.  No, sir.
18  Q.  Same with Michael Romeo?
19  A.  No, sir.
20  Q.  Same as the individual named Dave?
21  A.  No, sir.
22  Q.  You said there was another John?

Feder Reporting Company
(202) 863-0000

Page 51

1   A.  Yes.
2   Q.  Who is that?
3   A.  Another one of the bouncers.
4   Q.  Is this somebody that you met
5   while you were doing club detail?
6   A.  Yes.
7   Q.  Did you meet him when you were
8   doing club detail at Insomnia?
9   A.  Yes.
10  Q.  And you saw him again at FUR?
11  A.  Yes.
12  Q.  Did you see him again the night of
13  March 11, 2005?
14  A.  Yes.
15  Q.  Inside the club?
16  A.  No, outside of the club.
17  Q.  Outside in the course of the
18  incident?
19  A.  Yes.
20  Q.  Now, when you went to FUR on the
21  night of March 11th, how did you get there?
22  A.  Officer Schneider drove us from

Feder Reporting Company
(202) 863-0000

Page 52

1   1D1 station.
2   Q.  Directly from the station?
3   A.  Yes.
4   Q.  Who else was with you?
5   A.  It was myself, Officer Schneider
6   and Officer Ramirez in Officer Schneider's
7   vehicle.
8   Q.  Had you all just gotten off of
9   duty at this point?
10  A.  I want to say we were off probably
11  like maybe a half hour, 45 minutes.
12  Q.  What time was it when you went
13  over to the club?
14  A.  I don't want to impeach myself.
15  Is that on the paperwork there?
16      MR. BRUCKHEIM: Are you saying you
17  can't recall?
18      THE WITNESS: I can't remember the
19  date. I can't remember the exact time. I
20  think it was around -- I am assuming it was
21  11:30, 11:45 when we got to the club.
22

Feder Reporting Company
(202) 863-0000

Page 53

1      BY MR. CORCORAN
2   Q.  Did you have anything to drink
3   before you got there?
4   A.  No, sir.
5   Q.  You had just been on duty?
6   A.  Yes.
7   Q.  So you changed your clothes at the
8   precinct, at the station?
9   A.  That is correct.
10  Q.  Where did you come from?
11  A.  Where did we come from?
12  Q.  What precinct? Where were you
13  when you left?
14  A.  ID1, First District substation.
15  Q.  How far is that to the nightclub?
16  A.  I would assume 3 to 4 miles away.
17  Q.  Why did you decide to go to FUR
18  that night?
19  A.  We were all talking about it
20  during the day as to what we were going to do
21  that evening, where we were going to hang out,
22  at one of the local pubs. People wanted to go

Feder Reporting Company
(202) 863-0000

Page 54

1  dancing, hang out at FUR.
2    Q.  Did you bring anything with you
3  related to your police duties?
4    A.  My badge.
5    Q.  Just your badge?
6    A.  My badge and my ID.
7    Q.  Do you always keep your badge with
8  you at all times?
9    A.  Yes.
10   Q.  Is that something that you are
11 required to do?
12   A.  Yes. Pretty much we are supposed
13 at all times to keep our identification with
14 us.
15   Q.  And what is the purpose of that?
16   A.  The department's purpose, I don't
17 know. But I am assuming it is just the
18 purpose -- our general orders tell us to do
19 that so that is pretty much what we do.
20   Q.  What about your service weapon?
21 Your revolver?
22   A.  No.

Feder Reporting Company
(202) 863-0000

Page 55

1    Q.  You don't bring that?
2    A.  No. Especially because I knew I
3  was going out drinking.
4    Q.  So you don't want that on you.
5        What about your handcuffs?
6    A.  No, I didn't have those.
7    Q.  Would you ever bring them with you
8  when you were doing things off duty?
9    A.  Yes.
10   Q.  When?
11   A.  Typically, if I wasn't drinking
12 and I had my service weapon on me, I usually
13 carry a spare magazine and my handcuffs and
14 all in sort of a holster-type gear.
15   Q.  When you are off duty?
16   A.  Yes.
17   Q.  But if you know you are going to
18 go and socialize and have drinks you wouldn't
19 bring any of those items with you?
20   A.  No.
21   Q.  Why would you need to bring those
22 items with you if you were off duty?

Feder Reporting Company
(202) 863-0000

Page 56

1    A.  Well, because I have had occasions
2  where I actually had incidents occur in front
3  of me while I was off duty.
4    Q.  Such as what?
5    A.  Assaults. People attempting to
6  steal cars. Things of that sort.
7    Q.  So you want to be prepared to
8  respond to those incidents despite the fact
9  you are off duty?
10   A.  Correct.
11   Q.  And, is that, in fact, something
12 you are obligated to be prepared to do as an
13 MPD officer?
14   A.  Yes, that is correct.
15   Q.  But do you have the choice whether
16 to bring those things with you or are you
17 obligated to under all circumstances?
18   A.  The only circumstances under which
19 we are not required to have our service weapon
20 on us are during the times that we know we may
21 drink or will be drinking, at that desired
22 time.

Feder Reporting Company
(202) 863-0000

Page 57

1    Q.  What about handcuffs? Does the
2  same rule apply?
3    A.  Handcuffs is pretty much officer
4  preference. Me, I typically do bring mine
5  with me when I am not drinking. That is
6  because I have had run-ins where I actually
7  had to handcuff and subdue people while I was
8  off duty.
9    Q.  But you chose not to bring them
10 that night?
11   A.  Correct.
12   Q.  And, in your opinion, would it
13 have been a good choice for anyone to bring
14 them if they were going drinking, any police
15 officer?
16       MS. PHILLIPS: Objection. Calls
17 for speculation.
18       MR. BRUCKHEIM: Objection.
19       You can answer.
20       THE WITNESS: As I said before,
21 that is officer preference.
22       BY MR. CORCORAN

Feder Reporting Company
(202) 863-0000

Page 82

BY MR. CORCORAN
Q. What did you do when you got inside?
A. Pretty much just surveyed the dance floors, several dance floors that they have in there. Then we went to the VIP section and bought a drink.
Q. What is the VIP section?
A. I think it is called the Mink Room.
Q. Do you have to pay a separate admission to get there?
A. Not that I know. I don't think so.
Q. What do you have to do to get into the VIP section?
A. I guess be a VIP.
Q. And you were a VIP because you got in? Why were you a VIP? Because you knew the people there?
A. Yes. Because I had been there a bunch of times I was permitted to go in there.

Feder Reporting Company
(202) 863-0000

Page 83

Q. And the people who were security -- strike that question. Was there separate security for the VIP room?
A. There is a person that sits there and monitors the door that leads to the entrance to it, yes.
Q. Who was that? Do you know him?
A. I don't know him personally.
Q. But he knew you enough to recognize you?
A. No, it wasn't even that. When you are permitted to go to the VIP section they give you a stamp on your hand. I showed them the stamp and they let me walk in.
Q. So you had the stamp from the moment you walked in the front of the nightclub?
A. Yes.
Q. So the guys at the front door knew that you had been there before and you merited going to the special places in the nightclub?
A. As I said before, Dave is the one

Feder Reporting Company
(202) 863-0000

Page 84

who gave me the stamp. And Dave is the one who walked me in.
Q. Do you know Dave's last name?
A. No, sir, I do not.
Q. Did he walk you all the way to the VIP room?
A. No, he didn't. He just walked me to the door.
Q. You ordered a drink. What kind of drink did you have when you got there?
A. Red Bull and Grey Goose.
Q. What about the other guys that you were with, what did they have?
A. I don't know. I was monitoring my own glass.
Q. Did you buy drinks for them?
A. They brought their own drinks.
Q. Everybody bought their own?
A. Yes.
Q. You paid cash?
A. I paid cash for the first one. And then I was -- I went back. And when I was

Feder Reporting Company
(202) 863-0000

Page 85

about to get my second one I started up a tab on my credit card.
Q. Did you start a tab for your friends?
A. No, sir.
Q. So everybody was paying their own way?
A. Officer Phillips had gotten a beer, paid cash for it. But other than that.
Q. But when you started a tab you weren't buying drinks --
A. For everybody, no.
Q. Just yourself?
A. Yes.
Q. Do you know how many drinks you had on that tab?
A. I mean right after we got there, the incident ensued. So the drink I had and the second drink that I was about to start.
Q. Did you close out your tab that night?
A. Yes, I paid cash. I went ahead --

Feder Reporting Company
(202) 863-0000

Page 86

1  Q. So you didn't ultimately put the
2  drink charges on your credit card?
3  A. No, sir.
4  Q. You paid cash when you were done?
5  A. Yes, because I mean had we stayed
6  there longer I probably would have put it on
7  my credit card. But being it was $7 I paid
8  cash.
9  Q. Do you know how many drinks you
10 had in total while you were at the nightclub
11 that night?
12 A. One-and-a-half.
13 Q. That is all you were able to have?
14 A. Yes.
15 Q. What about the other officers that
16 were with you?
17 A. I didn't monitor their glasses.
18 Q. So you don't know.
19    After you went in the VIP room,
20 what did you do next?
21 A. After that I got my drink and came
22 back down to the main dance floor and checked

Feder Reporting Company
(202) 863-0000

Page 87

1  out the scenery. And then went up on the
2  stage which was also cordoned off as a VIP
3  section.
4  Q. The stage, itself?
5  A. Yes.
6  Q. Do you remember where the security
7  was to get onto the stage?
8  A. There was one guy at the bottom of
9  the steps and then there was another gentleman
10 at the top of the steps leading to the stage
11 platform.
12 Q. Who was the guy at the bottom?
13 A. I don't know.
14 Q. Do you remember anything about
15 him?
16 A. Maybe Hispanic. I think he was
17 Hispanic of some type.
18 Q. Had you seen him do security at
19 the nightclub before?
20 A. I remember his face vaguely.
21 Q. Do you know if he was one of the
22 guys who was involved in the incident?

Feder Reporting Company
(202) 863-0000

Page 88

1  A. No.
2  Q. He wasn't or you don't know?
3  A. I don't know.
4  Q. What about the guy at the top of
5  the stairs from the stage, who was that?
6  A. A black gentleman.
7  Q. Do you know who that was?
8  A. Subsequently I found out his name
9  was Michael. But at that time I had never
10 seen him before.
11 Q. You had never, ever seen him at
12 the nightclub before?
13 A. No. I never had the chance of
14 actually interacting with him.
15 Q. You knew other security at the
16 nightclub. Right?
17 A. Yes.
18 Q. There were other ones you knew and
19 you talked to?
20 A. Knew by face and said what is up
21 and things of that sort, yes.
22 Q. And these guys let you onto the

Feder Reporting Company
(202) 863-0000

Page 89

1  stage?
2  A. Yes.
3  Q. Because you had the right stamp?
4  Is that why you were able to get on?
5  A. Yes, sir.
6  Q. What was going on on the stage?
7  A. They pretty much had tables set up
8  and couches and people were dancing. And it
9  was just -- not as crowded as the dance floor
10 was.
11 Q. There were couches on the stage?
12 A. Yes.
13 Q. Is that the usual practice?
14    MR. FITZSIMMONS: Objection.
15 Foundation.
16    BY MR. CORCORAN
17 Q. To your knowledge, you had been to
18 the nightclub before. Right?
19 A. Yes. I assumed it was because I
20 had seen that like that before, yes.
21 Q. So there was enough people to sit
22 on the stage as well as dance?

Feder Reporting Company
(202) 863-0000

Page 94

1  through the crowd.
2  Q. Holding your drink, you had to
3  protect it?
4  A. Sort of. Typical. Typical
5  nightclub drink juggling.
6  Q. You got back on the stage. You
7  found Officer Phillips?
8  A. Yes.
9  Q. And then what happened next?
10 A. Me and Phillips just sat there and
11 were checking out the women in the club. And
12 just talked to each other. And at that time
13 out of my peripheral vision I saw one of the
14 bouncers and I guess the plaintiff having a
15 verbal altercation. At that time I really
16 wasn't even paying attention to it. You know,
17 that is their job. They are bouncers. That
18 is what they do.
19 Q. That wasn't why you were at the
20 nightclub that night?
21 A. No. No.
22 Q. And this is, the person who was

Feder Reporting Company
(202) 863-0000

Page 95

1  having the altercation, this is the individual
2  you identified as Michael?
3  A. Yes.
4  Q. And he was on the stage?
5  A. Yes.
6  Q. And you just saw them talking?
7  A. It looked like they were having --
8  a lot of hand gestures and a lot of -- it
9  looked like yelling. At that point I just
10 went back talking to Phillips and never paid
11 attention again until it got into actual
12 fighting.
13 Q. They weren't fighting at that
14 time?
15 A. No, sir.
16 Q. And you didn't see any reason to
17 involve yourself in it?
18 A. No, sir.
19     MR. CORCORAN: Let's take about
20 five minutes.
21     MS. PHILLIPS: Do you want to take
22 it at 11:00 o'clock?

Feder Reporting Company
(202) 863-0000

Page 96

1     (Discussion off the record.)
2     BY MR. CORCORAN
3  Q. So you didn't see any reason to
4  get involved in their discussion?
5  A. No, not at that time.
6  Q. And there was no physical
7  involvement in their discussion, they were
8  just --
9  A. It was, like I said, a lot of hand
10 gestures and things at that time. So I didn't
11 deem it necessary for me to interlope into
12 their conversation.
13 Q. If you recall, how much time
14 passed from when you first saw them having a
15 discussion and then when you saw the
16 altercation at issue in this lawsuit?
17 A. Roughly, a minute, two minutes.
18 Q. What did you first see?
19 A. Well, actually, at first I didn't
20 see anything. I felt a female, like, fall
21 into me and almost fall off of the stage. And
22 at that time I looked over and I saw both of

Feder Reporting Company
(202) 863-0000

Page 97

1  them involved in a physical altercation. And
2  then two more individuals jumped on to the
3  bouncer. And at that time I saw him fall
4  backwards. And then that is when the feet and
5  hands started coming into play and it became a
6  felony. So I had no choice but to get
7  involved. And I tapped Officer Phillips and
8  told him to hold my drink. He looked at me as
9  if I was silly because he is police also. So
10 we both sat our drinks down and went over and
11 attempted to break the fight up and grab the
12 most aggressive person at that time.
13 Q. Why did he look at you silly?
14 What do you mean?
15 A. Because, I mean, he is a police
16 officer. He is not going to sit there and
17 watch me try to break up a fight without him
18 getting involved also.
19 Q. He was sort of thinking you are
20 being dumb, let me help you?
21 A. Yes. Yes.
22 Q. Now, you said you saw the bouncer

Feder Reporting Company
(202) 863-0000

Page 98

1  fall?
2  A. Yes. He fell back on to his hand
3  like this, (Indicating.) At which time I saw
4  the plaintiff and his other friends continue
5  to throw punches and start to kick him.
6  Q. Did he fall on the stage?
7  A. Yes.
8  Q. This is all on top of the stage?
9  A. Yes, this is all on the stage.
10 Q. And did people clear away?
11 A. As I said, an Asian female almost
12 fell off of the stage. And I guess people
13 started to make way as they saw a fistfight
14 occurring.
15 Q. And you said that you saw the
16 plaintiff doing something to the bouncer.
17 What did you see him do?
18 A. I saw him throwing punches and
19 kicks.
20 Q. Did any of these connect?
21 A. Yes.
22 Q. Where were they connecting on the

Feder Reporting Company
(202) 863-0000

Page 99

1  bouncer?
2  A. I saw one punch hit his face. And
3  I saw, when he fall backwards, I saw him kick
4  in the, like, shin area.
5  Q. You said there were two other
6  individuals involved?
7  A. Yes.
8  Q. Had you seen them before that
9  night?
10 A. No, sir.
11 Q. What did they look like? Who were
12 they?
13 A. They both looked like -- well, all
14 three of them looked like they were from the
15 Middle East descent. But I had never seen
16 them before.
17 Q. What were they doing?
18 A. They were participating in the
19 assault.
20 Q. How?
21 A. Punches and kicks.
22 Q. And they were connecting as well?

Feder Reporting Company
(202) 863-0000

Page 100

1  A. Yes.
2  Q. And what was the bouncer doing?
3  Trying to defend himself?
4  A. Yes.
5  Q. And this is all on the stage?
6  A. Yes, it is.
7  Q. Did you see the bouncer hit
8  anybody in response?
9  A. I saw the bouncer connect with the
10 plaintiff, like, maybe once or twice, before
11 he fell backwards. And after that, when he
12 fell backwards, I guess he was at a
13 disadvantage and that is when we interceded.
14 We intervened.
15 Q. Did you see the bouncer hit any of
16 the other guys that were involved in this
17 fight, according to you?
18 A. I don't remember.
19 Q. Did Officer Phillips also see, if
20 you know, did he also see the other two
21 individuals hit the bouncer?
22 A. I don't know.

Feder Reporting Company
(202) 863-0000

Page 101

1  Q. You did?
2  A. Yes.
3  Q. Were there any other people who
4  saw this that were standing around you?
5  A. I don't know. I didn't go around
6  asking them.
7  Q. What did you do when you first
8  intervened?
9  A. I went towards the first, the most
10 aggressive person which happened to be the
11 plaintiff. And I just grabbed him by the arm
12 and Officer Phillips grabbed his other arm.
13 And at the same time Officer Phillips pulled
14 his badge from around his neck and told him to
15 calm down. And that is when the other two
16 guys like melted into the crowd that were
17 still up on the stage.
18 Q. How did you know the plaintiff was
19 the most aggressive individual?
20 A. Because he was the one that I
21 initially saw get into the altercation with,
22 the verbal altercation, what I assume was a

Feder Reporting Company
(202) 863-0000

Page 102

1  verbal altercation with the bouncer.
2      Q.  So, you assumed from having seen
3  him before that he was likely the problem?
4      A.  No. Including, included within
5  that, when the initial fight occurred, when
6  they first started throwing punches before the
7  other two people jumped into it, they were the
8  ones fighting and the bouncer was on the
9  ground. So I grabbed the person that was on
10 top.
11     Q.  The other two persons had fallen
12 to the ground?
13     A.  No, the bouncer, he was on the
14 ground. So I grabbed the guy who was on top
15 of the bouncer which happened to be the
16 plaintiff.
17     Q.  How was he on top? Had he fallen
18 onto him?
19     A.  No, he hadn't fallen onto him. He
20 was standing on top of him throwing punches
21 and kicking.
22     Q.  He was standing directly over him?

Feder Reporting Company
(202) 863-0000

Page 103

1      A.  Yes.
2      Q.  And the other two guys were on the
3  side?
4      A.  Yes. One was like behind him and
5  the other one was off to the -- I want to say
6  his left side because he was facing out
7  towards that way. (Indicating.)
8      Q.  You didn't see how this started.
9  Right?
10     A.  No, I honestly, how it all
11 occurred, before the assault, no, I have no
12 idea. I just know I saw them exchanging words
13 and the hand gestures.
14     Q.  There were words before and there
15 was a period of time you were minding your own
16 business, and then you saw --
17     A.  An assault.
18     Q.  And all three of the individuals
19 were involved in your opinion in assaulting
20 the bouncer. Correct?
21     A.  Yes, sir.
22     Q.  You only grabbed one of them?

Feder Reporting Company
(202) 863-0000

Page 104

1      A.  Yes, sir.
2      Q.  What about the other two guys?
3  They just got away?
4      A.  They just melted into the crowd,
5  as I said before, when I grabbed one arm and
6  Officer Phillips grabbed the other arm of the
7  plaintiff.
8      Q.  And they ran away basically?
9      A.  Yes.
10     Q.  And in your opinion they were as
11 guilty of assault as the plaintiff?
12     A.  That is correct.
13     Q.  So they should have been pursued,
14 too. Right?
15     A.  Yes. I feel that way, yes.
16     Q.  But they weren't?
17     A.  (Indicating.)
18     Q.  Did you ever see them again that
19 night?
20     A.  No. Not that I remember, no.
21     Q.  Inside or outside of the
22 nightclub?

Feder Reporting Company
(202) 863-0000

Page 105

1      A.  No, sir.
2      Q.  And you don't know what they were
3  doing at the nightclub?
4      A.  No, sir, I don't.
5      Q.  That was it for them? They got
6  away?
7      A.  Yes.
8      Q.  Now, have you learned subsequent
9  to the incident through this lawsuit that
10 those two other guys actually were working in
11 some capacity that night at the nightclub?
12     A.  I had heard conjecture to that
13 fact. Until you said it, it wasn't confirmed.
14     Q.  Do you know whether they regularly
15 worked at the nightclub?
16     A.  Like I said, before that night I
17 never paid attention to them.
18     Q.  If they worked at the nightclub
19 why would they want to beat up the bouncer?
20         MR. BRUCKHEIM: Objection.
21         MR. FITZSIMMONS: Objection.
22 Speculation.

Feder Reporting Company
(202) 863-0000

Page 114

1    A.   I don't know when but I know he
2  has been demoted.
3    Q.   Did you ever work under Sergeant
4  Moats?
5    A.   Not directly under him. But as to
6  him being an evening official, being like we
7  have maybe three or four sergeants per shift.
8    Q.   And when the bouncer came in to
9  make a statement, did you talk to him?
10   A.   Just pretty much, hey, what is up,
11 what is going on, and that was it. I went
12 back on the street.
13   Q.   And that was the last time you
14 ever saw him?
15   A.   No. I saw him again. I saw him
16 again. But never had any conversations about
17 this.
18   Q.   When did you see him again?
19   A.   One night I was at Modern, right
20 down the street, Modern. I guess it is a
21 lounge or whatever you want to call it.
22        MR. KAPLAN:  Can you spell that?

Feder Reporting Company
(202) 863-0000

Page 115

1         THE WITNESS: M-O-D-E-R-N.
2         BY MR. CORCORAN
3    Q.   Where is that? On K Street?
4    A.   No, it is on M Street.
5    Q.   And he is a bouncer there then?
6    A.   I don't know if he was a bouncer
7  or he was just there as a patron. I am not
8  too sure. I didn't ask him.
9    Q.   When was this?
10   A.   This was sometime in 2005. After
11 the incident, though.
12   Q.   Did you talk with him about the
13 incident?
14   A.   No, sir.
15   Q.   How many times have you seen him
16 since then?
17   A.   Maybe here and there. When I have
18 gone to MCCXXIII, and things like that, when I
19 was going to nightclubs. But I haven't seen
20 him since I stopped going to nightclubs.
21   Q.   You would see him as a patron or a
22 bouncer? Or you don't know?

Feder Reporting Company
(202) 863-0000

Page 116

1    A.   All the time I saw him I just saw
2  him as a patron. I guess, he was a patron. I
3  am not too sure.
4    Q.   You would just see him to say,
5  hey, and that was that?
6    A.   Yes.
7    Q.   When you intervened in the
8  incident at issue did you identify yourself as
9  a police officer?
10   A.   Yes.
11   Q.   To whom?
12   A.   To the plaintiff.
13   Q.   To Mr. Mazloum?
14   A.   Yes.
15   Q.   And you didn't have your badge
16 with you, though?
17   A.   No, I had my badge with me. I had
18 my badge and my ID with me.
19   Q.   Did you display your badge at that
20 point?
21   A.   I didn't display my badge but
22 Officer Phillips did, displayed his.

Feder Reporting Company
(202) 863-0000

Page 117

1    Q.   Is that the first thing he did
2  when he came over?
3    A.   As soon as we put hands on him
4  Officer Phillips pulled his badge from up out
5  of his shirt and showed it to him. And we
6  both said calm down, calm down, man, we are
7  the police.
8    Q.   And he was wearing his badge on a
9  chain underneath his shirt so he had to pull
10 it out to display it?
11   A.   Yes.
12   Q.   At any point in that evening did
13 you have to display your badge?
14   A.   My badge was attached to my belt
15 and I don't remember actually having to
16 display it. Was it actually shown that night?
17 It may have been, because the shirt I had on
18 was rather form fitting.
19   Q.   So you and Officer Phillips were
20 the first individuals who sort of made contact
21 with the plaintiff. Is that fair to say?
22   A.   Yes.

Feder Reporting Company
(202) 863-0000

Page 118

1  Q.  The first police officers?
2  A.  Yes, that is a fair assessment.
3  Q.  And what happened when you made
4  contact with him? What did he do?
5  A.  He was still flailing about. We
6  grabbed his arms and at that point he was
7  pretty much calm. Not calmed down, he was
8  still belligerent but he was under control.
9  Q.  You had him at that point?
10  A.  Yes.
11  Q.  What were people on the stage
12  doing as this was happening?
13  A.  Some of the people that were
14  there -- I guess they were with the girl who I
15  told you almost got knocked off of the stage,
16  some of them, they became belligerent, irate,
17  angry, and were trying to get towards him.
18  And at that point we -- me and Phillips had
19  everything under control so we weren't worried
20  about them.
21  Q.  Who were they belligerent towards?
22  A.  The plaintiff.

Feder Reporting Company
(202) 863-0000

Page 119

1  Q.  Why is that?
2  A.  Because he almost knocked the girl
3  off of the stage in the midst of the scuffle.
4  Q.  But they had backed off once they
5  saw you were involved?
6  A.  Yes.
7  Q.  And what did the bouncer do when
8  you became involved?
9  A.  The bouncer just stood up. And at
10  that time, myself and Officer Phillips, I am
11  on one side and Phillips is on the other side,
12  we walked him down the steps from the stage
13  and started to traverse our way through the
14  crowd.
15  Q.  And the bouncer stayed on the
16  stage or was he following you?
17  A.  I wasn't even paying attention at
18  that point. I was just trying to get through
19  the crowd. Like I said, people in the crowd
20  was angry. So I was having to deal with
21  people trying to reach out and grab the guy,
22  and spit flying, things of that sort.

Feder Reporting Company
(202) 863-0000

Page 120

1  Q.  But it is your testimony that you
2  didn't interact with the bouncer again that
3  night?
4  A.  No, I didn't.
5  Q.  What about the other security guy
6  on the stage? You don't know what happened to
7  him?
8  A.  I haven't the foggiest as to where
9  he was.
10  Q.  You don't know whether that was
11  one of Mr. Mazloum's friends who you say was
12  assaulting the bouncer?
13  A.  No, I don't know.
14  Q.  Now, you got to the bottom of the
15  stage?
16  A.  Yes.
17  Q.  With the plaintiff?
18  A.  Yes.
19  Q.  And you are each holding one of
20  his arms?
21  A.  Yes.
22  Q.  And then what happened next?

Feder Reporting Company
(202) 863-0000

Page 121

1  A.  At that point the other bouncer
2  started coming towards us as if they wanted to
3  take him outside. Being that we had already
4  taken him into custody and it was pretty much
5  my practice that, once I put my hands on
6  somebody, I am not letting -- there have been
7  other times where we had to escort people out
8  of nightclubs and I never let the bouncers
9  interact with the people we take into custody.
10  Because some bouncer can be brutal. Some
11  bouncers are not good people and they tend to
12  want to hit people when they hold them down, I
13  guess. So in order to avoid what I thought
14  was going to end up being some controversy, or
15  even before the controversy ensued, I decided
16  I would walk him out and not let the bouncer
17  touch him. We kept telling them we got him,
18  we got him, we got him. And we were walking
19  out of the club.
20  Q.  And it wouldn't be okay for a
21  bouncer to be brutal with a patron?
22  A.  It is not okay for anybody to be

Feder Reporting Company
(202) 863-0000

Page 162

1  A.  A lieutenant in the First
2  District. Well, he was. He has since
3  retired.
4  Q.  What was he doing there?
5  A.  He came onto the scene after --
6  whoever called the police, called the police.
7  He was like the first unit on the scene.
8  Q.  But you didn't interact with him
9  while he was there?
10 A.  No.
11 Q.  And you didn't see him while he
12 was there?
13 A.  No, I didn't sit down and actually
14 have a conversation with the lieutenant, no.
15 Q.  Did Ramirez tell you that Allman
16 had been there?
17 A.  Like I said, I think I saw him
18 pull up. But then Ramirez did confirm it was
19 Allman that pulled up.
20 Q.  You saw them pull up just as you
21 had brought the plaintiff outside?
22 A.  No. As I was like going back into

Feder Reporting Company
(202) 863-0000

Page 163

1  the club.
2  Q.  To look for your phone?
3  A.  Yes.
4  Q.  So Ramirez told you Acosta and
5  Smith hadn't arrested the plaintiff?
6  A.  Correct.
7  Q.  Did he tell you why?
8  A.  He didn't tell me why. But
9  subsequently I ended up calling Acosta, like,
10 the next day and asking him what happened.
11 Q.  But at the time you didn't know
12 why?
13 A.  No.
14 Q.  You just knew they hadn't done it?
15 A.  Yes.
16 Q.  Would you have arrested them if
17 you had pulled up? Strike that. Would you
18 have arrested the plaintiff if you had been in
19 their shoes?
20 A.  In my opinion, yes, I would have.
21 Q.  Based upon what happened?
22 A.  Based on the officers' statements

Feder Reporting Company
(202) 863-0000

Page 164

1  that were given, yes, I would have locked him
2  up.
3  Q.  But no one asked you at the time.
4  You went back in the nightclub?
5  A.  Yes.
6  Q.  And that ended your involvement in
7  the incident?
8  A.  Correct.
9  Q.  Did Ramirez express an opinion as
10 to why they didn't arrest the plaintiff?
11 A.  I don't remember.
12 Q.  Did you have -- did you have any
13 understanding as to why they would not have
14 arrested the plaintiff?
15 A.  From talking to Acosta, I mean, he
16 pretty much told me that the scene was messed
17 up. Because the next day I got sick so I was
18 on sick leave the next day. But, he told me
19 that the scene was messed up, and that the
20 bouncer didn't want to press charges or
21 something. Honestly, I was drinking TheraFlu
22 that day so the actual conversations I don't

Feder Reporting Company
(202) 863-0000

Page 165

1  remember. I just remember him saying
2  something to the effect that the scene was
3  messed up.
4       MR. KAPLAN: Drinking what?
5       THE WITNESS: TheraFlu.
6       BY MR. CORCORAN
7  Q.  Medicine. Did you have a fever?
8  A.  Yes.
9  Q.  With the flu?
10 A.  Yes.
11 Q.  Were you sick that night when you
12 went out?
13 A.  No. I didn't start feeling bad
14 until earlier that day.
15 Q.  The next day?
16 A.  Yes.
17 Q.  Went you left the nightclub you
18 left with Schneider, Phillips and Ramirez.
19 Correct?
20 A.  Yes.
21 Q.  But you said Schneider had met you
22 at the club. Right?

Feder Reporting Company
(202) 863-0000

Page 166

1  A. No, Phillips had met us at the
2  club, and Officer Schneider drove along with
3  me and Ramirez as passengers.
4  Q. So Phillips drove himself home?
5  A. Yes.
6  Q. And you, Ramirez, and Schneider
7  drove home as well?
8  A. Yes. Schneider took us back to
9  the station, at which point I got into my own
10 vehicle and drove home.
11 Q. So you didn't go anywhere else
12 that night?
13 A. No, sir.
14 Q. You said you had a phone call the
15 next day with Acosta?
16 A. Yes.
17 Q. What prompted that phone call?
18 A. Probably that phone call was
19 actually the fact that Officer Ramirez had
20 called me saying that the guy had come in and
21 made a complaint on him. At which point I
22 wanted to know exactly what happened on the

Feder Reporting Company
(202) 863-0000

Page 167

1  scene for them not to lock him up. That is
2  why I called Acosta.
3  Q. Why were you concerned about it?
4  MR. FITZSIMMONS: Objection.
5  Assumes facts not in evidence.
6  BY MR. CORCORAN
7  Q. You were concerned enough to call.
8  Right?
9  A. Yes. Why was I concerned? I was
10 concerned because I mean I felt that the guy
11 should have been arrested and I wanted to know
12 why they didn't lock him up.
13 Q. But you didn't care at the time,
14 right, what happened to him?
15 A. What are you saying, I didn't care
16 at the time?
17 Q. Well, not that you didn't care.
18 But at the time, once you got him outside you
19 felt enough of this. Right?
20 A. No, when I got him outside I lost
21 my phone. And at that time my phone was my
22 major focus, and I felt like I had two other

Feder Reporting Company
(202) 863-0000

Page 168

1  competent officers sitting outside that would
2  had enough common sense to take care of the
3  scene proficiently.
4  Q. But the next day you were
5  concerned that he hadn't been arrested?
6  A. After I received a phone call from
7  Ramirez, I was like why didn't they lock the
8  guy up. I wanted to know their reasoning
9  behind about not making an apprehension.
10 Q. Were you worried that it would be
11 a problem for you in some regard that he
12 hadn't been arrested?
13 A. No, sir, because I knew I did
14 nothing wrong.
15 Q. But you said at the time when you
16 discussed this issue when you were leaving the
17 nightclub that you were going to hear about
18 this. Right?
19 A. Yes.
20 Q. What did you mean by that? What
21 does that mean?
22 A. The fact that citizens tend to

Feder Reporting Company
(202) 863-0000

Page 169

1  make frivolous lawsuits and complaints
2  whenever they get an opportunity to. And by
3  him not being arrested that day on the scene,
4  that opened the door for all sorts of things
5  and the reason why I am sitting here right
6  now.
7  Q. So if he had been arrested, he
8  wouldn't have had grounds to make a complaint?
9  A. In my opinion, no, he wouldn't
10 have.
11 Q. Why not?
12 A. Because we would have gone to
13 trial and he would have been found guilty for
14 assaulting the bouncer. And I would have
15 testified to that fact.
16 Q. But he would have defenses to
17 that, wouldn't he? Criminal defendants always
18 just roll over?
19 MR. BRUCKHEIM: Objection.
20 THE WITNESS: I am not saying they
21 are always roll over. But I am saying that I
22 have never perjured myself and I have never

Feder Reporting Company
(202) 863-0000

Page 170

1  told a lie in court and typically tell the
2  truth. Whether or not a jury is inclined to
3  believe the truth is up to them. But my job
4  would have been done.
5         BY MR. CORCORAN
6     Q.  But the defendant would have had
7  the opportunity -- let's say you had arrested
8  the plaintiff. He would have had an
9  opportunity to tell his version of the story.
10 Right?
11    A.  Which is correct.
12    Q.  And he might have told exactly the
13 same thing that he has asserted in this
14 lawsuit?
15        MR. FITZSIMMONS: Objection.
16 Hypothetical. Calls for a conclusion.
17        THE WITNESS: I don't know.
18        BY MR. CORCORAN
19    Q.  But your assumption at the time
20 was he would not have done that if he had been
21 arrested?
22        MR. BRUCKHEIM: Objection. He

Feder Reporting Company
(202) 863-0000

Page 171

1  didn't testify to that.
2         BY MR. CORCORAN
3     Q.  Well, you are testifying, are you
4  not, that in your view at the time had the
5  plaintiff been arrested, he would not have
6  been in a position somehow to follow through
7  with this civil lawsuit. Is that fair to say?
8         MR. BRUCKHEIM: Again, I would
9  object. He didn't testify to that. If you
10 want to ask that as a separate question, I
11 would still object, but he can answer.
12        THE WITNESS: My testimony is more
13 so the fact that had he been arrested I think
14 a judge would have seen that this is a
15 frivolous lawsuit and wouldn't have even let
16 it go as far as it has gone.
17        BY MR. CORCORAN
18    Q.  You felt that at the time?
19    A.  I feel that way now.
20    Q.  I understand. But you testified,
21 did you not, that at the time that this
22 happened, you are leaving the nightclub, and

Feder Reporting Company
(202) 863-0000

Page 172

1  you find out from Ramirez that they didn't
2  arrest him and you say something to the effect
3  of we are going to hear about this -- right?
4     A.  Yes.
5     Q.  And by saying we are going to hear
6  about this you meant?
7     A.  I meant that the officers that
8  failed to make the arrest had opened the door
9  for us to get a complaint filed against us for
10 doing our jobs.
11    Q.  So it is fair to say, is it not,
12 that it was your view that had he been
13 arrested, that door that you say was opened
14 would not have been opened?
15    A.  It would have -- yes, that is my
16 opinion, that that door would never have been
17 opened.
18    Q.  And you believe he would not have
19 been able to assert the claims that he is
20 asserting now?
21    A.  Could he have asserted those
22 claims? Yes. But would they actually have

Feder Reporting Company
(202) 863-0000

Page 173

1  had any merit? No.
2     Q.  Why would they have not had any
3  merit in that context?
4     A.  Because, as I said before, the
5  trial, the ensuring trial for the criminal
6  charges, would have proven the point that it
7  was totally baseless and had no merit.
8     Q.  When you decided the next day to
9  call Acosta, how did you reach that decision?
10 Did you discuss the issue with Ramirez first?
11    A.  No. I just wanted to know exactly
12 what happened. What did I miss?
13    Q.  And so you called him yourself?
14    A.  Yes.
15    Q.  Did Ramirez say please call
16 Acosta?
17    A.  No.
18    Q.  Did you involve Ramirez in the
19 phone call in any way?
20    A.  Yes, he was on three way with me.
21    Q.  Were you with Ramirez when you
22 phoned --

Feder Reporting Company
(202) 863-0000

Page 242

1  A. Well, from watching the news they
2  said he is not even Muslim, he is Christian.
3  And they also said he wasn't drinking but I
4  knew that not to be true, too. I don't know.
5  I don't know if he is or isn't, that is not
6  even my concern.
7       I just do know this, on that night
8  in question, typically that is when the
9  majority of people of Arabian and Middle
10 Eastern descent hang out at FUR. And a vast
11 majority of my friends are Middle Eastern and
12 they were in that club that night.
13 Q. What was that?
14 A. I said a lot of my friends are of
15 Middle Eastern descent and they were in the
16 club that night.
17 Q. Who?
18 A. Let me see. Saltan was in there.
19      MR. KAPLAN: Who?
20      THE WITNESS: Saltan.
21      BY MR. CORCORAN
22 Q. Who is he?

Feder Reporting Company
(202) 863-0000

Page 243

1  A. He is a good friend of mine that I
2  hang out with me.
3  Q. Does he work at the club?
4  A. No, he doesn't.
5  Q. Is he involved in club promotion?
6  A. No. He just hangs out there.
7  Q. Did he see what happened?
8  A. I don't think so. I think he was
9  over in the Mink Room.
10 Q. Who else?
11 A. Other guys that I know by face.
12 Q. You don't know their names?
13 A. Yes.
14 Q. You would agree that if it is true
15 that Officer Ramirez used the word Al-Qaeda to
16 the plaintiff, that would be inappropriate.
17 Correct?
18      MR. BRUCKHEIM: Objection.
19      You can answer.
20      THE WITNESS: Yes, I agree. It
21 would be inappropriate.
22      BY MR. CORCORAN

Feder Reporting Company
(202) 863-0000

Page 244

1  Q. Do you know Saltan's last name?
2  A. Honestly, I couldn't even
3  pronounce it and I don't know how to spell it.
4  I would glady provide it to you guys in a
5  couple of days but I don't know how to spell
6  it.
7  Q. Do you know where he lives?
8  A. He stays in Falls Church.
9  Q. If you can get that information
10 for us.
11      Do you call him? Do you have his
12 phone?
13 A. I can see if his cell phone is
14 still on. I haven't talked to him in a couple
15 of months.
16      MR. CORCORAN: We would ask to get
17 that information.
18      All right. That is all the
19 questions I have.
20 EXAMINATION BY COUNSEL FOR DEFENDANTS NIGHT AND
21 DAY MANAGEMENT, LLC, M. REHMAN, J. FIORITO, M.
22      PERSONS

Feder Reporting Company
(202) 863-0000

Page 245

1       BY MR. FITZSIMMONS
2  Q. Officer my name is Paul
3  Fitzsimmons. I represent Night and Day in
4  this matter.
5       You mentioned you thought that the
6  plaintiff here might have been under some kind
7  of chemical intoxication at the time you had
8  encountered him that night. Is that right?
9  A. Yes, that is correct.
10 Q. Why do you say -- why did you
11 conclude that?
12 A. Because he smelled of alcohol and
13 he was totally belligerent. And with my six
14 years in the department, that has been
15 indicative of people who are intoxicated by
16 alcoholic beverages.
17 Q. You mentioned ultimately it took
18 four people to get the second handcuff on him?
19 A. Yes.
20 Q. You all were pretty good size
21 guys. Why did it take four people to do it?
22 A. That I can only leave to

Feder Reporting Company
(202) 863-0000

Page 246

1  conjecture. He was just extremely combative
2  and strong. I am 6' 4", and I weigh 240 but I
3  still couldn't get his left, his left arm
4  around behind his back.
5      Q.  Have you had any experience with
6  people who are on drugs that make them wild
7  and combative?
8      A.  Yes.
9      Q.  What kind of experience have you
10 had in that regard?
11     A.  I have had numerous incidents
12 where we have gotten into physical
13 altercations with subjects that were high on
14 PCP, cocaine, things of that sort that are
15 totally oblivious to any type of restraint
16 holds.
17     Q.  What has been your observations in
18 those situations about their strength?
19     A.  Their strength is like, I would
20 say, magnified.
21     Q.  Did you have any suspicions that
22 night in that regard regarding Mr. Mazloum?

Feder Reporting Company
(202) 863-0000

Page 247

1      A.  Yes, I did.
2      Q.  What was that?
3      A.  He was definitely intoxicated by
4  an alcoholic beverage because I could smell it
5  coming from his pores and his breath. And he
6  may also have been high on some type of
7  narcotic.
8      Q.  And you don't have anything
9  against Muslim people?
10     A.  No. No. None. That would be
11 sort of like self hate.
12     Q.  You wouldn't?
13     A.  No.
14     MR. FITZSIMMONS: I think that is
15 all I have.
16     Thank you very much.
17     MS. PHILLIPS: No questions.
18     MR. BRUCKHEIM: I have no
19 questions either.
20     MR. CORCORAN: Thank you very
21 much, officer.
22     MR. BRUCKHEIM: Mr. Modlin, you

Feder Reporting Company
(202) 863-0000

Page 248

1  have an option of doing one of two things:
2  You can read the transcript basically to
3  ensure that your testimony was taken down
4  accurately, that there were no errors in the
5  transcription, or you can waive that option.
6  I generally say it doesn't hurt to read it if
7  you if you want to check. If you would like
8  to read, you can do that. However, if you
9  feel everything got down okay, you want to
10 waive, I don't have a problem with that
11 either. But it is up to you.
12     THE WITNESS: I can -- I will read
13 it.
14     MR. BRUCKHEIM: He will read.
15     (Whereupon, at 1:40 p.m., the
16 deposition was concluded.)
17                +  +  +

Feder Reporting Company
(202) 863-0000

Page 249

1  CERTIFICATE FOR READING AND SIGNING
2
3       I hereby certify that I have read
4  and examined the within transcript and the
5  same is a true and accurate record of the
6  testimony given by me.
7       Any corrections I have listed on
8  the separate errata sheet enclosed, indicating
9  the page and line number of each correction.
10
11
12
13  _____
14  THADDEUS M. MODLIN, JR.
15
16  _____
     Date

Feder Reporting Company
(202) 863-0000