UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM          :
                       :
          Plaintiff    :
                       :
     vs.               : Civil Action No.
                       : 1:06:CV 00002
DISTRICT OF COLUMBIA,  : (JDB)
   et al.              :
                       :
          Defendants   :

                    Washington, D.C.
                    Wednesday, October 4, 2006

Deposition of:

        OFFICER RICHMOND PHILLIPS
called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices
of Katten Muchin Rosenman, LLP, 1025 Thomas
Jefferson Street, N.W., East Lobby, Suite 700,
Washington, D.C., before Zev V. Feder, CSR, a
Notary Public in and for the District of
Columbia, beginning at 9:34 a.m., when were
present on behalf of the respective parties:

Page 18

1  station?
2     A. Yes.
3     Q. What was the result of the charge
4  brought against her? Did she get formally
5  charged? Was she not?
6     A. She was placed in arrest.
7     Q. And then what happened after that
8  to her? Was she convicted of the charge?
9     A. I believe so. I don't know if she
10 paid out or --
11    Q. She brought a complaint. What was
12 the result of the complaint she brought
13 against you? What happened?
14    A. It was dismissed. It was
15 unfounded, I believe. It came out unfounded.
16    Q. It was dismissed internally by the
17 MPD?
18    A. Yes, the Citizen Complaint Review
19 Board.
20    Q. They looked at it --
21    A. Right.
22    Q. -- and said it was unfounded?

Feder Reporting Company
(202) 863-0000

Page 19

1     A. Right.
2     Q. There was another instance in
3  which a complaint was brought against you?
4     A. Right.
5     Q. Can you describe the circumstances
6  of that?
7     A. I was with two other officers and
8  an individual that was being arrested by the
9  other two officers stated that I flat his
10 tires on his bike.
11    Q. The arrested --
12    A. The person that was being arrested
13 stated that I flattened the tires on his bike.
14    Q. What had he done to lead to his
15 arrest?
16    A. I believe he had a knife, an
17 illegal knife. I don't know why he was
18 stopped but he was arrested. He was stopped
19 for having -- once they stopped him, he had an
20 illegal knife.
21    Q. They found it?
22    A. Right.

Feder Reporting Company
(202) 863-0000

Page 20

1     Q. And he charged that you had let
2  the air out of his tires?
3     A. Right.
4     Q. What was the result of that
5  complaint?
6     A. Unfounded.
7     Q. Those are the only times that
8  citizen complaints have been brought against
9  you?
10    A. Yes.
11    Q. No other times?
12    A. No.
13       (Discussion off the record.)
14       BY MR. CORCORAN:
15    Q. You are familiar with the
16 allegations in this lawsuit, right?
17    A. Yes.
18    Q. Have you had a chance to read the
19 complaint in the lawsuit?
20    A. Yes.
21    Q. Do you have some recollection of
22 the events in dispute?

Feder Reporting Company
(202) 863-0000

Page 21

1     A. Yes.
2     Q. I wanted to ask you some questions
3  about the night of the incident in question in
4  March of 2005.
5        FUR Nightclub is the place where
6  the incident occurred. Correct?
7     A. Yes.
8     Q. Had you ever been there before
9  that night?
10    A. Yes.
11    Q. How many times?
12    A. I worked overtime there, MPD
13 overtime.
14    Q. The club detail?
15    A. Yes.
16    Q. How many times did you work the
17 club detail?
18       MR. KAPLAN: Club zone.
19       BY MR. CORCORAN:
20    Q. It is called club zone. Correct?
21    A. Correct.
22    Q. How many times have you done that?

Feder Reporting Company
(202) 863-0000

Page 22

1   A.   I couldn't give you a round
2   figure. Probably 20 times before then.
3   Q.   Do MPD officers like to work club
4   zone if they can, in your experience?
5       MR. BRUCKHEIM: Objection. Calls
6   for speculation.
7       If you know, you can answer.
8       THE WITNESS: I do. I can't speak
9   for anyone else. I do.
10      BY MR. CORCORAN:
11  Q.   Why did you like to do it?
12  A.   I just like making money.
13  Q.   How much extra do you get paid
14  overtime to work club zone?
15  A.   It is time-and-a-half your salary.
16  Q.   What would be the shift that you
17  work if you worked the club zone detail?
18  A.   From 11:00 to 4:00.
19  Q.   Five hours?
20  A.   Depending on what time the club
21  closed.
22  Q.   What kind of obligations would you

Feder Reporting Company
(202) 863-0000

Page 23

1   have when you worked the club zone detail?
2   What would you have to do?
3   A.   Handle anything outside the club.
4   Individuals being disorderly. Taking reports.
5   Somebody might say their vehicle is broken
6   into, or any kind of disputes that happen
7   outside the club.
8   Q.   Would you remain outside the club
9   the entire time?
10  A.   Yes.
11  Q.   How many times have you worked
12  club zone in front of FUR?
13  A.   FUR was new, kind of new.
14  Probably ten times.
15  Q.   This is before the incident?
16  A.   Yes.
17  Q.   Ten times.
18      Have you worked club zone since
19  the incident?
20  A.   Yes.
21  Q.   How many times have you done that?
22  A.   Too many to name.

Feder Reporting Company
(202) 863-0000

Page 24

1   Q.   How many times did you work club
2   zone in front of FUR since the incident?
3   A.   I would probably say like between
4   20 and 30.
5   Q.   In front of FUR?
6   A.   Yes.
7   Q.   How many times have you been to
8   FUR as a patron before the incident?
9       MR. BRUCKHEIM: Objection as to
10  relevance.
11      You can answer.
12      THE WITNESS: Probably two or
13  three times.
14      BY MR. CORCORAN:
15  Q.   Did you ever meet any other
16  individuals who were affiliated with the club,
17  like security, or the owners, or managers?
18  A.   Meet them how?
19  Q.   Personally. While working on club
20  detail or as a patron.
21  A.   Working club detail, yes, I always
22  meet the club owners and the security.

Feder Reporting Company
(202) 863-0000

Page 25

1   Q.   Can you name some of those people?
2   A.   At which club?
3   Q.   At FUR.
4   A.   Dave. He is head of security.
5   Vic, he is one of the security officers. Mike
6   Romeo. He is the club owner. They call him
7   Mike Romeo.
8   Q.   That is his nickname, right?
9   A.   Yes.
10      Diego, I believe he is a co-owner.
11      Many I just know by face.
12  Q.   Were your interactions with these
13  individuals affiliated with FUR, were they
14  mostly on a professional level? Were they
15  mostly when you were doing club detail?
16  A.   Yes.
17  Q.   Did you ever socialize with these
18  guys when you were just a patron at the
19  nightclub?
20  A.   No.
21  Q.   Did you ever socialize with them
22  when you were outside of the nightclub?

Feder Reporting Company
(202) 863-0000

Page 38

1  he went back home.
2      Q.  To Arizona?
3      A.  Right.
4      Q.  Did you know anything about him
5  when you went out with him that night?
6      A.  Anything?
7      Q.  Did you know anything about his
8  wife?
9      A.  No.
10     Q.  About his family life?
11     A.  I know he was married and had a
12 couple of kids.  That's about it.
13     Q.  Did you know anything about
14 whether he was getting divorced?
15     A.  No.
16     Q.  Or the circumstances of which, you
17 didn't know, either?
18     A.  No.
19     Q.  You mentioned, also, that you knew
20 Michael Romeo?
21     A.  Yes.
22     Q.  When did you first meet him?  When

Feder Reporting Company
(202) 863-0000

Page 39

1  you were doing club detail?
2      A.  No.  Actually, I met him -- the
3  club was being built.  Someone broke into his
4  club and stole some stuff and they killed his
5  pit bull.  That's how I met him.
6      Q.  What club was that?
7      A.  FUR.  That's the club, FUR, when
8  FUR was being built.
9      Q.  They broke into the location
10 before it was completed?
11     A.  Right.
12     Q.  So you were doing police work and
13 you met him that way?
14     A.  Right.  Well, actually, that's not
15 actually how I met him.
16     Q.  Please tell us.
17     A.  I met him on a traffic accident,
18 and he said he was building the club.  I
19 didn't know who he was at the time.  I met him
20 on a traffic accident.  He said he was
21 building a club.  Probably like a week or two
22 later, I met him when somebody broke into his

Feder Reporting Company
(202) 863-0000

Page 40

1  club.
2      Q.  By luck.
3      A.  Right.
4      Q.  Did you see him the night of the
5  incident?
6      A.  I don't remember seeing him.
7      Q.  Have you talked to him since the
8  night of the incident?
9      A.  Talked to him in what capacity?
10     Q.  In any regard.
11     A.  Yes, I see him when I work clubs.
12     Q.  Did you talk to him about this
13 incident at all?
14     A.  No.
15     Q.  Have you ever heard of a guy named
16 John Fiorito?
17     A.  Yes.
18     Q.  Who is he?
19     A.  I believe John is a partial owner,
20 also.  I am not sure.  I think he has some
21 affiliation with the club.
22     Q.  Do you recall the last time you

Feder Reporting Company
(202) 863-0000

Page 41

1  spoke to him?
2      A.  Two weeks ago.
3      Q.  In what capacity did you talk to
4  him?
5      A.  He was at the club and I believe
6  he was working.  I spoke to him just to say
7  hi.
8      Q.  This is when you were doing club
9  zone detail?
10     A.  Right.
11     Q.  He came outside and talked to you
12 for a minute?
13     A.  Yes.
14     Q.  Had you met him before the night
15 at issue, March 11, 2005?
16     A.  Yes.
17     Q.  While you were doing club zone?
18     A.  Yes.
19     Q.  Have you ever talked to him while
20 you have been a patron at the club?
21     A.  Yes.
22     Q.  Inside the club you have talked to

Feder Reporting Company
(202) 863-0000

Page 42

1  him?
2  A. Yes.
3  Q. Do you recall seeing him the night
4  in question?
5  A. No.
6  Q. Have you ever talked to him about
7  this litigation?
8  A. No.
9  Q. Or the incident in question?
10 A. No.
11 Q. Going back to the night of the
12 incident, you said you drove yourself. Right?
13 A. Yes.
14 Q. Of the three guys that you were
15 going with, the three officers, which of them
16 would you have considered your closest friend?
17 A. I couldn't say any were my closest
18 friend. All of us were friends. Which one
19 was probably the least amount of my friend was
20 probably Snider, because I didn't know him
21 that well. I knew him but I didn't know him
22 that well.

Feder Reporting Company
(202) 863-0000

Page 43

1  Q. In your view, they were all just
2  people to go out with?
3  A. Right.
4  Q. They weren't really like close --
5  A. No.
6  Q. -- good pals?
7  A. No.
8  Q. Other than going to nightclubs
9  with these guys, did you ever do other kinds
10 of socializing with them?
11 A. No, other than working. Seeing
12 each other on the street in passing, but
13 that's about it.
14 Q. Why did you jointly decide you
15 wanted to go to FUR?
16 A. Because we worked the nightclub
17 and we worked that club and we knew how it
18 was.
19 Q. What did you know about it?
20 A. It was a nice club. Nothing crazy
21 ever happened there, so.
22 Q. How new was it when you went

Feder Reporting Company
(202) 863-0000

Page 44

1  there? How long had it been opened?
2  A. I couldn't give you -- it was new,
3  fairly new.
4  Q. Was it open in 2005?
5  A. Yes.
6  Q. So it had just been opened maybe a
7  couple of months?
8  A. Yes.
9  Q. The night you went to FUR did you
10 bring your badge with you?
11 A. Yes.
12 Q. Why did you bring your badge with
13 you?
14 A. Because I am still in the District
15 of Columbia and I have to have my credentials
16 on me at all times.
17 Q. That's a requirement of the MPD?
18 A. Yes.
19 Q. Did you bring your service weapon
20 with you?
21 A. No, I did not.
22 Q. Why not?

Feder Reporting Company
(202) 863-0000

Page 45

1  A. Because I knew I was going to be
2  drinking that night.
3  Q. Are there any rules that
4  specifically say you can't bring your service
5  piece with you when you know you are going to
6  be drinking?
7  A. Yes.
8  Q. Do you know the specific rule?
9  A. It is a general order and it
10 states that if you know you are going to be --
11 in short, if you know you are going to be out
12 drinking or you are going to be having some
13 alcoholic beverages, you shouldn't draw your
14 service weapon. You should leave it at the
15 station or somewhere secure.
16 Q. Do you know the purpose of that
17 rule?
18 A. Officer safety and human safety.
19 Q. What could happen if you did bring
20 your service weapon --
21 A. Anything could happen.
22 Q. Something could go wrong?

Feder Reporting Company
(202) 863-0000

Page 54

1  about it. It said his name. Other than that,
2  I didn't talk to him because he left.
3     Q. But somebody who had the power to
4  bring you to the station called you in that
5  day when they heard about the complaint?
6     A. Right.
7     Q. You wouldn't have gone if that
8  person hadn't called you, right?
9     A. Correct.
10    Q. If Ramirez had called you, you
11 wouldn't have had to go in, right?
12    A. No.
13    Q. When you got to the nightclub, you
14 came in. You don't recall if you paid, right,
15 but you came in.
16    A. Right.
17    Q. You don't recall if you passed the
18 metal detector. Correct?
19    A. I know I passed the metal
20 detector.
21    Q. You did?
22    A. I did.

Feder Reporting Company
(202) 863-0000

Page 55

1     Q. What about the other guys with
2  you?
3     A. I believe we all did. The way it
4  is set up, you have to go through the metal
5  detector.
6     Q. Do you know if Officer Ramirez
7  went through the metal detector?
8     A. I assume so.
9     Q. Did you see at that point if he
10 was carrying handcuffs with him?
11    A. No, I did not.
12    Q. So you didn't see if he removed
13 them or not before he went through?
14    A. No.
15    Q. You weren't paying attention?
16    A. I believe I went in first. So I
17 don't know if anybody else, whatever, anybody
18 else was going behind me.
19    Q. When you got inside of the club
20 what did you do?
21    A. Mingled around. Talked to a few
22 people.

Feder Reporting Company
(202) 863-0000

Page 56

1     Q. Do you remember where you went
2  first?
3     A. No.
4     Q. Did you get a drink?
5     A. Yes.
6     Q. What did you get?
7     A. Probably a beer, because that's
8  what I normally drink.
9     Q. Do you know how many drinks you
10 had in the club that whole night?
11    A. Probably like two or three beers.
12    Q. That was it?
13    A. Yes.
14    Q. Did you pay for them yourself?
15    A. Yes.
16    Q. With cash?
17    A. Yes.
18    Q. Did anyone buy drinks for you?
19    A. No.
20    Q. That's too bad.
21       Do you know how long you were at
22 the club overall?

Feder Reporting Company
(202) 863-0000

Page 57

1     A. I would probably say like two
2  hours.
3     Q. Two hours before the incident
4  occurred or two hours in total?
5     A. Probably two hours -- probably two
6  hours in total. Time just went by.
7     Q. When you got inside the club, of
8  the officers that you entered with, who were
9  you hanging out with the most, spending the
10 most time with?
11    A. Me and Officer Modlin. We were
12 like close together.
13    Q. He was the one you knew the best,
14 right?
15    A. I wouldn't say the best. We came
16 better friends because of people he knew.
17    Q. That's right. So did you go to
18 dance once you got inside?
19    A. Not once I got inside. I mingled
20 around.
21    Q. Do you recall prior to the
22 incident seeing the Plaintiff anywhere in the

Feder Reporting Company
(202) 863-0000

Page 62

1  some kind of a hold where he couldn't get
2  away. The bouncer couldn't get away.
3      Q.  The bouncer was wearing a jacket?
4      A.  Yes.
5      Q.  What kind of jacket?
6      A.  Like a blazer.
7      Q.  So he was holding a bouncer. Was
8  was the jacket covering the bouncer's face?
9      A.  Yes.
10     Q.  Were there any other individuals
11 with the Plaintiff at that time that you saw?
12     A.  Not that I remember seeing. I
13 just remember seeing him.
14     Q.  What were other people doing on
15 the stage when this was happening?
16     A.  Looking. The same thing we were
17 doing.
18     Q.  It was surprising?
19     A.  Yes.
20     Q.  Was the bouncer looking like he
21 was in distress?
22     A.  He was trying to get away from

Feder Reporting Company
(202) 863-0000

Page 63

1  him, yes.
2      Q.  What did you see next happen?
3      A.  Officer Modlin walked over towards
4  the Plaintiff and he pulled him away from him,
5  grabbed him from behind.
6      Q.  So Officer Modlin grabbed the
7  Plaintiff?
8      A.  Yes.
9      Q.  Then what did the Plaintiff do?
10     A.  He put his hands over his, behind
11 his head. And we escorted him off the stage.
12     Q.  So at that point you joined
13 Officer Modlin.
14     A.  Yes. I walked with him when he
15 walked because I finally noticed what he was
16 looking at.
17     Q.  Again, you get over to the
18 Plaintiff. Are there any other guys standing
19 there?
20     A.  There was a group of people there
21 but nobody was doing anything to help the
22 bouncer. They were just standing there.

Feder Reporting Company
(202) 863-0000

Page 64

1      Q.  Was anyone else involved with the
2  bouncer other than the Plaintiff?
3      A.  No.
4      Q.  You took the Plaintiff off the
5  stage. How did you hold him?
6      A.  I didn't hold him. I led the way.
7  I made a way so they could get out off the
8  stage.
9      Q.  You stood in front of Officer
10 Modlin?
11     A.  Yes.
12     Q.  What did the bouncer do at this
13 point?
14     A.  I don't know what he was doing. I
15 guess he was probably trying to get his coat
16 off his head. I don't know.
17     Q.  How was Officer Modlin holding the
18 Plaintiff?
19     A.  From behind with his arms behind
20 him.
21     Q.  In a headlock kind of thing?
22     A.  Not a headlock. With his arms

Feder Reporting Company
(202) 863-0000

Page 65

1  behind his back.
2      Q.  Like a restraining hold?
3      A.  Yes.
4      Q.  The kind of thing you learn in the
5  police academy?
6      A.  Yes.
7      Q.  And you employ in these
8  circumstances?
9      A.  Right.
10     Q.  Show me, if you can, what you did.
11     A.  What I did?
12     Q.  What he did. Sorry.
13     A.  He put his arms --
14     MR. KAPLAN: Here. Don't hold
15 back. I am the Plaintiff.
16     THE WITNESS: Like this.
17     MR. BRUCKHEIM: Let the record
18 reflect that Officer Phillips took his arms
19 and slid them up underneath Warren's arms and
20 kind of locked them around the shoulders.
21     (Discussion off the record.)
22     BY MR. CORCORAN:

Feder Reporting Company
(202) 863-0000

Page 70

1  Q. None of his friends or anybody
2  like that?
3  A. No.
4  Q. And you walked forward down the
5  stairs. Correct?
6  A. Yes.
7  Q. And that's the way you took the
8  Plaintiff?
9  A. Correct.
10 Q. Or the way Officer Modlin took the
11 Plaintiff. Right?
12 A. Well, he took him down, but I was
13 in the front clearing a path.
14 Q. Were you clearing people aside and
15 pushing them?
16 A. I wasn't pushing them. I was just
17 moving them to the side.
18 Q. Were you showing your badge as you
19 went through?
20 A. Yes.
21 Q. Did you ever see the bouncer do
22 anything to the Plaintiff prior to the time

Feder Reporting Company
(202) 863-0000

Page 71

1  when you saw the coat over the bouncer's head?
2  A. No.
3  Q. So you didn't understand what had
4  happened.
5  A. No.
6  Q. Now, what happened next as you
7  took the Plaintiff through the crowd? Where
8  were you taking him?
9  A. Out of the club.
10 Q. And there's a staircase that leads
11 out?
12 A. Yes.
13 Q. And what happened as you were
14 taking him out of the club?
15 A. Once we got to the stairwell to
16 take him up the stairs, he broke free of
17 Officer Modlin and turned around and started
18 fighting Officer Modlin.
19 Q. What did he do specifically to
20 Officer Modlin?
21 A. He broke away and he started
22 punching at him.

Feder Reporting Company
(202) 863-0000

Page 72

1  Q. Did he hit him?
2  A. I don't know if he hit him. He
3  didn't say anything about him being hit, but
4  he was swinging at him.
5  Q. He was swinging at him.
6  A. Yes.
7  Q. What did Officer Modlin do?
8  A. He was trying to grab his hands so
9  he wouldn't hit him, and he was moving his
10 head so he wouldn't hit him.
11 Q. And then what happened next?
12 A. After that Officer Ramirez came
13 with some handcuffs and we placed him under
14 arrest. We put handcuffs on him.
15 Q. Did anyone signal Officer Ramirez
16 to come over?
17 A. No. I don't know where he came
18 from.
19 Q. He just saw what was happening,
20 most likely.
21 A. Yes.
22 Q. And you didn't know up to that

Feder Reporting Company
(202) 863-0000

Page 73

1  point that he had his handcuffs with him.
2  A. No.
3  Q. But he produced them?
4  A. Yes.
5  Q. How did you subdue the Plaintiff
6  sufficiently to get the handcuffs on him?
7  A. He grabbed his arms. Once he
8  grabbed his arms, we turned him on his back
9  and we put handcuffs on his back from behind.
10 Q. You put him down on his stomach or
11 his back?
12 A. We had to turn him around because
13 he was on his back fighting on the steps.
14 Q. So he was falling under the steps?
15 A. He broke free of Officer Modlin
16 and turned around once we got to the steps.
17 Q. Did he fall at any point?
18 A. Not that I remember.
19 Q. So when you put the handcuffs on
20 him was he standing?
21 A. No. He was on his stomach,
22 because we had to turn him around.

Feder Reporting Company
(202) 863-0000

Page 74

1  Q. And was he laying on the stairs on
2  his stomach?
3  A. He was turned around.
4  Q. What do you mean? I guess I'm not
5  getting you.
6  A. I guess you would say he was on
7  his stomach then, because we had to turn him
8  around. So once he was turned around, we
9  placed the handcuffs on him. We picked him up
10 and took him up the steps.
11 Q. Did the handcuffs go on in front
12 of him like this?
13 A. No, they was behind him.
14 Q. So when you turned him did you
15 turn him onto his front, onto his stomach so
16 you could put the handcuffs behind his back?
17 A. Correct.
18 Q. This is while he was leaning on
19 the stairs?
20 A. Yes.
21 Q. Did he ever sit down on the floor
22 at that point?

Feder Reporting Company
(202) 863-0000

Page 75

1  A. Inside the club?
2  Q. Yes.
3  A. Not that I recall.
4  Q. Were you able to see the condition
5  of the Plaintiff at this point?
6  A. Inside the club?
7  Q. Yeah.
8  A. No, because we picked him up and
9  took him outside the club.
10 Q. Could you see inside if he was
11 hurt or if he had been hit or was bleeding?
12 A. No. It was kind of dark.
13 Q. Was music playing the whole time
14 while this was happening?
15 A. Yes.
16 Q. There's a light system at the
17 club. Right?
18 A. Yeah, I believe so.
19 Q. Were the lights going off and on
20 like they do in night clubs?
21 A. Yeah. They was like flickering
22 off and on, yes.

Feder Reporting Company
(202) 863-0000

Page 76

1  Q. So it was hard to see what was
2  going on inside?
3  A. Right.
4  Q. Did anyone say anything to the
5  Plaintiff at this point that you heard?
6  A. Say anything when? When we were
7  taking him up the steps?
8  Q. Yeah. The time that you brought
9  him down to the time that you handcuffed him.
10 A. Did anyone say anything to him?
11 Q. Did anyone say anything to him?
12 A. Not that I recall.
13 Q. You didn't say anything to him?
14 A. I was leading the path to get him
15 out. The only time I said anything to him was
16 when I had my badge.
17 Q. Up to this point had you actually
18 made physical contact with the Plaintiff?
19 A. No.
20 Q. You never grabbed his arm?
21 A. Yeah, to put it behind his back.
22 Q. You helped to put the handcuffs

Feder Reporting Company
(202) 863-0000

Page 77

1  on.
2  A. Yes.
3  Q. And the only officers involved in
4  doing that were you, Modlin and Ramirez?
5  A. Correct.
6  Q. Where was Officer Schneider during
7  this time?
8  A. No idea.
9  Q. He wasn't there at all.
10 A. No.
11 Q. Did you or Officer Ramirez say
12 anything to him at this point?
13 A. No.
14 Q. What was FUR security doing while
15 this was going on? Did they do anything to
16 interact or intervene?
17 A. At this time I believe they came
18 over so we could get him up the steps and
19 clear a path so we could take him outside.
20 Q. So they were helping you clear a
21 path?
22 A. Right.

Feder Reporting Company
(202) 863-0000

Page 142

1    THE WITNESS: No. I was just
2 going to hang out.
3    BY MR. CORCORAN:
4    Q.   You haven't been separated with
5 your wife at any time?
6    A.   No.
7    Q.   The night that you were at the
8 night club did you ever hear the phrase
9 "al-Qaeda" used in any respect?
10   A.   No.
11   Q.   Did you ever hear it used with
12 respect to the Plaintiff?
13   A.   No.
14   Q.   Did you ever determine what the
15 Plaintiff's racial background was or
16 ethnicity?
17   A.   No.
18   Q.   What did he look like?
19   A.   A white male to me.
20   Q.   You couldn't tell his racial
21 ethnicity.
22   A.   Not to my knowledge.

Feder Reporting Company
(202) 863-0000

Page 143

1    Q.   Did you understand what he was
2 saying when he tried to talk to you?
3    A.   Yeah. Well, I understood what he
4 was saying to Officer Ramirez, yes.
5    Q.   You heard him say things to
6 Officer -- did he have an accent?
7    A.   Slight.
8    Q.   What did the accent sound like?
9    A.   I don't remember.
10   Q.   Now, you talked a little bit about
11 working in the club zone. Right?
12   A.   Yes.
13   Q.   And there are certain obligations
14 when you work the club zone. I think you used
15 the phrase take a report.
16   A.   Yes.
17   Q.   What does that mean?
18   A.   If an incident takes place
19 outside, if someone said they had their car
20 broken into we would take a report or do a
21 PD-251 saying that someone had their car
22 broken into.

Feder Reporting Company
(202) 863-0000

Page 144

1    Q.   What's a PD-251?
2    A.   Incident report.
3    Q.   An incident report.
4    A.   Yeah. It's an incident report.
5 Also, it's an officer's report if a crime
6 takes place.
7    Q.   So a citizen can come up to you
8 and say something happened. And then what are
9 your obligations if that occurs?
10   A.   Investigate what happened.
11   Q.   If someone comes up to you, comes
12 out of the night club and tells you something
13 that has gone wrong, what do you have to do?
14   A.   Depending if it happens in the
15 scope of the club, I would take a report. If
16 someone said their car was broken into in the
17 block of the club --
18   Q.   Right.
19   A.   -- I would go down and
20 investigate, take a report.
21   Q.   When you take a report, what do
22 you do? Do you fill a form out?

Feder Reporting Company
(202) 863-0000

Page 145

1    A.   Yes.
2    Q.   Where do you fill the form out?
3    A.   Where would I fill it out?
4    Q.   Where do you do it? Right then
5 and there?
6    A.   If I have the forms with me in
7 that vehicle, I would. But if not, I would
8 take the information and go to the station and
9 do it.
10   Q.   How quickly? Would you go to the
11 station at the end of the detail when it ends?
12   A.   Yes.
13   Q.   And you'd do it right then and
14 there.
15   A.   Yes.
16   Q.   And that's what you're supposed to
17 do. Right?
18   A.   Yes.
19   Q.   If a citizen comes to somebody who
20 is on club zone detail as a complaint of
21 something that's gone on in the night club or
22 relates to it and the officer doesn't take a

Feder Reporting Company
(202) 863-0000

Page 146

1  report, is that a violation of standard
2  practices for the MPD?
3          MS. BATES: Objection.
4          MS. PHILLIPS: Objection.
5          THE WITNESS: Yes.
6          BY MR. CORCORAN:
7      Q.  It is.
8      A.  **Mmm-hmm.**
9      Q.  And is that obligation to take a
10 report and to record what a citizen tells you
11 via the 251, is that something that police
12 officers need to do even if they're not at the
13 night club or is it specific to the club zone
14 detail?
15     A.  **If an officer is working the club,**
16 **you mean?**
17     Q.  Well, if something happens in the
18 night club and uniformed officers are called
19 to deal with it, you're not on club zone
20 detail, and the citizen in the context of them
21 being there wants to complain about something,
22 what are those officers supposed to do?

Feder Reporting Company
(202) 863-0000

Page 147

1      A.  **Take a report.**
2      Q.  And fill out a 251.
3      A.  **Correct.**
4      Q.  PD-251. Either right then and
5  there or thereafter.
6      A.  **Correct.**
7      Q.  At some point.
8      A.  **Correct.**
9      Q.  And that's a violation in your
10 understanding of your obligations as an MPD
11 officer if you don't do that.
12     A.  **Correct.**
13         MR. CORCORAN: I don't have any
14 further questions. Thank you very much.
15         MR. BRUCKHEIM: Start down at the
16 end. I'm going to go last.
17         MS. BATES: I don't have any
18 questions.
19         MS. PHILLIPS: I don't have any
20 questions.
21         MR. VRICOS: None from me.
22         MR. BRUCKHEIM: I just have a

Feder Reporting Company
(202) 863-0000

Page 148

1  couple questions.
2  EXAMINATION BY COUNSEL FOR DEFENDANT PHILLIPS
3          BY MR. BRUCKHEIM:
4      Q.  Just for the record, I'm Michael
5  Bruckheim, and I represent Officer Phillips.
6          Officer Phillips, can you tell me,
7  did you ever actually see the Plaintiff, Emile
8  Mazloum, hit the bouncer --
9      A.  No.
10     Q.  -- with his fists?
11     A.  **I never saw him hit him. I just**
12 **saw him with his jacket pulled over his head.**
13     Q.  Okay. You testified that you
14 heard the Plaintiff calling Officer Ramirez
15 "...El Salvador." Can you recall anything
16 else the Plaintiff said either to Ramirez or
17 to you and Officer Modlin as you were
18 escorting him out of the club?
19     A.  **I don't recall him saying anything**
20 **else. Just that.**
21     Q.  This statement that you gave to
22 Mr. Coburn that's already been marked as

Feder Reporting Company
(202) 863-0000

Page 149

1  Exhibit 1 to this deposition, you signed this
2  statement. Is that correct?
3      A.  **Correct.**
4      Q.  Did you sign this statement after
5  reviewing the statement?
6      A.  **Yes.**
7      Q.  Would you have signed the
8  statement if there were any inaccuracies
9  contained within the statement?
10     A.  **No, I would not.**
11     Q.  So it's fair to say then that this
12 statement is an accurate rendition of your
13 observations as to what happened on that
14 evening?
15     A.  **Correct.**
16         MR. CORCORAN: Objection to form.
17         BY MR. BRUCKHEIM:
18     Q.  In this statement, if you could
19 take a look on Page 1, the second answer
20 starting in the third line and heading into
21 the fourth line, you stated that the Plaintiff
22 "intentionally fell down on the stairs to keep

Feder Reporting Company
(202) 863-0000