UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM                    :
                                 :
          Plaintiff              :
                                 :
     vs.                         :  Civil Action No.
                                 :  1:06:CV 00002
DISTRICT OF COLUMBIA,            :  (JDB)
  et al.                         :
                                 :
          Defendants             :

Washington, D.C.
December 18, 2006

Deposition of:
    LIEUTENANT FRANCIS MICHAEL ALLMAN,
called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices
of Katten Muchin Rosenman, LLP, 1025 Thomas
Jefferson Street, N.W., East Lobby, Suite 700,
Washington, D.C., before Lynell C.S. Abbott, a
Notary Public in and for the District of
Columbia, beginning at 9:44 a.m., when were
present on behalf of the respective parties:

Page 6

1  Q  If you don't understand a question
2  or you can't hear it, ask me to repeat it,
3  I'll do that. You must give verbal answers.
4  Don't shrug or nod or say "uh-huh" or
5  something that doesn't let the court reporter
6  record what you are saying. Try to let me
7  finish a question before you answer and don't
8  anticipate what I'm going to say. Similarly,
9  I'll try to wait until you've given a complete
10 answer before I ask another one. If you want
11 to take a break, you need time for the
12 bathroom or for anything, just let me know.
13 Okay?
14     A  Okay.
15     Q  Other than conversations with your
16 counsel here, did you do any other preparation
17 for this deposition?
18     A  No.
19     Q  So you didn't look at any
20 documents at home about the deposition.
21     A  No, not recently.
22     Q  When you say not recently, what do

Feder Reporting Company
(202) 863-0000

Page 7

1  you mean by that?
2     A  I was given, I was mailed a big
3  package. I retired from the Police Department
4  last May, as I guess you know.
5     Q  May of 2006. Right?
6     A  That's correct.
7     Q  So this year, okay.
8     A  And the Internal Affairs Division
9  of the Police Department eventually conducted
10 their investigation after everybody else had
11 conducted investigations, and they mailed me a
12 copy of their investigation. But to tell you
13 the truth, I never read it.
14    Q  But you haven't had any
15 conversations with any of the parties to the
16 lawsuit about your deposition today, have you?
17    A  No.
18    Q  Are you married?
19    A  I'm divorced.
20    Q  Can you please give me your
21 educational background starting with high
22 school and going forward?

Feder Reporting Company
(202) 863-0000

Page 8

1  A  I graduated from St. John's
2  College High School in D.C. in '72; graduated
3  from the University of Pennsylvania with a
4  bachelor's degree in biology in '76.
5  Q  Any post-graduate education?
6  A  Not from a university or an
7  accredited institution. I've had various
8  educational classes and seminars and so forth
9  from the Police Department.
10 Q  When did you go to the Police
11 Academy?
12 A  In '79, February of '79.
13 Q  Did you have any prior experience
14 with any kind of law enforcement or security
15 position before you made the decision to go to
16 the Police Academy?
17 A  None.
18 Q  When did you graduate from the
19 Police Academy?
20 A  A couple months after I was sworn
21 in.
22 Q  So sometime in 1979?

Feder Reporting Company
(202) 863-0000

Page 9

1  A  Yeah. I was entered and I was
2  sworn in in February of '79. I think I went
3  to the Seventh District in mid-spring of '79.
4  It only took a couple months.
5  Q  This was here in the District of
6  Columbia.
7  A  Right.
8  Q  And have you served as a police
9  officer anywhere in the United States other
10 than in the District of Columbia?
11 A  No.
12 Q  And what were the positions that
13 you achieved while you were a police officer
14 with the MPD?
15 A  I started out as a uniformed
16 officer in the Patrol Division. And as an
17 officer, I worked a variety of assignments,
18 including tactical operations and -- well,
19 that's it. Tactical officer, plainclothes,
20 and a uniformed officer in the Patrol
21 Division; and got promoted to Sergeant in
22 1985, was a field supervisor in the First

Feder Reporting Company
(202) 863-0000

Page 10

1  District; and was transferred to the Internal
2  Affairs division of the Police Department in
3  '87 as a Sergeant and stayed there a couple
4  years; got promoted to Lieutenant in '89 and
5  went back to the First District.
6          After a couple of years in the
7  First District -- well, not a couple years, a
8  year or so in the First District, they formed
9  a unit called the Rapid Deployment Unit and
10 they drew personnel from all the police
11 districts. And I was not assigned but
12 detailed to the Rapid Deployment Unit while it
13 existed in the early nineties.
14         And then after that was over I was
15 briefly reassigned to the Second Police
16 District, but then was transferred back to the
17 First District after a couple of months; then
18 remained at the First District until my
19 retirement.
20         While at the First District I was
21 assigned as a patrol supervisor and for a
22 while as a supervisor of the investigative

Page 11

1  section.
2      Q   Did you ever have the title Watch
3  Commander?
4      A   Yes.
5      Q   Is that a formal title?
6      A   That's the ranking official
7  working for any particular shift.
8      Q   So different kinds of people could
9  be Watch Commander in any --
10     A   It's supposed to be a Captain
11 every tour, but quite often it's a Lieutenant,
12 particularly on the midnight shifts.
13     Q   And you retired, as you said, in
14 the spring of 2006. Right?
15     A   That's correct.
16     Q   Do you have any employment at
17 present?
18     A   Yes.
19     Q   What is your employment today?
20     A   I have three jobs actually, all of
21 them part time. One of them is, in fact, at
22 FUR Night Club as a, they call it a security

Page 12

1  consultant, sort of help them oversee their
2  security operation, help with security
3  operations, testify at ABC hearings and so
4  forth, was a spokesman for the club.
5  Basically I do that on Friday and Saturday
6  nights when the club is open.
7          I also work at the National Museum
8  for Women in the Arts as a security person.
9  They have 24-hour police coverage of their
10 building. And I do a few shifts a week there.
11         And I work for a lady who owns a
12 limousine company out in Virginia. She has a
13 contract doing limousine service for Arlington
14 Cemetery's funerals. And I do that during the
15 day during the week sometimes, you know, as it
16 arises. So I have three jobs.
17     Q   The security advisor position at
18 FUR, when did you get that job?
19     A   After I retired.
20     Q   Sometime in May or June of this
21 year?
22     A   June, yeah.

Page 13

1      Q   Who hired you to do that?
2      A   Michael Romeo.
3      Q   Michael Rehman?
4      A   Rehman, yes.
5      Q   How long have you known him?
6      A   I have known him ever since he
7  owned Insomnia, which is, I don't know, five
8  years maybe, something like that.
9      Q   Do you know anyone else who is
10 associated with the night club?
11     A   John Fiorito.
12     Q   How did you meet him?
13     A   I met him many years ago. He's a
14 former police officer on the Metropolitan
15 Police. He's been around town ever since then
16 doing lighting and sound at various night
17 clubs. And I met him through a friend of a
18 friend, and have been friends with him for
19 many years.
20     Q   Did you meet him while he was a
21 police officer?
22     A   I did, but I wasn't real friendly

Page 14

1  with him. I became more friendly with him
2  right around 2000 or so.
3      Q   Had he left the employ of the MPD
4  by then, to your knowledge?
5      A   Yes, he had.
6      Q   He was working in Florida at that
7  point?
8      A   I'm hesitating because actually I
9  think he had a problem with -- we became
10 closer because he had a problem with his
11 record on the Police Department and he asked
12 me to help. And I tried to help him. He was
13 trying to get a job in law enforcement in
14 Florida, and I think that through my efforts
15 of resolving some issues on his employment
16 record with the Metropolitan Police that he
17 eventually got a position in Florida.
18     Q   What was his problem that he
19 needed help with?
20     A   He was not adjusting well when he
21 was on the Metropolitan Police and he had
22 problems with a particular Lieutenant that was

Feder Reporting Company
(202) 863-0000

Page 15

1  assigned to the Fourth District. That
2  Lieutenant turned out to be a very infamous
3  person by the name of Jeffrey Stowe who was
4  later indicted and served, is in prison now
5  for extorting homosexuals in the night clubs
6  in Southwest. If you've been around D.C. for
7  a length of time you'll remember that story.
8          Well, Lieutenant Stowe didn't like
9  John Fiorito. He quit the Police Department,
10 the D.C. Police Department and secured
11 employment with the Bladensburg Police
12 Department. But Stowe being the kind of guy
13 that he was and always wanting to go the extra
14 mile to screw over his enemies, he went to
15 Bladensburg Police Department and told them,
16 made several misrepresentations to them about
17 his employment with D.C. and, in fact, got him
18 fired from the Bladensburg Police Department.
19         And after that Fiorito worked like
20 several, like Aberdeen Proving Grounds, a few,
21 you know, like federal quasi police
22 departments, really more like security type

Feder Reporting Company
(202) 863-0000

Page 16

1  things in my opinion. But he was trying to
2  get back on a real police department. But it
3  was a bar to his employment because of this
4  problem that he had been fired from the
5  Bladensburg Police Department. And he asked
6  me to help him correct that problem.
7      Q   So what kind of misrepresentations
8  did he make about Mr. Fiorito?
9          MS. PHILLIPS: I'm going to object
10 to the extent it calls for speculation. But
11 you may answer. I'm also going to object to
12 relevancy. We've gone a long way down this
13 path. But you may answer.
14         THE WITNESS: There is also a
15 closing letter they put in the file when
16 people leave. And he said that it was
17 recommended that he would have been, something
18 along the lines of he would have been fired
19 had he not quit. His performance was
20 unsatisfactory. And he signed it with the
21 signature of a man named Charles Moore who was
22 the Acting Captain of the Fourth District at

Feder Reporting Company
(202) 863-0000

Page 17

1  the time.
2          And it was obvious -- and I went
3  to Captain Moore, located him in his
4  retirement out in Upper Montgomery County,
5  asked him about it, did a little investigation
6  on behalf of Mr. Fiorito. And, sure enough,
7  Captain Moore, retired Captain Moore,
8  submitted a letter saying that he never made
9  those representations and the signature on
10 that letter in his file was not his. And
11 armed with that, Mr. Fiorito was able to
12 straighten out his personnel record and secure
13 the employment in Florida.
14         BY MR. CORCORAN:
15     Q   And why did you do all this for
16 him?
17     A   Because I thought that he had been
18 wronged and he asked me to help and I said
19 okay.
20     Q   So he wasn't a close friend of
21 yours at that point.
22     A   We became closer friends --

Feder Reporting Company
(202) 863-0000

Page 34

1  other than the night in question, do you
2  recall ever making the decision somebody
3  needed to be arrested who had been at FUR?
4      A   I can't say for sure. I'm sure it
5  happened. It's not an unusual occurrence for
6  somebody to start a fight and not stop
7  fighting when the police tell them to stop
8  fighting. That's not unusual. But I can't
9  remember any, a specific date or time.
10     Q   When you say not unusual, you mean
11 not unusual at FUR or generally?
12     A   Not unusual anywhere really.
13     Q   Any night club.
14     A   Right.
15     Q   Now, the times that you had been a
16 patron at FUR, did you have to pay a cover to
17 get in?
18     A   No.
19     Q   Because you know the owners.
20 Right?
21     A   Yeah.
22     Q   And they can do that for people

Feder Reporting Company
(202) 863-0000

Page 35

1  that they know.
2      A   They can comp anybody they want
3  to.
4      Q   Do they have a metal detector to
5  get into the night club?
6      A   Mmm-hmm.
7          MS. PHILLIPS: Objection as to
8  time.
9          THE WITNESS: To my recollection,
10 they've always had metal detectors.
11         BY MR. CORCORAN:
12     Q   Before and after the incident.
13     A   I think they had them before and
14 after and during. That's my guess.
15     Q   Did you ever have to pass through
16 the metal detector when you went there as a
17 patron?
18     A   Everybody passes through the metal
19 detector.
20     Q   Did you ever bring your service
21 weapon with you into the night club?
22     A   On duty I did. When I was off

Feder Reporting Company
(202) 863-0000

Page 36

1  duty, the couple times that I might have been
2  there off duty, probably not because when they
3  changed that rule, when Ramsey changed the
4  rule that you didn't have to carry your gun at
5  all times in the District of Columbia, I
6  seldom carried my gun off duty.
7      Q   What about handcuffs, do you ever
8  carry them off duty?
9      A   No, I don't.
10     Q   Why not?
11     A   That's something a rookie would
12 do.
13     Q   Why do you say that?
14     A   The possibility that they might
15 run into something and be a hero and have the
16 tools there to do what they need to do. But
17 when you have 27 years on, you don't look to
18 arrest people. You don't look to -- you just
19 want to be left alone.
20     Q   Makes sense to me.
21     A   All right.
22     Q   Now, but let me ask you this

Feder Reporting Company
(202) 863-0000

Page 37

1  question: If you know, does the MPD have any
2  policies about officers off duty and drinking?
3      A   That's what I just alluded to.
4  There was Chief Ramsey who changed -- the rule
5  before Chief Ramsey was that you must carry
6  your service weapons at all times in the
7  District of Columbia. There were several
8  unfortunate shootings back around six or seven
9  years ago.
10         I'm very bad chronologically. So
11 whenever I say a time frame, I'm just as
12 likely to be right as wrong. But Ramsey
13 changed the policy because there were several
14 incidents where there were shootings and
15 alcohol became a question. And they revised
16 the General Order saying that if you
17 anticipate that you're going to drink
18 alcoholic beverages, you do not carry your
19 service weapon.
20     Q   You don't know exactly when that
21 happened, though.
22     A   No. I don't remember.

Feder Reporting Company
(202) 863-0000

Page 38

1  Q   What about the General Order, do
2  you know the number of it?
3  A   No, I don't.
4  Q   Does the District have any other
5  policies -- MPD, I should say -- have any
6  other policies about what off-duty officers
7  should do if they are drinking and they see
8  something that requires police action?
9  A   Well, officers are not allowed to
10 be under the influence of alcoholic beverages
11 whether on or off duty. That's the policy.
12 Q   They can't at all be?
13 A   You're not allowed to be under the
14 influence of alcoholic beverages at any time.
15 Q   So if an officer is out somewhere
16 in the city in the District and is under the
17 influence, in your experience what's the
18 sensible thing for them to do if they see
19 something going on that would require police
20 involvement?
21       MS. PHILLIPS: Objection. You may
22 answer.

Feder Reporting Company
(202) 863-0000

Page 39

1        THE WITNESS: You say if they've
2  been drinking. I mean it depends on the level
3  of their intoxication. If they're at a club
4  sipping on a cocktail and not under the
5  influence and they see an incident that
6  requires police intervention, sure, they can,
7  it would not be inappropriate for them to
8  intervene.
9        BY MR. CORCORAN:
10 Q   But what if they'd had enough to
11 be intoxicated?
12 A   Then they shouldn't do it.
13 Q   What should they do?
14 A   Well, like I said, they shouldn't
15 be intoxicated.
16 Q   But what's the purpose of that
17 policy? Do you know? I mean why would the
18 MPD have a policy or why does it have a policy
19 telling police officers they should never be
20 intoxicated off duty?
21 A   There are situations when the
22 issue of alcohol arises and if there's any

Feder Reporting Company
(202) 863-0000

Page 40

1  indication at all they they've been drinking,
2  they can discipline them for it.
3  Q   But do you have any sense of the
4  purpose behind a rule like that?
5        MS. PHILLIPS: Objection to the
6  extent it calls for speculation. But you may
7  answer.
8        BY MR. CORCORAN:
9  Q   What does that prevent from
10 happening?
11 A   I think the rule changed, the
12 initial rule changed that you can't carry your
13 gun or when you are required to carry your gun
14 at all times, I think they changed that
15 because of several incidents that occurred
16 around ABC establishments, you know. I think
17 that's why they changed it, to discourage that
18 kind of event from happening.
19 Q   Well, is it that there's a
20 possibility that the police officer might make
21 an error in judgment and misrespond to a
22 situation?

Feder Reporting Company
(202) 863-0000

Page 41

1        MS. PHILLIPS: Objection, but you
2  may answer.
3        THE WITNESS: I'm sure that's one
4  of the rationale for formulating that policy,
5  yes.
6        BY MR. CORCORAN:
7  Q   Do you think that policy
8  personally makes sense to you, based on your
9  experience?
10 A   I think that every situation is
11 different. And I think that you should be
12 able to analyze an incident and not be
13 encumbered by draconian policies and a lot of
14 Catch-22's where you can never be right. But
15 the Police Department likes to create
16 situations like that.
17 Q   Now, you've already testified
18 about your relationship with FUR and with
19 Mr. Fiorito and Mr. Romeo. Are there any
20 other people associated with FUR that you
21 would consider friends?
22 A   They are the only two, really. I

Feder Reporting Company
(202) 863-0000

Page 42

1  mean I've met a lot of people over time.
2      Q   Who else do you know there?
3      A   I know a lot of people now.
4      Q   Because you're there every week?
5      A   I work there every week, yeah.
6      Q   Do you ever socialize with
7  Mr. Fiorito or Rehman outside of the night
8  club?
9      A   We'll occasionally have a dinner
10 or something, me and Fiorito occasionally have
11 dinner.  That's about it.
12     Q   When he's up from Florida.  Right?
13     A   Yeah.  He's very busy.
14     Q   And he goes back and forth?
15     A   He goes back and forth.  I've
16 never been to Florida, never went on vacation,
17 nothing like that.  But we have dinner
18 together once in a while.
19     Q   And you've been in the night club
20 as a patron since the incident.  Correct?
21     A   Since, the incident here?
22     Q   The incident at issue in this

Feder Reporting Company
(202) 863-0000

Page 43

1  case, yeah.
2      A   Yeah.
3      Q   When you work there on the
4  weekends are you there all night, basically?
5      A   From like 9:30 until 3:00 or 9:30
6  until 3:30.
7      Q   What are your responsibilities as
8  a security advisor at the night club?  What do
9  you do precisely?
10     A   Try to answer -- well, when I'm
11 there doing it I do the same thing that a
12 regular bouncer does.  A lot of times they'll
13 give me an assignment, you know, "This is the
14 VIP door.  Nobody can get in without a blue
15 wrist band on."  And if they're short on staff
16 and they need me to do something like that,
17 I'll do it.  But by and large, I just sort of
18 roam around the night club and try to look for
19 trouble and prevent it.
20         And when there is an incident
21 where the police are involved such as an
22 arrest, I will write up an internal report for

Feder Reporting Company
(202) 863-0000

Page 44

1  the night club and put it in their file so
2  that they'll have a record of it should
3  something like this ever happen again.
4          And like I say, I have gone to the
5  ABRA hearings to testify on their policies
6  before and, you know, things of that nature.
7      Q   Do the bouncers work under you in
8  your capacity as --
9      A   No.  I'm sort of separate.  I'm
10 sort of off to the side out of the chain of
11 command.  David McLeod is the head of, he's
12 the boss of the bouncers.
13     Q   He directly oversees what they do.
14     A   Yeah.
15     Q   Do you have any input into the
16 security system at the night club?
17     A   Yeah, I have input.  If I can come
18 up with something that I think will work
19 better than what they're doing, I'll voice it.
20 But they certainly don't have to do it.
21     Q   Now, what about the cameras, do
22 you know anything about the security cameras

Feder Reporting Company
(202) 863-0000

Page 45

1  in the night club?
2      A   I know they have a camera system.
3      Q   Do you know how it works?
4      A   No, I'm not familiar with it
5  really.  It's in the back office -- or not the
6  front office.  The office right inside the
7  door.  And I am never there.  There's other
8  people in the hierarchy of the bouncing staff
9  that sit there and answer phones and monitor
10 the cameras, but I never do.
11     Q   Have you ever had any involvement
12 in the installation of the cameras?
13     A   No.
14     Q   Do you know what the cameras can
15 see in the night club and what they can't see?
16         MS. PHILLIPS:  Objection as to
17 time.  You may answer.
18         THE WITNESS:  Just from glancing
19 at them.  They cover I think most of the areas
20 of the night club.
21         BY MR. CORCORAN:
22     Q   But at the time of the incident,

Feder Reporting Company
(202) 863-0000

Page 66

1   Q   Do you know anything about his
2   divorce?
3       MR. BRUCKHEIM: Objection.
4       THE WITNESS: I only know from
5   when I came to talk to Ms. Phillips a couple
6   weeks ago, they mentioned something about he
7   had some --
8       MS. PHILLIPS: No.
9       BY MR. CORCORAN:
10  Q   I have no interest in knowing what
11  your attorney has told you about the case.
12  A   Yeah, well, I didn't know. I did
13  become aware that something happened with his
14  marriage but I was unaware of it before a
15  couple weeks ago.
16  Q   But other than conversations with
17  counsel, did you have any knowledge about a
18  criminal proceeding involving Ramirez in
19  Arizona?
20  A   No.
21  Q   When you saw him going into the
22  night club, did you know he had handcuffs with

Feder Reporting Company
(202) 863-0000

Page 67

1   him?
2   A   No.
3   Q   Could you see them on his body?
4   A   I don't recall seeing them.
5   Q   You have knowledge about the metal
6   detector at FUR. Right?
7   A   Yeah.
8   Q   Did you have knowledge at the time
9   about the metal detector?
10  A   I knew it was there. But I can
11  tell you that in my retirement I'm authorized
12  to carry a gun anywhere in the country, and I
13  do carry a gun. And I walked through the
14  metal detector and it won't go off. I mean,
15  you know.
16  Q   The metal detector at FUR.
17  A   Because I get there beforehand.
18  Q   Before the club is open.
19  A   They have to turn them on and tune
20  them. So I don't think that they work 100
21  percent of the time.
22  Q   Well, would the metal detector

Feder Reporting Company
(202) 863-0000

Page 68

1   have detected the handcuffs that Officer
2   Ramirez came in with?
3   A   They should have.
4   Q   Do you think it was appropriate
5   for him to bring handcuffs into the night
6   club?
7       MS. PHILLIPS: Objection.
8       MR. BRUCKHEIM: Objection.
9       THE WITNESS: It's not a violation
10  of any rule.
11      BY MR. CORCORAN:
12  Q   Today as a security advisor of the
13  night club, would you want or care if off-duty
14  officers bring handcuffs into the night club?
15      MR. BRUCKHEIM: Objection.
16      THE WITNESS: No, I wouldn't care.
17      BY MR. CORCORAN:
18  Q   Why not?
19  A   Because it's just a matter -- it's
20  just a piece of equipment. Handcuffs don't
21  handcuff people. People handcuff people.
22  Q   But as you have already testified,

Feder Reporting Company
(202) 863-0000

Page 69

1   you know, based on your experience as a police
2   officer, you would see no reason to carry
3   handcuffs with you when you're off duty.
4   Right?
5       MS. PHILLIPS: Objection;
6   misstates his previous testimony. But you may
7   answer.
8       THE WITNESS: There are some guys
9   that carry the whole, everything around. They
10  carry paperwork around with them in case they
11  run into something. I mean it's just a matter
12  of your approach and your level of dedication,
13  I guess. But I certainly wouldn't.
14      BY MR. CORCORAN:
15  Q   You described it, did you not, as
16  something a rookie would do, right?
17  A   Yeah.
18  Q   What does that mean when you say
19  that?
20  A   It means that they have energy and
21  they think that they are really making a
22  difference and catch bad guys and all that

Feder Reporting Company
(202) 863-0000

Page 70

1  kind of stuff, which as we all know can only
2  cause you trouble.
3     Q    In your experience if you are off
4  duty it's better to call the uniformed
5  officers and let them do the police job. Is
6  that fair to say?
7     A    Yep.
8     Q    You see a problem.
9     A    Yep. Unless it's an emergency
10 situation.
11    Q    Now, as of the night in question
12 and you're talking to Ramirez and he's going
13 to the night club -- let me preface my next
14 series of questions by saying, you know,
15 please describe to the extent your
16 recollection permits all the details you can
17 think of so we make sure we get a full record
18 of your testimony and we don't have to call
19 you in again to bug you.
20         As of the night in question, you
21 see Ramirez going into the night club. You
22 weren't particularly good friends with any of

Page 71

1  these off-duty officers. Correct?
2     A    No.
3     Q    You just knew them casually.
4     A    I knew them, worked with them.
5     Q    Were you at that point, though,
6  good friends with John Fiorito?
7     A    Yeah.
8     Q    He's a very good friend by
9  comparison. Right?
10        MS. PHILLIPS: Objection.
11        THE WITNESS: By comparison, yeah.
12        BY MR. CORCORAN:
13    Q    What about Michael Romeo, same
14 thing?
15    A    Less so than John. John is more
16 of a friend than Michael is.
17    Q    When you saw Ramirez going into
18 the night club, did you have at that point any
19 conversations with John Fiorito?
20    A    I might have been talking to
21 Fiorito when I saw Ramirez.
22    Q    So Fiorito came outside the night

Page 72

1  club to see you.
2     A    He was standing outside the night
3  club.
4     Q    He saw you pull up and he came
5  over and you were in uniform. Right?
6     A    Right. I was in a marked police
7  car in uniform.
8     Q    During that night on the night of
9  March 11th or the early morning of the 12th,
10 at any point did you go in the night club?
11    A    I don't think I did.
12    Q    You were always outside the whole
13 time.
14    A    I think I was.
15    Q    Now, after the time that you saw
16 Ramirez going in, when was the next time that
17 you had occasion to do anything relating to
18 the night club?
19    A    When I came back.
20    Q    And why did you come back?
21    A    John called me and said, "Can you
22 come back?" or "Can you swing by the night

Page 73

1  club? We have a problem," or "We have an
2  incident," or we have something. "We have an
3  incident." He asked me to come back and I
4  said okay.
5     Q    Now, what did he tell you besides
6  we have an incident?
7     A    That's all.
8     Q    He didn't say anything specific
9  about it?
10    A    Not on the initial conversation.
11    Q    How did he reach you?
12    A    Cell phone.
13    Q    And he has your cell phone because
14 he's a friend of yours?
15    A    Yeah, and I answer telephones for
16 enemies too, sometimes.
17    Q    Now, had there ever been another
18 occasion before this night when he had called
19 you to come do something in the night club
20 because of a problem?
21    A    I don't remember -- perhaps. It
22 wasn't an unusual thing. You know, he said,

Page 74

1  "Hey, we got something going on here. Can you
2  come by?" I didn't think anything of it. I
3  just said, "Okay. I'm on my way."
4     Q   Is that an acceptable way in your
5  experience as a police officer for citizens to
6  ask for police help? That's okay?
7         MS. PHILLIPS: Objection.
8         THE WITNESS: That's fine. That's
9  better than dialing 911 on a busy Friday night
10 and getting put on hold for half an hour.
11        BY MR. CORCORAN:
12    Q   Because it's a more direct way to
13 get assistance. Right?
14    A   That's right.
15    Q   Would you have responded the same
16 way if it was somebody you didn't know as
17 well?
18    A   If it was somebody that they had
19 my cell phone number and they asked me to
20 come, I would come. A lot of nighttime
21 businessmen around downtown had my cell phone
22 number.

Feder Reporting Company
(202) 863-0000

Page 75

1     Q   It's good for them to have a
2  relationship with police officers. Right?
3     A   Exactly.
4     Q   Because there's times where they
5  need assistance at night.
6     A   Exactly.
7     Q   When he contacted you, could you
8  have simply referred his complaint to the
9  dispatcher?
10    A   I could have. But I knew that it
11 was a very busy night that night. And I
12 didn't believe that if the dispatcher had
13 voiced it that they would have gotten a
14 response. I mean I knew that all the units in
15 Sector 1 of the First District were tied up on
16 other assignments at the time.
17    Q   Could you also have sent somebody
18 like a regular officer to respond to his
19 request?
20        MS. PHILLIPS: Objection; form,
21 asked and answered. But you may answer.
22        THE WITNESS: Yeah.

Feder Reporting Company
(202) 863-0000

Page 76

1         BY MR. CORCORAN:
2     Q   But you chose not to.
3     A   Right.
4     Q   What did you do after the call
5  came in and he asked you to come in, what did
6  you do then?
7     A   Drove there.
8     Q   Did you tell anyone where you were
9  going?
10    A   Not at that point in time.
11    Q   Did you need to tell anybody?
12    A   Not really.
13    Q   You were the ranking officer, so
14 you could in your judgment decide what was
15 appropriate.
16    A   Yeah.
17    Q   When did you arrive at the night
18 club?
19    A   I can't remember the exact time.
20 I'm sure a few minutes after he called me.
21    Q   Was it after midnight at that
22 point?

Feder Reporting Company
(202) 863-0000

Page 77

1     A   I'm inclined to say yes.
2     Q   Were you with anyone?
3     A   No.
4     Q   You were alone.
5     A   Yes.
6     Q   And you were in a patrol car?
7     A   Yes, a marked police car.
8     Q   And what is the first thing you
9  did when you got there?
10    A   Drove up and tried to scan the
11 scene to see what was going on.
12    Q   Where did you put the car?
13    A   In the street in front of FUR.
14    Q   Patterson Street?
15    A   Yeah, Patterson Street.
16    Q   What did you see initially? Could
17 you tell where you were needed?
18    A   Yeah. I saw Mr. Mazloum secured
19 in handcuffs, as I recall, and sitting on the
20 curb in front of the night club.
21    Q   On which side of the street was he
22 on?

Feder Reporting Company
(202) 863-0000

Page 78

1   A    I don't recall.
2   Q    Who was with him?
3   A    Ramirez, Fiorito, and the guy, I
4   think his name is Michael, but Persons.
5   Q    The bouncer.
6   A    The bouncer, yes.
7   Q    Persons, did you know him before
8   the night in question?
9   A    No.
10  Q    Had you ever seen him even?
11  A    No. I might have seen him, but it
12  didn't register who he was.
13  Q    Is he friends with you today as we
14  speak?
15  A    No.
16  Q    He still works for the night club.
17  Right?
18  A    He quit, then he came back. And
19  I'm not sure whether he's working there or not
20  right now.
21  Q    Have you ever talked with him
22  about the incident since it happened?

Feder Reporting Company
(202) 863-0000

Page 79

1   A    Nothing of substance.
2   Q    But you had sort of, other than
3   seeing him casually you didn't know him really
4   at all.
5   A    No, I didn't know him.
6   Q    So they were all standing there.
7   Correct?
8   A    Mmm-hmm.
9   Q    And they were the people that you
10  spoke to. Right?
11  A    Right, those three.
12  Q    Now, other than them, did you ever
13  that whole night speak to anyone else besides,
14  also besides the police officers who arrived
15  later, did you speak to anybody else on the
16  scene about what had happened?
17  A    No.
18  Q    Just those three guys.
19  A    Those three.
20  Q    Who did you talk to first of the
21  three?
22  A    Probably Fiorito.

Feder Reporting Company
(202) 863-0000

Page 80

1   Q    Do you recall what he told you?
2   A    Well, they all said basically the
3   same thing. And he said that this guy went
4   berserk in the night club and they had to drag
5   him out. And he was fighting like a mad man
6   and they got him out and he hurt himself by
7   falling all over the place.
8   Q    And that was that.
9   A    That's right.
10  Q    Then who did you talk to after
11  him?
12  A    Then Ramirez. I said, "Did you
13  use any service weapons on him?" And he said,
14  "I don't have any service weapons on me." And
15  I said, "Well, how did he get his injuries?"
16  And he said, "Well, he scraped his knee
17  against the concrete," or floor, and he had
18  abrasions on the corners of his body. But it
19  was consistent with having fallen down. They
20  were the injuries that you would get if you
21  fell down. So I said, "Okay, he fell down."
22  Q    How did Ramirez look to you?

Feder Reporting Company
(202) 863-0000

Page 81

1   A    Disheveled. His pants were torn
2   from his mid-thigh all the way down. He was
3   perspiring. He was agitated. He was excited.
4   Q    Did he look angry?
5   A    No.
6        MR. BRUCKHEIM: Objection.
7        THE WITNESS: No.
8        BY MR. CORCORAN:
9   Q    Did he appear intoxicated?
10  A    No. He wanted to handle the
11  arrest.
12  Q    Was he hurt in any way?
13  A    Not that I recall. He might have
14  had a scratch or two, but nothing that
15  required immediate medical attention.
16  Q    Do you ever recall using the
17  phrase "adrenalin rush" in connection with
18  Officer Ramirez when you looked at him?
19  A    Didn't I just use it? Yeah, I
20  think, it appeared like he was pumped up at
21  the time.
22  Q    Did he at that point tell you that

Feder Reporting Company
(202) 863-0000

Page 94

1  have been so quick to take their word for what
2  happened?
3         MR. BRUCKHEIM: Objection.
4         MS. PHILLIPS: Objection as to
5  form. And you may answer.
6         THE WITNESS: That's hard to say.
7         BY MR. CORCORAN:
8    Q    It would depend on the person.
9    A    Yeah.
10   Q    But it was easier to accept what
11 they were telling you to be the truth since
12 you already knew these individuals. Right?
13   A    I would say.
14        MR. BRUCKHEIM: Objection as to
15 form.
16        MS. PHILLIPS: Objection.
17        THE WITNESS: I would say yes.
18        BY MR. CORCORAN:
19   Q    Now, you testified just a moment
20 ago that no one ever came up to you and said,
21 "Hey, this guy got beat up." Right?
22   A    That's correct.
            Feder Reporting Company
              (202) 863-0000

Page 95

1    Q    It's also true, isn't it, that
2  nobody else ever came up to you and said,
3  "This guy was going crazy and he hit these
4  guys" or "hit a police officer." Right?
5    A    No, nobody said that.
6    Q    So the sole universe of people who
7  told you what happened were the three we were
8  just talking about.
9    A    That's correct.
10   Q    After you talked to them, what did
11 you do next?
12   A    I called for a unit because I knew
13 that it would require a unit to -- well, it
14 was my determination that your Plaintiff would
15 be placed under arrest for simple assault and
16 that would require a unit to handle it. So I
17 called for a unit to handle it.
18        I realized that I couldn't or
19 wasn't going to handle it myself. And I got
20 on the police radio and asked for a unit to
21 come up to the night club. When I did, the
22 dispatcher said, "Is that an arrest? Is that
            Feder Reporting Company
              (202) 863-0000

Page 96

1  a disorderly?" And that's police parlance for
2  a fight or something that can be handled with
3  no report. And my response was, "No. This is
4  an arrest situation." So I was calling for a
5  unit to come up and handle the arrest.
6         MR. CORCORAN: I have an exhibit
7  to mark.
8         (Document marked Deposition
9  Exhibit No. 1 for identification and
10 subsequently attached to the deposition.)
11        BY MR. CORCORAN:
12   Q    This is Allman 1 which is
13 identified as a Transcript of Radio
14 Transmissions. Lieutenant Allman, have you
15 seen this document ever before?
16   A    I have seen a transcript. I don't
17 know if it was exactly this document. But I
18 have seen this transcript before.
19   Q    If you look at the parentheticals
20 at the top of the page, it says 0152 hours.
21 Is that 1:52 in the morning?
22   A    That's correct.
            Feder Reporting Company
              (202) 863-0000

Page 97

1    Q    And Cruiser 100, was that the car
2  you were driving?
3    A    That would be me.
4    Q    So anytime it says Cruiser 100,
5  this is a transcript of what you said to the
6  dispatcher. Correct?
7    A    Correct.
8         MS. PHILLIPS: And you mean within
9  this document, Exhibit 1. Correct?
10        MR. CORCORAN: Yes. I'll just
11 state for the record I believe that this was
12 created by Mr. Skip Coburn.
13        BY MR. CORCORAN:
14   Q    If you look down to the middle it
15 says, "What do you have there, a disorderly?"
16 Do you see that?
17   A    Yes.
18   Q    And you say, "Unh, I believe he's
19 gonna have to go for simple assault." Is that
20 accurate to your recollection?
21   A    Yes.
22   Q    So that's what you were saying to
            Feder Reporting Company
              (202) 863-0000

Page 106

1  Q  How often did they work under you?
2  A  They were assigned to the midnight
3  section. They worked the midnight shift. So
4  I was more familiar with them.
5  Q  Did they generally work together?
6  A  Generally.
7  Q  Why is that?
8  A  Just because --
9      MS. PHILLIPS: Objection, but you
10 may answer.
11     THE WITNESS: They get along.
12 They requested it. The sergeant said okay.
13     BY MR. CORCORAN:
14 Q  Do they have good reputations as
15 officers?
16 A  Not especially.
17 Q  Did you ever hear any negative
18 things about them as officers or have any
19 disciplinary problems?
20 A  I heard something about Acosta,
21 but I was not involved in the investigation of
22 it, something about him chasing a guy in a

Feder Reporting Company
(202) 863-0000

Page 107

1  stolen car and firing his gun and not
2  reporting that he fired his gun right away, or
3  something along those lines. But I don't
4  remember anything negative about Smith.
5  Q  Are they friends of yours?
6  A  No.
7  Q  Have you ever socialized with
8  either of them?
9  A  No.
10 Q  When was the last time you saw
11 either one of them?
12 A  I saw them pretty regularly up
13 until the time I retired last May. I don't
14 recall seeing either of them since then.
15 Q  Have you ever seen them in FUR as
16 patrons?
17 A  I don't recall seeing them.
18     MR. CORCORAN: Let's take two or
19 three minutes.
20     MS. PHILLIPS: Okay.
21     (Recessed from 11:16 to 11:24
22 a.m.)

Feder Reporting Company
(202) 863-0000

Page 108

1      BY MR. CORCORAN:
2  Q  Going back to now we're in the
3  early morning of March 12, 2005. You
4  testified a moment ago, Lieutenant Allman, you
5  see officers Acosta and Smith arrive. They
6  get out of their patrol cars. Correct?
7  A  Okay.
8  Q  What do they do?
9  A  Walk up to where I'm standing.
10 Q  Why would they --
11     MS. PHILLIPS: Just a minute. I
12 think you said patrol cars. And so I just
13 want to object to form on that basis only.
14     MR. CORCORAN: What would be the
15 appropriate terminology to refer to the cars?
16     MS. PHILLIPS: Well, it's the
17 plurality, actually.
18     BY MR. CORCORAN:
19 Q  They were in one car. Right?
20 A  That's correct. They were in one
21 patrol car.
22 Q  Am I correct when I refer to it as

Feder Reporting Company
(202) 863-0000

Page 109

1  a patrol car or should I say squad car?
2  A  Whatever you prefer.
3  Q  Why were they the officers who
4  came over to talk to you initially? Why
5  wasn't it somebody else?
6  A  It was just their day, I suppose.
7  As a matter of fact, when they came up to me
8  they said, "Why can't you get some of these
9  rookies to handle it?" Well, I said, "This is
10 your complainant and that's your suspect. You
11 all handle it." And they said, "Why can't you
12 get some of these rookies" -- of course, they
13 only had like a couple years on the job
14 themselves, but there are people with less
15 experience than them -- "to handle it?" I
16 said, "I want you to handle it."
17     And there was no more discussion
18 after that. They didn't express any confusion
19 about what I told them. They expressed a
20 little bit of unwillingness about what I told
21 them to do, but they did not express confusion
22 to me.

Feder Reporting Company
(202) 863-0000

Page 110

1   Q   How did it come about, though?
2   Were they assigned by the dispatcher? Were
3   they the first car that was called to come see
4   you?
5   A   No. I just told them to handle
6   it.
7   Q   When they arrived --
8   A   I don't know what number they
9   were, but I could have told anybody to handle
10  it but they were there.
11  Q   They were the first uniformed
12  officers to approach you.
13  A   Right.
14  Q   So they weren't assigned by the
15  dispatcher to come and deal with it first.
16  A   I don't remember what their call
17  sign was, whether they answered up or what, or
18  whether they were 1011 or 1012. I'm not sure.
19  But when the units arrived on the scene,
20  they're the ones that walked up to me first.
21  Q   And you pointed out Mr. Mazloum
22  and said, "There's your suspect."

Feder Reporting Company
(202) 863-0000

Page 111

1   A   Right.
2   Q   And you used those precise words?
3   A   I think I said, "There's your
4   body," or something like that, "There's your
5   complainant. There's your body."
6   Q   Who is the complainant?
7   A   Persons.
8   Q   Persons was the complainant. So
9   you identified him as the complainant right
10  then and there to them?
11  A   Right.
12  Q   Did you use any words to the
13  effect of "Arrest this man" or anything like
14  that?
15  A   No. I thought it was clear from
16  my radio transmissions, from the context of
17  the situation, I felt that my directives to
18  them were very clear.
19  Q   And after you said that, did they
20  ask you any questions or communicate with you
21  in any regard?
22  A   Like I said, they only asked, "Why

Feder Reporting Company
(202) 863-0000

Page 112

1   can't you get one of these rookies?"
2   Q   Complained.
3   A   Yeah, complained about having to
4   handle it.
5   Q   Now, Acosta is a Hispanic guy.
6   Correct?
7   A   Yeah.
8   Q   Smith is a white guy?
9   A   Mmm-hmm, yes.
10  Q   Do you have any sense of what they
11  were like personally as people?
12  A   Well, I've had more contact with
13  Acosta. His father was also a policeman and I
14  worked with his father when he was on the
15  force. His father retired as an assistant
16  chief or something like that, deputy chief.
17  And so I had a better rapport with Acosta than
18  I did with Smith. But I didn't think that I
19  was telling them anything that they couldn't
20  handle or anything that they wouldn't do if I
21  told them to do it.
22  Q   Would you consider them by the

Feder Reporting Company
(202) 863-0000

Page 113

1   book officers?
2   A   No.
3   Q   You would not.
4   A   No.
5   Q   Why do you say that?
6   A   Several incidents prior to that of
7   the way they handled things, they're not by
8   the book.
9   Q   What do you mean? What instances
10  come to mind?
11  A   I think that they didn't like to
12  handle paperwork. I think that they would do
13  pretty much what they had to do to avoid
14  having to go through the tedious process of
15  handling arrest paperwork.
16  Q   And did you have that opinion of
17  them prior to this night?
18  A   I had inklings of it.
19  Q   What's Smith like as a person? Do
20  you have any opinion of him?
21  A   Now I do.
22  Q   What's the opinion now?

Feder Reporting Company
(202) 863-0000

Page 114

```
 1    A    Well, I thought that he was
 2  directly insubordinate to me that night and I
 3  resent that.
 4    Q    But at the time. Is he very
 5  serious?
 6    A    Yeah, usually pretty serious, I
 7  guess. I don't know.
 8    Q    Is there any possibility that they
 9  may have misunderstood what you told them to
10  do?
11    A    Well, I'm sure that that's what
12  they're saying now. But there was no doubt in
13  my mind at that time as to whether they
14  understood what I was telling them.
15    Q    And you have no doubt what you
16  intended to tell them. Correct?
17    A    No doubt.
18    Q    Which was "Arrest this guy"?
19    A    Yes.
20    Q    And they complained a little bit
21  to you.
22    A    Yes.
```
Feder Reporting Company
(202) 863-0000

Page 115

```
 1    Q    And then what happened next?
 2    A    I said, "No. You handle it." And
 3  they acted as though that they were going to
 4  handle it and they took possession of the guy.
 5  And I don't remember whether they exchanged
 6  the cuffs, but they made the usual motions as
 7  to, you know, taking control of him and
 8  putting him -- I don't remember whether I ever
 9  actually saw them put him in a transport car
10  or walk him over towards it. But I was
11  satisfied that they were going about the
12  business of handling this case.
13    Q    How much longer did you remain on
14  the scene after that?
15    A    Not much longer. I was done.
16    Q    Five minutes?
17    A    Maybe.
18    Q    What did you do while you were on
19  the scene?
20    A    Just looked around, got back in my
21  car, watched to make sure that the other units
22  who came there left and went back in service
```
Feder Reporting Company
(202) 863-0000

Page 116

```
 1  to answer the radio and drove off.
 2    Q    Did you talk to anyone else on the
 3  scene?
 4    A    I don't recall.
 5    Q    Did you have any further
 6  conversations with Mr. Fiorito?
 7       MS. PHILLIPS: Objection as to
 8  time. Before he left the scene?
 9       BY MR. CORCORAN:
10    Q    Before you left the scene and
11  after Acosta and Smith arrived.
12    A    I can't recall.
13    Q    But you left.
14    A    Yes, I left.
15    Q    Where did you go?
16    A    Around the First District Sector 1
17  area answering, going to calls of interest. I
18  don't remember exactly. But I left there.
19    Q    So you're still on shift at this
20  point. Right?
21    A    Yes.
22    Q    So you had more work to do.
```
Feder Reporting Company
(202) 863-0000

Page 117

```
 1    A    I didn't get off until like 6:00
 2  o'clock that morning.
 3    Q    Did you ever again that night run
 4  into or see Acosta and Smith? Or I should say
 5  that morning.
 6    A    Yes.
 7    Q    Where did you see them?
 8    A    It was out on the street
 9  somewhere. The location was -- I don't
10  remember the exact location. Just on the
11  street. They were in their car. I was in
12  mine.
13    Q    Did you have any conversation with
14  them?
15    A    I think I had found out by then
16  that they didn't arrest the guy.
17    Q    Did they tell you that?
18    A    I don't remember. I don't
19  remember whether they told me or whether
20  Fiorito told me or --
21    Q    So you had a subsequent
22  conversation with Fiorito after you left the
```
Feder Reporting Company
(202) 863-0000

Page 118

```
1  scene?
2     A    After I left the scene I found out
3  later that they did not place the subject
4  under arrest.  I found that out -- I don't
5  remember whether it was McLeod or Fiorito.  I
6  think I found that out from somebody at FUR.
7     Q    Did they phone you on your cell
8  phone to tell you that?
9     A    I would think that that's probably
10 the way it happened.
11    Q    And do you recall specifically
12 what they told you other than "He's not
13 arrested?
14    A    No, I don't recall specifically.
15 I think it was along the lines of "They let
16 the guy go."
17    Q    What was your reaction to that?
18    A    I was a little bit flabbergasted
19 and I wanted to find out why.
20    Q    And then when you saw Officers
21 Acosta and Smith, did you have a discussion
22 with them about this?
```

Feder Reporting Company
(202) 863-0000

Page 119

```
1     A    A brief discussion.
2     Q    What did you tell them?
3     A    I basically confirmed that they
4  had not handled the arrest.  And rather than
5  ask them why right then and there, I knew that
6  I should probably go back and ask other
7  people.  So I wanted to go back and talk to
8  Persons again and Fiorito again and anybody
9  else I could find there to find out what they
10 had done, exactly what they -- well, you know,
11 actually started investigation on them.  That
12 was my intent.  I was preparing starting an
13 investigation on them.  And I didn't want to
14 question them as the first step in my
15 investigation.  I wanted to save that until I
16 found out a little bit more background
17 information.
18    Q    Did they try to explain to you why
19 they hadn't made an arrest when you saw them
20 later that night?  Did they give you an
21 explanation?
22    A    Not a good one as I recall.
```

Feder Reporting Company
(202) 863-0000

Page 120

```
1     Q    Do you recall what they told you?
2     A    No, not exactly.
3     Q    But you weren't satisfied with --
4     A    No, I was not satisfied.
5     Q    Did you express to them any
6  displeasure at them not having done what you
7  wanted them to do?
8     A    I think I said that that's -- I
9  didn't yell at them.  I didn't say, "Hey, you
10 disobeyed me."  I was pretty calm about it,
11 because I didn't want to, you know, go off
12 half-cocked.  I wanted to find out what they
13 did.  But I definitely wanted to follow up on
14 it because I felt that it was a pretty serious
15 act of insubordination on their part.
16    Q    With that conversation that was
17 it, that's all you said to them, and then you
18 drove off?
19    A    Mmm-hmm.
20    Q    And you were sort of thinking
21 about what you would need to do to follow up?
22    A    Thinking about what I was going to
```

Feder Reporting Company
(202) 863-0000

Page 121

```
1  do, thinking about what they call numbers,
2  investigation numbers for the Police
3  Department.  Anytime anything happens on the
4  Police Department you're supposed to get a set
5  of numbers.
6     Q    Numbers, what does that refer to?
7  What does it mean?
8     A    It's sort of, it's the vehicle for
9  an investigation.  Whenever an investigation
10 takes place you call central source and get a
11 set of numbers.  And that becomes a tracking
12 device for the investigation through its
13 course on the Police Department.
14       So I knew that I was going to have
15 to get a set of numbers for an investigation
16 and write up a preliminary report addressing
17 their insubordination.  But I decided not to
18 do it at that point in time because it was
19 getting late.  The club had closed, I believe,
20 at that point.  I'd have to get back with the
21 people at FUR.  I didn't really know how to
22 classify the investigation at that point.  So
```

Feder Reporting Company
(202) 863-0000

Page 154

1  about it, and she just basically confirmed
2  just certain sketchy details. That's about
3  it.
4      Q    Did you have any additional
5  conversations with anyone associated with FUR
6  about the incident?
7          MS. PHILLIPS: Just that day or --
8          MR. CORCORAN: That day.
9          MS. PHILLIPS: Okay.
10         THE WITNESS: Not that I recall.
11         BY MR. CORCORAN:
12     Q    Did you ever have any
13 conversations at the time of the incident or
14 thereafter about the incident with Michael
15 Romeo?
16     A    Not that I recall. Maybe, I mean
17 he might have asked what happened or --
18 nothing of substance. I mean nothing that
19 registers with me.
20     Q    And in the days that followed the
21 incident in 2005, let's say through the
22 summer, did you ever have discussions with

Feder Reporting Company
(202) 863-0000

Page 155

1  John Fiorito about the incident?
2      A    Yeah. We talked about it a bit,
3  because Ramirez kept bringing it up. He was
4  talking about it a lot. As you know,
5  eventually Mr. Coburn got involved in it and
6  it was a matter of, it was a topic of
7  discussion for a little while.
8      Q    Among whom?
9      A    Ramirez mostly.
10     Q    He was calling you a lot to talk
11 to you about it?
12     A    Right. And I just told him, "The
13 only thing you can do now is just relax,
14 chill, and wait until it's over."
15     Q    And had he been put at this point
16 into non-contact status?
17     A    Yes.
18     Q    So he was then concerned about
19 that. Correct?
20     A    Right. He was very concerned
21 about that.
22         MR. BRUCKHEIM: Objection.

Feder Reporting Company
(202) 863-0000

Page 156

1          BY MR. CORCORAN:
2      Q    Going back to the conversation you
3  said you had with the complainant when he was
4  making the complaint on the 12th, did you take
5  notes of that conversation?
6      A    The phone conversation with the
7  complainant. If I did, I left it with the
8  packet that was already there and the packet
9  was seized by the FBI. So I never saw the
10 packet again after that night.
11     Q    When you talked to him was he at
12 the station when you phoned him?
13     A    Was he at the station?
14     Q    Yes.
15     A    No. I was at the station.
16     Q    So you were calling him after he
17 had left.
18     A    He had left the station and I had
19 called him.
20     Q    And you were Watch Commander at
21 that point.
22     A    Yes. I was the midnight Watch

Feder Reporting Company
(202) 863-0000

Page 157

1  Commander.
2      Q    And the purpose of the call was to
3  explain to him how the investigation was to
4  proceed?
5      A    Yes. I thought that I would be
6  conducting the investigation. So I spoke to
7  him as if I were going to be conducting the
8  investigation.
9      Q    And did you share with him at that
10 time any of your thoughts about his
11 culpability in the whole incident?
12     A    No. I was pretty matter-of-fact
13 about it. I said, "Well, your complaint will
14 be presented to the United States Attorney and
15 they'll make a determination as to whether an
16 assault occurred, whether you were
17 brutalized," you know, just basically gave him
18 a brief step by step synopsis of the way I
19 thought the investigation was going to
20 proceed.
21     Q    That was all you talked about with
22 him?

Feder Reporting Company
(202) 863-0000