UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM :
:
Plaintiff :
:
vs. : Civil Action No.
: 1:06:CV 00002
: (JDB)
DISTRICT OF COLUMBIA, :
et al. :
:
Defendants :

Washington, D.C.
Wednesday, November 29, 2006

Deposition of:

OFFICER DAVID SMITH

called for oral examination by counsel for Plaintiff, pursuant to notice, at the offices of Katten Muchin Rosenman, LLP, 1025 Thomas Jefferson Street, N.W., East Lobby, Suite 700, Washington, D.C. 20007-5201, before Renee A. Feder, CSR, a Notary Public in and for the District of Columbia, beginning at 2:53 p.m., when were present on behalf of the respective parties:

**A. I can't recall, sir. This incident happened two years ago.**
Q. So he was there and you don't remember if you talked to him. Do you remember what Officer Acosta was doing?
**A. He was standing near me. Other than -- I can't recall, sir. I don't want to tell you something that is not true.**
Q. Okay. What do you recall next occurring?
**A. I remember Officer Ramirez brought out the subject in handcuffs and walked him over to me.**
Q. When you say "brought out," where was he coming from?
**A. The inside of the nightclub.**
Q. You saw him physically come out the door of the nightclub?
**A. He was standing in the doorway the first time I saw him.**
Q. He was not standing in the street?
**A. No.**

Q. What did you see him do with the individual?
**A. He escorted him to me.**
Q. Right to you?
**A. Yes.**
Q. Now, you knew Officer Ramirez before. Correct?
**A. He is an acquaintance, yes.**
Q. How was he dressed that night?
**A. He was dressed off duty.**
Q. How did he look?
**A. I can't recall what he looked like.**
Q. But you didn't get any sense that he was distressed or upset?
**A. No.**
Q. How did the individual that he brought over to you look?
**A. He was slouched over. His T-shirt was torn. Other than that, I can't recall exactly what he looked like.**
Q. Did he have any blood on him?

**A. He had a little bit on his T-shirt.**
Q. How about his face?
**A. I can't recall what he had on his face.**
Q. Did he look like he was Caucasian?
**A. No.**
Q. What did he look like?
**A. He looked like he was Middle Eastern.**
Q. You were able to ascertain that right away?
**A. No, sir, I wasn't.**
Q. You ascertained that when?
**A. When he started speaking.**
Q. How did you know that from his speech?
**A. He had an accent, I guess is the word I am looking for.**
Q. So you could tell, you could tell from talking to him that he was probably Middle Eastern?

**A. I didn't know his nationality because we are not allowed to make determinations about that. But from his accent I inferred.**
Q. Do you recall at what point you made that inference in your conversation with him?
**A. No.**
Q. But sometime during it?
**A. Yes.**
Q. Now, when Officer Ramirez brought him toward you, you didn't know -- let's clarify. You didn't know he was there?
**A. That is correct.**
Q. And no one said on the radio we need to assist Officer Ramirez. Correct?
**A. Correct.**
Q. Were you surprised to see him?
**A. No.**
Q. Why not?
**A. Because off duty officers can do whatever they want. If they want to hang out**

**fight victims just like we fight suspects.**
Q. So putting handcuffs on, in other words, is not an indication that you believed he had done anything wrong. Is that fair to say?
**A. That is correct.**
Q. You just didn't know. Right? At that point you had no idea who he was or what had happened. Right?
**A. That is correct.**
Q. You had to find out. That is part of your job. Correct?
**A. Correct.**
Q. So did it surprise you that the individual was already handcuffed?
**A. No.**
Q. Did you have any thought at all about why he was handcuffed at that point?
**A. It is not my job to think, sir.**
Q. You were just reacting to the situation based on your training?
**A. Yes.**

Q. Now, why was it necessary to switch handcuffs?
**A. Because the on duty officers are supposed to relieve the off duty officers on the scene.**
Q. Any time an off duty officer is involved in an incident?
**A. Technically, according to general orders, they are supposed to remain on the scene to provide on duty officers with the correct information about how to classify reports, and also arrest any subjects, if necessary.**
Q. The entire time?
**A. They are supposed to, yes, sir.**
Q. Did that happen in this case?
**A. I don't know.**
Q. Why do you say you don't know?
**A. Just because I didn't see somebody doesn't mean they are not there, sir.**
Q. Did he remain with you at any time?

**A. No.**
Q. So, as far as you and Officer Acosta were concerned, he was not present when you were investigating what had occurred?
**A. That is correct.**
Q. Now, you understood that the handcuffs that you were taking off the plaintiff belonged to Officer Acosta or were issued to him -- sorry, Officer Ramirez?
**A. I don't know whose handcuffs they were, sir.**
Q. But you simply returned them to Officer Ramirez, whosever they were?
**A. That is correct.**
Q. And he took them and walked away.
Do you know if the police department has any policy about carrying handcuffs when off duty?
**A. It is not a requirement.**
Q. Is there any policy against carrying handcuffs when a police officer is off duty?

**A. If there is, I don't know, sir.**
Q. Do you carry your handcuffs when you are off duty?
**A. No, I don't.**
Q. Why not?
**A. Because I don't socialize in the city when I am off duty.**
Q. When you are outside of the city, do you carry your handcuffs with you?
**A. No, I don't.**
Q. Why not?
**A. Because they are not a part of the accessories that I carry, sir.**
Q. Do you think that you need to carry them with you when you are off duty?
**A. I can't speculate on that, sir.**
Q. Do you ever have any concern that you might want your handcuffs with you in the event you have to deal with a situation?
**A. If I have to deal with a situation, sir, I call the police.**
Q. What about if you have alcoholic

Q. He is not there at all. Who is there when you were speaking to the plaintiff?
**A. Myself and Officer Acosta.**
Q. Did you participate equally in that conversation?
**A. We did.**
Q. And you were both together the whole time when you had that conversation?
**A. I can't recall where his proximity to me was. I know I initially spoke to Mr. Mazloum.**
Q. Please describe for me that discussion.
**A. I asked him what had occurred. He mumbled a lot. He couldn't speak properly and he was slurring his speech. He reeked of alcohol. And then he stated to me, I am sorry, I am sorry. Once again, this is to the best of my recollection. I asked him what had happened. He said that some black guys had beat him up. I said, okay, what would you like me to do, sir. He told me he wanted me**

**to go into the club and arrest them. I said I would be happy to do so, but you would have to provide me some more information other than some black guys. He said he could not do so. I explained to him without more of a description I could not in good faith make any arrest.**
**Then he changed his story and said he had fallen off the stage and that he was sorry. And then he kept repeating he was sorry.**
Q. And that is the full substance of the conversation you had with him?
**A. To the best of my recollection.**
Q. Now, as you were speaking to him, it was during the course of this conversation that you concluded that he was probably Middle Eastern?
**A. Yes, sir.**
Q. Could you understand everything he was saying?
**A. He mumbled a lot. I couldn't**

**understand everything he was saying. But my job was to get a certain amount of information.**
Q. Would you attribute part of the difficulty in understanding what he was saying to the fact he was Middle Eastern?
**A. No.**
Q. Why not?
**A. Because he spoke -- even though he spoke with an accent, he had pretty good diction.**
Q. Do you know if he understood everything that you were saying?
**A. He acted like he did.**
Q. Why do you say that? What did he do?
**A. Because he made responses to my questions.**
Q. He was able to respond. So he wasn't -- he wasn't incoherent then?
**A. No.**
Q. Did you get a better look at him

as you were talking to him as to how injured he was?
**A. At this point, once again, I can't recall how much blood he had on him. But in any circumstance, where there is even the slightest possibility of injury we are to notify the D.C. Fire Department through our dispatcher.**
Q. Did you do so?
**A. I did not, but Officer Acosta did.**
Q. And you witnessed him do that?
**A. Yes.**
Q. Now, you said he reeked of alcohol. Did you do anything to test whether, in fact, he was inebriated?
**A. No.**
Q. You didn't conduct a field sobriety test?
**A. A field sobriety test is conducted on DUI suspects.**
Q. So it wasn't appropriate in your opinion to do that kind of test here?

**A. That is correct. Once again, we were treating him as a victim.**
Q. When you say victim, what do you mean? Do you mean to say you were not assuming that he had done anything wrong. Is that correct?
**A. That is correct.**
Q. You had to find out what had happened?
**A. We had to investigate.**
Q. In your experience, are there circumstances in which an individual is initially handcuffed but then it turns out to be somebody who has been the victim of an illegal act?
**A. Yes.**
Q. How many times have you experienced that to be the case?
**A. I can't estimate.**
Q. More than ten?
**A. I can't estimate, sir.**
Q. But it is common?

**A. Yes.**
Q. And how is it in those circumstances typically that an individual becomes handcuffs even though they are not to blame.
**A. Even though they are a victim, when we get on the scene the first thing our responsibility to do is to calm everything down, to make sure that the scene is safe. If the suspect is acting outrageous and yelling and screaming and waving his arms and posing a threat, then he goes into handcuffs. Or the victim is doing the same, then he goes into handcuffs, until we establish exactly what is going on.**
Q. Once you do that you can release the individual?
**A. That is correct.**
Q. In fact, that is what happened with this individual?
**A. That is correct.**
Q. Who made the decision to release

Mr. Mazloum from his handcuffs?
**A. Lieutenant Allman.**
Q. Lieutenant Allman told you to do that?
**A. No, Lieutenant Allman told us to get rid of him. Lieutenant Allman did not tell us to take him out of handcuffs. When the decision was made to get rid of him, then I took the handcuffs off.**
Q. The decision to get rid of him, was that somewhere in the midst of your conversation with him?
**A. Yes.**
Q. Lieutenant Allman then reappeared came over to you and Officer Acosta?
**A. We had several dealings with Mr. Mazloum. In between one of the dealings is when we asked Lieutenant Allman what he would like us to do with him.**
Q. That is when he said get rid of him?
**A. Just get rid of him.**

Q. You understood that to mean to release him?
**A. That is correct.**
Q. Let me make this clear or get this clear from you. It would be your testimony that at no time Lieutenant Allman told you to arrest this individual?
**A. That is correct.**
Q. And you only took the handcuffs off after Lieutenant Allman gave you the order to get rid of him?
**A. That is correct.**
Q. Now, it is true, is it not, that night -- let me strike that. That night you never had the occasion to go into the nightclub. Correct?
**A. In an unofficial capacity, no. In an official capacity, yes.**
Q. When did you go in the nightclub?
**A. I can't recall, sir.**
Q. Why did you go into it?
**A. To the best of my memory, we had a**

**call for a burglar alarm inside the nightclub during the daywork tour of duty. We responded over there and a patron was sleeping inside. And we escorted him out.**

Q. Was this on March 11?

**A. No.**

Q. This was later or before?

**A. Before.**

Q. That is the only time in your career that you ever been inside the FUR nightclub?

**A. Sir, there are approximately twelve to fifteen nightclubs in the city. I can't estimate how many times or how many calls I had to each of those nightclubs because they are all inside my beat and I work them all every Thursday, Friday and Saturday.**

Q. Getting back to March 11th, you didn't go in the nightclub that night. Correct?

**A. No.**

Q. No one asked you to go in?

**A. No.**

Q. And it is true as well that you were not there to witness anything that happened up to the time that the plaintiff was handcuffed. Correct?

**A. That is correct.**

Q. So you have no idea what happened inside. Right?

**A. That is correct.**

Q. So you don't know the circumstances under which he got handcuffed. Correct?

**A. Yes.**

Q. And you don't know whether he was the perpetrator or the victim or what. Right?

**A. That is correct.**

Q. And you don't know whether he fell on the floor or rolled around on the floor?

**A. That is correct.**

Q. So it is conceivable, isn't it, that his appearance and smell might relate to what happened to him inside the nightclub?

**A. Once again, it is not my job to assume. I can only go by the facts I have at the time.**

Q. And you could only observe how he was right then and there but you couldn't opine and you don't know how he got that way?

**A. That is correct.**

Q. Now, did Mr. Mazloum ever indicate to you that he needed any medical attention?

**A. No.**

Q. Or wanted it?

**A. No.**

Q. He never did?

**A. No.**

Q. Never asked for it?

**A. Not to my recollection, he did not.**

Q. Did he ever complain about his condition or how he felt?

**A. Sir, I can't recall whether he did or not. I know specifically we called the ambulance for him.**

Q. And he did tell you he felt, initially he indicated to you that he believed he had been assaulted by a big, black guy. Right?

**A. He said some black guys beat me up.**

Q. Was he distraught when he told you this?

**A. He was distressed, yes.**

Q. In what way? Was he crying?

**A. No.**

Q. Was he shouting?

**A. He was loud. I wouldn't consider him shouting. But, obviously, he was upset.**

Q. And upset meaning he felt like he had been mistreated? Is that fair to say?

**A. I can't assume what he was thinking at the time.**

Q. You couldn't tell.

Did you take him to be a particularly large person?

**A. No, sir.**

Q. Could you tell whether he looked in pain?
**A. He did not look in pain.**
Q. At the time you were telling -- you were indicating you were going to release him, what was his demeanor?
**A. He had calmed down by that point. He was no longer talking loud. He was saying he was sorry and he just wanted to go home.**
Q. And you let him out of the handcuffs and you and Officer Acosta returned to your car?
**A. That is correct.**
Q. Did you say goodbye to anybody?
**A. No.**
Q. You just walked away?
**A. I believe I turned to Lieutenant Allman and said have a nice day, sir. That was all.**
Q. And he said see you later?
**A. I can't remember what his salutation was.**

Q. But he clearly saw you walking away?
**A. That is correct.**
Q. He didn't say stop, what are you doing, you have to arrest this guy?
**A. No.**
Q. Have you ever had any subsequent conversations with Lieutenant Allman about the night in question?
**A. Later on that evening we saw him and we said, wow, Lieu, that was crazy. And he said, yes, that certainly was.**
Q. And that was the extent of the conversation?
**A. That is it.**
Q. And that is the last time you ever talked to him about this?
**A. About this incident, yes.**
Q. Have you ever heard anything about him contradicting what you were saying?
**A. Only through my attorney.**
Q. But you never heard from other

police officers?
**A. Through IAD and my attorney. That is all.**
Q. But your testimony is the truth. Correct?
**A. It has to be, sir. I swore to it.**
Q. So, if he indicates in any form that, in fact, he told you to arrest the plaintiff and he couldn't understand why you hadn't, that is not correct? That is false?
**A. That is not correct.**
Q. Now, you get back into the patrol car. Do you know what time it was at that point?
**A. I can't recall.**
Q. What did you do?
**A. We proceeded to leave.**
Q. Who was driving the car?
**A. I was.**
Q. And what happened as you were leaving? Which direction were you going?
**A. We were heading towards 1st**

**Street.**
Q. That would be in an easterly direction?
**A. Away from North Capitol.**
Q. And how far did you get?
**A. Maybe 100 yards.**
Q. Was it difficult to drive?
**A. There were a lot of people.**
Q. So how fast were you going?
**A. Less than 10 miles an hour.**
Q. And then what happened?
**A. Mr. Mazloum opened the car door to our cruiser and jumped in the back.**
Q. Did you see him get in?
**A. I was driving, sir. I was focused on the front.**
Q. You didn't see him?
**A. No.**
Q. You heard a noise and you turned around and he was there?
**A. Yes.**
Q. What did you do?

**A. I said what are you doing?**
Q. Describe for me the context of that conversation.
**A. He stated he wanted to be taken to the police station. And either I or Officer Acosta explained to him that the Metropolitan Police Department is not a taxi service, and the only way we take people to the police station is when they are under arrest. He said go ahead and arrest me, lock me up.**
Q. At that point had you had any conversations with him at all about his making a formal statement of any sort?
**A. No.**
Q. So where did he get the idea that he needed to go to the police station, do you know?
MR. SCHIFFERLE: Objection to form.
THE WITNESS: I can't assume that, sir.
BY MR. CORCORAN

Q. You had no idea?
**A. No.**
Q. All of a sudden he thought he needed to go there?
**A. That is correct.**
Q. And do you have any knowledge as to why he told you he wanted to be arrested at that point?
**A. Maybe because I looked at him and said the only way you are going to go to the police station is if you are arrested. He had never used that word up until that point during the conversation.**
Q. He expressed a willingness to be arrested?
**A. That is correct.**
Q. Were you serious that you were going to arrest him or were you just trying to tell him that so he would maybe calm down?
MR. SCHIFFERLE: Objection to form.
THE WITNESS: Sir, I was just

informing him of the policies of the Metropolitan Police Department.
BY MR. CORCORAN
Q. When he said arrest me, what was your intention to do at that point?
**A. Sir, my intention at that point was to escort him out of my cruiser because we had no reason to arrest them. We had established there was no veracity to his statement, and that all he wanted to do now is he was upset and he was trying to find some outlet for being upset. And I can't estimate or assume why he was.**
Q. When you say an outlet for him being upset, was it your belief that he just wanted to bother you?
**A. Sir, I can't assume why people act the way they do.**
Q. You don't know at all --
**A. No.**
Q. -- what he was thinking.
But you agree there was no

absolutely -- zero basis in your judgment to arrest this individual at this point?
**A. We are still treating him like a victim, yes, sir.**
Q. Nobody at this point when you are leaving, nobody from the nightclub and no other police officers on or off duty had come up to you or Officer Acosta and said this guy did something wrong in the nightclub, he needs to be arrested?
**A. Before we left I had an interaction with the bouncer that I stated before.**
Q. This interaction was before you left?
**A. That is correct.**
Q. Before you got in the car?
**A. That is correct.**
Q. And when you had this interaction with the bouncer, who was present?
**A. I can't recall, sir.**
Q. Where was Officer Acosta, do you

At what point did you have your conversation with him? Where were you in the stage of your discussion with Mr. Mazloum, the plaintiff?

**A. After we had initially released Mr. Mazloum for the first time.**

Q. To his friends?

**A. Yes.**

Q. The bouncer approached you at that point?

**A. He did.**

Q. Was he with anyone else?

**A. No.**

Q. And how did he look?

**A. Fine.**

Q. He didn't look hurt in the least?

**A. No.**

Q. Did he identify himself to you?

**A. I can't recall whether he did or not.**

Q. What did he tell you?

**A. He said that that guy who I was just talking to, this is once again to the**

**best of my recollection, had hurt his arm.**

Q. What did you say to him?

**A. I said why did it take you until after we released the suspect at this point to come up and tell me that there had been an incident.**

Q. So, you say by the time the bouncer came up to you, you had had your conversation with Lieutenant Allman, who had instructed you to release him, the plaintiff, and you had done so. Is that right?

MS. PHILLIPS: Objection to form.

THE WITNESS: To the best of my recollection.

BY MR. CORCORAN

Q. That is the order of the events as you recall?

**A. Yes.**

Q. So you asked the bouncer why did he wait?

**A. He said he had been in the back of the club, or something along those lines.**

Q. Then what happened?

**A. I told him I did not believe his story, because we had been outside in front of the nightclub the entire time dealing with Mr. Mazloum and he had ample time to come out and make a complaint against him.**

Q. What did he say in response to that?

**A. I can't recall.**

Q. Did you ever have any discussions with the bouncer about whether he would get arrested?

**A. Not that I can recall.**

Q. You don't recall telling the bouncer if he wanted to make a complaint he would have to be arrested, too?

**A. Of course not.**

Q. You would never say that to anybody?

**A. I can't recall what I said to him but I can tell you it wasn't that.**

Q. And you say "of course not." That

doesn't make any sense to ever say that, right, the way I posed my question to you?

**A. Sir, there are incidents where we would use that terminology. This is not one of those incidents.**

Q. What is an incident where you would use that terminology?

**A. Domestic violence disputes where there is a complaint where that one person has been fighting where D.C. law states that if there is evidence or a complaint of domestic abuse between two people, that every aggressor has to be arrested.**

Q. But that applies to domestic disputes. Right?

**A. That is correct.**

Q. In your experience, this kind of dispute is entirely different. Right?

**A. It is not a domestic, no, sir.**

Q. And you are basically telling me your training as an officer. Correct?

**A. Based on policy, yes, sir.**

Q. So the policy for dealing with this sort of situation is not to assume that everybody is equally guilty or innocent. Right?
**A. It is not my policy to assume anything, sir.**
Q. The policy you are told to implement, I am talking about.
**A. That policy that I just referred to, as I already stated, is based solely on domestic violence law.**
Q. So you would not under the circumstances of dealing with a dispute in a nightclub ever say to anybody I have to arrest all of you in order to figure out who is right and who is wrong?
**A. I can't say if I have ever said anything before, sir. I did not say that in this incident.**
Q. And that wouldn't have been appropriate to say. Right?
**A. Not during this incident, no.**

Q. By the time you talked to the bouncer you had already determined that the plaintiff had probably not done anything wrong. Right?
**A. I can only go by what the plaintiff had told me.**
Q. You had been given no reason to suspect him as a perpetrator of any kind at this point. Correct?
**A. We had no contradicting information as to the plaintiff's statement.**
Q. Are there any other things about the bouncer's story to you that didn't make sense to you or suspicious?
**A. The length of time, what he had stated, and his general demeanor.**
Q. What was his demeanor?
**A. He didn't look like he was upset, that he had been in a fight with the plaintiff.**
Q. Did he mention anything about other police officers being involved?

**A. Who?**
Q. Did the bouncer?
**A. No.**
Q. He made no reference to that at all?
**A. No.**
Q. And do you have any knowledge as you sit here today as to how much time had elapsed from the time you arrived on the scene until the time you had your conversation with the bouncer?
**A. No. It was after we released the plaintiff.**
Q. That is all you know? You know that for sure?
**A. That is correct.**
Q. Did Lieutenant Allman see you talking to the bouncer?
**A. I don't know what Lieutenant Allman saw, sir.**
Q. Did you ever see Lieutenant Allman talking to the bouncer?

**A. I can't recall whether he did or not, sir.**
Q. Now, at this point on the scene did you talk to any other police officers other than your partner and Lieutenant Allman?
**A. No. And Officer Ramirez when I transferred custody of the prisoner.**
Q. About all he said there was he was turning over custody and he called you Smithy. Is that your nickname?
**A. That is correct, sir.**
Q. That was it?
**A. That is all.**
Q. And from the time that you arrived until the time you left, no one other than the bouncer at the scene ever identified the plaintiff as having started a fight?
**A. No.**
Q. As you left the scene with your partner, did you believe that the plaintiff had done anything wrong?
**A. No.**

Q. You thought it was some kind of misunderstanding in the nightclub?
MR. BRUCKHEIM: Objection.
MS. PHILLIPS: Objection.
THE WITNESS: I don't know what had happened, sir. I didn't have enough information to make an arrest or even take a report.
BY MR. CORCORAN
Q. But you had certainly done your job in terms of restoring order to the situation?
**A. Yes.**
Q. Now, we talked about Lieutenant Allman earlier. Is he somebody that you ever socialized with?
**A. No.**
Q. Is he a friend of yours?
**A. No.**
Q. Do you know if he is still associated with the MPD?
**A. I don't know what his status is.**

Q. When is the last time you saw him?
**A. Six months ago.**
Q. And you left the scene before Lieutenant Allman?
**A. That is correct.**
Q. So he was still standing there when you drove away with Officer Acosta?
**A. Yes.**
Q. What was he doing?
**A. I can't recall what he was doing, sir. My attention was focused on where I was driving.**
Q. Did you ever see any other individuals besides the bouncer who appeared to be affiliated with the nightclub?
**A. I don't know who is affiliated with the nightclub or not.**
Q. You just wouldn't know from looking at them.
Did you see Officer Acosta speak to any other individuals at the scene other than those you have already told me about?

**A. Not to my recollection.**
Q. Did you ever see Officer Acosta go into the nightclub?
**A. No.**
Q. And other than Officer Ramirez bringing the plaintiff over to you, you saw nothing else in terms of their interaction?
**A. That is correct.**
Q. You have no idea whether one hit the other, one yelled at the other? You have no knowledge of that?
**A. I have no knowledge of that.**
Q. And the amount of time you did see them interact was maybe a minute?
**A. I can't estimate the amount of time, but it was very short.**
Q. Very short.
The next day is Saturday morning. Correct?
**A. Yes.**
Q. And you got off from your duty at 6:30 in the morning?

**A. Approximately.**
Q. During that day, did you have any other discussions with any individuals about the incident?
**A. No.**
Q. None at all?
**A. No.**
Q. You didn't talk to Officer Acosta?
**A. No.**
Q. Were you completely off duty that day or did you have to go to work the next afternoon?
**A. I was not scheduled to respond to work until that following evening.**
Q. 4:00 o'clock?
**A. 10:00 o'clock.**
Q. 10:00 o'clock.
So you go back on duty. During the time of your next duty, Saturday night, you heard from nobody about this incident?
**A. I don't speak to other police officers off duty, sir.**

the arriving on-duty officers until they are formally relieved. Is that right?

**A. Yes.**

Q. But you don't know whether, as you sit here today, whether Lieutenant Allman, did in fact, relieve Officer Ramirez or not? You just saw him go inside?

**A. My statement is they were relieved.**

Q. So when you say relieved, you meant to say they were officially permitted to leave?

**A. That is correct.**

Q. When you say they went back inside, who is the "they"?

**A. I believe that is a transcription error.**

Q. You meant "he"?

**A. That is correct.**

Q. You didn't see any other off duty officers with him at that time?

**A. That is correct.**





Q. At no time until later did you learn that there were three other off duty officers with him?

**A. That is correct.**

Q. Going down, further down the page, there is a sentence about, maybe two-thirds to the bottom. It says "We said, what you want us to do, sir?" Do you see that?

**A. Yes.**

Q. And "he wanted us to go in there and lock him up." Did he say that to you?

**A. Yes. He told us that he wanted us to arrest the guy.**

Q. So he was asking you to act and do something official?

**A. Yes, that is correct.**

Q. And despite the fact you ultimately determined you didn't need to do that, he conveyed that desire to you. Correct?

MR. SCHIFFERLE: Objection to form.





MS. PHILLIPS: Objection.

THE WITNESS: Yes.

BY MR. CORCORAN

Q. And further down you said "I'm treating him like he's a victim of a crime because I didn't have any other information to go off of." That was the appropriate way to treat him. Correct?

**A. There is no appropriate way to treat somebody. We were treating him based on the circumstances we had at the time.**

Q. But the manner in which you treated him in the circumstance is a product of the MPD policies. Right?

**A. Yes.**

Q. You are taught and trained how you should treat somebody under those circumstances. Right?

**A. Under which circumstances?**

Q. Well, the particular circumstances you faced. Correct?

**A. The policy can't evaluate and**





**govern every single situation, sir.**

Q. But it does tell you what factors to look for and how to weigh them. Right?

**A. Correct.**

Q. And it isn't just completely your discretion, you have to know what factors are more important than others. Right?

**A. Correct.**

Q. You say "My partner went off to talk to some other people." That is further down the page, almost at the bottom. Who else did he talk to?

**A. I can't recall, sir.**

Q. But there were other individuals on the scene other than Officer Acosta. You know that much?

**A. Correct.**

Q. It may have been police officers, it may have been civilians? You don't know?

**A. I don't know, sir. My attention was focused on Mr. Mazloum.**

Q. You, regardless of what Officer

recall what was stated.

BY MR. CORCORAN

Q. But you heard, you said you call it the rumor mill?

**A. That is correct.**

Q. Just small talk between officers?

**A. That is correct.**

Q. Do you have any recollection of who told you that the plaintiff had come in to file a complaint?

**A. No.**

Q. But you never heard your name mentioned in connection with it?

**A. No.**

Q. And that is all you heard?

**A. That is all.**

Q. The next answer down on the page it says "The crux of this entire incident is lack of information"?

**A. Yes.**

Q. What did you mean by that?

**A. If, in fact, there were on duty or**

**off duty officers at the club, they should have told us what was going on so we could properly determine how to handle the incident.**

Q. At the time they should have told you?

**A. That is correct.**

Q. So when you made that statement, you are saying in your opinion, the other defendants should have come and found you and told you what had happened?

**A. No. I am saying that there was a lack of information from all parties involved. We had no information about the incident whatsoever. Mr. Mazloum did not provide us with any good information. The on duty officers -- or the off duty officers didn't provide us with any information. And if he had any, Lieutenant Allman did not provide us with any information.**

Q. Do you think it was appropriate for the other defendants not to give you the information that you state you needed?

MR. SCHIFFERLE: Objection to form.

MR. BRUCKHEIM: Objection.

THE WITNESS: It is not my job to determine what is appropriate for what other people do.

BY MR. CORCORAN

Q. What if you had been in their shoes, what would you have done?

**A. It is not my job to determine how to do something in somebody else's shoes.**

Q. You are saying you won't answer my question?

**A. No. That is not my job, sir, to judge the appropriateness of somebody else's action.**

Q. I asked a different question. What would you do if you had been in the nightclub and had seen that and on duty officers arrived? What would you have thought was appropriate for you to do?

**A. Sir, I can't speculate how I would**

**have acted at the time. Actions at the time are determined by what is going on in the nightclub, the availability of backup, policy regarding the incident, who I had with me, what weapons I have, who is on the scene, how the complainant is acting, how the suspects are acting. So with as little information in that question as you have given me I cannot give a coherent or good response.**

Q. Okay. So you don't know. There are too many variables?

**A. That is correct.**

Q. But, at the very least, as your statement reveals, they didn't tell you anything?

**A. That statements is based on a lack of information from everybody.**

Q. They just didn't, they didn't tell you.

Then on the next page, Page 8, if you look halfway down, "The Washington Post," do you see that?