UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


EMILE MAZLOUM                    :
                                 :
              Plaintiff   :
                                 :
     vs.                         :   Civil Action No.
                                 :   1:06:CV 00002
                                 :   (JDB)
DISTRICT OF COLUMBIA,            :
   et al.                        :
                                 :
              Defendants :


                    Washington, D.C.

                    Wednesday, November 29, 2006


Deposition of:


          OFFICER JOSE ACOSTA
called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices
of Katten Muchin Rosenman, LLP, 1025 Thomas
Jefferson Street, N.W., East Lobby, Suite 700,
Washington, D.C. 20007-5201, before Renee A.
Feder, CSR, a Notary Public in and for the
District of Columbia, beginning at 10:32 a.m.,
when were present on behalf of the respective
parties:

Page 62

1    Q.    Why did you choose to go?
2    A.    Call for assistance. It is just
3    our beat. We want to help out.
4    Q.    Do you recall what time the call
5    for assistance came to you over your radio?
6    A.    I don't know the exact time. It
7    was after 1:00.
8    Q.    Do you recall who the call came
9    from?
10    A.    It came from Cruiser 100,
11    Lieutenant Allman.
12    Q.    Did they specifically identify FUR
13    as the place you were going?
14    A.    I think he gave the location which
15    is the only thing on that block at that time,
16    so it is FUR.
17    Q.    What time did you arrive on the
18    scene?
19    A.    A couple of minutes later. It
20    didn't take us long to get there.
21    Q.    A little bit after 1:00 o'clock?
22    A.    Yes.

Feder Reporting Company
(202) 863-0000

Page 63

1    Q.    I want to ask you more question.
2    As we go through this, please give as much
3    detail as you can so we make sure we
4    understand and get everything on the record
5    everything you know about the incident.
6        What first happened when you
7    arrived on the scene? What did you do?
8    A.    We walked up to Lieutenant Allman
9    and asked him what was going on.
10    Q.    You saw Lieutenant Allman at the
11    scene?
12    A.    Yes.
13    Q.    Who is Lieutenant Allman?
14    A.    He is a lieutenant on MPD. He was
15    acting watch commander that night.
16    Q.    And he was there already?
17    A.    He was there already.
18    Q.    Did you know he was going to be
19    there before you pulled up?
20    A.    I knew because he said he needed
21    assistance and he was there.
22    Q.    So the call came from him?

Feder Reporting Company
(202) 863-0000

Page 64

1    A.    He came over the air and asked for
2    assistance, yes.
3    Q.    Why would it be the case that he
4    would be there?
5    A.    He is the watch commander. It is
6    his district, his particular PSA. I don't
7    know why he would be there. He can be
8    anywhere. He could be doing his duties.
9    Q.    He held rank over you. Correct?
10    A.    Yes.
11    Q.    And over pretty much everybody
12    that was on duty that night. Is that fair to
13    say?
14    A.    Yes.
15    Q.    Is it normal for a lieutenant like
16    Lieutenant Allman to go on to the scene of an
17    incident?
18    A.    Yes, he has to.
19    Q.    He is required to?
20    A.    He is required to.
21    Q.    So any time there is an incident
22    in any nightclub he would likely have to go to

Feder Reporting Company
(202) 863-0000

Page 65

1    the scene?
2    A.    Yes.
3    Q.    Now, who else did you see outside
4    as you were approaching Lieutenant Allman
5    besides him? Did you recognize anybody?
6    A.    I saw a couple of the other
7    officers. I saw Officer Abbington, Officer
8    Green. There were a couple of people there.
9    There were a couple of officers there.
10    Immediately that is who we saw when we got on
11    the scene.
12    Q.    Did you see any of the off duty
13    officers at the time who are named in this
14    lawsuit?
15    A.    Not immediately.
16    Q.    So when you got out of the car at
17    first you didn't see any of them?
18    A.    No.
19    Q.    Did you see the plaintiff, Emile
20    Mazloum?
21    A.    The street was filled with people.
22    And we made our line, because of the call for

Feder Reporting Company
(202) 863-0000

1    **A.   No.**
2    Q.   Have you ever had your handcuffs
3 with you when you were socializing off duty
4 and drinking in particular?
5    **A.   No.**
6    Q.   Do you drink?
7    **A.   I drink.**
8    Q.   Have you ever taken handcuffs with
9 you to a nightclub, for example?
10    **A.   No.**
11    Q.   Why not?
12    **A.   Because usually I am wearing nice**
13 **clothes and I don't -- I already have my gun**
14 **with me.  I don't need any bulkiness.**
15    Q.   Do you bring a gun with you when
16 you go to a nightclub?
17    **A.   We can't anymore.**
18    Q.   When did that policy go into
19 effect, if you know?
20    **A.   I don't know the exact date.  It**
21 **came out if you are going to drink or if you**
22 **are going to go anywhere -- really, just if**

1 **you are going to drink you should not.  Or if**
2 **there is going to be armed security you don't**
3 **need -- you are not required to take your gun,**
4 **but you can.  I used to.**
5    Q.   When you drink do you ever think
6 about whether or not you need your handcuffs?
7    **A.   Prior to that general order coming**
8 **out, if I had any alcohol whatsoever, the**
9 **level of my police action was making a phone**
10 **call.**
11    Q.   That is all you would do?
12    **A.   Yes.**
13    Q.   Why is that?
14    **A.   (Indicating.)  A situation that**
15 **always happens.  Off duty incidents usually**
16 **result in, you know, a disciplinary or**
17 **something like that.  If I have had any**
18 **alcohol, I don't want that to come into**
19 **question.  I just make the phone call.**
20    Q.   It is safer -- in your view, it is
21 a more prudent action not to do anything
22 beyond making the phone call that you just

1 testified to.  Is that fair to say?
2    **A.   That is what I do.**
3    Q.   Other officers do other things?
4    **A.   Other officers do other things**
5 **based on their level of safety, what they feel**
6 **is necessary.**
7    Q.   Do you know if the MPD provides
8 any training or guidance as to what the
9 average officer should do in those
10 circumstances?
11    MS. PHILLIPS:  Objection to form.
12 You may answer.
13    THE WITNESS:  They give us
14 guidelines, general orders.  That is about it.
15 A couple of scenario-based training in the
16 academy.
17    BY MR. CORCORAN
18    Q.   Do you recall what those
19 guidelines say or advise?
20    MR. SCHIFFERLE:  Objection.
21    MS. PHILLIPS:  Objection.
22    THE WITNESS:  As it pertains to

1 what?
2    BY MR. CORCORAN
3    Q.   As it pertains to an off duty
4 officer when he has had drinks?
5    **A.   The only thing I can really recall**
6 **is the last general order that just came out,**
7 **that is, if he has been intoxicated, he is**
8 **supposed to notify the police, call**
9 **communications, 911, 311, stay on the scene**
10 **until properly relieved by an MPD official.**
11    Q.   So if an off duty officer sees an
12 incident or something going on, that is the
13 proper conduct?
14    MR. SCHIFFERLE:  Objection to
15 form.
16    THE WITNESS:  If he has been
17 drinking.
18    MR. CORCORAN:  Yes.
19    THE WITNESS:  And taking his own
20 safety and the safety of public in mind.
21    BY MR. CORCORAN
22    Q.   When did that order -- you say it

Page 74

1  was an order that came down?
2      **A.    A general order.**
3      Q.    A general order.  Do you recall
4  when that came down?
5      **A.    No, I don't -- it was last year.**
6  **I don't know the exact date of it.**
7      Q.    Sometime in 2005?
8      **A.    Maybe even late 2004.  I don't**
9  **remember the exact date.**
10      Q.    So it might have been before the
11  night in question?
12      **A.    I really don't know.**
13      Q.    But you know that that order
14  exists?
15      **A.    I know it does.**
16      Q.    In your view, generally, with or
17  without the order is, it is most prudent, if
18  you have had drinks and you are off duty and
19  you see an incident occurring, to stay on the
20  scene and make a phone call to uniformed
21  officers?
22          MR. SCHIFFERLE:  Objection to

Feder Reporting Company
(202) 863-0000

Page 75

1  form.
2          THE WITNESS:  If it is reasonable
3  to do so.  If it is safe.  If that is all that
4  is required, yes.
5          BY MR. CORCORAN
6      Q.    Now, you already testified what
7  Lieutenant Allman officially told you about
8  the plaintiff.  Did he walk away at that point
9  after he introduced -- well, strike that.  Did
10  he walk away after he had shown you where the
11  plaintiff was and Officer Ramirez had come
12  forward and the handcuffs had been switched?
13      **A.    He didn't really walk away.  He**
14  **stayed, he stayed right there, a couple of**
15  **feet behind us.**
16      Q.    Was he observing what was going
17  on?
18      **A.    Yes.**
19      Q.    He wasn't talking to other
20  officers at that point?
21      **A.    No.  He was standing there.  He**
22  **was looking at us.  I am pretty sure he was**

Feder Reporting Company
(202) 863-0000

Page 76

1  observing us.
2      Q.    When he told you here is your
3  disorderly, did you understand that to be an
4  order to you to arrest the plaintiff?
5      **A.    No.**
6      Q.    How did you interpret what he was
7  saying to you?
8      **A.    He is a disorderly.**
9      Q.    Meaning what?
10      **A.    Meaning he had done something in**
11  **the club.  Just being loud.  I really didn't**
12  **know.  All he said was disorderly, here is**
13  **your disorderly.  He pointed.  That drew my**
14  **attention to Officer Ramirez.  At which time**
15  **Officer Smith exchanged cuffs.**
16      Q.    And because he was identified as a
17  disorderly, what did you think you needed then
18  to do as a police officer?
19      **A.    I initiated an investigation.  I**
20  **just wanted to know what had happened.  I**
21  **began to speak to him.**
22      Q.    Because you didn't have enough

Feder Reporting Company
(202) 863-0000

Page 77

1  information at that point to determine whether
2  you needed to arrest him or not.  Is that fair
3  to say?
4      **A.    I didn't know anything that had**
5  **gone on at that point.**
6      Q.    So you had to find out?
7      **A.    I had to find out.**
8      Q.    And that is what you would usually
9  do under those circumstances, wouldn't you?
10      **A.    Yes, start a basic investigation.**
11  **Just to see what the circumstances were that**
12  **had taken place, if he needed anything, if**
13  **anything -- just basically what had occurred.**
14      Q.    And that is, in fact, why you were
15  called to the scene, isn't it?
16          MR. SCHIFFERLE:  Objection to
17  form.
18          THE WITNESS:  No, I wasn't called
19  to the scene.  I came --
20          BY MR. CORCORAN
21      Q.    The police were called to the
22  scene?

Feder Reporting Company
(202) 863-0000

Page 78

1          MS. PHILLIPS:  Objection.  Calls
2    for speculation.
3          You may answer.
4          THE WITNESS:  Initially we were
5    called to the scene to assist Cruiser 100.
6    That was the entirety.  When we got there,
7    this was presented to us.
8          BY MR. CORCORAN
9      Q.    But prior to the time that you
10   arrived when you were first called and then
11   after you first spoke to Lieutenant Allman,
12   you were never told come to the scene to make
13   an arrest?
14     A.    No.
15     Q.    And this is jumping ahead a little
16   bit, so forgive me.  Would it be your
17   testimony today generally that at no time did
18   Lieutenant Allman ever tell you to arrest this
19   man?
20     A.    At no time.
21     Q.    And, in fact, it is fair to say
22   later on, and again I am jumping ahead a

Page 79

1    little bit, later on he even saw you let the
2    plaintiff out of his handcuffs to depart.  Is
3    that fair to say?
4      A.    Yes.
5      Q.    Have you ever heard whether
6    Lieutenant Allman had said things contrary to
7    what you just testified to about the decision
8    or the order to arrest the plaintiff?
9      A.    Grapevine.  Just other officers.
10   No one -- I don't even remember who told me
11   that, to tell you the truth.  I just know
12   there were rumors.
13     Q.    And do you have any understanding
14   as to why Lieutenant Allman would say
15   something other than what you are saying
16   today?
17         MS. PHILLIPS:  Objection.  Calls
18   for speculation.
19         THE WITNESS:  I don't know why
20   Lieutenant Allman would.  I am not him.  I
21   don't know why he would say that.
22         BY MR. CORCORAN

Page 80

1      Q.    But you wouldn't say that?
2          MR. SCHIFFERLE:  Objection to
3    form.
4          THE WITNESS:  My testimony is that
5    he never told me that.
6          BY MR. CORCORAN
7      Q.    Now, when -- you said Officer
8    Smith was the one who switched out the cuffs?
9      A.    Yes.
10     Q.    So he put his cuffs on the
11   plaintiff?
12     A.    Yes.
13     Q.    And at this point did you get a
14   chance to look at the plaintiff?
15     A.    When Officer Smith brought him
16   over to me, yes.
17     Q.    Officer Smith picked him up and
18   brought him over?
19     A.    No, he got up and he walked over.
20     Q.    How did he look?
21     A.    A couple of scratches on his face.
22   He got a scratch on his shoulder, around his

Page 81

1    body area.  I think -- a couple of scratches.
2    I think he had some blood on his face.  His
3    clothes were a little, like disorganized.
4    They were pulled out.  It looked wrinkled.
5      Q.    Did he look distressed?
6      A.    He looked distressed.
7      Q.    Was he crying?
8      A.    No.
9      Q.    At the time he was first brought
10   over to you, was he screaming or yelling in
11   any way?
12     A.    No, he was quiet.
13     Q.    Now, did you get a chance to look
14   at Officer Ramirez when he was on the scene
15   when you first walked over?
16     A.    Office Ramirez -- while Officier
17   Smith was bringing Mazloum to us, me and
18   Allman, Ramirez walked with him.  I saw him.
19   He looked fine.  He didn't -- I didn't speak
20   to him.
21     Q.    Did he look angry?
22     A.    No.

Page 86

1  you?
2      **A.  He was my size.  I can't remember**
3  **his exact dimensions.**
4      Q.   He wasn't a huge guy.  Is that
5  fair to say?
6      **A.  What is huge?**
7      Q.   Like over 6-foot 2, 6-foot 3?
8      **A.  No.**
9      Q.   You know Officer Modlin.  Right?
10     **A.  Yes.**
11     Q.   Officer Modlin is bigger than the
12  plaintiff, as you recall.  Correct?
13     **A.  I think he is taller, yes.**
14     Q.   And larger, as well?
15     **A.  In weight, probably.**
16     Q.   Did he look threatening to you?
17     **A.  Mazloum?**
18     Q.   Yes.
19     **A.  I didn't perceive him as a threat.**
20     Q.   Did he look like he was from a
21  foreign country?
22     **A.  I don't know where he is from.**

Page 88

1      **A.  No, not unusual.**
2      Q.   You didn't get a sense of that?
3      **A.  No.**
4      Q.   Now, at any point when you first
5  started talking with him, did Mr. Mazloum tell
6  you he needed medical attention?
7      **A.  No.**
8      Q.   He never said anything about that?
9      **A.  No.**
10     Q.   He never said he needed help for
11  his injuries?
12     **A.  No.**
13     Q.   Did you ever seek to call an
14  ambulance to come and help him?
15     **A.  I did.**
16     Q.   You did?
17     **A.  I did.**
18     Q.   You called one?
19     **A.  I did.**
20     Q.   You did not call one?
21     **A.  I did.  I called one.**
22     Q.   You did?

Page 87

1      Q.   You couldn't tell?
2      **A.  I couldn't tell.**
3      Q.   You are not a medical expert.
4  Right?
5      **A.  No.**
6          MR. SCHIFFERLE:  Objection to
7  form.
8          Go ahead.
9          BY MR. CORCORAN
10     Q.   You have police training, I
11  understand, when people are intoxicated.  That
12  is fair to say.  Right?
13     **A.  Yes.**
14     Q.   You don't have medical knowledge
15  when people are or when they are not.  Right?
16     **A.  I am not a medical expert, no.**
17     Q.   Did you administer any kind of
18  field sobriety test when you interacted with
19  Mr. Mazloum at any time?
20     **A.  No.**
21     Q.   In talking with Mr. Mazloum, did
22  he have a funny accent?

Page 89

1      **A.  I called one immediately.  Just**
2  **because -- on the basis that he was bleeding,**
3  **he had some scratches on him.  And, you know,**
4  **he is going to need that medical attention,**
5  **even if we did arrest him, he needed to be**
6  **taken to the hospital or be treated so I just**
7  **wanted the board there, anyway.**
8      Q.   Did an ambulance ever come?
9      **A.  No.**
10     Q.   Why not?
11         MS. PHILLIPS:  Objection.  Calls
12  for speculation.
13         THE WITNESS:  I canceled the
14  board.
15         BY MR. CORCORAN
16     Q.   You canceled it?
17     **A.  Yes.  At his request.**
18     Q.   He specifically said don't call an
19  ambulance?
20     **A.  No, he specifically said I want to**
21  **go home.  I said, sir, I told him, sir, I have**
22  **the board coming, which is what we call the**

Page 94

1  **Lieutenant Allman. Once I took Mazloum the**
2  **paces away from Lieutenant Allman, Lieutenant**
3  **Allman excused Officer Ramirez.**
4      Q.   Did you think that was
5  appropriate?
6      MS. PHILLIPS:  Objection.
7      MR. BRUCKHEIM:  Join.
8      THE WITNESS:  I can't speak of
9  that. He is the lieutenant. It is his say.
10 He is the MPD official on the scene.
11     BY MR. CORCORAN
12     Q.   You have no opinion whether that
13 was appropriate or not?
14     **A.   I have no opinion.**
15     Q.   Let me ask you this. If you had
16 been in the nightclub off duty and had seen an
17 incident and had intervened and removed a
18 patron, would you have thought it was
19 appropriate for you to leave the scene once
20 the person was outside?
21     MR. SCHIFFERLE:  Objection to
22 form.

Feder Reporting Company
(202) 863-0000

Page 95

1      MR. BRUCKHEIM:  Same objection.
2      MS. PHILLIPS:  Join. And calls
3  for speculation.
4      THE WITNESS:  It just depends on
5  the situation. It depends on the scenario.
6  There are too many variances what would have
7  happened. It just depends. I don't know what
8  happened in there, what I could have
9  experienced in a club or, you know, what
10 happened.
11     BY MR. CORCORAN
12     Q.   But you can conceive of
13 circumstances where it might be appropriate
14 for a person under those circumstances, an
15 officer off duty, to stay on the scene just to
16 follow through on what is going on. Is that
17 fair to say?
18     **A.   Our general orders state we are**
19 **supposed to stay there until we are relieved**
20 **by an MPD official. I don't know if he had**
21 **already spoken to Lieutenant Allman. I don't**
22 **know what had happened. It wasn't my place to**

Feder Reporting Company
(202) 863-0000

Page 96

1  **say whether it was right or wrong for him to**
2  **be excused.**
3      Q.   Now, your conversations with
4  Mr. Mazloum, you alluded to him telling you
5  that somebody had assaulted him? What did he
6  say?
7      **A.   He said he had been assaulted**
8  **inside the club.**
9      Q.   By whom?
10     **A.   His exact words were a big, black**
11 **man.**
12     Q.   And he couldn't tell you any more
13 details about who the person was?
14     **A.   No.**
15     Q.   And you have already testified you
16 have no idea what really happened in the club.
17 You weren't there. Right?
18     **A.   I wasn't there.**
19     Q.   And no one -- at the scene, nobody
20 ever told you what had happened. Right?
21     **A.   No. No one told me.**
22     Q.   None of the off duty guys that we

Feder Reporting Company
(202) 863-0000

Page 97

1  talked about today, they never came up to you
2  and said this is what happened. Right?
3      **A.   No.**
4      Q.   Is it conceivable to you that
5  Mr. Mazloum was referencing Officer Modlin
6  when he said a big, black guy?
7      MR. BRUCKHEIM:  Objection.
8      MS. PHILLIPS:  Objection. Calls
9  for speculation.
10     THE WITNESS:  I don't know who he
11 was talking about.
12     BY MR. CORCORAN
13     Q.   Do you know about the bouncer who
14 was involved in this incident, Michael
15 Persons?
16     **A.   I know about him through this**
17 **incident and after, after Mazloum had already**
18 **left.**
19     Q.   You had a conversations with him
20 later that night. Correct?
21     **A.   I think I maybe had five words**
22 **with him.**

Feder Reporting Company
(202) 863-0000

1    **A.    No.**
2    Q.    Or did he walk?
3    **A.    No, he did not have to be forcibly**
4    **dragged.**
5    Q.    In any event, with respect to the
6    handcuffs, your assessment was it wasn't
7    appropriate at that point to take them off?
8    **A.    No, it wasn't that.  I wanted to**
9    **relax him, try to get him to tell me what**
10   **happened, put him at ease.  At this point I**
11   **was treating him like he was the victim.  Like**
12   **he had been involved in some incident.  So I**
13   **started talking to him.  I asked him very**
14   **politely, I said, look, will it make you feel**
15   **better if I take these handcuffs off?  Or are**
16   **you going to be calm?  Are you going to listen**
17   **to me?  Are you going to be violent?  He said,**
18   **no, please take them off.  I did.**
19   Q.    You did at that point?
20   **A.    I did.**
21   Q.    Those were Officer Smith's
22   handcuffs?

1    **A.    Yes.**
2    Q.    Did you hand them to Officer Smith
3    at that point.
4    **A.    I don't recall what I did with**
5    **them.**
6    Q.    Officer Smith, you don't know if
7    he was there with you or not?
8    **A.    I don't know where he was.**
9    Q.    Your testimony is that you had
10   some conversations with the plaintiff without
11   the participation of Officer Smith.  Is that
12   fair to say?
13   **A.    Yes.**
14   Q.    Did he, did Officer Smith
15   similarly have any conversations with the
16   plaintiff where you were not participating?
17   **A.    I don't know.**
18   Q.    But you do recall talking alone to
19   the plaintiff by yourself?
20   **A.    Yes.**
21   Q.    Now, it is your testimony that you
22   didn't fully comprehend what he was trying to

1    tell you.  Right?
2    **A.    Yes.**
3    Q.    He seemed a little incoherent, you
4    couldn't understand what he was saying other
5    than a big, black guy assaulted him?
6    **A.    Yes.**
7    Q.    In saying that, are you denying
8    that he did try to tell you that something bad
9    had happened to him?
10   **A.    The only part that -- initially**
11   **our conversation was what had happened.  He**
12   **said -- he refused to tell me.  Nothing.  I**
13   **just want to go.  It took several tries, even**
14   **after I took the handcuffs off of him to try**
15   **to relax him, to get the story of the big,**
16   **black guy.  He had said a big, black guy had**
17   **assaulted him.  He also stated he had fallen**
18   **down the stairs.  It took several questions,**
19   **several barrages on my part, to get him to**
20   **even say he was assaulted by a big, black guy.**
21   Q.    Did you find it frustrating to try
22   to talk to him?

1    **A.    No, it is just part of my job.**
2    Q.    How long in total -- strike that.
3         What amount of time did you spend
4    speaking to him when you were trying to get
5    information from him?
6    **A.    At which point?  At which point?**
7    Q.    The time you are talking about
8    now, when you first started talking to him and
9    you are trying to find out what happened, and
10   you take his handcuffs off, how much time
11   elapsed?
12   **A.    Anywhere from 15 to 20 minutes.**
13   Q.    At any time during that period,
14   did you think about taking a written statement
15   from him?
16   **A.    Not at that point.**
17   Q.    Why not?
18   **A.    Because it was, it was him telling**
19   **me nothing had happened.  At first, initially,**
20   **he was in handcuffs.  I wasn't going to start**
21   **taking a written statement while he was in**
22   **handcuffs.  He is unsecured at that point.  We**

Page 106

1  have proper places for those written
2  statements.  It is not out in the street in
3  front of a nightclub.
4      Q.    What would be a proper place for a
5  written statement in your experience?
6      A.    With a detective at the station.
7      Q.    He would have to go to the station
8  then in your experience to take a statement?
9      A.    No, he didn't need to.  It was him
10  telling me nothing had happened.
11      Q.    So you are saying you didn't think
12  a statement was necessary?
13      A.    I didn't know what was necessary.
14  I was trying to figure out what was necessary.
15      Q.    Do you have in your patrol car
16  with you at all times the necessary forms to
17  take a statement when you are in the field?
18      A.    No.
19      Q.    You don't?
20      A.    No, I don't.
21      Q.    There is not a form on which you
22  can take a statement that you might have in

Page 107

1  the car?
2      A.    It is not put in the car.
3      Q.    What is that form called?
4      A.    It is a 119, a witness statement.
5      Q.    So you have to -- you have to
6  specifically put that in the car in order to
7  get a statement from somebody?
8      A.    I would have to personally carry
9  it with me.
10      Q.    And you don't generally do that?
11      A.    No.
12      Q.    Why not?
13      A.    Because if it comes down to a
14  court matter I want a detective to take that
15  statement.
16      Q.    Your view was if you needed a
17  statement from him he would have to bring him
18  into the precinct?
19      A.    Not that I would have.  To at
20  least call a detective to make it a little
21  more solid.
22      Q.    And either bring the person out to

Page 108

1  the location or go back to the precinct
2  headquarters?
3      A.    Yes.
4      Q.    At what point did your
5  conversation with Mr. Mazloum cease?
6      A.    There were several times when his
7  friends came over and requested to take him
8  away.  I will take him home, officer, he gets
9  like this when he is drunk.  They said that
10  several times to me.  I want to say the first
11  few times I refused to let him go because I
12  was still trying to figure out what was going
13  on.  I was still trying to relax him enough
14  for him to give me a statement or at least
15  tell me what happened.  Something that I could
16  use.  At least 20, maybe even 30 minutes had
17  passed and I want to say on the third time
18  look, officer, we want to take him home.  He
19  gets like this when he is drunk.  Please
20  forgive him.  They even asked him to say he is
21  sorry to me.  And that wasn't necessary.  He
22  kept refusing to tell me anything.  So he just

Page 109

1  wanted to go home.  I let him go.
2      Q.    Do you know why they were saying
3  they were sorry?
4      A.    He said he was sorry because he
5  was acting drunk.
6      Q.    Because he was acting drunk.  Not
7  because he had done anything else?
8      A.    I don't know why they were saying
9  they were sorry.  They kept saying I am sorry,
10  officer, he gets like this when he is drunk.
11      Q.    Who were these friends?  How many
12  were there?
13      A.    I don't know who the friends were.
14  At least three of them.
15      Q.    What did they look like?
16      A.    They were male.  I really can't
17  recall a good description for them.  I know
18  they said they were his friends.  They were
19  males.  I don't know.  Dark hair.
20      Q.    Did they look like they were
21  Caucasians?
22      A.    I don't know what they were.

1    Q.   We would have to ask him?

2    **A.   Yes.**

3    Q.   So, he starts to walk away now and

4  nobody from the club does anything to stop

5  you.  Right?  They didn't say wait?

6    **A.   Nobody.**

7    Q.   So you thought the situation was

8  over?

9    **A.   Yes.**

10    Q.   What did you next do?

11    **A.   I walked over to Lieutenant**

12  **Allman.  I gave him like a little salute,**

13  **raised my hand up and gave him a salute and**

14  **said we are out of here.  I am sorry, before**

15  **we let him go, we did, we did walk over to**

16  **Lieutenant Allman.  At which point I asked him**

17  **what did he want us to do.  What do you want**

18  **us to do?  That was before we released him.  I**

19  **think he was with Officer Smith at that point.**

20  **He was close, he was calm.  There wasn't an**

21  **issue of security with him anymore.  At this**

22  **point just get rid of him.  We let him go.**

1  **Sent him on his way.**

2    Q.   At this point have you had any

3  conversations with Lieutenant Allman outside

4  the presence of Officer Smith?

5    **A.   I don't know where Officer Smith**

6  **was.  I know he was with me when -- or he was**

7  **standing near me, in the vicinity of me, when**

8  **I asked Lieutenant Allman what he wanted us to**

9  **do.**

10    Q.   You don't know whether he could

11  hear you or not?

12    **A.   I don't know what he heard.**

13    Q.   The only things you ever spoke to

14  Lieutenant Allman about were what you already

15  testified to and the subsequent conversation

16  where you said, okay, we are out of here, let

17  him go, goodbye?

18    **A.   Yes.**

19    Q.   Then what did you do?  Get in the

20  patrol car?

21    **A.   Yes.  Like I said, I saluted him,**

22  **a little goodbye to him, got back in the car**

1  **and headed eastbound out of Patterson Street.**

2    Q.   What sort of artery or

3  thoroughfare were you trying to get to?

4    **A.   First Street.**

5    Q.   And then what happened as you

6  started to drive?

7    **A.   He jumped in our car.**

8    Q.   How did he jump in?

9    **A.   He opened the back door, jumped**

10  **into the back seat of my cruiser.**

11    Q.   What did he do when he did that?

12  Did he say anything?

13    **A.   He started screaming at us.**

14    Q.   What was he screaming?

15    **A.   Arrest me.**

16    Q.   Did you know why he was doing

17  this?

18    **A.   I didn't.  It kind of startled me**

19  **that he even jumped in my car.**

20    Q.   Do you know why he wanted you to

21  arrest him?

22    **A.   He said arrest me.  He kept saying**

1  **arrest me, arrest me, lock me up.  Take me to**

2  **your station and lock me up.  At which point**

3  **we said no.**

4    Q.   Did you stop the car?

5    **A.   We did.**

6    Q.   Now, at the time he jumps into the

7  car and starts yelling at you to arrest him,

8  do you recall having any conversations with

9  him prior to that about whether or not you

10  were going to arrest him?

11    **A.   No.**

12    Q.   Did you ever discuss that with

13  him?

14    **A.   No.**

15    Q.   Had you ever discussed whether you

16  would need to arrest him in order for him to

17  file a complaint of any sort?

18    **A.   No.**

19    Q.   So you never made any

20  representations to him one way or the other

21  about that?  It never came up?

22    **A.   No.**

Page 118

1    Q.    You were very surprised?
2    A.    I didn't know why he would jump
3 into my cruiser and say arrest me.
4    Q.    What did you do when he did that?
5    A.    Stopped the car.  Turned around.
6 I mean, we always give people a chance to
7 correct their actions.  Sir, what are you
8 talking about?  Just lock me up, arrest me.
9 He kept screaming.  In the cruising it was
10 kind of unnerving.  It is a small car.  Sir,
11 lock you up for what?  You didn't do anything.
12 Lock me up.  Take me to your station.  Arrest
13 me.  Sir, I don't know what you are talking
14 about, get out of the cruiser.
15    Q.    Did you have to physically pull
16 him out?
17    A.    I did.
18    Q.    Did you do it or did Officer Smith
19 do it?
20    A.    I think we both did it.
21    Q.    Who was driving?
22    A.    I don't remember.  I think I was.

Page 120

1    A.    He just said arrest me.  He kept
2 screaming at me.
3    Q.    Did he say anything about wanting
4 to go to the station at that point?
5    A.    He said take me to your station,
6 lock me up.
7    Q.    Did he say anything about wanting
8 to make a statement?
9    A.    Never.
10    Q.    He didn't.  And you testified
11 earlier your view is that generally you want
12 people to make statements at the station.
13 Right?
14    A.    They can make them on the scene.
15 But they can make them with the detective.
16    Q.    Is it your testimony that you
17 never articulated to him that if he wanted to
18 make a statement the best idea would be for
19 him to come to the station?
20    A.    Can you say that again?  I am
21 sorry.
22       MR. CORCORAN:  Can you read back

Page 119

1    Q.    And how fast was the car going at
2 the time he jumped in?
3    A.    It was moving, but I want to say
4 less than 3 miles an hour.
5    Q.    Were a lot of people in the way?
6    A.    Yes.  We couldn't -- I had the
7 pace of taking my foot off the brake and
8 letting the car coast.
9    Q.    And did you specifically tell him
10 you haven't done anything wrong?  You used
11 those words or words like that?
12    A.    I did.  I said you hadn't done
13 anything.
14    Q.    That was your opinion at that
15 point, too?  You had no grounds to arrest him?
16    A.    I had nothing to arrest him.
17    Q.    You had no evidence that he had
18 done anything wrong in that nightclub?
19    A.    None.
20    Q.    Did Mr. Mazloum say or articulate
21 anything other than the sentiment arrest me?
22 Did he say why he wanted you to do that?

Page 121

1 the question?
2       (The record was read by the
3 reporter.)
4       THE WITNESS:  It never came up.  A
5 statement never came up at any point in our
6 conversation.  Him giving me or me taking one.
7       BY MR. CORCORAN
8    Q.    And he never asked to make one?
9    A.    He never asked.
10    Q.    He never specifically used those
11 words?
12    A.    No.
13    Q.    When he was doing this, jumping in
14 your car and yelling, what did you think he
15 wanted?  Did you understand what he was trying
16 to do?
17    A.    I just thought he was drunk and
18 acting like a crazy person.
19    Q.    You pulled him out.  And what did
20 you tell him?
21    A.    We asked him a few times to leave,
22 get out of cruiser.  Get out of the cruiser.

Page 122

1  **We are not taking you to jail.  We are not**
2  **locking you up.  Get out of the cruiser.  At**
3  **that point we exited the car.  We opened the**
4  **door and we asked him to get out again.  And**
5  **he refused to get out.  We grabbed him by his**
6  **arm.  I can't remember where I grabbed him, by**
7  **his arm or his side.  Officer Smith did the**
8  **same thing, tried to pull him out.  At which**
9  **point he grabbed a hold of my headrest and**
10 **refused to leave.**
11     Q.    So you pulled him out?
12     **A.    So we pulled him out.**
13     Q.    Then what did you do with him?
14     **A.    We pulled him out.  I started**
15 **talking to him again.**
16     Q.    And what did you tell him?
17     **A.    Sir, if something happened, you**
18 **need to tell me, you need to tell me what**
19 **happened.  He refused.  He said take me to**
20 **your station.  Lock me up.  Sir, again, you**
21 **didn't do anything.  He kept telling me, you**
22 **know, he was like take me to your station, he**

Page 123

1  **kept screaming it.  I didn't even know why.**
2  **Sir, that is when I asked him, I told him,**
3  **sir, I will take a report from you, it is just**
4  **paperwork for me, but you need to give me**
5  **something to go on.  You need to tell me a**
6  **description.  You need to tell me what**
7  **happened.  You need to tell me where you were.**
8  **A big, black guy assaulted me.  Do you want to**
9  **make a report?  No, I just want to go home.**
10 **That is when his friends came back again and**
11 **escorted him away from us.**
12     Q.    So it is your testimony that he
13 didn't want to make a report?
14     **A.    No.**
15     Q.    You gave him that specific
16 opportunity and he refused it?
17     **A.    I gave him several opportunities**
18 **to make a report.**
19     Q.    But it is also, you would admit,
20 that he was trying to express concern
21 generally about something that had happened,
22 he just couldn't articulate what had happened?

Page 124

1          MR. SCHIFFERLE:  Objection to
2  form.
3          MS. PHILLIPS:  I join.
4          BY MR. CORCORAN
5     Q.    Why else did he jump in the car?
6          MR. SCHIFFERLE:  Objection.
7          MR. BRUCKHEIM:  Objection.
8          MS. PHILLIPS:  Objection.
9          THE WITNESS:  I don't know why he
10 jumped in the car.  He started screaming lock
11 me up.  I can't speak to what he was thinking
12 at that point.
13         BY MR. CORCORAN
14    Q.    When he jumped in the car did you
15 think he had done anything wrong other than
16 just being strange?
17    **A.    I don't think he was strange.  I**
18 **just think he was drunk.**
19    Q.    I mean he hadn't done anything at
20 that point that you thought were grounds to
21 arrest him for?
22    **A.    No.**

Page 125

1     Q.    Are there any circumstances where
2  someone would jump in your police car or squad
3  car and you might consider arresting him?
4          MR. SCHIFFERLE:  Objection to
5  form.
6          THE WITNESS:  If he tried to
7  assault me.
8          BY MR. CORCORAN
9     Q.    He didn't do that, he never tried
10 to hit you or do anything?
11    **A.    No.**
12    Q.    So once you get him out of the car
13 and his friends come over, what did they do?
14 They took him away?  They walked away with
15 him?
16    **A.    Took him away.  I actually asked**
17 **him if he wanted an ambulance again at that**
18 **point just to clean him up.  Clean his blood**
19 **off.  A lot of times the board will come and**
20 **they won't transport him, just give him a**
21 **Band-Aid or put some solution.  I asked him**
22 **again.  He stated no.**

Page 126

1    **At which point I said to his**
2    **friends, look, he is drunk, you need to get**
3    **him out of here.  They said we are sorry, he**
4    **gets like this when he is drunk.  They kept**
5    **saying that.  At that point I said, look, he**
6    **is refusing the board here, but he needs to go**
7    **to the hospital or to the doctor to get his**
8    **cuts cleaned up.  They said, okay, we will**
9    **take him.**
10   Q.   Now, what did you do next?  You
11   didn't leave the scene at that point?
12   **A.   I did not.**
13   Q.   Why not?
14   **A.   I put the car in pack.  There were**
15   **just a lot of people out.  We couldn't move.**
16   **There was too much traffic there.  We couldn't**
17   **move.  We put the car in park.  We went back**
18   **over to Lieutenant Allman.  We asked him, we**
19   **said, did you see what happened?  Yes, the guy**
20   **is crazy.  I said okay.  That was the extent**
21   **of our conversation with Lieutenant Allman.**
22   Q.   So he saw, to your knowledge, he

Page 127

1    saw the plaintiff try to get into the patrol
2    car?
3    **A.   Yes.**
4    Q.   And he was kind of laughing about
5    it?
6    **A.   I don't know that he was laughing.**
7    Q.   Just kind of commenting how
8    strange it was, crazy it was, the plaintiff's
9    conduct?
10   **A.   He did comment on it.**
11   Q.   And he didn't say then wait a
12   second, arrest him?
13   **A.   No.  He didn't assault us.**
14   Q.   I mean Lieutenant Allman didn't
15   tell you why aren't you arresting this guy?
16   **A.   Never.**
17   Q.   How much longer were you on the
18   scene at this point?
19   **A.   That I am not sure.  15 minutes.**
20   Q.   So was it nearly 2:00 in the
21   morning at this point?
22   **A.   Probably.  Maybe a little passed**

Page 128

1    it.
2    Q.   What was the next thing you did?
3    You went over and talked to Lieutenant Allman,
4    commented on what had just happened.  Where
5    did he go?
6    **A.   Where did who go?**
7    Q.   Lieutenant Allman.
8    **A.   He stayed there.**
9    Q.   He just stood there.  Did you talk
10   to him further?
11   **A.   No.**
12   Q.   What was he doing then at that
13   point?
14   **A.   I don't know.  I don't know what**
15   **he was doing.  Just standing there.**
16   Q.   The incident that he called you to
17   deal with was finished, though, wasn't it?
18   **A.   It was getting finished.  It**
19   **wasn't totally finished.**
20   Q.   Why wasn't it totally finished?
21   **A.   We were still there.**
22   Q.   Now, did you ever tell -- let's go

Page 129

1    back just a second ago when you pulled the
2    plaintiff out of the car.  He jumps in the
3    car, you pull him out, and you have one more
4    conversation with him.  Did you ever tell him
5    that if he wanted to file a report he needs to
6    do that at the police station?
7    **A.   No.**
8    Q.   Did Officer Smith tell him that?
9    **A.   I don't know what Officer Smith**
10   **told him.**
11   Q.   You don't know what Officer Smith
12   told him?
13   **A.   No.**
14   Q.   That night, did you have any other
15   conversations with Lieutenant Allman at all on
16   the scene, when you were there on the scene?
17   **A.   No.**
18   Q.   That was the last one you had,
19   your commenting on what he did, and that was
20   it?
21   **A.   Yes.**
22   Q.   Now, what then happened next?  Why

1  didn't you then just leave, get back in your
2  car as you intended to do, and go?
3      **A.   I think my partner was approached**
4  **by the bouncer.**
5      Q.   So at that point the bouncer came
6  up.  How did he look?
7      **A.   African American male.  He was**
8  **heavy.  He was wearing all black.**
9      Q.   Did he look threatening?
10     **A.   I didn't find him threatening.**
11     Q.   Did he look strong?
12     **A.   He looked heavy.**
13     Q.   He testified he can lift
14  2000 pounds.
15         MR. SCHIFFERLE:  Objection.
16         MR. BRUCKHEIM:  Objection.
17         MS. PHILLIPS:  Objection.  He
18  didn't testify to that.  He pushed with his
19  legs, I think.
20         BY MR. CORCORAN
21     Q.   You didn't have any sense of his
22  power or strength when you saw him?

1      **A.   It didn't cross my mind, sir.**
2      Q.   He looked bigger than the
3  plaintiff, didn't he?
4      **A.   He was a heavy guy.  He looked**
5  **big.**
6      Q.   What did he first tell you?  Did
7  he have a conversation with Officer Smith
8  before you talked to him?
9      **A.   Yes, Officer Smith was talking to**
10  **him.  I didn't speak to him initially.**
11     Q.   What was the first thing you heard
12  him say?
13     **A.   That he had a torn bicep.**
14     Q.   A torn bicep.  Did he point it
15  out?
16     **A.   I don't think he pointed at it,**
17  **no.**
18     Q.   He just said that?
19     **A.   He just said it.**
20     Q.   Did it look like his clothes were
21  ripped?
22     **A.   No.**

1      Q.   Did he have any cuts or bruises on
2  him?
3      **A.   None that I observed.**
4      Q.   Any blood anywhere?
5      **A.   No.**
6      Q.   What was his demeanor?
7      **A.   Calm.**
8      Q.   Did he seem upset?
9      **A.   No, he seemed calm.**
10     Q.   So he said he had a torn bicep.
11  What else did he say?
12     **A.   He said he told -- he was telling**
13  **Officer Smith, I just overheard him, that that**
14  **guy was on the stage and that he had fallen**
15  **and he had tried to assault him and other**
16  **patrons.**
17     Q.   That is what he told Officer
18  Smith?
19     **A.   That is what he told Officer**
20  **Smith.**
21     Q.   Did you ask this individual any
22  questions?

1      **A.   I asked him where was he?**
2  **Because -- I asked him where he was because it**
3  **was my understanding that several officers had**
4  **approached the staff to ask if anyone had**
5  **gotten in a fight or been assaulted.  No one**
6  **came forward.  It is my understanding that was**
7  **done by several officers.**
8      Q.   How did you know that?
9      **A.   A couple of them came up to me.  I**
10  **think it was Officer Green, maybe.  I don't**
11  **remember who exactly came up to me, and told**
12  **me that, that they had talked to David and no**
13  **one had said anything that they had been**
14  **assaulted or there had been no fights inside.**
15     Q.   David McCloud, the security guy?
16     **A.   That is what the officer told me.**
17     Q.   When did you hear his?  Is this
18  while you were interviewing the plaintiff?
19     **A.   Yes.**
20     Q.   Before the plaintiff jumped into
21  the patrol car?
22     **A.   Before.**

Page 134

1    Q.    Was this a piece of information
2 that led you to believe that this was not an
3 incident that required an arrest?
4    **A.    It wasn't -- that was one of the**
5 **factors.  It wasn't the only factor.**
6    Q.    It was one, it was certainly one
7 factor?
8    **A.    It was one.**
9    Q.    No one was coming forward, get
10 this guy out of here, he hit me or he was
11 dangerous?  You never heard that?
12    **A.    I never heard that.**
13    Q.    And what else did the bouncer tell
14 you?
15    **A.    He wasn't talking to me, he was**
16 **talking to Officer Smith.**
17    Q.    You were just listening?
18    **A.    I was just listening.**
19    Q.    Did you ever get the sense that
20 the bouncer wasn't being completely truthful
21 with you?
22    **A.    I did.**

Page 135

1    Q.    Why?  What did he say that made
2 you think that?
3    **A.    The story didn't make sense.**
4    Q.    What about it did not make sense?
5    **A.    He was, he was a heavy guy.  He**
6 **looked fine.  He was calm.  Not like somebody**
7 **who had just been in a fight.  And the only**
8 **injury that he had sustained supposedly was a**
9 **torn bicep.  No marks, no bruises, no blood.**
10 **I said, clothes are fine.  Calm demeanor.**
11 **Didn't believe him.  I told him I didn't**
12 **believe him.**
13    Q.    Did it ever occur to you that he
14 might have been the big, black guy that the
15 plaintiff had referred to earlier?
16    **A.    It crossed my mind.**
17    Q.    Did you ask him anything about
18 that or not?
19    **A.    I didn't.  Officer Smith was**
20 **interviewing him.**
21    Q.    But it occurred to you?  You
22 thought about it?

Page 136

1    **A.    I thought about it.**
2    Q.    Did you ask him any specific
3 questions other than what you have testified
4 to so far?
5    **A.    I did not interview him, no.**
6    Q.    You just observed and were
7 listening to him?
8    **A.    I was.**
9    Q.    And then what happened?
10    **A.    I walked away.  I told him I**
11 **didn't believe him and I walked away.**
12    Q.    And Officer Smith continued to
13 speak to him?
14    **A.    Yes.**
15    Q.    Now, what did you do next after
16 you walked away?
17    **A.    I went to the scout car.**
18    Q.    Back to your car?
19    **A.    Back to my car.**
20    Q.    What did you do there?
21    **A.    I waited for Officer Smith.**
22    Q.    How long did you wait?

Page 137

1    **A.    I don't know.  Time elapsed.  Not**
2 **long.  A couple of minutes.**
3    Q.    And then he came over to you?
4    **A.    Yes.**
5    Q.    And what did he tell you?
6    **A.    I don't think we even spoke about**
7 **it.  We just kind of looked at each other and**
8 **said, okay, let's get out of here.**
9    Q.    So then you were able to drive
10 away and go back on patrol?
11    **A.    Yes.**
12    Q.    Now, the bouncer that you just
13 testified to that came over to you, do you
14 remember if he was wearing a jacket?
15    **A.    I don't know.  I just remember he**
16 **was wearing all black.**
17    Q.    He looked like he worked at FUR?
18    **A.    Yes.**
19    Q.    Did Officer Smith take any notes
20 of his conversation with this guy?
21    **A.    I don't know.**
22    Q.    Had you seen this individual, the

1  bouncer, at the scene at any time prior to the
2  time he started to talk to Officer Smith?
3      **A.    No.**
4      Q.    That was the first time you had
5  seen him?
6      **A.    The first time.**
7      Q.    And when you talk about this guy,
8  did you see any of the other off duty officers
9  who have been named in this lawsuit?
10     **A.    I didn't see any of them.**
11     Q.    You didn't see Officer Ramirez,
12  for example?
13     **A.    No.**
14     Q.    None of them were outside?
15     **A.    None of them.**
16     Q.    Lieutenant Allman was still there.
17  Right?
18     **A.    I saw no other off duty officers**
19  **outside of the nightclub.**
20     Q.    And the only one you ever saw was
21  Officer Ramirez?
22     **A.    That was the only one.**

1      Q.    And once he got his handcuffs
2  back, that was the last you saw of him that
3  night?
4      **A.    Yes.**
5      Q.    Do you know if the bouncer saw the
6  plaintiff try to get into your patrol car?
7      **A.    I don't know if he did or not.    I**
8  **didn't ask him.**
9      Q.    Do you know if he knew that the
10  plaintiff had tried to do that?
11         MR. BRUCKHEIM:  Objection.
12         THE WITNESS:  I have no idea what
13  he saw or knows or heard.
14         BY MR. CORCORAN
15     Q.    Did you talk to the bouncer at all
16  about his making a statement?
17     **A.    I didn't talk to the bouncer at**
18  **all.**
19     Q.    You just listened.  You never
20  asked him any questions.  You just said I
21  don't believe you and that was it?
22     **A.    Yes.**

1      Q.    And when you were departing, did
2  you have any final conversation with Officer
3  Smith about what the bouncer had just told
4  you?
5      **A.    I don't recall if we spoke about**
6  **it afterwards.  We just got in the car and**
7  **went back on patrol.**
8      Q.    After you stopped talking to the
9  bouncer, no one on the scene, whether FUR
10  personnel or MPD associated, no one came up to
11  you and said, we need to do further action on
12  this matter?  Like someone else needs to make
13  a statement or you need to investigate or go
14  over to the nightclub?
15     **A.    No, no one came forward.**
16     Q.    Did it ever occur to you that you
17  needed to go in the nightclub and see what had
18  happened?
19     **A.    No.**
20     Q.    Why not?
21     **A.    I had nothing to go on, sir.**
22     Q.    Because the only person you were

1  ever pointed to as having knowledge of the
2  incident was the plaintiff.  Right?
3      **A.    Yes.  He refused to tell me**
4  **anything.**
5      Q.    And nobody asked you to go in the
6  nightclub?
7      **A.    Nobody.**
8      Q.    Do you think they would have asked
9  you to go in the nightclub if the matter had
10  been more serious?
11         MR. SCHIFFERLE:  Objection.
12         MR. BRUCKHEIM:  Objection.
13         MS. PHILLIPS:  Objection.
14         BY MR. CORCORAN
15     Q.    In your experience?
16         MR. SCHIFFERLE:  Same objection.
17         MR. BRUCKHEIM:  Objection.
18         MS. PHILLIPS:  Join.
19         THE WITNESS:  I don't know what
20  other people would have asked me.  I go with
21  what I have.  Go from there.
22         BY MR. CORCORAN

1    Q.   After you talked to the bouncer,
2  you didn't talk to Lieutenant Allman again?
3    **A.   No, we just left.**
4    Q.   Did you ever talk to Lieutenant
5  Allman again after you left the scene?
6    **A.   We saw him later.**
7    Q.   At the station?
8    **A.   No.  I think we saw him on the**
9  **street.**
10    Q.   Somewhere else in town?
11    **A.   Yes.**
12    Q.   Do you remember where?
13    **A.   I can't remember the exact**
14  **location.  We did see him later on that night.**
15    Q.   Was he in a car or standing?
16    **A.   I think he was standing.**
17    Q.   Did you pull over to talk to him?
18    **A.   It was a scene of something.  I**
19  **don't know.  I think we just walked up to him**
20  **and spoke to him.**
21    Q.   Did you talk to him about this
22  incident?

1    **A.   We did.**
2    Q.   What did you tell him?
3    **A.   I think my comment was that was a**
4  **crazy scene.  He was like, yes, the guy was**
5  **crazy.  Did you see him jump in our car?  Yes,**
6  **I saw him.  We had a conversation about the**
7  **guy jumping in our car.  The whole thing was**
8  **just crazy.  We agreed on it and went our**
9  **separate ways.**
10    Q.   He didn't there at that point say
11  anything to you about why you didn't arrest
12  the guy or did you arrest him?
13    **A.   At no point did he say anything**
14  **about arresting the individual.**
15    Q.   Did he mention the other off duty
16  police officers who had been involved in the
17  incident?  Did he say what about Ramirez or
18  any of the other guys?
19    **A.   No.**
20    Q.   At that point did you know that
21  the other off duty officers like Officers
22  Modlin, Schneider or Phillips were at the

1  nightclub?
2    **A.   No.**
3    Q.   No one at that point told you they
4  had been there?
5    **A.   No.**
6    Q.   The only one you knew had been
7  there was Officer Ramirez?
8    **A.   Yes, Ramirez.**
9    Q.   So as of the second time that you
10  saw Lieutenant Allman, he knew you hadn't
11  arrested the plaintiff.  Right?
12    MR. BRUCKHEIM:  Objection.
13    THE WITNESS:  Yes.
14    BY MR. CORCORAN
15    Q.   And, to your knowledge, did you
16  leave the scene at FUR prior to the time
17  Lieutenant Allman did?
18    **A.   I don't know when Lieutenant**
19  **Allman left.**
20    Q.   He may have been gone by the time
21  you drove away finally?
22    **A.   Right.  I never saw him leave.  We**

1  **were facing the other way away from him.**
2    Q.   I just want to make sure you
3  identified everybody you talked to.  You said
4  that you talked to Dave McCloud at some point
5  that night at FUR?
6    **A.   Yes.**
7    Q.   And you talked to the bouncer?
8    **A.   I spoke to him, yes.**
9    Q.   Are those the only FUR employees
10  that you are aware of that you spoke to?
11    **A.   Yes.**
12    Q.   And you talked to your partner.
13  Right?
14    **A.   Yes.**
15    Q.   And Lieutenant Allman?
16    **A.   Yes.**
17    Q.   And this other Officer Green that
18  you have identified?
19    **A.   I don't know if he was Green.**
20    Q.   It was somebody?
21    **A.   It was another MPD officer.  I**
22  **cannot speak to who it was exactly.**

Page 146

1    Q.    And he was the one who told you no
2  one is coming forward?
3    **A.    No one came forward, yes.**
4    Q.    Did you have any other
5  conversations with any other MPD officers that
6  night at the scene about the incident?
7    **A.    No.**
8    Q.    Officer Smith, did he talk to
9  anybody -- strike that.  Are you aware of any
10  conversations that Officer Smith may have had
11  with other individuals at the scene?
12    **A.    He didn't tell me about any.**
13    Q.    Did you observe him having any
14  conversations at the scene that you weren't
15  involved in?
16    **A.    The only one was with the bouncer.**
17    Q.    Just the bouncer.  And you never
18  at any point during the whole time you were
19  there go into the nightclub?
20    **A.    No.**
21    Q.    Did you ever see Officer Smith go
22  into the nightclub?

Page 147

1    **A.    I didn't see him.**
2    Q.    He may have, you don't know?
3    **A.    I don't know.**
4    Q.    What about Lieutenant Allman?
5    **A.    The only time I saw him was when**
6  **he was standing there on the sidewalk.**
7    Q.    Do you know anything at all about
8  the security system that FUR has?
9    **A.    I don't know what they have.  It**
10  **has never come up.**
11    Q.    And you never had occasion when
12  you have been asked to go into the nightclub
13  to witness anything on the security system or
14  look at it or look at the cameras?
15    **A.    I have never seen the FUR security**
16  **system.**
17    Q.    At any point did you hear -- hold
18  on.  Did you have any conversations that night
19  with Officer Abbington?
20    **A.    I can't recall.  I know he was on**
21  **the scene.  I remember seeing him there.  I**
22  **remember looking at him getting out of the**

Page 148

1  **car.  He may have told me something.  I don't**
2  **remember my conversations with him.**
3    Q.    Was he on duty that night?  He was
4  a uniformed officer that night?
5    **A.    He was.**
6    Q.    He wasn't a patron at the
7  nightclub?
8    **A.    He was on duty.**
9    Q.    The same with Officer Green?
10    **A.    Yes.**
11    Q.    Do you know what they may have
12  seen?
13    **A.    No.**
14    Q.    Did you have any conversations
15  with them about what they saw on the scene?
16    **A.    No.**
17    Q.    Were they called upon, like you,
18  to respond to the incident?
19      MR. SCHIFFERLE:  Objection to
20  form.
21      THE WITNESS:  I think they
22  answered up on the radio for it.  I don't know

Page 149

1  if they were assigned to it.
2      BY MR. CORCORAN
3    Q.    Do you know if they had any
4  conversations with Officer Ramirez?
5    **A.    I don't know what conversations**
6  **they had.**
7    Q.    You never saw them talk to Officer
8  Ramirez that night?
9    **A.    Never saw them.**
10    Q.    Now, did you ever witness any
11  interaction between Officer Ramirez and the
12  plaintiff other than what you have already
13  testified to?
14    **A.    No.**
15    Q.    You never saw them having any
16  conversations?
17    **A.    No.**
18    Q.    Did you see them ever yell at each
19  other?
20    **A.    No.**
21    Q.    And it is true, is it not, that
22  they were together for a period of time before

Page 150

1  you arrived on the scene, to your knowledge?
2      MR. BRUCKHEIM:  Objection.
3      MS. PHILLIPS:  Join.
4      THE WITNESS:  When I arrived on
5  the scene they were standing, they were
6  together.
7  BY MR. CORCORAN
8      Q.    You don't know how long they were
9  together?
10     **A.   I do not.**
11     Q.    So you know nothing about their
12  interaction before you got there?
13     **A.   I know nothing about it.**
14     Q.    Your shift that night, it is
15  10:00 to 6:00?
16     **A.   It was either 10:00 to 6:00 or**
17  **10:30 to 7:00.  I can't recall what rotation**
18  **we were on.**
19     Q.    Did there come a time in the next
20  day that you heard anything about this
21  incident?
22     **A.   I was made aware.**

Page 151

1      Q.    What were the circumstances under
2  which you were made aware?
3      **A.   Officer Modlin called me.**
4      Q.    What time did he call you?
5      **A.   It was in the afternoon sometime.**
6  **I can't recall when.**
7      Q.    So you were off duty at that
8  point?
9      **A.   I was.**
10     Q.    How did he get your phone number?
11     **A.   He had it.**
12     Q.    Why did he have it?
13     MR. BRUCKHEIM:  Objection. Calls
14  for speculation.
15     THE WITNESS:  He had it from
16  calling me a couple of times.
17     BY MR. CORCORAN
18     Q.    He called you informally before to
19  go out and stuff like that?
20     **A.   No, he had called me about work.**
21     Q.    And you were just at home?  Were
22  you resting?

Page 152

1      **A.   I don't know what I was doing at**
2  **that point.**
3      Q.    But you had your phone with you
4  and you heard it ringing?
5      **A.   Yes.**
6      Q.    What did he tell you?
7      **A.   He said that the gentleman was in**
8  **there making a complaint on Ramirez.  What**
9  **happened?  He asked me what happened.  I told**
10  **him.  He was like -- I asked him, I asked him**
11  **why he was asking me.**
12     Q.    What did he tell you?
13     **A.   He said I was there that night.**
14     Q.    And that was the first time you
15  knew he had been there?
16     **A.   That was the first time I knew.**
17     Q.    How long did you have a
18  conversation?  How long did you talk?
19     **A.   A couple of minutes.**
20     Q.    And what did he ask you next?
21  What happened next in the conversation?
22     **A.   He just asked me, his words were,**

Page 153

1  **why didn't I lock him up.**
2      Q.    What did you say?
3      **A.   I said lock him up for what?**
4      Q.    What did he say?
5      **A.   He said for assaulting Ramirez.**
6      Q.    What was your response to that?
7      **A.   I was never made aware of that.**
8      Q.    So how did the conversation go
9  from there?  How did it conclude?  Was he
10  angry at you?
11     MR. BRUCKHEIM:  Objection.
12     THE WITNESS:  No.
13     BY MR. CORCORAN
14     Q.    Did he sound concerned?
15     **A.   He sounded like Modlin.  I**
16  **don't -- it is how he sounds.**
17     Q.    You thought it was strange that he
18  was calling you about this?
19     **A.   I think he was just making me**
20  **aware of it.**
21     Q.    Why did you need to be aware of
22  it?

1      MR. SCHIFFERLE:  Objection.
2      MR. BRUCKHEIM:  Objection.
3      MS. PHILLIPS:  I join.
4      BY MR. CORCORAN
5      Q.    In your experience, is it common
6  to have a call like that?
7      MR. SCHIFFERLE:  Objection to
8  form.
9      MR. BRUCKHEIM:  Objection.
10      MS. PHILLIPS:  Objection.
11      THE WITNESS:  I guess Officer
12  Modlin knew I was going to have to write a
13  statement on it.  He just wanted to give me a
14  heads-up.
15      BY MR. CORCORAN
16      Q.    Once the complaint had been
17  made --
18      MR. BRUCKHEIM:  Objection, I am
19  sorry, Brian.  I move to strike that portion
20  of his testimony as to why Modlin called or
21  why Modlin knew --
22      BY MR. CORCORAN

1      Q.    You are saying you thought he knew
2  that.  Right?
3      A.    Thought he knew what?
4      Q.    You surmised or guessed that he --
5  let me ask you this first.  Did he tell you or
6  did you discuss the fact that, as a result of
7  this complaint being made, you would have to
8  write a statement?
9      A.    Never spoke directly about writing
10  a statement.
11      Q.    Did it occur to you that you would
12  have to write a statement?
13      A.    If he was making a complaint I was
14  going to have to write, yes.
15      Q.    Why would you have to do that, to
16  your knowledge?
17      A.    Part of the investigation of an
18  complaint.
19      Q.    You assumed you would be involved
20  in the investigation?
21      A.    Yes.
22      Q.    Because you had some knowledge

1  about the incident?
2      A.    I was there that night.
3      Q.    Why was Modlin concerned that you
4  would have to make a statement?
5      MR. SCHIFFERLE:  Objection.
6      MR. BRUCKHEIM:  Objection.
7      MS. PHILLIPS:  Objection.
8      MR. CORCORAN:  If you know.
9      MR. SCHIFFERLE:  Same objection.
10  Still calls for speculation.
11      THE WITNESS:  I don't know if he
12  was concerned.  He was just telling me to tell
13  me.
14      BY MR. CORCORAN
15      Q.    Have you ever made a call like
16  that to another police officer?
17      MR. BRUCKHEIM:  Same objection.
18      THE WITNESS:  Yes.
19      BY MR. CORCORAN
20      Q.    When?
21      A.    Years ago.
22      Q.    What was the circumstances of the

1  situation in which you made a call?
2      A.    An officer came in -- not an
3  officer, a citizen came in.  I was dealing
4  with prisoner's property at the station and
5  screamed out loud he wanted to make a
6  complaint against an officer.
7      Q.    And you called somebody about it?
8      A.    I called that officer and said
9  there is guy here making a complaint, you need
10  to come in here.
11      Q.    You were looking out for him?
12      A.    Just telling him.
13      Q.    You don't need to tell him.
14  Right?
15      A.    I am not required to.
16      Q.    But you wanted to because they are
17  a fellow police officer.  Is that fair to say?
18      A.    I wanted to just let him know.
19      Q.    So did you understand Modlin to be
20  concerned that you were going to be
21  potentially in any kind of trouble?
22      MR. BRUCKHEIM:  Objection, again

1  calls for speculation.
2       MS. PHILLIPS:  Join.
3       THE WITNESS:  I don't know what
4  Officer Modlin concern was or why exactly he
5  was calling me.
6       BY MR. CORCORAN
7       Q.   He didn't say?
8       **A.   He didn't say.**
9       Q.   Was there anyone else in the call
10 besides him?
11      **A.   No.**
12      Q.   Officer Ramirez was not on the
13 call?
14      **A.   Not that call.**
15      Q.   There was a subsequent call?
16      **A.   Modlin called me back.**
17      Q.   How long after did he call you
18 back?
19      **A.   A couple of minutes.**
20      Q.   And this time Officer Ramirez was
21 on the call?
22      **A.   I think Officer Modlin called**

1  **Officer Ramirez and there was a three way**
2  **call.**
3       Q.   What was the substance of that
4  call?
5       **A.   Ramirez was asking me why he**
6  **wasn't locked up.**
7       Q.   What did you tell him?  The same
8  thing?
9       **A.   Yes.  Why would he be locked up?**
10      Q.   Did they explain to you why they
11 thought he should have been locked up?
12      **A.   I can't recall what they said**
13 **exactly.  I just know what I said.**
14      Q.   You don't remember anything they
15 said to you in response?
16      **A.   I remember they asked me why he**
17 **wasn't locked up.  I responded.  He said they**
18 **were making -- Ramirez said he was making --**
19 **that Mr. Mazloum was making a complaint**
20 **against him.  I told him okay.  So.  He asked**
21 **me, well -- the conversation went a little**
22 **further.  Why didn't you lock him up again?  I**

1  **said he didn't do anything.  I wasn't made**
2  **aware of anything that he did.  That was the**
3  **end of it.**
4       Q.   Did they reference Lieutenant
5  Allman at any time during the conversation?
6       **A.   No.**
7       Q.   Did you ever tell them that you
8  were sorry that you hadn't locked him up?
9       **A.   No.**
10      Q.   Did you ever tell him that you had
11 made a mistake in deciding not to arrest the
12 plaintiff?
13      **A.   Never.**
14      Q.   Are you aware -- strike that.  Do
15 you have any knowledge or testimony that they
16 may have given to that effect?
17      **A.   I don't know what they said.  I**
18 **haven't spoken to them about this.**
19      Q.   If they were to say or they have
20 said that you told them you were sorry, you
21 made a mistake, that would be false, wouldn't
22 it?

1       MR. BRUCKHEIM:  Objection.
2       MS. PHILLIPS:  Objection.
3       BY MR. CORCORAN
4       Q.   Because you didn't say that?
5       **A.   I didn't make a mistake, sir.**
6       Q.   You didn't offer any kind of,
7  gosh, I am sorry for the situation, or I am
8  sorry this happened, or anything like that in
9  your conversations with them in either of the
10 phone calls?
11      **A.   Never.**
12      Q.   Because you didn't feel that you
13 needed to?
14      **A.   I didn't.**
15      Q.   How did that second call end?
16      **A.   I think Ramirez was going through**
17 **a bad area or something and hung up the phone.**
18      Q.   That was that.  Did he sound
19 angry?
20      **A.   No.**
21      Q.   Annoyed?
22      MR. BRUCKHEIM:  Objection.

1        BY MR. CORCORAN
2    Q.    You didn't know?
3    **A.    I didn't know.**
4    Q.    That day did you have any other
5  conversations with anybody else about the
6  incident at FUR?
7    **A.    No.**
8    Q.    Did there ever come a time
9  thereafter that one or both of those guys
10  called you again to talk to you about it?
11    **A.    I think Modlin called me again.**
12    Q.    When was that?
13    **A.    Probably that day.**
14    Q.    So a third call?
15    **A.    A third call.**
16    Q.    What did he say this time?
17    **A.    I think he asked me again why I**
18  **didn't lock him up.**
19    Q.    And you told him the same thing?
20    **A.    The same thing.**
21    Q.    Was that conversation any
22  different than the other two?

1    **A.    No.**
2    Q.    How long did that one go for?
3    **A.    A couple of minutes.**
4    Q.    Why did he keep calling you back
5  to talk to you about the situation?
6        MR. BRUCKHEIM:  Objection.  Calls
7  for speculation.
8        THE WITNESS:  I don't know why he
9  called me.  He just kept asking me about it
10  and I told him.
11        BY MR. CORCORAN
12    Q.    He never sounded upset in any
13  regard?
14        MR. BRUCKHEIM:  Objection.
15        THE WITNESS:  No.  I don't speak
16  to him that much.
17        BY MR. CORCORAN
18    Q.    But you would agree he is the one
19  officer who was there that night, he is the
20  one that you knew the best?
21    **A.    The one that I dealt with the**
22  **most, yes.**

1    Q.    And you didn't think it was odd
2  that he kept calling you to talk to you about
3  this?
4    **A.    No.**
5    Q.    Three times, though?  It is your
6  testimony that he called you three separate
7  times?
8    **A.    Three times, where the first time**
9  **he called me, he wanted to get Ramirez on the**
10  **phone.  So he had to hang up.  So that made**
11  **call Number 2.  Call Number 2 ended because**
12  **Ramirez was disconnected.  So there had to be**
13  **a third call.**
14    Q.    So he was calling you back after
15  the second call went offline to sort of finish
16  your conversation?
17    **A.    Yes.**
18    Q.    And that was all within the space
19  of an hour?
20    **A.    Yes.**
21    Q.    Or even less than that?  A half
22  hour?

1    **A.    I would say a half hour.**
2    Q.    The third time that he called you
3  back, Officer Modlin, was Ramirez on the line
4  or not?
5    **A.    No, I didn't hear him.**
6    Q.    And after that call, did you have
7  any other conversations on that Saturday, the
8  12th of March, about the incident?
9    **A.    No.**
10    Q.    With anybody?
11    **A.    No.**
12        MR. CORCORAN:  Off the record.
13        (Discussion off the record from
14  12:37 to 12:38 p.m.)
15        BY MR. KAPLAN
16    Q.    Go back.  Now, since that date,
17  have you had any other conversations with
18  Officer Ramirez about the incident?
19    **A.    No.**
20    Q.    What about Officer Modlin?
21    **A.    Only to the fact that we were**
22  **getting served.**