Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM                    :
                                 :
          Plaintiff              :
                                 :
     vs.                         : Civil Action No.
                                 : 1:06:CV 00002
                                 : (JDB)
DISTRICT OF COLUMBIA,            :
   et al.                        :
                                 :
          Defendants :

            Washington, D.C.
            Tuesday, February 27, 2007

Deposition of:

     NIGHT and DAY MANAGEMENT, LLC
       DESIGNATED REPRESENTATIVE
            DAVID McLEOD
called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices
of Katten Muchin Rosenman, LLP, 1025 Thomas
Jefferson Street, N.W., East Lobby, Suite 700,
Washington, D.C. 20007-5201, before Renee A.
Feder, CSR, a Notary Public in and for the
District of Columbia, beginning at 1:47 p.m.,
when were present on behalf of the respective
parties:

Page 10

1  Q. Pardon me?
2  A. It is Maddox Training Facility,
3  which is like SPO training.
4  Q. M-A-D --
5  A. M-A-D-D-O-X.
6  Q. Maddox Training it is called?
7  A. Yes.
8  Q. Where is that?
9  A. Actually, we had some state
10 troopers -- I was trained by some ex-state
11 troopers, which they have the company. They
12 own the company.
13 Q. Where is this company located?
14 A. They came to me. They came to the
15 club to train me.
16 Q. Is Maddox a person's name?
17 A. I have no idea. That was the
18 company's name that they presented, as well as
19 a certificate.
20 Q. So this was training which you
21 acquired after you went to Insomnia?
22 A. Right.

Feder Reporting Company
(202) 863-0000

Page 11

1  Q. When you arrived at Insomnia you
2  had not yet had any of this training?
3  A. No. You don't really need, for
4  what I was doing, no, because I was just
5  searching.
6  Q. When you arrived at Insomnia you
7  were in charge of security?
8  A. Right.
9  Q. Even though you had not yet had
10 any of the training?
11 A. Well, nightclub training,
12 nightclub security is different from any SPO
13 security. To keep it -- it is pretty much you
14 are guarding the door.
15 Q. Pretty much?
16 A. You are guarding the door.
17 Q. So, are you saying it means it is
18 simpler?
19 A. It is real simple, yes.
20 Q. What did the training consist of
21 at Maddox?
22 A. It teaches you the basics of

Feder Reporting Company
(202) 863-0000

Page 12

1  verbal -- I would say verbal talking and hands
2  off procedures.
3  Q. What does hands off procedures
4  mean?
5  A. How to deal with a situation
6  without getting aggressive.
7  Q. Is this -- how long is the
8  training?
9  A. It is about three hours.
10 Q. One 3-hour session?
11 A. Yes.
12 Q. Did you have -- did you have any
13 other training beyond that or was that it?
14 A. That is pretty much it.
15 Q. When did Insomnia become FUR?
16 A. Insomnia never became FUR.
17 Insomnia closed down. FUR is a whole new
18 nightclub.
19 Q. And FUR started up when?
20 A. It was two years ago. I would say
21 roughly 2000 -- I am going to say five. I
22 don't recall.

Feder Reporting Company
(202) 863-0000

Page 13

1  Q. And you have had the same position
2  at FUR that you had at Insomnia. Is that
3  right?
4  A. Yes.
5  Q. Now, the -- I want to go over some
6  of the topics that you have been designated to
7  testify about starting with Number 5. It is
8  FUR's official policy and/or standard practice
9  as of March 11, 2005, regarding the use of
10 force by employees against patrons of FUR.
11 A. What is my policy?
12 Q. Well, not what is your policy, but
13 what is FUR's policy? Or what was FUR's
14 policy as of that date?
15 A. Terminate on the spot.
16 Q. What does that mean?
17 A. That means if you get into an
18 altercation at the nightclub and you touch a
19 patron in any way, you are fired right then
20 and there.
21 Q. Was that policy followed with
22 respect to this incident?

Feder Reporting Company
(202) 863-0000

Page 22

1  getting this statement -- after interviewing
2  Officers Modlin and Ramirez, the Spanish
3  officer, or the Hispanic officer, did you make
4  any effort to find other witnesses?
5      A.  No.
6      Q.  And I think I may have already
7  asked you this. Did you make any effort to
8  find the patron and ask him for his version?
9      A.  No.
10     Q.  Did it occur to you to do that?
11     A.  **At the time the patron was already**
12  **locked -- the officers already had him in**
13  **custody.**
14     Q.  Maybe yes and maybe no. But did
15  you make any effort to locate him and talk to
16  him?
17     A.  **I knew where he were. I seen him**
18  **across the street. But the officers had him**
19  **in custody so I didn't need to go over to talk**
20  **to him.**
21     Q.  You knew where the patron worked?
22     A.  **No, I know where he were. He was**

Page 23

1  **across the street.**
2      Q.  Okay. Did you make any effort to
3  talk to him when he was across the street?
4      A.  **No.**
5      Q.  Did you make any effort the next
6  day or on any of the days after that to call
7  him up?
8      A.  **No. I never met the guy.**
9      Q.  Did you get any training in the
10 Maddox Training about how to do
11 investigations?
12     A.  **No, I didn't.**
13     Q.  Well, even though, even though you
14 didn't get any training, would you agree that
15 it is common sense, that if you are
16 investigating an incident between -- an
17 altercation between two people, that you want
18 to try to get both sides' version and not just
19 one side's version?
20         MR. FITZSIMMONS: Objection to the
21 characterization.
22         THE WITNESS: I didn't even handle

Page 24

1  the case. John Fiorito was handling the case.
2  So I stepped aside.
3          BY MR. KAPLAN
4      Q.  Is John Fiorito your boss?
5      A.  **No, he is not.**
6      Q.  What is your relationship to
7  Mr. Fiorito?
8      A.  **Mr. Fiorito has the light and**
9  **sound inside the club.**
10     Q.  Well, you have security. Right?
11     A.  **Yes, I do.**
12     Q.  Well, is this a light and sound
13 matter?
14     A.  **No, it is not.**
15     Q.  Why does Mr. Fiorito have --
16     A.  **Because when MPD is on the scene,**
17 **and it is outside of FUR nightclub, it becomes**
18 **an MPD situation. It is not a FUR nightclub**
19 **situation. We are not licensed security**
20 **guards, we are not SPOs. We are, just like**
21 **you, working in a nightclub. Once it hits the**
22 **street, it is a MPD matter. And that is who**

Page 25

1  **takes care of it. MPD was on the scene. So**
2  **there is no need for me to walk over there to**
3  **investigate someone, because I don't have that**
4  **power.**
5      Q.  Is it your understanding that the
6  altercation between Mr. Persons and the patron
7  occurred outside?
8      A.  **My understanding is it occurred**
9  **inside. But it occurred with MPD officers who**
10 **escorted your client to the front door,**
11 **outside, across the street, and they took care**
12 **of it. Once it hits the street, ABC laws we**
13 **are not to intervene. It is an MPD problem.**
14     Q.  Don't you have a responsibility to
15 see that your zero tolerance policy is
16 enforced?
17     A.  **I did that. I investigated the**
18 **officers. I investigated my guy. If my guy**
19 **put his hands on a patron without the patron**
20 **striking him first, then he is at fault, he is**
21 **terminated. But other than that, once it**
22 **becomes MPD, and there with three or four MPD**

Page 26

1  officers handling it, it is not FUR nightclub.
2  We are not to intervene.
3      Q.   I don't want to -- I don't want to
4  belabor this.  Let me just ask you one more
5  question here.
6           Did you at any time, either that
7  night or in any of the following days, weeks,
8  or months, after you talked to Mr. Persons and
9  the two officers, Modlin and the Hispanic
10 officer, did you at any time consider calling
11 or attempting to call the patron to see what
12 his version is?
13     A.   I didn't even know who the patron
14 is.  No, I did not.
15     Q.   Are you saying the reason you
16 didn't do it is because you didn't know the
17 patron's name?
18     A.   I am saying the reason I didn't do
19 it is because it is now MPD.  MPD was handling
20 it.  They would forward me all reports.  Once
21 something happens on the streets of
22 Washington, D.C., outside of any nightclub,

Feder Reporting Company
(202) 863-0000

Page 27

1  anything, MCI, it does not matter, it becomes
2  an MPD problem.  Once MPD has it, they will
3  give us, if we are involved, they will forward
4  us a report.  It is a 251, generated through
5  ABC.  I get them all the time for anything,
6  car being broken into, cell phone being lost.
7  That is how it is done.  I am not an officer.
8  I am a civilian that works in a nightclub.
9      Q.   Right.  I understand.
10          Tell me once again -- I don't
11 think you told me yet, because I haven't
12 asked, why it is that once it spills over to
13 the outside, that Mr. Fiorito, the sound and
14 light man, took it over?
15     A.   Apparently, he was already -- he
16 was out there when the situation came over.
17 He didn't take it over.  He was just there.
18 That is, when I saw him there, he was just
19 there, I walked back inside.  He will let me
20 know later what happened before the report
21 hits me.
22     Q.   Well, since you are the security

Feder Reporting Company
(202) 863-0000

Page 28

1  person, why -- did you consider telling
2  Mr. Fiorito to go inside and you handle it?
3      A.   I didn't tell Mr. Fiorito to go
4  Inside.  I came outside.  I looked across the
5  street.  Your client was yelling a bunch of
6  profanity across the street.  I saw what was
7  going on.  I saw Mike Persons.  I saw John
8  Fiorito standing there.  I saw a bunch of MPD
9  guys, there were two more cops on the scene.
10 I turned back around and walked back into the
11 nightclub, because I saw MPD was there.  John
12 Fiorito was there.  Mike was there.  They will
13 tell me later what happened.
14     Q.   Okay.  And you say you left it
15 then to Mr. Fiorito to do whatever
16 investigation was going --
17     A.   Not an investigation.
18          MR. FITZSIMMONS:  Objection.
19 Mischaracterizes.
20          THE WITNESS:  Not an
21 investigation.  I left them over there to let
22 me know what happened, and what is going on.

Feder Reporting Company
(202) 863-0000

Page 29

1           BY MR. KAPLAN
2      Q.   And did Mr. Fiorito report back to
3  you?
4      A.   Yes, he did.  Mike Persons
5  reported right back to me, too.  They told me
6  what happened.  That is how I got my story.
7  That is how I got my statements.
8      Q.   We will come back to that a little
9  later.
10          Topic Number 6 is the method used
11 by FUR to communicate -- I guess maybe you
12 answered that one, too.  The method used by
13 FUR to communicate any such policy and/or
14 standard practice to its employees regarding
15 the use of force against patrons of FUR.
16          And your answer is that you tell
17 them?
18     A.   At no time no one is allowed to
19 touch a patron.
20     Q.   And you tell them that --
21     A.   -- at every security meeting we
22 have.

Feder Reporting Company
(202) 863-0000

Page 30

1  Q. How often is that?
2  A. We have a security meeting every
3  Friday. And Saturday. I have a staff meeting
4  on Saturdays, security meeting on Fridays.
5  Q. Other than topic seven, is the
6  training provided by FUR to its employees
7  regarding use of force against patrons, is
8  there any training other than what you tell
9  them?
10  A. There is no nightclub training
11  exists in no state, no forum, no country. The
12  training that I give my guys is the Maddox
13  training. That is something that FUR takes
14  initiative to give those guys. You don't have
15  to have training to work in a nightclub. We
16  take initiative to train our guys properly so
17  we don't have incidents and no one will get
18  hurt in a nightclub. There is no training for
19  nightclub security.
20  Q. And topic eight is the official
21  policy regarding the discipline of a FUR
22  employee who violates that official policy?

Feder Reporting Company
(202) 863-0000

Page 31

1  A. And I answered that question
2  already.
3  Q. You have answered that.
4     Automatic termination?
5  A. Automatic termination.
6  Q. No second chance?
7  A. No second chance.
8  Q. Have there been any such
9  occasions?
10  A. Yes, it has.
11  Q. How many people have been fired?
12  A. I have had two of my guys fired
13  for that reason.
14  Q. When did that occur?
15  A. One of them happened the same
16  night that this occurred.
17  Q. Same night?
18  A. Same night.
19  Q. What happened?
20  A. The guy, one of the patrons, was
21  leaving out of the back door, he turned back
22  and looked at my security guy, he said some

Feder Reporting Company
(202) 863-0000

Page 32

1  profanity to him, F' you. My security guard
2  didn't like it, so he attacked him.
3  Q. Were the police called?
4  A. No, they was not.
5  Q. What happened to the patron?
6  A. The patron came back inside. He
7  said -- because I knew him personally. He was
8  a personal friend of mine. He told me what
9  happened.
10  Q. What did he tell you?
11  A. He said one of my security guards
12  cracked him at the back door.
13  Q. And did what?
14  A. He said he pushed him to the
15  ground.
16  Q. Didn't hurt him?
17  A. No, it didn't hurt him. But just
18  the fact that it happened. It was
19  untolerable.
20  Q. Did you ask the patron -- who was
21  the security guard?
22  A. John Esby.

Feder Reporting Company
(202) 863-0000

Page 33

1  Q. Esby?
2  A. Yes.
3  Q. Did you ask the patron if he
4  wanted to file a police report?
5  A. Yes, I did.
6  Q. And he said?
7  A. He said, no, Dave, I don't need to
8  file a police report. I just want to let you
9  know that this happened.
10  Q. What time did this occur?
11  A. Roughly, we was closing so I would
12  say almost a quarter to 4:00, 4:00 o'clock.
13  Q. Is that incident in the log?
14  A. No. That incident was on camera.
15  So there is no need to put it in a log. That
16  is -- when my guy got fired, the patron didn't
17  press no charges. The patron was one of my
18  friends. He just came to let me know that
19  happened. I didn't need to log it up when I
20  saw it on tape that my guy did attack this
21  patron.
22  Q. Did you preserve the tape?

Feder Reporting Company
(202) 863-0000

Page 34

1  A. No. I brought both of them in, I
2  showed what happened, and I fired my guy on
3  the spot.
4  Q. And the reason you didn't keep --
5  you didn't wite it in the log is what?
6  A. Because the guy did not want to
7  press no charges. He said, Dave, I am just
8  letting you know this happened. He is a
9  personal friend of mine.
10  Q. You only write things in the log
11  when you think someone is going to press
12  charges?
13  A. It is not a think anything. I
14  write things in the log when MPD is called to
15  a scene, an ambulance is called to the scene
16  or someone wants to say we stole a cell phone
17  or something like that. If you lose a cell
18  phone I have to log it.
19  Q. So you write things in the log
20  when MPD is called to the scene. What is the
21  next category?
22  A. An ambulance is called to the

Feder Reporting Company
(202) 863-0000

Page 35

1  scene. Or loss of personal possessions in our
2  establishment.
3  Q. So if a patron is beaten by your
4  security guard and thrown out of the club but
5  the police aren't called --
6  A. That will never happen.
7  Q. Let me finish the question.
8     If a patron is beaten and the
9  police aren't called and the ambulance isn't
10  called, you wouldn't write that in the log?
11  A. That will never happen.
12  Q. Well, would you write that in the
13  log?
14  A. Yes, I will. And if a patron is
15  called -- one of my security guards beats a
16  patron, he is getting locked up. That will
17  never happened. Like I said, we are
18  civilians. You are not beyond the law because
19  you work at FUR nightclub or any club. It is
20  still a civil matter. If one of my guys beat
21  up a patron, he is getting locked up that
22  night.

Feder Reporting Company
(202) 863-0000

Page 36

1  Q. Isn't that what Mr. Esby did?
2  A. If the patron would have pressed
3  charges, then Mr. Esby would have gotten
4  locked up.
5  Q. And you would have written it in
6  the log?
7  A. And I would have wrote it in the
8  log.
9  Q. If for whatever reason the patron
10  doesn't want to press charges, for whatever
11  reason, he is embarrassed, or he doesn't want
12  to get in trouble with the police, or
13  whatever, you wouldn't write it in the log?
14  A. I have no need to. It wouldn't
15  generate a report for me.
16  Q. That was one incident.
17     What was the other incident where
18  someone got fired?
19  A. The other incident was, one I my
20  guys, he kind of grabbed a patron the wrong
21  way. He was breaking up a fight, my
22  understanding is he was breaking up a fight

Feder Reporting Company
(202) 863-0000

Page 37

1  but when he broke up the fight he kind of
2  grabbed the patron aggressively. When we have
3  a fight, you should step in, intervene and
4  step clear. You don't step in, intervene and
5  grab someone aggressively. I saw that
6  personally. I let him go, because I don't
7  know the next time something might happen and
8  it might be a little different than what he
9  did when I saw him.
10  Q. Who was that that got fired?
11  A. I can't recall his name right now.
12  It was before the Esby incident.
13  Q. 2005, 2004?
14  A. No.
15  Q. Esby was 2004, was it not?
16  A. Esby was 2005.
17  Q. So this was before that?
18  A. Yes.
19  Q. How long before?
20  A. I can't recall.
21  Q. Did you write it in the log?
22  A. No, I fired him personally.

Feder Reporting Company
(202) 863-0000

Page 38

1   Q.   So if you fire someone --
2   A.   I seen it.
3   Q.   You don't write anything in the
4   log?
5   A.   I seen the incident myself.
6   Meaning if I wasn't around or someone else
7   wasn't around, it wouldn't have been seen.
8   Q.   Right.  But when someone -- did
9   you ask the patron if he wanted the police
10  called?
11  A.   The patron didn't complain.
12  Q.   Well --
13  A.   All the patron knows is that guy
14  was breaking up the fight.  I just didn't, I
15  personally didn't like the way he did it.
16  Q.   So, fights don't get recorded in
17  the log unless the police are called?
18  A.   Well, I mean a fight can break out
19  anywhere.
20  Q.   But you don't put it in the log
21  unless the police are called?
22  A.   Unless it is an incident.

Feder Reporting Company
(202) 863-0000

Page 39

1   Q.   Or an ambulance?
2   A.   If that person wants to file a
3   complaint, wants to press charges, I don't
4   turn them away from that.  I will take them
5   right outside to the officers that is out
6   front and he can press charges.  That is when
7   it becomes a report.  And when it becomes a
8   report, that means I have to make a log
9   stating that that happened in my nightclub,
10  because I know it is coming back as a report.
11  Q.   Does it ever happen that the
12  patron decides a couple of days later to make
13  a complaint rather than the moment it happens?
14  A.   Sure.
15  Q.   Do you at that point put it in the
16  log?
17  A.   No, I still don't put it in the
18  log.  Because he is making a report and the
19  report is going to MPD.  They are going to
20  send me a copy of the report.
21  Q.   So, if the MPD is going to send
22  you a report, then you don't put it in the

Feder Reporting Company
(202) 863-0000

Page 40

1   log.  Is that right?
2   A.   There is no need.  MPD, whenever I
3   get an MPD report, like this one that we are
4   sitting at this table right now dealing with,
5   I get a 251.  A 251 means that it comes from
6   ABC.  That is a report in itself.  If you want
7   to look at the records and files that look
8   over with FUR nightclub or any club, or any
9   establishment, or any ABC establishment in
10  D.C., you get a 251 report with any police
11  report.  That is my report.
12       If you want to say it is logged
13  up, yes, it is logged.  This report right here
14  is logged.  Because I got a 251 off of this
15  case, because there was a police report
16  generated.  So that is my log right there.  I
17  can use that as a log.  Rather than me writing
18  it down and rather than MPD giving it to me,
19  it is still a report that was made.
20  Q.   But what you did in this case, you
21  didn't wait for the MPD to send you a report,
22  you wrote it in the log yourself?

Feder Reporting Company
(202) 863-0000

Page 41

1   A.   That is right.  Because I know it
2   is coming.  I had no idea that MPD -- that the
3   guy -- I thought the guy got arrested when I
4   went outside.
5   Q.   And you were expecting that you
6   would get an MPD report on it.  Right?
7   A.   I know I was going to get an MPD
8   report ot it.
9   Q.   If you were going to get an MPD
10  report, why did you write it in the log itself
11  since you were going to get an MPD report?
12  A.   Refresh my memory of what the
13  report is that is coming in.
14  Q.   Okay.  If you saw a fight going
15  on, and the patron did not immediately say he
16  wanted to file a police report, you would not
17  put it in the log.  Is that right?
18  A.   You are trying to spin that.  I
19  will put it to you this way.  If a fight goes
20  on and a patron is hurt in the fight, I give
21  the patron an option always, do you need an
22  ambulance, do you want to file a report?  That

Feder Reporting Company
(202) 863-0000

Page 42

1  is the first thing that comes out of my mind
2  at any incident.
3       Q.   Okay.  What I am trying to find
4  out is when would you write that incident in
5  your log?
6       A.   I would write it as an incident
7  after the fight occurred and I am on the scene
8  that shows this person is taking a report, he
9  wants to go to the hospital.  I have people
10 going to the hospital that don't even generate
11 a police report.  But I have in my log this
12 ambulance was called for this person.
13      Q.   How often do people go to the
14 hospital?
15      A.   Not often.  Like you are not
16 feeling well, you come outside, you had too
17 much to drink or you took some medicine at
18 home, you are on medication and you come to
19 the club and you have a drink and you are not
20 feeling well, I call an ambulance for that.
21      Q.   How often do you call an
22 ambulance?

Feder Reporting Company
(202) 863-0000

Page 43

1       A.   It is rare.  Very rare.
2       Q.   Once a week?
3       A.   No.  No.  Maybe twice -- once a
4  month, if that.
5       Q.   How often do fights get broken up?
6       A.   That is rare, too.  I can't answer
7  that.
8       Q.   Same frequency?
9       A.   Yes.  I can't tell you when a
10 fight is going to happen or not going to
11 happen.
12      Q.   But on the average?
13      A.   Every blue moon.  I can't answer
14 that question.
15      Q.   Have there been any other cases
16 where any employee of FUR used force against a
17 patron?
18      A.   No.  Besides this one that we are
19 sitting right here, so they say.
20      Q.   Let's talk about screening
21 procedures for the hiring of security
22 personnel.

Feder Reporting Company
(202) 863-0000

Page 44

1       A.   Background checks, police
2  clearance.
3       Q.   Who is in charge?
4       A.   I am.
5       Q.   What kind of background check?
6       A.   We do a background check, meaning
7  we have a company that checks -- that does
8  thorough background checks, makes sure you
9  have no felonies.  We do a police clearance
10 through Maryland, Virginia and D.C.  Meaning
11 if anything comes back stating you have been
12 in any misdemeanor, any assault charge, any
13 felonies, you cannot work at FUR nightclub.
14      Q.   Did you do those kind of checks
15 for Mr. Persons?
16      A.   Sure enough did.
17      Q.   All --
18      A.   Any employee at FUR nightclub.
19      Q.   Checks were all negative for
20 Mr. Persons?
21      A.   Yes, they were.
22      Q.   Topic 11 is the security system in

Feder Reporting Company
(202) 863-0000

Page 45

1  place at FUR as of March 11th including but
2  not limited to the video surveillance system
3  that is in place at such time.
4       A.   The video consist of a theft
5  thing.  We have all video cameras at all
6  registers, back door entrance, front door
7  entrance.  It is more used for theft than
8  anything.
9       Q.   How many cameras?
10      A.   Roughly, I am thinking maybe about
11 24.
12      Q.   Who installed them?
13      A.   I have no idea.
14      Q.   Ever hear of a company call JB
15 Security?
16      A.   I know JB.  I didn't know that is
17 what he called the company, JB Security.
18      Q.   What is JB's name, actually?
19      A.   I have no idea.  I call him JB.
20      Q.   Do you know where his place of
21 business is?
22      A.   I have no idea.

Feder Reporting Company
(202) 863-0000

Page 46

1  Q. How do you call him? How do you
2  contact him?
3  A. How do I contact him? I don't
4  contact JB.
5  Q. You have never called him?
6  A. I have never called JB.
7  Q. Who does call him?
8  A. Diego. Operations manager. He is
9  the operational -- he can deal with the money,
10 he controls the money. I don't contact him.
11 Q. Diego what?
12 A. Sanchez. That is his name.
13 Q. And what is his position?
14 A. He is the operational. He deals
15 with the money.
16 Q. What is JB's role on the security
17 cameras?
18       MR. FITZSIMMONS: Objection.
19 Foundation. What is his role?
20       BY MR. KAPLAN
21 Q. What is his role? Does he have a
22 role?

Page 47

1  A. I don't understand the question.
2  Q. What does JB do concerning the
3  video surveillance cameras?
4  A. JB just installs cameras.
5  Q. Does he maintain them?
6  A. Yes, he maintains my cameras.
7  Q. Does he come out once a week or
8  once a month?
9  A. I have no idea. He comes out
10 whenever a camera goes bad. I have no idea.
11 Q. Have there been any occasions
12 in the past two years when the -- when cameras
13 were taken out or added?
14 A. Rephrase that, sir? Repeat that
15 question.
16 Q. Yes. Have there been any
17 occasions in the past two years when any
18 cameras have been removed or new cameras have
19 been added?
20 A. Since today?
21 Q. Yes.
22 A. I have added two new cameras.

Page 48

1  Q. When was that?
2  A. Two months ago.
3  Q. Where are they?
4  A. One new camera outside. It is
5  facing west.
6  Q. Let's see. When you come out the
7  front door --
8  A. The new camera will be on your
9  right.
10 Q. The new camera is on your right?
11 A. Yes.
12 Q. So, the camera is at the front
13 door facing west?
14 A. It is shooting -- this is the
15 club. It is shooting this way. In other
16 words, it gives me an angle this way.
17 Q. Let me ask if you can draw a
18 diagram.
19 A. (Witness complying.) This is the
20 front of the club, okay.
21 Q. Put FD for front door.
22 A. Okay. I already have a camera

Page 49

1  going this way. The new camera is over here.
2  I will put "W" going that way. So I can see
3  anything up here as well as anything down
4  here.
5  Q. Okay. The new camera is attached
6  to the building?
7  A. Yes.
8  Q. Is it intended to get what is on
9  the sidewalk?
10 A. Well, no. It sees everything. It
11 will see the street. And this will see the
12 front door. Like people walking up the steps.
13 This camera will see the front, like people
14 walking up the steps. This camera will show
15 the street.
16 Q. Would it show the sidewalk across
17 the street?
18 A. This camera? Here?
19 Q. Yes.
20 A. No. It will show -- this is the
21 sidewalk in front of the building. In other
22 words, it will show probably a little bit of

Page 58

1  somebody got aggressive, that means you
2  attacked me.
3     Q.  So when he said he asked the guy
4  to get off of the stage and the guy got
5  aggressive, you took that to mean the guy
6  attacked him?
7     A.  The guy attacked him.
8     Q.  And he did it three times?
9     A.  No, the guy didn't attack him
10 three times.  He asked the guy to get off of
11 the stage three times.
12    Q.  And was the guy aggressive each
13 time?
14    A.  Each time the guy became a little
15 aggressive.  Meaning if you ask me to get off
16 of the stage, like you say get off of the
17 stage, and I look at you like I am about to
18 say some words to you, it looks like I am
19 getting upset, I am getting angry at you.
20 Then the second time you ask me to get off of
21 the stage, I am getting more and more angry.
22 Like I am going to launch at you but I am not

Feder Reporting Company
(202) 863-0000

Page 59

1  launching at you.  Then the third time he
2  asked the guy to get off the stage, the guy
3  got really aggressive and he launched at him.
4     Q.  That is what he said?
5     A.  That is how it is.
6     Q.  That is what he told you?
7     A.  That is what he told me.  The guy
8  attacked me.  He said aggressive.  I know what
9  that meant.
10    Q.  Well, aggressive could mean that
11 the guy pushed him, kicked him, punched him.
12 Did you ask him any of that?
13    A.  No.
14    Q.  So, what did he say he did?
15    A.  He said he defended himself.
16    Q.  Did he say how he defended
17 himself?
18    A.  I didn't get into the details with
19 that.
20    Q.  Was that the whole conversation?
21    A.  That was the end of our
22 conversation.

Feder Reporting Company
(202) 863-0000

Page 60

1     Q.  Who did you talk to next?
2     A.  The next conversation, I talked to
3  Fiorito, and I asked him what was going on
4  across the street.  He really didn't tell me
5  too much.  He just said the cops was handling
6  it.
7     Q.  And anything else that you
8  remember?
9     A.  That is pretty much it.
10    Q.  What was next?
11    A.  That was it.
12    Q.  Well, at some point you talked
13 to --
14    A.  The off duty officers, yes.  At
15 some point I talked to them.  Because they
16 work on detail.  Sometimes they work detail
17 with my club.
18    Q.  They were off duty?
19    A.  Yes.  So the next time they came
20 on duty I had a conversation with them.
21    Q.  About how long later?
22    A.  Maybe two or three weeks later.

Feder Reporting Company
(202) 863-0000

Page 61

1     Q.  And which one did you talk to
2  first?
3     A.  I talked to Modlin first.
4     Q.  What did he say?
5     A.  To my knowledge, I remember he
6  said he saw the guy swinging at Persons.
7     Q.  Anything else?
8     A.  That is pretty much what I can
9  remember.
10    Q.  And that is the interview you
11 wrote in the log?
12    A.  That is the interview I wrote in
13 the log.
14    Q.  When did you talk to the Hispanic
15 guy?
16    A.  Ramirez, the same night.  They was
17 both on duty.
18    Q.  Did you know Ramirez before this
19 incident?
20    A.  I know him by face.  I am not good
21 with names.  That is why I say the Spanish
22 guy.  I see so many faces.  I'm never good

Feder Reporting Company
(202) 863-0000

Page 66

1  then Greenberg, Goldberg. Jay Goldberg, I
2  think that is his name, if I am not mistaken.
3  And then from then on, he was the only one I
4  ever saw personally.
5    Q.  Did they look at where the camera
6  was?
7    A.  Yes.
8    Q.  And they were looking to see if
9  the cameras showed the stage?
10   A.  Yes. They were looking at the
11 cameras to see if any camera was pointed
12 directly onto the stage.
13   Q.  Other than the conversation with
14 Skip Coburn and the conversation with the FBI
15 agents, have you ever before today discussed
16 with anyone else the question of whether the
17 security cameras showed or did not show any of
18 this altercation?
19   A.  No.
20   Q.  On the night of March 11, did you
21 discuss with anyone at FUR whether the cameras
22 showed or did not show any of the altercation?

Feder Reporting Company
(202) 863-0000

Page 67

1    A.  No.
2    Q.  Or the next day, March 12, or any
3  other day in the month of March?
4    A.  No.
5    Q.  So you have never had any
6  conversation on that subject with Mr. Rehman,
7  Mike Romeo?
8    A.  You are talking about the staff?
9  The owner?
10   Q.  Yes.
11   A.  Yes, he asked me did I see
12 anything on the tape. I mean on the cameras.
13 I think you are talking about civilian-wise.
14 Of course, the boss is going to ask me did I
15 see anything on the cameras.
16   Q.  Okay. I thought I said anyone.
17   A.  Okay. Of course, the bosses asked
18 me and I told them no.
19   Q.  Let's go back to when was the
20 first conversation you had with anyone,
21 whether it is the boss or anyone, on the
22 subject of what the cameras showed.

Feder Reporting Company
(202) 863-0000

Page 68

1    A.  Mr. Romeo asked me did I see
2  anything on the cameras. I told him no. The
3  cameras do not point in those directions to
4  the stage.
5    Q.  When was that?
6    A.  That was the -- I think it was,
7  within a week after that incident.
8    Q.  What exactly did Romeo say?
9    A.  He said, David, did you see
10 anything on the cameras about the incident? I
11 said, Mr. Romeo, the cameras do not point to
12 the stage. Cameras are only there for theft
13 and exits. So, no.
14   Q.  What he said was did you see
15 anything on the cameras. Were you supposed to
16 have looked at the cameras to see if they
17 showed anything?
18       MR. FITZSIMMONS: Objection to
19 form. He wouldn't have looked at the cameras,
20 per se.
21       BY MR. KAPLAN
22   Q.  You can answer?

Feder Reporting Company
(202) 863-0000

Page 69

1    A.  I never looked at the cameras,
2  because there is nothing for me to look at. I
3  stated that, because the cameras do not point
4  to the stage.
5    Q.  When I say look at the cameras, I
6  mean look at the film or whatever. Is the
7  camera digital?
8    A.  No, I never looked at the film
9  because there is no film to look at.
10   Q.  It is digital cameras?
11   A.  It is digital cameras.
12   Q.  When you looked to see if anything
13 was captured, what do you call that?
14   A.  I never looked to see if anything
15 was captured because there is nothing to look
16 at.
17   Q.  So you had not looked at anything
18 that might or might not have been captured.
19 Correct?
20   A.  I have nothing to look at.
21   Q.  And you didn't look at anything?
22   A.  I looked at no cameras, because I

Feder Reporting Company
(202) 863-0000

Page 110

```
 1  that he owns the building, what was your basis
 2  for saying that?
 3      A.  I never said he owned the
 4  building.  You did.  I said my boss is Mike
 5  Romeo.
 6          MR. KAPLAN:  Can you read back
 7  that question?
 8          (The record was read by the
 9  reporter.)
10          THE WITNESS:  No.  I know my boss
11  is Mike Romeo.
12          MR. KAPLAN:  Let's take a few
13  minutes.
14          (A recess was taken.)
15          BY MR. KAPLAN
16      Q.  Mr. McLeod, you know where all of
17  the cameras are located at FUR?
18      A.  Do I know?
19      Q.  Yes.
20      A.  Yes.
21      Q.  If I were up on the stage, and I
22  walked down the steps off of the stage onto
```

Feder Reporting Company
(202) 863-0000

Page 111

```
 1  the main floor, walked across the 30 or so
 2  feet from those steps to the steps going up to
 3  the tunnel, walked up the steps to the tunnel
 4  through the tunnel and out the front door,
 5  straight out across the street to the sidewalk
 6  across the street and sat down, would any of
 7  the FUR cameras have caught anything that I
 8  did?
 9      A.  Yes.
10      Q.  Which ones?
11      A.  The front door would catch you
12  coming down the steps.  And then as you are
13  leaving out of the club, it would catch you
14  going out of the club.
15      Q.  And would any of the inside
16  cameras have caught me also?
17      A.  No.
18      Q.  But at least, at least the outside
19  cameras would show me, right, as you just
20  said?
21      A.  Yes.
22      Q.  So, some portion of this incident
```

Feder Reporting Company
(202) 863-0000

Page 112

```
 1  would have been captured on the film.
 2  Correct?
 3      A.  Yes.
 4      Q.  Did it ever occur to you to check
 5  any of the outside cameras to see if they
 6  caught any of it?
 7      A.  No.
 8      Q.  And that is because of why?
 9      A.  Because if nothing happened coming
10  down the steps of the nightclub, nothing
11  happened walking out of the door of the
12  nightclub.
13      Q.  How do you know that?
14      A.  Because I have guys -- as you walk
15  into FUR, before you hit the first steps, you
16  are going to go through seven guys.  Before
17  you walk -- as you walk into FUR, before you
18  make a left or a right, you are going to have
19  one guy here and one guy here.  These are guys
20  stationary every time a club opens.  Nothing
21  happened here.  Nothing happened coming down
22  the steps.
```

Feder Reporting Company
(202) 863-0000

Page 113

```
 1      Q.  How do you know that?
 2      A.  They would have said -- they would
 3  have told me it happened.
 4      Q.  Did anyone tell you nothing did
 5  happen?
 6      A.  No one told me something happened.
 7      Q.  Did anyone tell you nothing
 8  happened?
 9      A.  Are you trying to twist it around?
10  No one told me that something happened.
11      Q.  Did anyone tell you that nothing
12  happened?
13      A.  Yes, my guys are right there.
14      Q.  Who told you nothing happened?
15      A.  Okay.  I have a guy as you walk
16  out of the club --
17      Q.  Just give me the names.
18      A.  It could be any particular
19  security guy that night.  There is no name.
20  It could be any one of my guys.  It can be one
21  of my females.  It can be any security guard
22  there that night.
```

Feder Reporting Company
(202) 863-0000

Page 142

1  level, there is a stage.  Right?
2      A.  Yes.
3      Q.  Whose responsibility is it to
4  determine who can be on the stage?
5      A.  Security.
6      Q.  What directions, what are the
7  rules that security is supposed to be applying
8  in determining who can be on the stage?
9          MR. FITZSIMMONS:  Objection.
10 Vague.
11         THE WITNESS:  It depends on the
12 night.  Usually the rules are if you have a
13 table, you are allowed on the stage.
14         BY MR. KAPLAN
15     Q.  If you don't have a table.
16     A.  You can't be on the stage.
17     Q.  In fact, on Friday nights the
18 stage is full of people dancing who don't have
19 a table.  Right?
20     A.  It is like --
21     Q.  Is that right?
22     A.  Probably so.

Feder Reporting Company
(202) 863-0000

Page 143

1      Q.  Are you saying all of those people
2  are on there illegally?
3      A.  Like I said, it depends on the
4  night.
5      Q.  Friday nights?
6      A.  Fridays nights, no offense, if you
7  are a hot girl, you are going to get on the
8  stage.  If you look good, you are going to get
9  on the stage.  It is called VIP.  It is a
10 place where only the VIPs can get on the
11 stage.  Depends on the night.
12     Q.  So either you have to be a VIP or
13 a hot girl?
14     A.  Exactly.
15         MR. FITZSIMMONS:  We are out of
16 luck, Warren.
17         MR. KAPLAN:  Speak for yourself.
18         THE WITNESS:  Sometimes we don't
19 sell those tables on the stage.  And I can't
20 have an empty stage just because we are not
21 selling the tables.
22         BY MR. KAPLAN

Feder Reporting Company
(202) 863-0000

Page 144

1      Q.  So hot girls and VIPs.  VIP, what
2  do you have to do to be a VIP?
3      A.  Look good.
4      Q.  So what do you think about
5  Mr. Corcoran and myself?  Would we be able to
6  get on the stage?
7          MR. FITZSIMMONS:  That is not
8  fair.  He is under oath.
9          MR. CORCORAN:  We have been on the
10 stage, by the way.
11         BY MR. KAPLAN
12     Q.  Who decides whether someone is --
13 looks good enough to be on the stage?
14     A.  Unfortunately, security decides
15 that.
16     Q.  Now, when you have a promoter like
17 Masoud, he usually brings some of his own
18 people.  Right?
19     A.  Right.
20     Q.  In fact, on the night that we are
21 talking about here, he had a couple of people
22 inside, did he not?

Feder Reporting Company
(202) 863-0000

Page 145

1      A.  It could be.
2      Q.  Do they get to participate in
3  deciding who looks good enough to be on the
4  stage?
5      A.  Sometimes, yes.
6      Q.  I know I asked you a lot of
7  questions about the security camera, and now I
8  am putting that aside for a moment.  Other
9  than Mr. Persons and Officer Modlin and the
10 Hispanic officer, is there anyone else that
11 you have ever, with whom you have ever
12 discussed what happened during the night of
13 March 11th and 12th?
14     A.  You didn't say Skip.
15     Q.  And Skip Coburn?
16     A.  No.
17     Q.  How about Mr. Fiorito, Mr. Rehman?
18     A.  We really didn't discuss -- I
19 don't know anything so we didn't really
20 discuss what happened that night.
21     Q.  Did anyone ever tell you that
22 there was a meeting on the night of March 12th

Feder Reporting Company
(202) 863-0000

Page 158

1  gentlemen took a break of about ten minutes or
2  so in the middle of their questioning.  Did I
3  say one word to you during that break?
4      A.  No.
5      Q.  Did I look at you during that
6  break?
7      A.  No.
8      Q.  All right, let's continue.
9          Mr. Kaplan, asked you to draw this
10 diagram which is Exhibit 1.  And one of the
11 things you marked on here was OC.  That stands
12 for what?
13     A.  Well, that is what he told me to
14 say.
15     Q.  Stands for old camera?
16     A.  Yes.
17     Q.  And he asked you about reviewing
18 the tape, the tape of the incident on 3/24/06
19 from the exhibit that he looked at?
20     A.  Right.
21     Q.  Did you ever have occasion to
22 review the tape from this old camera

Feder Reporting Company
(202) 863-0000

Page 159

1  corresponding with the incident that we are
2  dealing with here?
3      A.  Did I review that tape?
4      Q.  Yes.
5      A.  Yes, I have seen it.
6      Q.  Okay.  How did it come about that
7  you reviewed that type?
8      A.  The next day I looked at them
9  coming out of the club.
10     Q.  Okay.  How did it come about that
11 you decided to look at this tape?
12     A.  I mean, we discussed to look at
13 the tape because of the simple fact -- I
14 gradually looked at the tape of people coming
15 out of the club.  In other words, I review
16 tapes, anyway.
17     Q.  You say "we discussed."  Who did
18 you discuss this with, reviewing the tape?
19     A.  Mr. Romeo.
20     Q.  Are you certain it was Mr. Romeo?
21     A.  Yes.  He asked me to look at the
22 tape.

Feder Reporting Company
(202) 863-0000

Page 160

1      Q.  Did Mr. Fiorito ask you to look at
2  the tape?
3      A.  They both was there.
4      Q.  They both was there.  When did
5  they ask you to review the tape?
6      A.  The next day.
7      Q.  And when did you actually review
8  the tape?
9      A.  Saturday.
10     Q.  What did you see when you reviewed
11 the tape?
12     A.  I seen the patron coming out, four
13 guys around him, walking down the steps.
14     Q.  Did you see this group from any
15 other vantage?
16     A.  You also see them walking out of
17 the club from the camera that is pointed
18 directly toward the front door.
19     Q.  Who did you see exactly in this
20 tape?
21     A.  Well, I saw the Spanish cop, I saw
22 the -- it is the Spanish cop.  There is

Feder Reporting Company
(202) 863-0000

Page 161

1  Modlin.  It a white cop that I don't know.
2  And it is another cop, a black cop, a black
3  cop that I don't know.  I guess that is
4  Phillips.  I assume, I don't know.  And your
5  patron, the patron is in the middle of these
6  four cops.
7      Q.  How long in hours or minutes or
8  seconds did these people appear on the OC
9  camera screen?
10     A.  Second.  Seconds.
11     Q.  How many seconds?
12     A.  I am going to say maybe 30
13 seconds, if that is the most, walking.  You
14 see them walking, and walking down.
15     Q.  You are talking about both
16 cameras, you see them for 30 seconds?
17     A.  Yes, both cameras.  You see them
18 walk out and walk down.
19     Q.  You say walked out.  Did you see
20 Mr. Mazloum getting dragged out?
21     A.  No.  He walked out on his own
22 recognizance.

Feder Reporting Company
(202) 863-0000

Page 162

1   Q.  You can tell that from looking at
2   the tape?
3   A.  Yes.  You can tell that by looking
4   at the tape.  You can see him walking out with
5   four guys around him.  He gets to the steps.
6   You can see him walking down the steps with
7   four guys around him.
8   Q.  Did you make any kind of report to
9   Mr. Fiorito about what you looked at after you
10  looked at this tape?
11  A.  I let him know he walked out.
12  That is the only report I can give him.
13  Q.  Did you report to him that you saw
14  cops beating Mr. Mazloum as he was walking
15  down the stairs?
16  A.  No, I never saw that.
17  Q.  Other than these guys walking down
18  the stairs, was there anything happening?
19  A.  No, they walked him out.
20  Q.  By what means did you review this
21  tape for this purpose?  How did you do it?
22  A.  What do you mean?  Well, you

Feder Reporting Company
(202) 863-0000

Page 163

1   can't -- you go in and you -- first of all,
2   you go in and you have to back it up.  Then
3   you back it up and you can see, as they are
4   walking out, there are two cameras.  One
5   camera goes this way and one camera is
6   outside.  You have to go through that camera.
7   Once you get the time frame on that camera,
8   you have to repeat it and go to the outside
9   camera, and match both times frames.
10  Q.  How long did you spend performing
11  this review?
12  A.  Five minutes.  Five, ten minutes,
13  tops.
14  Q.  Is it possible for anybody to walk
15  up to the FUR security system and review old
16  footage?
17  A.  No.
18  Q.  Why not?
19  A.  It is coded.
20  Q.  What do you mean?
21  A.  Meaning you have to have a code to
22  get into the cameras.

Feder Reporting Company
(202) 863-0000

Page 164

1   Q.  You mean into the monitors?
2   A.  Into the monitors.
3   Q.  What kind of code?
4   A.  It is a four digit pin code.
5   Q.  Who has the four digit pin code at
6   FUR?
7   A.  Myself and Diego.
8   Q.  Does Michael Rehman have it?
9   A.  No.
10  Q.  Does John Fiorito have it?
11  A.  No.
12  Q.  Does anyone else have it besides
13  you and Diego?
14  A.  No, Diego and myself.
15  Q.  Did you ever tell it to anybody
16  else?
17  A.  No.
18  Q.  Did Michael Rehman ever ask you to
19  destroy any footage of what happened that
20  night?
21  A.  No.  You can't destroy it anyway.
22  But no.

Feder Reporting Company
(202) 863-0000

Page 165

1   Q.  Did John Fiorito ever ask you to
2   destroy any footage from that night?
3   A.  No.
4   Q.  Did anyone ever ask you to destroy
5   any footage from that night?
6   A.  No.
7   Q.  Did you ever report to anybody
8   that you had seen something on the tape that
9   suggested to you that it needed to be saved as
10  evidence?
11  A.  No.
12      MR. FITZSIMMONS:  I have no
13  further questions.
14  EXAMINATION BY COUNSEL FOR DEFENDANTS ACOSTA AND
15              SMITH
16      BY MR. SCHIFFERLE
17  Q.  Mr. McLeod, my name is Carl
18  Schifferle.  I am the attorney who is
19  representing two officers, Officer Acosta and
20  Officer Smith.
21      It is my understanding that you
22  know Officer Jose Acosta?

Feder Reporting Company
(202) 863-0000