UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EMILE MAZLOUM | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | Civil Action No. |
| | : | 1:06:CV 00002 |
| DISTRICT OF COLUMBIA, | : | (JDB) |
| et al. | : | |
| | : | |
| Defendants | : | |

Washington, D.C.
October 25, 2006

Deposition of:

JOHN FIORITO,

called for oral examination by counsel for Plaintiff, pursuant to notice, at the offices of Katten Muchin Rosenman, LLP, 1025 Thomas Jefferson Street, N.W., East Lobby, Suite 700, Washington, D.C., before Zev V. Feder, CSR, a Notary Public in and for the District of Columbia, beginning at 9:41 a.m., when were present on behalf of the respective parties:

Q. About what time was this?
**A. I don't recall the time but I believe you have a statement here that I could look at the time. But it was after midnight. I know that much.**
Q. Where were you at this point?
**A. Where was I when I first saw the incident?**
Q. Where were you when you first became aware that there was some incident going on, yes.
**A. I was walking through the tunnel of the club.**
Q. You were walking through the tunnel that goes from the entrance area to the dance hall area. Is that correct?
**A. Yes.**
Q. Where on the tunnel were you?
**A. I was at the end where the carpet starts and you see a set of stairs to go down into that area.**
Q. You were at the top of those

stairs?
**A. Correct.**
Q. What did you observe?
**A. I looked to the left and I saw two individuals that I recognized as off-duty police officers having a physical confrontation, struggle, escorting out -- I don't know how to pronounce his last name.**
Q. Mr. Mazloum?
**A. Mazloum. Towards me.**
Q. And where were they?
**A. They were in front of me coming towards me, towards the steps.**
Q. They were on the main dance floor?
**A. They were coming from the main dance floor area.**
Q. They weren't on the stage. Correct?
**A. No.**
Q. They were on the floor between the stage and the steps that you were coming, about to go down. Correct?

**A. Yes, sir.**
Q. And what is the approximate distance between the steps that you were about to go down and the stage?
**A. Maybe 20 feet, 25 feet.**
Q. And approximately where were they when you first became aware of them?
**A. In between the stage -- they were coming from in between the far area from the stage between the steps. If I looked down, and I know you all have been at the club, they were at the halfway point, if you understand.**
Q. I think I do. So you are saying they were approximately halfway between the stage and the steps that go up to the catwalk?
**A. Correct.**
Q. And these two off-duty officers were who?
**A. Officer Modlin and Officer Richmond Phillips.**
Q. And you say they were escorting Mr. Mazloum?

**A. Yes.**
Q. How were they escorting him?
**A. One was on each side of his arm and they were coming towards this direction, toward me.**
Q. Up until that point had you seen Mr. Mazloum or been aware of Mr. Mazloum that evening?
**A. No.**
Q. Had you seen Officer Modlin or Officer Phillips prior to that moment during the evening?
**A. I saw them when they came in the venue. But that was the last time I had any contact with them.**
Q. Where were you when they came in?
**A. They passed me somewhere in the club. I don't recall. But I remember saying hi to them.**
Q. Where do you usually stay when you are at the club?
**A. I walk around.**

Q. So they were walking toward you. What were they doing? What were the two of them doing? What was Mr. Mazloum doing?

**A. They looked to me like there was a struggle incurring, and as they came towards me, it happened very quickly. Mr. Mazloum went face first into the red carpeted stairs with the two officers behind him. And they went down, as well.**

**And the first thing I said to them was, "What is going on?" And nobody responded to me because there was so much music and noise and screaming and fighting going on between the three of them that they weren't paying attention to me.**

**So I stood there and then all of a sudden, out of the crowd, two more off-duty police officers appeared, known as Officer Ramirez and Officer Lou Schneider.**

**The struggle continued to go on. They continued to go back and forth. I did hear them identify themselves as police**

**officers, as I got closer to them. And the fight consistently escalated at that point while they were struggling to try to control Mr. Malzoum. Then a pair of handcuffs appeared --**

Q. Mazloum.

**A. Mazloum.**

**Then a pair of handcuffs appeared and they attempted to handcuff him.**

Q. Were you standing in one place while all this was going on?

**A. That's correct.**

Q. And that was where? On the stairs?

**A. I had come down the stairs and gotten out of the way.**

Q. So you were down on the main floor?

**A. Correct.**

Q. Was it a band, was it loud music, or was it a deejay?

**A. Deejay.**

Q. What was the decibel level?

**A. It is pretty high. But there is a 30 to 40 percent drop by the stairwell area because you are not on the main dance floor.**

Q. When you say the decibel level was pretty high, how high is that?

**A. It runs about 110, the sound pressure level.**

Q. And is it the same at all places on the dance floor or is it different from one place to another?

**A. You have your main dance area, the square. It is louder there. As you leave the dance floor you lose about 30 percent, so you can still have a conversation with somebody.**

Q. How about on the stage?

**A. Up on the stage it is just as loud.**

Q. Would you agree that it is essentially impossible to have a conversation at 110 decibels?

**A. No, it is not.**

Q. It is not impossible?

**A. No, and people do it all the time.**

Q. You have to shout?

**A. You don't have to shout. You have to be in close proximity to the person.**

Q. What was the lighting?

**A. FUR has a very extensive discotheque lighting show, which sweeps the floor. But the house lighting, of course, is off. I call them floodlights or work lights, cleanup lights. They are not on when the club is operating.**

Q. Is it essentially -- do you know what the lighting level is down on the floor?

**A. It is not done by a level. Each machine puts out full capacity lighting. But it is a decent brightness to the room. You can still see clearly, you can see everybody in the place.**

Q. Would it be enough light to, say, read a newspaper if anyone was interested in reading a newspaper?

**brought out some towels and a clean, I believe, a shirt they attempted to give him, because Mr. Mazloum's shirt was destroyed, I believe, during the altercation.**

**We immediately tried to calm him down but he wasn't paying any attention to me or JC, but he allowed us to clean him up and help him. But it was apparent that he was very, very hostile at that point, and talking to him was not going to be an effective measure of de-escalating the incident.**

**At that time there was an incident involving four off-duty metropolitan police officers. I did not know how it started or where it initially started but I contacted the police because I felt that something had occurred here and it needed to be properly investigated.**

**Lieutenant Allman arrived on the scene, who was the First District watch commander, who was at that point the highest ranking police official out of the district**

**working for supervision.**

**In front of me -- first, I explained to him what I saw and what happened. He then spoke to the off-duty officers, briefly, and called for a beat officer to respond by getting on the radio and calling the dispatcher. When the dispatcher asked him what he had, he advised them, simple assault, at this time.**

**Mr. Mazloum was sitting over on the curb in the supervision of Officer Ramirez and I saw Richmond Phillips over there.**

**At one point he became more angry and got up and started kicking and screaming, and got in the police officers' faces.**

**During that time he was put back on the ground. Being that he was handcuffed, he was sitting on a part of the curb that did not have grass between the sidewalk. It was -- had dirt, pavement, mixture of rock. He went backwards on the ground and they did not have the ability, for some reason, to**

**control his fall. He hit the ground sort of hard.**

**At that point he started crying.**

**There was nothing more that I could do, being that they had Lieutenant Allman there, and within moments after that Officer Smith and Acosta arrived on the scene.**

**Officer David Smith is a big, very large white male.**

**At that point Mr. Mazloum got up again and walked towards --**

Q. Got up by himself?

**A. Got up by himself, and walked towards Officer David Smith, who was dressed in the police BDU, dark blue uniform with the blue military style cap. He attempted to try to talk to Officer Smith and Officer Smith put his hand out in front of him and stopped him from coming any further.**

**While he was still in handcuffs, I then saw Lieutenant Allman come over and advise Officer Smith and Acosta that "There**

**was your suspect for simple assault," referring to Mr. Mazloum. And, "There were your four witnesses..." -- no "Your four police officers and your witness," referring to me.**

**I stood there for a few minutes. They said, "You are free to go."**

**I went back inside. I thought it was going to be handled properly. And I felt that I had no more involvement in it at this point.**

Q. Other than Officer Modlin identifying himself as a policeman, back inside, before the group went up the steps to the tunnel, did you hear any other conversation at any time during the evening between either Mr. Mazloum, or the officers, or anyone else?

**A. Are you asking me prior to this, anything during the evening?**

Q. I mean, up until the point where you went back inside.

**A. No.**

Q. Once you went back into the club, you say at some point -- this is now after the 2:30 period. At some point after that you had some conversation with Mr. Persons?

**A. After that weekend I had a conversation with him. Just asked him what happened.**

Q. We are still at the club that night. We are still in the morning of March 12th, after you have gone back inside the club but before you go home.

**A. Correct.**

Q. Are you with me?

**A. Yes.**

Q. During that period of maybe a couple of hours, did you have any conversation with any of the off-duty policemen or anyone who was an employee of the club?

**A. I just said, I didn't talk to the police officers. I talked to Mike Persons because he told me that nothing had happened**

**outside, that they just barred him or kicked him away after they had him out there.**

Q. Had you seen Mr. Persons outside the club when you were outside the club?

**A. Yes.**

Q. What was he doing?

**A. Standing around.**

Q. At that point when you were out there seeing him standing around, did you know whether he had had any connection with the altercation?

**A. No.**

Q. So at some point later that morning he told you what?

**A. He told me what happened, what the final result was outside, and he gave me a short synopsis of what had happened.**

Q. What did he tell you had happened outside?

**A. Outside, he said that Officers Smith and Acosta told him that, if we arrest him, we have to arrest you. That they just**

**let him go. And I said okay.**

Q. And he gave you a short synopsis of what had occurred before?

**A. Correct.**

Q. What was the short synopsis?

**A. He said that he came up to the stage and he wasn't permitted up there, and came back again --**

Q. When you say he?

**A. Mr. Mazloum came up.**

Q. Mr. Mazloum.

**A. Came up and attempted to gain access to the stage, and he wasn't given access to the stage. Came back again. They wound up getting into a confrontation where he alleged and informed me that Mr. Mazloum pushed him and knocked him to the floor. And that's when the police officers came in and got involved. Because they observed an assault.**

Q. So he told you about an altercation that occurred before the police

officers got involved?

**A. Correct.**

Q. Between himself and Mr. Mazloum.

**A. Yes.**

Q. And you hadn't seen that, yourself?

**A. Correct.**

Q. Mr. Persons, is he African-American?

**A. Yes.**

Q. How big -- describe him. Height, weight.

**A. He might be a little shorter than me. I am 6 feet. But he is fatter, more roly-poly.**

Q. Can you give us an estimate of his weight?

**A. Between two and 300. Maybe 250. I don't know.**

Q. Where were you when you had this conversation with Mr. Persons?

**A. At the front entrance, the bistro**

Q. Tell me the entire conversation that you had with Mr. Alkadi outside when you were waiting for Lieutenant Allman to do his thing?

**A. He came outside. He said, "That's my friend." I said something to the effect that your friend is really drunk and messed up over there, and I said, was involved in a fight. He goes, "Yeah, I know." He said, "I got involved." And he started explaining to me that he was involved and grabbed his friend while he was up on the stage.**

**I said, "Well, don't worry about that." I said, "The police are coming now." I told him that there was nothing to worry about. He was concerned about his friend. I said, "Don't worry about it." I said, "I have called the watch commander to come down here, and I have called 911." I said, "They are going to take care of it."**

Q. Have you finished your answer?

**A. Yes.**

Q. Have you told us everything that you recall that was said between you and Mr. Alkadi in that conversation?

**A. Yes.**

Q. Did you have any conversation with Mike Romeo that night about the incident?

**A. Yes.**

Q. Tell me about that conversation.

**A. I briefly told him that there was --**

Q. Excuse me. At what point in time was this?

**A. I don't remember. The end of the night before we left.**

Q. All right.

**A. I briefly told him that there was a very unfortunate incident that happened in the club tonight. There was an altercation that took place. We don't know much about it.**

**That was basically it.**

Q. What did he say?

**A. He said okay. He asked me if I**

**was there. I told him yes. I said, "I called the police." I said, "They are looking into the matter." I said, "I'm sure Dave will be able to get statements from security to find out what happened."**

Q. Anything else?

**A. That's it.**

Q. Did anyone request Dave -- did you have a conversation with Dave?

**A. No, not that night.**

Q. To your knowledge did Dave get statements from security?

**A. Not that evening.**

Q. Ever?

**A. I don't know what happened with him until the next day. That's when the story continues.**

Q. Well, to your knowledge, has Dave ever gotten statements from anyone in security?

**A. I would presume he has.**

Q. Have you ever seen them?

**A. No.**

**(Discussion off the record.)**

**BY MR. KAPLAN:**

Q. What happened the next day?

**A. Around 6:00 o'clock at night, my cell phone rang. And it was Officer Ramirez calling me telling me that Mr. Mazloum and two of his friends were at the First District police station filing a complaint against him. And I said, "Okay. So why are you calling me?"**

**He said, "Well, there are two guys here saying they are with FUR Security."**

**I said, "Well, I don't know anything about this. I will call Dave. I will look into it for you and get back to you."**

**I called Dave. He said he had no knowledge of this.**

**I contacted Ramirez back. I said, "I don't have any knowledge of FUR employees down there with them."**

**Ramirez described one of them to him. I said, "Well, maybe that's his friend."**

**He said, "Well, they are in here making allegations."**

Q. What was the description he gave you?

**A. Short, stocky guy. He described him as the guy that I always saw wearing certain glasses and a jacket at night at FUR when I saw him. So I figured, I kind of figured out who it was.**

Q. He said short, stocky, wearing glasses?

**A. Yes, that wore glasses at night. Sunglasses at night.**

Q. And a jacket?

**A. Yes. Always dressed nicely. I said, "I think I know who you are talking about."**

Q. Did he say he was wearing glasses at the police station?

**A. No.**

Q. What did he say?

**A. Just what I told you.**

Q. He said there is a guy here who wore glasses at night.

**A. Right. Wore sunglasses at night. Usually wore a suit. And that's it. So we contacted Masoud next.**

**Let me finish my conversation with Ramirez, then.**

**I said, "Well, what is the problem, Ramirez," to him.**

**And he said, "Well, they are in with Lieutenant Taylor and she is calling for mobile crime."**

**I said, "So let her call for mobile crime. She has to take a complaint. What's the big deal?"**

**He got very upset and asked about the video system at FUR. I said, "Yes, --**

Q. Excuse me. I have to interrupt you. I am a little confused here.

You said something about calling

Masoud. Is this before you called Masoud?

MR. FITZSIMMONS: He interrupted himself. He said, "Let me get back to my conversation with Ramirez."

BY MR. KAPLAN:

Q. So this is before you called Masoud?

**A. I was still with Ramirez.**

Q. So this is the conversation, now, after you have talked to Dave and you called Ramirez back.

**A. That's correct, sir.**

**Continuing to tell him, have Lieutenant Taylor come up to talk to us, interview us, do whatever she needs to do.**

**He asked about the video. I said, "I don't know anything about the video." I said, "I don't use it." I said, "I don't know how to work it." But I said, "Have Lieutenant Taylor call Dave." I said, "I know he can burn a copy of whatever is recorded on disk." I said, "Have her go to CVS, buy a disk, and**

**come up here and see Dave and let her go through it, and don't worry about it." And that was the end of my conversation with him.**

**Then I called Masoud.**

Q. Wait a minute.

What did you do next? Then you called Masoud?

**A. When I got to the club I called Masoud in the presence of Michael.**

Q. In your conversations with Ramirez, it was just the two of you?

**A. That's it.**

Q. Two conversations. He called you. Then you called him back.

**A. That's correct.**

Q. Then after that, the next contact you had was with Masoud or with Michael?

**A. At Michael with the club, and then I called Masoud from the club.**

Q. The conversations with Ramirez, you were not at the club?

**A. That's correct. My cell phone**

him go, and did you know that medical attention was not provided. Right?

**A. (Indicating.)**

Q. Was it clear to you, from looking at Mr. Mazloum, that he needed medical attention?

**A. I don't care if someone cuts their finger. When I am a police officer, I always call for an ambulance and let the medical professionals be the one to decide, and have them sign and refuse the form. I was qualified and trained to do that. Any injury, the policy I was always trained at, that you will provide and render first aid and let a qualified medical professional make the determination if the person needs further assistance.**

Q. If someone sprained their finger, you wouldn't call an ambulance, would you?

**A. Sure. They sprain their finger, how do I know it is not broken?**

Q. And if someone breaks a finger,

you call an ambulance for that?

**A. Sure. Call an ambulance for everything.**

Q. If someone has a cut on their arm, you call an ambulance for that?

**A. If it is a cut and it just needs a little, tiny band-aid, I would offer them a band-aid. But I would say, "Would you like me to call an ambulance?" It is always offered. That way the liability is moved off me as a policeman.**

Q. What was Mr. Mazloum's appearance when you saw him outside?

**A. He was more dirty than anything, from rolling around on a dirty nightclub floor. That's why I had JC come out there and clean him up.**

Q. Was he not bleeding profusely from the face?

**A. I did not see him bleeding profusely. I saw cuts and abrasions.**

Q. You didn't see blood streaming

from his nose?

**A. No.**

Q. It wasn't obvious to you that he had a broken nose?

**A. No, it wasn't obvious that he had a broken nose at the time to me.**

Q. Would it surprise you to hear that when he went to the hospital they told him he had a broken nose?

**A. No, not when I saw him fall face first on the steps. It wouldn't have surprised me.**

Q. So when you saw him fall face first, then you saw blood coming from his nose?

**A. No, I didn't see anything at the time in the nightclub. I saw him fall face first. Yes, that could have broken his nose on the stairs.**

Q. Let's talk a little about the security cameras.

**A. Uh-huh.**

Q. How many security cameras are there inside the club?

**A. I have no idea.**

Q. The cameras show -- are you aware that the cameras show a portion of the dance floor near the steps?

**A. I have never studied those cameras. I know they show a lot of different areas. I know that the purpose, they were installed for loss prevention, to monitor the bartenders, the cashiers and the staff from stealing. That's the purpose of those cameras.**

Q. They also show the steps going down from the catwalk, do they not?

**A. You would have to ask Dave where they are positioned.**

Q. Did you look at the films of that night?

**A. When Dave was in the office the next day or so, I told him to look at it and see if he could pull up any film or anything.**

**He said there was nothing to see. There was nothing on them. And nobody saw anything.**

**I said, "Oh, well, if the police want it, they have already been offered. They can come and get it."**

Q. Are you saying that you don't know that the cameras show the steps leading up to the catwalk?

MR. FITZSIMMONS: Objection. Assumes facts not in evidence.

THE WITNESS: I don't know the exact positioning of those cameras. I don't look -- I have been in that office. I spend minutes at a time in that office, if any.

BY MR. KAPLAN:

Q. And there is also a camera that shows the area outside the club, including across the street from the club. Is that not true?

MR. FITZSIMMONS: Objection. Assumes facts not in evidence.

BY MR. KAPLAN:

Q. Are you aware of that?

**A. I am not aware of the positioning of those cameras. I do know there is a camera right at the cashier that shines on the entrance.**

Q. What is the system for preservation or rerecording over the camera film?

MR. FITZSIMMONS: Objection. Foundation.

THE WITNESS: From what Dave has told me, the cameras automatically rerecord every seven days. It is not a disc or anything. It is some type of memory that it has. It recopies over every seven days if you don't go in there for any reason. You have to manually, I think, burn it.

BY MR. KAPLAN:

Q. So after seven days the old image is wiped out and a new image appears? Is that it?

MR. FITZSIMMONS: Objection.

Foundation.

THE WITNESS: That was what was explained to me but I don't know that for a fact.

BY MR. KAPLAN:

Q. When was that explained to you?

**A. By Dave.**

Q. When?

**A. Within the time frame of him looking at the cameras and that incident.**

Q. Did you tell Dave that Mr. Mazloum had filed a complaint and was, apparently, going to pursue a complaint over this incident?

**A. I told him that the police had contacted me and that there was a complaint being made. I said if there is -- I have already told -- I told him what I told Ramirez on the phone, which was I told Lieutenant -- tell him to tell Lieutenant Taylor to contact you, the head of security, and come up and look at the video, if there is any video.**

Q. Did you tell Ramirez in that conversation how many days he had to do that before the tape would be recycled?

**A. No, how would I tell him that, when I told you that Dave explained to me, after the fact, how the system works. I had never looked at the system before.**

Q. When you spoke to Dave, was it that same day that you spoke to Ramirez that you spoke to Dave?

**A. Yes, Saturday night.**

Q. What exactly did you tell Dave?

**A. I said go through the cameras between these hours and see if there is anything there during that incident. He said he attempted to.**

Q. When did he tell you that?

**A. That night.**

Q. So the same night you told him to go through the cameras, he told you he did go through the cameras?

**A. Yes, he looked at them.**

Q. Did you tell him which ones to look at?

**A. No.**

Q. Did you tell him, in the club, where it took place?

**A. Yes, I told him where it took place, and he saw the end of it outside. I told him to look it over and, if there was anything there, to attempt to burn it and save it for the police if he could even see anything on the cameras.**

Q. When did he get back to you?

**A. He got back to me that night.**

Q. And what did he say?

**A. He said, "The cameras were all on the staff, John." He said, "There is nothing there. You were across the street. The camera was on the front door. It doesn't show anything."**

**I said, "All right. Well, if they want it, they made the complaint. The police will come down here and look it over, and go**





**through it themselves," which they had done before.**

Q. Has there been any change in the number or placement of security cameras since the club opened?

**A. I have no idea.**

Q. Since the incident in March of 2005 have there been any changes in the number or the placement of cameras?

**A. I have no idea.**

Q. Who would know?

**A. Dave McLeod. That is a security matter. I am the sound and lighting technician.**

Q. Did you tell Dave that he should look at the bottom of the steps, of the steps going down from the catwalk to the dance floor?

**A. No. I gave him the whole area where I was. I said: Mike Persons can tell you more about it but, I said, I believe this started at the stage. We went up the steps to**





**the tunnel and straight out the front door.**

Q. And across the street?

**A. Correct.**

Q. Was there any memorandum made of that conversation?

**A. No.**

Q. When Dave said it doesn't show anything, did you say, "Well, maybe we should preserve any films from tonight, anyway, because it looks like there may be a lawsuit coming"?

**A. How would I predict there is a lawsuit coming? And, two --**

Q. Well, you knew Mr. Mazloum had filed a complaint with the police department.

MR. FITZSIMMONS: That's argumentative. You can turn it down. He didn't say lawsuit.

BY MR. KAPLAN:

Q. You knew that, did you not?

**A. No.**

Q. You didn't know he had filed a





complaint?

**A. The complaint, yes. You just said lawsuit. The complaint was against the police officers. Why would I have any worry that the club had any liability or him having a claim against the club when, as far as I knew at that point, it was the police had assaulted him, based on what his friend told me.**

Q. Even if there was no claim against the club, even if the only claim was against the police, you knew that those videotapes could potentially include important evidence that would be relevant in his claim against the police, right?

**A. That's correct.**

Q. My question is, did you suggest or have any conversation with Mr. McLeod about the desirability of preserving those videotapes in case anyone had any question about what was on them?

MR. FITZSIMMONS: Objection. Asked and answered.

THE WITNESS: I think by me telling Ramirez that -- have Lieutenant Taylor go to CVS and buy a DVD and come look at it, and then me telling Dave to look it over, is enough insinuation for a reasonable person to understand that, if I am telling you to look something over, that if there is something there, I said, "Burn it." That right there is me telling him to preserve it if there is something there.

I think I have answered it now.

MR. BRUCKHEIM: For the record, can you clarify what "Burn it" means?

THE WITNESS: Burn, usually, like a computer, you have a disc drive, you burn it onto a CD. You tape and record it.

BY MR. KAPLAN:

Q. Did you make any effort to notify Mr. Mazloum that, if he or his representatives wanted to come by and look at the tape, they could do that?

**A. No. I didn't have his number. I**

**didn't know Mr. Mazloum. And they had already filed an official complaint. I would have thought the Metropolitan Police Department would have been efficient and competent, and gotten right on this. They used to.**

Q. Did you make any effort to get Mr. Mazloum's phone number or his contact information?

MR. FITZSIMMONS: At what point are we talking?

BY MR. KAPLAN:

Q. At any point, so you could notify him that he could come or have his representative come and look at the videotape?

**A. No, not after I heard the allegations from his friend, because his friend's perception of the facts I thought were what I call go home and sleep on it, and wake up the next day and say, oh, we are going to get some money out of the D.C. Government, so let's go down and get some lawyers and trump up some story. I don't think he was in**

**good faith making his complaint because he felt his civil rights were violated or that he felt some undoing was wrong. I felt it was for monetary gain.**

**At that point there was an official investigation. I was still employed as a police officer. I had no reason to contaminate, get involved or get in the middle of this investigation, especially that it was in the FBI's hands.**

Q. Well, you got in the middle of it sufficiently to tell Mr. Ramirez that he should tell Lieutenant Taylor that, if she wanted to come look at the films, she could, right?

**A. That's advice. That is passing it on that she can come look at it.**

Q. But you didn't give that same advice to anyone on Mr. Mazloum's side of the complaint, did you?

**A. No. Because I didn't know any of you at that time and you never reached out to**

**contact us. You just went on fetched allegations and put it on the newspaper without doing your due diligence first. Now you are going to see that there is a little bit more to this story than what you actually know.**

**If you contacted the club, to be honest with you, we were deeply concerned. If anybody gets hit, or anybody, an alleged allegation or something, that would have been a big concern. But being that this wasn't given the opportunity for the police to even do their job internally, and it just went to this level, what do you expect anybody to do? We had to wait to this day, and now we are all here.**

Q. Did you have any conversation with Mike Romeo about, you know, if Mr. Mazloum pursues his complaint, if the ABC board makes an investigation, they might want to come and look at the videotapes of that night?

**A. No.**

**We did not feel that the club was in any wrongdoing. In fact, we felt that we gave every bit of effort to help and do the right thing by rendering first aid, and notifying the police, and doing everything in our power. At that point it is the government's job to do their job. It was a crime.**

Q. Are you saying you only would have preserved the tape if the club was guilty of wrongdoing?

**A. No.**

Q. What does that have to do with your answer?

**A. It does have to do with my answer. It clearly tells you, there is no reason to preserve a tape if there is nothing on the tape to see. So what part did you not understand? I told Dave to look it over. Do you see anything? Do you see these cops? Do you see Mr. Mazloum? Do you see his friends? Did you see anybody?**

**He said to me, he did not see anybody and that there was nothing to preserve.**

**So if there was nothing to preserve, what evidence am I preserving?**

Q. Did you ever look at any of the tapes, yourself?

**A. No, because I don't know how to work the machine.**

Q. And you didn't ask anyone to work the machine so that you could look at it. Right?

**A. I asked Dave to do it and do his job, just like I told you.**

Q. But you never asked him to work the machine so you could, yourself, look at the tapes?

**A. No.**

Q. The conversation that you have talked about with Dave, was that before or after the meeting with Mr. Alkadi?

**A. Dave was notified, the minute I**

**got off the phone with Ramirez, as I told you, and I called him and told him what I told Lieutenant Taylor -- tell Ramirez to tell Lieutenant Taylor. So Dave had already been told and knew about what was going on.**

Q. So his review of the tapes took place before or after you met with Mr. Alkadi?

**A. I don't know when he did it. It was that night.**

Q. When did he report to you that he had looked at the tapes? Was that before or after you met with Mr. Alkadi?

**A. It was after.**

Q. Does FUR, has FUR ever saved any footage from the security cameras?

**A. Not until after, as I advised you earlier, on the policy change, due to this incident, and now preserve every little thing that happens in the club, and write an incident report.**

Q. Why is that?

**A. From learning. As you have**

**incidents, and now that even though the club has been falsely accused of something, they protect themselves.**

Q. Has there ever been an occasion previously when FUR saved any film from any incident?

**A. No. As I said, there was never an incident in the club until this day.**

Q. Inside the club or outside the club?

**A. I am not aware of any incidents inside or outside the club.**

Q. The process for preserving the tape, do you know what that process is? If you wanted to preserve what happened last night at the club, do you know how you do that?

**A. No.**

Q. This is Dave's area of expertise?

**A. Dave does it. I have never used the machine. I don't know how it is done. It is locked out. Only, I believe, he has the**

**access to it.**
Q. Mr. Fiorito, I am going to ask you some questions which I think may be yes or no type of questions. But if you need to answer with more than yes or no, why, of course you can.
At the meeting with Mr. Alkadi, did you say to Mr. Alkadi that he should -- did you get angry with him?
**A. No.**
Q. Did you ever display anger toward him during that conversation?
**A. No.**
Q. Did you ever threaten Mr. Mazloum in that conversation?
**A. No.**
Q. Did you ever tell Mr. Alkadi that he should tell his friend, that is, Mr. Mazloum, that Mr. Mazloum would get burned if he continues with making this claim, with pursuing this claim?
**A. No.**

**And I would like to add, I think you have the statement. It clearly states that I told him directly, though, and --**
MR. FITZSIMMONS: You can continue. Go ahead.
THE WITNESS: Since a lot of people, meaning that I have a long time in law enforcement, they are very intimidated to talk to me, and I come off very strong and direct, a lot of people take that the wrong way. But I did, clearly, tell him that make sure you are prepared to tell the truth, I said, because all your lies are going to come out later when an investigator starts looking into this.
BY MR. KAPLAN:
Q. Did you say to Mr. Alkadi that Mr. Mazloum had initiated the altercation by punching Officer Ramirez?
**A. Absolutely not.**
**That was not the basis or the foundation of the meeting. We were attempting**

**to find out what they were doing and what was going on.**
Q. I don't think I asked you what the basis or the foundation of the meeting was.
MR. FITZSIMMONS: I think he answered your question. He said, "Absolutely not."
BY MR. KAPLAN:
Q. Did you say to Mr. Alkadi that, in some fashion, Mr. Mazloum had initiated the altercation?
**A. No.**
Q. Did you ever use the word "burn" in reference to what would happen to Mr. Mazloum?
**A. No.**
Q. That is -- please let me finish the question. That is, that Mr. Mazloum would be burned if he pursued the investigation any further?
**A. No.**
Q. Was the word "burned" used at all

in that conversation?
**A. Not unless --**
Q. In any context?
**A. Not that I used.**
Q. Did anyone use it?
**A. Not that I remember.**
Q. There is an allegation, in paragraph 45 of the complaint, that alleges that you were acting within -- excuse me, paragraph 46. That you were acting within the scope of your employment that night, and you have denied that.
What is the basis for that denial?
MR. FITZSIMMONS: Objection. You are calling for a legal conclusion. He is not qualified to answer that.
BY MR. KAPLAN:
Q. Do you believe you were acting within the scope of your employment that night?
**A. I was a witness to something that happened. I felt I did the right thing as a**

**A. That's correct.**
Q. And then at some point later you were told you are free to go. Is that right?
**A. Correct.**
Q. Was that Lieutenant Allman who told you that?
**A. Yes.**
Q. How long were you out there between the time Officers Acosta and Smith arrived and you were told you are free to go, and went back inside?
**A. Ten minutes.**
Q. During that time did you hear Officers Acosta and Smith say anything to anyone?
**A. Lieutenant Allman went over and spoke to both of them with the officers. Then Lieutenant Allman spoke to them privately. And then after they finished their little huddle of what they were discussing, that's when they told me that we were dismissed, we can go back inside.**

Q. Did you overhear, then, officers Acosta and Smith say anything?
**A. No.**
Q. Did you hear Mr. Mazloum say anything to either Officer Acosta or Officer Smith?
**A. The only thing I saw Mr. Mazloum do is approach Officer David Smith. As I said, he put his hand up and stopped him. I believe he was telling him to wait a minute. I didn't hear any other conversations between them two.**
Q. Between Mr. Mazloum and either Officer Acosta or Officer Smith?
**A. That's correct.**
Q. Do you remember anything else that you heard or overheard being said to Officer Acosta or Officer Smith other than what we have already discussed?
**A. No. Just the facts of what went on. Just brief. They were being told of what went on.**

Q. Who was being -- who was telling them what was --
**A. The four off-duty police officers, when they were over there talking to them. Because when we went back inside, I said, "Is everything taken care of?" They said yes.**
Q. So you, at least, saw Officers Acosta and Smith in a discussion with the four off-duty officers?
**A. Yes.**
Q. Did you hear any specifics of that conversation or overhear any specifics?
**A. No.**
MR. SCHIFFERLE: That's all I have. Thank you.

EXAMINATION FOR DEFENDANT DISTRICT OF COLUMBIA
BY MS. PHILLIPS:

Q. I believe I heard you mention something called a class A shirt that MPD officers were wearing. What is a class A shirt?
**A. It is the lighter dress shirt.**

Q. Short sleeve or long?
**A. They can be both. Lieutenant Allman was wearing one. His was a long sleeve, because he always wears a tie. It is a very light weight drip shirt.**
Q. Do you recall whether any of the other officers were wearing long sleeves or short sleeves?
**A. Smith and Acosta were just wearing regular BDU uniforms. I don't remember if Dave had on, David Smith had on long sleeve or short sleeve but that is still a light weight material. It is an open, no tie, more durable uniform but it is still a light weight material.**
Q. You said that you heard some of the words coming from Mr. Mazloum. Did you ever hear Mr. Mazloum use any words or terms that might be considered ethnic slurs?
**A. No.**
Q. Did you hear that any of the officers lost their cell phone in the club