## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM,

               Plaintiff,

v.

DISTRICT OF COLUMBIA *et al.*,

               Defendants.

Civil Action No. 1:06 CV 00002
(JDB)

## REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT
## OF DEFENDANTS NIGHT AND DAY MANAGEMENT, LLC,
## MICHAEL REHMAN, JOHN FIORITO, AND MICHAEL PERSONS

Thomas S. Schaufelberger
Paul A. Fitzsimmons
SAUL EWING LLP
2600 Virginia Avenue, N.W.
The Watergate—Suite 1000
Washington, D.C.  20037
Telephone: (202) 333-8800

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

I.  INTRODUCTION ........................................................................................ 1

II.  ARGUMENT ................................................................................................ 2

    A.  Plaintiff's Count V Spoliation Claim Fails Because Plaintiff Cannot
        Establish Various Required Elements Of That Cause Of Action,
        Including Most Particularly Any "Significant Impairment In The
        Ability To Prove His Action" As A Result Of The Missing Evidence ........ 2

        1.  Overview to Plaintiff's spoliation claim ........................................ 4

        2.  The Parties apparently agree that Plaintiff cannot establish
            any "significant impairment" in the ability to prove any of
            his tort claims due to the unavailability of video recordings
            as to the two cameras—"Camera 02" and "Camera 09"—
            pointed at the Club's front door .................................................. 7

        3.  Attorney Corcoran's testimony on what "Camera 03" and
            "Camera 01" *would have* shown of these events suffers
            from the insurmountable infirmity being unfounded and
            incorrect, a condition stemming from his evident lack of
            understanding of this system and its use by FUR ........................ 9

            a.  When the Club is open for business, "Camera 03" is
                always rotated towards a cash register at a bar, not
                90 degrees away from that point toward the
                "Tunnel" corridor ........................................................ 9

            b.  When the Nightclub is open for business,
                 "Camera 01" is always initially rotated to the west
                to view a line of people waiting to get in the Club
                and, later in the evening, is often rotated to the east
                to view patrons exiting the Club, but it is never
                positioned during business hours to view north to
                the curb across the street ............................................ 10

            c.  Conclusion:  Plaintiff presents this Court—and
                could present the trier in this action—no evidence
                that any relevant surveillance images of him were
                ever recorded on the night in question other than
                uninteresting and uncontested images of him
                walking under escort out FUR's front door ................ 14

        4.  Plaintiff's evidence does not show that the FUR Defendants
            had knowledge of a potential civil action against them
            when the video recordings were overwritten ................................ 15

5.      Plaintiff has not established that FUR had any legal duty to preserve these video recordings                                                    17

6.      The video recordings at issue were not destroyed but, rather, were automatically overwritten in the normal course of business                                                                        18

7.      Conclusion:  For manifold reasons, Plaintiff's spoliation claim fails                                                                              19

B.      Plaintiff's Count IV D.C. Human Rights Act Claim Fails Because The FUR Defendants Never Took Any Statutorily Proscribed "Adverse Action" Against Plaintiff And Because They Did Not Destroy Any Crucial Video Recordings Of This Event                                        20

C.      Plaintiff's Count II Assault And Battery Claim Against Mr. Persons And FUR Fails As A Matter Of Law Because His Uncorroborated Claim Of A "Surprise Attack" Against Him By Defendant Persons Is "Too Incredible To Be Accepted By Reasonable Minds"                        22

III.    CONCLUSION                                                              31

# TABLE OF AUTHORITIES

**CONSTITUTIONAL PROVISIONS**
U.S. CONST. amend. I ................................................................................................. 21


**CASES**
*Agosto v. Immigration and Naturalization Service*, 436 U.S. 748, 98 S.Ct 2081, 2095, 56
   L.Ed.2d 677 (1978) ............................................................................................... 25
*Allstate Insurance Company v. Cannon*, 644 F. Supp. 31 (E.D.Mich. 1986) ............................. 25
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)22, 29, 30
*Battocchi v. Washington Hosp. Ctr.*, 601 A.2d 28 (D.C. 1991) ..................................................... 18
*Burris v. Richards Paving, Inc.*, 461 F.Supp.2d 244 (D. Del. 2006) ........................................... 23
*Callahan v. Stanley*, 703 A.2d 1014 (N.J. Super. Ct. Law Div. 1997) ......................................... 17
*Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) .................... 23
*Cordova v. Harrah's Reno Hotel-Casino*, 707 F.Supp. 443 (D.Nev. 1988) ................................ 25
*Dawn v. Sterling Drug, Inc.*, 319 F.Supp. 358 (C.D.Cal. 1970) ................................................... 24
*de La Paz v. Danzl*, 646 F.Supp. 914 (N.D.Ill. 1986) .................................................................. 25
*Ettinger v. Johnson*, 566 F.2d 692 (3rd Cir. 1977) ...................................................................... 25
*Hales v. First Appalachian Corp.*, 494 F.Supp. 330 (D.Ala. 1980) ............................................. 24
*Kansas v. Favela*, 911 P.2d 792 (Kan. 1996) ................................................................................. 2
*Koplin v. Rosel Well Perforators*, 734 P.2d 1177 (Kan. 1987) .................................................... 17
*Lestina v. IBM*, 1991 U.S. Dist. LEXIS 21736 (D.Vt. 1991) ....................................................... 24
*Lincecum v. Collins*, 958 F.2d 1271 (5th Cir. 1992) ...................................................................... 2
*Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903 (3rd Cir. 1984) ........................................... 25
*Mazloum v. District of Columbia*, 442 F.Supp.2d 1 (D.D.C. 2006) ............................................. 20
*Molinos de Puerto Rico, Inc. v. Sheridan Towing Co.*, 62 F.R.D. 172 (D.P.R. 1973) ................ 24
*O'Farrell v. Funk*, 2006 U.S. Dist. LEXIS 72060 (C.D.Ill. 2006) ............................................... 25
*Prince v. Rice*, 453 F.Supp.2d 14 (D.D.C. 2006) .......................................................................... 20
*Robinson v. Winter*, 457 F.Supp.2d 32 (D.D.C. 2006) ................................................................ 20
*Sauer v. Law, Union & Rock Ins. Co.*, 17 F.R.D. 430 (D.Alaska 1954) ...................................... 24
*Schwartzman, Inc. v. Atchison, T. & S.F. Ry.*, 857 F.Supp. 838 (D.N.M. 1994) ........................ 24
*Selsor v. Callaghan & Co.*, 609 F.Supp. 1003 (N.D.Ill 1985) ..................................................... 24
*Smith v. Woods*, 2006 U.S. Dist. LEXIS 29745 (N.D.N.Y. 2006) ............................................... 23
*State v. Hobbs*, 801 P.2d 1028 (Wash. App. 1990) ........................................................................ 3
*Top Notch Prods. v. Bank One Co.*, 2007 U.S. Dist. LEXIS 21599 (E.D.Mich. 2007) ............... 23
*Torba v. J.M. Smucker Co.*, 888 F.Supp. 851 (N.D.Ohio 1995) .................................................. 24
*United States v. Gibson*, 205 U.S.App.D.C. 53, 636 F.2d 761 (1980) .......................................... 3
*United States v. Henderson*, 409 F.3d 1293 (11th Cir. 2005) ........................................................ 3
*Vale v. Bonnett*, 89 U.S.App.D.C. 116, 191 F.2d 334 (1951) .......................................... 23, 26, 29
*Waterhouse v. District of Columbia*, 353 U.S.App.D.C. 205, 298 F.3d 989, 991-92 (2002) ....... 23
*Witcherd v. Principi*, 2006 U.S. Dist. LEXIS 2206 (D.Fla. 2006) ............................................... 23

**RULES**

Fed.R.Civ.P. 56 ................................................................................................... 22, 23, 27, 29

Fed.R.Evid. 701 ................................................................................................................ 3

Fed.R.Evid. 703 ................................................................................................................ 3

**OTHER AUTHORITIES**

10A C. Wright & A. Miller, Federal Practice and Procedure (2007) ............................................ 25

10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure (2d ed. 1983) ........... 24, 25

Moore's Federal Practice (2d ed. 1976) ..................................................................................... 25

**REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
OF DEFENDANTS NIGHT AND DAY MANAGEMENT, LLC,
MICHAEL REHMAN, JOHN FIORITO, AND MICHAEL PERSONS**

## I.    INTRODUCTION

Defendants Night & Day Management, LLC t/a The Fur Factory ("N&D" or "FUR"),

Michael Rehman ("Rehman"), John Fiorito ("Fiorito"), and Michael Persons ("Persons")

(sometimes referred to herein as "FUR Defendants"), by and through counsel, respectfully

submit the following reply memorandum in support of their Motion for Summary Judgment as to

the Second Amended Complaint of Plaintiff Emile Mazloum.

Against the FUR Defendants, Plaintiff has asserted:  (1) a spoliation of evidence claim

against Mr. Rehman, Mr. Fiorito, and FUR due to the unavailability of the video surveillance

recording from the early morning of March 12, 2005; (2) a District of Columbia Human Rights

Act claim against the FUR Defendants for allegedly retaliating against Plaintiff after he had filed

a police misconduct report; and (3) an assault and battery claim against Mr. Persons and FUR.

For reasons set forth in the FUR Defendants opening brief ("Mem.") regarding their

Motion For Summary Judgment and below, Plaintiff cannot prevail on his spoliation claim

against Mr. Rehman, Mr. Fiorito, and/or FUR in that Plaintiff has not established various

required elements of this cause of action.  Further, Plaintiff cannot prevail on his Human Rights

Act claim against the FUR Defendants because he has not established that any adverse action

was taken by these Defendants against him after he filed his police misconduct complaint.

Finally, Plaintiff cannot prevail on his assault and battery claim against Mr. Persons and FUR in

because that claim is too incredible for reasonable minds to believe.

## II.    ARGUMENT

### A.    Plaintiff's Count V Spoliation Claim Fails Because Plaintiff Cannot Establish Various Required Elements Of That Cause Of Action, Including Most Particularly Any "Significant Impairment In The Ability To Prove His Action" As A Result Of The Missing Evidence

In order to prevail on a reckless or negligent spoliation claim, a plaintiff must establish:

(1) the existence of a potential civil action; (2) a legal or contractual duty to preserve evidence which is relevant to that action; (3) destruction of that evidence by the duty-bound defendant; (4) significant impairment in the ability to prove the potential civil action; (5) a proximate relationship between the impairment of the underlying suit and the unavailability of the destroyed evidence; (6) a significant possibility of success of the potential civil action if the evidence were available; and (7) damages adjusted for the estimated likelihood of success in the potential civil action.

*Holmes v. Amerex Rent-a-Car*, 180 F.3d 294, 297 (D.C. Cir. 1999) ("*Holmes*"), quoted in FUR Defendants' opening summary judgment brief (Mem. at 11).

As discussed in that opening brief and below, Plaintiff's reckless or negligent spoliation claim (Second Amended Complaint, Count V) fails for a number of reasons, but one conspicuous reason for that failure is that Plaintiff—who would of course bear the burden of proving the affirmative of his case in this respect—has no evidence to suggest adequately that the video recordings in question would have revealed anything of any actual interest to this case.

Preliminarily in this regard, however, several important issues are presented by Plaintiff's extensive reliance on testimony proffered via the June 29, 2007 Declaration of Brian H. Corcoran ("Corcoran Dec."). Courts rightly tend to disfavor testimony on contested matters given by a lawyer within that lawyer's own case. *E.g.*, *Lincecum v. Collins*, 958 F.2d 1271, 1280 (5th Cir. 1992) ("As for [the attorney's] affidavit, we are loathe to accept the self-serving statements of habeas counsel as evidence that other persons were willing and able to testify on [the client's] behalf"); *Kansas v. Favela*, 911 P.2d 792, 801-02 (Kan. 1996) (citing *State v. Hobbs*, 801 P.2d

1028 (Wash. App. 1990)) ("the self-serving assertions by the defendant's attorney, without expert testimony, was insufficient to justify the sentencing court's finding").  *Cf.* D.C. Rules of Prof'l Conduct R. 3.7 ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness[.]").

Moreover, lay witnesses are permitted to give testimony only based on their firsthand observations, which of course contrasts with the abilities of expert witnesses, who are permitted to give opinion testimony as well, whether based on evidence presented at trial or on other secondhand data.  *See*, *e.g.*, Fed.R.Evid. 703, Advisory Committee's Note; *cf.*, *e.g.*, *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) ("the ability to answer hypothetical questions is '[t]he essential difference' between expert and lay witnesses").  Correlatively, lay witnesses are limited in their testimony to things they have actually observed, as opposed to things they may believe they "would have" observed had circumstances been different:  "[W]e know of no case holding that a trial judge must permit a lay witness to use one set of observations as the foundation for an opinion about what he might have seen under different circumstances."  *United States v. Gibson*, 205 U.S.App.D.C. 53, 56, 636 F.2d 761, 764 (1980).  Here, Attorney Corcoran's repeated use of the subjunctive tense in his Declaration—his several assertions that FUR cameras "would have captured" images of Plaintiff in certain locations (Corcoran Dec. at ¶¶ 6-10)—indirectly acknowledges, accurately, that the testimony proffered therein constitutes impermissible opinion evidence rather than generally permissible lay observation.

Bearing in mind as well that non-expert witnesses may not base their opinions on "scientific, technical, or other specialized knowledge," Fed.R.Evid. 701(c), the FUR Defendants would note that Attorney Corcoran's opinions that the video record here "would have" captured

images of Plaintiff inevitably turn on various videographic assumptions. For example, Attorney Corcoran conducted his July 2006 inspection during the day rather than at night, so visibility levels may have been quite different from those at the time of the incident in question; additionally, at the time of the incident in question, most or all of these shots may have been crowded with people—whereas the Club was virtually empty at the time of his inspection—and the people present in the Club on the night in question may have in numerous instances blocked the camera or distorted the image. *Most conspicuously, however, as discussed in greater length infra, Attorney Corcoran is merely speculating as to the direction in which two of the four cameras referenced in his Declaration were actually pointing at the time in question.*

Because Attorney Corcoran may, thus, not permissibly testify as a lay witness here regarding what images these cameras "would have captured," the FUR Defendants respectfully ask that his Declaration be disregarded as inadmissible and incompetent in that (i) the deadline for qualifying experts has already long passed, without him having been identified as such and without his having been subject to cross-examination during the now-completed discovery phase of this case, (ii) his Declaration specifies no expertise in videography, and (iii) his assertions (and omissions) therein independently betray no such expertise.

Without waiver of that request, however, the FUR Defendants otherwise address, *infra*, the nature and substance of Plaintiff's proffered evidence in this regard.

### 1.    Overview to Plaintiff's spoliation claim

To begin with concerning Plaintiff's assertions regarding alleged spoliation, it should be noted that Attorney Corcoran makes no claim that any FUR security cameras would have or could have captured images of these parties either on FUR's main stage, on the several steps leading to that stage, or on the staircase leading from the main dance floor up to the beginning of

the "Tunnel" corridor, each of which is a physical location of considerable interest regarding this litigation.

As well concerning Plaintiff's spoliation assertions, it should be observed that Plaintiff has himself sworn under oath (January 29-30, 2007 Deposition of Emile Mazloum ("Mazloum Dep."), attached hereto as "Exhibit 1," at 115) that, before he ever reached the top of the staircase leading from the main dance floor to the beginning of the "Tunnel" area, he was already bleeding from or about his nose, allegedly as a result of an off-duty police officer's having hit him at the bottom of that "Tunnel" staircase (i.e., just above the below-ground-level main dance floor):

> Q.     Do you know the name of which man hit you in the face?
> A.     Well, I saw the guy. I didn't know at that moment what was his name until later on the next day. I know, I know what was his name.
> Q.     And his name was?
> A.     Mr. Ramirez
> Q.     When you were hit in the face, where in your face were you hit?
> A.     My left eye and my nose
> Q.     After you were hit in the face, what happened?
> A.     Well, he hit me in the face with a word saying shut up, you fucking al Qaeda. *And then I started bleeding.* [Emphasis added.] And after that they just, they dragged me outside and they dropped me on the -- they took me from the club, across the street, and they dropped me on the ground.
> Q.     Let me go back and ask a couple of questions about that. It is your testimony that after you were hit in the face, that Mr. Ramirez said shut up, you fucking al Qaeda?
> THE INTEPRETER: You said after he hit him in the face, right?
> MR. BRUCKHEIM: Yes.
> THE WITNESS: No, not after. When he was -- when he was hitting me, he said it at the same moment when I was -- when I look to see who was doing that, he hit me in the face with the same time he was talking and he said shut up, you fucking al Qaeda.
> BY MR. BRUCKHEIM
> Q.     So he said it at the same time he hit you?
> A.     Yes.
> Q.     And this was at the bottom of the stairs that led up to the tunnel?
> A.     The bottom of the stairs inside the club.

In terms of that bleeding having begun before Plaintiff was escorted out of the Club, Defendant Officer Ramirez (August 8, 2006 Deposition of Anthony Ramirez ("Ramirez Dep."), attached hereto as "Exhibit 2," at 319-20) concurs:

> [BY MR. BRUCKHEIM:]
> Q.    Again skipping subjects, you had testified that when you first observed Mr. Mazloum you noted that his face was bloody?
> A.    In the nightclub?
> Q.    In the nightclub.
> A.    Yes.

Relatedly, as to the two FUR cameras pointed at the Club's front door—"Camera 02" and "Camera 09" (*see* Corcoran Dec. at ¶¶ 7 and 8)—not even Plaintiff asserts that the footage therefrom would have shown anything other than a group of men escorting Plaintiff from the building.  Thus, the absence of that footage at trial would not and could not constitute any "significant impairment" (*Holmes*, 180 F.3d at 297) regarding Plaintiff's trying to make out a case concerning whether he was battered (i) on or about FUR's main stage or (ii) on or about the bottom of the staircase leading up from FUR's main dance floor, particularly as Plaintiff himself has testified under oath that he was bleeding from his nose before he ever reached the point of those two front-door cameras and as one of the police officers here concurs that the bleeding started inside the Club (Mazloum Dep. at 115).

Finally concerning Plaintiff's spoliation claims, Attorney Corcoran's sworn assertions are wholly incorrect that one FUR security camera "*would have* captured footage showing Mr. Mazloum being taken through the 'tunnel' on his way to the front door" (Corcoran Dec. at ¶ 6 (emphasis added)) and that another camera "*would have* captured footage of any activity across the street from FUR" (*id*. at ¶ 9 (emphasis added)), at which latter "curb" location outside the Club Plaintiff claims to have been battered by one or more off-duty police officers (Mazloum

Dep. at 127-29).  Plainly put, Attorney Corcoran simply does not know what he is speculating about regarding those two cameras.

As detailed below, these factors warrant this Court's entry of summary judgment on this spoliation claim in favor of the FUR Defendants.

> **2.      The Parties apparently agree that Plaintiff cannot establish any "significant impairment" in the ability to prove any of his tort claims due to the unavailability of video recordings as to the two cameras— "Camera 02" and "Camera 09"—pointed at the Club's front door**

As each party to this litigation acknowledges, Plaintiff was indeed led out of the front door of the Club and down the outside steps in front of that door with several off-duty police officers around him, and, as FUR has acknowledged (February 27, 2007 Deposition of David McLeod ("McLeod Dep."), attached hereto as "Exhibit 3," at 160-61), that sequence near its front door was captured on its security camera system.  However, that video footage—in total, at most, thirty seconds in length—merely showed Plaintiff walking out of the building on his own with officers holding him by the arms.  (*Id*. at 161.)  Specifically in this respect, the testimony of FUR Security Manager David McLeod that that video recording did not show Plaintiff being struck or physically abused by the men escorting him (*id*. at 162) squares with Plaintiff's own testimony as to what occurred at that point:

> Q.      … From the time you exited FUR's main front door to the time that you got to the sidewalk in front of that front door, was anyone hitting you?
> MR. CORCORAN:  Objection; asked and answered yesterday.
> THE WITNESS:  No, sir.
> Q.      At that same period of time was anyone assaulting you other than in the sense that they had you by the arms and were leading you?
> A.      No, sir.

(Mazloum Dep. at 369-70, also quoted in the Fur Defendants' opening brief, Mem. at 16-17.)

*Nowhere in his response to the FUR Defendants' Motion for Summary Judgment does Plaintiff*

*attempt to deviate from his earlier above-quoted testimony.*

Thus, even had the video recordings of this pedestrian activity at the front door of the

Nightclub (*see* Corcoran Dec. at ¶ 8) been preserved and ultimately presented as evidence,

Plaintiff would not have had any "significant possibility" of success in proving his claims based

on that evidence because

   (a)   the recording merely showed Plaintiff, near the front entrance of FUR, being led
         out of the Nightclub by several off-duty MPD officers (McLeod Dep. at 160-62)
         and

   (b)   not even Plaintiff claims to have been battered in any way during the period when
         he was at the front entrance of the club (and, thus, in the view of these two
         cameras) but instead acknowledges that he was merely being walked out of the
         club by these men (Mazloum Dep. at 368-70) after his nose had been bloodied at
         the bottom of the "Tunnel" staircase (Mazloum Dep. at 115; Ramirez Dep. at
         319-20), entirely out of view of the "Tunnel" corridor camera.

Therefore, with no dispute between or among the parties as to what the overwritten FUR security

video recordings of activity at the front door of the Nightclub would show the trier, no spoliation

tort can succeed as to recordings of images from those two cameras, "Camera 02" and

"Camera 09."  As a matter of law, no "significant impairment in the ability to prove [Plaintiff's]

civil action" (*Holmes*, 180 F.3d at 297) can result merely from the absence of video footage

showing Plaintiff walking out of the door of this building, an event uncontested in this litigation.

**3.**     **Attorney Corcoran's testimony on what "Camera 03" and "Camera 01"** *would have* **shown of these events suffers from the insurmountable infirmity being unfounded and incorrect, a condition stemming from his evident lack of understanding of this system and its use by FUR**

**a.**     **When the Club is open for business, "Camera 03" is always rotated towards a cash register at a bar, not 90 degrees away from that point toward the "Tunnel" corridor**

Attorney Corcoran maintains that a FUR security camera, "Camera 03," "*would have* captured footage showing Mr. Mazloum being taken through the 'tunnel' on his way to the front door." (Corcoran Dec. at ¶ 6 (emphasis added).) However, what Attorney Corcoran swears as being true and correct is in fact merely his unfounded and erroneous speculation.

In this regard, Attorney Corcoran rather conspicuously fails to state in his Declaration that the camera in question—the only camera at FUR which can reveal any view of the "Tunnel"— horizontally rotates through 360 degrees. (July 12, 2007 Certification of Diego Sequeira ("Sequeira Cert.," attached hereto as "Exhibit 4") at ¶ 3.) Although it is possible to position that camera so that it can look down into the "Tunnel" corridor from the reception area inside FUR's front door, in fact that camera is *never* so positioned during the Club's operating hours. (*Id.*) While the camera is sometimes rotated during the day to observe, for example, the foot traffic of deliverymen, the camera is *always* trained during operating hours—as are 15 other cameras within FUR—at one of FUR's cash registers; this particular security camera is the only one that FUR has now or has ever had which is capable of watching that particular cash register (which register itself has always been in that same location). (*Id.*) Moreover, none of the rotatable cameras at FUR turns automatically; instead, each such camera turns only by the remote control of a human operator. (*Id.* at ¶ 4.) Plaintiff proffers no evidence whatsoever which tends in any way to contradict these points.

Therefore, Attorney Corcoran's putative "expert" evidence in favor of his client is simply incorrect:  this "Camera 03" was not pointing toward the "Tunnel" corridor at the time of this incident, and it could not have captured any image of Plaintiff as it was instead pointed toward a bar cash register.  (Sequeira Cert. at ¶ 5.)  Particularly as Attorney Corcoran did not even acknowledge in his Declaration the rotational capabilities of this camera—still less did he try to speak particularly to the issue of which direction that camera was actually pointing at the time of this incident—his proffered testimony concerning "Camera 03" (Corcoran Dec. at ¶ 6) must be rejected as entirely speculative and lacking in foundation.

In sum, Plaintiff has presented no testimony with any evidentiary foundation to suggest adequately that—at the time of the incident in question, after midnight during operating hours on March 11-12, 2005, *as opposed to during a mid-day, off-hours inspection of the Club in July 2006* (Corcoran Dec. at ¶¶ 2-3)—this camera was pointed in any direction other than directly at a bar cash register (Sequeira Cert. at ¶ 5).  Plaintiff has thus failed to establish that any footage from this "Camera 03" would have been anything other than wholly irrelevant to this litigation.  As a result, and as a matter of law, the absence of footage from this "Camera 03" cannot serve as the basis for any spoliation claim.

> **b.  When the Nightclub is open for business, "Camera 01" is always initially rotated to the west to view a line of people waiting to get in the Club and, later in the evening, is often rotated to the east to view patrons exiting the Club, but it is never positioned during business hours to view north to the curb across the street**

Attorney Corcoran maintains that another FUR security camera, "Camera 01," "*would have* captured footage of any activity across the street from FUR."  (Corcoran Dec. at ¶ 9 (emphasis added).)  However, Attorney Corcoran's sworn speculations are again wholly

incorrect, again apparently due to his lack of understanding of the video surveillance equipment and FUR's use thereof.

As with the above-referenced "Camera 09," Attorney Corcoran fails to observe in his Declaration that this "Camera 01"—the only camera at FUR which can view the curb area in question—can rotate horizontally through 360 degrees (noting here, however, that roughly half of that rotation shows only the outside wall on the north side of the building FUR occupies). (Sequeira Cert. at ¶ 6.)  Thus, the camera—wall-mounted on the west side of the Club's front door—can be pointed to the extreme left on Patterson Street, rotated 180 degrees to the extreme right to face due east on that same street, or positioned to any point in-between.  (*Id.*)

At the northernmost point of that rotation, one can see the curb area across Patterson Street where off-duty defendant police officers held Plaintiff until on-duty officers arrived. (Sequeira Cert. at ¶ 7.)  During hours when the Nightclub is *not* open for business, the camera is, for two main reasons, typically rotated into that northernmost position.  First, as the Club's front office has no windows, positioning this camera to the north allows people in the front office to see when deliveries or visitors are approaching that front entrance.  (*Id.*)  Second, when no one is in the building, positioning this camera to the north provides the possibility of recording any unlawful entry into the building that might occur through the Club's front doors.  (*Id.*)

However, when the Nightclub is open for business, that "Camera 01" serves a business rather than a security role.  (*Id.* at ¶ 8.)  During regular business hours, all security hands at FUR are "on deck"—attending to admission issues, hosting, roaming the floors, or providing other security functions—and no one from FUR's security staff regularly mans the front office, where the only monitors FUR has for the video surveillance cameras are located.  (*Id.*)  During those hours, a live feed from this "Camera 01" enables FUR's General Manager Diego Sequeira to

11

monitor the Club's admission lines: the general admission line the west of the camera's position and, to the east, the VIP admission line (as well as FUR's main exit door). (*Id*.) During hours when the Club is open for business, no one at the Club other than Mr. Sequeira typically watches the display monitor for this camera (or for any other camera); more particularly, Mr. Sequeira is not aware of anyone's watching any of the video monitor screens during the night in question in this litigation. (*Id*.)

When FUR is open for business, its regular practice is to start the evening with this camera pointed in its due-west position. (*Id*. at ¶ 9.) FUR's typical practice is for that camera to stay in that position at least until around midnight or one o'clock a.m. (*Id*.) Although the camera sometimes stays in that same westerly position the entire night, often it is repositioned around midnight or one o'clock by Mr. Sequeira to face due-east, in order to be able to observe the flow of patrons exiting the club (which may then have a corresponding impact on how quickly the admission line to the west can be permitted to move). (*Id*.)

During operating hours of the Club, Mr. Sequeira—who from time to time mans the front office during portions of those hours but who does not do so on a regular basis—is exclusively interested in business matters and thus leaves security matters exclusively to the security staff; other than regarding the size and flow of the admission lines, he is entirely uninterested at those times in what is happening outside the Club. (Sequeira Cert. at ¶ 10.) Specifically, Mr. Sequeira is never interested in goings-on, if any, on the curb across the street to the north of the club. (*Id*.) In all the time the Club has been in business—and he has always been the Club's General Manager—Mr. Sequeira has never had occasion to rotate "Camera 01" to examine the area near that curb during any hours when that the Club has been open to the public. (*Id*.) When

"Camera 01" is in either of its westerly or easterly positions, the curb area across the street from FUR where Plaintiff was detained is entirely outside the camera's view.  (*Id*.)

Regarding the incident in question, Mr. Sequeira did not hear about any fracas until sometime after the close of business that day (i.e., 3 or 4 a.m. on Saturday, March 12, 2005).  (*Id*. at ¶ 11.)  As a result, at the time this incident was occurring, he had no reason whatsoever to rotate "Camera 01" to its northernmost position—towards that curb across from FUR—where it might have captured images of Plaintiff being held by some of the off-duty defendant police officers, and Mr. Sequeira is aware of no one else who either did so or might have done so.  (*Id*.)

In sum, although "Camera 01" can record images of the curb area on Patterson Street across from FUR, Attorney Corcoran did not make any observation at all in his Declaration regarding another salient capability that camera has—*viz*., its ability to rotate—nor did he thus purport to present any corresponding evidence regarding the particular direction in which that camera was actually pointed at the time of the incident in question.  The only testimony of record in this case on that "rotation" issue is that of Mr. Sequeira, quoted above.  Thus, Attorney Corcoran's Declaration testimony itself fails, as a matter of law, due to its utter lack of foundation regarding this crucial point; correspondingly—as to the substantive issue of the particular rotational position of this camera at the time in question—Mr. Sequeira's direct testimony that the camera did not record any events across the street from the Club at that northern curb that night is both entirely credible and completely unchallenged.

Because Plaintiff has presented—and can present—no evidence that "Camera 01" in fact captured any footage of this curb area during any relevant time, it is likewise correct that, as a matter of law, Plaintiff cannot establish any significant impairment to his proving his claim as a result of the absence of the recording.  Therefore, as to "Camera 01" as well, Plaintiff's

spoliation claim fails as a matter of law even without reference to the other elements of this cause of action.

> **c.     Conclusion:  Plaintiff presents this Court—and could present the trier in this action—no evidence that any relevant surveillance images of him were ever recorded on the night in question other than uninteresting and uncontested images of him walking under escort out FUR's front door**

As a result of Plaintiff's election not to retain an expert with actual expertise regarding video surveillance equipment, Plaintiff must content himself with trying to present—over the above-stated objections of the FUR Defendants (*see supra* at 4)—expert evidence through his own legal counsel on the nature and operation of FUR's video surveillance equipment. However, that attorney's "Declaration" testimony does not address even the most fundamental issue that any qualified expert would have considered:  "In what direction was each of the two rotatable cameras in question actually pointing at the time of this incident?"  Neither does Plaintiff in any respect seek to demonstrate what images from "Camera 02" and "Camera 09" were supposedly of such marked interest as to form the basis of a spoliation cause of action here.

Because of this absence of probative, admissible evidence, Plaintiff has not shown, "on the basis of reasonable inferences derived from both existing and spoliated evidence, that [any] ability to prevail in the underlying lawsuit [has been] significantly impaired due to the absence of the spoliated evidence."  *Holmes*, 710 A.2d at 847.  In this litigation, it is manifestly not a "reasonable inference" either

> (a)     that—notwithstanding the only affirmative evidence on the point and without any evidence whatsoever supporting Plaintiff—a security camera in this Nightclub ("Camera 03") was actually pointed at an indoor corridor rather than at a cash till;

> (b)     that—notwithstanding the only affirmative evidence on the point and without any evidence whatsoever supporting Plaintiff—a camera outside this Nightclub ("Camera 01") was pointed at a curb across the street north of the Club's main

entrance rather than at one or the other of two lines, to the building's west and east, of people trying to gain admission to the Club; or

(c)     that—notwithstanding the affirmative evidence on the point, including testimony by Plaintiff himself—security cameras at the front door of this Nightclub ("Camera 02" and "Camera 09") captured anything more substantial than merely images of several men, including Plaintiff, walking out that door.

Restated slightly, no reasonable juror could conclude, based on the evidence of record here, that either FUR's rotatable "Camera 01" or its rotatable "Camera 03" captured any image at all of Plaintiff.  Similarly, no reasonable juror could conclude that the absence at trial of images from "Camera 02" or "Camera 09" of Plaintiff walking out of the Club under escort might have any effect whatsoever on—still less constitute any "significant impairment" (*Holmes*, 180 F.3d at 297) regarding—Plaintiff's trying to make out a case concerning his contentions that he was battered either (i) on or about FUR's main stage, (ii) on or about the bottom of the staircase leading up from FUR's main dance floor, or (iii) on or about the curb across the street from FUR's front door.

As a result, Plaintiff's spoliation claim against the FUR Defendants must, as a matter of law, fail, even before consideration of other elements of that cause of action.

> **4.     Plaintiff's evidence does not show that the FUR Defendants had knowledge of a potential civil action against them when the video recordings were overwritten**

Plaintiff asserts that there is "ample evidence from which a reasonable jury could find that the FUR Defendants had knowledge of Plaintiff's potential claims and potential lawsuit against them and the off-duty officers of the MPD."  (Pl.Opp.Mem. at 14.)  However, none of the evidence that Plaintiff points to indicates that the FUR Defendants had knowledge of a potential claim against them.

Mr. Fiorito was informed only that Plaintiff had filed a police misconduct complaint against Officer Ramirez.  Plaintiff asserts, without citation to authority, that "[p]olice misconduct complaints like the one Plaintiff lodged are often the predicate for future lawsuits." (Pl.Opp.Mem. at 15.)  However, even were that assertion true, a jury could reasonably infer therefrom only that a police misconduct complaint against Officer Ramirez might have engendered a lawsuit *against that officer*, not a lawsuit against the FUR Defendants.

Moreover, the fact that Mr. Fiorito asked Mr. McLeod to view the video recordings from the night of March 11-12, 2005 does not demonstrate that Mr. Fiorito was aware of any potential civil action against FUR or any FUR employees.  Instead, a reasonable jury would infer that he asked Mr. McLeod to view whatever recordings there were because he had an understandable interest in learning the contents of those recordings after becoming aware that a police misconduct report had been filed.

Furthermore, Plaintiff erroneously asserts that Mr. Fiorito "threatened Alkadi that the Nightclub could file suit against Mr. Mazloum if the allegations in his police misconduct complaint were false" and, based on that assertion, suggests that "Mr. Fiorito contemplated that the police complaint exposed FUR to some potential liability."  (Pl.Opp.Mem. at 15-16.) However, Mr. Fiorito did not threaten that FUR would file suit against Plaintiff but, instead, only informed Mr. Alkadi, truthfully and accurately, that the police could file charges against Plaintiff were he found to have been making false statements to them.  (February 26, 2007 Deposition of Imad Alkadi ("Alkadi Dep."), attached hereto as "Exhibit 5," at 389.)

**5.     Plaintiff has not established that FUR had any legal duty to preserve these video recordings**

Because the FUR Defendants had no knowledge of a potential civil action against them (as detailed immediately above), no legal duty was imposed upon them to preserve the video recording:  a non-party to a suit has "no general duty in the common law to preserve evidence," and, "[a]bsent some special relationship or duty rising by reason of an agreement, contract, statute, or other special circumstance, the general rule is that there is no duty to preserve possible evidence for another party to aid that other party in some future legal action against a third party."  *Holmes*, 710 A.2d at 849, *citing Koplin v. Rosel Well Perforators*, 734 P.2d 1177, 1179 (Kan. 1987).

Indeed, Plaintiff implicitly concedes that the FUR Defendants had no knowledge of a potential civil action against them in arguing that a "special relationship" existed between himself and the FUR Defendants that, allegedly, imposed a duty upon FUR to preserve evidence for him in his potential suit against a third party.  (Pl.Opp.Mem. at 16.)  However, *Callahan v. Stanley*, 703 A.2d 1014 (N.J. Super. Ct. Law Div. 1997), the New Jersey state court decision Plaintiff relies on for support that a "special relationship" existed, examined facts dissimilar to the present situation.  In *Callahan*, the court found a "special relationship" imposing a duty to preserve evidence existed where an employer indeed took voluntary, affirmative steps to preserve evidence immediately after an accident.  703 A.2d at 1018.  However, here, none of the FUR Defendants took steps to preserve the video evidence and, in fact, made no suggestion to anyone that they intended to take any affirmative steps to prevent the video recordings from being overwritten in the normal course of business.  Mr. Fiorito asked Mr. McLeod to view the video recordings but did not ask him to preserve those video recordings (and Mr. McLeod

independently felt no need to do so in light of the fact that they only showed these men walking out of the Club (McLeod Dep. at 160-61)). Further, and contrary to Plaintiff's contention (Pl.Opp.Mem. at 15-16), the fact that Mr. Fiorito informed Officer Ramirez that a MPD representative was welcome to FUR to view and burn a CD copy of the video recording itself demonstrates that Mr. Fiorito had no intention of taking independent steps himself to preserve the video recording. Therefore, as the FUR Defendants took no affirmative steps to preserve the video recording or to indicate they would do so, Plaintiff cannot establish that a "special relationship" requiring Plaintiff to preserve the video recording ever arose.

Moreover, Plaintiff's reliance on the *Battocchi v. Washington Hosp. Ctr.*, 601 A.2d 28 (D.C. 1991), is misplaced as Plaintiff must establish the elements of a spoliation claim as outlined in *Holmes* in order to prevail on his spoliation count.[1] The guidance provided in *Battocchi* is irrelevant to the present inquiry of whether FUR had a legal duty to preserve evidence but might, instead, be relevant only were Plaintiff seeking an adverse inference at trial based on the unavailability of that evidence.

### 6. The video recordings at issue were not destroyed but, rather, were automatically overwritten in the normal course of business

Contrary to Plaintiff's assertion that the video recording here was destroyed (Pl.Opp.Mem. at 19), the video recording was in fact, in the normal course of business, automatically overwritten three days after this incident (McLeod Dep. at 72). Both Mr. McLeod and Mr. Sequeira, the only two FUR employees with the four digit pin code to access FUR's

---

[1] It might also be noted that *Battocchi* imposes a high standard that must be met before a court can allow a jury to make an adverse inference against a party that failed to preserve evidence. To justify an adverse inference, "the circumstances of the [destruction] must manifest bad faith …. [as] [m]ere negligence is not enough." 581 A.2d at 766.

video surveillance recordings, have testified that no one at FUR requested that they destroy any video recordings pertaining to the night of March 11-12, 2005. (McLeod Dep. at 164-65; May 30, 2007 Certificate of Diego Sequeira at ¶¶ 8-9).

Plaintiff further asserts that, even if the video recording had been overwritten in the normal course of business, the FUR Defendants are not absolved of liability because they failed to prevent the recordings from being overwritten. (Pl.Opp.Mem. at 20.) However, this argument is misplaced because the FUR Defendants had no legal duty to preserve the video recording (*see* discussion *supra* at 17-18). As the FUR Defendants had no legal duty to preserve the video recording, they had no duty to take affirmative steps to prevent those recordings from being overwritten in the normal course of business.

## 7.    Conclusion:  For manifold reasons, Plaintiff's spoliation claim fails

For each and all of the reasons discussed above—*viz.*, because Attorney Corcoran's Declaration should be disregarded in its entirety as inadmissible and incompetent, because "Camera 02" and "Camera 09" did not view anything of interest here, because "Camera 03" and "Camera 01" did not view Plaintiff at all, because the FUR Defendants had no knowledge of a potential civil action against them when the video recordings were overwritten, because FUR had no legal duty to preserve these video recordings, and because the video recordings at issue were not destroyed but were instead automatically overwritten in the normal course of business—the FUR Defendants are entitled to a grant of summary judgment in their favor as to Plaintiff's Count V spoliation claim.

**B.    Plaintiff's Count IV D.C. Human Rights Act Claim Fails Because The FUR Defendants Never Took Any Statutorily Proscribed "Adverse Action" Against Plaintiff And Because They Did Not Destroy Any Crucial Video Recordings Of This Event**

In order to establish a *prima facie* case of retaliation, a Plaintiff must establish that: "(1) he engaged in protected activity under the DCHRA, or opposed practices made unlawful under the DCHRA; (2) he was subjected to adverse action; and (3) there is a causal nexus between the two." *Mazloum v. District of Columbia*, 442 F.Supp.2d 1, 13 (D.D.C. 2006). However, Plaintiff cannot establish the second prong of a retaliation claim: as a matter of law, Plaintiff cannot establish that any "adverse action" was taken against him by any of the FUR Defendants. As a result, Mr. Fiorito, Mr. Rehman, and FUR are entitled to summary judgment on Plaintiff's Count IV.

In trying to make a case concerning "adverse action," Plaintiff first alleges that statements made by Mr. Fiorito to Plaintiff's friend Mr. Imad Alkadi during their March 12, 2005 conversation constitute adverse actions taken against Plaintiff. (Pl.Opp.Mem. at 23-24.) To establish the "adverse action" prong of a retaliation claim under the DCHRA, though, a plaintiff must show that he himself had some relationship with the alleged retaliating party through which relationship he was thus in a position to have been actually harmed—i.e., placed in a demonstrably worse position—by actions taken against him by that other party. *See, e.g., Prince v. Rice*, 453 F.Supp.2d 14 (D.D.C. 2006) (employee suffered an adverse action because employer downgraded her duties); *Robinson v. Winter*, 457 F.Supp.2d 32 (D.D.C. 2006) (employee suffered adverse action where employer denied him overtime, assigned him to menial tasks, and denied him a cartridge for a respirator used to prevent inhalation of noxious fumes on the job).

Here, Plaintiff cannot possibly establish that any adverse action was taken against him by the FUR Defendants because Plaintiff and FUR did not have any such relationship with each other.

Moreover, Plaintiff cannot establish even that he was actually harmed or placed in a worse position at all as a result of any of the alleged actions. Specifically, Plaintiff was not harmed as a result of any of the statements Mr. Fiorito made to Mr. Alkadi. During their meeting, Mr. Fiorito merely informed Mr. Alkadi that Plaintiff could be charged for providing false information. (Alkadi Dep. at 389.) That observation could not possibly constitute an adverse action under the DCHRA as it was unarguably true: Plaintiff could indeed be charged for providing false information to the police. (If anything, Mr. Fiorito's true statement might have helped this sobered Plaintiff as it could have made him all the more aware of the potential legal ramifications of his actions.) Against this backdrop, the FUR Defendants are aware of no reason why Mr. Fiorito's comments should or might be regarded as anything other than constitutionally protected free speech, U.S. Const. amend. I, and there of course appear no grounds whatsoever to infer that the DCHRA was ever intended to attempt to override such constitutional protections, still less that the statute could or might appropriately be construed as enabling that result.

Furthermore, Mr. Fiorito's statement to Mr. Alkadi that he was no longer welcome at FUR as a promoter (Alkadi Dep. at 200-01) could not constitute any actionable "adverse action" against Plaintiff as that statement did not harm Plaintiff himself or place Plaintiff himself in any demonstrably worse position. Moreover, because Mr. Alkadi had misrepresented himself to the police as being a FUR security employee (October 25, 2006 Deposition of John Fiorito, attached hereto as "Exhibit 6," at 117, 125), Mr. Fiorito had every right in the world to inform him that he was no longer welcome as a promoter at FUR.

Lastly concerning this "adverse action" prong of the DCHRA, because—as a matter of law—neither Mr. Rehman, Mr. Fiorito, nor anyone else at FUR illegally despoiled any evidence (*see supra* at 2-19), Plaintiff likewise fails to make out a *prima facie* case of an "adverse action" based upon those spoliation claims.

For these reasons, and as a matter of law, Plaintiff's Count IV claims against the FUR Defendants fail, and those defendants are thus entitled to a grant of summary judgment in their favor.

### C. Plaintiff's Count II Assault And Battery Claim Against Mr. Persons And FUR Fails As A Matter Of Law Because His Uncorroborated Claim Of A "Surprise Attack" Against Him By Defendant Persons Is "Too Incredible To Be Accepted By Reasonable Minds"

According to Plaintiff (Pl.Opp.Mem., esp. at 1-2 and 8-9), *any tale* of battery sworn to by a litigant—no matter how farfetched, no matter how much contradicted by other evidence—is adequate to get that case past a judge to a jury (particularly, it would seem, where such a tale is vouched for by that litigant's counsel as being an "honest rendition of the disputed facts" (Pl.Opp.Mem. at 1)).  "For now," we are dogmatically told, "the Plaintiff's version[ of what happened on the night in question] is the one that must be credited."  (Pl.Opp.Mem. at 9 (footnote omitted).)

In fact, however, with battery claims as with any other cause of action, summary judgment is appropriate whenever

> "'there is no *genuine* issue as to any material fact and … the moving party is entitled to a judgment as a matter of law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (quoting FED. R. CIV. P. 56(c))[ (emphasis added)]. A dispute about a material fact "is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A moving party is "entitled to judgment as a matter of law" against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

*Waterhouse v. District of Columbia*, 353 U.S.App.D.C. 205, 207-08, 298 F.3d 989, 991-92 (2002) (ellipses in original).

Relatedly, Plaintiff attempts to characterize the "too incredible to be accepted by reasonable minds" summary judgment test stated by the District of Columbia Court of Appeals in *Vale v. Bonnett*, 89 U.S.App.D.C. 116, 118, 191 F.2d 334, 336 (1951) ("*Vale*"), as being outdated and aberrant in federal civil practice. (*See* Pl.Opp.Mem. at 8-10 (describing that decision as "musty," "baroque," offering a "misguided path," and of "low precedential value").) In this same regard, Plaintiff advises the Court that "[t]he last time any court in the United States discussed, cited, or mentioned the *Vale* case as valuable precedent was in 1985." (*Id*. at 9 n.2.)

While that last statement by him may be true in a literal sense, Plaintiff—who doubtless suffers from no "lack of comprehension" of Rule 56 jurisprudence (*see id*. at 1)—manages somehow to neglect to inform this Court that, across the country over the past half-century, many federal courts have set out the same "too incredible to be accepted by reasonable minds" summary judgment test described in *Vale*, albeit often without making reference to that specific decision. *E.g.*, *Top Notch Prods. v. Bank One Co.*, 2007 U.S. Dist. LEXIS 21599 at *7 (E.D.Mich. 2007) ("In terms of motions for summary judgment, '[e]vidence that is too incredible to be accepted by reasonable minds does not raise an issue of credibility to defeat a motion for summary judgment.'" (citations omitted)); *Burris v. Richards Paving, Inc.*, 461 F.Supp.2d 244, 251 (D. Del. 2006) (same; citations omitted); *Smith v. Woods*, 2006 U.S. Dist. LEXIS 29745 at *12 (N.D.N.Y. 2006) (same; citations omitted); *Witcherd v. Principi*, 2006 U.S. Dist. LEXIS 2206 at *4 (D.Fla. 2006) ("The court may disregard evidence that is too incredible to be

believed."); *Torba v. J.M. Smucker Co.*, 888 F.Supp. 851, 854 (N.D.Ohio 1995), citing *Selsor v. Callaghan & Co.*, 609 F.Supp. 1003, 1010 (N.D.Ill 1985) ("[The Court's] duty in ruling on … summary judgment motion is to resolve issues of credibility in [nonmovant's] favor, [however] this duty extends only to plausible issues of credibility. … [if] an offer of evidence … is too incredible to be believed, the court may disregard it." (ellipses and bracketed text in original; citation omitted)); *Schwartzman, Inc. v. Atchison, T. & S.F. Ry.*, 857 F.Supp. 838, 847 (D.N.M. 1994) (court may grant summary judgment despite contrary testimony is when it is "too incredible to be accepted by reasonable minds" (citation omitted)); *Lestina v. IBM*, 1991 U.S. Dist. LEXIS 21736 at **28-29 (D.Vt. 1991), citing 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2727, at 169-70 (2d ed. 1983) (issues created by conflicting evidence should be resolved in favor of party opposing summary judgment unless evidence creating conflict is "too incredible to be accepted by reasonable minds") (other citations omitted); *Hales v. First Appalachian Corp.*, 494 F.Supp. 330, 333 (D.Ala. 1980) ("The court may disregard evidence that is too incredible to be believed."); *Molinos de Puerto Rico, Inc. v. Sheridan Towing Co.*, 62 F.R.D. 172, 177 (D.P.R. 1973) ("a party opposing a summary judgment cannot offer evidence that by its nature is so incredible as to be unacceptable by reasonable minds" (citations omitted)); *Dawn v. Sterling Drug, Inc.*, 319 F.Supp. 358, 361 (C.D.Cal. 1970) (summary judgment may be granted where "the tendered evidence is in its nature too incredible to be accepted by reasonable minds"); *Sauer v. Law, Union & Rock Ins. Co.*, 17 F.R.D. 430, 432 (D.Alaska 1954) (agreeing that tendered evidence of its nature too incredible to be accepted by reasonable minds cannot defeat summary judgment motion (citation omitted)).

The court in *O'Farrell v. Funk*, 2006 U.S. Dist. LEXIS 72060 at *68 (C.D.Ill. 2006), also looked to commentators Wright & Miller as well as to a powerful dissent in a Supreme Court case for this same legal proposition:

> "A court never is required to accept evidence that is inherently incredible or 'too incredible to be accepted by reasonable minds.'" "There must be a degree of substantiality to the evidence proffered in opposition to a summary judgment motion if the motion is to be defeated." *Agosto v. Immigration and Naturalization Service*, 436 US. 748, 772-773, 98 S.Ct[.] 2081, 2095, 56 L.Ed.2d 677 (U.S. 1978) (Powell & Rehnquist, dissent), citing 10 C Wright & A. Miller, Federal Practice & Procedure § 2725, p.512 (1973)[.[2]]

*See also Ettinger v. Johnson*, 566 F.2d 692, 696 (3rd Cir. 1977):

> "When at the hearing on a motion for summary judgment there is contradictory evidence, or the movant's evidence is impeached, an issue of credibility is present, provided the contradicting or impeaching evidence is not too incredible to be believed by reasonable minds. The evidence contradicting or impeaching that of the movant will usually be produced by the opposing party, but it may appear in the movant's own evidentiary materials."  [*Quoting* Moore's Federal Practice para. 56.15[4] at 56-523 (2d ed. 1976) (footnotes omitted).]

In *Cordova v. Harrah's Reno Hotel-Casino*, 707 F.Supp. 443, 447 (D.Nev. 1988), the court affirmatively relied on this "too incredible to be believed by reasonable minds" rationale in entering summary judgment against a plaintiff who was, like Plaintiff here, a liar:

> Conflicts of credibility should not be resolved on a hearing on a motion for summary judgment unless the opponent's evidence is too incredible to be believed by reasonable minds." *Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 909 (3rd Cir. 1984); *Allstate Insurance Company v. Cannon*, 644 F. Supp. 31, 34 (E.D.Mich. 1986); *de La Paz v. Danzl*, 646 F. Supp. 914, 920 fn. 14 (N.D.Ill. 1986). In this case the testimony of plaintiff of what occurred when Steven Shaw was called over to see the found money is absolutely incredible, not to be believed by reasonable minds, as is the suggested inference that Shaw had somehow indicated that it was appropriate for her to pocket the found money.

---

[2] *See also* 10A C. Wright & A. Miller, Federal Practice and Procedure § 2727 at n.79 and accompanying text (2007) ("The evidence offered must have the force needed to allow a jury to rely on it and the court may disregard an offer of evidence that is too incredible to be believed.").

Thus, as detailed above, the "too incredible to be accepted by reasonable minds" summary judgment test stated by the District of Columbia Court of Appeals in *Vale* comports fully with law long recognized and applied by numerous other federal courts, as well as championed by at least two of the leading federal civil procedure commentators.

Despite this ubiquitously recognized law, Plaintiff would have this Court now reach and draw, *inter alia*, the following conclusions and inferences regarding his battery claim against Mr. Persons and FUR:

That,

    (i)    notwithstanding the sworn testimony of a City of Alexandria, Virginia police officer trained and experienced in detecting chemical intoxication (February 23, 2007 Deposition of Humberto Trapero ("Trapero Dep.," attached in full to the FUR Defendants' opening brief, Mem. at "Exhibit 8" thereto) at 18-21) that—even two hours or more after this incident occurred at the Nightclub—said officer could hardly make sense of what Plaintiff was saying due to the level of Plaintiff's intoxication (*id.* at 17),

    (ii)    notwithstanding said officer's sworn testimony that Plaintiff expressly admitted he had had too many drinks that evening (*id.* at 22), and

    (iii)    notwithstanding other similar testimony of record (*e.g.*, October 3, 2006 Deposition of Thaddeus M. Modlin, Jr., attached hereto as "Exhibit 7," at 94-100),

*a reasonable jury could conclude* (a) that Plaintiff was not inebriated on the night in question (*see* Plaintiff's Counter-Statement at ¶ 2) and, thus, (b) that no inebriation on Plaintiff's part was a factor what had occurred that night and (c) that Plaintiff's other testimony concerning this incident is correspondingly untainted by his claim of having consumed "no more than three drinks the entire night" (Counter-Statement at ¶ 2).[3]

---

[3] Contrary to what Plaintiff suggests to this Court, City of Alexandria Police Officer Trapero never agreed—on cross-examination or otherwise—that Plaintiff's "symptom" of an "even stronger smell[ "of alcoholic beverage"] every time that he spoke" (Trapero Dep. at 21) was "consistent with [Plaintiff's claim of having been] assaulted.  Counter-Statement ¶ 69." (Pl.Opp.Mem. at 11 n.4.)

(footnote continued …)

That, notwithstanding the fact that Plaintiff's own friend Imad Alkadi testified (Alkadi Dep. at 335-37) that he saw Plaintiff use a small set of steps to get onto the stage that night on two different occasions—testimony consistent with Mr. Person's in this regard (November 17, 2006 Deposition of Michael Andre Persons, Jr., ("Persons Dep."), attached hereto as "Exhibit 8," at 98-101)—*a reasonable jury could conclude* Plaintiff testified accurately that he had been on the stage only once that entire evening (which, according to his sworn testimony, he had accomplished by climbing up the front of that stage rather than by using the stage steps (Mazloum Dep. at 251-52)).

And, ***perhaps most saliently regarding Plaintiff's battery claim***, that—notwithstanding the sworn and emphatic eyewitness testimony of Plaintiff's own friend Marwan Abi-Aad that, at the beginning of their physical contact with each other on the stage steps, Mr. Persons "put his hands *on [Plaintiff's] shoulders*" (February 12, 2007 Deposition of Marwan Abi-Aad ("Abi-Aad Dep."), attached hereto as "Exhibit 9," at 158 (emphasis added)), making it appear to Mr. Abi-Aad that Mr. Persons was trying "[t]o rush [Plaintiff] … [o]ut of the stage" (*id.*),[4] testimony consistent with Mr. Person's in this regard (Persons Dep. at 98-101)—*a reasonable jury could conclude* Mr. Persons actually initiated these parties' first contact with each other by suddenly grabbing Plaintiff from behind and out of the blue around Plaintiff's arms in a "bear hug" (Mazloum Dep. at 100-01 and 338), thereby effecting "a physical, surprise attack on Mr. Mazloum" (Response Br. at 10) while Mr. Persons was following Plaintiff down FUR's narrow stage steps.

Against the backdrop of these facts and the applicable law, the FUR Defendants again respectfully submit that, within the strictures of Fed.R.Civ.P. 56, this Court may and should rightfully conclude that, in this rather unusual setting, these FUR Defendants are entitled to summary judgment as to Plaintiff's battery claim.

Whereas Plaintiff asserts that Mr. Persons made "a physical, surprise attack on [him]" (Response Br. at 10) by grabbing him from behind in a "bear hug" (Mazloum Dep. at 338),

---

(... footnote continued)

Moreover, of course, Plaintiff's admission to Officer Trapero that he had had too many drinks that evening (Trapero Dep. at 22) could scarcely be regarded as logically "consistent with [Plaintiff's claim of having been] assaulted.  Counter-Statement ¶ 69."  (Pl.Opp.Mem. at 11 n.4.)

[4] As quoted in fuller part, *infra* at 29 n.5, Mr. Abi-Aad likewise testified that "when [Plaintiff] hit the second stair this is when [Mr. Persons] put his hands on [Plaintiff's] back and he was hurrying him up."  (Abi-Aad Dep. at 152.)

Mr. Persons' unexceptional rebuttal to that claim is that he did not do so but that he was instead merely escorting Plaintiff down the steps from FUR's main stage area, with his hands on Plaintiff's back, whereupon Plaintiff suddenly turned and attacked him (Persons Dep. at 101-02). No reasonable jury could reject Mr. Person's defense in favor of Plaintiff's claim, especially in light of the fact that Plaintiff's own friend Marwan Abi-Aad—who was unarguably in a position to observe the situation, who testified that he did observe the two descending these steps, and who was unarguably not inebriated at the time—swore under oath that *the first physical contact he observed of Plaintiff and Mr. Persons together was of Mr. Persons immediately behind Plaintiff and descending the stage steps with both of his hands on Plaintiff's shoulders, not on Plaintiff's waist, appearing to be trying to "rush" Plaintiff off of the stage.* (Abi-Aad Dep. at 152 and 158.)[5]

---

[5] Relatedly, the FUR Defendants must point out the falsehood of Plaintiff's unsubstantiated representation to this Court that "[b]oth Imad Alkadi and Marwan Abi-Aad, who witnessed the incident, deny that Mazloum initiated the incident[.]" (Pl.Opp.Mem. at 10.)

In actuality, Mr. Alkadi and Mr. Abi-Aad each stated under oath that they did not know how this tussle between Plaintiff and Mr. Persons began (emphases added in quoted text below):

*Alkadi Deposition*:

> A.   I don't know what happened.  I don't know what happened there. [At 341.]

> Q.   *So you didn't see anything that happened before they were physically engaged with each other.*
> A.   *That is correct.*  [At 341-42.]

> Q.   Well, you don't know whether they talked at all before that incident, do you?
> A.   Yeah, I don't.  That's what I'm saying, I don't know.  [At 344.]

*Abi-Aad Deposition* (at 152-54):

(footnote continued …)

Because Mr. Persons' rebuttal position *is not* in any respect beyond credibility whereas Plaintiff's unsubstantiated claim of a "surprise attack" upon him *is* "too incredible to be accepted by reasonable minds," *Vale*, 191 F.2d at 336—both inherently and in light of Mr. Abi-Aad's unambiguous testimony—Plaintiff's battery claim against Mr. Persons and FUR must be dismissed because that claim in fact presents "'no *genuine* issue as to any material fact,'" *Anderson*, 477 U.S. at 247 (*quoting* Fed.R.Civ.P. 56(c); emphasis added).  A dispute about a

---

(... footnote continued)

| | | |
|---|---|---|
| Q. | Is your testimony that Mr. Persons was essentially chasing Mr. Mazloum down the stairs? |
| A. | No, no. |
| Q. | He was following him, though? |
| A. | *I don't know.  However, when he hit the second stair this is when he put his hands on his back and he was hurrying him up.* |
| Q. | You saw Mr. Persons touch Mr. Mazloum for the first time when Mr. Mazloum was on the second step on the way down? |
| A. | Yes. |
| Q. | And your testimony is that Mr. Persons had never had any contact with him up to that point. |
| A. | *I didn't see what happened.*  I hadn't seen him before.  All I saw when he touched him when [*sic*; apparently, "was that"] he was on the second step. |
| …. | |
| Q. | *Do you know for a fact whether Mr. Mazloum and Mr. Persons ever talked with each other before you saw the two on the stairs together that evening?* |
| A. | *No.* |
| Q. | *You don't know.* |
| A. | *No.* |
| ... | |
| Q. | Did it appear to you that Mr. Persons was trying to escort Mr. Mazloum out of the bar? |
| A. | No. |
| Q. | What would cause you to say no to that question? |
| A. | Because he did not create any problems.  He wasn't into any fight. |
| Q. | Well, with all due respect, you hadn't seen him before.  Right? |
| A. | Yeah. |
| Q. | *So you don't really know whether he had started anything or not.* |
| A. | *Well, no, I don't know.* |

material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* at 248, and, here, no reasonable jury could conclude that the testimony of Plaintiff's friend Marwan Abi-Aad—a person who, along with Imad Alkadi, spent hours with Plaintiff later that same day going to various police stations to assist Plaintiff in making a claim against MPD regarding what had happened regarding alleged actions by off-duty police officers against Plaintiff (Alkadi Dep. at 182-83)—could rightly be rejected on this key "hands-on-shoulders" issue. Because, according to both Mr. Abi-Aad's and Mr. Persons' testimony, these men's physical contact did not begin with a bear-hug-from-behind-while-descending-steps "surprise attack" upon Plaintiff, Plaintiff's battery claim against Mr. Persons and FUR—highly suspect even on its face—is revealed as being literally incredible, and that claim therefore must fail.

For these reasons, Mr. Persons and FUR respectfully ask that this Court grant summary judgment in their favor as to Plaintiff's Count II battery claim.

III.     CONCLUSION

For the reasons stated above and in their opening brief, Defendants Night & Day Management, LLC, Michael Rehman, John Fiorito, and Michael Persons ask that this Court grant them summary judgment on all claims against them herein.

Respectfully submitted,

/s/ Paul A. Fitzsimmons

_____
Thomas S. Schaufelberger, Bar No. 371934
Paul A. Fitzsimmons, Bar No. 444829
SAUL EWING LLP
2600 Virginia Avenue, N.W.
The Watergate—Suite 1000
Washington, D.C.  20037
Telephone: (202) 333-8800

Counsel for
Defendants Night & Day Management, LLC,
Michael Rehman, John Fiorito, and
Michael Persons