# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMILE MAZLOUM,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA *et al.*,<br><br>　　　　　　Defendants. | Civil Action No. 1:06 CV 00002<br>(JDB) |

**CERTIFICATE OF DIEGO SEQUEIRA**

I, Diego Sequeira, do hereby declare and certify as follows:

1. I am over the age of 18 years, am competent to execute this Certificate, and have knowledge of the statements made herein.

2. I am the General Manager of Night and Day Management, LLC, d/b/a FUR Nightclub ("FUR" or the "Club").

3. Regarding what Attorney Corcoran terms "Camera 03" in the "Declaration" by him filed in this action, that camera—the only one at FUR which can reveal any view of the "Tunnel" corridor (which leads from the front entrance area of the Club to the top of a staircase leading down to the Club's main dance floor)—horizontally rotates through 360 degrees. Although it is possible to position that camera so that it can look down into the "Tunnel" corridor from the reception area inside FUR's front door, in fact that camera is *never* so positioned during the Club's operating hours. While the camera is sometimes rotated during the day to observe, for example, the foot traffic of deliverymen, the camera is *always* trained during operating hours—as are 15 other cameras within FUR—at one of FUR's cash registers; this particular security

camera is the only one that FUR has now or has ever had which is capable of watching that particular cash register (which register itself has always been in that same location).

4.  Moreover, none of the rotatable cameras at FUR turns automatically; instead, each such camera turns only by the remote control of a human operator.

5.  Because the incident at issue occurred during regular business hours, "Camera 03" was not pointing toward the "Tunnel" corridor at the time of this incident, and it could not have captured any image of Plaintiff as it was instead pointed toward a bar cash register.

6.  Regarding what Attorney Corcoran terms "Camera 01," that camera—the only camera at FUR which can view the curb area in question—horizontally rotates through 360 degrees (noting, however, that roughly half of that rotation shows only the outside wall on the north side of the building FUR occupies). Thus, the camera—wall-mounted on the west side of the Club's front door—can be pointed to the extreme left on Patterson Street, rotated 180 degrees to the extreme right to face due east on that same street, or positioned to any point in-between.

7.  At the northernmost point of that rotation, one can see the curb area across Patterson Street where off-duty defendant police officers held Plaintiff until on-duty officers arrived. During hours when the Nightclub is *not* open for business, the camera is, for two main reasons, typically rotated into that northernmost position. First, as the Club's front office has no windows, positioning this camera to the north allows people in the front office see when deliveries or visitors are approaching that front entrance. Second, when no one is in the building, positioning this camera to the north provides the possibility of recording any unlawful entry into the building that might occur through the Club's front doors.

8. However, when the Nightclub is open for business, that "Camera 01" serves a business rather than a security role. During regular business hours, all security hands at FUR are "on deck"—attending to admission issues, hosting, roaming the floors, or providing other security functions—and no one from FUR's security staff regularly mans the front office, where the only monitors FUR has for the video surveillance cameras are located. During those hours, a live feed from this "Camera 01" enables me to monitor the Club's admission lines: the general admission line the west of the camera's position and, to the east, the VIP admission line (as well as FUR's main exit door). During hours when the Club is open for business, no one at the Club other than I typically watches the display monitor for this camera (or for any other camera); more particularly, I am not aware of anyone's watching any of the video monitor screens during the night in question in this litigation.

9. When FUR is open for business, its regular practice is to start the evening with this camera pointed in its due-west position. FUR's typical practice is for that camera to stay in that position at least until around midnight or one o'clock a.m. Although the camera sometimes stays in that same westerly position the entire night, I often reposition it around midnight or one o'clock to face due-east, in order to be able to observe the flow of patrons exiting the club (which may then have a corresponding impact on how quickly the admission line to the west can be permitted to move).

10. During operating hours of the Club, I from time to time man the front office during portions of those hours, but I do not do so on a regular basis. When I am looking at the video monitors during operating hours, I am exclusively interested in business matters and thus leave security matters exclusively to the security staff; other than regarding the size and flow of the admission lines, I am entirely uninterested at those times in what is happening outside the

Club. Specifically, I am never interested in goings-on, if any, on the curb across the street to the north of the club. In all the time the Club has been in business—and I have always been the Club's General Manager—I have never had occasion to rotate "Camera 01" to examine the area near that curb during any hours when that the Club has been open to the public. When "Camera 01" is in either of its westerly or easterly positions, the curb area across the street from FUR where Plaintiff was detained is entirely outside the camera's view.

11. Regarding the incident in question, I did not hear about any fracas until sometime after the close of business that day (i.e., 3 or 4 a.m. on Saturday, March 12, 2005). As a result, at the time this incident was occurring, I had no reason whatsoever to rotate "Camera 01" to its northernmost position—towards that curb across from FUR—where it might have captured images of Plaintiff being held by some of the off-duty defendant police officers, and I am aware of no one else who either did so or might have done so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

_____
Diego Sequeira

Executed: July 12, 2007