**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EMILE MAZLOUM,

                    Plaintiff,

v.                                                              Civil Action No. 1:06 CV 00002
                                                              (JDB)

DISTRICT OF COLUMBIA *et al.*,

                    Defendants.

**RESPONSE**
**OF DEFENDANTS NIGHT AND DAY MANAGEMENT, LLC,**
**MICHAEL REHMAN, JOHN FIORITO, AND MICHAEL PERSONS**
**TO PLAINTIFF'S SUR-REPLY**

Plaintiff begins his Sur-Reply by urging that "[t]he inordinate length" of the FUR

Defendants' Reply brief serves "to underscore the myriad issues of disputed fact requiring trial."

To the contrary, the FUR Defendants therein detail, point-by-point, demonstrable falsehoods in

Plaintiff's own testimony plus his other misrepresentations of the record herein, thus revealing

how, in fact, there are no genuine issues of material fact regarding his claims against these FUR

Defendants. Quite frankly, had there been fewer such falsities to debunk, their Reply might well

have been shorter (noting, however, that various other inaccuracies were not taken on at all).[1]

---

[1] A related error on Plaintiff's part is his mislabeling as "desperate" (Sur-Reply at 1) the tone of
the FUR Defendants' Reply. A "tone" perhaps manifested therein is a general frustration that
although, for example, the sworn testimony of his sober-at-the-time-in-question friend squarely
contradicts him on his battery claim, Plaintiff—based on his own lies of having been the victim
of "a physical, surprise attack" by Defendant Persons (Opp.Mem. at 10)—yet seeks to drag the
FUR Defendants past this suit's summary judgment phase all the way through a jury trial.
        That general frustration is, also frankly, not lessened by the substance, or quality, of
Plaintiff's Sur-Reply, dealing with spoliation issues.

Before addressing general admissibility issues raised in Plaintiff's Sur-Reply regarding Attorney Corcoran's proffered testimony, it seems valuable here to review several substantive points concerning Plaintiff's spoliation claim *still uncontested after that Sur-Reply*:

1.     Plaintiff has presented no evidence whatsoever that either of the cameras pointed directly at the front door of the Club—"Camera 02" and "Camera 09"—would have captured anything more interesting than what has been admitted:  i.e., images of several men escorting Plaintiff out that door.

2.     Plaintiff has presented no evidence whatsoever that either of the other two cameras at issue here—"Camera 03" (the cash register camera) and "Camera 09" (the outside queuing lines camera)—was mounted in any fixed, non-rotatable position.  Entirely to the contrary, the only evidence of record herein on that point is that each such camera is rotatable horizontally through 360 degrees.  (July 12, 2007 Sequeira Certification at ¶¶ 3 and 6.)

3.     Plaintiff has presented no evidence whatsoever that either of those two rotatable cameras was capable of rotating other than by means of the manual control of an operator.  Entirely to the contrary, the only evidence of record herein on that point is that each such camera is rotatable only by and through such operator control.  (*Id*. at ¶ 4.)

4.     Plaintiff has presented no evidence whatsoever that anyone was manually controlling either of the rotatable cameras at the time Plaintiff was anywhere near those rotating cameras.  Entirely to the contrary, the only evidence of record herein on that point is that no one regularly manned the controls of those cameras during the Club's operating hours and that Mr. Sequeira, who sometimes monitors the outside queuing lines during those hours, (a) was not aware of anyone's watching any of the video monitor screens during the night in question, (b) did not himself rotate the "queuing line" camera that night (*or any other*) to view the curb area in question, and (c) did not learn of this fracas until sometime after the close of business that day.  (*Id*. at ¶¶ 8 and 11.)

5.     Plaintiff has presented no evidence whatsoever that either of the rotatable cameras actually captured, as opposed to 'was capable of capturing if so directed,' any image of Plaintiff.  Entirely to the contrary, the only evidence of record herein on that point is that, at the times in question, each such camera—in conformity with FUR's self-evidently understandable desire, testified to by Mr. Sequeira, of keeping tabs on its cash registers and its customer waiting lines rather than on hallways and nearby street curbs—was pointed, respectively, in a direction entirely away from the "Tunnel" area Plaintiff was being escorted through and the outside curb area where he was held for a time by off-duty MPD officers.  (*Id*. at ¶¶ 3, 5, and 8-11.)

These uncontestable facts regarding those four FUR video cameras need then to be examined against the controlling law on spoliation:

> [I]n order to demonstrate that the defendant's [spoliation] actions proximately caused the harm alleged, plaintiff must show, *on the basis of reasonable inferences derived from both existing and spoliated evidence*, that (1) the plaintiff's ability to prevail in the underlying lawsuit was significantly impaired due to the absence of the spoliated evidence; and (2) there had been a significant possibility of success in the underlying claim against the third party.

*Holmes v. Amerex Rent-a-Car*, 710 A.2d 846, 847 (D.C. 1998) (emphasis added).

In light of these uncontestable evidentiary facts and this operative law, the FUR Defendants respectfully submit that it would be impossible for any reasonable jury to conclude

   a.    that, although not even Plaintiff has asserted that "Camera 02" or "Camera 09" would have captured anything more interesting than images of several men escorting Plaintiff out FUR's front door, *a "reasonable inference" therefrom would be that "plaintiff's ability to prevail in the underlying lawsuit was significantly impaired due to the absence of" those bland images* (*id.*), or

   b.    that, although Plaintiff has presented and can present (i) *no evidence whatsoever* that "Camera 03" (the cash register camera) and "Camera 09" (the outside queuing lines camera) lacked the capability of being rotated horizontally through 360 degrees; (ii) *no evidence whatsoever* that either of those two rotatable cameras was capable of rotating other than via the manual control of an operator; (iii) *no evidence whatsoever* that anyone in fact manually controlled either of the rotatable cameras at the time Plaintiff was anywhere near those rotating cameras; (iv) *no evidence whatsoever* that, at the times in question, either of the rotatable cameras was—contrary to the direct testimony of Mr. Sequeira concerning FUR's universal practices concerning the use of these cameras—pointed in any direction other than, respectively, at a bar cash register and at an outside waiting queue; and (v) *no evidence whatsoever* that either of the rotatable cameras actually captured any image at all of Plaintiff, *a "reasonable inference" based on this "body" of evidence would be that a FUR video camera did actually capture images of Plaintiff* **on the curb across the street from FUR** *being beaten by off-duty police officers and that FUR was aware of the security system's recording thereof.*

Thus, and once again frankly, Plaintiff—in continuing to press his specious spoliation claim—is hoping merely that a jury might have an opportunity *to speculate* impermissibly in his favor.

Against that backdrop, there may indeed be little need to address the rest of Plaintiff's Sur-Reply comments and arguments on his spoliation claim. Nonetheless, the FUR Defendants would, for the record, make two main, albeit perhaps obvious, points.

First, Plaintiff has the chutzpah to argue—wrongly in both ways—that his own counsel's "Declaration" is kosher but that Mr. Sequeira's "Certification" is not.

Attorney Corcoran's repeated Declaration assertions that FUR's video surveillance system "would have captured" images of Plaintiff on the night in question (Corcoran Dec. at ¶¶ 6-10) were manifestly based on his assumption that images captured in a midday, pre-opening July 2006 inspection of the FUR surveillance system were closely representative of what that system would have captured and recorded around midnight during a bustling March 2005 Friday/Saturday FUR event, *including the incorrect assumption* that cameras which he apparently didn't even know were rotatable pointed in the same direction at night as during his daytime inspection. Rather baffling is how—especially in light of Mr. Sequeira's July 12, 2007 Certification—Plaintiff could possibly think that his presenting, in his Sur-Reply, a grainy photo from his counsel's July 2006 daytime inspection at FUR might somehow overcome those overarching foundational problems. In any event, Attorney Corcoran's speculations amount to nothing more or less than impermissible and utterly ill-founded "expert" testimony.

By contrast, Mr. Sequeira has given testimony, through his Certifications, on matters on which he has detailed, firsthand knowledge: the operational capabilities of the cameras in question and FUR's longstanding practices regarding the use of those cameras and the related video equipment. The FUR Defendants are unaware of any rule that would preclude him from providing such testimony in rebuttal to undisclosed Expert Corcoran's foundationless speculations—made in support of his own client's efforts to state a *prima facie* spoliation case—

about what images any given camera supposedly "would have captured" on the night in

question.[2]

Second, Plaintiff seems intent on further wasting everyone's time here by attempting to

bring into play reports (Sur-Reply at 4-5) of an incident outside the FUR Nightclub *a year after*

*his own incident* (Plaintiff mistakenly describes his own fracas as having occurred in "March

2006," *id*. at 5, rather than in March 2005).  Those unprobative reports give no indication as

to whether that other event took place within any FUR camera's field of vision or as to whether

the "outside video tape" thereof offered by FUR to the MPD actually showed anything of that

incident, *still less anything of the curb area whereat Plaintiff had been detained a year earlier*.

Respectfully submitted,

/s/ Paul A. Fitzsimmons
_____
Thomas S. Schaufelberger, Bar No. 371934
Paul A. Fitzsimmons, Bar No. 444829
SAUL EWING LLP
2600 Virginia Avenue, N.W.
The Watergate—Suite 1000
Washington, D.C.  20037
Telephone: (202) 333-8800

Counsel for
Defendants Night & Day Management, LLC,
Michael Rehman, John Fiorito, and
Michael Persons

---

[2] Moreover, Mr. Sequeira was the only person identified in discovery as having had dealings with the surveillance system's installation/maintenance provider, JB Security.  (*See* Exhibit A hereto.)

Relatedly, Plaintiff's complaint that FUR's Rule 30(b)(6) designee David McLeod "said **nothing** in his deposition regarding camera repositioning, despite opportunities to so explain" (Sur-Reply at 4 (emphasis in original)) sounds suspiciously like lawyer-speak for "we really wish now that we had asked him some better questions … or maybe even retained an actual video expert," a conclusion strongly reinforced by the absence of any reference by Plaintiff to any deposition colloquy wherein Mr. McLeod should, arguably, have discussed that camera repositioning ability.