# EXHIBIT A

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 2
 3
 3   EMILE MAZLOUM                  :
 4                                  :
 4              Plaintiff           :
 5                                  :
 5       vs.                        :  Civil Action No.
 6                                  :  1:06:CV 00002
 6                                  :  (JDB)
 7   DISTRICT OF COLUMBIA,          :
 7      et al.                      :
 8                                  :
 8              Defendants          :
 9
 9               Washington, D.C.
10               Tuesday, February 27, 2007
10
11   Deposition of:
11
12       NIGHT and DAY MANAGEMENT, LLC
12         DESIGNATED REPRESENTATIVE
13               DAVID McLEOD
14   called for oral examination by counsel for
15   Plaintiff, pursuant to notice, at the offices
16   of Katten Muchin Rosenman, LLP, 1025 Thomas
17   Jefferson Street, N.W., East Lobby, Suite 700,
18   Washington, D.C. 20007-5201, before Renee A.
19   Feder, CSR, a Notary Public in and for the
20   District of Columbia, beginning at 1:47 p.m.,
21   when were present on behalf of the respective
22   parties:
```

Page 2

On behalf of the Plaintiff:

BY: WARREN KAPLAN, ESQ.
   Washington Lawyers' Committee for
   Civil Rights and Urban Affairs
   11 DuPont Circle, N.W.
   Suite 400
   Washington, D.C. 20036
   (202) 319-1000

   and

BY: BRIAN CORCORAN, ESQ.
   Katten Muchin Rosenman, LLP
   1025 Thomas Jefferson Street, N.W.
   East Lobby, Suite 700
   Washington, D.C. 20007-5201
   (202)625-3681

On behalf of Defendants Night and Day Management, LLC, M. Rehman, J. Fiorito, M. Persons:

BY: PAUL A. FITZSIMMONS, ESQ.
   Saul Ewing, LLP
   2600 Virginia Avenue, N.W.
   Suite 1000 - The Watergate
   Washington, D.C. 20037-1922
   (202)333-8000

On behalf of Defendants Ramirez, Modlin, Phillips and Schneider:

BY: LETICIA L. VALDES, ESQ.
   Office of the Attorney General
   Government of District of Columbia
   441 4th Street, N.W. 6th Floor South
   Washington, D.C. 20001
   (202)442-9845

Page 3

BY: DAVID A. JACKSON, ESQ.
   Office of the Attorney General
   Government of District of Columbia
   441 4th Street, N.W. 6th Floor South
   Washington, D.C. 20001
   (202)724-6519

On behalf of Defendants Acosta and Smith:

BY: CARL SCHIFFERLE, ESQ.
   Office of the Attorney General
   Government of District of Columbia
   441 4th Street, N.W. 6th Floor South
   Washington, D.C. 20001
   (202)442-9845

+ + +

CONTENTS

WITNESS: DAVID McLEOD

EXAMINATION BY:         PAGE:
MR. KAPLAN              5
MR. FITZSIMMONS         157
MR. SCHIFFERLE          165
MS. VALDES              174
MR. KAPLAN              177

Page 4

EXHIBITS

DEPOSITION NO.   MARKED FOR IDENTIFICATION

1  Diagram                            53

2  MPD Complainant/Suspect Statement,  63
   7/27/05

3  ABC case Report plus attachments   97

* ** *

Page 5

Thereupon,
        DAVID MCLEOD
was called for examination by counsel and,
after having been duly sworn by the Notary,
was examined and testified as follows:
   EXAMINATION BY COUNSEL FOR PLAINTIFF
        BY MR. KAPLAN
   Q.   Mr. McLeod, my name is Warren
Kaplan. And I am an attorney for the
plaintiff in this case, Emile Mazloum. And
with me is Mr. Corcoran, who is co-counsel
also for the plaintiff.
        You have been designated by FUR to
testify as to certain specific topics on
behalf of FUR. Are you aware of that?
   A.   Yes.
   Q.   And there are approximately 12
topics which I understand you are designated
to testify about. And I am also informed at
the prior deposition of Mr. Fiorito, there
were some of the topics that he was testifying
about, but he said you would be the better

Page 42

1  is the first thing that comes out of my mind
2  at any incident.
3     Q.  Okay. What I am trying to find
4  out is when would you write that incident in
5  your log?
6     A.  I would write it as an incident
7  after the fight occurred and I am on the scene
8  that shows this person is taking a report, he
9  wants to go to the hospital. I have people
10 going to the hospital that don't even generate
11 a police report. But I have in my log this
12 ambulance was called for this person.
13    Q.  How often do people go to the
14 hospital?
15    A.  Not often. Like you are not
16 feeling well, you come outside, you had too
17 much to drink or you took some medicine at
18 home, you are on medication and you come to
19 the club and you have a drink and you are not
20 feeling well, I call an ambulance for that.
21    Q.  How often do you call an
22 ambulance?

Page 43

1     A.  It is rare. Very rare.
2     Q.  Once a week?
3     A.  No. No. Maybe twice -- once a
4  month, if that.
5     Q.  How often do fights get broken up?
6     A.  That is rare, too. I can't answer
7  that.
8     Q.  Same frequency?
9     A.  Yes. I can't tell you when a
10 fight is going to happen or not going to
11 happen.
12    Q.  But on the average?
13    A.  Every blue moon. I can't answer
14 that question.
15    Q.  Have there been any other cases
16 where any employee of FUR used force against a
17 patron?
18    A.  No. Besides this one that we are
19 sitting right here, so they say.
20    Q.  Let's talk about screening
21 procedures for the hiring of security
22 personnel.

Page 44

1     A.  Background checks, police
2  clearance.
3     Q.  Who is in charge?
4     A.  I am.
5     Q.  What kind of background check?
6     A.  We do a background check, meaning
7  we have a company that checks -- that does
8  thorough background checks, makes sure you
9  have no felonies. We do a police clearance
10 through Maryland, Virginia and D.C. Meaning
11 if anything comes back stating you have been
12 in any misdemeanor, any assault charge, any
13 felonies, you cannot work at FUR nightclub.
14    Q.  Did you do those kind of checks
15 for Mr. Persons?
16    A.  Sure enough did.
17    Q.  All --
18    A.  Any employee at FUR nightclub.
19    Q.  Checks were all negative for
20 Mr. Persons?
21    A.  Yes, they were.
22    Q.  Topic 11 is the security system in

Page 45

1  place at FUR as of March 11th including but
2  not limited to the video surveillance system
3  that is in place at such time.
4     A.  The video consist of a theft
5  thing. We have all video cameras at all
6  registers, back door entrance, front door
7  entrance. It is more used for theft than
8  anything.
9     Q.  How many cameras?
10    A.  Roughly, I am thinking maybe about
11 24.
12    Q.  Who installed them?
13    A.  I have no idea.
14    Q.  Ever hear of a company call JB
15 Security?
16    A.  I know JB. I didn't know that is
17 what he called the company, JB Security.
18    Q.  What is JB's name, actually?
19    A.  I have no idea. I call him JB.
20    Q.  Do you know where his place of
21 business is?
22    A.  I have no idea.

Page 46

1   Q.  How do you call him? How do you
2 contact him?
3   A.  How do I contact him? I don't
4 contact JB.
5   Q.  You have never called him?
6   A.  I have never called JB.
7   Q.  Who does call him?
8   A.  Diego. Operations manager. He is
9 the operational -- he can deal with the money,
10 he controls the money. I don't contact him.
11   Q.  Diego what?
12   A.  Sanchez. That is his name.
13   Q.  And what is his position?
14   A.  He is the operational. He deals
15 with the money.
16   Q.  What is JB's role on the security
17 cameras?
18       MR. FITZSIMMONS: Objection.
19 Foundation. What is his role?
20       BY MR. KAPLAN
21   Q.  What is his role? Does he have a
22 role?

Page 47

1   A.  I don't understand the question.
2   Q.  What does JB do concerning the
3 video surveillance cameras?
4   A.  JB just installs cameras.
5   Q.  Does he maintain them?
6   A.  Yes, he maintains my cameras.
7   Q.  Does he come out once a week or
8 once a month?
9   A.  I have no idea. He comes out
10 whenever a camera goes bad. I have no idea.
11   Q.  Have there been any occasions
12 in the past two years when the -- when cameras
13 were taken out or added?
14   A.  Rephrase that, sir? Repeat that
15 question.
16   Q.  Yes. Have there been any
17 occasions in the past two years when any
18 cameras have been removed or new cameras have
19 been added?
20   A.  Since today?
21   Q.  Yes.
22   A.  I have added two new cameras.

Page 48

1   Q.  When was that?
2   A.  Two months ago.
3   Q.  Where are they?
4   A.  One new camera outside. It is
5 facing west.
6   Q.  Let's see. When you come out the
7 front door --
8   A.  The new camera will be on your
9 right.
10   Q.  The new camera is on your right?
11   A.  Yes.
12   Q.  So, the camera is at the front
13 door facing west?
14   A.  It is shooting -- this is the
15 club. It is shooting this way. In other
16 words, it gives me an angle this way.
17   Q.  Let me ask if you can draw a
18 diagram.
19   A.  (Witness complying.) This is the
20 front of the club, okay.
21   Q.  Put FD for front door.
22   A.  Okay. I already have a camera

Page 49

1 going this way. The new camera is over here.
2 I will put "W" going that way. So I can see
3 anything up here as well as anything down
4 here.
5   Q.  Okay. The new camera is attached
6 to the building?
7   A.  Yes.
8   Q.  Is it intended to get what is on
9 the sidewalk?
10   A.  Well, no. It sees everything. It
11 will see the street. And this will see the
12 front door. Like people walking up the steps.
13 This camera will see the front, like people
14 walking up the steps. This camera will show
15 the street.
16   Q.  Would it show the sidewalk across
17 the street?
18   A.  This camera? Here?
19   Q.  Yes.
20   A.  No. It will show -- this is the
21 sidewalk in front of the building. In other
22 words, it will show probably a little bit of