## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EMILE MAZLOUM** | |
| **Plaintiff,** | |
| v. | Civil Action No.  06-0002 (JDB) |
| **DISTRICT OF COLUMBIA METROPOLITAN POLICE DEPARTMENT, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiff, Emile Mazloum, alleges that he was the victim of a nightclub beating orchestrated by several police officers together with certain nightclub employees.  Plaintiff visited the FUR Nightclub on the evening of March 11, 2005, and claims that he was assaulted by a bouncer employed by the club and then subsequently beaten by several off-duty police officers who later conspired to cover-up the entire incident.  Plaintiff brought suit against several Metropolitan Police Department ("MPD") officers, the District of Columbia, and certain employees of the FUR Nightclub alleging violations of 42 U.S.C. §§ 1981 and 1983 and the District of Columbia's Human Rights Act ("DCHRA"), as well as assault and battery and spoliation of evidence.  Discovery has now closed in this case, and currently before the Court are defendants' various motions for summary judgment and partial summary judgment.

## BACKGROUND

The bitterly disputed facts of this case are set out in detail in Mazloum v. District of Columbia, 442 F. Supp. 2d 1 (D.D.C. 2006), and briefly recounted here.  On the evening of March 11-12, 2005, plaintiff -- a person of "Lebanese heritage . . . [who] appears visually to be of

Middle Eastern ethnicity," Pl.'s Counter-Statement of Facts at 1-- was a patron at the FUR

Nightclub in Washington, D.C.  Id. at 3.  Plaintiff's two friends -- Marwan Abi-Aad and Imad

Alkadi -- worked as party promoters for the club and were "manning the stairs that led to the

stage above the main dance floor" at the time of the incident.  Id. at 5.  During the course of the

evening, plaintiff was "dancing on the stage just off the main dance floor" and he then "walked to

the stairs that exit the stage, intending to descend."  Id. at 3.  From this point forward, the parties'

respective versions of the events depart dramatically.  As plaintiff would have it, upon attempting

to exit the stage, he was grabbed by defendant Michael Persons, a bouncer employed at the club.

Id.  For his part, Persons does not deny grabbing plaintiff, but he maintains that he did so because

plaintiff appeared "very agitated" in response to Persons asking him to leave the stage and he

believed that plaintiff was about to strike him.  FUR Mot. for Summ. J. (hereinafter "FUR Mot.")

at 23.  Thus, Persons claims, he grabbed plaintiff's hands in self-defense.  Id.

Alkadi witnessed the grabbing and sought to intervene on plaintiff's behalf, and in the

course of that attempt all three men fell to the floor.  Pl.'s Counter-Statement of Facts at 5-6.  At

that point, defendants Modlin, Phillips, Schneider, and Ramirez[1] -- off-duty plain clothes MPD

officers who were also patrons at the club that night -- became involved in the incident.  Id. at 6.

In short, their version of the story is that they witnessed an altercation between two individuals,

intervened to remove the more aggressive of the two combatants, and then escorted him out of the

club to await the arrival of on-duty MPD officers, all the while employing only as much force as

reasonably necessary to effectuate their task.

---

[1] Although all four were off-duty officers, the Court will hereinafter refer to Modlin, Phillips, and Schneider as the "off-duty officers."  In some respects the claims against Ramirez are unique, and it is therefore appropriate to address him separately.

More specifically, Modlin claims that he first became aware of the altercation when another club patron fell against him and he turned to observe plaintiff and Persons "engaged in a struggle."  Defs. Phillips, Modlin & Schneider Mot. for Summ. J (hereinafter "Defs. Phillips, Modlin & Schneider Mot.") at 5.  He then intervened and "sought out who he believed was the most aggressive individual, who in his view happened to be the plaintiff."  Id.  Officers Phillips and Schneider joined the fray when they observed Modlin involved in the altercation.  Both officers maintain that plaintiff was resisting their efforts to remove him; in particular, Phillips stated that he believed plaintiff was "punching at defendant Modlin," and Schneider similarly "observed plaintiff on his side, punching and kicking, and officers Ramirez and Modlin trying to handcuff him."  Id. at 5-6.  For his part, Ramirez became involved at some point and produced a set of handcuffs that the officers then placed on plaintiff before leading him out of the club.  Id.  While waiting with plaintiff outside of the club for the on-duty officers to arrive, the off-duty officers "sat plaintiff down when he tried to stand up."  Id. at 5.

Not surprisingly, plaintiff paints a very different picture of the events on that evening.  In his view, he was assaulted not only by Persons but then again by the off-duty officers during the course of this brief arrest.  According to plaintiff, he was merely exiting the stage when -- without any prior warning or request by Persons to avoid the stage area -- Persons "approached him from behind, wrapped his arms around [plaintiff], and began choking [him]."  Pl.'s Counter-Statement of Facts at 3.  Furthermore, plaintiff maintains that while Persons had him pinned down, Alkadi attempted to intervene on his behalf, causing all three men to fall to the floor.  Id. at 6.  At that point, plaintiff argues that the off-duty officers (particularly Modlin and Phillips) got involved in the altercation and separated him from Persons and Alkadi without first identifying themselves as

police officers.  Id. at 6-7.  Now joined by Ramirez and Schneider, the off-duty officers then proceeded to "drag[] [plaintiff] along the ground across the dance floor . . . while pushing him and hitting him in the back."  Id. at 7.  Most significantly, while still inside of the club, plaintiff claims that Ramirez "punched [him] in the face and nose, in a single glancing blow" and simultaneously exclaimed to him: "Shut up, you fucking Al-Qaeda!"  Id. at 8.

After he was dragged outside by the officers, plaintiff continued to protest his treatment, repeatedly stating: "What did I do?  I didn't do anything."  Id. at 9.  In response, plaintiff states that Ramirez kicked him and again uttered: "Shut up, you fucking Al-Qaeda."  Id.  When plaintiff attempted to pull himself up from the ground, he maintains that Phillips and Ramirez "caused [him] to fall hard back on the ground."  Id.  While waiting for the on-duty officers to arrive, plaintiff further insists that Ramirez continued to "taunt" him by referring to him repeatedly as a "fucking terrorist."  Id.  Plaintiff believes that he was assaulted at least in part due to his ethnicity.

Eventually a squad car arrived, and the on-duty MPD officers -- defendants Acosta and Smith (hereinafter "the on-duty officers") -- began to investigate what had occurred at the club. Id. at 9-10.  After conferring in private with Ramirez and Persons, the on-duty officers spoke with plaintiff about the incident.  Id. at 10-11.  Plaintiff states that once the on-duty officers determined that "there was no evidence that [he] had done anything wrong," they then removed his handcuffs and released him but rebuffed his attempts to file a complaint against the off-duty officers.  Id. at 11-12.  After leaving the scene, plaintiff proceeded to the Inova Alexandria Hospital, where he was treated for a "broken nose, bloody left eye, scrapes on his face and ears, swelling on the left side of his neck . . . and an assortment of cuts, deep bruises and bumps on his head."  Second Am. Compl ¶ 42.

It is undisputed that on the next afternoon, March 12, 2005, plaintiff went to the First

District station in D.C. to file a formal police complaint against the officers involved in the

incident. Pl.'s Counter-Statement of Facts at 13. While there, he saw and recognized Ramirez,

obtained his name and badge number and then recorded them in the complaint. Id. Tipped off to

plaintiff's intentions, Ramirez called defendants Rehman and Fioritio, managers of the FUR

Nightclub, to inform them of plaintiff's complaint. Id. at 15. Ramirez also called defendants

Modlin, Schneider, and Acosta, but none of those individuals "recall the specifics" of their

respective conversations. Id. at 14. Later that evening, Alkadi was summoned to a meeting at

FUR with defendants Rehman, Fiorito, and Persons. Id. at 15-16. According to plaintiff, at that

meeting Fiorito reportedly warned Alkadi that plaintiff would be "burned" if he proceeded with

his complaint or filed a lawsuit. Id. at 16. Alkadi, for his part, noted the several security cameras

around the club and inquired as to whether any of them may have captured the incident on tape.

Id. Fiorito allegedly responded initially by stating that "I don't have it anymore. Everything is

gone." Id. Plaintiff also maintains that Fiorito quickly "changed his story and claimed that

footage of the incident had never been captured." Id.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its

motion by "informing the district court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## **DISCUSSION**

### **A. Motion for Summary Judgment by Officers Phillips, Modlin, and Schneider**

Plaintiff brings claims against the off-duty officers in Counts I, II, III, and IV.  In response, the off-duty officers have moved for summary judgment on all claims against them. They also have requested that the Court hold that punitive damages are not available against them in this case.  For the reasons set forth below, the Court will grant in part and deny in part defendants' motion on Count I, and deny their motions with respect to the remaining Counts.

*1. Count I: Qualified Immunity & Excessive Force*

In Count I, plaintiff brings a claim under 42 U.S.C. § 1983 alleging that the off-duty officers wrongfully arrested him and employed excessive force in violation of the Fourth Amendment.[2]  Second Am. Compl. ¶ 58.  In response, the off-duty officers maintain that they are entitled to qualified immunity and that, in any event, plaintiff's arrest was based on probable cause.  Defs.' Phillips, Modlin & Schneider Mot. at 7.  They further contend that they did not use excessive force against the plaintiff.  Id. at 10.

Police officers enjoy a qualified immunity from suits alleging violations of constitutional rights.  See Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court has made it clear that there are two inquiries involved in qualified immunity analysis.  The first question is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. at 201.  If the court determines that there is no such violation, the analysis is over and the officer is entitled to qualified immunity.  If, however, there is a constitutional violation, the second step in the analysis is to determine "whether the right was clearly established."  Id.

Thus, the initial inquiry is whether plaintiff has alleged that the off-duty officers violated his constitutional rights.  In Graham v. Connor, the Supreme Court held that the "reasonableness inquiry" in an excessive force claim under the Fourth Amendment is an "objective one": "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  490 U.S. 386, 396 (1989).  Moreover, at the summary judgment phase where -- as here -- the facts are

---

[2] In his opposition briefing, plaintiff focuses solely on the excessive force aspects of his Fourth Amendment claim.

hotly disputed, "this usually means adopting . . . the plaintiff's version of the facts" for the first

step of the qualified immunity inquiry.  Scott v. Harris, 127 S. Ct. 1769, 1774-75 (2007).  In

determining whether there has been an unconstitutional use of excessive force, a court must

consider several factors, "including the severity of the crime at issue, whether the suspect poses

an immediate threat to the safety of the officers or others, and whether he is actively resisting

arrest or attempting to evade arrest by flight."  Saucier, 533 U.S. at 205.

        In this case, the off-duty officers first insist that plaintiff's excessive force claim fails

because he has not laid out with sufficient specificity each defendant's personal involvement in

violating his constitutional rights.  Defs.' Phillips, Modlin & Schneider Mot. at 10.  The off-duty

officers cite to Simpkins v. District of Columbia, 108 F.3d 366 (D.C. Cir. 1997), to support this

contention.  The reliance on Simpkins is misplaced, however; the cited passage merely

establishes that a "complaint must at least allege that the defendant . . . was personally involved in

the illegal conduct."  Id. at 369.  Here, plaintiff has done just that and has thus met this light

burden.  Next, the off-duty officers maintain that their actions were objectively reasonable under

Saucier because they formed a "reasonable belief that plaintiff was perpetrating an assault upon

the bouncer in violation of the laws of the District of Columbia."  Defs.' Phillips, Modlin &

Schneider Mot. at 11.  Moreover, they argue, "the amount of force exacted by these defendants

was only that which was necessary to break up the assault, and to arrest plaintiff."  Id.

        Unsurprisingly, plaintiff tells a different story.  Viewed in the light most favorable to him,

the facts show that upon descending from the stage in the club, he was accosted by defendant

Persons.  While Persons had him pinned to the ground, the off-duty officers "entered the fray" and

dragged him down the stairs and outside of the club, handcuffing him and "pushing and hitting

him in the back" along the way.  Pl.'s Off-Duty Opp'n at 11.  When he was finally thrown outside

of the club, plaintiff was subjected to additional physical abuse by Ramirez, while the off-duty

officers "slam[med] [him] back to the ground when he attempted to stand up."  Id. at 12.

As the Supreme Court has indicated, resolution of the first stage of the qualified immunity

inquiry normally requires "adopting . . . the plaintiff's version of the facts."  Scott, 127 S. Ct. at

1774-75.  Accepting the facts as set out above, the Court finds that the off-duty officers' actions

were not "objectively reasonable" and thus a constitutional violation likely occurred.  Many of the

relevant factors identified by the Supreme Court in Graham provide useful guidance here.  At the

outset, Graham indicates that courts should gauge the severity of the crime at issue, an inquiry

that cuts sharply in plaintiff's favor.  He was merely exiting the stage when he was grabbed and

pinned down by defendant Persons; that is hardly a crime on plaintiff's part.  Although the off-

duty officers contend that they witnessed plaintiff assaulting the bouncer, the Court must view the

facts in the light most favorable to plaintiff, which dictates giving credit to plaintiff's account on

this point.  Plaintiff also posed no threat to the officers or other club patrons before the officers

became involved in the incident; indeed, if plaintiff is to be believed, it was Persons that posed

such a threat, if anyone did.  Plaintiff, moreover, was not evading arrest at the time that the off-

duty officers intervened.  Finally, although it is true that he was flailing his arms and legs about

after the officers became involved, the D.C. Circuit has indicated that attempts to free oneself

after the use of force in question has occurred are not relevant to the inquiry concerning the

officer's initiation of force.  DeGraff v. Dist. of Columbia, 120 F.3d 298, 302 (D.C. Cir. 1997).  In

short, accepting plaintiff's version of the events, he was a victim twice over: first of an

unprovoked assault by defendant Persons and then again by the off-duty officers.  The Court

cannot say on these facts that the off-duty officers' actions were objectively reasonable for the purposes of an excessive force claim.  Indeed, as plaintiff would have it, these facts do not justify the use of <u>any</u> force against him since he had engaged in no culpable conduct.  <u>See</u> <u>Scott</u>, 127 S. Ct. at 1778 (holding that it is "appropriate . . . to take into account . . . [the] relative culpability" of a plaintiff in resolving an excessive force claim).

The cases cited by the off-duty officers do not point to a different result.  To begin with, the off-duty officers rely on <u>Graham</u>, which held that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" constitutes excessive force.  490 U.S. at 396 (quoting <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d. Cir. 1973)).  Be that as it may, plaintiff's recitation of the facts here amounts to more than an allegation of a mere "push or shove."  Indeed, this case also involves significantly more than the "gratuitously violent shove" that was found lacking in <u>Saucier</u>.  533 U.S. at 208.  Again, as described above, plaintiff alleges that he was assaulted by the officers, repeatedly pushed and hit in the back, dragged across the nightclub floor, and then thrown to the ground outside (not to mention the more serious assault by Ramirez).  Moreover, the context of <u>Saucier</u> makes its holding a particularly poor fit for this case. In <u>Saucier</u>, the Supreme Court's decision was informed in part by the fact that the officer in question was on-duty and was assigned with the task of, among other things, "protect[ing] the safety and security of the Vice President of the United States."  <u>Id.</u> at 209.  In addition, it was undisputed in <u>Saucier</u> that the officer had the requisite authority to detain the plaintiff in the first instance; the only question was whether he used appropriate force in doing so.  <u>Id.</u> at 207.  The context of this case, however, is dramatically different.  Not only is there no circumstance even approaching the importance of the special duty to protect high-ranking members of the executive

branch as in <u>Saucier</u>, but the officers in this case were off-duty and charged with no special obligation to intervene in the altercation between Persons and plaintiff.

<u>Stevens v. Stover</u>, 727 F. Supp. 668 (D.D.C. 1990), cited by defendants, is similarly inapposite. In <u>Stevens</u>, the officers were faced with a fleeing suspect who "resisted arrest . . . refused to show her license and registration, and almost struck an officer with her vehicle in trying to flee." <u>Id.</u> at 671. Indeed, those are some of the relevant factors expressly cited in <u>Graham</u> that point towards resolution in favor of the officer. In any event, it is clear that none of those factors are present in the instant case. Along the same lines, <u>Richardson v. U.S. Department of Interior</u>, 740 F. Supp. 15 (D.D.C. 1990), is no aid to the off-duty officers. There the plaintiff disobeyed a direct order from a uniformed officer, appeared to be trespassing, and also attempted to "wrench away" from the officer after being detained. <u>Id.</u> at 18. In this case, by contrast, plaintiff contests that the off-duty defendants even identified themselves as officers, let alone issued a direct order to him in their official capacity. In sum, the Court is persuaded that, based on plaintiff's version of events, a constitutional violation occurred, and hence will proceed to the second stage of the qualified immunity inquiry.

The second step of the qualified immunity analysis is to determine whether "the [constitutional] right was clearly established." <u>Saucier</u>, 533 U.S. at 201. In <u>Saucier</u>, the Supreme Court indicated that "there is no doubt that <u>Graham v. Connor</u> . . . clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." <u>Id.</u> at 201-02. Furthermore, the Supreme Court held, the "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 202.

The relevant question, then, is whether it would be clear to reasonable officers that found themselves in the same situation as the off-duty officers did here that the conduct in question would be unlawful. Thus, the inquiry is as follows: would a reasonable off-duty officer, who had arguably consumed some alcohol,[3] believe it would be lawful to drag and handcuff a similarly-situated plaintiff across the nightclub, while pushing and hitting him from behind, and then drop him outside of the club after witnessing an altercation between that plaintiff and a bouncer? The Court does not believe so. According to plaintiff, the off-duty officers all admit that they "did not witness[] how the altercation between the bouncer and [plaintiff] began." Pl.'s Off-Duty Opp'n at 11. Accepting that, the Court cannot conclude that a reasonable off-duty officer would necessarily believe that it was lawful to intervene in the same fashion as these defendants did here, particularly since, it bears repeating, plaintiff insists that he was already pinned down by Persons. That factual account simply would not permit reasonable off-duty officers to conclude that plaintiff had committed a crime warranting their intervention, particularly with the degree of force that plaintiff alleges defendants employed here. On this record, the Court holds that the off-duty officers are not entitled to qualified immunity. Accordingly, defendants' motion on this aspect of Count I will be denied.

### 2. Count I: Due Process

The off-duty officers argue that plaintiff's due process claim against them fails because the

---

[3] Plaintiff's opposition briefing is replete with references to the alleged use of alcohol by the off-duty officers on the evening in question. Defendants, however, maintain that "[t]here is no record evidence, either direct or through inference, that [they] were in any way under the influence of alcohol." Defs' Phillips, Modlin & Schneider Reply at 5 n.1. It appears, however, that plaintiff has produced deposition testimony that does establish that the off-duty defendants consumed at least some alcohol over the course of the evening. Pl.'s Counter-Statement of Facts ¶ 3.

District of Columbia is "not a state" and thus the "proscriptions of the Fourteenth Amendment" -- in particular, the state action doctrine -- do not apply to it. Defs.' Phillips, Modlin & Schneider Mot. at 13. This is a bit of an odd assertion since plaintiff does not, in fact, necessarily base his due process claim on the Fourteenth Amendment. Plaintiff does allege generically that his right to "due process" has been violated by the off-duty officers' use of excessive force. Second Am. Compl. ¶ 58. But he does not specifically identify the Due Process Clause of the Fourteenth Amendment as the basis for his Section 1983 claim. At the same time, moreover, plaintiff states that the "Due Process aspect of his Section 1983 claim was excised from the Second Amended Complaint." Pl.'s Opp'n to Phillips, Modlin & Schneider's Mot. for Summ. J. (hereinafter "Pl.'s Off-Duty Opp'n") at 18 n. 9. Nonetheless, as noted above, there is still a reference to "due process" in the Second Amended Complaint in Paragraph 58. In any event, Mazloum's due process claim fails because the Supreme Court has indicated that a plaintiff must bring an unconstitutional excessive force claim under the Fourth Amendment rather than the Due Process Clause. Graham v. Connor, 490 U.S. 386, 395 (1989). Accordingly, the Court grants summary judgment to the off-duty officers on this aspect of the Section 1983 claim.

### 3. Count III: Section 1981 Claim & Count IV: DCHRA Claim

According to the off-duty officers, they are entitled to summary judgment on Count III because plaintiff's claim under 42 U.S.C. § 1981 fails to identify an "impaired contractual relationship under which the plaintiff has rights." Defs.' Phillips, Modlin & Schneider Mot. at 14. Such a relationship, the off-duty officers argue, is a prerequisite to recovery under Section 1981. Id. To support their assertion, the off-duty officers rely on Domino's, Inc. v. McDonald, 540 U.S. 470 (2006). Plaintiff responds that Section 1981 encompasses claims of unlawful

-13-

discrimination that do not arise solely out of contract, and that <u>Domino's</u> does not teach

otherwise.  Pl.'s Off-Duty Opp'n at 6-8.

This Court has explained that to state a claim for racial discrimination under Section

1981, a plaintiff "must allege that (1) the plaintiff is a member of a racial minority; (2) the

defendant intended to discriminate against the plaintiff on the basis of race; and (3) the

discrimination concerned an activity enumerated in § 1981." <u>Williams v. Fed. Nat'l Mortgage</u>

<u>Assoc.</u>, 2006 WL 1774252 at *4 (D.D.C. June 26, 2006).  The crux of defendants' argument on

Count III is that plaintiff cannot establish the third prong of this test because only racial

discrimination arising out of a contractual relationship is legally cognizable under Section 1981.

The off-duty officers maintain that the Supreme Court recently held precisely that in <u>Domino's</u>.

There, the plaintiff was the sole shareholder and employee of a corporation that entered into a

series of contracts with Domino's.  546 U.S. at 473.  Domino's, however, refused to perform

under those contracts, allegedly due to its racial animus towards plaintiff, an African-American.

<u>Id.</u>  Plaintiff then brought suit under Section 1981 alleging that "Domino's had broken its

contracts with [the corporation] because of racial animus towards" him, but he did so in his

<u>personal</u> capacity rather than on behalf of the corporation.  <u>Id.</u> at 474.  Rejecting plaintiff's

argument that he had a cause of action under Section 1981 "because he 'made and enforced

contracts' for [the corporation]," <u>id.</u> at 475, the Supreme Court held that "[a]ny claim brought

under § 1981 . . . must initially identify an impaired 'contractual relationship' . . . under which the

plaintiff has rights." <u>Id.</u> at 476.  The plaintiff failed to meet that threshold showing because

although his complaint did identify a contractual relationship -- the one between Domino's and

plaintiff's corporation -- under well-established principles of agency and corporations law, "the

shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." Id. at 477. Simply put, because the plaintiff in his personal capacity had no rights or liabilities under the contract, he lacked standing to sue for impairment of that contract under Section 1981. Id. at 479. Hence, Domino's does not require a contractual relationship for a Section 1981 claim, but only requires that where a contract is the basis of a Section 1981 claim, the plaintiff must have rights to assert under the contract.

In this case, the off-duty officers latch on to some of the broad language in Domino's to argue that the case precludes any claim under Section 1981 that does not involve a strict contractual relationship. Although it is true that some of the Supreme Court's statements could arguably be read to imply such a result, a close reading reveals that the Supreme Court's holding was limited to the "make and enforce" contracts clause of Section 1981. Because plaintiff's claim in this case arises out of the "full and equal benefit" clause of Section 1981, the Court concludes that a lack of contractual privity does not foreclose plaintiff's claim.[4]

At the outset, it is worth noting that the plaintiff in Domino's explicitly framed his claim in terms of the "make and enforce contracts" clause of the statute. 546 U.S. at 475 (establishing that plaintiff argued that he had a cause of action because he 'made and enforced contracts' for the corporation). Thus, the Supreme Court did not have occasion to discuss any other part of Section

---

[4] Section 1981 provides:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

1981, and in particular the opinion makes no reference to the "equal benefit" clause of the statute. As plaintiff correctly points out, other circuits have "maintained . . . allegations of overt acts of discrimination" that do not involve contractual relationships under Section 1981 by way of the "equal benefit" clause. Pl.'s Off-Duty Opp'n at 7. For instance, in Evans v. McKay, 869 F.2d 1341 (9th Cir. 1989), the Ninth Circuit sanctioned a discriminatory wrongful arrest claim under the equal benefit clause. In that case, the plaintiffs -- caucasians living on an Indian reservation -- alleged that the Tribal Council instigated a racially-motivated "arrest-boycott conspiracy" to drive plaintiffs from the Reservation. 869 F.2d at 1344. Despite the lack of a contractual relationship between the parties, the court held that the plaintiffs had sufficiently pled overt acts motivated by racial animus to sustain a claim under Section 1981. Id. at 1345. The Second Circuit, in a lengthy opinion addressing the history and purpose of the statute, reached the same conclusion. In Phillip v. Univ. of Rochester, 316 F.3d 291 (2d Cir. 2003), the plaintiffs alleged that they were wrongfully arrested by private university police officers on the basis of their race.[5] Id. at 293. The Second Circuit -- while discussing a series of cases from the Third and Sixth Circuits -- noted that the rights "'to make and enforce contracts' and to enjoy the 'full and equal benefit of all laws and proceedings for the security of persons'" were distinct from one another but equally important in the statutory scheme of Section 1981. Id. at 294, 297-98. The court then permitted the plaintiffs' claim to proceed under the equal benefit clause. Id. at 298. Finally, there is some authority in the D.C. Circuit that similarly suggests that Section 1981 claims may proceed under

---

[5] Indeed, in a list of claims that bears a large degree of similarity to those in the instant case, plaintiffs alleged: "false arrest and imprisonment, battery and excessive use of force, assault, malicious prosecution, intentional and negligent infliction of emotional distress, and violation of the equal benefit clause of Section 1981." Phillip, 316 F.3d at 293.

the equal benefit clause in the absence of a contractual relationship. See Banks v. Chesapeake & Potomac Tel. Co., 802 F.2d 1416, 1421 (D.C. Cir. 1986) ("Both § 1983 and § 1981 provide remedies for a broad range of actions that could be characterized as various state torts. . . . Section 1981, like § 1983, broadly protects the right of all persons 'to the full and equal benefit of all laws and proceedings for the security of persons and property.'") (emphasis added); see also Crawford-El v. Britton, 93 F.3d 813, 837 n. 12 (D.C. Cir. 1996), vacated on other grounds, 523 U.S. 574 (1998) (Silberman, J., concurring) ("In addition to § 1983, plaintiffs can sue officials for monetary relief under 42 U.S.C. § 1981 (1994) (civil action for denying persons the 'full and equal benefit of all laws and proceedings' guaranteeing security of persons and property) . . . .").

Against that backdrop, the operative question here is whether the Supreme Court intended Domino's to alter the structure of claims under the equal benefit clause. It is true that Domino's contains sweeping language that may be read to encompass the entire scope of Section 1981: "Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship' . . . under which the plaintiff has rights." 546 U.S. at 476; see also id. at 479 ("[W]e hold that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'"). Although language from a Supreme Court opinion is not to be cast aside lightly, this Court is not convinced that Domino's was intended to foreclose civil actions not arising out of contract. The issue simply was not presented. As noted above, Domino's is devoid of any reference to the equal benefit clause; on its own terms, the opinion deals exclusively with the "make and enforce contracts" clause. Indeed, the central issue of Domino's is most appropriately characterized as a contractual standing question concerning the threshold showing required under the "make and enforce" clause of

Section 1981. In sum, Domino's holds that an agent -- with no rights or liabilities under the contract -- who simply enters into a contract on behalf of the principal cannot then use that contract as the basis for a Section 1981 claim in the agent's personal capacity. Put another way, it is the principal's contractual discrimination claim, not the agent's.

But the Court fails to see how that logic would apply to the equal benefit clause. A claim involving the deprivation of the equal benefit of laws need not rely on a contractual obligation to create any rights: the applicable substantive law already performs that role. Moreover, if the Supreme Court had meant to preclude any claim under Section 1981 in the absence of a contract, including causes of action derived from the equal benefit clause, then surely the Court would have made at least a passing reference to the equal benefit clause and the body of authority it was displacing. But it did not, and this Court now concludes that plaintiff need not rely on a contractual relationship to proceed with his Section 1981 claim based on the equal benefit clause.

That does not necessarily mean, however, that plaintiff's Section 1981 equal benefit clause action survives summary judgment. The off-duty officers argue that plaintiff has failed to establish that they intended to discriminate against him on the basis of race.[6] Phillips, Modlin & Schneider Mot. at 14. According to the off-duty officers, plaintiff has neglected to establish that they even knew of his ethnicity beforehand, let alone that they were motivated to discriminate against him on the basis of that ethnicity. Id. In addition, the officers point out that there is no allegation or evidence demonstrating that Phillips, Modlin, or Schneider uttered any racial slurs or epithets. Id. Significantly, the off-duty officers point to plaintiff's deposition testimony where

---

[6] All parties to this action appear to concede that plaintiff established that he is a member of a racial minority.

he admitted that he "did not know" if the officers had "accosted him due to his Arab ethnicity" as proof that plaintiff has failed to carry his burden on this inquiry. Id. Plaintiff responds that the off-duty officers were "complicit in an apparently racially-motivated application of excessive force." Pl.'s Off-Duty Opp'n at 21. Needless to say, plaintiff's conclusory allegation is insufficient at the summary judgment stage. Plaintiff further maintains that he need only "point to 'some evidence establishing a reasonable inference' that the defendants' actions were racially motivated." Id. (quoting Clifton Terrace Assoc., Ltd. v. United Tech. Corp., 929 F.2d 714, 722 (D.C. Cir. 1991)). That may be correct, but plaintiff has failed to meet even that hurdle: he has produced no evidence (aside from mere allegation) that the off-duty officers were motivated by racial prejudice. Simply put, if plaintiff can survive summary judgment on this record, then any arrest involving a member of a racial minority group would give rise to a Section 1981 claim. The Court does not believe that the statute sweeps so broadly.

In the absence of direct evidence of discriminatory motives by the off-duty officers, plaintiff retreats to the bystander theory of liability in an attempt to survive summary judgment. Pl.'s Off-Duty Opp'n at 22. The elements of bystander liability are spelled out in Fernandors v. District of Columbia: an officer is liable under that theory if he "(1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." 382 F. Supp. 2d 63, 72 (D.D.C. 2005). Unfortunately, plaintiff's entire briefing on this point consists of a passing parenthetical reference, so the Court is not clear on the scope or basis of plaintiff's argument on this point. Nevertheless, plaintiff insinuates that the off-duty officers were aware that Ramirez was violating Mazloum's constitutional rights, had a reasonable opportunity to prevent that from occurring and chose not to so act.

For their part, the off-duty officers deny that plaintiff can satisfy any of the <u>Fernandors</u> criteria. Phillips, Modlin & Schneider Reply at 3. Most significantly, all three off-duty defendants testified in their depositions that they did not witness Ramirez refer to plaintiff as "Al-Qaeda" or employ any other ethnic slurs. Phillips, Modlin & Schneider Mot. Ex. 2 at 12; <u>id.</u> Ex. 3 at 14-15; <u>id.</u> Ex. 4 at 5. There is plainly a disputed issue of fact as between Ramirez and plaintiff over the use of discriminatory slurs; it is not apparent, however, that plaintiff has produced any direct evidence that contradicts the off-duty officers' assertions that they never overheard any such statements. On the other hand, plaintiff has maintained that he was struck by Ramirez and referred to as "Al-Qaeda" on two separate occasions. The first such incident occurred inside of the club, when all of the off-duty officers were present. Pl.'s Counter-Statement of Facts Ex. 1 at 9. The second occurred outside of the club, where the record is vague as to which, if any, of the off-duty officers -- aside from Ramirez -- were present. <u>Id.</u> at 11. This may indeed be sufficient evidence to support a permissible inference that the off-duty officers overheard the alleged racial slurs. Thus, the Court is faced with resolving this motion with the sworn deposition statements of the off-duty officers that they did not witness anyone employing any racial slurs on one side and the plaintiff's sworn statement that he was the victim of such epithets in the presence of those officers on the other. The very fact of framing the inquiry in this fashion suggests the proper resolution at this juncture. The Court cannot make such determinations on summary judgment. <u>See</u> <u>United States v. Project on Gov't Oversight</u>, 454 F.3d 306, 308 (D.C. Cir. 2006) (noting that a court must "eschew making credibility determinations or weighing the evidence" at the summary judgment phase). Accordingly, the off-duty officers'

motion for summary judgment on Count III will be denied.[7]

The analysis under Count IV, plaintiff's DCHRA claim, is largely duplicative of the Court's undertaking on plaintiff's Section 1981 claim. Indeed, in their briefing, the parties have not even separately addressed the claims of intentional discrimination. Plaintiff's claim against the off-duty officers under the DCHRA is based on DCHRA § 2-1402.31, which prohibits, among other things, racial discrimination in places of public accommodation. To sustain a claim of race discrimination under the DCHRA, plaintiff must prove "intentional discrimination, which may be shown by direct or indirect evidence." Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 86 (D.D.C. 2006). Thus, the analysis stated above with respect to direct evidence of race discrimination under Section 1981 is equally applicable here. Consequently, if plaintiff's claim survives under the DCHRA, it must do so on the basis of bystander liability. Although it makes some degree of intuitive sense to regard "bystander liability" as a type of "indirect evidence" of intentional discrimination under the DCHRA, plaintiff has pointed to no authority -- and the Court is aware of none -- that holds that bystander liability is a doctrine applicable to the DCHRA. Nevertheless, as explained in more detail below in Section B.3 of this Memorandum Opinion, the DCHRA is informed by developments in the federal civil rights statutes. To the extent that the District of Columbia recognizes bystander liability in that context, the Court finds that it is reasonable to hold that bystander liability also applies to DCHRA claims given the close relationship between that D.C. statute and its federal counterparts. Accordingly, for the reasons set forth above regarding bystander liability and plaintiff's Section 1981 claim, the off-duty

_____

[7] This conclusion will not foreclose the possibility that the evidence at trial will not, as a matter of law, support this claim. See Fed. R. Civ. P. 50.

officers' motion for summary judgment on Count IV will be denied.

### 4. Count II: Assault + Battery Claims

In Count II of his Second Amended Complaint, plaintiff asserts claims for assault and battery against the off-duty officers. Second Am. Compl. ¶ 65. In response, the off-duty officers make two principal arguments. First, they maintain that there is "no evidence that [they] had any improper contact with plaintiff." Defs.' Phillips, Modlin & Schneider Mot. at 15. Second, they argue that even if such contact occurred, "a police officer is privileged to use force" to make a lawful arrest "so long as the means employed are not in excess of those which [he] reasonably believes is necessary." Id. at 15-16. These defendants contend that they employed reasonable force, and hence they insist that their actions with respect to plaintiff were privileged and cannot form the basis of an assault and battery claim. The Court rejects these arguments.

In the District of Columbia, assault is "defined as an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." Etheredge v. Dist. of Columbia, 635 A.2d 908, 916 (D.C. 1993). A battery, meanwhile, "is an intentional act that causes a harmful or offensive bodily contact." Id. In this case, the off-duty officers argue that plaintiff has no evidence of improper contact by those officers because he cannot "specifically identify" the role that each defendant played in the assault and battery. Defs.' Phillips, Modlin & Schneider Mot. at 15. This argument is related to the contention rejected above in the context of the excessive force claim, see Simpkins, 108 F.3d at 369, and it is similarly without merit here. As plaintiff correctly points out, the off-duty officers have "themselves all admit[ted] that they grabbed [plaintiff] or made contact with him, albeit in different ways." Pl.'s Off-Duty Opp'n at 23 (emphasis in original).

-22-

Police officers in the District have a "qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary.'" Etheredge, 635 A.2d at 916 (quoting Jackson v. Dist. of Columbia, 412 A.2d 948, 956 (D.C. 1980)).  Where excessive force is employed, however, the qualified privilege is destroyed.  Smith v. Dist. of Columbia, 882 A.2d 778, 788 (D.C. 2005). Significantly, the D.C. Court of Appeals has noted the similarity between the privileged use of force defense in assault and battery claims and the excessive force analysis in Section 1983 claims.  Etheredge, 635 A.2d at 916.  In Etheredge, the D.C. Court of Appeals cited to Graham v. Connor as informing the privileged use of force analysis for assault and battery claims under District of Columbia common law.  Id.; see also Smith, 882 A.2d at 793 ("In light of our analysis of the evidence supporting [plaintiff's] battery claim . . . we hold that the trial court improperly granted appellee's motion for judgment as a matter of law regarding [plaintiff's] § 1983 claim."). This Court has already explained above why the off-duty officers are not entitled to summary judgment on the excessive force claim, and will not belabor the same point here with respect to assault and battery.  Suffice it to say, the record contains conflicting factual accounts of the incident that raise a material issue of fact with respect to whether the officers used excessive force in effecting plaintiff's arrest.  Thus, the off-duty officers' qualified privilege argument fails because there is no such privilege in a case involving excessive force, and the question whether there was excessive force employed in this case is one for the jury.  As the D.C. Court of Appeals put it, "[a]lthough [the officer] claimed that he believed that he and his partner were in danger, an impartial jury could rationally find that his belief was unreasonable under the circumstances." Etheredge, 635 A.2d at 917.  So, too, here: although the off-duty officers maintain that their

actions in this case were reasonable, on this record a rational jury could find otherwise. Hence, the off-duty officers' motion for summary judgment with respect to Count II will be denied.

### 5. Punitive Damages

Finally, the off-duty officers argue that plaintiff's claim "for punitive damages against these defendants must be dismissed with prejudice." Defs.' Phillips, Modlin & Schneider Mot. at 16. However, punitive damages is a remedy, not a freestanding ground for relief. See, e.g., Int'l Kitchen Exhaust Cleaning Ass'n v. Power Washers of N. America, 81 F. Supp. 2d 70, 74 (D.D.C. 2000). Indeed, plaintiff has not stated a "claim" for punitive damages, but merely requested punitive damages in his prayer for relief. See Second Am. Compl. at 23. In any event, because of the extensive factual disputes in this case regarding the excessive force and assault and battery claims, the Court is not prepared to say that punitive damages are not available as a matter of law.

## B. Defendant Ramirez's Motion for Partial Summary Judgment

The Second Amended Complaint asserts claims against defendant Ramirez in Counts I, II, III, IV, and VI. Ramirez has moved for partial summary judgment on Counts I, III, IV, and VI. For the reasons set forth below, the Court will grant in part and deny in part Ramirez's motion on Count IV, grant his motion on Counts I and VI, and deny his motion on Count III.

### 1. Count I: Due Process

For the reasons set forth in Part A.2 of this Memorandum Opinion, Ramirez's motion for summary judgment on the due process issue is hereby granted.

### 2. Count III: Section 1981

Ramirez maintains that plaintiff's Section 1981 claim fails due to a lack of a contractual

relationship between the parties.  Ramirez Mot. for Summ. J. (hereinafter "Ramirez Mot.") at 5.

As detailed above in Part A.3 of this Memorandum Opinion, the Court rejects this contention.

Because this is the only basis for Ramirez's motion for summary judgment on Count III, that

motion will be denied.

### 3. Count IV: DCHRA

Although it is not entirely clear from the briefing in this case, plaintiff has two distinct

claims under the DCHRA against Ramirez.  The first is a claim of intentional unlawful racial

discrimination in a place of public accommodation under DCHRA § 2-1402.31.  The second is an

interference claim under DCHRA § 2-1402.61(a).  The Court will address each in turn.

On the intentional discrimination claim, Ramirez argues that plaintiff cannot establish that

he was discriminated against on the basis of his race.  Ramirez Mot. at 6.  Ramirez maintains that

his alleged assault of plaintiff, coupled with the purported use of the term "Al-Qaeda," is

"insufficient to establish that [Ramirez] engaged in intentional discrimination."  Id.  In response,

plaintiff argues that Ramirez's position is "utterly incorrect as a matter of law," and insists that his

factual assertions that he was the victim of Ramirez's racial slurs and a racially-motivated beating

constitute an adequate basis for the DCHRA claim.  Pl.'s Ramirez Opp'n at 9-10.

In relevant part, DCHRA § 2-1402.31 bars unlawful discrimination in denying "full and

equal enjoyment of . . . accommodations of any place of public accommodations."  See DCHRA

§ 2-1402.31(1).  As noted above, to state a claim of race discrimination under the DCHRA,

plaintiff must prove "intentional discrimination, which may be shown by direct or indirect

evidence."  Lemmons, 431 F. Supp. 2d at 86.  Direct evidence of discrimination "is evidence that,

if believed by the fact finder, proves the particular fact in question without any need for

inference." Id. (quoting Davis v. Ashcroft, 355 F. Supp. 2d 330, 340 n.2 (D.D.C. 2005)

(emphasis in original)).  In particular, direct evidence "includes any statement or written

document showing a discriminatory motive on its face." Id. (emphasis in original).  With that

established, it is apparent that Ramirez's motion for summary judgment must be denied.

Ramirez's alleged "Al-Qaeda" statements demonstrate, on their face, a racial motivation in the

supposed beating of plaintiff; as Davis makes clear, this satisfies the DCHRA threshold.  Ramirez

contends that there is no proof that he "intervened [in] the incident with the intentional purpose of

discriminating against plaintiff." Ramirez Reply at 3.  But if employing racial slurs while

assaulting an individual in custody is insufficient to establish a race discrimination claim under

the DCHRA, it is difficult to imagine what would suffice.  Ramirez's motion with respect to the

intentional discrimination cause of action under the DCHRA will accordingly be denied.

 Plaintiff's second DCHRA claim against Ramirez is an interference cause of action under

DCHRA § 2-1402.61(a).  To establish such a claim, a plaintiff must prove that "(1) he engaged in

protected activity under the DCHRA, or opposed practices made unlawful under the DCHRA; (2)

he was subjected to adverse action; and (3) there is a causal nexus between the two." Mazloum,

442 F. Supp. 2d at 12 (citing Carter-Obayuwana v. Howard Univ., 764 A.2d 779, 790 (D.C.

2001)).  Here, Ramirez contends that plaintiff was not subject to any adverse action for purposes

of the DCHRA because Ramirez neither "tried to prevent [plaintiff] . . . from filing his

complaint," nor "retaliated against [plaintiff] because he filed a complaint."  Ramirez Mot. at 6.[8]

According to plaintiff, however, Ramirez did interfere with plaintiff's protected activity by

---

 [8] Plaintiff states that filing "a complaint with the MPD" is "clearly 'protected activity' as
defined by the statute," and that he has therefore satisfied the first element of an interference
claim. Pl.'s Ramirez Opp'n at 10.  Ramirez does not appear to contest this point.

creating "the conditions in which evidence (such as potentially critical video proof of what had

occurred) could (and would) be destroyed." Pl.'s Ramirez Opp'n at 11. Moreover, plaintiff insists

that because it is "difficult to gauge . . . what total impact this conspiratorial conduct had on

[plaintiff's] ability to obtain redress" it is therefore "more appropriate . . . that Ramirez show that

Plaintiff was *not* subject to adverse action." Id. (emphasis in original). To support that

contention, plaintiff cites to Sullivan v. Murphy, which held that the burden shifted "to the

defendant to come forward with pertinent evidence" because the defendant had "muddled the

evidence." Id. (quoting Sullivan, 478 F.2d 938, 970 (D.C. Cir. 1973)).

For his part, Ramirez responds that "plaintiff has confused the fact that he bears the

burden to prove his claim." Ramirez Reply at 4. In addition, Ramirez argues that Sullivan is

distinguishable from this case because in Sullivan the defendant had exclusive control of the

evidence in question, whereas here Ramirez was "*never* in possession or control of the alleged

video evidence." Id. at 4 (emphasis in original). The Court accepts Ramirez's characterization of

Sullivan but also notes an added complexity in this case that he has glossed over: although

Ramirez was not personally in control of the video evidence, plaintiff alleges that Ramirez in fact

conspired with the custodians of that tape to have it destroyed. Indeed, plaintiff has alleged

certain undisputed facts -- among them that Ramirez spoke with the FUR defendants about the

tape on the same day that he learned that plaintiff was filing a complaint (Pl.'s Ramirez Opp'n at

3) -- that may support an inference of conspiratorial conduct among the defendants. Moreover,

plaintiff has also established that defendant Fiorito indicated that the tape was "gone" on the very

same evening that the plaintiff arrived at the police station to file his report, two days before it

would have been automatically destroyed in the regular course of business. Id. Viewed in the

light most favorable to plaintiff, these facts raise a permissible inference that Ramirez conspired with the FUR defendants to destroy the evidence in order to frustrate plaintiff's ability to prosecute his police complaint.  The question remains whether that can provide the basis for an interference claim under the DCHRA.

Plaintiff presents a novel view of adverse action in this case.  In brief, his argument is that the possible destruction of the videotape has hindered his ability to succeed in his lawsuit arising from the incident.  Moreover, he also maintains that the loss of the video evidence has deprived him of the only "neutral, nonparty eye-witness" in this case.  Pl.'s Ramirez Opp'n at 11.  In his view, this constitutes adverse action for purposes of the DCHRA.  There is some force to plaintiff's argument in this regard.  Although this type of interference impedes plaintiff's ability to succeed in his lawsuit, rather than his police complaint (the protected activity itself), that should not necessarily preclude plaintiff's claim.  The D.C. Circuit has held that a "retaliatory act" need not be "related to [plaintiff's] employment" in the context of Title VII employment discrimination claims.  Rochon v. Gonzales, 438 F.3d 1211, 1213 (D.C. Cir. 2006).  The Supreme Court, moreover, recently stated that "the anti-retaliation provision [of Title VII] . . . is not limited to discriminatory actions that affect the terms and conditions of employment."  Burlington N. Ry. Co. v. White, 126 S. Ct. 2405, 2412-13 (2006).  The D.C. Court of Appeals has repeatedly noted that it looks to Title VII and the federal civil rights statutes for guidance in interpreting the DCHRA.  See, e.g., Daka, Inc. v. Breiner, 711 A.2d 86, 92 n.14 (D.C. 1998) ("This court has 'often looked to cases construing Title VII to aid us in construing the D.C. Human Rights Act.'") (quoting Atlantic Richfield Co. v. District of Columbia Commission on Human Rights, 515 A.2d 1095, 1103 n.6 (D.C. 1986)); Benefits Commc'n Corp. v. Klieforth, 642 A.2d 1299, 1301 (D.C.

1994) ("In interpreting [the DCHRA] we have generally looked to cases from the federal courts involving claims brought under the Civil Rights Act of 1964 for guidance and have adopted those precedents when appropriate."). Thus, Rochon and White are both instructive and suggest that adverse action actionable under the DCHRA does not necessarily have to be directly related to the protected activity.

On the other hand, plaintiff has offered no authority -- and the Court is aware of none -- supporting his proposition that destruction of evidence can provide the basis for a retaliation or interference claim. Moreover, plaintiff's claim to harm associated with the loss of the tape evidence is speculative, particularly since he has never had the opportunity to review the contents of the video itself.[9] Given the novel and questionable nature of plaintiff's adverse action theory on this point, including the entirely speculative assertion of injury, the Court is inclined to address this issue primarily in the context of the spoliation cause of action rather than under the DCHRA. The Court does not believe that this step will materially alter plaintiff's capacity to recover on the merits given the high degree of similarity between the two claims. Ramirez's motion for summary judgment on the interference claim under the DCHRA accordingly will be granted.[10]

---

[9] The FUR defendants, of course, maintain that the video would not have produced any probative evidence that would aid plaintiff's case. FUR Mot. at 16.

[10] Assuming that the Court did reach the final element of an interference claim -- a "causal nexus" between the adverse action and the protected activity -- the causation showing would be easily established in this case. It is not disputed that Ramirez placed calls to both the FUR defendants as well as his fellow officers after learning of plaintiff's intention to file a police report. Pl.'s Ramirez Opp'n at 11. Plaintiff has also produced testimony (albeit disputed) that the videotape was "gone" -- that is, destroyed -- as early as the evening that his complaint was filed with the MPD. Id. No elaborate theory of legal causation is required to link these two acts and viewed in the light most favorable to the nonmovant, a reasonable juror could conclude that Ramirez and the FUR defendants discussed disposing of the videotape.

### 4. Count VI: Aiding and Abetting Spoliation

In the District of Columbia, a cause of action for aiding and abetting requires proof of the following elements:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983).  Neither party has directly addressed the elements of aiding and abetting in the briefing.  Both parties focus instead on the components of a spoliation claim without any reference to how they relate to the aiding and abetting elements.  Be that as it may, Ramirez's main contentions here are that he had no duty to preserve the videotape evidence, he did not have the capacity to destroy the tape because it was not under his control, and plaintiff has failed to prove the requisite causal connection to establish the spoliation claim.  Ramirez Mot. at 7.  In response, plaintiff specifically incorporates the arguments contained in the spoliation section of his FUR opposition brief.  Pl.'s Ramirez Opp'n at 14.  Plaintiff maintains that he need only show that Ramirez "*played a role*" in the destruction of the evidence and that it is uncontested that Ramirez telephoned "FUR personnel . . . after [plaintiff] was seen at the police precinct station."  Id. at 15 (emphasis in original).  In light of the first requirement of an aiding and abetting claim -- that the party receiving aid must have performed an unlawful act -- it is the Court's view that resolution of this issue will turn on the outcome of the spoliation claim against the FUR defendants.  As detailed in Part E.3 of this Memorandum Opinion, because the Court grants summary judgment to the FUR defendants on that claim, it is likewise appropriate to do so here.  Ramirez's motion for summary judgment on the aiding and abetting spoliation claim will therefore be granted.

-30-

**C. Motion for Summary Judgment by Defendants Acosta and Smith**

This Court previously dismissed all of the claims against defendants Acosta and Smith, the on-duty officers, except for the DCHRA cause of action. <u>See</u> <u>Mazloum</u>, 442 F. Supp. 2d at 14. On April 17th, 2007, this Court denied summary judgment on that remaining claim based on the record as it then existed. <u>See</u> <u>Mazloum v. Dist. of Columbia</u>, 2007 WL 1141581 at *3 (D.D.C. April 17, 2007). Now that discovery has been completed, the on-duty officers bring a renewed motion for summary judgment on the DCHRA claim, which is now contained in Count IV of the Second Amended Complaint. For the reasons set forth below, the Court will grant summary judgment to defendants Acosta and Smith.

As previously explained, to state a prima facie claim for retaliation or interference under the DCHRA, "a plaintiff must allege that: (1) he engaged in activity protected under the DCHRA, or opposed practices made unlawful under the DCHRA; (2) he was subjected to adverse action; and (3) there is a causal nexus between the two." <u>Mazloum</u>, 442 F. Supp. 2d at 12. In addition, to demonstrate the requisite causal nexus, a plaintiff must prove that the defendant had "awareness" of the supposed protected activity. <u>Id.</u> at 12-13. In this case, defendants Acosta and Smith are entitled to summary judgment on Count IV because -- even assuming that plaintiff can satisfy the first two prongs of a valid DCHRA claim -- plaintiff has failed to carry his burden on the "causal nexus" element.

At the outset, the Court addresses plaintiff's contention that the "law of the case" doctrine precludes the renewed motion for summary judgment on this issue. <u>See</u> Pl.'s Opp'n to Defs.' Acosta & Smith Mot. for Summ. J. (hereinafter "Pl.'s Acosta & Smith Opp'n") at 6-7. According to plaintiff, because this motion represents the "*third* dispositive motion" challenging the

DCHRA claim, the Court should decline the opportunity to "re-open questions" that it has already decided.  Id. at 7 (emphasis in original).  Although plaintiff concedes that a party may renew a motion for summary judgment "as long as it is supported by new material," id. (quoting 11 James Wm. Moore et al., Moore's Federal Practice, § 56.10[7] (3d ed. 2006)), he maintains that the instant motion "offers no arguments or evidence that were not presented in [defendants'] last motion."  Id. at 8.  As Acosta and Smith point out, however, this motion is based on "new evidence following full discovery."  Defs.' Acosta & Smith Reply at 1.  While their original motion was based solely on plaintiff's discovery responses, this renewed motion is supported by additional deposition testimony from defendants Acosta and Smith themselves that is directly responsive to the disputed factual issues identified in this Court's prior Memorandum Opinion.  Id. at 1-2.  As such, the "law of the case" doctrine does not preclude the Court from deciding the motion now before it.  Kurth v. Dobricky, 487 A.2d 200, 225 (D.C. 1985) ("[A] renewed motion for summary judgment may only be granted, for example, when . . . depositions taken subsequent to the first motion materially expand the record so that '[t]he motion on which summary judgment [is] granted [is] not an identical motion.'") (quoting Brownfield v. Landon, 307 F.2d 389, 393 (D.C. Cir. 1962)); see also Weschsler v. Hunt Health Sys., Ltd., 198 F. Supp. 2d 508, 514 (S.D.N.Y. 2002) ("A party may renew its motion for summary judgment as long as it is supported by new material.").

On the merits, the on-duty officers begin by pointing out that plaintiff "voiced no complaint of discrimination" to them.  Defs'. Acosta & Smith Mot. for Summ. J. (hereinafter "Defs.' Acosta & Smith Mot.") at 7.  Moreover, they maintain that plaintiff did not disclose to them "any statements referencing his race, national origin or religion," nor did he inform them of

Officer Ramirez's alleged "Al-Qaeda" comments directed towards him. Id. Thus far, these are the same arguments made during the course of their first motion for summary judgment. In resolving that motion in favor of plaintiff, however, this Court indicated that the private conversation between Ramirez and the officers may have clued Acosta and Smith in to Ramirez's discriminatory conduct:

> From this evidence, one could reasonably infer that, during the course of Acosta's and Smith's conversation with Ramirez, they learned of plaintiff's perceived Muslim background and became aware that discriminatory police conduct might have occurred and that they further were aware that Mazloum's repeated requests to file a complaint on the heels of the incident encompassed a claim that Ramirez's conduct was discriminatory.

Mazloum, 2007 WL 1141571 at *3. That permissible inference, the Court reasoned, created a "genuine issue of material fact as to whether Acosta and Smith were aware that plaintiff's alleged request to file a police complaint encompassed opposition to discriminatory police conduct." Id.

Supported by new deposition evidence, Acosta and Smith argue that such an inference is now precluded by the record. In particular, they maintain that "[d]epositions produced no evidence that defendant Ramirez disclosed in this conversation with Officers Acosta and Smith any discriminatory conduct." Defs.' Acosta & Smith Mot. at 10. Significantly, Mr. Alkadi's deposition testimony revealed that he could not overhear the conversation between the two on-duty officers (Acosta and Smith) and Ramirez, and thus could not speculate as to the substance of that discussion. Id. at Ex. G. Both officers confirmed in their depositions that "they did not learn that night about any alleged discriminatory treatment by anyone of the plaintiff, whether based on race, national origin or religion." Id. at 10-11. Moreover, they state that they also never learned about the derogatory "Al-Qaeda" comments uttered by Ramirez. Id. at 11.

In response, plaintiff's principal argument is that it is "reasonable to infer that Ramirez,

whose virulent racist bias had just manifested itself in the form of racial epithets and physically violent acts, shared, or displayed, his animus toward Mazloum with his colleagues Acosta and Smith." Pl.'s Acosta & Smith Opp'n at 11.  But that inference is foreclosed by the uncontradicted deposition testimony of Acosta and Smith indicating that they were not so informed.  In the absence of competing evidence -- rather than mere assertions -- a juror would be forced to speculate to adopt plaintiff's version of the events.   As the D.C. Circuit has concluded, "[t]he possibility that a jury might speculate in the plaintiff's favor is insufficient to defeat summary judgment."  Haynes v. Williams, 392 F.3d 478, 485 (D.C. Cir. 2004).  Plaintiff has the burden to produce relevant evidence to create a material issue of fact on the causal nexus prong of his DCHRA claim, but he has failed to carry that burden here.  Thus, it is appropriate to grant summary judgment to defendants Acosta and Smith at this juncture.  Accordingly, Count IV will be dismissed with respect to defendants Acosta and Smith -- there are now no remaining claims against those two defendants.

**D. Motion for Summary Judgment by Defendant District of Columbia**

In his Second Amended Complaint, plaintiff lists three claims against the District of Columbia.  Count II asserts a claim against the District for assault and battery on the basis of respondeat superior.  In Count III, plaintiff alleges that the District engaged in unlawful race discrimination in violation of 42 U.S.C. § 1981.  Finally, in Count IV, plaintiff claims that the District violated the DCHRA.  The District has responded by filing a motion to dismiss all claims against it or, in the alternative, for summary judgment in its favor.  As detailed below, the Court will grant the District's motion on Count III but deny it in all other respects.

*1. Count III: Section 1981*

The Court can quickly dispose of the Section 1981 claim against the District.  Plaintiff concedes that he did not "intend to assert [a Section 1981] claim against the District, but inadvertently left in [his] Second Amended Complaint a reference to the District in Count III." Pl.'s Opp'n to Def. Dist. of Columbia's Mot. for Summ. J. (hereinafter "Pl.'s D.C. Opp'n") at 1 n.1. Accordingly, plaintiff has consented to the District's request for dismissal on Count III.  Id. Hence, plaintiff's claim in Count III concerning the District of Columbia will be dismissed.

*2. Counts II & IV and Section 12-309 Notice Requirement*

The District makes only one argument in favor of dismissal on Counts II and IV: that plaintiff failed to comply with the notice requirement of D.C. Code § 12-309 thereby precluding recovery against the District.[11]  Def. Dist. of Columbia Mot. to Dismiss (hereinafter "D.C. Mot. to Dismiss") at 13.  D.C. Code § 12-309 provides:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.  A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

D.C. Code § 12-309 (2001).  The purpose of this statutory provision, according to the D.C. Court of Appeals, is to "provide an early warning to District of Columbia officials regarding litigation

---

[11] Although the District concedes that there is no D.C. Court of Appeals case holding that Section 12-309 applies to claims under the DCHRA, the District points to two opinions from the Superior Court of the District of Columbia that have in fact reached that conclusion.  D.C. Mot. to Dismiss at 14-15.  Moreover, the District persuasively argues that because one of the chief purposes of Section 12-309 is to provide timely notice of "unliquidated damages" claims against the District, and such damages are authorized under the DCHRA, it is therefore logically appropriate to subject DCHRA claims to the demands of Section 12-309.  Id. at 15.  The Court agrees.  For his part, plaintiff does not appear to contest this point.

likely to occur in the future." Pitts v. Dist. of Columbia, 391 A.2d 803, 807 (D.C. 1978).

Moreover, Section 12-309 also serves to "permit the District to conduct an early investigation of

the facts and circumstances surrounding such claims." Id. Because the code provision is "in

derogation of the common law, it is to be strictly construed." Id. at 807. Nevertheless, the

content requirements of the notice given to the District -- apart from the act of notice itself -- "'are

to be interpreted liberally, and in close cases [courts are to] resolve doubts in favor of finding

compliance with the statute.'" Shaw v. Dist. of Columbia, 2006 WL 1274765 (D.D.C. May 8,

2006) (quoting Wharton v. District of Columbia, 666 A.2d 1227, 1230 (D.C. 1995)). Finally, a

police report "is an alternative form of notice added to 'take care of those instances in which

*actual notice* is had by the District of Columbia from the police department, although technical

notice may not have been filed by the person injured.'" Pitts, 391 A.2d at 808 (quoting Miller v.

Spencer, 330 A.2d 250, 252 (D.C. 1974) (emphasis in original)). Thus, the inquiry with respect

to a police report's capacity to satisfy Section 12-309's notice obligation is whether "the District

should have anticipated, as a consequence of receiving the police reports, that a complaint by

[plaintiff] would be forthcoming." Allen v. Dist. of Columbia, 533 A.2d 1259, 1262 (D.C. 1987).

Plaintiff maintains that his Citizen Complaint Report, filed the very day of the alleged

beating, satisfies Section 12-309. Pl.'s D.C. Opp'n at 4; see also Pl.'s D.C. Opp'n Ex. C. The

District dismisses the Citizen Complaint Report as a basis for satisfying the statute because it was

written by plaintiff himself and thus is not a "writing by the Metropolitan Police Department" as

required by the code. Def. Dist. of Columbia Reply (hereinafter "D.C. Reply") at 2. In this

limited sense, the District is correct. However, as a result of plaintiff delivering that complaint

report, the MPD completed a "Complaint Summary Sheet" to accompany plaintiff's report on

March 14, 2005, two days after the incident.  Id. Ex. D.  The Complaint Summary Sheet is, of

course, a writing by the MPD created during the regular course of business well within six

months of the incident.  In fact, precisely this combination of a Citizen Complaint Report coupled

with a Complaint Summary Sheet was held to satisfy Section 12-309 in Shaw v. District of

Columbia.  2006 WL 1274765 at *7 (D.D.C. May 8, 2006).

        Despite Shaw, the District maintains that the content of the Complaint Summary Sheet

could not have put the District on notice of "a possible Human Rights claim" because it "makes

no mention of Plaintiff's race or national origin."  D.C. Reply at 3.  At the outset, however, it

should be noted that even if the Court were to accept this argument -- which it does not -- the

argument would only be grounds to dismiss the DCHRA claim against the District.  The Court

does not take the District to contend that the Complaint Summary Sheet could not have put it on

notice of a potential assault and battery claim, nor could the District make a credible argument to

that effect given the content of the summary.  The Complaint Summary Sheet provides:

> C-1 stated while inside the FUR nightclub he was being held by one of the clubs
> [sic] bouncers.  Plain clothes MPD Officers approached C-1 and handcuffed him.
> C-1 said that the officers began punching him in the head.  C-1 was taken outside
> were [sic] officers banged his head against the ground and kicked him several
> times.  Uniformed officers arrived on the scene and switched handcuffs on the
> complainant.  The plain clothes returned inside the club.  C-1 requested that a
> report be taken by the uniformed officers.  Uniformed officers refused to take a
> report and advised C-1 that he would be arrested if a report was taken.  C-1 asked
> to be arrested and jumped in the back seat of the scout car.  The uniformed
> officers took C-1 out of the vehicle and threw him to the ground.  C-1 had a friend
> at the scene who took him to the hospital.

Pl.'s D.C. Opp'n Ex. D.  As the D.C. Court of Appeals has held, a police report satisfies Section

12-309 if it contains "information as to the time, place, cause and circumstances of injury or

damage with at least the same degree of specificity required of a written notice."  Allen, 533 A.2d

at 1262.  The Complaint Summary Report, on its face, contains all of the requisite information

with respect to a potential claim of assault and battery.

Whether the summary report also put the District on notice of a potential DCHRA claim is

a somewhat closer question.  The District is correct that the Complaint Summary Report, taken

alone, does not make "mention of Plaintiff's race or national origin," nor does it reference the "Al-

Qaeda" comments that Ramirez allegedly hurled at plaintiff.  D.C. Reply at 3.  The Complaint

Summary Report, however, should not be viewed in a vacuum.  To begin with, the Memorandum

of the MPD Office of Professional Responsibility report issued on June 6, 2006 contains

extensive factual findings regarding the incident in question, including references to the alleged

discriminatory comments made by Officer Ramirez.[12]  Pl.'s D.C. Opp'n Ex. C at 2.  This suggests

that the conjunction of the Citizen Complaint Report and the Complaint Summary Report did in

fact place the District on notice of Ramirez's racially-motivated comments that might give rise to

a DCHRA claim.  More importantly, however, plaintiff's Citizen Complaint Report on its face

describes the comments made to him by Officer Ramirez, comments that support the inference

that plaintiff's beating was racially motivated.  Id. Ex. A at 2.  As noted below, the District cannot

maintain that it lacked notice of this potential claim simply because the MPD neglected to include

this relevant information in the Complaint Summary Report.  Hence, the Court finds that the

---

[12] The District maintains that the Memorandum of the MPD Office of Professional
Responsibility is inapposite here because it was "not completed until nine months after" the
incident.  D.C. Reply at 2.  To begin with, however, it is not entirely clear from the face of the
statutory language whether the six-month requirement applies to police reports in addition to other
forms of notice under Section 12-309.  In any event, even if this Memorandum is not legal notice
for the purposes of the statute, it is still instructive in that it demonstrates that the notice that the
MPD had that did fall within the six-month window -- mainly the Citizen Complaint Report and
the Complaint Summary Report -- was adequate enough to allow a thorough investigation of the
incident in question.

District was on sufficient notice of a potential DCHRA claim.

The District's additional argument that the summary sheet is inadequate because it does not list the "specific officers involved . . . and, therefore, [did not] put the District on notice to investigate for a possible lawsuit," D.C. Reply at 3, borders on frivolous.  To begin with, plaintiff provided the name of at least one officer -- Officer Ramirez -- in his Citizen Complaint Report, yet that information failed to make it into the Complaint Summary Sheet through no fault of the plaintiff.  See Pl.'s D.C. Opp'n Ex. C.  To suggest that the District may escape notice for the purposes of Section 12-309 because the MPD -- intentionally or through oversight -- neglected to include in its police report relevant information that was available to it at the time would indeed be a perverse result.  Moreover, at the time, plaintiff did not know the names of the other officers involved in the incident, although such information was readily available to the MPD upon cursory investigation.  In any event, the Complaint Summary Sheet rather plainly spells out allegations of police misconduct, the type that are frequently the basis for assault and battery lawsuits.  In Shaw, this Court noted that a police report that detailed an alleged unprovoked and unwarranted beating of the plaintiff by police officers was sufficient to put the District on notice of the possibility of a lawsuit against it.  2006 WL 1274765 at *8 ("The facts relayed by Plaintiff in the applicable police report reflect a quintessential basis upon which claims of . . . common law assault and battery . . . are typically asserted against the acting police officers . . . .").  So too here.

In this case, the Complaint Summary Sheet provides the "District with the details necessary for it to go directly to the governmental departments involved in the injuring event and receive additional information about the basis for the claim."  Allen, 533 A.2d at 1264.  In short,

plaintiff's allegations as listed in the summary sheet -- even without the names of any particular officers -- are sufficient to allow the District to "anticipate[] . . . that a complaint by [plaintiff] would be forthcoming."  Id. at 1262; see also Bowers-Bunce v. Dist. of Columbia, 497 F. Supp. 2d 146, 161-62 (D.D.C. 2007) (holding that a MPD incident report that described a prisoner's suicide while in MPD custody was adequate notice for the purposes of Section 12-309).  This is particularly true in light of the D.C. Court of Appeals policy to interpret the content of a notification under Section 12-309 liberally.  See Wharton, 666 A.2d at 1230; see also Shaw, 2006 WL 1274765 at *7 ("Requiring a police report such as the Citizen Complaint Report, written by a layperson . . . and the accompanying Complaint Summary Sheet, drafted by 'Lt. Munk' of the MPD, also a non-attorney . . . to specifically set forth complex causes-of-action would obviate the general rule that '[t]he content requirements of any notice under § 12-309 are to be interpreted liberally.'").

Finally, the District insists that even if adequate notice was given regarding the content of the notification, plaintiff has still failed to satisfy Section 12-309 because he did not forward the Complaint Summary Sheet to the Mayor within six months of his injury.  D.C. Reply at 4.  According to the District, there is "nothing in the statute that states that the police report or document does not have to be sent to the Mayor."  Id.  The Court disagrees.  To the contrary, in fact, there is nothing in the statute that suggests that the police report does have to be sent to the Mayor.  As a purely textual matter, the statutory language indicates that the requirement that notice be sent to the Mayor applies only to notice sent by means other than a police report.  The second sentence of Section 12-309 states that a police report is "sufficient notice" without any mention of a duty to send such a report to the Mayor.  See D.C. Code § 12-309.  Moreover, this

interpretation is consistent with the purpose of the statute as elucidated by the D.C. Court of Appeals. In Allen, the D.C. Court of Appeals made clear that the police report is an "alternative form of notice . . . to 'take care of those instance in which *actual notice* is had by the District of Columbia from the police department, although technical notice may not have been filed by the person injured.'" 391 A.2d at 808 (quoting Miller, 330 A.2d at 252) (emphasis in original). Indeed, that passage from Allen expressly indicates that a police report satisfies Section 12-309 even when the person injured has not filed "technical notice" with the Mayor. To hold otherwise would effectively reduce the police report component of Section 12-309 to mere surplusage as it would serve no independent purpose apart from the "technical notice" aspect of Section 12-309.

Although the District admits that there is no direct authority to support its contention, it maintains that the D.C. Court of Appeals "has consistently held that notice to subordinate officials does not take the place of written notice to the Mayor." D.C. Reply at 4. Two of the cases cited by the District on this final point, however, are distinguishable on the grounds that they do not involve police reports issued by the MPD but rather "technical notice" given by putative plaintiffs to the Mayor's subordinates. Id. at 4-5; see also Hunter v. Dist. of Columbia, 943 F.2d 69, 73 (D.C. Cir. 1991) ("The District Court record . . . does not contain any police report or, for that matter, any reason -- other than [plaintiff's] allegation that he was arrested -- to believe that one exists."); Brown v. Dist. of Columbia, 251 F. Supp. 2d 152, 165 (D.D.C. 2003) ("Plaintiff does not state that she satisfied the alternative prong of the exhaustion requirement by filing a 'police report.'"). In fact, Brown contains language that undermines the District's argument: "[T]wo types of notice can satisfy the requirements of Section 12-309 . . . written notice to the Mayor of the District of Columbia or . . . a police report prepared in the regular

-41-

course of duty." 251 F. Supp. 2d at 165. The use of the disjunctive strongly suggests that the Brown court did not believe that a police report also needed to be sent to the Mayor. Finally, the District curiously cites to Pitts to support its argument. D.C. Reply at 5. Because Pitts, in fact, held that the police "Report of Investigation" in question satisfied Section 12-309, and there is no indication in the opinion that the plaintiff filed that report directly with the Mayor, the Court fails to see how this cuts in favor of the District's position.

On this record, then, the Court holds that the Complaint Summary Sheet meets the requirements of Section 12-309. Moreover, it need not have been independently forwarded to the Mayor by plaintiff. Hence, the District's motion to dismiss, and in the alternative for summary judgment, will be denied with respect to Counts II and IV.

**E. Motion for Summary Judgment by the FUR Defendants**

Finally, the Second Amendment spells out various claims against the FUR defendants in Counts II, IV, and V. The FUR defendants now move for summary judgment on all three Counts. For the reasons set forth below, the Court will grant their motion on Counts IV and V but deny their motion on Count II.

*1. Count II: Assault + Battery Claim*

In Count II, plaintiff asserts a claim of assault and battery against Persons as well as FUR, as Persons's employer, under the doctrine of respondeat superior. Second Am. Compl. ¶¶ 65, 71. The FUR defendants request summary judgment on this issue because, they argue, Persons "as a matter of law . . . reasonably acted in self-defense against Plaintiff." FUR Mot. at 22. For the reasons set forth below, the Court disagrees and will therefore deny the motion as to Count II.

As an initial matter, the FUR defendants do not deny that Persons "grabbed" plaintiff first;

-42-

instead, they maintain that Persons was privileged to do so in self-defense.  FUR Mot. at 23.  In

the District of Columbia, self-defense justifies "any person . . . in using reasonable force to repel

an actual assault, or if he reasonably believes he is in danger of bodily harm.'" Etheredge, 635

A.2d at 917 (quoting Johnson v. Jackson, 178 A.2d 327, 328 (D.C. 1962)).  According to the

FUR defendants, Persons had twice requested that plaintiff leave the stage earlier in the evening

and both times plaintiff responded with "nasty comment[s]" and appeared "agitated."  FUR Mot.

at 23.  Upon the third time that Persons saw plaintiff on stage and asked him to leave the area,

plaintiff again was "very agitated" and this time "stopped moving" and "turned around to Mr.

Persons, and raised his hands against Mr. Persons." Id.  At this point, the FUR defendants argue,

Persons reasonably believed that "Plaintiff was about to strike him due to the agitation Plaintiff

had expressed coupled with his aggressive hand movements" and thus "grabbed Plaintiff's hands

in self-defense and told him to calm down." Id.

It should come as no surprise that plaintiff disputes this account.  Plaintiff first insists that

he was never warned that evening to leave the stage.  Pl.'s Opp'n to FUR Mot. for Summ. J.

(hereinafter "Pl.'s FUR Opp'n") at 9-10.  Indeed, as plaintiff tells it, he was descending from the

stage area when Persons grabbed him from behind in an unprovoked and surely unexpected

assault. Id.  Plaintiff also maintains that, in addition to his own deposition testimony to that

effect, two other witnesses confirm his account of the incident. Id. at 10.  While evidently

conceding that this sort of dispute does not normally lend itself to summary disposition, the FUR

defendants nevertheless insist that in this "rather unusual setting" summary judgment is

appropriate.  FUR Reply at 27.  Indeed, the FUR defendants effectively base their entire argument

on this point on the contention that plaintiff's version of the events is "too incredible to be

accepted by reasonable minds." Id. at 26.  The Court simply cannot agree with that contention in this summary judgment context.

    With Persons's assault conceded, resolution of this Count will turn on the force of the self-defense argument made by the FUR defendants.  Self-defense is an inherently fact-bound inquiry that often turns on context to determine whether a defendant's actions were "reasonable" given the circumstances.  Where, as here, those circumstances are vigorously disputed -- and, indeed, virtually all witnesses to the events are interested in the outcome of the litigation to some degree -- the decision will turn predominantly on credibility determinations.  Plaintiff persuasively argues that credibility determinations are the province of the jury, not this Court on a motion for summary judgment.  Pl.'s FUR Opp'n at 1 (quoting Project on Government Oversight, 454 F.3d at 308 ("Where, as here, [a] case turns on controverted facts and the credibility of witnesses, the case is peculiarly one for the jury.")).  The Court is satisfied that a rational jury could find for the plaintiff on this hotly disputed factual record; accordingly, the FUR defendants' motion for summary judgment on Count II must be denied.

    *2. Count IV: DCHRA*

    In Count IV, plaintiff brings suit against the FUR defendants alleging unlawful retaliation under DCHRA § 2-1402.61.  Second Am. Compl. ¶¶ 79-80.  As explained earlier, to state a retaliation or interference claim a plaintiff must show that: "(1) he engaged in protected activity under the DCHRA, or opposed practices made unlawful under the DCHRA; (2) he was subjected to adverse action; and (3) there is a causal nexus between the two."  Mazloum, 442 F. Supp. 2d at 13.  The FUR defendants insist that plaintiff has failed to carry his burden on the adverse action element.  FUR Reply at 20.  Plaintiff responds with two principal arguments in support of his

interference claim.  First, he states that the threats directed at Alkadi during his meeting with the FUR defendants following the filing of plaintiff's police report constitute actionable adverse action.  Pl.'s FUR Opp'n at 23.  Second, plaintiff argues that the alleged destruction of the videotape evidence is also legally sufficient adverse action.  Id.  The Court rejects the latter argument for the reasons set forth in Part B.3 of this Memorandum Opinion.  The Court now turns to plaintiff's contentions concerning the so-called "threats."

Plaintiff maintains that Alkadi (and plaintiff by association) was "directly threatened and warned not to proceed with the complaint."  Pl.'s FUR Opp'n at 23.  At the meeting in question, defendant Fiorito cautioned that plaintiff could be prosecuted for making false statements to the police.  Id. at 24.  Moreover, he also stated that plaintiff "would be burned" if he proceeded with his complaint and then added that any videotape evidence from the prior evening was already "gone."  Id.  These facts, according to plaintiff, indicate that the FUR defendants aimed "to intimidate [plaintiff] from proceeding with the investigation," and thus rise to adverse action under the DCHRA.  Id.  The Court disagrees.  As the FUR defendants correctly point out, to establish adverse action in the retaliation context, the applicable action must be able to "conceivably dissuade a reasonable worker from making or supporting a charge of discrimination."  Prince v. Rice, 453 F. Supp. 2d 14, 28 (D.D.C. 2006).  More importantly, the action must "constitute an 'objectively tangible harm,'" such as a demotion or reassignment of duties.  Id. (quoting Brown v. Snow, 407 F. Supp. 2d 61, 65 (D.D.C. 2005)).  Drawing once again from the federal statutory context, the Court believes that the same requirement of "tangible harm" is equally applicable in DCHRA interference claims as in employment retaliation cases.  As such, plaintiff's DCHRA claim falters because he cannot demonstrate any tangible harm

arising <u>solely</u> from the alleged threats made to Alkadi.[13]  Plaintiff has failed to carry his burden on

his DCHRA claim and accordingly the Court will grant summary judgment to the FUR

defendants on Count IV.

### 3. Count V: Spoliation

This brings us to the last issue.  In Count V plaintiff accuses the FUR defendants of

reckless or negligent spoliation of evidence in violation of prevailing District of Columbia law.

Second Am. Compl. ¶ 87.  In particular, plaintiff alleges that the FUR defendants had a legal duty

to preserve the videotape evidence from the club's video surveillance system.  <u>Id.</u> ¶ 88.

According to plaintiff, the destruction of this evidence has hindered his ability "to prove the

allegations of his civil claim" because the tape "constituted incontrovertible proof of what had

occurred both within and outside of the Nightclub."  <u>Id.</u> ¶ 89.  Instead of relying on such

evidence, plaintiff maintains, he is now forced to "rely on the testimony of eye witnesses and can

expect opposing witnesses to present contrary testimony."  <u>Id.</u>  The District of Columbia

recognizes as independent tort for reckless or negligent spoliation of evidence.  <u>Holmes v.</u>

<u>Amerex Rent-A-Car</u>, 294 F.3d 294, 297 (D.C. Cir. 1999).  The elements of that cause of action

are as follows:

> (1) [E]xistence of a potential civil action; (2) a legal or contractual duty to preserve
> evidence which is relevant to that action; (3) destruction of that evidence by the duty-
> bound defendant; (4) significant impairment in the ability to prove the potential civil
> action; (5) a proximate relationship between the impairment of the underlying suit

---

[13] Plaintiff notes that Alkadi was dismissed from further party promoter jobs because of his involvement in the incident with plaintiff. Pl.'s FUR Opp'n at 24.  The FUR defendants maintain that Alkadi was fired for making misrepresentations to the police rather than his mere association with plaintiff.  FUR Reply at 21.  In any event, this fact alone cannot constitute adverse action against <u>plaintiff</u> because any tangible harm present flowed to Alkadi rather than plaintiff himself.

and the unavailability of the destroyed evidence; (6) a significant possibility of success of the potential civil action if the evidence were available; and (7) damages adjusted for the estimated likelihood of success in the potential civil action.

Id.  The FUR defendants, for their part, argue that plaintiff cannot satisfy any of those seven elements in this case.

The parties have produced voluminous filings regarding the spoliation claim, which feature a vigorous debate over what the video cameras may have captured (or not captured) that evening.  The Court need not reach those issues, however, because even assuming that plaintiff can satisfy all the other requirements for a spoliation of evidence cause of action, the Court concludes that he cannot prevail on the second prong of the inquiry.  In other words, plaintiff cannot establish on this record that defendant had any duty to preserve the videotape in question.

Plaintiff makes two principal arguments that the FUR defendants did in fact have such a duty.  The first is that a "special relationship" gave rise to a duty to preserve in this case because the FUR defendants offered to permit MPD officials to review and copy the tape.  Pl.'s FUR Opp'n at 17.  Plaintiff's second point is drawn from District of Columbia adverse inference authority that he claims points to the existence of a special duty to preserve evidence within a party's "exclusive control."  Id. at 18.  The Court is not persuaded on either count.  The D.C. Court of Appeals has explained that "[t]here is no general duty in the common law to preserve evidence in a third-party spoliation situation."  Holmes v. Amerex Rent-A-Car, 710 A.2d 846, 849 (D.C. 1998).  Hence, "[f]or a spoliation claim to succeed in negligence . . . the plaintiff must establish the existence of such a 'special relationship' that creates a duty to preserve the evidence for use in the future litigation."  Id.  That duty can arise by "'agreement, contract, statute, or other special circumstance.'" Id. (quoting Koplin v. Rosel Well Perforators, 734 P.2d 1177, 1179 (Kan.

1987)).[14]

To begin with, the Court does not believe that Callahan v. Stanley Works, 703 A.2d 1014 (N.J. Sup. Ct. 1997), cited by plaintiff, is on point here. Plaintiff argues that Callahan stands for the proposition that "special circumstances" can impose a duty to preserve evidence when a party takes steps to preserve that evidence following an incident. Pl.'s FUR Opp'n at 17. In this case, plaintiff contends that because FUR offered to allow MPD officials to "view and copy, if necessary, the video recordings," it therefore demonstrated a "willingness to preserve the video recordings." Id. But FUR's offer on its face does not indicate that the nightclub intended to preserve anything; indeed, it expressly contemplated a situation where the MPD itself -- and not FUR -- would have an opportunity to preserve the videotape. Moreover, this offer is not the sort of affirmative step towards preservation exhibited in Callahan. There, the third party "placed an evidence tag on the subject [evidence] shortly after the accident and put it away." Callahan, 703 A.2d at 1016. Thus, the party in question affirmatively marked the item as evidence and took steps to store it for safe-keeping -- thereby, it incurred "gratuitously . . . a duty to preserve the [evidence] and failed to perform that duty." Id. at 1018. Here, in contrast, the FUR defendants performed neither task. FUR's mere offer to exhibit the videotape to the MPD officials is insufficient to establish a duty to preserve that videotape for the plaintiff.

The Court is also not persuaded by plaintiff's argument based on District of Columbia authority concerning adverse inference instructions. In Holmes, the D.C. Court of Appeals explained that in cases "where a defendant negligently or recklessly destroy[s] evidence needed

---

[14] In this case, it does not appear that plaintiff maintains that the FUR defendants had any duty to preserve the videotape imposed by way of statute or contract. Instead, his argument is based on the existence of a "special circumstance."

by the plaintiff in a civil suit between the two parties . . . 'a fact-finder may be permitted to draw an adverse inference from the failure of a party to preserve evidence within his exclusive control.'" 710 A.2d at 848 (quoting Williams v. Washington Hospital Center, 601 A.2d 28, 31 (D.C. 1991)).  Plaintiff also cites to Battocchi v. Washington Hospital Center, 581 A.2d 759 (D.C. 1990), for the proposition that "the fact-finder is permitted to draw an adverse inference . . . where destruction of evidence is beneficial to the spoliating party."  Pl.'s FUR Opp'n at 18.  Based on these cases, plaintiff argues that a "special relationship" exists in this case that imposed a duty on the FUR defendants to preserve the videotape evidence.  Plaintiff overstates this authority, however.  Battocchi and the other cases cited by plaintiff apply to adverse inference instructions rather than spoliation claims.  To permit an adverse inference instruction does not necessarily imply that a party incurred a legal duty to preserve evidence in the tort sense.  The Court offers no opinion on whether the facts put forth by plaintiff would justify an adverse inference instruction in this case, but concludes only that they are not sufficient to establish a legal duty to preserve evidence for purposes of a spoliation cause of action.  Plaintiff points to no authority in the District or otherwise to support his contention that mere exclusive control of evidence can establish a duty to preserve it for purposes of a spoliation claim.  Accordingly, the FUR defendants' motion for summary judgment on Count V will be granted.[15]

## CONCLUSION

---

[15] Plaintiff also invites this Court to "ignore entirely the obligation to establish a duty to preserve" and hold, as "[s]everal jurisdictions" evidently have, that in cases of intentional destruction of evidence, the duty to preserve is "assumed."  Pl.'s FUR Opp'n at n.6.  The Court declines this invitation.  Although other jurisdictions may recognize a separate cause of action for intentional destruction of evidence, plaintiff has not demonstrated that the District of Columbia does so.

For the foregoing reasons, the Court will take the following actions: (1) the off-duty officers' motion will be granted in part and denied in part with respect to Count I, and denied with respect to Counts II, III, and IV; (2) Ramirez's motion will be granted in part and denied in part on Count IV, granted with respect to Counts I and VI, and denied with respect to Count III; (3) the on-duty officers' motion on Count IV will be granted and the action is hereby dismissed in its entirety with respect to them; (4) the District's motion will be granted with respect to Count III and denied with respect to Counts II and IV; and (5) the FUR defendants' motion will be granted with respect to Counts IV and V and denied with respect to Count II.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:    November 6, 2007