UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMILE MAZLOUM, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DISTRICT OF COLUMBIA, *et al.*, ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. 1:06 CV 00002 <br> (JDB) |

## PLAINTIFF'S MOTION *IN LIMINE* TO REOPEN DISCOVERY FOR THE PURPOSE OF DEPOSING MR. DIEGO SEQUEIRA

Plaintiff Emile Mazloum ("Mazloum"), by his undersigned counsel, for his motion *in limine* seeking to reopen discovery for the limited purpose of deposing a single witness of the FUR Defendants[1], Mr. Diego Sequeira, respectfully states as follows:

### PRELIMINARY STATEMENT

In support of their summary judgment motion earlier this year, the FUR Defendants offered a declaration from a previously-unidentified witness, Diego Sequeira, general manager of the FUR Nightclub. Mr. Sequeira appears to have detailed knowledge of the (allegedly) variable positioning of FUR's security camera system, and offered his testimony as to whether the cameras would have picked up the events of March 12, 2005. *See* "Certificate" of Diego Sequeira, a true copy of which is attached as Exhibit A. Such testimony bears directly on the Plaintiff's allegations that FUR (in

---

[1] The term "FUR Defendants" refers to remaining defendants Night and Day Management, LLC ("FUR Nightclub") and Michael Persons.

1

concert with Officer Ramirez) allowed the recorded video images from that night to be destroyed. Mr. Sequeira was never identified in FUR's discovery responses as an individual with such specialized knowledge of the camera system, nor was he designated as FUR's 30(b)(6) "expert" on the camera system, and accordingly his deposition was not noticed during the discovery period. Plaintiff was thus very surprised to learn this past July just how much Mr. Sequeira evidently "knows" about the camera system.

To date, and despite Plaintiff's repeated requests, FUR has refused to make Mr. Sequeira available for deposition, on the grounds that dismissal of the spoliation claim renders the issue of the cameras in the lawsuit moot. But D.C. law permits the Plaintiff to seek an adverse inference at trial that the destroyed video evidence would have helped his case and/or harmed the Defendants -- regardless of whether a party has a spoliation cause of action. Mr. Sequeira's testimony is necessary to evaluate and prepare for FUR's likely attempt to rebut this inference. Accordingly, his deposition should be compelled to occur in December.[2]

## STATEMENT OF FACTS

As this Court is well aware, the FUR Defendants and Plaintiff greatly disagree, to put it mildly, whether FUR's security camera system would have captured certain aspects of the battery Plaintiff alleges he suffered on March 12, 2005 both inside and outside of the FUR Nightclub. Plaintiff's assertions about the camera system and what it would have captured are not mere conjecture but are instead based on (i) review by attorneys of the camera system during a Rule 34(a)(2) inspection of the FUR premises July 2006, (ii) images captured during that review, (iii)

---

[2] Plaintiff will withdraw its motion if the FUR Defendants represent that they will not (i) call Sequeira as a witness at trial, (ii) make any use of his declaration at trial, or otherwise (iii) make arguments through other witnesses contained in the declaration about adjustments in camera positioning.

independent video evidence taken by a third party in January 2006[3], and (iv) testimony of FUR's witnesses – and, in particular, its specifically-designated 30(b)(6) representative on these matters, Mr. David McLeod (FUR's head of security). *See generally* Plaintiff's Brief in Opposition to the FUR Defendants' Summary Judgment Motion, dated June 29, 2007 (Docket No. 123); Plaintiff's Omnibus Counter-Statement of Facts, dated June 29, 2007 (Docket No. 126)(the "Counter-Statement"); and Plaintiff's Sur-Reply in Further Opposition to the FUR Defendants' Summary Judgment Motion, dated July 27, 2007 (Docket No. 136).

It is undisputed that the "tape," or saved video images, of what the security cameras captured on March 12th no longer exists. Counter-Statement at ¶¶ 63-66. Discovery revealed that the saved images recorded by the cameras would be overwritten from where they were archived, on a computer hard drive, every five days. However, there is evidence as well that FUR knew, the very same day the images were recorded, that these same images might have captured the incident. *Id.* Moreover, there is ample evidence in the record that Ramirez immediately alerted FUR personnel (in particular, John Fiorito, a FUR co-owner and former MPD officer) when Mazloum complained of the incident at a precinct station, and that Fiorito told a third party (Imad Alkadi) that the images in question were "gone" - *the very next night.* Several witnesses (in particular, Fiorito and McLeod) have further admitted that they reviewed the tapes that very day (allegedly even offering to make them available

---

3 In the course of discovery, Plaintiff learned of the existence of Mr. Skip Coburn, a private citizen unaffiliated with the MPD who takes an inordinate interest in police internal affairs and frequently acts on his own to support the MPD's efforts. He conducted an independent, personal investigation into the entire Mazloum incident in 2005 and 2006, going so far as to take "statements" from some of the relevant parties – all with the goal of exonerating Officer Ramirez. When Mr. Coburn learned that Plaintiff had filed this lawsuit in January 2006 and had specifically alleged that the video evidence of the incident had been destroyed, he immediately went to the FUR Nightclub himself and made his own video record of what the cameras could show internally during operating hours congruent with the time Mazloum was beaten (*i.e.,* between one and two a.m.). *See* images from January 22, 2006 video, a true copy of which is attached as Exhibit B; excerpts from the September 11, 2006 deposition of Skip Coburn, true copies of which are attached as Exhibit C, at 145:7 – 155:19. Coburn testified that these images were recorded directly from the FUR security camera system. As the image reveals, the "stage" area of the Nightclub and much of the path leading to the stairs arising out of the dance floor toward the Nightclub's entrance are plainly visible.

to the MPD upon request). Counter-Statement at ¶¶ 58, 65. These are the factual bases for Plaintiff's assertion that the video evidence was destroyed as a result of a conspiracy between FUR and Ramirez aiming to eliminate proof of what had actually occurred in order to protect the potentially culpable parties.

In attempting to undermine this argument as marshaled in support of Plaintiff's spoliation claim, FUR attached to its reply in support of its summary judgment motion a declaration from Mr. Sequeira. *See* Exhibit A. In that declaration, Mr. Sequeira reveals intimate knowledge of the camera system – and makes a new factual assertion, regarding FUR's practices of rotating or repositioning cameras within the club during business hours, never before made by any other FUR witness.

Plaintiff was shocked to learn, post-discovery, that Mr. Sequeira had such intimate and specific knowledge of the camera system. FUR had never previously provided in its discovery responses so specific an explanation for why the cameras allegedly did not capture the Mazloum beating. More significantly, FUR never identified Mr. Sequeira as a person with such specific knowledge of the workings of its security cameras in any of its discovery responses (*See* Exhibit B to Plaintiff's Sur-Reply). And in response to Plaintiff's 30(b)(6) deposition notice seeking a FUR witness with knowledge of the security camera systems, it produced only a single witness, Mr. McLeod, as its camera system "expert," and he made no mention of such facts despite the opportunity to do so in his testimony. *See* Plaintiff's Sur-Reply at 4. Had he been disclosed properly during discovery, Plaintiff would unquestionably have deposed Mr. Sequeira.

In light of the above, Plaintiff's counsel contacted FUR's counsel at the very beginning of the fall, informing him that there might be a need to take the deposition of Mr. Sequeira and asking that a date in the following three months be reserved for that purpose. *See* August 31, 2007 e-mail, a true

copy of which is attached as Exhibit D. Plaintiff received no response. A month later, Plaintiff renewed his request to be permitted to depose Mr. Sequeira if circumstances required. *See* October 15, 2007 letter, a true copy of which is attached as Exhibit E. This time, FUR's counsel indicated that they would produce Mr. Sequeira only in the event the spoliation claim was not dismissed. *See* October 22, 2007 e-mail from Paul Fitzsimmons, Esq., a true copy of which is attached as Exhibit F.

## ARGUMENT

It is within this Court's discretion to permit some additional, post-cutoff discovery on a showing of good cause. Local Rule 16.4(a); *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 294 F.3d 148, 151 (D.C. Cir. 2002)(noting that district courts are granted "great latitude" in setting timeframe for discovery generally). Here, Plaintiff seeks leave of Court to depose Mr. Sequeira before trial - preferably in December - so it can probe the extent of his "new" testimony on the issue of camera placement and camera angle adjustment. Because these issues are directly relevant to an adverse inference the Plaintiff will seek against FUR and Defendant Ramirez regarding the destruction of the video evidence, this Court should grant the relief requested herein.

I.  **PLAINTIFF IS ENTITLED TO SEEK AN ADVERSE INFERENCE AT TRIAL BASED ON FUR'S DESTRUCTION OF THE MARCH 12TH VIDEO EVIDENCE.**

This Court's November 6, 2007 opinion ruling on the Defendants' summary judgment motions recognized that, under applicable D.C. law, a party may seek an adverse inference where relevant evidence appears to have been destroyed. November 6, 2007 Opinion (Docket No. 139) at 48-49, *citing Williams v. Washington Hospital Center*, 601 A.2d 28, 31 (D.C. 1991), *and Battocchi v. Washington Hospital Center*, 581 A.2d 759 (D.C. 1990). That inference can be obtained based upon two levels of conduct. *Rice v. U.S.*, 917 F. Supp. 17, 19 (D.D.C. 1997). First, evidence of a

5

party's "bad faith" destruction of evidence "gives rise to a strong inference that production of the [evidence] would have been unfavorable to the party responsible for its destruction." *Rice*, 917 F. Supp. at 19, *quoting Battocchi*, 581 A.2d at 765-66. "Bad faith" includes both deliberate/intentional acts of destruction as well as acts performed with "reckless disregard" for the importance of the evidence. *Battocchi,* 581 A.2d at 766. Under such circumstances, the D.C. Court of Appeals has held that the court "***must*** submit the issue of lost evidence to the trier of fact with corresponding instructions allowing an adverse inference." *Id.*

Second, even if no "bad faith" is evident, a trial court still has the discretion to permit the adverse inference to go to the jury merely based on a party's "failure to preserve" relevant evidence through its own negligence. *Battocchi,* 581 A.2d at 766 (observing that the rule permitting an adverse inference is "well established" in D.C.). Where the destruction of the evidence does not rise to the level of outright bad faith, a trial court is to consider a number of factors, such as "the degree of negligence or bad faith involved, the importance of the evidence lost to the issues at hand, and the availability of other proof enabling the party deprived of the evidence to make the same point." *Rice,* 917 F. Supp. at 20, *citing Battocchi*.

The facts adduced in discovery in this case would support either level of adverse inference. FUR admits that the video evidence no longer exists. It was destroyed with FUR's knowledge that Mazloum had initiated the MPD complaint.[4] There is evidence in the record that it was deliberately destroyed on the day of the incident – after FUR was alerted to the fact that Mazloum was present at

---

4 The fact that the lawsuit itself was not filed as of March 12th does not mean FUR lacked sufficient notice of the importance of the video evidence. The FUR Defendants plainly were aware, as of March 12th, of "the possibility of litigation" relating to the incident (having been tipped off by one of the primary instigators of the assault, Officer Ramirez). FUR was also concerned enough about the Nightclub's own potential role in such litigation to attempt to browbeat a witness (Imad Alkadi). Such circumstances are plainly sufficient notice, as other federal courts have recognized. *Rice,* 917 F. Supp. at 20 (finding defendant's denial of awareness of need to preserve evidence based on possibility of litigation "simply implausible" where significance of evidence at issue (blood sample) was known to defendant before destruction of evidence occurred, despite the fact that lawsuit had not been filed at that time).

a police precinct station complaining of the assault he had experienced at the Nightclub less than twenty-four hours earlier. The FUR officials knew that their own security employee, Michael Persons, had been implicated in the assault and battery incident. There is also evidence that FUR personnel reviewed the tape before its destruction, and then informed a third party (Imad Alkadi) that it was "gone" in the hopes of dissuading Mazloum from pursuing his claim against the MPD. The computer hard drive itself, which automatically overwrites the video evidence after five days, would not have even begun to do so until March 17th – five days after Fiorito told Alkadi that the evidence was already "gone." All of the above amply suggest a malicious, willful intent to destroy evidence that was likely harmful to FUR and/or Ramirez – in which case D.C. law *requires* submission of an "adverse inference" instruction to the jury.

Even if the evidence were less redolent of FUR's bad faith, it would still support permitting the inference, based upon the factors to be considered under the "failure to preserve" standard. The video evidence would clearly be helpful to Mazloum's overall case, as it would likely show images of the Defendants and what they did in their interactions with Mazloum. It would also display images of Mazloum himself. Given that the Defendants attempt to portray Mazloum as a drunken instigator of the event, actual photographic proof of how Mazloum appeared as he was taken from the Nightclub would be instructive on this point. Other than eyewitness testimony (much of which comes from persons with an interest in the case's outcome), there is no other neutral, contemporaneous proof of what happened within the Nightclub at the time of the incident. And there is also little dispute that FUR was on notice of the significance of the video evidence, since its personnel not only knew that Mazloum had complained at an MPD station within *minutes* after he did so, but learned of it from another defendant (Officer Ramirez). Even before FUR personnel viewed the tape, they demonstrated an awareness of the significance of the evidence by specifically

telling Ramirez that police investigators were free to come and view the tapes themselves (an invitation that was either never passed on to Ramirez's superiors or never acted upon at all).

FUR's counsel has previously suggested that the dismissal of the spoliation claim renders the issue of the security cameras irrelevant, almost as a matter of law. This is completely wrong, and assumes there is some legal connection between a cause of action for spoliation and a request that destroyed evidence be viewed negatively against the party responsible for the destruction – a linkage this Court has recognized does not exist. *See* Summary Judgment Opinion at 49 ("[t]o permit an adverse inference instruction does not necessarily imply that a party incurred a legal duty to preserve evidence in the tort sense"). Indeed, in *Battocchi*, *Williams*, and *Rice*, the claimant sought to invoke the adverse inference in support of independent claims, and did not assert a spoliation claim like that previously asserted in this lawsuit.

Here, the adverse inference would be used to support the Plaintiff's remaining claims, which center on the beating Mr. Mazloum suffered. It can be applied both to the claims asserted against FUR (via its employee Persons) and the off-duty officers. All are alleged to have been involved in the assault of Mazloum, all likely were caught on the cameras either inside or outside the Nightclub, all were aware of Mazloum's complaint as of March 12th, all had reason to benefit from destruction of the evidence, and all communicated with each other repeatedly about the incident once Mazloum set his complaint in motion.[5]

Similarly, FUR cannot defeat Plaintiff's request for an adverse inference by arguing that it would be futile, by conclusorily asserting that the internal cameras would not have "shown"

---

[5] Because of Ramirez's round of cell phone calls to his co-defendants once he sighted Mazloum making his complaint, and their undeniable awareness of the complaint the same day it was filed, it is reasonable to impute any of his alleged discussions with FUR about the destruction of the evidence to the other off-duty officers. At a minimum, however, Plaintiff should be permitted to seek the adverse inference against Ramirez, Persons, and FUR.

8

anything. This is a *contested issue of fact*. Plaintiff's inspection of the camera system, the independent "Coburn video," which plainly shows the stage, plus the testimony of other witnesses, all suggest the internal cameras did capture much of the incident, both inside and outside the Nightclub. FUR's arguments to the contrary are all based on the self-serving testimony of FUR personnel (McLeod, Sequeira, and Fiorito), who have claimed variously that (i) they did not even need to look at the video evidence because they simply "knew" it showed nothing, (ii) they in fact did look at it on March 12th, and/or (iii) they offered to save it for the MPD. The finder of fact needs to hear these witnesses say these things to evaluate their credibility, but the Court cannot (for purposes of evaluating Plaintiff's right to seek this inference) accept their testimony as true – especially given the existence of persuasive contrary evidence. Certainly, the elements of the adverse inference as set forth in *Battocchi* do not include an obligation on Plaintiff's part to prove the evidence would be useful to his case – this conclusion is *inferred* from other facts, and thus an end of obtaining the inference, not a means.

FUR's entire argument misapprehends what the adverse inference seeks to accomplish: an explanation for why evidence is missing in a case. Plaintiff is entitled to suggest to the jury that the reason the missing evidence was destroyed (or at least allowed to be over-written on the computer hard drive) was because it would have aided his cause, which FUR and/or the off-duty officers wished to thwart. Given the myriad suspicious facts about the circumstances under which the evidence was destroyed, coupled with FUR's same-day knowledge of Mazloum's intent to complain about his treatment, and the bizarrely contradictory testimony amongst FUR witnesses regarding whether the tape was reviewed or not, there are ample facts from which a juror could conclude that the evidence would have provided visual, real-time proof supporting Mazloum's testimonial claims about his beating.

## II.  SEQUEIRA'S TESTIMONY IS RELEVANT TO THE ADVERSE INFERENCE.

Plaintiff does not require Mr. Sequeira's testimony to establish the adverse inference resulting from the destruction of the video evidence. Indeed, the existing record provides sufficient grounds to meet the "bad faith" level of the inference and other elements required to obtain such an inference. Plaintiff nevertheless requires Mr. Sequeira's deposition to evaluate arguments the FUR Defendants will make (and indeed, already have) to rebut the inference at trial. As noted above, the FUR Defendants claim the lost video evidence would have shown nothing at all about the incident. They employed Mr. Sequeira's declaration to bolster this argument, by adding the new contention that camera positioning is routinely adjusted by hand, and that the cameras did not "face" relevant places within (or even outside) the Nightclub on March 12th. *See generally* Exhibit A. This is contrary to Plaintiff's findings (corroborated by third party evidence) that many portions of Mazloum's journey through the Nightclub would have been captured, including the stage area where the incident began. Accordingly, Sequeira's testimony is relevant to this defense, and the Plaintiff should be permitted an opportunity to probe the factual bases for his statements.

It is telling (particularly in the context of the adverse inference Plaintiff wishes to obtain) that FUR would argue against permitting the requested discovery by claiming it would be futile – while at the same time asserting that the **basis** for this futility is evidence that was never disclosed in discovery, and that it also refuses to permit Plaintiff to explore. It is this very sort of denial of access to probative evidence that the adverse inference for missing evidence arises out of and is designed to thwart (and, indeed, to punish). *Battocchi,* 581 A.2d at 766 (observing that the adverse inference instruction has both an "evidentiary and a punitive rationale"). Plaintiff should be permitted to depose the very person whose testimony FUR will rely on to challenge the inference.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that he be permitted to depose Mr. Diego Sequeira in the month of December. Plaintiff particularly asks that this motion be dealt with in an expeditious fashion, in order to facilitate deposing Mr. Sequeira sufficiently in advance of trial.

                                            Respectfully submitted,

Dated: November 14, 2007        /s/ _____
                                            Brian H. Corcoran (Bar No. 456976)
                                            Katten Muchin Rosenman LLP
                                            1025 Thomas Jefferson St., NW
                                            Suite 700 East Lobby
                                            Washington, D.C. 20007
                                            Ph: (202) 625-3500
                                            Fax: (202) 298-7570
                                            Brian.Corcoran@kattenlaw.com

                                            Susan Huhta (Bar No. 453478)
                                            Warren R. Kaplan (Bar No. 034470)
                                            Washington Lawyers' Committee for
                                            Civil Rights and Urban Affairs
                                            11 Dupont Circle, NW
                                            Suite 400
                                            Washington, D.C. 20036
                                            Ph: (202) 319-1000
                                            Fax: (202) 319-1010
                                            Warren_Kaplan@washlaw.org

                                            Attorneys for Plaintiff
                                            Emile Mazloum