```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2
    --------------------------------X
 3  EMILE MAZLOUM,                  :
                                    :
 4          Plaintiff               :  Civil Action No:
                                    :  1:06CV0002
 5            -vs-                  :
                                    :  Pages 1 - 270
 6  DISTRICT OF COLUMBIA, et        :
    al.,                            :
 7                                  :
            Defendants.             :
 8  --------------------------------X
 9
10
11            Deposition of Skip Coburn
12                 Washington, D.C.
13            Monday, September 11, 2006
14
15
16
17
18
19
20  Reported by:  Kathleen M. Vaglica, RMR
21  Job No:  175425
22
```

Page 142

1 correct, on this issue?
2    A.   Yes.
3    Q.   He had the same goal as you, right, to see
4 if this officer could be reinstated?
5    A.   Pending the completion of an
6 investigation. Again, that would be supposition a
7 little bit on my part, but I would think the answer
8 to that is yes. One would have to ask Sergeant
9 Moats if at that time it was one of his goals. I
10 don't know that for a fact, but I would guess, so --
11 sergeants usually want their officers available for
12 duty.
13    Q.   Now, you've testified about interviewing
14 various witnesses, and you also testified that you
15 did at some point go to the actual premises of the
16 Fur Nightclub; correct?
17    A.   Mm-hmm.
18    Q.   How many times did you go there in the
19 course of your investigation?
20    A.   Before I met with you guys, at least three
21 or four times, and subsequent to my interview with
22 you gentlemen I went later to verify something once.

Page 143

1    Q.   But that was after your report was
2 submitted to Ponton?
3    A.   That's correct. So maybe three, maybe
4 three. Actually, it's more than that if you count
5 out on the street. I went back, I only went in the
6 club three times, well, once, a couple times during
7 the day and one time at night because I wanted to
8 get that DVD. I wanted to record a DVD of the dance
9 floor, and I went there at a specific time on a
10 Saturday night so it was the same time frame as the
11 date of the event. But I went to the club many
12 times out on the street trying to find different
13 people like valet parking. Is so and so here
14 tonight? No. And I also, on one Friday night I
15 went to a security meeting of all the security staff
16 and asked them was there anybody there that had been
17 on, had been working that night. So that would have
18 been a fourth time inside. But I went outside the
19 club several times trying to find out is so and so
20 here tonight, blah, blah, blah, and it took me a
21 long time to track people down because it was their
22 night off.

Page 144

1    Q.   When was the first time you went there,
2 went to Fur?
3    A.   Whatever was the first meeting that was
4 set up to interview John Fiorito; it would be his
5 witness statement.
6    Q.   You went the first time to interview a
7 witness?
8    A.   The first time I went was to interview
9 John Fiorito.
10    Q.   And subsequent trips?
11    A.   To interview more people or try and
12 develop witnesses that had not been already
13 identified to me.
14    Q.   When did you first go there to check out
15 the physical premises of the nightclub?
16    A.   It wasn't when I -- if John Fiorito walked
17 me out onto the dance floor and showed it to me at
18 all, he must have done that, but I don't remember
19 it. What I do remember, going back there
20 specifically with a long list of questions in my
21 mind, where is the bar? Where are the stairs? How
22 far is it from the stage to the other stairs? Where

Page 145

1 are the video cameras? I went back with a much
2 greater detail subsequently, and that would have
3 been after -- well, I don't know, way subsequent to
4 my first interview with Fiorito when I went back
5 with all sorts of questions and took my tape
6 measure.
7    Q.   You talked about in your testimony a
8 moment ago about getting a DVD. What was the DVD
9 of?
10    A.   The dance floor. When I found out that
11 there was a video surveillance system --
12    Q.   When did you find that out? Let me ask
13 you this.
14    A.   January.
15    Q.   Did you find out after the complaint was
16 filed about this case?
17    A.   No, I found out about your lawsuit.
18 Nobody mentioned the video surveillance system. And
19 I said what is this about video cameras. Yeah, we
20 got them. Nobody came to pick anything up, and I
21 said I want to see. I went over that next weekend
22 and was shown where all the cameras are and

Page 146

1 everything they showed, so, when they showed me
2 everything, I said, okay, I want a copy of that
3 camera, the only one that shows the dance floor.
4 I'll be back here at Saturday night 1 o'clock in the
5 morning to do it the same time as what March 12 was.
6     Q.    Why were you asking for this?
7     A.    Because in your lawsuit, in the lawsuit
8 it's alleged that all sorts of people conspired to
9 destroy physical evidence, and, when I inquired as
10 to what that might be, I was told one of the pieces
11 of physical evidence supposed to have been conspired
12 to have been destroyed and was destroyed was video
13 surveillance of the alleged incident, so I wanted to
14 see, one, could that have occurred and, two, how
15 come nobody ever told me about this before, and what
16 I found out was there is no video camera that
17 surveys where these alleged incidents took place.
18          So I wanted a copy of the widest angle
19 that that camera can show, which I gave to you guys,
20 to just lay that down as a fact that, hey, my
21 investigation doesn't seem to indicate that anybody
22 conspired to destroy any video surveillance evidence

Page 147

1 of this alleged incident because no video
2 surveillance capability exists at that club for the
3 location where the alleged incident should have
4 taken place.
5     Q.    Did you produce a copy of this DVD to us?
6     A.    I did when I came and met with you guys.
7     Q.    So you were trying to disprove that
8 allegation when you read it in the Complaint?
9     A.    To me it was a very important fact.
10 Initially, I went there and said, hey, is it
11 possible there could be video surveillance, and they
12 said, well, no, because that camera doesn't show
13 that, but, even if it did, our systems overwrite in
14 five days.
15    Q.    Five days?
16    A.    I don't know why it varies, but they said
17 five to seven days.
18    Q.    Not the next day?
19    A.    No, five -- they told me. All I know is
20 what they told me. They said our system overwrites
21 in five to seven days, and I criticized them, and I
22 said, well, when this incident happened, why didn't

Page 148

1 someone save it? Everybody I talked to there said
2 this kind of thing happens all the time. People get
3 drunk; we escort them out of the club. We don't
4 save videotape every time something happens. It's
5 no big deal.
6     Q.    So you were concerned that that allegation
7 in the Complaint might affect your, the intent of
8 your report; is that fair to say?
9          MS. PHILLIPS:  Objection to form.
10         MS. BATES:  Object to form.
11         THE WITNESS:  I would have been very
12 happy -- made it clear to you guys -- very happy to
13 have a piece of videotape, regardless of what it
14 showed, because it would have helped move the
15 process along more towards somebody --
16 BY MR. CORCORAN:
17    Q.    But you were beyond moving the process --
18         MS. PHILLIPS:  You are interrupting him in
19 the middle of the record, and the record is already
20 very, very tortuous to me to understand. Because of
21 that, I can't even imagine what the court reporter
22 is having. You've interrupted him in the middle of

Page 149

1 his answer a number of times, but this is the one,
2 given the posture of your question, the tone and the
3 accusatory manner, seems to be very important he be
4 allowed to finish his answer before you start again.
5 If you would do so for the record, I would be most
6 appreciative.
7 BY MR. CORCORAN:
8     Q.    Your objection is noted. Probably you're
9 more concerned of the answer the witness has given.
10    A.    I have a good answer. As I have told you
11 all the time, I wanted to get every piece of
12 physical evidence. I wanted to talk to everybody.
13 I exhausted every possible method I knew of to track
14 down people who could have seen anything, heard
15 anything, that I could get statements out of some.
16 Some people declined to a speak to me, but I got
17 statements from everybody else, and, when I found
18 out that there was this allegation, that I initially
19 was really upset because I thought maybe somebody
20 had lied to me or by omission not told me about
21 something, so I was upset.
22         And I called two or three people and said

Page 150

1 what is this I read in the newspaper, and it was
2 then that I obtained, the case that I obtained about
3 this surveillance stuff. What is that? And they
4 said, yeah, we have a video surveillance camera,
5 but, but the reason it never came up was because
6 nobody thought anything was going to develop about
7 this, and I think what goes to your question is I
8 wouldn't have cared what the video surveillance tape
9 showed. If there had been one, that would have been
10 fine with me, because it would have been just more
11 facts for the case.
12      And you have to understand also that the
13 reason this wound up in a letter going to Ponton
14 requesting that Ramirez be reinstated to duty was
15 because of the preponderance of the evidence I
16 collected. If I had run into anywhere evidence that
17 made me want to back up, which has happened, like I
18 tell you, in most cases I back off from these things
19 and say, hey, this is too big for me to investigate.
20 I don't have the capability. I don't feel enough
21 conviction in my belief to ask the chief to do
22 something. If I had come across anything that

Page 151

1 indicated contrary to my conclusions, I would have
2 done my initial letter to Ponton differently or
3 maybe never submitted it, but that's not what
4 happened.
5      And just to go back to your question, I
6 wouldn't have cared what the surveillance, but I
7 thought it was important, once I went to them and
8 they said, yeah, we have a video camera, but it
9 doesn't show that area, and, two, it overwrites in
10 five days. Then I found that I wanted everybody to
11 know, okay, this allegation that the police
12 conspired with the club to destroy evidence is not
13 founded because no evidence of that location could
14 have existed. I've got the camera frame to show
15 that. Again, my initial question came up with an
16 answer, and like everything else I wanted to share
17 that fact with all parties involved, and I gave
18 copies of that DVD to the F.B.I. and the U.S.
19 Attorney's office and to you guys and to you guys
20 and --
21   Q.   Okay, Mr. Coburn, but you've already
22 testified, have you not, that you had concluded

Page 152

1 several months earlier that this case, this incident
2 was more than a situation where they were gray;
3 correct? You already concluded you thought this guy
4 was innocent; right?
5   A.   Absolutely.
6   Q.   So by the time you learned of the -- and
7 you were never told about any surveillance system
8 prior to January 2006; right?
9   A.   Correct.
10   Q.   No one ever volunteered that; correct?
11   A.   Never came up in any of the discussions
12 there was video camera surveillance of the dance
13 floor, and subsequently I was told that the reason
14 nobody ever mentioned it is because this camera
15 doesn't show anything of that --
16   Q.   It's been an oversight?
17   A.   They said to me, Skip, nobody ever brought
18 it up because the camera, there's no camera that
19 surveys that area.
20   Q.   But you felt this was a significant new
21 fact that you needed to address, one way or the
22 other; correct?

Page 153

1   A.   Absolutely. I read the lawsuit very
2 carefully. I had been trying for months
3 unsuccessfully to get a copy of the PD 99 so I could
4 know what the hell everybody was accused of. I was
5 sort of operating in the dark here, because I didn't
6 know exactly what the complaint was, just in
7 general.
8   Q.   And, if you weren't able to refute the
9 fact, that might have affected the overall aim of
10 your report; right?
11        MS. PHILLIPS: Objection to form.
12        MS. BATES: Objection.
13        MS. PHILLIPS: Just a second. Excuse me.
14 Objection to form. Misstates his testimony.
15        THE WITNESS: The report had already been
16 submitted.
17 BY MR. CORCORAN:
18   Q.   It's dated January 30; right?
19   A.   All I know is, when I submitted the
20 report, I didn't have a copy of the videotape
21 because I had to submit it to people subsequently
22 separately. Didn't you get yours -- oh, you got

Page 154

1 yours separately. I don't know. We're talking
2 about a week's difference or something.
3    Q.   Timing is important sometimes, isn't it,
4 though, Mr. Coburn?
5         MS. PHILLIPS:  Is that a question?
6         THE WITNESS:  It was a question.
7 BY MR. CORCORAN:
8    Q.   Yes.
9    A.   Timing is always important.
10   Q.   Let's mark as four this document.
11        (Coburn Exhibit No. 4, 1/30/06 letter to
12 Assistant Chief Ponton, was marked for
13 identification.)
14        THE WITNESS:  Like I said, initially, I
15 was really upset to find out that in all those
16 discussions nobody had ever mentioned a videotape,
17 and so I asked them about it, and that's when they
18 told me we didn't bring it up because there's no
19 camera that shows where this actually took place.
20 Then I figured that was important to let everybody
21 know.
22 BY MR. CORCORAN:

Page 155

1    Q.   I just marked as four a letter you
2 submitted to Assistant Chief Ponton.
3    A.   Yes, sir.
4    Q.   Dated January 30, 2006; correct?
5    A.   Right. Correct.
6    Q.   And, if you refer back to Coburn 3, which
7 is the F.B.I. report -- here it is before you.
8    A.   Yes.
9    Q.   You'll note at the bottom paragraph that
10 you indicate that you received the security video on
11 January 22.  Do you see that?
12   A.   Yes, okay. Good. I'm sure we have this.
13 It's a week a part. It happened a week earlier.
14   Q.   You received it before you submitted this
15 report?
16   A.   Okay. Fine. Obviously, it didn't result
17 in changing anything. And it could have if there
18 had been -- if there had been a video, obviously, it
19 became a new fact.
20   Q.   And you even address it in your letter to
21 Chief Ponton?
22   A.   Okay. Good. I forgot. That's a year

Page 156

1 ago.
2    Q.   If you look at page ten of your report,
3 you'll see with regard to the allegation --
4    A.   Yeah, you're right. So I did know this
5 before I submitted my record. I had forgotten it.
6    Q.   -- address this in the report one way or
7 the other to Chief Ponton?
8    A.   Good. Fine. I was off a week.
9    Q.   Why did you -- strike that. You're aware
10 that the lawsuit was filed in January 2006; correct?
11   A.   The what?
12   Q.   Lawsuit here, the reason we're here today.
13   A.   I read about it, I learned about it in the
14 Washington Post, which I think is in here somewhere.
15   Q.   One of your attachments to your report?
16   A.   That's how I found about it. Skip, have
17 you seen the newspaper, called me at the office.
18   Q.   Is the timing of this report in any way
19 related to the lawsuit? You had been working on the
20 report for several months at this point. What made
21 you decide to submit the report on January 30?
22   A.   I actually have -- it was done. The cake

Page 157

1 was ready to come out of the oven. I think I had
2 exhausted, I couldn't find any more witnesses to
3 interview. It was done. I didn't have anything
4 else I could add to it.
5    Q.   You weren't at all concerned about the
6 lawsuit's existence?
7    A.   I don't think that affected the timing.
8 What difference would it make? The lawsuit is
9 filed.
10   Q.   You weren't concerned that the lawsuit
11 might affect the investigation?
12   A.   No.
13   Q.   Not your investigation?
14   A.   Nothing so far had affected the
15 investigation, and the police department wasn't
16 doing it anyway. This is sending a letter to
17 someone who had nothing to do with the
18 investigation, because the F.B.I. and the U.S.
19 Attorney's office was doing the investigation, so
20 no, I didn't expect that this letter would have
21 anything to do with the investigation. I just
22 wanted Ramirez returned to duty.