# EXHIBIT 1

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 2
 3
 3   EMILE MAZLOUM                  :
 4                                  :
 4                Plaintiff         :
 5                                  :
 5        vs.                       :  Civil Action No.
 6                                  :  1:06:CV 00002
 6                                  :  (JDB)
 7   DISTRICT OF COLUMBIA,          :
 7      et al.                      :
 8                                  :
 8                Defendants        :
 9
 9                 Washington, D.C.
10                 Tuesday, February 27, 2007
10
11   Deposition of:
11
12        NIGHT and DAY MANAGEMENT, LLC
12           DESIGNATED REPRESENTATIVE
13                DAVID McLEOD
14   called for oral examination by counsel for
15   Plaintiff, pursuant to notice, at the offices
16   of Katten Muchin Rosenman, LLP, 1025 Thomas
17   Jefferson Street, N.W., East Lobby, Suite 700,
18   Washington, D.C. 20007-5201, before Renee A.
19   Feder, CSR, a Notary Public in and for the
20   District of Columbia, beginning at 1:47 p.m.,
21   when were present on behalf of the respective
22   parties:
```

Page 158

1  gentlemen took a break of about ten minutes or
2  so in the middle of their questioning. Did I
3  say one word to you during that break?
4     A.  No.
5     Q.  Did I look at you during that
6  break?
7     A.  No.
8     Q.  All right, let's continue.
9         Mr. Kaplan, asked you to draw this
10 diagram which is Exhibit 1. And one of the
11 things you marked on here was OC. That stands
12 for what?
13    A.  Well, that is what he told me to
14 say.
15    Q.  Stands for old camera?
16    A.  Yes.
17    Q.  And he asked you about reviewing
18 the tape, the tape of the incident on 3/24/06
19 from the exhibit that he looked at?
20    A.  Right.
21    Q.  Did you ever have occasion to
22 review the tape from this old camera

Feder Reporting Company
(202) 863-0000

Page 159

1  corresponding with the incident that we are
2  dealing with here?
3     A.  Did I review that tape?
4     Q.  Yes.
5     A.  Yes, I have seen it.
6     Q.  Okay. How did it come about that
7  you reviewed that type?
8     A.  The next day I looked at them
9  coming out of the club.
10    Q.  Okay. How did it come about that
11 you decided to look at this tape?
12    A.  I mean, we discussed to look at
13 the tape because of the simple fact -- I
14 gradually looked at the tape of people coming
15 out of the club. In other words, I review
16 tapes, anyway.
17    Q.  You say "we discussed." Who did
18 you discuss this with, reviewing the tape?
19    A.  Mr. Romeo.
20    Q.  Are you certain it was Mr. Romeo?
21    A.  Yes. He asked me to look at the
22 tape.

Feder Reporting Company
(202) 863-0000

Page 160

1     Q.  Did Mr. Fiorito ask you to look at
2  the tape?
3     A.  They both was there.
4     Q.  They both was there. When did
5  they ask you to review the tape?
6     A.  The next day.
7     Q.  And when did you actually review
8  the tape?
9     A.  Saturday.
10    Q.  What did you see when you reviewed
11 the tape?
12    A.  I seen the patron coming out, four
13 guys around him, walking down the steps.
14    Q.  Did you see this group from any
15 other vantage?
16    A.  You also see them walking out of
17 the club from the camera that is pointed
18 directly toward the front door.
19    Q.  Who did you see exactly in this
20 tape?
21    A.  Well, I saw the Spanish cop, I saw
22 the -- it is the Spanish cop. There is

Feder Reporting Company
(202) 863-0000

Page 161

1  Modlin. It a white cop that I don't know.
2  And it is another cop, a black cop, a black
3  cop that I don't know. I guess that is
4  Phillips. I assume, I don't know. And your
5  patron, the patron is in the middle of these
6  four cops.
7     Q.  How long in hours or minutes or
8  seconds did these people appear on the OC
9  camera screen?
10    A.  Second. Seconds.
11    Q.  How many seconds?
12    A.  I am going to say maybe 30
13 seconds, if that is the most, walking. You
14 see them walking, and walking down.
15    Q.  You are talking about both
16 cameras, you see them for 30 seconds?
17    A.  Yes, both cameras. You see them
18 walk out and walk down.
19    Q.  You say walked out. Did you see
20 Mr. Mazloum getting dragged out?
21    A.  No. He walked out on his own
22 recognizance.

Feder Reporting Company
(202) 863-0000

Page 162

1   Q.  You can tell that from looking at
2  the tape?
3   A.  Yes. You can tell that by looking
4  at the tape. You can see him walking out with
5  four guys around him. He gets to the steps.
6  You can see him walking down the steps with
7  four guys around him.
8   Q.  Did you make any kind of report to
9  Mr. Fiorito about what you looked at after you
10 looked at this tape?
11  A.  I let him know he walked out.
12 That is the only report I can give him.
13  Q.  Did you report to him that you saw
14 cops beating Mr. Mazloum as he was walking
15 down the stairs?
16  A.  No, I never saw that.
17  Q.  Other than these guys walking down
18 the stairs, was there anything happening?
19  A.  No, they walked him out.
20  Q.  By what means did you review this
21 tape for this purpose? How did you do it?
22  A.  What do you mean? Well, you

Feder Reporting Company
(202) 863-0000

Page 163

1  can't -- you go in and you -- first of all,
2  you go in and you have to back it up. Then
3  you back it up and you can see, as they are
4  walking out, there are two cameras. One
5  camera goes this way and one camera is
6  outside. You have to go through that camera.
7  Once you get the time frame on that camera,
8  you have to repeat it and go to the outside
9  camera, and match both times frames.
10  Q.  How long did you spend performing
11 this review?
12  A.  Five minutes. Five, ten minutes,
13 tops.
14  Q.  Is it possible for anybody to walk
15 up to the FUR security system and review old
16 footage?
17  A.  No.
18  Q.  Why not?
19  A.  It is coded.
20  Q.  What do you mean?
21  A.  Meaning you have to have a code to
22 get into the cameras.

Feder Reporting Company
(202) 863-0000

Page 164

1   Q.  You mean into the monitors?
2   A.  Into the monitors.
3   Q.  What kind of code?
4   A.  It is a four digit pin code.
5   Q.  Who has the four digit pin code at
6  FUR?
7   A.  Myself and Diego.
8   Q.  Does Michael Rehman have it?
9   A.  No.
10  Q.  Does John Fiorito have it?
11  A.  No.
12  Q.  Does anyone else have it besides
13 you and Diego?
14  A.  No, Diego and myself.
15  Q.  Did you ever tell it to anybody
16 else?
17  A.  No.
18  Q.  Did Michael Rehman ever ask you to
19 destroy any footage of what happened that
20 night?
21  A.  No. You can't destroy it anyway.
22 But no.

Feder Reporting Company
(202) 863-0000

Page 165

1   Q.  Did John Fiorito ever ask you to
2  destroy any footage from that night?
3   A.  No.
4   Q.  Did anyone ever ask you to destroy
5  any footage from that night?
6   A.  No.
7   Q.  Did you ever report to anybody
8  that you had seen something on the tape that
9  suggested to you that it needed to be saved as
10 evidence?
11  A.  No.
12      MR. FITZSIMMONS: I have no
13 further questions.
14 EXAMINATION BY COUNSEL FOR DEFENDANTS ACOSTA AND
15                SMITH
16      BY MR. SCHIFFERLE
17  Q.  Mr. McLeod, my name is Carl
18 Schifferle. I am the attorney who is
19 representing two officers, Officer Acosta and
20 Officer Smith.
21      It is my understanding that you
22 know Officer Jose Acosta?

Feder Reporting Company
(202) 863-0000