UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


EMILE MAZLOUM                    :

                                 :

            Plaintiff   :

                                 :

      vs.                        :   Civil Action No.

                                 :   1:06:CV 00002

DISTRICT OF COLUMBIA,            :   (JDB)

  et al.                         :

                                 :

            Defendants :


                      Washington, D.C.

                      October 25, 2006


Deposition of:


            JOHN FIORITO,


called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices
of Katten Muchin Rosenman, LLP, 1025 Thomas
Jefferson Street, N.W., East Lobby, Suite 700,
Washington, D.C., before Zev V. Feder, CSR, a
Notary Public in and for the District of
Columbia, beginning at 9:41 a.m., when were
present on behalf of the respective parties:

Page 34

1      MR. FITZSIMMONS: Yes.
2      THE WITNESS: It is $130,000 a
3  year flat fixed payout.
4      BY MR. KAPLAN:
5      Q.    And this comes in monthly checks?
6      A.    **It comes weekly. $2500 week.**
7      Q.    Who is that check made payable to?
8      A.    **To Melissa Fiorito.**
9      Q.    Is that for the original capital
10 investment you made to buy the five percent
11 interest, or the ten percent interest which
12 became a five percent interest, or is that for
13 your weekly trips?
14     A.    **That is the continuing maintenance**
15 **that it stays on permanently now. There was a**
16 **different amount in the earlier stage of the**
17 **first two years.**
18     Q.    What was it then?
19     A.    **A lot higher.**
20     Q.    And what was it then? How much
21 higher?
22     A.    **It varied from seven to $10,000 a**

Feder Reporting Company
(202) 863-0000

Page 35

1  week.
2      Q.    Why did it get reduced?
3      A.    **Due to the fact that I was doing**
4  **other things and I just wanted to get a fixed**
5  **amount settled for her in case anything ever**
6  **happened to me, whether I was killed as a**
7  **policeman, and I wanted to protect my wife and**
8  **make sure she had some type of guaranteed**
9  **income.**
10     Q.    So at first the payments were not
11 in a fixed amount. They were dependent on,
12 what, the gross?
13     A.    **The net profit.**
14     Q.    Ten percent of the net profit?
15     A.    **Correct.**
16     Q.    But then you decided that you
17 wanted to have a guaranteed fixed amount that
18 wasn't dependent upon that profit. Is that
19 right?
20     A.    **That's correct, sir.**
21     Q.    So it was adjusted down to what it
22 is now?

Feder Reporting Company
(202) 863-0000

Page 36

1      A.    **Correct.**
2      Q.    And this fixed amount is
3  guaranteed for how long?
4      A.    **That's the indefinite agreement.**
5  **If the place were to be sold, then she would**
6  **receive five percent of the sale proceeds.**
7      Q.    The checks that are received are
8  deposited into a joint bank account?
9      A.    **They are deposited to her bank**
10 **account.**
11     Q.    And do they make their way into a
12 joint bank account or into your bank account?
13     MR. FITZSIMMONS: Objection.
14 Argumentative.
15     BY MR. KAPLAN:
16     Q.    You may answer.
17     A.    **No.**
18     Q.    Are you saying you have no
19 financial benefit from those checks?
20     A.    **No.**
21     Q.    None of that money goes to pay
22 your living expenses or any financial benefit

Feder Reporting Company
(202) 863-0000

Page 37

1  for you?
2      A.    **Well, she pays all the bills for**
3  **the house.**
4      Q.    Do you have any responsibilities
5  other than taking care of the lighting and
6  sound system?
7      A.    **No.**
8      Q.    Do you have any role in the
9  security system?
10     A.    **Initially? When the club was**
11 **being constructed I wrote the FUR employee**
12 **manual, which contains to the security**
13 **procedures. It is a variety of everything**
14 **going on into the club.**
15     Q.    You wrote the FUR employee manual?
16     A.    **That's correct.**
17     Q.    What was your qualification for
18 writing the FUR employee manual? Have you
19 ever done that before?
20     A.    **I have written and authored**
21 **general orders while employed at the Pentagon**
22 **police that were approved by the U.S.**

Feder Reporting Company
(202) 863-0000

Page 38

1  Attorney's office, the Chief of Police. I had
2  written lesson plans. I had years of
3  experience as a law enforcement officer. So I
4  felt, they felt I was qualified to implement a
5  security plan, which they had, then, of
6  course, over the years, changed it due to
7  regulations and laws changing.
8      Q.    How about the security camera
9  system?
10     A.    I have nothing to do with that.
11     Q.    And who installed that?
12     A.    That was done by a guy named JB --
13  his name is JB. He owns a company called JB
14  Security Systems. They are somewhere in
15  Maryland.
16     Q.    What does JB stand for?
17     A.    I don't know. That is what they
18  call him. That's his name.
19     Q.    Have you seen him at the club?
20     A.    Yes.
21     Q.    At the time of the original
22  installation, or since then, or both?

Page 39

1      A.    I have seen him on and off at the
2  club. But the original installations, we saw
3  him do the installation of the cameras.
4          MR. KAPLAN: We are about to go to
5  a new topic. Anybody need a break?
6          (Discussion off the record.)
7          BY MR. KAPLAN:
8      Q.    Mr. Fiorito, did you happen to be
9  at the club on March 11, 2005?
10     A.    Yes. That's the date of the
11  incident, yes.
12     Q.    How did you happen to be there at
13  that time?
14     A.    I was here for my weekend visit to
15  maintain the sound and lighting.
16     Q.    March 11th was a Friday.
17     A.    Right.
18     Q.    Just to refresh your recollection.
19     A.    Yes, I remember.
20     Q.    So you were at the club that
21  night. What time would you have gotten to the
22  club?

Page 40

1      A.    I don't know what time I got there
2  that day but I was there for the evening,
3  throughout the night.
4      Q.    Throughout the night and into the
5  early morning hours of the next morning,
6  Saturday the 12th?
7      A.    Yes, sir.
8      Q.    About what time on Saturday did
9  you go home?
10     A.    It was probably 4:00 or 5:00 in
11  the morning.
12     Q.    Where do you stay when you come to
13  Washington?
14     A.    Either at a hotel. Back then it
15  was a hotel. Now I have an apartment that I
16  share with the operations manager at the club,
17  Diego.
18     Q.    Where is that located?
19     A.    Rockville, Maryland.
20     Q.    Where?
21     A.    Rockville, Maryland.
22     Q.    What does Mr. -- Mr. Sequeira is

Page 41

1  the operations manager. What does that mean?
2  What does he do?
3      A.    The operations manager is the
4  person that orders the daily liquor, orders
5  the regular products for the club. Bar
6  management, scheduling. Just general
7  day-to-day duties.
8      Q.    Does he do hiring and firing?
9      A.    That is done by the general
10  manager.
11     Q.    And who is that?
12     A.    That person at this time, his name
13  is Ray Voight, V O I G H T.
14     Q.    V O I G H T?
15     A.    Yes.
16     Q.    How long has he been the general
17  manager?
18     A.    Maybe the last three months.
19     Q.    And before him?
20     A.    Was a person named William Smith.
21     Q.    How long was he the general
22  manager?

Page 90

1  commander of the Special Operations Branch.
2     Q.   Who is the commander of the First
3  District, or who was it at the time?
4     A.   At the time it was Tommie McGuire.
5     Q.   Does FUR have an informal
6  relationship with the police department so
7  that off-duty police officers get favored
8  treatment?
9     A.   No.
10    Q.   Are off-duty police officers
11 allowed to come in free?
12    A.   Yes.
13    Q.   Well, that's favored treatment, is
14 it not?
15    A.   That is standard all over the
16 city.  They get in for free.  Police officers
17 are allowed in.  No one seems to ever question
18 them at the door if they are on or off duty.
19    Q.   And they get in by just showing
20 their badge?
21    A.   Yes, they show their ID card, or
22 credentials.

Feder Reporting Company
(202) 863-0000

Page 91

1     Q.   Is there any other category of
2  public employees who are able to get in by
3  just showing their badge or their --
4     A.   We let all firemen, EMS.  We comp
5  military people into the club.  We try to help
6  out any public safety worker, let them into
7  the club free of any charge.  Especially,
8  soldiers that are fighting in other countries.
9     Q.   How about people who belong to the
10 National Guard?
11    A.   Sure.  That is a form of --
12    Q.   Air Force Reserves?
13    A.   Sure.  That is to Dave's
14 discretion at the front door who he comps into
15 the club.
16    Q.   How about former Air Force
17 Reserves?
18    A.   If you have an ID card, you can
19 probably talk Dave into letting you in, if you
20 are a former military person.
21       MR. FITZSIMMONS:  He is looking
22 for a free --

Feder Reporting Company
(202) 863-0000

Page 92

1       MR. KAPLAN:  I will keep that in
2  mind.
3       THE WITNESS:  The cover charge is
4  not a major thing at the club.  Customer
5  service.  They are big on customer service.
6  They are usually pretty liberal at the door
7  policies.
8       MR. KAPLAN:  That's good to know.
9       BY MR. KAPLAN:
10    Q.   Do off-duty police officers
11 frequently come to the club as patrons?
12       MR. FITZSIMMONS:  Objection.
13 Calls for conclusion.
14       MS. PHILLIPS:  Join.
15       THE WITNESS:  I don't know.
16       BY MR. KAPLAN:
17    Q.   Would it be fair to say that on
18 any given weekend there are likely to be
19 several off-duty police officers in the crowd?
20       MS. PHILLIPS:  Objection.
21 Foundation.
22       THE WITNESS:  I am not there

Feder Reporting Company
(202) 863-0000

Page 93

1  enough to give you an answer to that.
2       BY MR. KAPLAN:
3     Q.   Mr. McLeod is the head of
4  security.  Is that right?
5     A.   Yes.
6     Q.   Do you know what his background
7  is?
8     A.   No.
9     Q.   Has he been the head of security
10 since the club opened?
11    A.   Yes.
12    Q.   How many people work in security
13 under Mr. McLeod?
14    A.   I would say 50 or less.
15    Q.   50 or less?
16    A.   No more than 50.  Up to 50, maybe.
17    Q.   Do these people have any required
18 training?
19    A.   Yes.
20    Q.   What training is required?
21    A.   They are required to complete the
22 D.C. security officers' course and they are

Feder Reporting Company
(202) 863-0000

Page 94

1  required to complete full background checks
2  and provide criminal record checks from their
3  local jurisdiction and the D.C. police
4  department.  And they have to be free and
5  clear of any criminal convictions to be
6  employed there in security.
7      Q.    What is this D.C. security
8  officers' course?  Who gives that?
9      A.    They have a person come in that
10  ran a security company that was listed to
11  teach the class in the beginning.
12      Q.    Is this something, does this have
13  some official status with some agency of the
14  District of Columbia?
15      A.    Yes.  All security are licensed
16  through the Special Police Branch up at 14th
17  and U Street, Northwest.
18      Q.    That is part of the MPD?
19      A.    Yes, it is supervised by the
20  Metropolitan Police Department.
21      Q.    So the MPD issues?
22      A.    They set a standard, I believe it

Feder Reporting Company
(202) 863-0000

Page 95

1  is called, of what security guard required
2  training is.
3      Q.    Who actually gives the training?
4      A.    A licensed security agency that is
5  qualified or licensed to teach the class.
6      Q.    Do you know what that agency is?
7      A.    No.
8      Q.    Or who that agency is?
9      A.    Dave McLeod would be able to tell
10  you who did it in the beginning.
11      Q.    So you, yourself, I take it,
12  wouldn't have any knowledge as to whether
13  Mr. Persons ever took that course?
14      A.    No.
15      Q.    You know Mr. Persons, or you did
16  know him while he was employed at the club.
17  Right?
18      A.    I know him as an acquaintance.  I
19  have seen him in there.  It is not somebody
20  that --
21      Q.    Did you ever talk to him?
22      A.    Briefly.

Feder Reporting Company
(202) 863-0000

Page 96

1      Q.    Nothing that you recall?
2      A.    Nothing other than hi, how are
3  you, nice to see you, and moving on.
4      Q.    Had he been there since the club
5  opened?
6      A.    I don't know.
7      Q.    Do you know how long he was there?
8      A.    No, sir.
9      Q.    No idea?
10      A.    No.
11      Q.    The course that is given in the
12  security guard training, do you know, is that
13  a one day course, a two week course?  Do you
14  know anything about it?
15      A.    I already told you, I don't know
16  anything about it.  You can ask Dave and he
17  can provide you that information.
18      Q.    Do you know whether someone who
19  takes the course gets some kind of a license
20  from the D.C. Special Police Branch?
21      A.    No, sir.
22          MR. KAPLAN:  Let's mark this.

Feder Reporting Company
(202) 863-0000

Page 97

1          (Document referred to marked
2  Deposition Exhibit No. 1 for identification
3  and subsequently retained by counsel.)
4          BY MR. KAPLAN:
5      Q.    Is Exhibit 1 the manual that you
6  referred to that you wrote?
7      A.    I did the initial.  The revised,
8  that's the latest version.  As I said earlier,
9  it gets updated by the management as things
10  change there.  The initial foundation was put
11  together by me but there have been
12  modifications that I have not participated in.
13      Q.    Is the document in front of you
14  the original manual or the updated?
15      A.    It is the updated.  It gets
16  constantly updated.
17      Q.    Can you tell us when the last
18  update was?
19      A.    No.
20      Q.    Or what the last update was?
21      A.    No.
22      Q.    Just, if you will just read, do

Feder Reporting Company
(202) 863-0000

Page 98

1  you see the page number, the Bates numbers at
2  the bottom right-hand corner of each page?
3      A.   Yes.
4      Q.   Turn to page 290 for the section
5  called -- 291, rather.  The section called
6  proper altercation procedures.
7      A.   Uh-huh.
8      Q.   I would just like you to read that
9  to yourself.
10         MR. FITZSIMMONS:  Stopping where?
11         MR. KAPLAN:  To the middle of the
12 next page.
13         BY MR. KAPLAN:
14     Q.   Just read that to yourself.  My
15 question is going to be -- I will tell you the
16 question in advance, so you know what you are
17 looking for.
18         The question is, is this the
19 original version that you drafted or has it
20 been changed?
21     A.   (Pause).  That has not been
22 changed.  Because I put in the medical, and

Feder Reporting Company
(202) 863-0000

Page 99

1  rendering first aid, and making the
2  notifications, and determining if medical
3  assistance is required.
4      Q.   Is there anything, to your
5  knowledge, in the manual about how to deal
6  with intoxicated patrons?
7      A.   I will have to look through it.
8  (Pause).
9          I don't see anything.
10     Q.   Is there any policy you are aware
11 of at FUR that talks about how to deal with
12 intoxicated patrons?
13     A.   Most people know, when you have an
14 intoxicated person, there is no dealing with
15 them.  They don't respond to reason in any
16 way.
17     Q.   So what is supposed to happen if a
18 FUR employee comes across an intoxicated
19 person, or a person he believes is
20 intoxicated?
21     A.   They are not to serve to the point
22 where a person is intoxicated but sometimes

Feder Reporting Company
(202) 863-0000

Page 100

1  you can't control that because who knows who
2  gave them a drink or passed a drink on.  But
3  when you have an intoxicated person, you try
4  to treat them the same as you treat anybody
5  who isn't intoxicated, with the same fair,
6  kind and customer service related methods.
7  But, usually, intoxicated people don't listen.
8      Q.   What you just said, is this
9  something that is written down anywhere in a
10 policy?
11     A.   No, because that is more my
12 opinion.  That's not really a policy.  I mean,
13 that's just me with my training in law
14 enforcement and years of speaking to
15 intoxicated people, that they don't respond
16 the same way as a normal person who hasn't had
17 any type of alcohol.
18     Q.   As you sit here today, are you
19 aware of any policy that has ever been
20 promulgated by FUR, by the management of FUR,
21 to its employees on that topic?
22     A.   No.

Feder Reporting Company
(202) 863-0000

Page 101

1      Q.   Do you know if there is a log
2  maintained of all unusual incidents that occur
3  at the club?
4      A.   There is a log that is now
5  currently maintained.
6      Q.   How long has that been in effect?
7      A.   Since this incident.
8      Q.   It started with this incident?
9      A.   Yes.
10     Q.   Who maintains that log?
11     A.   The head of security, Dave McLeod.
12         MR. KAPLAN:  Counsel, why has that
13 not been produced to us?
14         MR. FITZSIMMONS:  I don't know if
15 it has been requested.
16         MR. KAPLAN:  I am quite sure all
17 documents relating to this incident were
18 requested.
19         MR. FITZSIMMONS:  He didn't say it
20 pertained to this incident.
21         MR. KAPLAN:  I thought he did.
22         THE WITNESS:  No.  You asked me if

Feder Reporting Company
(202) 863-0000