UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


EMILE MAZLOUM                    :
                                 :
             Plaintiff    :
                                 :
     vs.                         :   Civil Action No.
                                 :   1:06:CV 00002
                                 :   (JDB)
DISTRICT OF COLUMBIA,            :
   et al.                        :
                                 :
             Defendants :


                    Washington, D.C.

                    Tuesday, February 27, 2007

Deposition of:


        NIGHT and DAY MANAGEMENT, LLC

        DESIGNATED REPRESENTATIVE

             DAVID McLEOD

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the offices

of Katten Muchin Rosenman, LLP, 1025 Thomas

Jefferson Street, N.W., East Lobby, Suite 700,

Washington, D.C. 20007-5201, before Renee A.

Feder, CSR, a Notary Public in and for the

District of Columbia, beginning at 1:47 p.m.,

when were present on behalf of the respective

parties:

1    **A.   Yes.**
2    Q.    Is he still employed at FUR?
3    **A.   Yes.**
4    Q.    When was he employed?  When was he
5    hired?
6    **A.   I can't recall.**
7    Q.    Has he been employed continuously
8    since he was first hired?
9    **A.   Yes.**
10   Q.    Was he ever terminated or did he
11   ever leave voluntarily for some period?
12   **A.   He is always employed.  He is**
13   **still employed.**
14   Q.    Did you ever have any problems
15   with his performance?
16   **A.   No.**
17   Q.    What type of training, if any, was
18   Mr. Persons given?
19   **A.   The same that I was, the Maddox.**
20   Q.    Where did that take place?
21   **A.   It took place at orientation at**
22   **FUR.**

1    Q.    Was he trained alone or with
2    others?
3    **A.   My whole staff.**
4    Q.    The whole staff gets training at
5    one time?
6    **A.   Yes.**
7    Q.    How large is your staff?
8    **A.   Roughly, 30 to 40 people.**
9    Q.    How often do they get this
10   training?
11   **A.   We try to do it, I will say,**
12   **annually.  So maybe once every year because I**
13   **get new staff.**
14   Q.    Does the training involve giving
15   people any written materials?
16   **A.   Not -- what do you mean?**
17   Q.    Are people given any written
18   handouts to study?
19   **A.   Yes.  You get a manual.**
20   Q.    What is the manual called?
21   **A.   It is called Maddox Training**
22   **Facility.**

1    Q.    It is called --
2    **A.   Maddox Training, they have a**
3    **training booklet.  That is what it is called.**
4    **I am not sure offhand.**
5    Q.    How big is it?
6    **A.   It is just roughly, maybe about**
7    **25, 30 pages.  Just a little manual.**
8    Q.    Can we get a copy of it?
9    **A.   If I have it.  If I have it, I**
10   **will get you one.**
11   Q.    Has Mr. Persons ever been
12   disciplined by FUR in any way for his
13   involvement in this incident?
14   **A.   No.**
15   Q.    Have any policies at FUR been
16   changed or modified since this incident?
17   **A.   No.**
18   Q.    Do you have any information about
19   whether FUR owns any other business?
20   **A.   No.**
21   Q.    Have you ever heard of something
22   called the Helman Company?

1    **A.   No.**
2    Q.    Or the Helman Company, Inc.?
3    **A.   No.**
4    Q.    Did you ever hear of anything
5    called 33 PST, LLC?
6    **A.   No.**
7    Q.    Do you know who owns the building
8    where FUR operates?
9    **A.   All I know, it is Mike Romeo.**
10   MR. FITZSIMMONS:  Objection.
11   Foundation.
12   BY MR. KAPLAN
13   Q.    What is your basis for believing
14   that Mike Romeo owns the building?
15   **A.   What is my basis?**
16   Q.    Yes.  Has he told you that?
17   **A.   No, he told me -- he is my boss.**
18   **He hired me.**
19   Q.    Did he ever or did anyone ever
20   else tell you that he owns the building?
21   **A.   No.**
22   Q.    So, when you said a moment ago

Page 126

1    BY MR. KAPLAN
2       Q.   If a person doesn't feel he needs
3    to call a manager, then even though a patron
4    is getting more and more unruly and
5    aggressive, the policy is he doesn't have to
6    call the manager.  Right?
7       **A.   If he feels --**
8       Q.   Can you answer that yes or no?
9       **A.   Yes.  If he feels he doesn't need**
10   **to call the manager, yes.**
11      Q.   So, the policy is if a patient, if
12   a patron is getting more and more unruly and
13   aggressive, you don't have to call over the
14   manager unless you feel that you should?
15      **A.   The policy is --**
16      Q.   Is that right?  Can you answer
17   that yes or no?
18      **A.   Yes.**
19      Q.   Let's come back just a second to
20   Skip Coburn.
21         I think we saw that you spoke to
22   Mr. Coburn and he took a statement from you on

Page 127

1    July 27, 2005.  Do you recall approximately
2    six months after that, in January of 2006,
3    after the complaint in this case was filed,
4    that Mr. Coburn came back to you and asked you
5    about the video surveillance camera?
6       **A.   I don't remember.**
7       Q.   No recollection of that at all?
8       **A.   No.**
9       Q.   Have you reviewed any documents in
10   preparation for this deposition?
11      **A.   What do you mean?**
12      Q.   Well, is there some part of my
13   question that is unclear?
14      **A.   You said review any document for**
15   **the deposition?  Have I seen anything?**
16      Q.   Have you sat down and read any
17   documents, looked at any documents to prepare
18   for this deposition?
19         MR. FITZSIMMONS:  Other than those
20   he may have seen with his counsel.
21         THE WITNESS:  No.  I am not
22   understanding the question.  But, no.

Page 128

1    BY MR. KAPLAN
2       Q.   Have you discussed your testimony
3    with anyone other than Mr. Fitzsimmons?
4       **A.   No.**
5       Q.   Is there any requirement that a
6    security officer at FUR who sees a problem,
7    whether it is an altercation that is going on
8    or an altercation that might break out, or
9    some other kind of security related problem,
10   is there any requirement that such a person
11   should try to get another security person
12   involved in observing or participating in the
13   action?
14      **A.   In the manual, yes.**
15      Q.   Is that something that you repeat
16   at your regular security briefings?
17      **A.   Yes.**
18      Q.   Do you have -- is there any
19   indication that Mr. Persons on March 12th
20   attempted to bring any other security person
21   into the picture?
22      **A.   I have no idea.**

Page 129

1       Q.   Did you ask him?
2       **A.   No, I didn't.**
3       Q.   If he didn't, would that be a
4    violation of the policy?
5          MR. FITZSIMMONS:  Objection.
6    Vague as to time frame.
7          THE WITNESS:  A security guy has
8    to use his own suggestions.  So did he violate
9    the policy by not calling someone?  That is a
10   yes or no question.  Yes.  Did he feel he
11   needed help?  If he felt he needed help, then
12   you call someone.  If you felt you don't need
13   some help, then you don't call somebody.
14         BY MR. KAPLAN
15      Q.   So the official policy is you only
16   call someone if you feel you need help.  Is
17   that right?
18      **A.   It is not official but that is how**
19   **we would say.**
20      Q.   That is not what the official
21   policy says?
22      **A.   No.  I know what the official**

1  **policy says.**
2      Q.    The official policy says you call
3  someone, not just if you think you need help,
4  but the official policy says you call someone.
5  Right?
6      A.    **I know what the official policy**
7  **is.  I wrote it.  I know what the official**
8  **policy is.**
9      Q.    Are you saying that people know
10  that the official policy really isn't binding?
11      A.    **It depends on the situation.**
12      Q.    So, that the official policy
13  doesn't apply to certain situations.  Is that
14  right?
15      A.    **It doesn't.  But that is the**
16  **official policy that I wrote in that manual.**
17      Q.    When you wrote it, did you intend
18  that people should believe it should be
19  followed?
20      A.    **Yes.  All of my rules should be**
21  **followed.**
22      Q.    Did you think it should be

1  followed in all cases or only if the person
2  feels like following it?
3      MR. FITZSIMMONS:  Objection.
4  Compound.
5      THE WITNESS:  Certain rules is a
6  gray area.  You know that and I know that.
7  That particular rule, if he felt he wasn't in
8  harm's way, why would he call someone?  Maybe
9  that is how he felt.  It is a gray area for
10  any rule.  It is a gray area to get a speeding
11  ticket.
12      BY MR. KAPLAN
13      Q.    Is there someplace in the employee
14  manual where it says there are gray areas?
15      A.    **No, it is nowhere where it says**
16  **this is a gray area.  I know what I wrote and**
17  **that is the rule.  Okay.  Did Mr. Person**
18  **follow that rule?  No, he didn't.**
19      Q.    Thank you.
20      Was he ever reprimanded for not
21  following the rule?
22      A.    **No, he wasn't.**

1      Q.    Did it ever occur to you that if
2  he had followed that rule, none of us might be
3  sitting here today?
4      MR. FITZSIMMONS:  Objection.
5  Calls for speculation.
6      THE WITNESS:  No, it didn't.
7  Because your client attacked my security
8  guard.  So no, I never thought if he followed
9  that rule.
10      BY MR. KAPLAN
11      Q.    That is what you believe because
12  that is what you were told.  Right?
13      A.    **Exactly.**
14      Q.    You never saw that with your own
15  eyes?
16      A.    **No, I didn't.**
17      Q.    And you never asked any,
18  Mr. Mazloum or any of the people who were with
19  him, if that was true, did you?
20      A.    **No, I didn't.**
21      Q.    Mr. McLeod, have you ever been
22  arrested?

1      A.    **No.**
2      Q.    Never convicted of any crime?
3      A.    **No.**
4      Q.    I am not sure I asked you this.
5  Have you ever been deposed before today?
6      A.    **I beg your pardon?**
7      Q.    Have you ever been deposed before
8  today?
9      A.    **No.**
10      Q.    Do you have any ownership interest
11  in FUR?
12      A.    **No.**
13      Q.    Does FUR encourage off duty police
14  to come in as patrons?
15      A.    **No.**
16      Q.    Do off duty police get admitted
17  free?
18      A.    **All MPD gets admitted free.**
19      Q.    All what?
20      A.    **All MPD officers get admitted**
21  **free.**
22      Q.    But you don't encourage -- that is