UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
EMILE MAZLOUM,                      )
                                    )
            Plaintiff,              )      Civil Action No. 1:06 CV 00002
                                    )      (JDB)
      v.                            )
                                    )
DISTRICT OF COLUMBIA, *et al.*,     )
                                    )
            Defendants.             )
_____ )

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE FUR DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE PLAINTIFF FROM INTRODUCING EVIDENCE RELATING TO FUR'S VIDEO SURVEILLANCE SYSTEM**

Plaintiff Emile Mazloum ("Mazloum"), by his undersigned counsel, for his opposition to the motion *in limine* filed by the FUR Defendants seeking to preclude the use or reference at trial of evidence pertaining to FUR's video camera surveillance system, respectfully states as follows:

**PRELIMINARY STATEMENT**

FUR's carefully parsed motion to exclude any reference to its video surveillance system studiously ignores any mention of a particularly inconvenient fact. As sworn testimony establishes, FUR's owners have previously admitted destroying certain video surveillance evidence despite their knowledge that Mazloum had filed a complaint about the beating he received from Defendant Persons and the off-duty MPD officers on March 12, 2005 at the FUR Nightclub. Moreover, there is evidence in the record that the video was destroyed just hours after FUR personnel learned of Mazloum's complaint. Given such conduct, the FUR Defendants' motion *in limine* appears to be nothing more than yet another attempt to sweep under the carpet evidence that suggests their

culpability in this case.

There are no grounds as a matter of law for precluding this highly relevant evidence. It relates directly to an adverse inference Plaintiff will seek at trial regarding the FUR Defendants' destruction of this evidence. This inference will be used as circumstantial proof to support Plaintiff's battery claim against Michael Persons and FUR (claims which themselves, as this Court has recognized, are already amply supported with direct proof as well), by offering an explanation for why the evidence is missing. Accordingly, the video evidence is sufficiently probative and relevant to Plaintiff's claims to permit its introduction. FUR's conclusory assertion that the evidence would have shown nothing of any relevance to the battery claim cannot withstand close scrutiny, given that this "fact" is hotly disputed. FUR's other argument against admission of aspects of this evidence – an attack on the admissibility of the "Attorney Corcoran" affidavit, which was used at the summary judgment stage merely to introduce the video evidence – is a canard, a product of FUR's disingenuous misportrayal of the purpose for which that affidavit was offered.

**ARGUMENT**

I.  **THE VIDEO SURVEILLANCE EVIDENCE IS RELEVANT TO AN ADVERSE INFERENCE PLAINTIFF IS ENTITLED TO SEEK AT TRIAL REGARDING DESTRUCTION OF THE VIDEO EVIDENCE.**

Plaintiff's rationale for offering the video surveillance evidence from the time of the incident is addressed at length in Plaintiff's Motion *in Limine* seeking leave to depose Diego Sequeira (the contents of which are incorporated by reference herein). *See* Plaintiff's November 14, 2007 Motion in *Limine* (Docket No. 142) at 5-9. In brief, the camera evidence goes to the adverse inference Plaintiff will seek at trial regarding the FUR Defendants' destruction of the recording of actual video "feed" from March 11-12, 2005 on that same date. It will specifically be relevant as well if and when FUR attempts to rebut this inference by asserting that the video would not have shown

2

anything – by giving the jury a concrete sense of the sorts of images the cameras were capable of recording, based upon Plaintiff's best possible reconstruction of what the cameras show, as well as similar evidence obtained by third parties. *See* Plaintiff's Motion *in Limine* at 3 n.3. The fact that D.C. case law recognizes the availability of such an adverse inference under the circumstances underscores the relevance of such evidence to the Plaintiff's claims.

FUR argues that the available security camera evidence is not itself sufficiently probative of whether Persons actually assaulted Mazloum. This argument too narrowly defines probative value. Circumstantial evidence is commonly admitted in proceedings despite the fact that, by definition, it does not directly prove one's case. 1 *McCormick on Evidence* § 185 (6th Ed. 2006)("[a]n item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered . . . A brick is not a wall"). Although Plaintiff has direct proof to offer in support of his allegations,[1] he may also offer circumstantial proof as well. Given that the video itself no longer exists, circumstantial proof of what the video might have shown is the best either side can do.

FUR goes on to specifically challenge the evidence's probative effect - despite its nonexistence. To that end, it argues that (i) only the "outside" camera captured anything of the incident, (ii) no camera ever pointed at the stage (and thus there would have been no filming of Persons's initial striking of Mazloum), and (iii) the various interior cameras that (based on Plaintiff's July 2006 inspection) seemed likely to have captured moments in Mazloum's "journey" out of the Nightclub were regularly repositioned. But these assertions are far from concluded in FUR's favor, as each is either based on self-serving FUR witness testimony or is contradicted by other, equally

---

1 This is not a case where the Plaintiff must solely, or primarily, rely on circumstantial evidence. As this Court has recognized, Mazloum easily meets his *prima facie* case against Persons – in part because Persons admits that he struck Mazloum, and only seeks to defend the claim based on an argument of self-defense.

probative evidence. Specifically:

      A.    *Testimony of David McLeod* - FUR cites the testimony of David McLeod, its head of security and designated 30(b)(6) witness on security camera issues, for the "fact" that he personally reviewed the camera and only saw a brief image of Mazloum being escorted out of the Nightclub. Putting aside that such self-serving testimony proves nothing, it bears pointing out that the portions designated from McLeod's deposition in support of this "fact" come from the end of the deposition, when FUR's counsel questioned him on redirect – and during which time which McLeod ***contradicted*** earlier testimony in response to the same questions. In particular, McLeod first told Plaintiff's counsel that he had never reviewed the tapes. *Compare* McLeod Tr. (true excerpts from which are attached hereto as Exhibit A) at 69:14-16 ("I never looked to see if anything was captured because there is nothing to look at") *with* Ex. 1 to FUR's Motion *in Limine* on Surveillance Evidence at 158:21-159:5 (testifying that he did look at the "tape"). Given such transparent attempts to launder McLeod's earlier testimony, there is ample reason to believe a jury would not find him credible on these matters.

Moreover, even if the video record could conclusively be shown to reveal only one long segment from the latter half Mazloum's escorted "journey," as the FUR Defendants assert, that more limited evidence would still have had evidentiary value to the case had it been preserved. The Defendants as a group have frequently raised Mazloum's alleged inebriation as an explanation for what instigated the incident, asserting variously that Mazloum was totally intoxicated, reeking of alcohol, slurring his speech, unsteady on his feet, *etc*. Plaintiff testified to the contrary. Footage of the Plaintiff being taken out of the Nightclub could thus be very persuasive on this issue. In particular, if it showed Plaintiff walking out of FUR briskly under his own power between the two officers, it would have branded the "totally intoxicated" portrayal as a lie, and undermined a significant basis for FUR's defense.

B.   *Camera Positioning* - FUR's denials that any internal camera points at the stage (where the incident with Persons began) are undercut by video footage taken in January 2006 by Skip Coburn, a private citizen who took it upon himself to investigate the incident in a desire to exonerate Ramirez.  Coburn's own video (which FUR permitted him to take) ***does*** reveal the stage area in question, along with other relevant adjacent areas - all of which Mazloum would have passed through as he was taken out of the Nightclub (*See* Exhibit B to Plaintiff's Motion *in Limine* to Reopen Discovery).  In addition, certain witnesses (mainly Mr. Sequeira) have testified that the cameras were regularly repositioned manually.  While FUR interprets such testimony to close the door on the issue, the fact that the cameras can be easily repositioned could permit an inference that the cameras on the night of March 11-12th also were pointed at the stage, regardless of FUR's allegedly "normal" practices.

C.   *Plaintiff's Inspection of the Security Camera System* - Plaintiff's Rule 34(a)(2) inspection of the FUR Nightclub premises and its security camera system revealed, among other things, that an exterior camera would have picked up Mazloum's end-point in his journey, when he was dropped in handcuffs on the curb across the street.  *See* Exhibit A to Plaintiff's Sur-Reply in Opposition to FUR's Summary Judgment Motion, dated July 26, 2007 (Docket No. 136).  FUR's response – that this camera was, during business hours, normally repositioned to focus on the front of the Nightclub, and not across the street (as was the case when Plaintiff inspected the Nightclub) – was first stated by Diego Sequeira.  This is a witness whom, as Plaintiff has repeatedly pointed out, was never identified in discovery as possessing *any* specialized knowledge about the security cameras. Plaintiff should be permitted to depose this witness to gauge the truthfulness of his claims – and to weigh the extent to which he can say that the camera angles and positioning observed by plaintiff's legal team on July 7, 2006 were either similar or dissimilar to the camera orientations of March 11, 2005.  His present declaratory testimony, standing alone and not subject to cross-

5

examination, is not enough to resolve this fact issue conclusively in FUR's favor.

In short, all of FUR's assertions about what the camera system would or would not have picked up are vigorously contested by Plaintiff. Fur cannot offer its self-serving view of the facts as "proof" the video would be unavailing to Plaintiff and/or not harmful to FUR. In effect, FUR is relying on the "too incredible" argument (to use its counsel's words) that because its own witnesses deny something out of hand, they should be believed and the issue put to rest. (By such logic, Plaintiff should be awarded a judgment now, based solely on his testimony that Mr. Persons beat him, without regard to Persons's defenses to the same). Of course, because the video evidence is gone, no one can say for certain what the security cameras would have shown – and it is from this fact, coupled with the suspicious and unreasonable context for the destruction of the video evidence, that the adverse inference flows.

II. **EVIDENCE OBTAINED BY PLAINTIFF'S COUNSEL PURSUANT TO ITS RULE 34(A)(2) INSPECTION OF FUR'S SURVEILLANCE CAMERA SYSTEM IS ADMISSIBLE PROOF THAT THE CAMERAS' FIELD OF VIEW INCLUDED AREAS WHERE ASPECTS OF PLAINTIFF'S ASSAULT AND BATTERY TOOK PLACE.**

The FUR Defendants continue (as they have since this past summer's briefing of summary judgment) to rail against the "Attorney Corcoran" declaration, appended to Plaintiff's Opposition to FUR's Summary Judgment, characterizing it as inadmissible, nonexpert testimony. Such assertions misconstrues the reason the specific video images were offered via attorney affidavit.

As is often the case with pleadings in which exhibits are included, Plaintiff employed an attorney affidavit as a vehicle for offering the video evidence to be considered by the Court on summary judgment. It was never Plaintiff's intent to designate Mr. Corcoran as an "expert" on the security camera system. The format of a "covering affidavit" was used simply to identify and describe record evidence the Plaintiff was relying on for summary judgment purposes, because the

evidence at issue (still captures of video images) was not self-explanatory on its face.[2]  Mr. Corcoran's testimony will not be offered at trial to speculate as to what the images do, or do not, show, and accordingly this entire argument has no bearing on the probative value of the underlying images and/or what they reveal.

To the extent the FUR Defendants' objections go to the admissibility of the images themselves, rather than merely to the form in which they were presented to the Court, such objections are meritless.  The FUR Defendants cannot dispute that this evidence was derived by Plaintiff at the July 2006 Rule 34 inspection, in full view of FUR's counsel.  A videographer took the images and could, if necessary, authenticate them.  The images and footage can be utilized at trial in a number of ways – for example, as direct visual proof of the existence of the camera system and location of cameras; as demonstrative exhibits to illustrate direct witness testimony about the system; or as rebuttal and impeachment evidence to contradict statements of FUR witnesses.  They are accordingly sufficiently reliable to be used as evidence at trial, in one form or another.

In any event, this argument once again mischaracterizes Plaintiff's purpose in offering the video images from its inspection.  There is no direct proof in existence of what the video feed showed on March 12th, ***because that evidence was destroyed.***  All witnesses who have any knowledge of the FUR security camera system are FUR employees, inherently interested in the outcome of the case.  Plaintiff accordingly seeks (as D.C. law permits) an adverse inference about the likely content of the destroyed evidence.  To the extent FUR tries to rebut that inference by offering testimony that in fact it does not matter the evidence was destroyed, Plaintiff may fairly rely on circumstantial proof about what the cameras might have captured to suggest to the jury that

---

2  As a technical matter, Plaintiff was not even obligated by Rule 56 to offer the video images with a "covering affidavit," as was in fact done here, since the images were obtained in discovery, pursuant to a proper Rule 34(a)(2) inspection request, and therefore constitute part of the discovery record.  11 James Wm. Moore, *et al., Moore's Federal Practice* § 56.10[4][c][ii], n. 61 (3d ed. 2007)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

indeed the video would have provided evidence harmful to FUR, and was destroyed for that reason. It would be beyond unreasonable for this Court to overlook the FUR Defendants' prior, knowing destruction of relevant evidence - then, in the context of evidentiary matters, permit these same Defendants to hide behind unverifiable denials of what the evidence would have shown to justify preclusion of the issue entirely from this case. The jury should be permitted to see these images so that it can decide for itself whether to believe FUR's rebuttal argument on this point.[3]

### III.  THE VIDEO EVIDENCE PASSES THE RULE 403 "PROBATIVE VERSUS PREJUDICIAL" BALANCING TEST.

Given the fact that this jurisdiction recognizes the availability of an adverse inference where evidence has been destroyed, the probative value of the security system evidence is indisputable. FUR suggests that the evidence nonetheless will be more prejudicial than probative. But the Rule 403 test for balancing probative value versus prejudicial effect looks to see if the evidence at issue is *unfairly* prejudicial. *U.S. v. Gloster,* 185 F.3d 910, 914 (D.C. Cir. 1999)(upholding admission of evidence on Fed. R. Evid. Rule 403 grounds). Federal courts recognize that evidence is not "unfairly prejudicial" simply because it is not favorable to a party. *U.S. v. Emeron Taken Alive, II,* 262 F.3d 711, 714-15 (8th Cir. 2001)("[t]here is a difference between evidence that is unfair in that it hurts a party's case and evidence that is unfairly prejudicial"); *see also SEC v. DiBella,* No. 3:04 CV 1342(EBB), 2007 WL 1395101, at *3 (D. Conn. May 8, 2007)("[e]vidence is not unfair or excluded for Rule 403 balancing purposes if it is merely damning").

Here, The FUR Defendants seek to evade the adverse inference not on the basis of a real risk of unfair prejudice, but rather because they recognize that their improper and irresponsible conduct

---

[3] Plaintiff will of course also rely on cross-examination of witnesses such as David McLeod and Diego Sequeira to show that these witnesses lack credibility and/or that they cannot establish themselves that the evidence would not

in destroying the evidence is (along with other direct evidence) proof of their culpability. It is FUR's own improper conduct, contemporaneous with the incident, that makes this evidence prejudicial – not the fact of its admission. There is no legal basis to exclude this evidence on Rule 403 grounds.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the FUR Defendants' Motion *in Limine* to preclude Plaintiff's offering of evidence relating to FUR's security camera system at trial be denied in its entirety.

Respectfully submitted,

Dated: November 20, 2007

/s/
Brian H. Corcoran (Bar No. 456976)
Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW
Suite 700 East Lobby
Washington, D.C. 20007
Ph: (202) 625-3500
Fax: (202) 298-7570
Brian.Corcoran@kattenlaw.com

Susan Huhta (Bar No. 453478)
Warren R. Kaplan (Bar No. 034470)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, D.C. 20036
Ph: (202) 319-1000
Fax: (202) 319-1010
Warren_Kaplan@washlaw.org

Attorneys for Plaintiff
Emile Mazloum

---

have shown anything.