Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM           :
                        :
         Plaintiff      :
                        :
    vs.                 :   Civil Action No.
                        :   1:06:CV 00002
                        :   (JDB)
DISTRICT OF COLUMBIA,   :
   et al.               :
                        :
         Defendants     :

Washington, D.C.
Tuesday, February 27, 2007

Deposition of:

NIGHT and DAY MANAGEMENT, LLC
DESIGNATED REPRESENTATIVE
DAVID McLEOD

called for oral examination by counsel for Plaintiff, pursuant to notice, at the offices of Katten Muchin Rosenman, LLP, 1025 Thomas Jefferson Street, N.W., East Lobby, Suite 700, Washington, D.C. 20007-5201, before Renee A. Feder, CSR, a Notary Public in and for the District of Columbia, beginning at 1:47 p.m., when were present on behalf of the respective parties:

Page 62

1  with names. You told me your name. To be
2  honest with you, I don't recall it.
3      Q.  I have the same problem.
4          Now, Mr. Jones --
5      MR. FITZSIMMONS:  Good joke.
6      BY MR. KAPLAN
7      Q.  You talked to the Hispanic officer
8  the same night you talked to Modlin?
9      A.  Yes. They were both saying the
10 same thing. They saw the guy attack Mike
11 Persons down on the stage.
12     Q.  Did the Hispanic officer tell you
13 anything that was in any way different than
14 what Modlin told you?
15     A.  He didn't put it the same way. He
16 used the word he saw him attack. Modlin used
17 the word he saw him swing, you know.
18     Q.  Did he tell you anything else?
19     A.  No. That was pretty much it.
20     Q.  Did anyone ever discuss with you
21 the question of security cameras and what the
22 security cameras might show or not show?

Feder Reporting Company
(202) 863-0000

Page 63

1      A.  Skip.
2      Q.  Skip Coburn?
3      A.  Yes.
4      Q.  When would that have been?
5      A.  Maybe a couple of weeks later.
6      Q.  I think the evidence is that
7  Mr. Coburn was taking statements in July.
8  Does that sound right?
9      A.  Yes, he came, he came -- I think
10 the guy was suing the MPD. That is why he
11 came to me, to get cameras and all of that.
12     Q.  Was this at the time that
13 Mr. Coburn interviewed you?
14     A.  Yes.
15     MR. KAPLAN:  Mark number 2.
16     (Document referred to marked
17 Deposition Exhibit No. 2 for identification
18 and subsequently attached to the deposition.)
19     BY MR. KAPLAN
20     Q.  I just want to ask you now about
21 the date which appears on the bottom right of
22 the first page. You see the date of

Feder Reporting Company
(202) 863-0000

Page 64

1  July 27 --
2      A.  2000.
3      Q.  -- 2005?
4      A.  I don't have a 2005.
5      MR. FITZSIMMONS:  Here it says
6  2000.
7      MR. KAPLAN:  It is box 13 and box
8  16.
9      THE WITNESS:  Yes.
10 It is 2000 in 16. That is why --
11     MS. VALDES:  I think they refers
12 to the time, to the actual time.
13     MR. FITZSIMMONS:  Military time, I
14 believe.
15     BY MR. KAPLAN
16     Q.  All right. You don't need to read
17 the whole thing right now. I just want to
18 pinpoint the date.
19         It was July 27th that you spoke to
20 Mr. Coburn. Right?
21     A.  Yes.
22     Q.  And what did Mr. Coburn have to

Feder Reporting Company
(202) 863-0000

Page 65

1  say about the cameras?
2      A.  He wanted to see if there was a
3  camera facing the stage.
4      Q.  What did you say?
5      A.  I told him no.
6      Q.  Is that the only time anyone ever
7  asked you about the video cameras,
8  surveillance cameras?
9      A.  No. We had some FBI agents came
10 in. I can't recall their names, but they
11 asked about the surveillance cameras, too.
12     Q.  When did they come?
13     A.  They came right after Skip. I
14 guess he puts his report to them, or whatever,
15 and they came by. I am going to say roughly
16 within that week.
17     Q.  Within the week after July 27th?
18     A.  Yes.
19     Q.  How many agents came?
20     A.  It was two.
21     Q.  And did they come inside the club?
22     A.  Yes. I met, I met one first. And

Feder Reporting Company
(202) 863-0000

Page 66

1  then Greenberg, Goldberg. Jay Goldberg, I
2  think that is his name, if I am not mistaken.
3  And then from then on, he was the only one I
4  ever saw personally.
5      Q.  Did they look at where the camera
6  was?
7      A.  Yes.
8      Q.  And they were looking to see if
9  the cameras showed the stage?
10     A.  Yes.  They were looking at the
11 cameras to see if any camera was pointed
12 directly onto the stage.
13     Q.  Other than the conversation with
14 Skip Coburn and the conversation with the FBI
15 agents, have you ever before today discussed
16 with anyone else the question of whether the
17 security cameras showed or did not show any of
18 this altercation?
19     A.  No.
20     Q.  On the night of March 11, did you
21 discuss with anyone at FUR whether the cameras
22 showed or did not show any of the altercation?

Feder Reporting Company
(202) 863-0000

Page 67

1      A.  No.
2      Q.  Or the next day, March 12, or any
3  other day in the month of March?
4      A.  No.
5      Q.  So you have never had any
6  conversation on that subject with Mr. Rehman,
7  Mike Romeo?
8      A.  You are talking about the staff?
9  The owner?
10     Q.  Yes.
11     A.  Yes, he asked me did I see
12 anything on the tape.  I mean on the cameras.
13 I think you are talking about civilian-wise.
14 Of course, the boss is going to ask me did I
15 see anything on the cameras.
16     Q.  Okay.  I thought I said anyone.
17     A.  Okay.  Of course, the bosses asked
18 me and I told them no.
19     Q.  Let's go back to when was the
20 first conversation you had with anyone,
21 whether it is the boss or anyone, on the
22 subject of what the cameras showed.

Feder Reporting Company
(202) 863-0000

Page 68

1      A.  Mr. Romeo asked me did I see
2  anything on the cameras.  I told him no.  The
3  cameras do not point in those directions to
4  the stage.
5      Q.  When was that?
6      A.  That was the -- I think it was,
7  within a week after that incident.
8      Q.  What exactly did Romeo say?
9      A.  He said, David, did you see
10 anything on the cameras about the incident?  I
11 said, Mr. Romeo, the cameras do not point to
12 the stage.  Cameras are only there for theft
13 and exits.  So, no.
14     Q.  What he said was did you see
15 anything on the cameras.  Were you supposed to
16 have looked at the cameras to see if they
17 showed anything?
18         MR. FITZSIMMONS:  Objection to
19 form.  He wouldn't have looked at the cameras,
20 per se.
21         BY MR. KAPLAN
22     Q.  You can answer?

Feder Reporting Company
(202) 863-0000

Page 69

1      A.  I never looked at the cameras,
2  because there is nothing for me to look at.  I
3  stated that, because the cameras do not point
4  to the stage.
5      Q.  When I say look at the cameras, I
6  mean look at the film or whatever.  Is the
7  camera digital?
8      A.  No, I never looked at the film
9  because there is no film to look at.
10     Q.  It is digital cameras?
11     A.  It is digital cameras.
12     Q.  When you looked to see if anything
13 was captured, what do you call that?
14     A.  I never looked to see if anything
15 was captured because there is nothing to look
16 at.
17     Q.  So you had not looked at anything
18 that might or might not have been captured.
19 Correct?
20     A.  I have nothing to look at.
21     Q.  And you didn't look at anything?
22     A.  I looked at no cameras, because I

Feder Reporting Company
(202) 863-0000

Page 70

1  have no cameras that go to the stage.
2    Q.  When Mr. Romeo said, David, did
3  you see anything on the cameras about the
4  incident, was it your understanding that he
5  felt you should be looking at what the cameras
6  show?
7    A.  Mr. Romeo doesn't know what the
8  cameras show.
9    Q.  He didn't ask -- he hadn't
10 previously asked you to go look at the
11 cameras?
12   A.  No, he asked me did you see
13 anything on the cameras. And back then and
14 there I let him know we do not have cameras
15 that point to the stage.
16   Q.  Was that the whole conversation?
17   A.  That is pretty much our
18 conversation as far as the camera incident.
19   Q.  And you think that was within a
20 week or so after the incident?
21   A.  Actually, yes, it was within the
22 week.

Feder Reporting Company
(202) 863-0000

Page 71

1    Q.  Do you have any way of pinpointing
2  the date?
3    A.  I have no idea.
4    Q.  Your best estimate, your best
5  recollection is it was about a week?
6    A.  I would say a week. I have no
7  idea.
8    Q.  Did you have any conversation with
9  anyone else about the subject of what the
10 surveillance cameras might have shown?
11   A.  No.
12   Q.  Any conversation with Mr. Fiorito?
13   A.  About the cameras?
14   Q.  Yes.
15   A.  I let both of them know there is
16 nothing on the cameras.
17   Q.  Well, now, when did you have the
18 conversation with Mr. Fiorito?
19   A.  Actually, I can't recall. It is
20 so far back. Everything is jumbled, but I
21 can't recall.
22   Q.  Was it a separate conversation or

Feder Reporting Company
(202) 863-0000

Page 72

1  the same conversation?
2    A.  I am trying to think if both of
3  them were together. They could have been
4  together. I can't recall.
5    Q.  What was the system for
6  preservation of what was caught in the
7  cameras, if you wanted to preserve something?
8    A.  If I wanted to preserve something?
9    Q.  Yes.
10   A.  I could burn it.
11   Q.  How would you do that?
12   A.  It is a computer -- it is
13 computerized. The same way you want to
14 download a file, I download what I need to
15 burn.
16   Q.  If you didn't download and burn
17 something, what would happen?
18   A.  It falls off.
19   Q.  It falls off?
20   A.  Meaning it disappears. It just
21 erases within three days.
22   Q.  Does everyone know that -- well,

Feder Reporting Company
(202) 863-0000

Page 73

1  strike that. Does Mr. Fiorito know that?
2    A.  No.
3    Q.  Does mr. Rehman know that?
4    A.  No.
5    Q.  Who else at FUR knows that?
6    A.  Just myself and Diego.
7    Q.  Did Mr. Persons ever tell you that
8  after the original altercation on the stage,
9  there was, there was sort of a continuing
10 altercation through the club, across the main
11 floor of the main ballroom, up the steps to
12 the tunnel, through the tunnel, out the front
13 door out onto the street and outside?
14   A.  No.
15   Q.  Well, you saw that there was some
16 activity going on outside. Right?
17   A.  When I came outside, I seen this
18 guy standing up screaming and hollering.
19   Q.  And that was right across the
20 street from the front door. Right?
21   A.  Yes, he was saying a bunch of
22 profanity and all of that.

Feder Reporting Company
(202) 863-0000