UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                       )
EMILE MAZLOUM,                         )
                                       )
            Plaintiff,                 )   Civil Action No. 1:06 CV 00002
                                       )   (JDB)
      v.                               )
                                       )
DISTRICT OF COLUMBIA, *et al.*,        )
                                       )
            Defendants.                )
_____)

**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO REOPEN
DISCOVERY FOR THE LIMITED PURPOSE OF DEPOSING DIEGO SEQUEIRA**

Plaintiff Emile Mazloum, in further support of his motion *in limine* to reopen discovery for the limited purpose of deposing Diego Sequeira, and in response to the FUR Defendants' opposition to same, states as follows:

The FUR Defendants seek to transform the simple discovery issue raised by Plaintiff's motion *in limine* - whether Plaintiff should be able to depose a witness who should have been identified long ago in response to several valid discovery requests, but never was - into a broader referendum on whether any adverse inference is available at all in this action. But their argument rests wholly on a conflation of the duty of care element of a spoliation claim with the lesser burden applicable to the adverse inference: the obligation to preserve evidence when (as cited by the FUR Defendants themselves in their opposition brief in *Kraus v. GMC,* No. 03 Civ. 4467 (CM), 2007 WL 3146911, at *3 (S.D.N.Y. Oct. 24, 2007)) "a party should have known that the evidence might be relevant to future litigation." This inadvertent quote – which the FUR Defendants mistakenly

believe disposes of the issue in their favor - hoists the FUR Defendants on their own proverbial petard.

A.  **The FUR Defendants Misconstrue Relevant Law Governing the Adverse Inference Instruction.**

Aware that they cannot deny that the video security camera incident evidence was destroyed with full knowledge on the part of FUR personnel of the existence of Mazloum's MPD complaint, the FUR Defendants have decided instead to rely on legal arguments which find no support in any applicable case law, in this or any other jurisdiction.

First, the FUR Defendants falsely assert that it is "federal decisional law" that the dismissal of a spoliation cause of action automatically deprives the Plaintiff of the right to seek an adverse inference based on destroyed evidence. FUR Defendants' Opp. at 2. This argument hinges on a single New York district court case, *Kraus v. GMC,* No. 03 Civ. 4467 (CM), 2007 WL 3146911 (S.D.N.Y. Oct. 24, 2007), which is demonstrably not on point. The *Kraus* court denied a party's request for sanctions for spoliation solely because the defendant (General Motors, an enormous corporation) lacked any notice at the time the relevant evidence (an automobile involved in an accident) was destroyed that the injured plaintiff was contemplating a lawsuit. The *Kraus* court went on to find that, for the same reasons, an adverse inference arising from the destruction of the evidence was not warranted. *Kraus,* 2007 WL 3146911 at *1-*3. Significantly, the *Kraus* claimant *did not* assert a cause of action for spoliation. And nowhere in that decision does the Court state that dismissal of a spoliation cause of action *always* eliminates the relevance of an adverse inference.

Second, and more seriously, the FUR Defendants have chosen to ignore the key language of *Kraus* as noted above. As *Kraus* recognizes, the "obligation to preserve evidence arises, for example, when a party *should have known that the evidence might be relevant to future litigation.*"

2

*Kraus,* 2007 WL 3146911 at *3 (emphasis added).[1]  This is the crux of the difference between a spoliation cause of action and an adverse inference based on spoliation sought in support of a different claim – a difference understood well by this Court.  *See* November 6, 2007 Opinion (Docket No. 139) at 49 ("[t]o permit an adverse inference instruction does not necessarily imply that a party incurred a legal duty to preserve evidence in the tort sense").  While a spoliation cause of action is, much like a negligence claim, dependent on a showing of the existence of a legal duty to preserve,[2] the adverse inference can arise merely on the basis of notice of a pending, or potential, claim.

The applicable jurisprudence on the adverse inference – which the FUR Defendants otherwise ignore in their opposition, or incorrectly argue is not controlling[3] – is crystal clear on this point.  *More v. Snow,* 480 F. Supp. 2d 257, 274-75 (D.D.C. 2007)(*citing Battocchi v. Washington Hosp. Ctr.,* 581 A.2d 759 (D.C. 1990)); *Rice v. U.S.,* 917 F. Supp. 17 (D.D.C. 1996).  Decisions such as *Battocchi* and *Rice* focus in part on whether the destroying party possessed any awareness that the destroyed evidence was potentially relevant to a pending claim or suit.  More to the point, and as

---

1 Tellingly, the FUR Defendants cite the same language in their own brief.  *See* FUR Defendants' Opposition at 3.  Evidently the FUR Defendants failed to grasp that this citation undermines their position.

2 To assert a common law negligence claim in this jurisdiction, a party must establish, among other things, the existence of duty of care owed by the defendant to the plaintiff.  *Powell By and Through Ricks v. Dist. of Columbia,* 634 A.2d 403, 406 (D.C. 1993).  The adverse inference, by contrast, is not a stand-alone cause of action, and can be obtained simply if the party who destroyed the evidence had knowledge of its significance – something less than a general duty to preserve.

3 The FUR Defendants, likely aware that *Rice* flies in the face of its strained reading of the law on adverse inferences, seek to diminish its precedential value by asserting in a footnote that the *Rice* court mistakenly applied D.C. law on a federal evidentiary issue.  FUR Defendants' Opp. at 2 n.1.  *Rice,* however, which temporally superseded the sole D.C. federal case the FUR Defendants cite, *Johnson v. WMATA,* 764 F. Supp. 1568 (D.D.C. 1991), noted that the *Johnson* decision was not in fact contrary to existing D.C. case law on the subject.  *Rice,* 917 F. Supp. at 20.  Furthermore, an even more recent D.C. District Court decision, *More v. Snow,* 480 F. Supp. 2d 257, 275 (D.D.C. 2007) completely embraces *Rice* – thus underscoring its superior precedential value.  And, finally, it is not evident that any separate federal case law jurisprudence on the point would apply a yardstick for determining the appropriateness of an adverse inference any different from that enunciated in *Rice* under D.C. law.  *See, e.g., Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99, 108 (2d Cir. 2002)(an adverse inference is available not only where a party has acted in willful/bad faith but also where a party is merely negligent in permitting evidence to be destroyed).  Thus, regardless of whether D.C. cases like *Rice* are correct in looking to D.C. Court of Appeals decisions on the adverse inference, it is plain that federal law in this jurisdiction and others recognizes the same standard for seeking an inference as that embraced in *Rice.*

observed in *Rice,* notice can be found to exist even *before* a lawsuit has been filed. *Rice,* 917 F. Supp. at 20 ("[t]he suggestion that defendant was without notice of a potential claim at the time it [destroyed the evidence] is . . . simply implausible").

Here, there is substantial, unrebutted evidence establishing the FUR Defendants' notice of Mazloum's potential claim. Without belaboring facts reviewed numerous times in this lawsuit, Plaintiff points to the following:

- When Officer Ramirez first called FUR co-owner John Fiorito from the police station to report that Mazloum had come in and filed a complaint of police misconduct, Ramirez was "very upset" that other MPD officers were officially responding to the complaint, and thereupon began to ask Fiorito questions about the Nightclub's video camera system. (*See* Excerpts from Deposition of John Fiorito, true copies of which are attached as Exhibit A, at 117:4 to 121:4);

- Fiorito, by his own unqualified admission, expressly understood that the video camera footage constituted potentially very important evidence in the litigation that might flow from the police complaint that had been filed by Mazloum. In this regard, he specifically stated at his deposition as follows:

    > Q: Even if there was no claim against the club, even if the only claim was against the police, you knew that those videotapes could potentially include important evidence that would be relevant in his claim against the police, right?
    >
    > A: That's correct.

    Ex. A at 149:9-15.

- Fiorito immediately directed David McLeod, FUR's director of security, to review the video camera footage and report back to him what it showed regarding the incident. (Ex. A at 145:8-22);

- McLeod did review the footage and reported back to Fiorito that same evening. (Ex. A at 145:13-18); and

- Approximately five hours after his conversation with Ramirez on the topic of the video camera evidence, Fiorito told Imad Alkadi that the film footage was now "gone", and that he should tell Mazloum that "he [Mazloum] is going to get burned" ( *See* Excerpts from

4

Deposition of Imad Alkadi, true copies of which are attached as Exhibit B, at 417:11 – 419:6).

Such evidence overwhelmingly establishes that the FUR Defendants were aware of the significance of the video evidence to Mazloum's nascent complaint, sufficient to meet the standard of notice set forth in *Kraus*. Any assertions to the contrary are, as put by the *Rice* court, "simply implausible."

To bulwark their assertion that establishing a "duty to preserve" is a prerequisite to seek an adverse inference, the FUR Defendants cite only *Jinks-Umstead v. England,* No. Civ.A. 99-2691 (GK), 2005 WL 3312947 (D.D.C. Dec. 7, 2005). But this case, besides being against the weight of more persuasive authority, is also distinguishable in other respects. There, a district court discussed the availability of the adverse inference available for *withheld* materials in discovery – not unquestionably destroyed evidence. This opinion, moreover, cites to not one of the cases this Court has already found are on point, such as *Battocchi*. And it involves a wholly different sort of misconduct – discovery omissions deemed by the *Jinks-Umstead* court to be merely "sloppy." The same cannot be said of FUR's destruction of the video evidence contemporaneous with Mazloum's filing of his complaint, and after being tipped off about Mazloum's conduct by a co-defendant to boot.

At bottom, the FUR Defendants' argument reflects a gross misunderstanding of why courts permit parties to seek adverse inferences when evidence is apparently destroyed despite notice of its potential relevance to a lawsuit. As noted in *Battocchi*, 581 A.2d at 766, the adverse inference serves both an evidentiary and punitive purpose:

> [t]he evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document . . . The other rationale for the inference "has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying evidence before it can be introduced at trial."

*Citations omitted.* These are important evidentiary and public policy considerations independent from the concerns that relate to the elements of a tort claim like spoliation. As this Court has already recognized, a party could be held to account in an *evidentiary* context for destroying relevant evidence, even where that same party could not be held liable in damages for the same conduct.[4] Contrary to the FUR Defendants' protestations, there would be nothing unreasonable or inconsistent in so concluding, with respect to "Acme Corporation" – or FUR.

**B.  Plaintiff Has Established that the Destroyed Video Evidence Would Have Helped Him and/or Harmed the Defendants.**

Once again, the FUR Defendants ask this Court to make fact findings in their favor on issues upon which they bear the burden of proof, and in advance of trial as well. Thus, they argue strenuously, based in large part on the arguably inadmissible Sequeira testimony as well as other self-serving statements from FUR witnesses, that Plaintiff cannot *prove* the video evidence would have helped him (in particular, by showing images of FUR's employee Persons striking Mazloum). However, their argument raises too high the bar the Plaintiff must meet to show the missing evidence's relevance and/or probative value for the purpose of the adverse inference analysis.

It is correct that the Plaintiff must demonstrate some degree of relevance between the missing evidence and the claims in support of which the evidence would have been offered had it been available. FUR Defendants' Opp. at 4. But this standard is not nearly as rigorous as the FUR

---

4 The *Johnson* case block quoted in the FUR Defendants' Opposition contains another misstatement of the law on the adverse inference available when evidence is destroyed. That cite suggests that only in cases when "truly bad" or egregious conduct is shown can a party obtain the inference. However, as this Court is aware, applicable D.C. case law decided subsequent to *Johnson*, such as *Battocchi,* embraces the concept that even mere negligent destruction of evidence provides circumstances appropriate for obtaining the adverse inference, so long as the critical fact (knowledge of the significance of the evidence) is present. D.C. District Court cases, as well as federal courts in other jurisdictions, have thereupon recognized this "two tier" analysis for evaluating the appropriateness of adverse inference instructions. *More* v. *Snow*, 480 F. Supp. 2d 257, 275 (D.D.C. 2007)(a court may employ an adverse inference even if intentional or reckless conduct is not evident); *see also Residential Funding Corp.,* 306 F.3d at 108 (in the Second Circuit, the "culpable state of mind" factor in determining whether to allow an adverse inference can be satisfied merely by proof of negligence in appropriate cases, since the party that allowed the evidence to be destroyed should bear the risk). Here, of course, there is more than sufficient evidence to conclude the destruction of the video proof was not negligent, but deliberate.

6

Defendants suggest. As noted by the Second Circuit in *Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99, 109 (2d Cir. 2002), when evaluating whether missing evidence would have been "relevant" to a party's claims, "[c]ourts must take care not to 'hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence,' because doing so 'would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction" (*citing Kronisch v. U.S.,* 150 F.3d 112, 128 (2d Cir. 1988) and *Byrnie v. Town of Cornwall*, 243 F.3d 93, 110 (2d Cir. 2001)). Thus, "a court's role in evaluating the "relevance" factor in the adverse inference analysis is limited to insuring that the party seeking the inference has adduced enough evidence of the contents of missing materials such that a reasonable jury *could* find in its favor." *Id.* at 109 n.4, *citing Byrnie,* 243 F.3d at 109-10 (emphasis in original). D.C. courts themselves also recognize the importance of evaluating probativeness in favor of the party seeking the admission of contested evidence – not by giving weight to contrary evidence offered in favor of its exclusion. *Johnson,* 764 F. Supp. at 1578-79.

Applying the appropriate standard, it is plain that Plaintiff has demonstrated the relevance of the missing evidence to his claims, such that a jury could find the missing video evidence would have favored Mazloum. As a threshold matter (and as discussed in detail above), Plaintiff will offer highly persuasive evidence at trial that FUR personnel destroyed the video proof with full knowledge of its importance – the sort of "bad faith" proof which many federal courts state is ***alone*** sufficient to meet this relevance standard, without any additional proof of what the cameras might have shown. *See, e.g., Residential Funding Corp.,* 306 F.3d at 109; *Rice*, 917 F. Supp. at 20 (where sufficient bad faith or recklessness in destruction of evidence is shown, the trial court is obligated to submit the issue to the jury with instructions allowing the inference). Beyond this (and as discussed in greater detail in the underlying motion, Plaintiff's opposition to the FUR Defendants' parallel

7

motion, and Plaintiff's Opposition to the FUR Defendants' Summary Judgment motion), the testimony of FUR witnesses, plus Plaintiff's efforts to ascertain what the FUR security cameras show, have unearthed substantial circumstantial proof suggesting that some combination of FUR's cameras would have captured various portions of the incident from start to finish.  Thus, even if the video evidence did not show every second of Mazloum's ordeal, or contain high definition images of Persons striking Mazloum (which the FUR Defendants seem to believe is the only form the evidence could come in to be sufficiently relevant), it would have likely shown enough portions of it to illuminate many contested issues of fact in this case.

The FUR Defendants' continued efforts to pick apart the many pieces of circumstantial proof offered by Plaintiff so far need not be rebutted point by point at this preliminary stage of the proceedings, but instead raise contested issues properly left to the jury to decide.  Yet it is readily evident that these factual "assertions" by the FUR Defendants are themselves questionable at the outset.  Thus,

- Fur denies that the "Coburn video" image shows the stage (FUR Defendants' Opp. at 4-5), when clearly it does (*see* Ex. B to Plaintiff's Motion *in Limine*).  The mere existence of this image undercuts the self-serving claims of FUR witnesses that "no" camera ever pointed at the stage – since Coburn, a private individual, testified he obtained such images on his own directly from the FUR security system at the time the lawsuit was filed in 2006 (months before Plaintiff's inspection of the Nightclub security system).  Moreover, Plaintiff vigorously disputes FUR's argument that the relevant portions of the stage where the incident occurred would not have been captured by such camera shots, or that they would not have caught some portions of Mazloum's initial interaction with Persons;

- FUR alleges the Plaintiff "does not claim" the tunnel staircase (at the foot of which Mazloum was beaten and handcuffed) would be captured by a camera – but FUR's co-owner, John Fiorito, admitted, in his May 2005 statement to an FBI investigator, that a camera "covers the stairs" leading from the "tunnel" to the dance floor of the Nightclub, showing "who comes down and who comes up" the stairs(*See* Excerpts from May 24, 2005 FBI Statement of John Fiorito, true copies of which are attached as Exhibit C, at 6 (document no. 7669)).

Given such contested issues (among many others), this Court simply cannot accept the FUR

Defendants' factual proffers as "proving" the destroyed video evidence would not have assisted Mazloum, when Mazloum has offered his own, well-founded interpretation of such proof that a jury might find equally persuasive. This is a matter to be decided by the jury, when it considers FUR's efforts to rebut the adverse inference. The FUR Defendants ultimately want this Court to adopt an upside-down version of the adverse inference. But Plaintiff is not obligated as a matter of law to *disprove* the FUR Defendants' defense to the adverse inference in order to obtain it in the first place.

C. **The FUR Defendants Have No Excuse for Failing to Identify Mr. Sequeira Adequately in Discovery, Thus Necessitating His Deposition Before Trial.**

Plaintiff has repeatedly cited the FUR Defendants' own discovery responses to demonstrate their repeated failure to identify Mr. Sequeira or otherwise indicate that he possessed relevant additional information about the security cameras that the FUR Defendants would be relying on at trial. *See, e.g.,* Ex. B to Plaintiff's Sur-Reply in Opposition to FUR's Summary Judgment Motion, dated July 26, 2007 (Docket No. 136). Knowing that Sequeira possessed knowledge of the security camera system apart from David McLeod (FUR's head of security), the FUR Defendants should have produced an additional security camera witness in response to Plaintiff's 30(b)(6) deposition notice. *See U.S. ex rel. Fago v. M & T Mortgage Corp.,* 235 F.R.D. 11, 22-23 (D.D.C. 2006)("the responding entity [to a 30(b)(6) deposition notice] *must* designate more than one deponent if multiple deponents are necessary to respond to all of the relevant areas of inquiry")(emphasis added) . They did not. Even if the FUR Defendants' counsel did not learn that Mr. Sequeira possessed such relevant knowledge until later in discovery, or even at the summary judgment phase, nothing would have prevented the FUR Defendants from amending their discovery responses at that time (as Plaintiff did when appropriate) and then agreeing to make Mr. Sequeira available. This is what reasonable and fair-minded litigants do – and what this Court expects them to do. Again, they did not.

In the hopes of distracting the Court's attention from the above, the FUR Defendants now attempt to fault Plaintiff for failing to identify a "video expert" who could conclusively reconstruct what the videos would or would not have shown.[5] Once again, the FUR Defendants miss the point. ***The video evidence has been destroyed.*** No party can say for certain today what the evidence would or would not show. It is precisely due to this fact that Plaintiff will seek an adverse inference at trial that the destroyed evidence would have assisted the Plaintiff's case and/or harmed the FUR Defendant's case. The FUR Defendants have already signaled their intent at trial to attempt to rebut this inference, but that issue is far from decided in their favor. Since FUR intends to rely on Sequeira's testimony to support its rebuttal point, the Plaintiff deserves the opportunity to depose him and measure the depth of his knowledge on these important issues.

---

5  As pointed out in Plaintiff's opposition to the FUR Defendants' parallel motion *in limine,* the whole subject of the necessity of expert testimony herein is a red herring. The law does not require "video reconstruction" expert testimony to obtain the adverse inference for destroyed evidence, especially in light of its bad faith destruction. More specifically, there is nothing here on which an expert could opine. The issue is purely factual: based on their location and aim, and the available photos of the monitoring screens, did the cameras capture those parts of the premises where the action took place? To the extent that it becomes relevant whether the cameras were likely to have captured relevant evidence, the jury needs no "expert" assistance to answer this question.

## CONCLUSION

For the foregoing reasons, Plaintiff reiterates his request that discovery be reopened for the limited purpose of permitting him to depose Diego Sequeira.

Respectfully submitted,

Dated:  November 28, 2007

/s/
Brian H. Corcoran (Bar No. 456976)
Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW
Suite 700 East Lobby
Washington, D.C.  20007
Ph: (202) 625-3500
Fax: (202) 298-7570
Brian.Corcoran@kattenlaw.com

Susan Huhta (Bar No. 453478)
Warren R. Kaplan (Bar No. 034470)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, D.C.  20036
Ph: (202) 319-1000
Fax: (202) 319-1010
Warren_Kaplan@washlaw.org

Attorneys for Plaintiff
Emile Mazloum