UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM                        :
                                     :
            Plaintiff                :
                                     :
    vs.                              :  Civil Action No.
                                     :  1:06:CV 00002
DISTRICT OF COLUMBIA,                :  (JDB)
    et al.                           :
                                     :
            Defendants               :

Washington, D.C.
October 25, 2006

Deposition of:

JOHN FIORITO,

called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices
of Katten Muchin Rosenman, LLP, 1025 Thomas
Jefferson Street, N.W., East Lobby, Suite 700,
Washington, D.C., before Zev V. Feder, CSR, a
Notary Public in and for the District of
Columbia, beginning at 9:41 a.m., when were
present on behalf of the respective parties:

Page 114

1   Q.   Tell me the entire conversation
2  that you had with Mr. Alkadi outside when you
3  were waiting for Lieutenant Allman to do his
4  thing?
5   A.   He came outside. He said, "That's
6  my friend." I said something to the effect
7  that your friend is really drunk and messed up
8  over there, and I said, was involved in a
9  fight. He goes, "Yeah, I know." He said, "I
10 got involved." And he started explaining to
11 me that he was involved and grabbed his friend
12 while he was up on the stage.
13      I said, "Well, don't worry about
14 that." I said, "The police are coming now."
15 I told him that there was nothing to worry
16 about. He was concerned about his friend. I
17 said, "Don't worry about it." I said, "I have
18 called the watch commander to come down here,
19 and I have called 911." I said, "They are
20 going to take care of it."
21   Q.   Have you finished your answer?
22   A.   Yes.

Feder Reporting Company
(202) 863-0000

Page 115

1   Q.   Have you told us everything that
2  you recall that was said between you and
3  Mr. Alkadi in that conversation?
4   A.   Yes.
5   Q.   Did you have any conversation with
6  Mike Romeo that night about the incident?
7   A.   Yes.
8   Q.   Tell me about that conversation.
9   A.   I briefly told him that there
10 was --
11   Q.   Excuse me. At what point in time
12 was this?
13   A.   I don't remember. The end of the
14 night before we left.
15   Q.   All right.
16   A.   I briefly told him that there was
17 a very unfortunate incident that happened in
18 the club tonight. There was an altercation
19 that took place. We don't know much about it.
20      That was basically it.
21   Q.   What did he say?
22   A.   He said okay. He asked me if I

Feder Reporting Company
(202) 863-0000

Page 116

1  was there. I told him yes. I said, "I called
2  the police." I said, "They are looking into
3  the matter." I said, "I'm sure Dave will be
4  able to get statements from security to find
5  out what happened."
6   Q.   Anything else?
7   A.   That's it.
8   Q.   Did anyone request Dave -- did you
9  have a conversation with Dave?
10   A.   No, not that night.
11   Q.   To your knowledge did Dave get
12 statements from security?
13   A.   Not that evening.
14   Q.   Ever?
15   A.   I don't know what happened with
16 him until the next day. That's when the story
17 continues.
18   Q.   Well, to your knowledge, has Dave
19 ever gotten statements from anyone in
20 security?
21   A.   I would presume he has.
22   Q.   Have you ever seen them?

Feder Reporting Company
(202) 863-0000

Page 117

1   A.   No.
2      (Discussion off the record.)
3      BY MR. KAPLAN:
4   Q.   What happened the next day?
5   A.   Around 6:00 o'clock at night, my
6  cell phone rang. And it was Officer Ramirez
7  calling me telling me that Mr. Mazloum and two
8  of his friends were at the First District
9  police station filing a complaint against him.
10 And I said, "Okay. So why are you calling
11 me?"
12      He said, "Well, there are two guys
13 here saying they are with FUR Security."
14      I said, "Well, I don't know
15 anything about this. I will call Dave. I
16 will look into it for you and get back to
17 you."
18      I called Dave. He said he had no
19 knowledge of this.
20      I contacted Ramirez back. I said,
21 "I don't have any knowledge of FUR employees
22 down there with them."

Feder Reporting Company
(202) 863-0000

Page 118

1  Ramirez described one of them to
2  him. I said, "Well, maybe that's his friend."
3      He said, "Well, they are in here
4  making allegations."
5      Q. What was the description he gave
6  you?
7      A. Short, stocky guy. He described
8  him as the guy that I always saw wearing
9  certain glasses and a jacket at night at FUR
10 when I saw him. So I figured, I kind of
11 figured out who it was.
12     Q. He said short, stocky, wearing
13 glasses?
14     A. Yes, that wore glasses at night.
15 Sunglasses at night.
16     Q. And a jacket?
17     A. Yes. Always dressed nicely. I
18 said, "I think I know who you are talking
19 about."
20     Q. Did he say he was wearing glasses
21 at the police station?
22     A. No.

Feder Reporting Company
(202) 863-0000

Page 119

1      Q. What did he say?
2      A. Just what I told you.
3      Q. He said there is a guy here who
4  wore glasses at night.
5      A. Right. Wore sunglasses at night.
6  Usually wore a suit. And that's it. So we
7  contacted Masoud next.
8          Let me finish my conversation with
9  Ramirez, then.
10         I said, "Well, what is the
11 problem, Ramirez," to him.
12         And he said, "Well, they are in
13 with Lieutenant Taylor and she is calling for
14 mobile crime."
15         I said, "So let her call for
16 mobile crime. She has to take a complaint.
17 What's the big deal?"
18         He got very upset and asked about
19 the video system at FUR. I said, "Yes, --
20     Q. Excuse me. I have to interrupt
21 you. I am a little confused here.
22         You said something about calling

Feder Reporting Company
(202) 863-0000

Page 120

1  Masoud. Is this before you called Masoud?
2      MR. FITZSIMMONS: He interrupted
3  himself. He said, "Let me get back to my
4  conversation with Ramirez."
5      BY MR. KAPLAN:
6      Q. So this is before you called
7  Masoud?
8      A. I was still with Ramirez.
9      Q. So this is the conversation, now,
10 after you have talked to Dave and you called
11 Ramirez back.
12     A. That's correct, sir.
13         Continuing to tell him, have
14 Lieutenant Taylor come up to talk to us,
15 interview us, do whatever she needs to do.
16         He asked about the video. I said,
17 "I don't know anything about the video." I
18 said, "I don't use it." I said, "I don't know
19 how to work it." But I said, "Have Lieutenant
20 Taylor call Dave." I said, "I know he can
21 burn a copy of whatever is recorded on disk."
22 I said, "Have her go to CVS, buy a disk, and

Feder Reporting Company
(202) 863-0000

Page 121

1  come up here and see Dave and let her go
2  through it, and don't worry about it." And
3  that was the end of my conversation with him.
4          Then I called Masoud.
5      Q. Wait a minute.
6          What did you do next? Then you
7  called Masoud?
8      A. When I got to the club I called
9  Masoud in the presence of Michael.
10     Q. In your conversations with
11 Ramirez, it was just the two of you?
12     A. That's it.
13     Q. Two conversations. He called you.
14 Then you called him back.
15     A. That's correct.
16     Q. Then after that, the next contact
17 you had was with Masoud or with Michael?
18     A. At Michael with the club, and then
19 I called Masoud from the club.
20     Q. The conversations with Ramirez,
21 you were not at the club?
22     A. That's correct. My cell phone

Feder Reporting Company
(202) 863-0000

Page 122

1  rang at 6:00 o'clock. I was in an apartment
2  in D.C. hanging out.
3      Q. Then you went to the club?
4      A. Uh-huh.
5      Q. Told Michael?
6      A. I told Michael about what had
7  happened. Michael said, "Call Masoud and ask
8  him if this is his guy."
9          Masoud said, "Okay, I'll look into
10 it." Masoud called back within five minutes
11 and said, yes, it is his guy. I told him to
12 stop by and see you guys at the club and
13 explain what was going on.
14     Q. Was Michael on the conversation
15 with Masoud?
16     A. He was standing next to me while I
17 was holding the phone.
18     Q. Tell me the whole conversation
19 with Masoud.
20     A. I asked Masoud if this guy worked
21 for him or was down at the police station, did
22 he know anything about what was going on from

Feder Reporting Company
(202) 863-0000

Page 123

1  the incident last night.
2          So he called the guy and had the
3  guy stop by FUR Nightclub on his way to work
4  at Dream Nightclub, to stop by and talk to us
5  to tell us what happened, what was going on.
6          So we waited and when he arrived
7  we sat down in the main office and talked to
8  him.
9      Q. What time did he arrive?
10     A. I don't remember.
11     Q. Approximately.
12     A. I have a statement that I wrote
13 down everything that was transpired during the
14 interview. Maybe the time is on there.
15     Q. I understand. I am just asking
16 for your best recollection.
17     A. I don't know.
18     Q. Before midnight?
19     A. Yes.
20     Q. It was when he got off work at
21 Dream?
22     A. On his way to work at Dream. It

Feder Reporting Company
(202) 863-0000

Page 124

1  would probably be before 11:00, if you want to
2  narrow it down. Somewhere between 7:00 and
3  11:00.
4      Q. This is Mr. Alkadi?
5      A. Yes.
6      Q. So Mr. Alkadi dropped by -- he
7  came to FUR sometime between 7:00 and 11:00?
8      A. Yes.
9      Q. And did you see -- were you the
10 first one at FUR to greet him when he came in?
11     A. He came in. Michael was sitting
12 in the office. We just went into the office
13 and spoke to him.
14     Q. When you say the office, do you
15 mean the little door on the right as you come
16 in?
17     A. Yes, sir.
18     Q. Where the cameras, the monitors
19 are?
20     A. Yes, sir.
21     Q. Who was in that room?
22     A. Myself and Michael.

Feder Reporting Company
(202) 863-0000

Page 125

1      Q. Anyone else?
2      A. That's it.
3      Q. How long did the meeting last?
4      A. Ten, 15 minutes.
5      Q. Just the three of you? You,
6  Michael and Mr. Alkadi. Is that right?
7      A. That's what I said.
8      Q. Tell me everything that you recall
9  that was said by each of you during that
10 conversation.
11     A. We sat down and Michael let me
12 lead the question with the questions. And I
13 asked him what was going on, why was he down
14 at the metropolitan police station
15 representing himself as a FUR employee. And
16 can you please fill us in on what is going on,
17 because, as I said, we have already initiated
18 a call to have this incident investigated.
19         So, he said that the officers hit
20 his friend. And I said, "Well, can you tell
21 me when this occurred? Because I was with you
22 outside. When did this happen? Did this

Feder Reporting Company
(202) 863-0000

Page 142

1  He said there was nothing to see. There was
2  nothing on them. And nobody saw anything.
3      I said, "Oh, well, if the police
4  want it, they have already been offered. They
5  can come and get it."
6      Q.  Are you saying that you don't know
7  that the cameras show the steps leading up to
8  the catwalk?
9      MR. FITZSIMMONS:  Objection.
10 Assumes facts not in evidence.
11     THE WITNESS:  I don't know the
12 exact positioning of those cameras. I don't
13 look -- I have been in that office. I spend
14 minutes at a time in that office, if any.
15     BY MR. KAPLAN:
16     Q.  And there is also a camera that
17 shows the area outside the club, including
18 across the street from the club. Is that not
19 true?
20     MR. FITZSIMMONS:  Objection.
21 Assumes facts not in evidence.
22     BY MR. KAPLAN:

Feder Reporting Company
(202) 863-0000

Page 143

1      Q.  Are you aware of that?
2      A.  I am not aware of the positioning
3  of those cameras. I do know there is a camera
4  right at the cashier that shines on the
5  entrance.
6      Q.  What is the system for
7  preservation or rerecording over the camera
8  film?
9      MR. FITZSIMMONS:  Objection.
10 Foundation.
11     THE WITNESS:  From what Dave has
12 told me, the cameras automatically rerecord
13 every seven days. It is not a disc or
14 anything. It is some type of memory that it
15 has. It recopies over every seven days if you
16 don't go in there for any reason. You have to
17 manually, I think, burn it.
18     BY MR. KAPLAN:
19     Q.  So after seven days the old image
20 is wiped out and a new image appears? Is that
21 it?
22     MR. FITZSIMMONS:  Objection.

Feder Reporting Company
(202) 863-0000

Page 144

1  Foundation.
2      THE WITNESS:  That was what was
3  explained to me but I don't know that for a
4  fact.
5      BY MR. KAPLAN:
6      Q.  When was that explained to you?
7      A.  By Dave.
8      Q.  When?
9      A.  Within the time frame of him
10 looking at the cameras and that incident.
11     Q.  Did you tell Dave that Mr. Mazloum
12 had filed a complaint and was, apparently,
13 going to pursue a complaint over this
14 incident?
15     A.  I told him that the police had
16 contacted me and that there was a complaint
17 being made. I said if there is -- I have
18 already told -- I told him what I told Ramirez
19 on the phone, which was I told Lieutenant --
20 tell him to tell Lieutenant Taylor to contact
21 you, the head of security, and come up and
22 look at the video, if there is any video.

Feder Reporting Company
(202) 863-0000

Page 145

1      Q.  Did you tell Ramirez in that
2  conversation how many days he had to do that
3  before the tape would be recycled?
4      A.  No, how would I tell him that,
5  when I told you that Dave explained to me,
6  after the fact, how the system works. I had
7  never looked at the system before.
8      Q.  When you spoke to Dave, was it
9  that same day that you spoke to Ramirez that
10 you spoke to Dave?
11     A.  Yes, Saturday night.
12     Q.  What exactly did you tell Dave?
13     A.  I said go through the cameras
14 between these hours and see if there is
15 anything there during that incident. He said
16 he attempted to.
17     Q.  When did he tell you that?
18     A.  That night.
19     Q.  So the same night you told him to
20 go through the cameras, he told you he did go
21 through the cameras?
22     A.  Yes, he looked at them.

Feder Reporting Company
(202) 863-0000

Page 146

```
 1      Q.   Did you tell him which ones to
 2  look at?
 3      A.   No.
 4      Q.   Did you tell him, in the club,
 5  where it took place?
 6      A.   Yes, I told him where it took
 7  place, and he saw the end of it outside. I
 8  told him to look it over and, if there was
 9  anything there, to attempt to burn it and save
10  it for the police if he could even see
11  anything on the cameras.
12      Q.   When did he get back to you?
13      A.   He got back to me that night.
14      Q.   And what did he say?
15      A.   He said, "The cameras were all on
16  the staff, John." He said, "There is nothing
17  there. You were across the street. The
18  camera was on the front door. It doesn't show
19  anything."
20           I said, "All right. Well, if they
21  want it, they made the complaint. The police
22  will come down here and look it over, and go
```
Feder Reporting Company
(202) 863-0000

Page 147

```
 1  through it themselves," which they had done
 2  before.
 3      Q.   Has there been any change in the
 4  number or placement of security cameras since
 5  the club opened?
 6      A.   I have no idea.
 7      Q.   Since the incident in March of
 8  2005 have there been any changes in the number
 9  or the placement of cameras?
10      A.   I have no idea.
11      Q.   Who would know?
12      A.   Dave McLeod. That is a security
13  matter. I am the sound and lighting
14  technician.
15      Q.   Did you tell Dave that he should
16  look at the bottom of the steps, of the steps
17  going down from the catwalk to the dance
18  floor?
19      A.   No. I gave him the whole area
20  where I was. I said: Mike Persons can tell
21  you more about it but, I said, I believe this
22  started at the stage. We went up the steps to
```
Feder Reporting Company
(202) 863-0000

Page 148

```
 1  the tunnel and straight out the front door.
 2      Q.   And across the street?
 3      A.   Correct.
 4      Q.   Was there any memorandum made of
 5  that conversation?
 6      A.   No.
 7      Q.   When Dave said it doesn't show
 8  anything, did you say, "Well, maybe we should
 9  preserve any films from tonight, anyway,
10  because it looks like there may be a lawsuit
11  coming"?
12      A.   How would I predict there is a
13  lawsuit coming? And, two --
14      Q.   Well, you knew Mr. Mazloum had
15  filed a complaint with the police department.
16           MR. FITZSIMMONS: That's
17  argumentative. You can turn it down. He
18  didn't say lawsuit.
19           BY MR. KAPLAN:
20      Q.   You knew that, did you not?
21      A.   No.
22      Q.   You didn't know he had filed a
```
Feder Reporting Company
(202) 863-0000

Page 149

```
 1  complaint?
 2      A.   The complaint, yes. You just said
 3  lawsuit. The complaint was against the police
 4  officers. Why would I have any worry that the
 5  club had any liability or him having a claim
 6  against the club when, as far as I knew at
 7  that point, it was the police had assaulted
 8  him, based on what his friend told me.
 9      Q.   Even if there was no claim against
10  the club, even if the only claim was against
11  the police, you knew that those videotapes
12  could potentially include important evidence
13  that would be relevant in his claim against
14  the police, right?
15      A.   That's correct.
16      Q.   My question is, did you suggest or
17  have any conversation with Mr. McLeod about
18  the desirability of preserving those
19  videotapes in case anyone had any question
20  about what was on them?
21           MR. FITZSIMMONS: Objection.
22  Asked and answered.
```
Feder Reporting Company
(202) 863-0000

Page 150

 1    THE WITNESS: I think by me
 2 telling Ramirez that -- have Lieutenant Taylor
 3 go to CVS and buy a DVD and come look at it,
 4 and then me telling Dave to look it over, is
 5 enough insinuation for a reasonable person to
 6 understand that, if I am telling you to look
 7 something over, that if there is something
 8 there, I said, "Burn it." That right there is
 9 me telling him to preserve it if there is
10 something there.
11    I think I have answered it now.
12    MR. BRUCKHEIM: For the record,
13 can you clarify what "Burn it" means?
14    THE WITNESS: Burn, usually, like
15 a computer, you have a disc drive, you burn it
16 onto a CD. You tape and record it.
17    BY MR. KAPLAN:
18  Q.  Did you make any effort to notify
19 Mr. Mazloum that, if he or his representatives
20 wanted to come by and look at the tape, they
21 could do that?
22  A.  No. I didn't have his number. I

Feder Reporting Company
(202) 863-0000

Page 151

 1 didn't know Mr. Mazloum. And they had already
 2 filed an official complaint. I would have
 3 thought the Metropolitan Police Department
 4 would have been efficient and competent, and
 5 gotten right on this. They used to.
 6  Q.  Did you make any effort to get
 7 Mr. Mazloum's phone number or his contact
 8 information?
 9    MR. FITZSIMMONS: At what point
10 are we talking?
11    BY MR. KAPLAN:
12  Q.  At any point, so you could notify
13 him that he could come or have his
14 representative come and look at the videotape?
15  A.  No, not after I heard the
16 allegations from his friend, because his
17 friend's perception of the facts I thought
18 were what I call go home and sleep on it, and
19 wake up the next day and say, oh, we are going
20 to get some money out of the D.C. Government,
21 so let's go down and get some lawyers and
22 trump up some story. I don't think he was in

Feder Reporting Company
(202) 863-0000

Page 152

 1 good faith making his complaint because he
 2 felt his civil rights were violated or that he
 3 felt some undoing was wrong. I felt it was
 4 for monetary gain.
 5    At that point there was an
 6 official investigation. I was still employed
 7 as a police officer. I had no reason to
 8 contaminate, get involved or get in the middle
 9 of this investigation, especially that it was
10 in the FBI's hands.
11  Q.  Well, you got in the middle of it
12 sufficiently to tell Mr. Ramirez that he
13 should tell Lieutenant Taylor that, if she
14 wanted to come look at the films, she could,
15 right?
16  A.  That's advice. That is passing it
17 on that she can come look at it.
18  Q.  But you didn't give that same
19 advice to anyone on Mr. Mazloum's side of the
20 complaint, did you?
21  A.  No. Because I didn't know any of
22 you at that time and you never reached out to

Feder Reporting Company
(202) 863-0000

Page 153

 1 contact us. You just went on fetched
 2 allegations and put it on the newspaper
 3 without doing your due diligence first. Now
 4 you are going to see that there is a little
 5 bit more to this story than what you actually
 6 know.
 7    If you contacted the club, to be
 8 honest with you, we were deeply concerned. If
 9 anybody gets hit, or anybody, an alleged
10 allegation or something, that would have been
11 a big concern. But being that this wasn't
12 given the opportunity for the police to even
13 do their job internally, and it just went to
14 this level, what do you expect anybody to do?
15 We had to wait to this day, and now we are all
16 here.
17  Q.  Did you have any conversation with
18 Mike Romeo about, you know, if Mr. Mazloum
19 pursues his complaint, if the ABC board makes
20 an investigation, they might want to come and
21 look at the videotapes of that night?
22  A.  No.

Feder Reporting Company
(202) 863-0000