UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EMILE MAZLOUM,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No.  06-0002 (JDB) |
| **DISTRICT OF COLUMBIA METROPOLITAN POLICE DEPARTMENT, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

On December 14, 2007, this Court issued an Order staying a portion of these proceeding and moving the trial date to April 23, 2008.  See Mazloum v. Dist. of Colum., No. 06-2 Dckt. # 158 (D.D.C. Dec. 14, 2007).  The facts of this case are set out in prior opinions of this Court and will not be repeated here.  See, e.g., Mazloum v. Dist. of Colum., --- F.Supp.2d ----, 2007 WL 3257010 (D.D.C. Nov. 6, 2007).  Currently before the Court are the parties' several motions *in limine*.  In his two motions, plaintiff seeks to: (1) preclude defendants from introducing evidence regarding his finances, particularly a loan application dated April 28, 2005; and (2) re-open discovery to depose Diego Sequeira, general manager of the FUR Nightclub. The FUR defendants, for their part, seek to preclude plaintiff from introducing evidence regarding the club's video surveillance system, as well as evidence of its policies and practices in dealing with customers.  The motions are now fully briefed and ripe for resolution.  The Court will address each in turn.

**I.      Plaintiff's Motion to Preclude the Admission or Use of Financial Evidence**

During his deposition, counsel for Officers Ramirez, Phillips, Modlin, and Schneider (collectively "the off-duty officers") questioned plaintiff about certain housing loan documents (hereinafter "the financial records") that defendants had subpoenaed from third-party JLM Direct Funding Ltd.  Pl.'s Financial Records Reply at 2.[1]  Those records indicate that on a loan application, signed and dated on April 28, 2005, plaintiff noted that he was "earning a monthly income of $10,833.00."  Defs.' Financial Records Opp'n at 3-4.  According to the off-duty officers, however, that statement conflicts with plaintiff's deposition testimony that he "was unable to work between March 11, 2005 . . . and September, 2005."  Id. at 4.  Thus, defendants may seek to introduce this evidence to impeach plaintiff's credibility at trial.

Plaintiff asserts that there are two critical defects that preclude those documents from being introduced into evidence.  To begin with, he contends that the financial records amount to extrinsic evidence on a collateral matter that would only confuse the jury and waste the Court's time.  In addition, plaintiff argues that defendants cannot introduce the records because they were not obtained in accordance with Fed. R. Civ. P. 45(b)(1) and he asks the Court to exercise its inherent power to exclude the documents because of that violation.  The off-duty officers respond that the records are relevant to a primary issue in the case.  They further assert that the Rule 45 violation was a mere inadvertent, and harmless, error on their part.

---

[1] The Court will refer to the various motions, oppositions, and replies as follows: (1) plaintiff's motion *in limine*, and corresponding briefs, relating to the financial records will be referred to as "Pl.'s Financial Records Mot."; (2) plaintiff's motion *in limine*, and corresponding briefs, relating to reopening discovery will be referred to as "Pl.'s Disc. Mot."; (3) the FUR defendants' motion *in limine*, and corresponding briefs, relating to the video surveillance evidence will be referred to as "FUR Video Mot."; and (4) the FUR defendants' motion *in limine*, and corresponding briefs, relating to FUR's policy matters will be referred to as "FUR Policy Mot."

Rule 45(b)(1) provides that if a subpoena "commands the production of documents . . . a notice must be served on each party" when the subpoena is issued. See Fed. R. Civ. P. 45(b)(1). In this case, the off-duty defendants did not serve any such notice on plaintiff when they issued the subpoena to the third-party that produced plaintiff's financial records. Nor did defense counsel even provide plaintiff or his attorneys with a copy of the financial documents prior to the commencement of plaintiff's deposition. Pl.'s Financial Records Reply at 3. In fact, plaintiff had no idea that defendants had obtained the financial records and planned to question him about them until defendants "plunk[ed] a copy of . . . [the] undisclosed loan application down on the table . . . and commenc[ed] to ask questions about it." Id.

The off-duty defendants have plainly violated Rule 45(b)(1) in this case. They argue, however, that the violation was unintentional and occurred through "inadvertence, error, and the press of other business." Defs.' Financial Records Opp'n at 7. Moreover, the off-duty defendants maintain that plaintiff has not demonstrated that the lack of disclosure "prejudiced him" because plaintiff's counsel could have reviewed the documents after the first day of the deposition to prepare plaintiff for the second day of testimony. Id. at 8. That is not entirely correct. To begin with, even if plaintiff's counsel reviewed the documents and questioned plaintiff regarding them on the second day of the deposition, the fact remains that the off-duty defendants were able to depose plaintiff on the first day without giving counsel the opportunity to prepare the deponent for that line of questioning. Moreover, as plaintiff correctly notes, there was a risk that discussing the financial documents with plaintiff during the pendency of his deposition might be construed as impermissible "coaching." See, e.g., United States v. Philip Morris, Inc., 212 F.R.D. 418, 420 (D.D.C. 2002). The off-duty defendants' conclusory

statement that plaintiff would not "have moved to quash the subpoena" in any event is wholly speculative and contradicted by plaintiff's representations in his reply brief.  See Pl.'s Financial Records Reply at 5.  Indeed, the very purpose of Rule 45(b)(1) is to remove any doubt over such questions by requiring disclosure at the outset.

Rule 45(b)(1) is designed, in part, to avoid the very sort of "surprise" that occurred in this case.  As plaintiff correctly notes, his counsel "had no reasonable opportunity to prepare him for that line of inquiry."  Id. at 6.  It is also troubling that defense counsel, when informed by plaintiff's attorneys that he was required to notice opposing parties of third-party subpoenas, replied: "I don't believe that is the case."  Id. Ex. B.  That, however, is indeed the case.  Plaintiff assigns a nefarious motive to defendants' discovery violation, citing their allegedly "shift[ing]" excuses, id. at 5, but the Court observes that defendants' assertion that the non-disclosure was a result of "error" is consistent with defense counsel's mistaken statement during the deposition.

Inadvertent or otherwise, however, a violation has in fact occurred and the question is what action, if any, the Court should take in response.  Plaintiff, naturally, urges that the Court should exclude the acquired documents from evidence solely on this basis by exercising its inherent powers.  Courts have so-called "inherent power" to "protect their integrity and prevent abuses of the judicial process."  Shepherd v. Am. Broadcasting Co., Inc., 62 F.3d 1469, 1474 (D.C. Cir. 1995) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991)).  The discretion to "preclud[e] the admission of evidence" is one of those powers.  Id. at 1475.  The Court will return to this question of remedy after it examines the possible evidentiary uses that the off-duty officers may seek to make of the loan application.

Turning first to plaintiff's other objection to the financial records evidence, the Court notes that it is well-settled that collateral matters cannot be proved by extrinsic evidence. See, e.g., United States v. Hayes, 369 F.3d 564, 567 (D.C. Cir. 2004). As plaintiff puts it, a matter is collateral if it "is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness." Pl.'s Financial Records Reply at 5 (citing McCormack on Evidence § 45 (6th ed.)). Here, plaintiff argues that the financial records evidence is entirely collateral because the "documents shed no light at all upon what took place the evening of March 11, 2005." Pl.'s Financial Records Mot. at 6. Moreover, because plaintiff "will not be seeking to recover . . . any lost wages incurred while he was out of work recuperating from the injuries he suffered in the FUR attack," he contends that this evidence "has no bearing on his damages claims" either. Id. Defendants respond that the financial records are not collateral because the information "goes directly to [plaintiff's] credibility as it relates to the underlying incident, and the alleged severity of his injuries." Defs.' Financial Records Opp'n at 4. If plaintiff was not in fact so badly injured that he was out of work for six months, the argument goes, that fact is relevant to the assessments of injury and damages in this case. And, alternatively, if plaintiff was indeed so injured but nevertheless falsely represented his income on the loan application, that would impeach his credibility, according to defendants.

The off-duty officers' position has some surface appeal. At the outset, it is worth noting that the financial records, to the extent that they establish a fact of consequence, are mainly

relevant to the issue of damages.[2]  Here, the evidence says very little about the underlying liability of the off-duty officers because the documents in question do not relate to the incident itself.  Defendants assert that the records are "clearly relevant to the scope of plaintiff's injuries" and also "challenge plaintiff's credibility" as to the veracity of his asserted injuries.  Id. at 5.  The Court agrees in part.  The loan application does not directly relate to plaintiff's damages: nowhere in the document does it specify the extent of his injuries, the costs incurred, or the like.  As explained above, the financial records have nothing whatsoever to do with the incident on March 11-12, 2005.  Thus, the only manner in which the document can relate to the scope of plaintiff's injuries is through impeachment of his trial testimony.

But the loan application is only cognizable impeachment evidence if plaintiff is first asked whether he was out of work as a result of his injuries and he answers in the affirmative.  If plaintiff responds (consistent with his deposition testimony) that he missed six months of work because he was suffering from the repercussions of the assault, defendants may legitimately present evidence of the loan application that appears (at least on the surface) to contradict that assertion. Because that line of questioning is relevant to a primary issue in the case -- damages -- defendants may present extrinsic impeachment evidence at trial.  On the other hand, if plaintiff responds that he was not out of work for a substantial period of time following the March 2005 incident, then defendants cannot introduce the financial records into evidence because they would be stripped of their impeachment value and, standing alone, they are only minimally probative

---

[2] It is conceivable that, in some circumstances, the scope of injury would be relevant to the underlying liability of a defendant.  For example, if the applicable tort required a threshold of severity to be actionable, that might present the sort of scenario where scope of injury would be closely intertwined with the liability inquiry.  Indeed, evidence of the scope of plaintiff's injuries could be relevant to the excessive force claim asserted here by plaintiff under 42 U.S.C. § 1983.

on the damages issue.

Plaintiff nevertheless argues that there is a significant risk that the jury would use evidence of the loan application to regard plaintiff as "some sort of 'cheat,'" Pl.'s Financial Records Reply at 8, an impermissible inference in his view. Consequently, he insists that the loan application is unfairly prejudicial and should be barred by Fed. R. Evid. 403. The Court disagrees. Any risk of unfair prejudice resulting from this evidence is minimal. To begin with, the probative force of the loan application as impeachment evidence is admittedly low. As plaintiff himself argues, the assertions on the face of the loan do not necessarily contradict anything in plaintiff's deposition testimony. To the extent that the loan application has any prejudicial impact, counsel will be given a full opportunity to rehabilitate plaintiff on re-direct examination. Specifically, plaintiff has already asserted that he "set forth an *average* base monthly income of $10,833" on his loan application. Id. at 7 (emphasis in original). Thus, he stresses that "[a]n estimation of his monthly income is not inconsistent with his having been out of work for some period" of time as of the date the documents were signed. Id. at 7-8. Plaintiff will have ample opportunity to present that explanation to the jury. The Court does not foresee that this progression of events would unduly delay the proceedings or result in confusing the issues for the jurors.

The off-duty officers also propose to use the financial records as evidence of plaintiff's "overall propensity for truth and veracity." Def.'s Financial Records Opp'n at 3. Plaintiff responds that the financial records may not be used to attack his "character for truthfulness" under Fed. R. Evid. 608(b). Here, plaintiff is correct. In relevant part, Rule 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting

the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." Fed. R. Evid. 608(b). The assertions contained on plaintiff's loan applications quite plainly do not amount to a conviction for purposes of Rule 609. Thus, the off-duty defendants are categorically barred from offering the financial records into evidence to prove plaintiff's general character for truthfulness.[3]

That brings us back to the Rule 45 issue. As the foregoing discussion establishes, solely as a matter of the rules of evidence, defendants will be permitted to make just one possible use of the loan application. The question, then, is whether even that evidentiary use should be disallowed due to the off-duty officers' Rule 45(b)(1) violation. Inherent powers "must be exercised with restraint and discretion," Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980), and employed only with utmost caution "[b]ecause of their very potency," Chambers, 501 U.S. at 44. Based on the record in this case, the Court declines to exercise its inherent power to bar the use of the loan application as impeachment evidence on the damages issue. Ultimately, the Court cannot conclude that plaintiff was unduly prejudiced by this violation. First, although due to the violation neither plaintiff nor his attorneys were aware that the off-duty defendants intended to question him about the loan application at his deposition, he cannot claim to have been truly "surprised" by the document in one sense -- after all, plaintiff completed and signed it, and hence was aware of it and presumably already had a copy of it. This fact mitigates the prejudice to plaintiff here.

More importantly, the main harm to plaintiff is that his attorneys were not able to prepare

---

[3] Consistent with Rule 608(b), of course, defendants may (if the Court allows) inquire about the loan application on cross-examination of plaintiff, to the extent it is probative of plaintiff's character for truthfulness or untruthfulness.

him for questioning concerning the application prior to the deposition. But that harm will not be reflected at trial. Simply put, if plaintiff testifies at trial consistently with his deposition testimony concerning how long he was out of work following the attack, his deposition (and any unfairness) on that point will become moot. And if, on the other hand, he contradicts his deposition testimony at trial, any impeachment will be through use of the deposition transcript, not the loan application. In any event, when defendants seek to cross-examine him at trial, his counsel will undoubtedly by then have prepared him to respond to that imminent questioning. Thus, by the time plaintiff takes the stand, if he is asked about the loan application, any prejudice that might have infected his deposition will no longer be relevant or present. Accordingly, the Court declines to exercise its inherent remedial power in this instance.

In sum, the admissibility of the loan application as impeachment evidence is contingent on plaintiff's response to defendants' questioning during cross-examination. If plaintiff indicates that he was out of work for some period of time following the supposed attack, defendants may introduce the financial records in an attempt to impeach him on that issue because the alleged inconsistency between those documents and his trial testimony will be relevant to his damages claim, a primary issue in this case. Defendants may not, however, employ those same documents to attack plaintiff's character for truthfulness under Rule 608. Thus, plaintiff's motion *in limine* relating to financial records will be granted in part and denied in part.

## II.    Plaintiff's Motion to Re-Open Discovery & The FUR Defendants' Motion to Exclude Video Surveillance Evidence

The Court will address plaintiff's motion to re-open discovery and the FUR defendants' motion to exclude video surveillance evidence at the same time because they raise related issues. In his motion, plaintiff seeks to depose Diego Sequeira, the general manager of FUR.

Specifically, plaintiff seeks the opportunity to question Mr. Sequeira about the certificate he authored concerning FUR's video system; the FUR defendants submitted that certificate during the summary judgment round of briefing. For their part, the FUR defendants oppose re-opening discovery. They also seek to preclude plaintiff from introducing any evidence whatsoever regarding what FUR's video system might (or might not) have captured on the night of March 11-12, 2005. In fact, in the reply brief on their motion, the FUR defendants suggest that plaintiff's only relevant use for the video surveillance evidence -- and, consequently, the only use he would have in deposing Mr. Sequeira at this time -- would be to establish a case for an adverse inference instruction. FUR's Video Reply at 2. And because they contend that an adverse inference instruction is unavailable to plaintiff as a matter of law, the FUR defendants argue that it is therefore appropriate to grant their motion to exclude this evidence and deny's plaintiff's motion to re-open discovery. Id.

    Because these questions may ultimately turn on the availability of an adverse inference instruction in this case, the Court will address that issue first. The FUR defendants' principal argument is that the inference is unavailable to plaintiff as a matter of law because they had no obligation to preserve the evidence at the outset. FUR's Discovery Opp'n at 2-3. As explained below, the Court disagrees, but it must first decide what body of law to apply to this adverse inference inquiry. The FUR defendants insist that plaintiff, who initially cited adverse inference case law from the D.C. Court of Appeals, "err[ed] in arguing" that those cases govern these proceedings because "federal" adverse inference doctrine, rather than D.C. precedent, applies here. Id. at 1-2. Plaintiff responds that the FUR defendants' contention is erroneous, and he additionally asserts that "federal" adverse inference law points to the outcome he advocates in

any event.  Pl.'s Disc. Reply at 2-3.

Plaintiff has the better of this argument.  The FUR defendants' position relies heavily upon Johnson v. WMATA, 764 F. Supp. 1568 (D.D.C. 1991), which held that adverse inference is an evidentiary issue and that "federal, not state, rules govern" such questions.  Id. at 1579.  Thus, citing a D.C. Circuit opinion, the court in Johnson concluded that "[t]he appropriate federal doctrine is the so-called adverse inference rule which 'provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.'" Id. (citing Int'l Union v. NLRB, 459 F.2d 1329, 1336 (D.C. Cir. 1972)).  The court then added that "[n]ormally, such inferences are not drawn unless there is evidence of 'evil intent, bad faith or willfulness.'" Id. (citing Vick v. Texas Employment Comm'n., 514 F.2d 734, 737 (5th Cir. 1975)).  But the Johnson court was merely distinguishing, as this Court has also done, see Mazloum, 2007 WL 3257010 at *28 ("To permit an adverse inference instruction does not necessarily imply that a party incurred a legal duty to preserve evidence in the tort sense."), between spoliation of evidence as a matter of District of Columbia tort law and the adverse inference doctrine.  Johnson, 764 F. Supp. at 1579 ("[The plaintiffs] make these arguments under the rubric of the District of Columbia's spoliation of evidence doctrine.  However, . . . federal, not state, rules govern procedural matters such as what evidence may be admitted.").  The FUR defendants read far too much into that passage.  The District of Columbia case law cited by plaintiff here deals directly with adverse inference law, not the independent spoliation of evidence tort.

There is nothing in Johnson to suggest that the District's adverse inference precedents do

not square with their "federal" counterparts, to the extent that the two are different at all.[4]  In fact, subsequent cases in this district have expressly relied on District of Columbia precedent to analyze adverse inference issues.  See, e.g., More v. Snow, 480 F. Supp. 2d 257, 275 (D.D.C. 2007) (expressly incorporating the elements of adverse inference doctrine found in Battocchi v. Washington Hosp. Ctr., 581 A.2d 759, 765-66 (D.C. 1990)); Rice v. United States, 917 F. Supp. 17, 20 (D.D.C. 1996) (same).  The FUR defendants' suggestion that the court in Rice was somehow "mislead" by the litigants into applying the incorrect legal standard is baseless.  FUR's Disc. Opp'n at 2 n.1.  Instead, as noted above, their belief that Johnson and Rice are in tension stems from a misreading of Johnson, and to a certain extent their misinterpretation of Rice.

In any event, there is little, if any, difference between the articulation of the adverse inference standard found in District of Columbia case law and the so-called "federal" approach favored by the FUR defendants.  Their reliance on Kraus v. GMC, 2007 WL 3146911 (S.D.N.Y. Oct. 24, 2007), is misplaced.  According to defendants, Kraus stands for the proposition that "federal decision law . . . holds that where, as here, a plaintiff has tried but failed to make out a spoliation tort claim, that plaintiff is *not* entitled to any corresponding adverse inference instruction."  FUR's Disc. Opp'n at 2 (emphasis in original).  That is incorrect.  As plaintiff notes, the FUR defendants have conflated "the duty of care element of a spoliation claim with the lesser burden applicable to the adverse inference."  Pl.'s Disc. Reply at 1.[5]  Kraus merely held that an adverse inference instruction was not warranted because

---

[4] Similarly, there is nothing in the D.C. Circuit's opinion in Int'l Union that indicates any distinction between state and federal adverse inference law.

[5] This confusion is understandable.  Aside from being related doctrines to begin with, the court in Kraus stated that: "Because plaintiff has not established spoliation, it is not entitled to an

"litigation was not pending nor reasonably foreseeable to [the defendant]" when the evidence at issue was destroyed. 2007 WL 3146911 at *3. Conversely, the court explained that an adverse inference is appropriate where there has been destruction of evidence and "the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed." Id. (quoting Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998)). Such an obligation, the court stated, can arise "when a party should have known that the evidence might be relevant to future litigation." Id.

Jinks-Umstead v. England, 2005 WL 3312947 (D.D.C. Dec. 7, 2005), another case cited by the FUR defendants, similarly does not advance their argument here. To begin with, in that case the court denied the plaintiff's request for an adverse inference "most importantly" on the basis that the plaintiff was provided an alternative avenue to receive the very same information that was initially withheld from her. Id. at *4. Simply put, the plaintiff was "given the opportunity to obtain all the relevant information which she was denied at the first trial." Id. That fact alone distinguishes Jinks-Umstead because that is plainly not the case here.[6] Moreover, the passage cited by the FUR defendants actually references another case, Thompson v. HUD,

_____

adverse inference charge." 2007 WL 3146911 at *3. But on this Court's reading, at least, the court in Kraus was using the term "spoliation" in a different sense than the FUR defendants do here. Indeed, the court noted that: "Even without a discovery order, a district court may impose sanctions for spoliation." Id. at *1. It is evident that the court meant the physical act of spoliation -- that is, the destruction of documents or evidence with notice of their potential usefulness in litigation -- as opposed to the independent tort of spoliation, as the FUR defendants evidently interpret the statement. This conclusion is supported by the Kraus court's subsequent analysis of the adverse inference issue. Indeed, as explained above, "spoliation" as the Kraus court would have it is really no different than an adverse inference instruction.

    [6] The underlying data at issue in Jinks-Umstead were not, in fact, destroyed. 2005 WL 3312947 at *4. The present case is markedly different.

219 F.R.D. 93 (D.Md. 2003). There, the court held that there are three elements required to establish an adverse inference:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind"; and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it.

Id. at 101 (internal citations omitted). That standard is not materially different in substance from District of Columbia precedent. Thus, the Court will draw from both federal and District of Columbia case law, mindful of the fact that federal authority may be somewhat more persuasive because federal courts apply the evidentiary rules that are applicable in this proceeding.

Turning to the elements of the adverse inference inquiry, it is clear that plaintiff can at least make out a non-frivolous case for an adverse inference instruction here. Of course, the Court is not deciding today whether plaintiff will in fact get an adverse inference instruction at trial. Instead, the only issue at this time is whether, as FUR argues, such an instruction is unavailable to plaintiff as a matter of law.

The first question, then, is whether the FUR defendants incurred any obligation to preserve the video recordings made by their surveillance system on the night in question. Here, Kraus provides some guidance with its holding that such an obligation can arise "when a party should have known that the evidence might be relevant to future litigation." 2007 WL 3146911 at *3. Similarly, it is "well established" under District of Columbia law that "a fact-finder may draw an inference adverse to a party who fails to preserve relevant evidence within his exclusive control." Battocchi, 581 A.2d at 766. Hence, the operative inquiry is whether the FUR

defendants should have reasonably foreseen the possibility of litigation when they caused the tape to be over-written. The Court has no difficulty concluding that they should have.

Plaintiff cites a litany of facts, most of which are undisputed by defendants, that establish that the FUR defendants were put on notice of the possibility of a lawsuit. Most importantly, it is undisputed that Officer Ramirez informed the FUR defendants of plaintiff's police complaint on the very same day that he filed it. Pl.'s Disc. Reply Ex. A at 3. In response to that notification, the FUR defendants reviewed the videotape and even offered to make it available to Ramirez upon request. And in his deposition, John Fiorito acknowledged that he knew the videotapes, "[e]ven if there was no claim against the club . . . could potentially include important evidence that would be relevant in [plaintiff's] claim against the police." Id. Ex. A at 6. FUR also undeniably had exclusive control over the recordings. In short, there was an altercation on the night of March 11-12, 2005 that involved an employee of FUR and as early as March 12th the FUR defendants were aware that plaintiff had filed a police complaint arising out of that incident. It is common knowledge that citizen complaints alleging police misconduct frequently form the basis of subsequent lawsuits. It therefore defies reason to say that the FUR defendants were not aware that the video tape evidence could be relevant in potential litigation; indeed, it is fair to say that FUR could at that point have anticipated that it would in fact be a party in that putative action. See, e.g., Rice, 917 F. Supp. at 20 (holding that it was "simply implausible" that the defendant did not have a reasonable expectation of litigation because it had actual knowledge of the nature and scope of plaintiff's injury). The Court is satisfied that, following the principles of Kraus -- the case, it bears repeating, that the FUR defendants argue establishes the correct standard to follow here -- as well as District of Columbia law, plaintiff can

persuasively argue that the FUR defendants incurred an obligation to preserve the video evidence.

The second adverse inference element is somewhat more complicated. To warrant the instruction, defendants must have destroyed the evidence (or allowed it to be destroyed) with a sufficiently "culpable mind." Needless to say, the precise contours of this requirement are not abundantly clear. Nevertheless, plaintiff argues that existing precedent supports granting an adverse inference instruction both in situations where a defendant deliberately (or recklessly) destroyed evidence and where such destruction results from mere negligence. Pl.'s Disc. Reply at 6 n.4. For their part, the FUR defendants do not focus on this element in their briefing, so the Court is left to guess at their position, although it is safe to assume that defendants would argue that deliberate or reckless destruction of evidence is required.

Plaintiff insists that he can indeed establish that FUR deliberately destroyed the videotape evidence in question. This contention is based chiefly on the deposition testimony of Mr. Alkadi, who claimed that on March 12th he was told by FUR representatives that the video tape evidence was "gone," although the tape was not scheduled for routine destruction for several days. Id. Ex. B at 2-3. To plaintiff, this shows that the FUR defendants intentionally destroyed the tape prematurely. But there is some apparent ambiguity in Mr. Alkadi's testimony as to whether John Fiorito meant to convey that the tapes had been destroyed or that they had never captured the incident in the first instance. Id. Ex. B at 2-3. In any event, because the Court concludes that the adverse inference doctrine embraces negligent (in addition to deliberate) destruction of evidence, it need not resolve this issue at this juncture.

Very recently, in More v. Snow, another judge from this District held that negligent

-16-

failure to preserve evidence can support an adverse inference instruction, explaining that:

> [A] court may employ an adverse inference due to a party's failure to preserve evidence, even if deliberate or reckless conduct is not present. In doing so, the court should consider the degree of negligence or bad faith involved, the importance of the evidence involved, the importance of the evidence lost to the issues at hand, and the availability of other proof enabling the party deprived of the evidence to make the same point.

480 F. Supp. 2d at 275 (internal quotations omitted) (citing Battocchi, 581 A.2d at 766-67). The Second Circuit reached a similar conclusion in Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2d Cir. 2002). There, the court noted that the "culpable state of mind" factor can be satisfied "by showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently*." 306 F.3d at 108 (citing Byrnie v. Town of Cromwell, 243 F.3d 93, 109 (2d Cir. 2001)). According to the Second Circuit, the adverse inference instruction "may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence." Id. That sound insight informs the decision here. To be sure, any adverse inference instruction grounded in negligence would be considerably weaker in both language and probative force than an instruction regarding deliberate destruction. But it is nonetheless a cognizable basis for an instruction.

The question, then, is whether plaintiff can establish that the FUR defendants were, at a minimum, negligent in permitting the tape to be overwritten. On this record, the Court concludes that plaintiff may be able to do so. As explained above, at the very least the FUR defendants were aware of plaintiff's police complaint, reviewed the tape themselves, and offered to make it available to Officer Ramirez and the MPD. Those facts alone are sufficient to support an inference of negligence in subsequently permitting the tape to be destroyed. Plaintiff can legitimately argue that a reasonable party facing the same circumstances would have taken at

least some steps to preserve the video evidence.

The final element of the adverse inference inquiry is easily satisfied here.  See Residential
Funding Corp, 306 F.3d at 109 (explaining that the "relevance" threshold in adverse inference
cases is limited to determining whether "a reasonable trier of fact could infer that 'the destroyed
. . . evidence would have been of the nature alleged by the party affected by its destruction")
(internal citations omitted).  The video evidence is quite plainly relevant both to plaintiff's claims
and to defendants' defenses in this case.  Defendants, who vigorously maintain that the tape
captured almost no footage of the incident, nevertheless concede that some action was recorded.
Even if the video merely displayed plaintiff being led out of the nightclub, which the FUR
defendants stated "the parties seem to agree actually happened," FUR's Disc. Opp'n at 6, that
limited footage would still have been highly relevant to the case.  FUR suggests that because the
tape would only have revealed what the parties seem to agree to -- plaintiff being led out of the
club -- it would therefore have been irrelevant.  Id.

FUR is mistaken.  The parties agree that plaintiff was escorted out of the club by the
officers, but they vehemently dispute the manner in which that occurred.  Plaintiff claims he was
being repeatedly punched and assaulted in the process, whereas defendants naturally contest that
version.  The tape might have provided an objective account of the events, something sorely
lacking in this case.  In any event, the Court concludes that plaintiff can make a cognizable
argument that the recording would have been relevant to this case.  Thus, plaintiff has
demonstrated that the adverse inference instruction is, at the very least, not barred as a matter of
law.  Accordingly, the Court rejects the FUR defendants' argument that "an adverse inference
instruction here is, as a matter of law, impermissible under the applicable federal evidence

rules."  FUR's Video Reply at 2.

That leaves the FUR defendants' objection to plaintiff re-opening discovery to depose

Mr. Sequeria, which also implicates FUR's motion to preclude the video surveillance evidence.

The Court will not belabor this point for long.  Suffice it to say, the parties forcefully disagree

over what the surveillance system would actually have captured on the evening in question.  This

is the unfortunate consequence of the destruction of the tape.  Plaintiff seeks to depose Mr.

Sequeira, and the Court will permit him to do so.  FUR's primary objection is that plaintiff has

not shown "good cause" to depose Mr. Sequeria at this late date, arguing mainly that plaintiff's

failure to make a more rigorous examination of the video surveillance system during his Rule

34(a)(2) inspection of the nightclub should somehow preclude his request to take this deposition

now.  FUR's Discovery Opp'n at 7.

The Court disagrees.  To begin with, plaintiff correctly notes that the FUR defendants did

not identify Mr. Sequeira as an individual who could provide informed answers to video-related

questions in their Rule 30(b)(6) notice.  Nevertheless, for the first time in their reply brief at the

summary judgment phase, the FUR defendants relied heavily on a certificate submitted by Mr.

Sequeira that contains details about the orientation of the nightclub's cameras.  They take

plaintiff to task for failing "to depose Mr. Sequeira during the course of discovery," id. at 7, but

the fact is that by the time plaintiff learned that Mr. Sequeira could speak intelligently to the

inner-workings of the surveillance system, discovery had already closed.  Moreover, plaintiff has

offered to withdraw his request to depose Mr. Sequeira in return for the FUR defendants' pledge

that they will not: "(i) call Sequeira as a witness at trial, (ii) make any use of his declaration at

trial, or otherwise (iii) make arguments through other witnesses contained in the declaration

-19-

about adjustments in camera positioning." Pl.'s Discovery Mot. at 2 n.2. Simply put, the FUR

defendants cannot resist plaintiff's efforts to depose Mr. Sequiera yet also expect to utilize his

certificate to their advantage. Thus, the Court will re-open discovery to permit this deposition to

go forward. The parties should take note, however, that this is not an invitation to re-do the

entire discovery process. Instead, discovery is re-opened only for the very limited purpose of

conducting a focused three-hour deposition of Mr. Sequiera.

Accordingly, the Court will grant plaintiff's motion to re-open discovery. Additionally,

and contrary to the FUR defendants' position, because an adverse inference instruction is not

foreclosed as a matter of law, the Court will deny the FUR defendants' motion to preclude the

video surveillance evidence.

### III.     FUR's Motion to Preclude Policy and Practices Evidence

The FUR defendants seek to prevent plaintiff from introducing any evidence relating to

"any FUR policies and practices regarding dealing with its customers," and specifically a FUR

employee manual that "sets forth procedures employees should follow in the event of an

altercation." FUR Policy Mot. at 1. They argue that such evidence is irrelevant under Fed. R.

Evid. 401 and should be excluded under the balancing test required by Fed. R. Evid. 403.

Plaintiff responds that the policy evidence is relevant both to the FUR defendants' asserted

affirmative defense of self-defense and to the availability of punitive damages. Pl.'s Policy

Opp'n at 4-6. Rule 403, according to plaintiff, is also no bar here because the FUR defendants

are not unfairly prejudiced.

At the outset, it is worth noting that the policy manual evidence is not relevant to the

assault or battery claims remaining against the FUR defendants. In the District of Columbia, the

tort of assault is "defined as an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993). Battery, meanwhile, is "an intentional act that causes a harmful or offensive bodily contact." Id. Whether defendant Persons violated FUR's internal guidelines has no bearing on whether he is liable for either assault or battery. Plaintiff does not dispute that; he argues instead that the doctrine of self-defense, which the FUR defendants will rely on at trial, implicates the policy manual. Self-defense justifies "any person . . . in using reasonable force to repel an actual assault . . . or if he reasonably believes he is in danger of bodily harm." Id. at 917. Here, plaintiff insists that "the policies set forth in the FUR manual are relevant to the reasonableness of Persons's allegedly self-defensive behavior" because those policies "specifically obligated and trained Persons to find another member of security to assist his efforts -- not to take matters into his own hands." Pl.'s Policy Opp'n at 6. That, in turn, informs the circumstances regarding the reasonableness of Persons's belief that plaintiff was about to strike him, according to plaintiff. Id. at 4-5.

In support of his position, plaintiff cites to Fernandors v. District of Columbia, 2006 WL 449300 (D.D.C. Feb. 23, 2006), in which this Court held that General Orders of the Metropolitan Police Department were admissible for purposes of determining whether the officers in that case were acting in accordance with police procedure. Id. at 2. That fact was relevant, the Court found, to whether the officers "reasonably believed they were using a level of force that was proper under the circumstances," which related directly to the officers' asserted qualified privilege to use force to effect an arrest. Id. Seizing on the evidentiary result in Fernandors, plaintiff attempts to bootstrap its reasoning to the instant case. But Fernandors is

not on point.  The General Orders establish, among other things, the proper amount of force to use when arresting an individual.  In that sense, the defendants in Fernandors would have known they were employing excessive force if they were violating the General Orders.  The policy manual in this case, however, merely instructs FUR employees to "find another member of security to assist" in efforts to "defuse situations with disruptive individuals."  Pl.'s Policy Opp'n at 6.  Although Persons undeniably failed to adhere to that instruction, that fact alone says nothing about whether -- once he engaged plaintiff on his own -- Persons reasonably believed that he was in danger of bodily harm.  Put another way, the policy manual covers how employees are directed to initiate contact with unruly patrons, but Persons' self-defense argument involves what he reasonably believed after he had initiated that contact.  Viewed in that light, the policy manual is irrelevant to the self-defense claim in this respect under Fed. R. Evid. 401. Accordingly, plaintiff cannot rely on this justification to introduce the manual into evidence.

Plaintiff's second proffered use for the FUR policy evidence also fails.  According to plaintiff, evidence that Persons violated FUR's internal policies is relevant to establish that his conduct constituted the sort of outrageous behavior that warrants punitive damages.  Id.  As plaintiff correctly notes, in the District of Columbia punitive damages may only be awarded "to punish defendants' outrageous conduct, maliciousness, wantonness, gross fraud, recklessness or willful disregard of another's rights."  Henson v. W.H.H. Trice & Co., 466 F. Supp. 2d 187, 193 (D.D.C. 2006) (citing Bay Gen. Indus. v. Johnson, 418 A.2d 1050, 1058 (D.C. 1980)).  In the Court's view, however, Persons' violation of the policy manual demonstrates, at most, mere negligence.  Admittedly, even evidence of negligence may be minimally relevant to the issue of punitive damages because negligent behavior, in some sense, is at least "on the way" to more

egregious conduct.  But the probative value of this evidence is so slight here that it is substantially outweighed by the danger of unfair prejudice.  The Court thus concludes that evidence of FUR's policy and practices is precluded by Fed. R. Evid. 403 because the jury might be inclined to use the policy manual violation as evidence relating to the FUR defendants' underlying liability for assault and battery.  To be sure, that danger may not be especially great, but the probative value of the policy evidence is so de minimis that it is substantially outweighed by that risk of unfair prejudice.  Hence, the Court will grant the FUR defendants' motion *in limine* on this issue of FUR's policies and practices.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part plaintiff's motion *in limine* relating to the financial records evidence, grant plaintiff's motion *in limine* to re-open discovery, deny the FUR defendants' motion *in limine* to preclude introduction of the video surveillance evidence, and grant the FUR defendants' motion *in limine* to preclude plaintiff from introducing evidence of the nightclub's policies and practices.  A separate Order accompanies this Memorandum Opinion.


_____/s/_____
JOHN D. BATES
United States District Judge


Dated:   January 16, 2008