Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM                    :
                                 :
         Plaintiff               :
                                 :
    vs.                          : Civil Action No.
                                 : 1:06:CV 00002
DISTRICT OF COLUMBIA,            : (JDB)
    et al.                       :
                                 :
         Defendants              :

Washington, D.C.
October 25, 2006

Deposition of:

JOHN FIORITO,

called for oral examination by counsel for Plaintiff, pursuant to notice, at the offices of Katten Muchin Rosenman, LLP, 1025 Thomas Jefferson Street, N.W., East Lobby, Suite 700, Washington, D.C., before Zev V. Feder, CSR, a Notary Public in and for the District of Columbia, beginning at 9:41 a.m., when were present on behalf of the respective parties:

Page 22

1  in her name.
2  Q. But you did the work that earned
3  it, right?
4  A. Correct.
5  Q. Does your wife know Mr. Romeo?
6  A. Yes.
7  Q. Had she met him at the time you
8  were having this conversation with him back in
9  2004?
10  A. She met him when we entered into
11  the deal, yes.
12  Q. Did she contribute anything to get
13  her ownership interest? Did she pay anything?
14  A. My wife's money is my money, too.
15  The cost of the equipment.
16  Q. How much money did you put in?
17  A. Approximately a quarter of a
18  million dollars.
19  Q. So you provided not just the
20  supervision but you provided the equipment,
21  also. Is that correct?
22  A. That's correct, sir.

Feder Reporting Company
(202) 863-0000

Page 23

1  Q. What is your membership interest?
2  A. My wife owns five percent of the
3  business.
4  Q. Your wife owns five percent?
5  A. Correct.
6  Q. Who owns the other 95 percent?
7  MR. FITZSIMMONS: Objection. May
8  call for speculation.
9  MR. KAPLAN: Please don't coach
10  the witness.
11  MR. FITZSIMMONS: I have to render
12  my objection or else it is not valid.
13  MR. KAPLAN: You are coaching the
14  witness. It is an improper remark.
15  Please answer the question.
16  THE WITNESS: Can I answer the
17  question?
18  MR. FITZSIMMONS: Go ahead, if you
19  know.
20  THE WITNESS: The two owners of
21  the venue are Michael's wife and my wife.
22  Michael's wife owns the licenses.

Feder Reporting Company
(202) 863-0000

Page 24

1  BY MR. KAPLAN:
2  Q. Are you saying it is 95 and five?
3  A. No, it is not 95 and five. There
4  are three other minority partners.
5  Q. Who are they?
6  A. One is Jasper Braswell, whose role
7  in the company is construction and all
8  building repairs.
9  The other is Diego, who is
10  Michael's operations manager.
11  Then Mark Rabin who is an attorney
12  out of -- I think he is in the Bethesda area,
13  his office.
14  Q. What is Diego's last name.
15  A. It is Sequeira. I believe it is
16  spelled S E Q U E I R A. I think.
17  Q. Has there been any change in
18  ownership since 2004?
19  MR. FITZSIMMONS: Objection.
20  Foundation.
21  BY MR. KAPLAN:
22  Q. To your knowledge?

Feder Reporting Company
(202) 863-0000

Page 25

1  A. Not to my knowledge. I don't
2  know.
3  Q. Did you ever tell anyone that you
4  had a ten percent interest?
5  A. No. I had ten percent originally.
6  Q. When did that change?
7  A. We restructured it. I don't
8  recall the exact date it was restructured.
9  Q. Approximately when was that?
10  A. Early in the stage.
11  Q. How did the restructuring come
12  about?
13  A. I don't recall. It was just
14  restructured at one point.
15  Q. Whose idea was the restructure?
16  A. It was a mutual agreement.
17  Q. You felt you had -- ten percent
18  was too much and you asked it be changed?
19  A. It was because -- I don't recall
20  how the conversation came up. It was the
21  amount of investment. I believe it was for
22  what the cost of the build-out was, the value

Feder Reporting Company
(202) 863-0000

Page 26

1  of everything. It came into an accounting
2  thing.
3      Q.   Is the $250,000, is that what you
4  paid out-of-pocket for your -- or does that
5  include your time, as well.
6      A.   No, that is out-of-pocket.
7      Q.   How did it come about that it was
8  in your wife's name rather than your name?
9      A.   Because I was employed as a law
10 enforcement officer and it is illegal for a
11 police officer, even from out of state, to own
12 an alcohol establishment.
13     Q.   And that was the rule at Surfside?
14     A.   That's Florida law.
15          It was the same for D.C. police
16 officers. It is pretty much a rule you find
17 everywhere.
18     Q.   So you were trying to conceal your
19 ownership interest by putting it all in your
20 wife's name?
21          MR. FITZSIMMONS: Objection.
22 Argumentative.

Feder Reporting Company
(202) 863-0000

Page 27

1          THE WITNESS: Negative. The
2  policy of the agencies and the policy is that
3  all off-duty or outside employment has to be
4  approved and they were aware of it. They had
5  copies of the membership documents and it was
6  approved by the head of the department.
7          BY MR. KAPLAN:
8      Q.   Who is the they?
9      A.   Chief of Police.
10     Q.   The Chief of the Surfside police
11 department?
12     A.   Correct.
13     Q.   He knew all about it?
14     A.   Correct.
15     Q.   What is his name?
16     A.   He is no longer there.
17     Q.   What is his name?
18     A.   Lawrence Bimler.
19     Q.   So Bimler knew what your role was
20 and knew you were putting in $250,000
21 supervising the construction but the
22 membership interest was being put all in your

Feder Reporting Company
(202) 863-0000

Page 28

1  wife's name?
2      A.   That's correct. As long as you
3  don't have any other role in it, it is not a
4  conflict of interest. Each off-duty
5  employment is reviewed on a case by case
6  basis. They make the deciding decision
7  whether you can participate or do something.
8  Same as Lake County knew about it or anybody
9  else.
10     Q.   Was it Chief Bimler's idea to put
11 the membership interest in your wife's name
12 rather than your name?
13     A.   No.
14     Q.   Whose idea was that?
15     A.   That was the only way to do it.
16 That was my idea.
17     Q.   You think if it had been in your
18 name and your wife's name it wouldn't have
19 passed muster?
20     A.   That would have been illegal.
21          MR. FITZSIMMONS: Objection.
22          BY MR. KAPLAN:

Feder Reporting Company
(202) 863-0000

Page 29

1      Q.   That would have been illegal. But
2  it was okay as long as you put it all in your
3  wife's name?
4      A.   That's correct.
5      Q.   Mr. Braswell, does he do the
6  building repairs at FUR?
7      A.   Yes, he does.
8      Q.   And Mr. Sequeira is the operations
9  manager at FUR?
10     A.   That's correct.
11     Q.   Since 2004, since the club -- the
12 club opened in 2004?
13     A.   Yes.
14     Q.   Since the club opened what has
15 your role been? Excuse me. Hold that.
16 Strike that question for the moment.
17          You mentioned something about some
18 documents which show the ownership interest.
19 What documents are those?
20     A.   That would be the membership
21 agreement.
22     Q.   Who signed the membership

Feder Reporting Company
(202) 863-0000

Page 30

1  agreement?
2  A. My spouse and Michael, at the
3  time.
4  Q. And subsequently?
5  A. Subsequently, they are in the
6  process of redoing the agreement, because it
7  doesn't have all the members listed on it, on
8  one paper. So that is why they are redoing
9  it.
10 Q. Have there been any documents,
11 whether it is one document or several
12 documents, have there been other documents
13 since the original membership agreement?
14 A. No, not that I have participated
15 or seen.
16 Q. Or that your wife has seen?
17 A. Correct. She is the only one that
18 signed it.
19 Q. Is there anything in writing that
20 says that you are going to do, you are going
21 to put in the $250,000, and put in the sound
22 system, in return for your wife getting a five

Feder Reporting Company
(202) 863-0000

Page 31

1  or ten percent interest?
2  A. Yes. That's what it would say.
3  That's what the agreement says.
4  Q. That's what the first agreement
5  says?
6  A. Correct. It says I will install a
7  grade A sound system in return for the five
8  percent membership interest.
9  MR. KAPLAN: Counsel, I believe
10 that agreement has been called for by previous
11 document requests. Mr. Rehman testified that
12 there was no such agreement.
13 MR. FITZSIMMONS: I will look into
14 it.
15 MR. KAPLAN: Thank you. We would
16 like to have a copy of that, obviously.
17 BY MR. KAPLAN:
18 Q. Does your wife receive annual
19 financial statements and tax returns?
20 A. There is a scheduled K-1 prepared
21 at the end of the year.
22 Q. That is by Night and Day?

Feder Reporting Company
(202) 863-0000

Page 32

1  A. It is by Eric Cohen & Associates.
2  They are the CPA firm.
3  Q. What is it? Eric?
4  A. Cohen, C O H E N, & Associates,
5  CPA.
6  Q. Where is it?
7  A. Gaithersburg, Maryland.
8  Q. They are the CPA for Night and
9  Day?
10 A. Correct.
11 Q. Getting back to my previous
12 question, after the club was up and running,
13 what has your role been from then until now?
14 A. I supervise all technical aspects
15 of it to do with the lighting and sound. I
16 maintain it, make periodic visits.
17 Q. You have been living in Florida
18 since then, right?
19 A. Yes.
20 Q. So you come from Florida. How
21 often do you come?
22 A. The club, they fly me up at their

Feder Reporting Company
(202) 863-0000

Page 33

1  expense every other week, at least. Twice a
2  month.
3  Q. And when you come you stay for how
4  long?
5  A. A night or two.
6  Q. And what do you do?
7  A. I will go in and check, inspect,
8  test all the sound and lighting and make sure
9  it is working properly. If it requires any
10 repairs, I will take care of it, and then I
11 will leave.
12 Q. Do you get paid a salary for that?
13 A. No.
14 Q. Do you get paid anything for that?
15 A. No. It is a fixed -- my wife
16 receives a fixed payout for the membership
17 interest.
18 Q. What is that?
19 A. The amount?
20 Q. Yes.
21 THE WITNESS: Do I have to tell
22 him that?

Feder Reporting Company
(202) 863-0000

Page 34

1    MR. FITZSIMMONS: Yes.
2    THE WITNESS: It is $130,000 a
3  year flat fixed payout.
4    BY MR. KAPLAN:
5    Q.   And this comes in monthly checks?
6    A.   It comes weekly. $2500 week.
7    Q.   Who is that check made payable to?
8    A.   To Melissa Fiorito.
9    Q.   Is that for the original capital
10 investment you made to buy the five percent
11 interest, or the ten percent interest which
12 became a five percent interest, or is that for
13 your weekly trips?
14   A.   That is the continuing maintenance
15 that it stays on permanently now. There was a
16 different amount in the earlier stage of the
17 first two years.
18   Q.   What was it then?
19   A.   A lot higher.
20   Q.   And what was it then? How much
21 higher?
22   A.   It varied from seven to $10,000 a

Feder Reporting Company
(202) 863-0000

Page 35

1  week.
2    Q.   Why did it get reduced?
3    A.   Due to the fact that I was doing
4  other things and I just wanted to get a fixed
5  amount settled for her in case anything ever
6  happened to me, whether I was killed as a
7  policeman, and I wanted to protect my wife and
8  make sure she had some type of guaranteed
9  income.
10   Q.   So at first the payments were not
11 in a fixed amount. They were dependent on,
12 what, the gross?
13   A.   The net profit.
14   Q.   Ten percent of the net profit?
15   A.   Correct.
16   Q.   But then you decided that you
17 wanted to have a guaranteed fixed amount that
18 wasn't dependent upon that profit. Is that
19 right?
20   A.   That's correct, sir.
21   Q.   So it was adjusted down to what it
22 is now?

Feder Reporting Company
(202) 863-0000

Page 36

1    A.   Correct.
2    Q.   And this fixed amount is
3  guaranteed for how long?
4    A.   That's the indefinite agreement.
5  If the place were to be sold, then she would
6  receive five percent of the sale proceeds.
7    Q.   The checks that are received are
8  deposited into a joint bank account?
9    A.   They are deposited to her bank
10 account.
11   Q.   And do they make their way into a
12 joint bank account or into your bank account?
13   MR. FITZSIMMONS: Objection.
14 Argumentative.
15   BY MR. KAPLAN:
16   Q.   You may answer.
17   A.   No.
18   Q.   Are you saying you have no
19 financial benefit from those checks?
20   A.   No.
21   Q.   None of that money goes to pay
22 your living expenses or any financial benefit

Feder Reporting Company
(202) 863-0000

Page 37

1  for you?
2    A.   Well, she pays all the bills for
3  the house.
4    Q.   Do you have any responsibilities
5  other than taking care of the lighting and
6  sound system?
7    A.   No.
8    Q.   Do you have any role in the
9  security system?
10   A.   Initially? When the club was
11 being constructed I wrote the FUR employee
12 manual, which contains to the security
13 procedures. It is a variety of everything
14 going on into the club.
15   Q.   You wrote the FUR employee manual?
16   A.   That's correct.
17   Q.   What was your qualification for
18 writing the FUR employee manual? Have you
19 ever done that before?
20   A.   I have written and authored
21 general orders while employed at the Pentagon
22 police that were approved by the U.S.

Feder Reporting Company
(202) 863-0000

Page 46

1   Q.   About what time was this?
2   A.   I don't recall the time but I
3   believe you have a statement here that I could
4   look at the time. But it was after midnight.
5   I know that much.
6   Q.   Where were you at this point?
7   A.   Where was I when I first saw the
8   incident?
9   Q.   Where were you when you first
10  became aware that there was some incident
11  going on, yes.
12  A.   I was walking through the tunnel
13  of the club.
14  Q.   You were walking through the
15  tunnel that goes from the entrance area to the
16  dance hall area. Is that correct?
17  A.   Yes.
18  Q.   Where on the tunnel were you?
19  A.   I was at the end where the carpet
20  starts and you see a set of stairs to go down
21  into that area.
22  Q.   You were at the top of those

Feder Reporting Company
(202) 863-0000

Page 47

1   stairs?
2   A.   Correct.
3   Q.   What did you observe?
4   A.   I looked to the left and I saw two
5   individuals that I recognized as off-duty
6   police officers having a physical
7   confrontation, struggle, escorting out -- I
8   don't know how to pronounce his last name.
9   Q.   Mr. Mazloum?
10  A.   Mazloum. Towards me.
11  Q.   And where were they?
12  A.   They were in front of me coming
13  towards me, towards the steps.
14  Q.   They were on the main dance floor?
15  A.   They were coming from the main
16  dance floor area.
17  Q.   They weren't on the stage.
18  Correct?
19  A.   No.
20  Q.   They were on the floor between the
21  stage and the steps that you were coming,
22  about to go down. Correct?

Feder Reporting Company
(202) 863-0000

Page 48

1   A.   Yes, sir.
2   Q.   And what is the approximate
3   distance between the steps that you were about
4   to go down and the stage?
5   A.   Maybe 20 feet, 25 feet.
6   Q.   And approximately where were they
7   when you first became aware of them?
8   A.   In between the stage -- they were
9   coming from in between the far area from the
10  stage between the steps. If I looked down,
11  and I know you all have been at the club, they
12  were at the halfway point, if you understand.
13  Q.   I think I do. So you are saying
14  they were approximately halfway between the
15  stage and the steps that go up to the catwalk?
16  A.   Correct.
17  Q.   And these two off-duty officers
18  were who?
19  A.   Officer Modlin and Officer
20  Richmond Phillips.
21  Q.   And you say they were escorting
22  Mr. Mazloum?

Feder Reporting Company
(202) 863-0000

Page 49

1   A.   Yes.
2   Q.   How were they escorting him?
3   A.   One was on each side of his arm
4   and they were coming towards this direction,
5   toward me.
6   Q.   Up until that point had you seen
7   Mr. Mazloum or been aware of Mr. Mazloum that
8   evening?
9   A.   No.
10  Q.   Had you seen Officer Modlin or
11  Officer Phillips prior to that moment during
12  the evening?
13  A.   I saw them when they came in the
14  venue. But that was the last time I had any
15  contact with them.
16  Q.   Where were you when they came in?
17  A.   They passed me somewhere in the
18  club. I don't recall. But I remember saying
19  hi to them.
20  Q.   Where do you usually stay when you
21  are at the club?
22  A.   I walk around.

Feder Reporting Company
(202) 863-0000

Page 114

1  Q. Tell me the entire conversation
2  that you had with Mr. Alkadi outside when you
3  were waiting for Lieutenant Allman to do his
4  thing?
5  A. He came outside. He said, "That's
6  my friend." I said something to the effect
7  that your friend is really drunk and messed up
8  over there, and I said, was involved in a
9  fight. He goes, "Yeah, I know." He said, "I
10 got involved." And he started explaining to
11 me that he was involved and grabbed his friend
12 while he was up on the stage.
13     I said, "Well, don't worry about
14 that." I said, "The police are coming now."
15 I told him that there was nothing to worry
16 about. He was concerned about his friend. I
17 said, "Don't worry about it." I said, "I have
18 called the watch commander to come down here,
19 and I have called 911." I said, "They are
20 going to take care of it."
21 Q. Have you finished your answer?
22 A. Yes.

Feder Reporting Company
(202) 863-0000

Page 115

1  Q. Have you told us everything that
2  you recall that was said between you and
3  Mr. Alkadi in that conversation?
4  A. Yes.
5  Q. Did you have any conversation with
6  Mike Romeo that night about the incident?
7  A. Yes.
8  Q. Tell me about that conversation.
9  A. I briefly told him that there
10 was --
11 Q. Excuse me. At what point in time
12 was this?
13 A. I don't remember. The end of the
14 night before we left.
15 Q. All right.
16 A. I briefly told him that there was
17 a very unfortunate incident that happened in
18 the club tonight. There was an altercation
19 that took place. We don't know much about it.
20     That was basically it.
21 Q. What did he say?
22 A. He said okay. He asked me if I

Feder Reporting Company
(202) 863-0000

Page 116

1  was there. I told him yes. I said, "I called
2  the police." I said, "They are looking into
3  the matter." I said, "I'm sure Dave will be
4  able to get statements from security to find
5  out what happened."
6  Q. Anything else?
7  A. That's it.
8  Q. Did anyone request Dave -- did you
9  have a conversation with Dave?
10 A. No, not that night.
11 Q. To your knowledge did Dave get
12 statements from security?
13 A. Not that evening.
14 Q. Ever?
15 A. I don't know what happened with
16 him until the next day. That's when the story
17 continues.
18 Q. Well, to your knowledge, has Dave
19 ever gotten statements from anyone in
20 security?
21 A. I would presume he has.
22 Q. Have you ever seen them?

Feder Reporting Company
(202) 863-0000

Page 117

1  A. No.
2     (Discussion off the record.)
3  BY MR. KAPLAN:
4  Q. What happened the next day?
5  A. Around 6:00 o'clock at night, my
6  cell phone rang. And it was Officer Ramirez
7  calling me telling me that Mr. Mazloum and two
8  of his friends were at the First District
9  police station filing a complaint against him.
10 And I said, "Okay. So why are you calling
11 me?"
12     He said, "Well, there are two guys
13 here saying they are with FUR Security."
14     I said, "Well, I don't know
15 anything about this. I will call Dave. I
16 will look into it for you and get back to
17 you."
18     I called Dave. He said he had no
19 knowledge of this.
20     I contacted Ramirez back. I said,
21 "I don't have any knowledge of FUR employees
22 down there with them."

Feder Reporting Company
(202) 863-0000

1  Ramirez described one of them to
2  him. I said, "Well, maybe that's his friend."
3  He said, "Well, they are in here
4  making allegations."
5  Q. What was the description he gave
6  you?
7  A. Short, stocky guy. He described
8  him as the guy that I always saw wearing
9  certain glasses and a jacket at night at FUR
10  when I saw him. So I figured, I kind of
11  figured out who it was.
12  Q. He said short, stocky, wearing
13  glasses?
14  A. Yes, that wore glasses at night.
15  Sunglasses at night.
16  Q. And a jacket?
17  A. Yes. Always dressed nicely. I
18  said, "I think I know who you are talking
19  about."
20  Q. Did he say he was wearing glasses
21  at the police station?
22  A. No.

Feder Reporting Company
(202) 863-0000

1  Q. What did he say?
2  A. Just what I told you.
3  Q. He said there is a guy here who
4  wore glasses at night.
5  A. Right. Wore sunglasses at night.
6  Usually wore a suit. And that's it. So we
7  contacted Masoud next.
8  Let me finish my conversation with
9  Ramirez, then.
10  I said, "Well, what is the
11  problem, Ramirez," to him.
12  And he said, "Well, they are in
13  with Lieutenant Taylor and she is calling for
14  mobile crime."
15  I said, "So let her call for
16  mobile crime. She has to take a complaint.
17  What's the big deal?"
18  He got very upset and asked about
19  the video system at FUR. I said, "Yes, --
20  Q. Excuse me. I have to interrupt
21  you. I am a little confused here.
22  You said something about calling

Feder Reporting Company
(202) 863-0000

1  Masoud. Is this before you called Masoud?
2  MR. FITZSIMMONS: He interrupted
3  himself. He said, "Let me get back to my
4  conversation with Ramirez."
5  BY MR. KAPLAN:
6  Q. So this is before you called
7  Masoud?
8  A. I was still with Ramirez.
9  Q. So this is the conversation, now,
10  after you have talked to Dave and you called
11  Ramirez back.
12  A. That's correct, sir.
13  Continuing to tell him, have
14  Lieutenant Taylor come up to talk to us,
15  interview us, do whatever she needs to do.
16  He asked about the video. I said,
17  "I don't know anything about the video." I
18  said, "I don't use it." I said, "I don't know
19  how to work it." But I said, "Have Lieutenant
20  Taylor call Dave." I said, "I know he can
21  burn a copy of whatever is recorded on disk."
22  I said, "Have her go to CVS, buy a disk, and

Feder Reporting Company
(202) 863-0000

1  come up here and see Dave and let her go
2  through it, and don't worry about it." And
3  that was the end of my conversation with him.
4  Then I called Masoud.
5  Q. Wait a minute.
6  What did you do next? Then you
7  called Masoud?
8  A. When I got to the club I called
9  Masoud in the presence of Michael.
10  Q. In your conversations with
11  Ramirez, it was just the two of you?
12  A. That's it.
13  Q. Two conversations. He called you.
14  Then you called him back.
15  A. That's correct.
16  Q. Then after that, the next contact
17  you had was with Masoud or with Michael?
18  A. At Michael with the club, and then
19  I called Masoud from the club.
20  Q. The conversations with Ramirez,
21  you were not at the club?
22  A. That's correct. My cell phone

Feder Reporting Company
(202) 863-0000

Page 122

1  rang at 6:00 o'clock. I was in an apartment
2  in D.C. hanging out.
3      Q.   Then you went to the club?
4      A.   Uh-huh.
5      Q.   Told Michael?
6      A.   I told Michael about what had
7  happened. Michael said, "Call Masoud and ask
8  him if this is his guy."
9           Masoud said, "Okay, I'll look into
10 it." Masoud called back within five minutes
11 and said, yes, it is his guy. I told him to
12 stop by and see you guys at the club and
13 explain what was going on.
14     Q.   Was Michael on the conversation
15 with Masoud?
16     A.   He was standing next to me while I
17 was holding the phone.
18     Q.   Tell me the whole conversation
19 with Masoud.
20     A.   I asked Masoud if this guy worked
21 for him or was down at the police station, did
22 he know anything about what was going on from

Feder Reporting Company
(202) 863-0000

Page 123

1  the incident last night.
2           So he called the guy and had the
3  guy stop by FUR Nightclub on his way to work
4  at Dream Nightclub, to stop by and talk to us
5  to tell us what happened, what was going on.
6           So we waited and when he arrived
7  we sat down in the main office and talked to
8  him.
9      Q.   What time did he arrive?
10     A.   I don't remember.
11     Q.   Approximately.
12     A.   I have a statement that I wrote
13 down everything that was transpired during the
14 interview. Maybe the time is on there.
15     Q.   I understand. I am just asking
16 for your best recollection.
17     A.   I don't know.
18     Q.   Before midnight?
19     A.   Yes.
20     Q.   It was when he got off work at
21 Dream?
22     A.   On his way to work at Dream. It

Feder Reporting Company
(202) 863-0000

Page 124

1  would probably be before 11:00, if you want to
2  narrow it down. Somewhere between 7:00 and
3  11:00.
4      Q.   This is Mr. Alkadi?
5      A.   Yes.
6      Q.   So Mr. Alkadi dropped by -- he
7  came to FUR sometime between 7:00 and 11:00?
8      A.   Yes.
9      Q.   And did you see -- were you the
10 first one at FUR to greet him when he came in?
11     A.   He came in. Michael was sitting
12 in the office. We just went into the office
13 and spoke to him.
14     Q.   When you say the office, do you
15 mean the little door on the right as you come
16 in?
17     A.   Yes, sir.
18     Q.   Where the cameras, the monitors
19 are?
20     A.   Yes, sir.
21     Q.   Who was in that room?
22     A.   Myself and Michael.

Feder Reporting Company
(202) 863-0000

Page 125

1      Q.   Anyone else?
2      A.   That's it.
3      Q.   How long did the meeting last?
4      A.   Ten, 15 minutes.
5      Q.   Just the three of you? You,
6  Michael and Mr. Alkadi. Is that right?
7      A.   That's what I said.
8      Q.   Tell me everything that you recall
9  that was said by each of you during that
10 conversation.
11     A.   We sat down and Michael let me
12 lead the question with the questions. And I
13 asked him what was going on, why was he down
14 at the metropolitan police station
15 representing himself as a FUR employee. And
16 can you please fill us in on what is going on,
17 because, as I said, we have already initiated
18 a call to have this incident investigated.
19          So, he said that the officers hit
20 his friend. And I said, "Well, can you tell
21 me when this occurred? Because I was with you
22 outside. When did this happen? Did this

Feder Reporting Company
(202) 863-0000