UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILE MAZLOUM,

    Plaintiff,

v.

DISTRICT OF COLUMBIA et al.,

    Defendants.

Civil Action No. 06-0002 (JDB)

**RESPONSES AND OBJECTIONS OF FUR DEFENDANTS TO
PLAINTIFF'S PROPOSED NON-STANDARD JURY INSTRUCTIONS**

Defendant Night & Day Management, LLC ("FUR") and Michael Persons (together, the "FUR Defendants"), by their counsel, respectfully submit the following responses and objections to Plaintiff's Proposed Non-Standard Jury Instructions:

**PLAINTIFF'S PROPOSED GENERAL INTRODUCTORY STATEMENT**

Objections: The FUR Defendants object to Plaintiff's intertwining—and thus confusing—his common law Assault and Battery claims against all defendants with his several statutory claims, which are pending only against the other defendants. The Assault and Battery discussion should instead be addressed first and should thereafter be expressly differentiated from discussion of his statutory causes of action; correspondingly, all other instructions should be appropriately reordered.

**PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. _____
INSTRUCTION RE CIRCUMSTANTIAL EVIDENCE**

Objections: D.C.'s Standardized Civil Jury Instruction 2.10 is pithier and better.

### PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. _____
### ASSAULT AND BATTERY

Objections:  D.C.'s Standardized Civil Jury Instructions 19.01 and 19.03 are superior in that they accurately specify that the conduct complained of must be intentional *and unlawful*.

### PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. _____
### SELF-DEFENSE AS AN AFFIRMATIVE DEFENSE TO
### A CLAIM OF ASSAULT AND BATTERY

Objections:  D.C.'s Standardized Civil Jury Instruction 19.06 is pithier and better, and Plaintiff leaves out a key part of the approved instruction, *id*., namely:  "If a person reasonably believes the other person is an aggressor, he or she does not have to wait for the aggressor to make the first move."

Plaintiff also tendentiously and unfairly ends his proposed instruction with a statement regarding how the jury "must find for Plaintiff on his battery claim" under certain circumstances but neglects to point out that, under opposite circumstances, it "must find"—*in all respects*—for the FUR Defendants.

### PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. _____
### VICARIOUS LIABILITY FOR ASSAULT AND BATTERY

Objections:  Plaintiff herein misstates the law to suggest that FUR would be liable merely if Mr. Persons acted in connection with his employment and if his conduct was consistent with his employment duties; conspicuously absent from this proposed instruction is the fact that FUR would be liable to Plaintiff only if Mr. Persons himself were found so liable.

### PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. _____
### PUNITIVE DAMAGES – GENERAL INSTRUCTION

Objections:

(1)   As a matter of law, no punitive damages charge concerning the FUR Defendants is permissible in these circumstances.

Regarding claims such as Plaintiff's against the FUR Defendants, the District of Columbia Court of Appeals has unambiguously admonished: "Punitive damages are not allowable in every case of assault and battery. They are allowable only where there is evidence of actual malice, wanton conduct, deliberate violence, or intent to injure." *Wanis v. Zwennes*, 364 A.2d 1193, 1195 (D.C. 1976) (footnotes omitted).

In order for such damages to be assessed under District of Columbia law, Plaintiff must prove "outrageous" or "reckless" conduct by Mr. Persons toward Plaintiff's safety and/or Mr. Person's having uttered "heated words or derogatory comments" *and also*, importantly, Mr. Person's having thus conducted himself or spoken "***prior to the assault***" has to be established or else the matter is nothing but a garden-variety assault and battery claim,[1] according to cases such as *Croley v. Republican National Committee*, 759 A.2d 682, 695-96 (D.C. 2000) (emphases added):

> [W]e are satisfied that Mr. Croley did not present clear and convincing evidence to satisfy the elements of punitive damages, and no reasonable inference that the elements were met may be made on the record in this case. The District of Columbia standard jury instruction on punitive damages provides, in relevant part:
>
>> You may award punitive damages only if the plaintiff has proved with clear and convincing evidence:
>>
>>> (1) that the defendant acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff;
>>> AND
>>> (2) that the defendant's conduct itself was outrageous, grossly fraudulent, or reckless toward the safety of the plaintiff.
>
> A review of the record and testimony in this case reveals no evidence satisfying all of the elements of punitive damages. At trial, Mr. Croley testified he had complained

---

[1] The fact that punitive damages are not a favorite of the law is reflected in the aggravated nature of the defendant's conduct—and, inferentially, state of mind—that must be shown to justify an award. *Price v. Griffin*, 359 A.2d 582, 589 (D.C. 1976).

3

to the police about parking by the RNC on Ramsey Court and signs that the RNC had placed on the RNC building saying, "Parking by permit only." In January 1984, several months before the March 26, 1984 assault, a fuel oil truck trying to make a delivery to Mr. Croley's house could not get through because of RNC cars parked on Ramsey Court, "people from the [RNC]" refused to move the cars. On at least one occasion when a police officer arrived in response to Mr. Croley's complaint, Mr. Mills was called out and asked to produce the permit for the "parking by permit only" signs. Mr. Mills refused to produce the permit and, later, a District of Columbia official apparently ordered the signs to be removed. *In recounting the disagreement with Mr. Mills about parking, Mr. Croley mentioned no personal encounter with Mr. Mills that manifested "outrageous" or "reckless" conduct "toward [his] safety"* **prior to the assault**. *Nor did he mention any heated words or derogatory comments uttered by Mr. Mills or Mr. Lyons* **before the assault** *on March 26, 1984.* After detailing how he went outside on Ramsey Court to take pictures of the dumpster, the condition of the surrounding area, and Mr. Mills' statement that he could not engage in any activity on Ramsey Court, Mr. Croley described the assault on him in the following words:

> As I was turning around to take another picture, Mr. Mills grabbed me and pulled me toward him. And then I - - I don't remember anything, until I was on the pavement, with Mr. Mills standing over me. I was sort of on my side, curled up a little bit, and my left side. And Mr. Mills was standing over me, with one foot - - I guess it would have been his left foot at my back, and his right foot at my chest. And then I - - when I - - I was a little - - I started calling for the police ...

***This account is devoid of comments or mention of gestures by Mr. Mills or Mr. Lyons which would satisfy the requirements for an award of punitive damages.*** *Although the jury could infer, from Mr. Croley's recitation of the March 26 events, deliberate and intentional conduct by Mr. Mills and Mr. Lyons resulting in the assault and battery of Mr. Croley,* ***the required showing of entitlement to punitive damages is more stringent and must rise to clear and convincing evidence***. The jury could reasonably infer from Mr. Orban's and Mr. Croley's testimony that Mr. Mills had placed his foot on Mr. Croley's chest after he was thrown to the ground and had left a "red mark" or an "abrasion" on his chest, but nothing in either man's testimony shows, by clear and convincing evidence, that this act satisfied the requirements for the award of punitive damages. *See United Mine Workers[v. Moore*, 717 A.2d 332, 341-42 (D.C. 1998)]. Based on our review of the record, we are satisfied that the trial court did not err in refusing to submit the issue of punitive damages to the jury, since as a matter of law Mr. Croley was not entitled to such damages.

Similarly here, Plaintiff's own testimony in this litigation (excerpts from his January 29-30, 2007 deposition are attached hereto as Exhibit 1) —*taken as true here for the very limited purpose of examining his request for a punitive damages charge to the jury*—

establishes that Plaintiff had no substantive contact at all with Mr. Persons before the time Mr. Persons is supposed to have grabbed Plaintiff, without warning, from behind in a "bear hug":

```
                              317
 7    Q    You testified already, I believe,
 8    that you went up one time to Mr. Persons and
 9    he said, "No, you can't get on the stage," and
10    you went back down.  Is that correct?
11         MR. CORCORAN:  Objection; asked
12    and answered.
13         THE WITNESS:  I didn't go on the
14    stage the first time.  I just stepped one or
15    two steps up.  And then he asked me to wait.
16         BY MR. FITZSIMMONS:
17    Q    Didn't you say "wait or something"
18    yesterday?
19    A    Yes.
20    Q    Okay.  Well, you're not quite sure
21    what he said?  Is that the idea?
22    A    Yeah, I'm sure.
                              318
 1    Q    What did he say?
 2    A    He said, "Wait.  Don't come here,"
 3    or something like that, you know.
 4    Q    Either "wait" or "don't come here"
 5    or something.
 6    A    He said, "Wait."  I don't know,
 7    the noise there and everything.  But he said,
 8    "Wait."  That's what I --
 9    Q    Well, did he say, "Wait" or did he
10    say, "Don't come here"?
11         MR. CORCORAN:  Objection; asked
12    and answered.
13         THE WITNESS:  He said "Wait."
14         BY MR. FITZSIMMONS:
15    Q    Did you have any idea what he was
16    asking you to wait for?
17    A    No.
18    Q    Well, I take it since you said
19    there was one time when you were on the stage
20    and off the stage, that you weren't counting
21    that one time we just talked about with
22    Mr. Persons.
                              319
 1         MR. CORCORAN:  Objection; assumes
 2    that waiting in line is equivalent to being on
 3    the stage.
 4         THE WITNESS:  When I was on the
 5    stage, I was once on the stage.  When I talked
 6    to Mr. Persons, I was on the steps of the
 7    stage.
 8         BY MR. FITZSIMMONS:
 9    Q    Other than that exchange with
10    Mr. Persons, when you were on the steps and
11    you turned around and left, did you have any
12    other exchanges of words with Mr. Persons that
13    evening?
14    A    No, sir.
                         …
                              337
11    Q    Okay.  You did tell [the FBI] that you
12    remembered getting up on the stage and
13    dancing?
14    A    Yes, sir.
15    Q    Okay.  The report continues.
16    "After dancing for about 15 minutes, Mazloum
17    walked to the stairs leading off the stage and
18    walked down the first step or two."
19         Mr. Mazloum, did you give this
20    information to the FBI?
21    A    I think so.
22    Q    The report continues.  "Marwan was
                              338
 1    still working the chain at the bottom of the
 2    stairs leading to the stage, and Mazloum
 3    paused on the first or second step down the
 4    stairs to let people entering the stage pass
 5    him."
 6         Sir, did you give this information
 7    to the FBI?
 8    A    I think so.
 9    Q    The report continues.  "While he
10    waited on the first or second stair from the
11    top, Mazloum was grabbed from behind in a bear
12    hug and Mazloum did not know the identity of
13    the person holding him."
14         Sir, did you give this information
15    to the FBI?
16    A    Yes.
17    Q    Sir, the report continues.
18    "Mazloum began twisting to free himself from
19    the hold and saw that it was Security 1 who
20    was restraining him."
21         Sir, did you give this information
22    to the FBI?
                              339
 1    A    I don't think so.
 2    Q    In what respect is that statement
 3    inaccurate, in your view?
 4    A    I was trying to tell them that I
 5    was trying to move to see who grabbed me from
 6    behind.
 7    Q    And you weren't twisting to free
 8    yourself?
 9    A    Yes, sir.
```

5

| | | | | |
|---|---|---|---|---|
| 10 | Q | My statement is correct, you were | 15 | A   No, sir. |
| 11 | | not trying to free yourself? | 16 | Q   *You twisted but you could not see* |
| 12 | A | No. I tried to free myself. | 17 | *it was Michael Persons?* |
| 13 | Q | Did you see that it was what they | 18 | A   No, sir. |
| 14 | | termed Security 1, which is Michael Persons? | | |

Thus, under the applicable legal standard set forth in cases such as *Croley*, Plaintiff has no grounds to seek punitive damages in this circumstance against the FUR Defendants. According to Plaintiff's own above-quoted testimony, whatever might be ultimately found by the jury regarding responsibility for the instigation of this minor ruckus between Plaintiff and Mr. Persons, Plaintiff cannot possibly establish that, "*prior to the assault*," Mr. Persons exhibited any "outrageous" or "reckless" conduct toward Plaintiff's safety or that Mr. Persons uttered any "heated words or derogatory comments." *Croley*, 759 A.2d at 695. Absent such evidence, Plaintiff has no grounds vis-à-vis the FUR Defendants to ask that this Court give any punitive damages charge at all to the jury, and, therefore, Plaintiff's request for this proposed jury instruction as well as all other requested instructions pertaining to punitive damages as to the FUR Defendants should properly be denied.

(2) Without waiver of the above-stated objections, "reckless indifference" is not a standard for permitting an assessment of punitive damages under District of Columbia law.

(3) Without waiver of the above-stated objections, no punitive damages charge concerning the FUR Defendants should in any event be given until after the jury has rendered a verdict against Mr. Persons, as such a charge might in and of itself wrongly, unduly, and prejudicially suggest to the jury that a predicate therefor—namely, liability for assault and battery—had already been established as a matter of law. *See Croley*, 759 A.2d at 694-95 (court deferred decision on punitive damages charge until after jury returned with a verdict for plaintiff).

6

**PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. _____
BURDEN OF PROOF - PUNITIVE DAMAGES**

Objections:  *See* "PUNITIVE DAMAGES – GENERAL INSTRUCTION" Objections above.

**PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. _____
PUNITIVE DAMAGES – MICHAEL PERSONS**

Objections:  *See* "PUNITIVE DAMAGES – GENERAL INSTRUCTION" Objections above.

**PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. _____
PUNITIVE DAMAGES – RESPONDEAT SUPERIOR LIABILITY**

Objections:  *See* "PUNITIVE DAMAGES – GENERAL INSTRUCTION" Objections above.

**PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. _____
ADVERSE INFERENCE BASED ON DESTRUCTION OF EVIDENCE**

Objections:

(1)   Notwithstanding that he seeks a *directory* adverse inference instruction against FUR based on the unavailability of video surveillance recordings from that night,[2] Plaintiff can present no adequate evidence regarding what the video recordings would supposedly have shown *that would have been helpful to him*, and he is thus entitled to no adverse inference instruction at all.  *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 100-01 (D.Md. 2003) (party must show evidence that was destroyed or altered was relevant to the claims or defenses of the

---

[2] Plaintiff asks that the Court give the following instruction:  "[Contingent on specified potential findings of fact concerning loss of these recordings,] *I am instructing you to infer* from this fact that the video evidence that was destroyed, had it been produced, would have been favorable to the Plaintiff and/or damaging to the Defendants."  (Plaintiff's Request at 32 (emphasis added).)

party that sought the discovery of the spoliated evidence "*to the extent that a reasonable factfinder could conclude that the lost evidence **would have supported** the claims or defenses of the party that sought it*" (emphases added)).

Although this Court earlier observed—in recently permitting Plaintiff to take a deposition of FUR employee Diego Sequeira—that "the parties forcefully disagree over what the surveillance system would actually have captured on the evening in question" (January 16, 2008 Opinion at 19), quite obviously no mere "disagreement" about what the recordings would have captured should suffice as grounds to charge a jury that it either could or must find that those recordings "***would have supported** the claims*" of Plaintiff.

Here, the video recordings at issue breaks down into two basic groups of locations: (i) the front door area of the Nightclub and (ii) all other areas in and around the Nightclub, beginning from where this fracas started on the steps of the Nightclub's main stage and ending at an outside across-the-street curb, whereat off-duty MPD officer defendants held Plaintiff until on-duty officers arrived.

As detailed below regarding that first "front door" category, ***all the evidence*** indicates this video recording would have shown no more than Plaintiff's being led out the door. Why missing recordings of that pedestrian scene might rightly engender any adverse inference instruction against the FUR Defendants is still unexplained by Plaintiff.

As also detailed below regarding the second "other areas" category of recordings, Plaintiff—even after his deposition of Mr. Sequeira—yet has ***no evidence whatsoever, nor is there any reasonable inference***, that any rotatable camera which had the capability of capturing any portion of this scene at issue was actually pointed in a direction to do so at the time in question. In this respect, Plaintiff founds his adverse inference instruction request on the

8

unstated notion—both directly contrary to below-referenced evidence given by Mr. Sequeira and without any affirmative evidence supporting Plaintiff's position—that FUR was in fact *not* employing its rotatable cameras to keep watch over tills where thousands of dollars in cash transactions take place every night and watch over lines of people queuing up outside to gain entrance; instead, for unknown and unspecified reasons, FUR was supposedly more interested in recording seas of poorly illuminated dancers on its main dance floor, hundreds of pedestrians in its hallways, and, by contrast, virtually no one at all at a typically empty curb on the far side of the street outside its front door.

Regarding that first "front door" category, the recordings at issue showed—according to the testimony of FUR employee David McLeod (excerpts from his February 27, 2007 deposition are attached hereto as Exhibit 2)—Plaintiff walking out of the front door of the building *on his own* with police officers holding him by the arms:

```
                               158
 8     Q.   All right, let's continue.
 9          Mr. Kaplan, asked you to draw this
10   diagram which is Exhibit 1.  And one of the
11   things you marked on here was OC.  That stands
12   for what?
13     A.   Well, that is what he told me to
14   say.
15     Q.   Stands for old camera?
16     A.   Yes.
17     Q.   And he asked you about reviewing
18   the tape, the tape of the incident on 3/24/06
19   from the exhibit that he looked at?
20     A.   Right.
21     Q.   Did you ever have occasion to
22   review the tape from this old camera

                               159
 1   corresponding with the incident that we are
 2   dealing with here?
 3     A.   Did I review that tape?
 4     Q.   Yes.
 5     A.   Yes, I have seen it.
 6     Q.   Okay.  How did it come about that
 7   you reviewed that type?
 8     A.   The next day I looked at them
 9   coming out of the club.

10     Q.   Okay.  How did it come about that
11   you decided to look at this tape?
12     A.   I mean, we discussed to look at
13   the tape because of the simple fact -- I
14   gradually looked at the tape of people coming
15   out of the club.  In other words, I review
16   tapes, anyway.
17     Q.   You say "we discussed."  Who did
18   you discuss this with, reviewing the tape?
19     A.   Mr. Romeo.
20     Q.   Are you certain it was Mr. Romeo?
21     A.   Yes.  He asked me to look at the
22   tape.

                               160
 1     Q.   Did Mr. Fiorito ask you to look at
 2   the tape?
 3     A.   They both was there.
 4     Q.   They both was there.  When did
 5   they ask you to review the tape?
 6     A.   The next day.
 7     Q.   And when did you actually review
 8   the tape?
 9     A.   Saturday.
10     Q.   What did you see when you reviewed
11   the tape?
12     A.   I seen the patron coming out, four
```

```
13  guys around him, walking down the steps.
14     Q.  Did you see this group from any
15  other vantage?
16     A.  You also see them walking out of
17  the club from the camera that is pointed
18  directly toward the front door.
19     Q.  Who did you see exactly in this
20  tape?
21     A.  Well, I saw the Spanish cop, I saw
22  the -- it is the Spanish cop.  There is

                    161
1   Modlin.  It a white cop that I don't know.
2   And it is another cop, a black cop, a black
3   cop that I don't know.  I guess that is
4   Phillips.  I assume, I don't know.  And your
5   patron, the patron is in the middle of these
6   four cops.
7      Q.  How long in hours or minutes or
8   seconds did these people appear on the OC
9   camera screen?
10     A.  Second.  Seconds.
11     Q.  How many seconds?
12     A.  I am going to say maybe 30
13  seconds, if that is the most, walking.  You
14  see them walking, and walking down.
15     Q.  You are talking about both
16  cameras, you see them for 30 seconds?

17     A.  Yes, both cameras.  You see them
18  walk out and walk down.
19     Q.  You say walked out.  Did you see
20  Mr. Mazloum getting dragged out?
21     A.  No.  He walked out on his own
22  recognizance.

                    162
1      Q.  You can tell that from looking at
2   the tape?
3      A.  Yes.  You can tell that by looking
4   at the tape.  You can see him walking out with
5   four guys around him.  He gets to the steps.
6   You can see him walking down the steps with
7   four guys around him.
8      Q.  Did you make any kind of report to
9   Mr. Fiorito about what you looked at after you
10  looked at this tape?
11     A.  I let him know he walked out.
12  That is the only report I can give him.
13     Q.  Did you report to him that you saw
14  cops beating Mr. Mazloum as he was walking
15  down the stairs?
16     A.  No, I never saw that.
17     Q.  Other than these guys walking down
18  the stairs, was there anything happening?
19     A.  No, they walked him out.
```

(McLeod Dep. at 159-62.)  Plaintiff's own testimony (Exhibit 1) squares *fully* with that of

Mr. McLeod in that Plaintiff testified that he was not being assaulted while he was being led out

of the front doors of FUR:

```
                    368
4        BY MR. FITZSIMMONS:
5    Q   Sir, the[ FBI] report continues.
6   "Mazloum was dragged up the stairs through the
7   tunnel and out the front of the club."
8        Sir, did you give that information
9   to the FBI?
10   A   Not exactly.
11   Q   How is that statement incorrect?
12   A   When you say that they dragged me
13  up the stairs and the hallway and all the way
14  outside --
15   Q   That's incorrect?
16   A   That's incorrect.
17   Q   Okay.  What was correct about how
18  you got out of the club?
19       MR. CORCORAN:  Objection; asked
20  and answered.

21       THE WITNESS:  They hold me with my
22  two arms, they dragged me on the steps, and

                    369
1   then I walk outside.
2        BY MR. FITZSIMMONS:
3    Q   Okay.  When you got out the front
4   door of the FUR Night Club, there were steps
5   that led down to the sidewalk.  Is that
6   correct?
7    A   I think so.
8    Q   The men still had you by each arm
9   at that point?
10   A   I think so.
11   Q   But all three of you were walking?
12   A   Yes, sir.
13   Q   And you walked down the stairs
14  with the three men?
```

```
15    A   Yes, sir.
16    Q   While you were on the stairs, was
17  anybody -- excuse me.  Strike that.  While you
18  were on those -- strike that.
19          From the time that you exited
20  FUR's main front door to the time that you got
21  to the sidewalk in front of that front door,
22  was anyone hitting you?
                                              370
1           MR. CORCORAN:  Objection; asked
2   and answered yesterday.
3           THE WITNESS:  No, sir.
4           BY MR. FITZSIMMONS:
5     Q   At that same period of time was
6   anyone assaulting you other than in the sense
7   that they had you by the arms and were leading
8   you?
9     A   No, sir.
```

Because the content of the front door video recordings would, *by Plaintiff's own admission*, not have shown Plaintiff being assaulted or battered, such recordings would in no event have helped him establish his assault and battery claim against Persons or FUR. As a result, pursuant to Federal Rule of Evidence 402, evidence concerning the existence and/or content of that recording should be entirely excluded from evidence, and, *a fortiori*, these missing recordings could not possibly form the basis of any valid adverse inference instruction.

Regarding the second "other FUR areas" category of recordings—which involve Plaintiff's unsupported claims that interior and exterior rotatable cameras were pointed at him during the incident in question—the operations manager of FUR has repeatedly testified that these rotatable cameras were instead pointed, respectively, at the bar's cash registers and the customer lines. For example, in his recent Court-ordered deposition (excerpts from his February 14, 2007 deposition are attached hereto as Exhibit 3), Mr. Sequeira testified:

> **(a)   That FUR's outside camera in the front of its building is, at night, *always* pointed at the customer waiting lines (which form directly in front of and parallel with the face of the building):**

```
                                              96
20    Q   Do you ever recall an instance
21  where you moved [the camera] to point across the street[ during the daytime]
22  and then you didn't move it back at night?

                                              97
1     A   No.  I always move it back at
2   night.
3     Q   You know for a fact you always
4   move it back at night?
5     A   Mmm-hmm, because I'm always
```

2

> 6   looking at the[outside customer] lines at the beginning of the
> 7   night, the middle of the night.
> 8   Q   You look at the lines?
> 9   A   Mmm-hmm.
> 10  Q   But you said you don't always
> 11  monitor the cameras, right?
> 12  A   Mmm-hmm.
> 13  Q   Sometimes you don't monitor them
> 14  at all?
> 15  A   Mmm-hmm.
> 16  Q   So why are you looking at the
> 17  lines then?
> 18  A   To see how busy it is.

**Thus, during business hours, that outside camera would *never* have been pointed at a typically empty curb across the street from FUR's front door (whereat Plaintiff was ultimately detailed by police after his expulsion from the Nightclub).**

(b)   **That the rotatable camera within the front part of the first floor of the Nightclub is *never* pointed at the "Tunnel" corridor during business hours:**

>                              105
> 3   Q   So it would be your testimony that
> 4   the camera that would potentially shoot down
> 5   this tunnel that we're talking about would
> 6   never face down the tunnel?
> 7   A   That's right.
> 8   Q   It never would?
> 9   A   What's the point of that?  There's
> 10  no point to watch the tunnel.  I have no
> 11  business watching the tunnel when I have no
> 12  money going through it.  So what's the point
> 13  of watching that tunnel?  Is there any money
> 14  value to it?  No.  So why would I put a camera
> 15  to the tunnel when it would have no money
> 16  value to it.

**Instead, that camera is *always* pointed at the cash register at one of the bars in that area (Exhibit 3 at 102-04).**

(c)   **That the rotatable camera within the "basement" floor of the Nightclub is *never* pointed at the main dance floor area during business hours but is instead always pointed at the main bar there:**

>                              143
> 15  Q   And does [the camera above the main dance floor] normally point in this
> 16  direction[ towards that dance floor]?
> 17  A   No.
> 18  Q   Where does it normally point?
> 19  A   The bar.

11

```
20    Q    So you turned it specifically for
21    [Skip Coburn] for this instance[ when Coburn obtained a recording]?
22    A    Mmm-hmm.
```

                                    144
```
1     Q    And do you know if on the night in
2     question, March 2005, what direction this
3     camera was pointing in?
4     A    The bar.
5     Q    How do you know that to be the
6     case as you sit here today?
7     A    That's the bar camera.
8     Q    Your testimony is that's a bar
9     camera, that's how you know?
10    A    Mmm-hmm. That's where I always
11    point it. That's what footage that we
12    gave you later, basically that's what it is
13    used for, we showed you basically what it's
14    made for. It's a zoom pan-tilt. I can scan
15    my whole bar.
```

Thus, *no evidence exists* tending to show that any of the rotatable cameras in FUR's video surveillance system would have captured any image of Plaintiff on the night in question. The *only* evidence in this respect—evidence which, it must be noted, makes infinitely more sense than Plaintiff's contrary unsupported speculations—establishes that the rotatable cameras were pointed in the direction of "money" (i.e., the bar tills and the customer waiting lines), not at parts of the Nightclub through which Plaintiff was ultimately escorted out. Because no evidence, and no fair inference, concerning FUR's surveillance system would assist Plaintiff even in his attempting to make a *prima facie* case of assault and battery, evidence concerning that system should be excluded at trial pursuant to Federal Rule of Evidence 402[3] and, *a fortiori*, those

---

[3] Furthermore, evidence concerning the video surveillance system should be excluded pursuant to Federal Rule of Evidence 403 because such evidence would be unduly prejudicial and might tend to cause confusion and mislead the jury as to the assault and battery claim at issue in this action. Presenting this evidence might lead the jury to believe that the issue at hand regarding the FUR Defendants concerns loss of the March 12, 2005 video recording rather than assault and battery.

missing video recordings could not possibly form the basis of any well-founded adverse inference instruction.

Two final points should be noted regarding this "adverse inference" request by Plaintiff.

First, while FUR may have been naïve to have left to the Metropolitan Police Department the task of preserving any video surveillance recordings from the evening in question, nonetheless the fact that David McLeod saw only highly uninteresting shots of Plaintiff being escorted out the front door (Exhibit 2 at 159-62) does indicate strongly why no one at FUR thought this footage was of any great import.  Relatedly, as detailed above, that footage would—even according to Plaintiff's own testimony—have shown nothing more than his being escorted out these front doors.

The second main point here, concerning rotatable cameras at other parts of the building, raises a somewhat broader legal issue:  *just how prescient is an entity like FUR obligated to be in order to avoid becoming the victim of an adverse inference instruction*?  As operations manager Diego Sequeira has testified, FUR's rotatable cameras are *always* turned, during business hours, towards the "money" aspects of this business—the tills and the customer lines—rather than at corridors and dance floors uninteresting to him; security manager David McLeod, aware of that practice, didn't even bother in this instance to look at video recordings from cameras located in the dance floor and "Tunnel" areas because he figured, *rightly*, that images of bartenders pouring drinks and making change were entirely irrelevant to the incident in question.  Against this backdrop, *does the law actually charge an entity like FUR as follows?*:

> If video cameras that you always use during business hours to look exclusively at "money" areas of your club have the physical capability of rotating to observe, instead, people passing through your hallways, *you are legally responsible*—after a customer like Plaintiff has been thrown out of your establishment—to recognize that you will ultimately have to prove that what was never the business practice in your Nightclub regarding the use of those rotatable cameras was in fact not done on the night in question,

13

>and you will have to do so by having the foresight to retain video recordings *which, as a function of your regular business practices, do not show that customer at all.*
>
>Absent your foresight in this regard, the jury will be instructed to conclude not merely (a) that your "bar cameras" were, at the time in question, pointed not towards those bars tills but, instead, towards pedestrian areas *but also* (b) that these hypothesized recordings from those cameras would have shown images supportive of Plaintiff in his claims against you.

Briefly put, while a failure to preserve items constituting direct evidence concerning a claim (for example, a wrecked car involved in an accident) may be one thing vis-à-vis adverse inference rulings, a failure to preserve "non-evidence" is quite another matter. Particularly in that FUR's "show-me-the-money" practice concerning the positioning of these security cameras—testified to as detailed above—is *completely* understandable in the context of this cash-based business, there is no good reason *either* for FUR to be charged under the law to have had an obligation to retain Mazloum-free video recordings which would have merely confirmed that commonsense practice *or*, still less, for it now to be punished for not having done so.

Based on these reasons, Plaintiff's request for any adverse inference instruction against the FUR Defendants is unfounded and should appropriately be rejected.

(2) Without waiver of the above-stated objections, no reason whatsoever exists in this situation for any adverse inference instruction to be made directory rather than permissive. If the Court sees fit to give any adverse inference instruction at all here, the FUR Defendants should certainly be free to argue to the jury that Plaintiff's arguments in this regard are ridiculous.

14

Respectfully submitted,

/s/ Paul A. Fitzsimmons
_____
Thomas S. Schaufelberger, Bar No. 371934
Paul A. Fitzsimmons, Bar No. 444829
SAUL EWING LLP
2600 Virginia Avenue, N.W.
The Watergate—Suite 1000
Washington, D.C.  20037
Telephone: (202) 333-8800
Counsel for
Defendants Night & Day Management, LLC and Michael Persons

Dated:  March 28, 2008

15