UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                               )
EMILE MAZLOUM,                 )
                               )
            Plaintiff,         )          Civil Action No. 1:06 CV 00002
                               )          (JDB)
        v.                     )
                               )
DISTRICT OF COLUMBIA, *et al.*,)
                               )
            Defendants.        )
_____)


**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS RAMIREZ,
PHILLIPS, MODLIN, AND SCHNEIDER'S
MOTIONS FOR JUDGMENT AS A MATTER OF LAW**

Susan Huhta
Warren R. Kaplan
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW, Suite 400
Washington, D.C.  20036

David Gonen
Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW
Suite 700 East Lobby
Washington, D.C.  20007

Attorneys for Plaintiff

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

PROCEDURAL BACKGROUND ......................................................................................11

ARGUMENT ......................................................................................................................12

I.     THE COURT SHOULD DENY RAMIREZ' RULE 50(B) MOTION FOR
       JUDGMENT AS A MATTER OF LAW ON THE EXCESSIVE FORCE CLAIM........12

       A.     Legal Standards Applicable to A Rule 50(b) Motion ..........................................12

       B.     There Was Legally Sufficient Evidence in the Trial Record For A
              Reasonable Jury To Find That Ramirez Engaged In Excessive Force In
              Violation of the Fourth Amendment ...................................................................13

              1.     Legal Standards Governing Excessive Force.............................................13

              2.     The Trial Evidence Was More Than Legally Sufficient To Support
                     a Finding of Excessive Force. ...................................................................15

              3.     Ramirez Violates Well Settled Principles in Arguing For Judgment
                     As A Matter of Law Based On The Special Interrogatory Answers
                     and the Jury's Assault-and-Battery Verdict ..............................................22

                     a.     Ramirez' arguments based on the jury's findings ignore the
                            Rule 50(b) standard and would result in reversible error..............22

                     b.     Ramirez's arguments based on inconsistencies in the
                            verdict fail in any event................................................................23

       C.     Ramirez Is Not Entitled to Qualified Immunity For Excessive Force. .................25

              1.     Legal Standards Governing Qualified Immunity.......................................25

              2.     Standard of Review for a Qualified Immunity Motion Under Rule
                     50(b). .......................................................................................................25

              3.     Standards for Interpreting the Jury's Special Interrogatory
                     Answers....................................................................................................26

4.    Qualified Immunity Does Not Shield Defendant Ramirez From Liability for Excessive Force. .................................................. 28

II.    THE COURT SHOULD DENY RAMIREZ' RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE UNLAWFUL ARREST CLAIM. ................................................................................................................ 33

A.    Legal Standards Governing Unlawful Arrest. ........................................ 33

B.    There Was Legally Sufficient Evidence in the Trial Record For A Reasonable Jury To Find That Ramirez Engaged In Unlawful Arrest In Violation of the Fourth Amendment. .................................................. 35

C.    Ramirez Is Not Entitled To Qualified Immunity For Unlawful Arrest. ............... 38

III.    THE JURY'S PUNITIVE DAMAGES AWARD AGAINST RAMIREZ IS SUPPORTED BY AMPLE EVIDENCE ........................................................... 39

IV.    THE OFF-DUTY OFFICERS CANNOT OBTAIN, LET ALONE SEEK, JUDGMENT AS A MATTER OF LAW BECAUSE THIS COURT LACKS JURISDICTION OVER THE RELEVANT CLAIMS DUE TO THE PENDING APPEAL ............................................................................................................. 41

CONCLUSION .................................................................................................................. 44

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Anderson v. Creighton*, 483 U.S. 635 (1987)................................................................24, 25, 38

*Atlantic & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd.*, 369 U.S. 355 (1962) ........................ 26

*Barbour v. Merrill*, 48 F. 3d 1270 (D.C. Cir. 1995) ................................................................. 39

*Barham v. Ramsey*, 338 F. Supp. 2d 48 (D.D.C. 2004) ..........................................................28, 35

*Barnhart v. Dollar Rent A Car Sy. Inc.*, 595 F.2d 914 (3rd Cir. 1979)...................................... 27

*Bauer v. Norris*, 713 F.2d 408 (8th Cir. 1983)......................................................................16, 17

*Beran v. U.S.*, 1992 WL 182261 (D.D.C. 1992) ...................................................................... 34

*Bloom v. Luis*, 198 F. Supp. 2d 141 (D. Conn. 2002) .............................................................. 38

*Building Indus. Ass'n. of Ca. v. Babbitt*, 70 F. Supp. 2d 1 (D.D.C. 1999) ................................ 41

*Burr v. Burns*, 439 F. Supp. 2d 779 (S.D. Ohio 2006)..........................................................34, 35

*Casillas-Diaz v. Palau*, 463 F.3d 77 (1st Cir. 2006) ............................................................... 39

*Chaney v. City of Orlando, Fl.*, 483 F.3d 1221 (11th Cir. 2007)................................................ 22

*Chelios v. Heavener*, 2008 WL 746842 (7th Cir. Mar. 21 2008)...........................................20, 34

*Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000) ............................................. 12

*DeGraff v. District of Colombia*, 120 F.3d 298 (D.C. Cir. 1997) ..............................18, 19, 31, 37

*District of Columbia v. Murphy*, 631 A.2d 34 (D.C. 1993) ....................................................... 34

*Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991)..................................................................... 19

*Dunaway v. New York*, 442 U.S. 200 (1979) ........................................................................... 33

*Edwards v. Okie Dokie, Inc.*, 473 F. Supp. 2d 31 (D.D.C. 2007) ............................................... 33

*Floyd v. Laws*, 929 F.2d 1390 (9th Cir. 1991) ........................................................................ 27

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008)..............................................................36, 38

*Gallick v. Baltimore and Ohio R.R. Co.*, 372 U.S. 108 (1963)...............................................26, 27

*Gordon v. Norman*, 788 F.2d 1194 (6th Cir. 1986) .........................................................................39

*Graham v. Connor*, 490 U.S. 386 (1989).............................................................................. passim

*Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56 (1982)................................................41

*Hadley v. Gutierrez*, 526 F.3d 1324, 2008 WL 1947008 (11th Cir. May 6, 2008)......................14

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..................................................................................14

*Hudson v. District of Columbia*, 517 F. Supp. 2d 40 (D.D.C. 2007)..............12, 13, 15, 22, 25, 33

*Hundley v. District of Columbia*, 494 F.3d 1097 (D.C. Cir. 2007)................................................26

*Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999).........................................................................25

*Ingrum v. Nixa Reorganized School Dist. R-2,966*, F.2d 1232 (8th Cir. 1992) ...........................26

*Jones v. Buchanan*, 325 F.3d 520 (4th Cir. 2003)...............................................................15, 18, 32

*Jones v. Rivers*, 732 F. Supp. 176 (D.D.C. 1990) .........................................................................40

*Karnes v. Skrutski*, 62 F.3d 485 (3rd Cir. 1995) ..........................................................................25

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004).........................................................13, 25

*Kirkland v. District of Columbia*, 70 F.3d 629 (D.C. Cir. 1995) ..................................................13

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002) ..........................................................................16

*Logan v. City of Pullman*, 392 F. Supp. 2d 1246 (E.D. Wash. 2005) ...........................................18

*Los Angeles Nut House v. Holiday Hardware Corp.*, 825 F.2d 1351 (9th Cir. 1987).................26

*Lyles v. Micenko*, 468 F. Supp. 2d 68 (D.D.C. 2006) .................................................33, 35, 37, 39

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) .......................................................................18

*Mazloum v. District of Colombia Metropolitan Police Dept.*, 522 F. Supp. 2d 24 (D.D.C. 2007)................................................................................................................................. passim

iv

*Mazloum v. District of Columbia*, 442 F. Supp. 2d 1 (D.D.C. 2006) ............................................ 43

*McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750 (3d Cir. 1990) .......................................... 23

*McDowell v. Rogers*, 863 F.2d 1302 (6th Cir. 1988) .................................................................... 16

*McNair v. Coffey*, 234 F.3d 352 (7th Cir. 2000) ........................................................................... 25

*Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33 (D.D.C. 2003) ............................................................ 39

*Morfin v. City of East Chicago*, 349 F.3d 989 (7th Cir. 2003) ..................................................... 19

*Mosley v. Wilson*, 102 F.3d 85 (3d Cir. 1996) .............................................................................. 23

*P.B. v. Koch*, 96 F.3d 1298 (9th Cir. 1996).................................................................................. 18

*Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823 (D.C. Cir. 1988) ..................................... 15

*Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994)............................................................................. 19

*Saucier v. Katz*, 533 U.S. 194 (2001)........................................................... 13, 18, 20, 21, 24, 38

*Scott v. District of Columbia*, 101 F.3d 748 (D.C. Cir. 1997) ................................................. 18, 20

*Smith v. Pollin*, 194 F.2d 349 (D.C. Cir. 1952).................................................................... 42, 43

*Solomon v. Auburn Hills Police Dep't.*, 389 F.3d 167 (6th Cir. 2004) ........................... 16, 17, 20

*Strauss v. Stratojac Corp.*, 810 F.2d 679 (7th Cir. 1987) ......................................................... 26

*Studley, Inc. v. Gulf Oil Corp.*, 407 F.2d 521 (2d Cir. 1969)................................................. 23, 27

*Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29 (1944) ............................................................ 12

*Tennessee v. Garner*, 471 U.S. 1 (1985) ................................................................................... 14

*Thompson v. Douds*, 852 So. 2d 299 (Fla. Dist. Ct. App. 2003)................................................. 18

*United States v. Barber*, 557 F.2d 628 (8th Cir. 1977) ............................................................. 34

*United States v. Cisneros*, 26 F. Supp. 2d 24 (D.D.C. 1998)..................................................... 43

*United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997)........................................................ 41

*United States v. Wesley*, 293 F.3d 541 (D.C. Cir. 2002)............................................................ 33

*Wardlaw v. Picket*, 1 F.3d 1297 (D.C. Cir. 1997)..................................................... 18, 20

*Warlick v. Cross*, 969 F.2d 303 (7th Cir. 1992) ........................................................ 27

*Washington v. United States*, 414 F.2d 1119 (D.C. Cir. 1969) ................................. 37

*Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005)................................................... 20

*Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995) ...................................................... 36

*Wilks v. Reyes*, 5 F.3d 412 (9th Cir. 1993).............................................................. 27

## STATUTES AND RULES

42 U.S.C. § 1983 ...................................................................................................... passim

Fed. R. Civ. P. 49(b).................................................................................................. 42

Fed. R. Civ. P. 50(a)(1) ............................................................................................ 1, 41

Fed. R. Civ. P. 50(a)(2) ............................................................................................ 42

Fed. R. Civ. P. 50(b)(1) ............................................................................................ 1, 12, 22

Fed. R. Civ. P. 60(b).................................................................................................. 42

## MISCELLANEOUS

*Wright & Miller*, 9B Fed. Prac. & Proc. Civ.2d § 2513 (2008)............................... 12, 24

Plaintiff Emile Mazloum ("Mazloum"), by his undersigned counsel, for his response to (i) Defendant Anthony Ramirez' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b)(1), and (ii) Defendants Thaddeus Modlin, Richmond Phillips and Louis Schneider's (the "Off-Duty Officers") motion for judgment as matter of law pursuant to Fed. R. Civ. P. 50(a)(1), hereby states as follows:

## **INTRODUCTION**

The jury that heard this case squarely found that Ramirez **did** engage in acts of excessive force against Mazloum at FUR Nightclub on March 11, 2005, in violation of Mazloum's Constitutional rights.  *See* May 6, 2008 Verdict (the "Verdict"), Response to Interrogatory No. 12-14.   Unable to accept the judgment of the jury, Ramirez and his counsel (also representing co-defendant the District of Columbia) hope to escape the jury's reasoned, and unassailable, findings by arguing that the Section 1983 verdict is based on insufficient evidence as a matter of law.  Yet it is readily evident from a review of the trial record that the primary claim of police misconduct against Ramirez—that while in an off-duty capacity he acted out of all proportion and treated Mazloum, an individual never guilty of any crime, as a dangerous felon, using brutal and unnecessary force against him—is amply supported.  There was, moreover, ample evidence upon which a reasonable jury could (and did) find that Ramirez and his fellow off-duty officers arrested Mazloum without probable cause.  Ramirez simply cannot make the Rule 50 showing required for this Court to invalidate the jury's determination.

Alternatively, Ramirez argues that he is entitled to qualified immunity based on the jury's special interrogatory answers.  Putting aside the fact that Ramirez never attempted to invoke immunity before trial (and thus patently had little faith in the applicability of the doctrine), this argument is unavailing.  Ramirez ignores well-settled principles governing the interpretation of

jury verdicts by cherry-picking amongst the jury's interrogatory answers, ignoring responses clearly favorable to Mazloum while going to great lengths to interpret the others in a manner that *undermines*, rather than sustains, the jury's general verdict.  But that approach is precisely what the case law forbids.  When the interrogatory responses are interpreted as the law requires—to be harmonized, if fairly possible, with each other and the overall verdict—it is readily evident that Ramirez is not entitled to immunity.

Finally, the three Off-Duty Officers, who filed an interlocutory appeal last fall to evade trial of the Section 1983 claims asserted against them, now make the curious argument that they too are entitled to dismissal of those same appealed, and stayed, claims as a result of certain of the jury's factual findings.  To rebut this argument, merely the obvious need be pointed out: ***those claims are presently on appeal***.  This Court has no jurisdiction over them at this time. They were not tried.  If and when the claims are back before the district court and the Off-Duty Officers file a proper motion for their dismissal that this Court has the capacity to entertain, Plaintiff will address their arguments, which seem to involve an unpersuasive attempt to selectively "piggyback" on fact-findings reached during the trial of *different* claims.

For all these reasons, the Defendants' motion should be denied in its entirety and the jury's verdict should be allowed to stand.

## STATEMENT OF FACTS

Plaintiff submits the following statement of facts adduced at trial.[1]  In accordance with the requirements of Rule 50, this recitation views the evidence and all reasonable inferences in the light most favorable to the Plaintiff (the non-moving party):[2]

---

[1]  This statement was written without the benefit of formal transcripts and is thus based on trial notes and the deposition testimony.

***Going to FUR on March 11, 2005***

On March 11, 2005, Mazloum—a 37-year-old man of Lebanese descent—went to FUR Nightclub in D.C. with his friends Marwan Abi-Aad and Imad Alkadi.  Marwan and Imad worked part-time for a promoter named Massoud A, who "promoted" Friday nights at FUR Nightclub.  Mazloum had gone to the club a few times prior to that night, enjoying the evening while his friends Marwan and Imad performed their job of assisting the FUR security personnel in monitoring access to the stage.

Before leaving for FUR, Mazloum and his friends had dinner, starting at about 6 - 6:30 p.m., during which Mazloum consumed one or two beers, with two or three more being consumed while at the Club. While there was much testimony about Mazloum's alleged drunkenness on the night of the incident (testimony that in almost every instance was elicited from interested witnesses trying to impeach Mazloum[3]), Mazloum consistently testified that, while he drank and felt less inhibited, he was never "drunk" that night—a claim corroborated by Marwan's testimony that he had never known Mazloum to be drunk, out of control, or to initiate any altercation, on March 11 or at any other time.  Importantly, Mazloum has never been in trouble with the law, has never been charged with a crime, and has never been formally arrested.

---

[2] Contrary to Ramirez' unjustified assumption, a Rule 50(b) motion concerns only the *legal sufficiency* of the evidence offered at trial and is thus unaffected by a jury's actual findings.  Only Ramirez' qualified immunity arguments implicate the jury's interrogatory responses, which will be discussed in the appropriate sections below.

[3] The sole non-party witnesses who believed Mazloum was drunk were Officers Acosta and Trapero.  Yet both admitted that they could not be sure and that they based their conclusions on indicia that were consistent with Mazloum having been assaulted, not drunk.  These officers could also be expected to shade their testimony to protect their fellow officers from liability.  In addition, the bulk of the testimony on drunkenness relied on the claim that Mazloum smelled of alcohol, but the evidence showed that Mazloum was driven, then pinned, to the ground of the Nightclub before being removed.  Several witnesses testified that the floor was wet and smelled of alcohol as a result of club patrons bumping into each other with drinks during hours of dancing.

And he had never been involved in a violent altercation before the March 11, 2005 incident, or after.

At about 9:30 p.m., the three drove to FUR, and upon arrival Mazloum wandered about while his friends took their stations at the stairs of the stage.   At approximately midnight, Mazloum attempted to go up the steps onto the stage.  His friend Marwan opened the rope at the bottom of the steps,[4] but when Mazloum climbed up a few steps, he was signaled to stop and wait by the bouncer, Michael Persons.  Mazloum turned, and went back down to the main dance floor, and started to dance.

Some time before the incident, the four off-duty officers were admitted onto the stage by Persons, after being approved by Michael "Romeo" Rehman, one of FUR's co-owners.   Persons testified that, as Officer Modlin came up onto the stage, he said to Persons, "We're here if you need us."  Persons understood this to mean that if he had any security problems, Modlin and his friends would assist.  It was further unrebutted that the off-duty officers had all participated in "Club Zone" overtime duty in the past, and were thus very familiar with the Nightclub.   A reasonable inference was that the officers were predisposed to side with Persons in any situation.

Before the incident occurred, Mazloum was dancing with a woman on the main dance floor near the far end of the stage opposite the steps.  At some point the woman boosted herself onto the stage, which was less crowded than the main dance floor.  She waved for Mazloum to join her, which he did, by boosting himself up as well.  Mazloum saw a number of other people climbing onto the stage without encountering any interference or admonition ("Everybody does

---

[4] Marwan testified that he had discretion as to whom to allow past the velvet rope at the bottom of the stage steps. Although there was a preference for attractive women and men who were "VIP"s, the rules were not strict; ordinary men could and did go on the stage as well.   At bottom, Imad and Marwan were concerned with keeping the stage from becoming overcrowded.

it; nobody saying anything"). The reason he did not use the stairs was that the dance floor was so packed with people that it would have taken a long time to get to the stairs.

### Initiation of Incident by Persons

Mazloum and his friend danced for about fifteen minutes on the stage, and no FUR employee said anything to him during this time. After a song ended, Mazloum decided to leave the stage to check on his friends. As he was walking down the steps, he was grabbed from behind by the bouncer (Persons) who had followed him, unbeknownst to Mazloum. Persons threw Mazloum to the floor, where he faced downward, with Persons' massive body on top of him, pinning him.[5] Mazloum was scared and did not know what was happening to him or why; prior to that moment, Mazloum had been minding his own business and never had any conversation with Persons. Mazloum testified that he struggled to break free from Persons, but at no point did he swing at him, nor was he able to given that he was face down. Also, contrary to Persons' testimony that Marwan Abi-Aad and Imad Alkadi punched and otherwise assaulted him, these men denied doing so, nor did they pile on or fall on top of Persons.[6]

The obvious physical disparities between Mazloum and Persons further underscores both the low probability that Mazloum would have started the altercation and the serious physical distress in which Mazloum found himself upon being assaulted by Persons. Weighing 260 pounds (over fifty pounds more than Mazloum at the time), Persons was strong enough to leg-press 2,000 pounds and had tried out for a professional NFL football team. The physical

---

[5] While Persons first testified that he *fell* on Mazloum, he readily admitted on cross that he "could have" *thrown* him to the ground.

[6] Although Persons testified that Abi-Aad and Alkadi assaulted him, Persons did not have them ejected from the club later that morning after the incident, nor did he complain about them to the police. In fact, Persons spoke to Alkadi later that night and did not accuse Alkadi of hitting him.

interaction between these two individuals was no contest; in short order Mazloum was pinned face-down on the floor, with Persons kneeling on top of him.  Such circumstances do not indicate any danger posed by Mazloum, and suggest no grounds for the police to target him.

### Massive Intervention by Off-Duty Officers

Two of the Off-Duty Officers (Modlin and Phillips) were dancing and drinking on the stage.  Modlin testified that he had drunk one-and-a-half alcoholic drinks by that point, and admitted that he had previously been too drunk to drive after consuming two alcoholic drinks. Phillips testified to having consumed two-to-three alcoholic drinks by that time.  A reasonable jury could of course infer that they had drunk more than they admitted at trial.

Modlin and Phillips became aware of the nearby altercation due to patrons bumping into them or backing off.  Notably, both defendants admitted at trial that (as the jury ultimately found in one of its special interrogatory answers) they had not seen the initiation of the incident, and therefore had no idea why Persons and Mazloums were involved in a physical altercation.  These two defendants set down their drinks, made their way through the crowd, and arrived at the point where they saw Mazloum firmly pinned to the floor under Persons' immense weight.  (While Modlin and Phillips testified that they saw Mazloum assaulting Persons, a reasonable jury could reject that testimony.[7])  These defendants supposedly concluded that Mazloum was the instigator and aggressor, despite his helpless state trapped under Persons, and they decided to treat

---

[7]  Although on a Rule 50 motion the Court cannot credit the defendants' testimony concerning what they saw or did not see upon intervening, it bears noting that Modlin's and Phillips' accounts not only lacked credibility, but contradicted one another.  Modlin testified that he saw three men (Mazloum, Imad, and Marwan) assaulting Persons, while Phillips, who had walked over a second after, testified only that he saw Mazloum assaulting Persons.  It is undisputed that despite Modlin's claim to have witnessed Imad and Marwan committing assault, they were never approached by the police.  A jury could readily infer that Modlin's and Phillips' testimony was false and designed to justify their conduct.

Mazloum like a dangerous felon who posed a great threat to themselves and others, when he plainly did not.

### *Excessive Force by the Off-Duty Officers*

Rather than taking Persons—the apparent aggressor—into custody, or simply separating the two men and asking them questions, Modlin instantly targeted Mazloum, grabbing him in such a tight grip that Mazloum was immobilized, and could not wiggle free. Modlin and Schneider then roughly forced Mazloum across the dance floor, from the stage area to the steps leading up to the tunnel. Officer Modlin, who himself weighed 240 pounds at the time of the incident, testified that Mazloum was "in his custody" as of the moment Modlin began to take Mazloum across the dance floor. Mazloum screamed out, demanding to know why they were doing this to him, and protesting that he "didn't do anything." None of the off-duty officers responded to his questions.

Modlin and Phillips testified that they had identified themselves as police officers verbally and by wearing their badges. Whether or not this was true, Mazloum testified that he did not see or hear these officers identify themselves, which is hardly surprising given that he was face-down under Persons and then suddenly assaulted by two additional unknown men. It was also dim inside the club, and witnesses testified that the decibel level was very high (in fact, Persons stated he wore ear plugs due to this fact), so that to talk to someone a person would have to talk or shout into the other person's ear. Modlin in fact testified that, due to the volume of the music, he did not know whether Phillips announced himself as a police officer to Mazloum. Accordingly, for purposes of the Rule 50 motion, it must be assumed that Mazloum in fact did not comprehend that any of the off-duty officer defendants were police.

Mazloum struggled to free himself from these unknown assailants, but he at no time swung at any of the officers, just as he testified that he never swung at the bouncer. When they reached the bottom of the tunnel staircase, Mazloum fell against the bottom steps. Modlin came down on top of him, pinning Mazloum against the steps with his body weight. At this point, Ramirez, who also testified to consuming alcohol that night, joined the fray, handcuffs at the ready. While Mazloum felt the men pushing and kicking him in the back, Ramirez pulled Mazloum's right arm and roughly handcuffed Mazloum's right hand behind Mazloum's back, after which Schneider joined in and cuffed Mazloum's left hand.

Meanwhile, Marwan, from his position on the stage steps, could see two fist punches raining down on someone. Because of the intervening throng of people, he could not see if the punches were connecting, or on whom. And it is here when Ramirez punched the handcuffed Mazloum in a glancing blow across the nose and eye, and called him a "fucking Al Qaeda."[8]

Mazloum's ordeal did not end when he was forced up the tunnel steps and removed from the Nightclub in handcuffs like a dangerous criminal rather than the innocent victim that he was. While sitting on the street in ripped clothing, Mazloum was cold and called out for someone to pull his shirt back down on his body. Nobody in the crowd stepped forward to assist. Ramirez, who was standing guard over Mazloum, told him to "shut up." Mazloum, in response, told Ramirez to shut up. Ramirez then kicked Mazloum and again called him a "fucking Al Qaeda."

---

[8]  The jury did not resolve whether this statement was in fact made. Verdict at 5 ("*15. Mr Ramirez called Mr. Mazloum a "fucking al qaeda"? We, the jury cannot unanimously agree whether or not "fucking al qaeda" was said…*").

Mazloum replied that he was a Catholic, not a Muslim, and (as he in all candor admitted at trial, in marked contrast to the self-serving blanket denials of the defendants) called Ramirez a "fucking Salvador." Ramirez laughed at Mazloum's obvious distress.

As Imad Alkadi testified, Mazloum attempted several times to get on his feet, and Ramirez responded by kicking him. Once, Mazloum was half-way up when Ramirez pushed him back down and slammed his head onto the sidewalk. Mazloum was very scared, and for the first time in his adult life, began to cry. It is undisputed that at no point during the entire incident did Ramirez ask questions of Mazloum or anyone else to determine the justification for Mazloum's arrest or the need for his continued custody and handcuffing.

### Aftermath of Incident

Eventually, uniformed officers arrived. They chatted off to the side with Ramirez, out of Mazloum's hearing. The uniformed officers spoke to Mazloum, who told them he had been assaulted, and pointed out Ramirez and Persons as his assailants. Officer Acosta, who testified at trial, admitted that he found it strange that none of the officers who were unquestionably present at the time came up to inform him about the nature of Mazloum's conduct—indeed, no witnesses from the Nightclub at all corroborated stories of Mazloum being the aggressor. Acosta found the sole witness who did try to finger Mazloum—Michael Persons—not credible. As a result of the above, the uniformed officers told Mazloum that he had done nothing wrong and to go home. On the drive home, Mazloum learned from Imad for the first time that the individuals who had removed him violently from the Nightclub were in fact off-duty police officers.

As Mazloum and others testified, and as reflected by photographs, this incident left Mazloum seriously injured and he sought treatment at a hospital later that morning. He sustained a broken nose, a bloody eye, a busted lip, bumps on his head, and severe bruising on his

9

shoulders, back, and torso—indicating that the force used against him was prolonged and significant.  He experienced intense pain from his injuries for an extended period of time thereafter, and had surgery to repair his broken nose.  He was unable to return to work to perform the physical labor that was the mainstay of his employment until September, and has continued to experience intermittent back pain.

Testimony concerning the events of March 12 established that Ramirez was well aware of the misconduct he had engaged in.  When Mazloum went to the appropriate precinct station less than twelve hours after the incident, he coincidentally ran into Ramirez coming out of the police building; Ramirez averted his eyes in the hopes of not having to deal directly with Mazloum.  Once aware that Mazloum intended to file a complaint, he threateningly took down information from Mazloum.  He also acted quickly to phone Modlin as well as Acosta.  More tellingly, he phoned John Fiorito, a co-owner of FUR and former MPD Officer, to let him know what had transpired and (according to Fiorito's deposition testimony, read at trial) to express concerns about what the video cameras might have recorded.  It was this call that led Fiorito to demand that Imad Alkadi return to FUR, at which time he uttered the completely unrebutted statement that "everything [referring to the surveillance tapes] was gone."  Such conduct is not consistent with innocence.

Finally, the defendants were repeatedly heard to testify that that they were *always* on duty, in uniform or not, and that they were thus required to intervene in this incident.  However, MPD has regulations that govern the behavior of off-duty officers and that prohibited the off-duty officers' use of force against Mazloum.  *See* MPD Special Order entitled "Carry Service Firearms While Off-Duty In The District of Columbia" (effective date: April 1, 2004) (Plaintiff's Trial Exhibit 11). (Rule IV.B.1 states:  "Unarmed, off-duty members . . . [s]hall not take direct

10

police action as a Metropolitan Police Officer unless such action can be taken safely *without use of force* or the endangerment of others." (emphasis added)). The MPD regulations instruct off-duty officers to call for uniformed assistance when witnessing an incident, and to serve a support role when observing an incident while off-duty. A reasonable jury could conclude that the defendants violated these regulations.

## PROCEDURAL BACKGROUND[9]

Ramirez and the three Off-Duty Officers filed summary judgment motions in May 2007, although only the Off-Duty Officers asserted qualified immunity as grounds for dismissal. In November 2007, this court denied the Off-Duty Officers' summary judgment motion on Mazloum's section 1983 claims, holding that there were genuine issues of material fact that prevented judgment in their favor both on the merits and on qualified immunity. *See Mazloum v. District of Colombia Metropolitan Police Dept.*, 522 F. Supp. 2d 24, 34-35 (D.D.C. 2007). Despite Mazloum's argument that an appeal would be frivolous, the three officers thereupon filed an interlocutory appeal of that qualified immunity determination, thus depriving this court of jurisdiction over the Section 1983 claims.

At the April 2008 trial, Ramirez moved for judgment as a matter of law pursuant to Rule 50(a) on all claims relevant here, but the court denied the motion. The court granted the Off-Duty Officers' Rule 50(a) motion to dismiss the assault and battery claims against them, but (due to the stay) did nothing with respect to the untried 1983 claims. At the close of evidence, the jury was instructed and provided with a verdict form that encompassed a general verdict and special interrogatory questions. On May 6, 2008, after three days of deliberation, the jury returned its verdict. *See* Verdict (Docket Entry #204).

---

[9] Mazloum offers the following brief statement to supplement the Defendants' account of the procedural history.

As is relevant here, the jury's general verdict found for Mazloum on his Section 1983 claim that Ramirez deprived him of his "constitutional rights to be free from unlawful arrest or the use of excessive force"; found that Ramirez was liable for $5,000 in compensatory damages and $25,000 in punitive damages on the Section 1983 claim; and found that Persons committed battery. *See* Verdict, pp. 1-3. The jury also completed special interrogatories in which it determined, among other things, that Persons had Mazloum pinned to the ground before the officers' intervention; that prior to that intervention Mazloum did not pose a risk to the officers; that the off-duty officers roughly handled Mazloum with excessive force, and that Ramirez acted overly aggressive toward Mazloum and employed excessive force against him. *See* Verdict (Questions 3, 5, 10, 12-14).

## ARGUMENT

## I.    THE COURT SHOULD DENY RAMIREZ' RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE EXCESSIVE FORCE CLAIM

### A.    Legal Standards Applicable to A Rule 50(b) Motion

As Ramirez acknowledges, a Rule 50(b) motion for judgment as a matter of law should be granted "only in extreme cases." Dist. Mem. at 10; *see also Daskalea v. District of Columbia,* 227 F.3d 433, 441 (D.C. Cir. 2000) ("Because granting judgment as a matter of law 'intrudes upon the rightful province of the jury, it is highly disfavored.'"). This logically follows from the fact that it is the "jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences [and] judges the credibility of witnesses . . . Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35 (1944).

The standards for granting a pre-submission motion under Rule 50(a) and a "renewed" post-verdict motion under Rule 50(b) are the same. *See* Dist. Mem. at 10; *see also* Wright & Miller, Federal Practice & Procedure, § 2537. The Court must view the evidence in the light most favorable to Mazloum as the non-moving party and determine conflicts of evidence in the non-movant's favor. *Hudson v. District of Columbia*, 517 F. Supp. 2d 40, 45 (D.D.C. 2007). It may not weigh the evidence, make credibility determinations, or substitute its own judgment for that of the jury. *Id.* To prevail, a defendant must demonstrate that "'the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor.'" *Id.* (quoting *McGill v. Munoz,* 203 F.3d 843, 845 (D.C. Cir. 2000)).

Indeed, a court ruling on a Rule 50(b) motion must "'disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Kerman v. City of New York,* 374 F.3d 93, 94  (2d Cir. 2004); *see also Kirkland v. District of Columbia,* 70 F.3d 629, 635-636 (D.C. Cir. 1995) (upholding denial of Rule 50(b) motion in excessive force case where reasonable jury could have believed that plaintiff murder suspect was "empty handed" and could have rejected the officers' testimony that they saw a dark object resembling an Uzi in his hand "as either a fabrication or the delusion of overeager policemen").

**B.    There Was Legally Sufficient Evidence in the Trial Record For A Reasonable Jury To Find That Ramirez Engaged In Excessive Force In Violation of the Fourth Amendment**

1.    *Legal Standards Governing Excessive Force.*

This Court's November 6 2007 summary judgment decision aptly set forth the standards governing resolution of Section 1983 claims asserting excessive force. *See Mazloum,* 522 F. Supp. 2d at 34-35. To briefly summarize, the first question in analyzing a constitutional claim

made under Section 1983 is: "Taken in the light most favorable to the [plaintiff], do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  A police officer engages in excessive force in violation of the Fourth Amendment[10] where he uses greater force than is objectively reasonable.  *Id.* at 201-202.

As the Supreme Court observed in *Graham v. Connor*, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." 490 U.S. 386, 397 (1989).  The analysis requires consideration of the "totality of the circumstances," *see Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985), and proceeds from the "perspective of a reasonable officer on the scene," rather than with 20/20 vision of hindsight, *see Graham*, 490 U.S. at 396.  As the jury was instructed, the *Graham* factors for assessing reasonableness include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396 (citation omitted).

Importantly, in conducting the "reasonableness" inquiry, an officer's individual subjective intent, motivation, or belief is irrelevant.  *Mazloum*, 522 F. Suppp. 2d at 33; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 815-18 (1982).  If sufficient evidence shows that the conduct was *not* reasonable—as is the case here—it is no rejoinder for Ramirez to argue that *he* thought Mazloum was a threat, or believed in good faith that his actions were appropriate.  *See, e.g., Hadley v. Gutierrez*, 526 F.3d 1324, 2008 WL 1947008, *4 (11th Cir. May 6, 2008) ("While Officer Ortivero might have subjectively believed Hadley posed a risk of danger—Hadley was

---

[10] The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated."  U.S. CONST. AMEND IV.

14

admittedly high on cocaine and paranoid—we do not consider the subject belief of Officer Ortivero in determining whether force is excessive.  Rather, excessive force is judged solely on an objective basis.")

> 2.    *The Trial Evidence Was More Than Legally Sufficient To Support a Finding of Excessive Force.*

Ramirez' analysis blithely ignores the standards governing a motion under Rule 50. Instead, he does the opposite—crediting the defendants' accounts of the facts, while refusing to treat Mazloum's and his witnesses' testimony as true.  Moreover, Ramirez largely ignores the *Graham* factors, which weigh heavily in Mazloum's favor.  Finally, Ramirez disregards the Court's highly relevant summary judgment decision of November 6, 2007, which painstakingly applied the relevant legal standards to the incident in question under a standard identical to that of Rule 50[11] and based on evidence materially the same as that offered at trial.  Ramirez has provided no cause for departing from the Court's reasoning in that decision.

As reflected in the statement of facts above, the trial evidence plus "all reasonable inferences" that can be drawn therefrom, when "viewed in the light most favorable to the non-moving party," *Hudson,* 517 F. Supp. 2d at 45, were more than legally sufficient to permit a reasonable jury to find that Officer Ramirez used greater force against Mazolum than was objectively reasonable.  Mazloum had committed no crime and was found pinned to the ground, but the defendants nevertheless treated him like a dangerous criminal, in the absence of any evidence and without performing even the most minimal investigation. Credible eyewitness testimony established that Ramirez was the officer that engaged in the most serious abuse of Mazloum.  Even if Ramirez engaged in only one of the punctuated acts of violence alleged—

---

[11] *See Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 828 n.29 (D.C. Cir. 1988) (noting that summary judgment standard is the same as that under Rule 50, but the latter involves trial evidence).

either punching Mazloum in the face, slamming his head against the sidewalk, or kicking him—even one of those acts perpetrated against a handcuffed person would be totally disproportionate to any legitimate police need and thus objectively unreasonable. *See generally Jones v. Buchanan*, 325 F.3d 520, 529, 532-534 (4th Cir. 2003) (reasonable jury could find excessive force where officer knocked handcuffed plaintiff to ground and jumped on him, breaking his nose, even where plaintiff was "drunk and disruptive"; collecting numerous cases finding excessive force against handcuffed plaintiffs, even where the plaintiff had engaged in criminal activity or had resisted arrest).[12]

Indeed, given that Mazloum had done nothing criminal, even the conduct that Ramirez himself admitted he engaged in—roughly handcuffing Mazloum, keeping him handcuffed throughout the period they were outside, and leg "sweeping" him each time he attempted to stand up[13]—constituted objectively unreasonable force. *See, e.g.*, *Bauer v. Norris*, 713 F.2d 408, 412-413 (8th Cir. 1983) (denying Rule 50(b) motion where officer tightly handcuffed plaintiffs' wrists behind their back despite lack of evidence of criminal conduct: "We acknowledge that the force applied in the instant case was relatively minor and that evidence supporting plaintiffs' claim might well have been stronger. … Nevertheless, we conclude that the record, viewed in the light most favorable to the verdict, does support a conclusion by the jury that . . . the use of *any* force by [the officer] in the course of his encounter and arrest of [the plaintiffs] was

---

[12] *See, e.g., Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) (reasonable jury could find that officer's slamming of plaintiff's head against trunk after securing plaintiff in handcuffs was "objectively unreasonable and clearly unlawful"; denying qualified immunity); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (officer's hitting handcuffed plaintiff with nightstick was excessive, even where plaintiff had engaged in criminal activity and fled from police).

[13] Ramirez suggests that his "sweeping" of Mazloum cannot be excessive force because it was a technique taught at the police academy. Dist. Mem. at 19. That is untenable. Like every punch, kick, or other type of force taught at the police academy, such force can be objectively excessive if it is unnecessary under the circumstances—such as where, as here, there is no cause to use *any* force at all against a non-culpable victim of an assault.

unreasonable….”); *Solomon v. Auburn Hills Police Dep't.*, 389 F.3d 167 (6th Cir. 2004) (reasonable jury could find officer's tackling and rough handcuffing excessive during arrest for assaulting a police officer).

Application of the factors addressed in *Graham* and other cases shows that there was more than sufficient evidence of excessive force, as does this Court's detailed analysis in its November 6, 2007 summary judgment decision.

- **Whether a crime had been committed and, if so, the severity of the crime at issue.**[14]

The trial evidence permits the conclusion that Persons assaulted Mazloum and that, when when Modlin and Phillips first saw them, the massive bouncer had Mazloum pinned to the ground. Having only seen Persons pinning Mazloum face-down to the ground, no reasonable officer could believe that *Mazloum* was assaulting Persons, nor could such an officer somehow speculate that Mazloum had earlier "attacked the club bouncer." Dist. Mem. at 13. This factor is critical: The lack of criminal conduct on Mazloum's part rendered the use of *any* force against him excessive.[15] As this Court held:

> *Graham* indicates that courts should gauge the severity of the crime at issue, an inquiry that cuts sharply in plaintiff's favor. [Mazloum] was merely exiting the stage when he was grabbed and pinned down by defendant Persons; that is hardly a crime on plaintiff's part. Although the off-duty officers contend that they witnessed plaintiff assaulting the bouncer, the Court must view the facts in the

---

[14] This phrasing of the *Graham* factors is taken from the jury instructions in this case (p. 46).

[15] Ramirez mistakenly asks the Court to accept Modlin's and Phillips's testimony that they saw Mazloum assaulting Persons, despite the fact that the evidence must be taken in the light most favorable Mazloum. Ramirez also halfheartedly asserts that the officers could have believed that Mazloum had committed trespass since he "refused to leave FUR Nightclub after Defendant Persons and the remaining Defendants sought to remove him." Dist. Mem. at 13. However, the officers did not know Persons had (allegedly) told Mazloum to leave—in fact, they testified to not knowing how the incident began. Nor is there evidence that the officers themselves told Mazloum to leave, much less gave him an opportunity to do so. In any event, trespass in these circumstances is a "minor offense," not a "severe crime" that would justify significant force. *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 174 (6th Cir. 2004).

light most favorable to plaintiff…. Indeed, as plaintiff would have it, these facts do not justify the use of *any* force against him since he had engaged in no culpable conduct.

*Mazloum*, 522 F. Supp. 2d at 34-35 (internal citation omitted). Nothing presented at trial warrants departure from that analysis, which is firmly grounded in the caselaw.  *See, e.g.*, *Bauer*, 713 F.2d at 412-413 (holding that the absence of any wrongful conduct rendered the "use of *any* force" by the officers unreasonable).[16] The "reasonableness" balancing test thus begins heavily— indeed decisively—weighted against the use of force.

Mazloum's lack of criminal conduct meaningfully distinguishes his case from those where an officer's use of force has been upheld because it was indisputable that the officer was faced with handling a person engaged in criminal activity.  *See, e.g. Saucier*, 533 U.S. at 203 (finding for officer where he undeniably had authority to detain the protestor based on his conduct and where officer acted urgently to "protect the safety and security of the Vice President of the United States from persons unknown in number").[17]

- ***Whether the plaintiff posed an immediate threat to the safety of the defendant or others.***

When the officers first intervened upon seeing Mazloum pinned to the ground by Persons, Mazloum quite obviously did not pose an "immediate threat," *Graham*, 490 U.S. at 396,

---

[16] *See also P.B. v. Koch*  96 F.3d 1298, 1303 (9th Cir. 1996) ("[S]ince there was no need for force, Koch's use of force was objectively unreasonable."); *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1261 (E.D. Wash. 2005) ("The key issue is the need for force: '[t]he *force* which was applied must be balanced against the *need* for that force: it is *the need for force* which is at the *heart* of the *Graham* factors.'  Thus, where there is no need for force, *any* force used is constitutionally unreasonable.") (internal citation omitted); *Thompson v. Douds*, 852 So. 2d 299 (Fla. App. 2 Dist. 2003) ("the fact that [plaintiff] had committed no offense at all militates against the use of any force"; "the use of force was improper ab initio"); *Jones v Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003) (plaintiff's commission of no crime or "minor crime" weighs heavily in favor of excessive force finding).

[17] *See also Scott v. District of Columbia*, 101 F.3d 748 (D.C. Cir. 1997) (holding force was not excessive where plaintiff crashed into four cars while drunk driving and then attempted to escape from the backseat of a police cruiser); *Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987).  *Cf. DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. Cir. 1997) (finding that a reasonable jury could find force excessive even where it was undisputed that plaintiff had engaged in drunk driving).

to any of the officers, nor to other nightclub patrons. *Cf. Wardlaw v. Picket*, 1 F.3d 1297, 1304 (D.C. Cir. 1997) (holding that officers' use of force was appropriate where plaintiff charged at the officers, shouting, and "raising a fear that he was about to attack"). Nor was there any suggestion that the officers suspected that Mazloum had a weapon. *Cf. Jones*, 325 F.3d at 520 (noting that many cases finding an "immediate threat" involve an armed suspect or suspicion that the suspect is armed). And while Mazloum understandably struggled to free himself from Persons, he was face down and never swung at him. The victim of an attack is not ordinarily thought to "threaten" the safety of his aggressor, and certainly no reasonable officer could believe that Mazloum posed a threat to Persons, much less an "immediate" one. *See Mazloum*, 552 F. Supp. 2d at 34 ("Plaintiff also posed no threat to the officers or other club patrons before the officers became involved in the incident; indeed, if plaintiff is to be believed, it was Persons that posed such a threat, if anyone did.").

- ***Whether the plaintiff actively resisted arrest or attempted to evade arrest.***

This Court's summary judgment reasoning is again on point. Viewing the evidence in the light favorable to Mazloum, he clearly was not "evading arrest at the time that the off-duty officers intervened." *Mazloum,* 552 F. Supp. 2d at 34. Moreover, "although it is true that [Mazloum] was flailing his arms and legs about after the officers became involved, the D.C. Circuit has indicated that attempts to free oneself *after* the use of force in question has occurred are not relevant to the inquiry concerning the officer' initiation of force." *Id.* at 34 (citing *DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. Cir. 1997)). As is well settled in

19

*DeGraff* and other cases,[18] Mazloum's subsequent attempts to defend himself from the officers' excessive force cannot be twisted into a *justification* for the imposition of that force.

Even putting the *DeGraff* rule aside, the third *Graham* factor nevertheless weighs heavily for Mazloum. A reasonable jury could find that, certainly by the time Mazloum was pinned to the bottom steps of the tunnel staircase and handcuffed behind his back, he could hardly mount any meaningful physical resistance at all, much less attack the officers or attempt flight. (And, as Mazloum testified, at no time during the entire incident—whether handcuffed or not—did he swing at any officers.) The threat posed would have been negligible—not only because Mazloum was handcuffed, but also because he was decisively outnumbered by four officers and the bouncer, who were all (as even a child could have observed at trial) of significantly greater size. Under these circumstances, no meager resistance by Mazloum could have justified Ramirez's subsequent disproportionate and unnecessary violence while Mazloum was handcuffed and defenseless.[19]

- ***Whether The Force Used Resulted In Injury.***

"Injury is a relevant factor in determining whether an officer used excessive force," *Chelios v. Heavener*, 2008 WL 746842, at *8 (7th Cir. Mar. 21 2008), although "an excessive force claim does not require any particular degree of injury," *id.* In concluding that an officer's

---

[18] *See Dixon v. Richer,* 922 F.2d 1456, 1463 (10th Cir. 1991) ("That [plaintiff] resisted being choked and beaten does not retroactively justify it.")*; Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (reasonable jury could find that plaintiff's resistance did not justify force where the plaintiff "did not resist arrest in any way prior to the officers' use of excessive force"); *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994).

[19] Courts have acknowledged that "resistance" encompasses a broad spectrum of verbal and physical conduct and that minimal physical resistance, even before handcuffing, does not justify rough force. *See, e.g., Solomon*, 389 F.3d at 174 (plaintiff's crossing of arms in response to officer's leg sweeping and to prevent handcuffing "does not create a presumption of actively resisting arrest that would justify Officer Miller's actions [throwing plaintiff against wall and roughly handcuffing her]"); *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated").

use of force was reasonable, courts have noted the plaintiff's lack of "hurt" or "injury." *See, e.g., Saucier*, 533 U.S. at 209 ("Our conclusion is confirmed by the uncontested fact that the force was not so excessive that respondent suffered hurt or injury."); *Wardlaw,* 1 F.3d 1297, 1304 (D.C. Cir. 1993) (noting that plaintiff "did not consider his injuries severe enough to require medical attention"); *Scott*, 101 F.3d at 760 (similar).

Here, in sharp contrast, the trial evidence shows that Mazloum experienced serious "hurt" and "injury," *see Saucier*, 533 U.S. at 209, including a broken nose, bloodied eye, busted lip, and severe bruising on his body; that he sought both immediate and follow-up medical care; and that he continues to experience pain from the incident. Even if Mazloum's injuries may be partly attributable to the initial battery by Persons, both the severity and extensiveness of the injuries, coupled with the testimony describing Ramirez' and the other officers' conduct, would permit a reasonable jury to infer that 1) Ramirez was a significant cause of Mazloum's injuries, and 2) the force he applied to cause those injuries amounted to far more than a "mere push or shove," *id.* at 209.[20]

- ***Other relevant factors**.*

In addition to all of the above, evidence was introduced at trial that the officers' use of force under these circumstances violated MPD standards governing the conduct of off-duty police officers. *See* Exhibit 11. The evidence also established that the officers had been drinking at the time they intervened; a reasonable jury would be permitted to infer that they had drunk more than they admitted. In contrast to what occurred here, a reasonable officer who is off-duty and knows he is under the influence of alcohol would act with much more caution than one who

---

[20] Of course, as *Saucier* indicated, even a "push or shove" could be excessive depending on the circumstances. *See* 553 U.S. at 209 ("Pushes and shoves, like other police conduct, must be judged under the Fourth Amendment standard of reasonableness.").

is on-duty and sober.  Additionally, there was evidence of the web of connections between the officers and FUR Nightclub (and, in particular, testimony about Ramirez' suspicious phone call to FUR personnel once he learned of Mazloum's effort to complain of his mistreatment), all of which suggested the defendants' inherent interest in protecting the Nightclub.  A reasonable jury could find that Ramirez was accordingly conscious of the fact that he had violated Mazloum's rights.

3.      *Ramirez Violates Well Settled Principles in Arguing For Judgment As A Matter of Law Based On The Special Interrogatory Answers and the Jury's Assault-and-Battery Verdict*

a.      Ramirez' arguments based on the jury's findings ignore the Rule 50(b) standard and would result in reversible error.

Because he cannot succeed by engaging in a proper Rule 50(b) analysis, Ramirez resorts to arguing that the jury's verdict on the 1983 claim is allegedly contradicted or undermined by other parts of the verdict.  Specifically, Ramirez argues that the jury's special interrogatory findings show that its excessive force finding is "without legal justification."  Dist. Mem. at 19.  Ramirez also argues that the favorable verdict rendered by the jury with respect to the battery claim asserted against him "directly and effectively dictates" that its excessive force verdict for Mazloum "cannot stand."  *Id.* at 17.

Such arguments reveal a fundamental misunderstanding of the purpose of a Rule 50(b) motion, which assesses whether "'the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor.'"  *Hudson*, 517 F. Supp. 2d at 45.  The proper analysis is thus "squarely and narrowly focused on the sufficiency of evidence … regardless of whether the district court's analysis is undertaken before or after submitting the case to the jury."  *Chaney v. City of*

22

*Orlando, Fl.*, 483 F.3d 1221, 1227 (11th Cir. 2007); *see also* Dist. Mem. at 11 ( "A Rule 50(b) motion is merely the renewal of a Rule 50(a) motion for a directed verdict and the applicable standard is the same ….").

Accordingly, how a jury ultimately resolves a claim or issue is irrelevant to the disposition of a Rule 50(b) motion.[21]  It is therefore reversible error for a district court to base— as Ramirez urges—its Rule 50(b) determination on a jury's findings. *See, e.g., Chaney*, 483 F.3d at 1228 ("a Rule 50(b) motion should be decided in the same way it would have been decided prior to the jury's verdict, and that the jury's particular findings are not germane to the legal analysis. . . . [B]y repeatedly making decisions on the Rule 50 motion through the lens of what the jury found[,] the court engaged in an erroneous analysis in deciding Officer Cute's renewed motion for judgment as a matter of law,"); *see also Mosley v. Wilson*, 102 F.3d 85, 89 (3d Cir. 1996) (no authority "authorizes a district court to grant judgment as a matter of law based on the jury's inconsistency on different claims.").  This Court should reject the District's similarly erroneous argument here.

        b.    Ramirez's arguments based on inconsistencies in the verdict fail in any event.

Ramirez' arguments based on verdict inconsistencies fail in any event.  *First*, as a threshold matter, his argument is procedurally improper.  While Ramirez could have argued under Rule 49(b) and 59(e) that the jury's special interrogatory findings conflict with its general verdict on excessive force, and that he is accordingly entitled to a new trial or amendment of the verdict, he failed to do so and has therefore waived such an argument.

---

[21] For example, a court could properly hold in a negligence case that there is legally sufficient evidence for a jury to find that the traffic light was green.  That holding in no way is undermined by the fact that a jury ultimately finds, upon resolving conflicting evidence, that the traffic light was red.  Only if a reasonable jury could only find one way on an issue is judgment as a matter of law appropriate.

*Second,* Ramirez' argument based on the special interrogatory findings is in direct contravention of the Seventh Amendment and the case law, which requires that courts interpreting interrogatory answers "*harmonize* the jury's several pronouncements if possible rather than use the answers to special questions as weapons for destroying the general verdict." *Studley, Inc. v. Gulf Oil Corp.*, 407 F.2d 521, 526 (2d Cir. 1969) (emphasis added); *see also McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 763 (3d Cir. 1990) ("[A] trial court is under a constitutional mandate to search for a view of the case which *reconciles*, not deconstructs, the jury's interrogatory answers.") (internal quotation marks omitted). Indeed, as will be explained in the qualified immunity section below, a court must make every reasonable effort to construe special interrogatory answers to be *consistent with one another* and to *support* the general verdict. There is a reasonable—and indeed probable—interpretation of the jury's interrogatory responses that coheres with the trial evidence and sustains the jury's general verdict finding excessive force. Ramirez's request that this Court act contrary to such settled law should not be entertained.

*Finally*, any inconsistency in the verdict between the excessive force and battery findings can only be resolved in favor of Mazloum. As Mazloum has argued in support of his post-verdict motion, special findings control over a general verdict in the event of a conflict. *See* Wright & Miller, § 2513. Here, the jury's special interrogatory finding that Defendant Ramirez "employed excessive force" against Mazloum (Questions 12-14) conflicts with—and therefore takes precedence over—the jury's general verdict finding that Ramirez was not liable for battery. It is thus the general verdict for Ramirez on battery, and not the finding on the Section 1983 claim, that should be set aside, pursuant to Rules 49(b) and 59(e).

24

**C.    Ramirez Is Not Entitled to Qualified Immunity For Excessive Force.**

1.    *Legal Standards Governing Qualified Immunity.*

If a constitutional violation is established, a defendant may assert qualified immunity, which turns on whether the right in question was "clearly established." *Saucier*, 553 U.S. at 201. The "dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.   Qualified immunity thus implicates legal, rather than factual, mistake:   "An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.* at 205.   For a right to be clearly established, it is not necessary that the "very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Rather, it is sufficient that "in the light of preexisting law the unlawfulness [of the action] must be apparent." *Id.*

In evaluating a claim of qualified immunity, courts should be careful not to carry that doctrine so far, and apply it so rigidly, that they unduly frustrate the vindication of constitutional rights that is the purpose of a Section 1983 claim. *Cf. McNair v. Coffey*, 234 F.3d 352, 356 (7th Cir. 2000) (Easterbrook, J.) ("Let us never forget that immunity in § 1983 cases is a judicial invention.  Congress provided for liability in absolute terms.  Public officials who violated the Constitution or laws must pay; immunity is anti-textual").

2.    *Standard of Review for a Qualified Immunity Motion Under Rule 50(b).*

For the most part, the same standard for assessing a Rule 50(b) motion applies when a qualified immunity defense is asserted post-trial. *See Karnes v. Skrutski,* 62 F.3d 485, 494 (3rd Cir. 1995) ("The standard for granting or denying a motion for judgment as a matter of law does

not change in the qualified immunity context."). Accordingly, in ruling on such a motion, a court must view the facts bearing on qualified immunity in the light most favorable to the non-moving party. *See Iacobucci v. Boulter,* 193 F.3d 14, 23 (1st Cir. 1999) (collecting cases). However, unlike in a usual Rule 50(b) analysis, a court must defer with regard to specific factual issues for which the jury made special findings to aid the Court in its immunity determination. *See Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) (reversing district court's post-verdict grant of qualified immunity in an unlawful arrest case and holding that court should have taken facts relevant to qualified immunity in the light most favorable to Plaintiff except with respect to a factual issue that the jury determined in a special interrogatory response); *Hudson*, 517 F. Supp. 2d at 51 (in ruling on post-verdict motion for qualified immunity, the court considers the amount of force used and the situation facing officer "in the light most favorable to Plaintiffs"; determining that, "[w]ith due regard for the jury's role in making credibility determinations, and viewing the facts in the light most favorable to Plaintiffs, the Court concludes that Officer Merrit is not entitled to qualified immunity").

      3.      *Standards for Interpreting the Jury's Special Interrogatory Answers.*

In interpreting the jury's special interrogatory answers for purposes of qualified immunity analysis, it is well settled that the Court must make every reasonable effort to construe the interrogatory answers in a manner so that they are consistent with one another and support the general verdict. *See Los Angeles Nut House v. Holiday Hardware Corp.*, 825 F.2d 1351, 1353 (9th Cir. 1987) ("When there is an inconsistency between a general verdict and a written interrogatory, if reasonably possible we resolve the inconsistency in favor of sustaining the judgment."); *Hundley v. District of Columbia*, 494 F.3d 1097 (D.C. Cir. 2007) (emphasizing in an excessive force case where a special interrogatory response allegedly conflicted with the

26

general verdict, the "special obligation on the court to view the evidence in a manner that reconciles the verdicts if possible").[22]

Indeed, the Supreme Court has instructed that courts must adopt *any* view of the case that fairly harmonizes the interrogatory answers: "[I]t is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them: 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.' We therefore must attempt to reconcile the jury's findings, by exegesis if necessay." *Gallick v. Baltimore and Ohio R.R. Co.*, 372 U.S. 108, 119 (1963) (quoting *Atlantic & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)). In reconciling the interrogatories, a court may even "hypothesize that the jury misunderstood a phrase or misinterpreted a question." *Floyd v. Laws*, 929 F.2d 1390, 1399 (9th Cir. 1991).

Accordingly, courts have not hesitated to parse ambiguous interrogatories in order to reach an interpretation that sustains the jury's verdict. *See, e.g., Gallick*, 372 U.S. at 119 ("We do not believe that the conclusion of fatal inconsistency is compelled by these findings. In the first place, the jury might not have equated a foreseeable insect bite with a mishap' or injury.… The answer to Question 20 thus might mean simply that while an insect bite was foreseeable, there was no reason to anticipate a 'mishap' or 'injury' from such a bite.").[23]

---

[22] *See also Ingrum v. Nixa Reorganized School Dist. R-2,* 966 F.2d 1232 (8th Cir. 1992) ("[E]very reasonable interpretation should . . . be indulged in favor of the general verdict in an effort to harmonize it with the answers to the interrogatories…."); *Strauss v. Stratojac Corp.,* 810 F.2d 679, 683-684 (7th Cir. 1987) ("The trial judge has a responsibility to uphold the seventh amendment and must make every reasonable effort to sustain the jury verdict by reading the answers consistently").

[23] *See also, e.g., Wilks v. Reyes,* 5 F.3d 412, 416 (9th Cir. 1993) (where jury found officer liable for excessive force but awarded "zero" damages, despite instruction that at least "nominal" damages should be awarded, court reconciled inconsistency by reasoning that while "nominal" for damages awards means "insignificantly small or trifling," in a lay sense it also means "in name only") (internal quotation marks omitted); *Barnhart v. Dollar Rent A Car Sy. Inc.,* 595 F.2d 914, 918 (3rd Cir. 1979) (reconciling seemingly contradictory interrogatory answers in a contract case by interpreting one question as referring to the written contract and the other question as referring to the alleged oral modification: "Although [the second question] does not specifically refer to the alleged oral

4. *Qualified Immunity Does Not Shield Defendant Ramirez From Liability for Excessive Force.*

Ramirez' analysis of qualified immunity is as flawed as his analysis of the merits of the underlying Section 1983 claim. Thus, he fails to view the evidence in the light most favorable to Mazloum; fails to "harmonize" the jury's verdict, instead employing the special interrogatory answers "as weapons for destroying the general verdict," *Studley,* 407 F.2d 521 at 526; and disregards this Court's reasoned qualified immunity analysis in its summary judgment decision.

Taking the facts in the light most favorable to Mazloum—and taking those facts established in the interrogatory responses, construed to sustain the excessive force verdict—it would have been clear to any reasonable officer in Ramirez's position that he had engaged in unconstitutional excessive force. As indicated in this Court's summary judgment decision, the key to the immunity analysis in this case is the fact that, faced with a citizen like Mazloum who was guilty of no criminal conduct, no reasonable officer would have believed that *any* force was warranted. The Court reasoned as follows:

> According to plaintiff, the off-duty officers all admit that they "did not witness how the altercation between the bouncer and [plaintiff] began." . . . Accepting that, the Court cannot conclude that a reasonable off-duty officer would necessarily believe that it was lawful to intervene in the same fashion as these defendants did here, *particularly since, it bears repeating, plaintiff insists that he was already pinned down by Persons. The factual account simply would not permit reasonable off-duty officers to conclude that plaintiff had committed a crime warranting their intervention, particularly with the degree of force that plaintiff alleges defendants employed here.*

*Mazloum*, 552 F. Supp. 2d at 36 (internal citations omitted; emphasis added). This conclusion is only stronger with respect to Ramirez' acts of violence against Mazloum while he was

---

modification, neither the district court nor [the defendant] have suggested any alternative interpretation that would harmonize the answers to [the two questions]"); *see also Warlick v. Cross,* 969 F.2d 303, 305 (7th Cir. 1992) (resolving inconsistency between finding of false arrest and special interrogatory answer rejecting plaintiff's theory that the officer planted the evidence; the court identified other theories of the evidence that would support a finding of no probable cause).

handcuffed.   Denial of qualified immunity is further supported by the fact that MPD policy prohibited the off-duty officers' use of force in these circumstances.  *See Barham v. Ramsey*, 338 F. Supp. 2d 48, 59 (D.D.C. 2004) (MPD guidelines prohibiting conduct supports denial of immunity).

The jury's interrogatory answers support the Court's qualified immunity reasoning.  The jury found that the off-duty officers did not "witness[] the start of the interaction between Mr. Mazloum and Mr. Persons" (Question 4), and even if they had, they would have seen that "Mr. Persons initiated the physical contact with Mr. Mazloum" (Quesiton 2).  Most significantly, the jury found that "Mr. Mazloum was pinned to the ground prior to the intervention by the off-duty officers" (Question 3).   As this Court correctly determined, this scenario "would not permit reasonable off-duty officers to conclude that plaintiff had committed a crime warranting their intervention."  *Mazloum*, 552 F. Supp. 2d at 36.

Those interrogatory answers that are cited as contradictory to this conclusion can in fact be harmonized with the verdict.  Thus, it is true that the jury answered "yes" to the broadly worded question of whether, prior to the officers' intervention in the incident between Mazloum and Persons, Mazloum "had engaged in any conduct that warranted the involvement of the police." (Question 1).   Yet that answer is easily reconciled with the jury's overall verdict of excessive force.  It is reasonably interpreted as an acknowledgement that the physical fracas that Mazloum and Persons were engaged in was disruptive enough within the Nightclub to legitimately draw the attention of defendants Modlin and Phillips (who, according to their testimony, were nearby enough on the stage to feel other patrons bump into them in an effort to step away from the altercation).  While he was pinned to the ground and believed himself to be in great danger, Mazloum legitimately struggled to defend himself from Person's assault.  This is

29

certainly conduct that "warranted the involvement of the police." But rather than come to his aid, they joined forces with the bouncer against him.

In light of the above, although the police's initial *attention* to this incident was legitimate (as the answer to special interrogatory 1 suggests), it does not follow that the subsequent *scope or manner* of the Defendants' intervention (and, in particular, Ramirez' conduct) was reasonable. The officers had a range of responses available to them, from (1) taking Persons, the presumptive aggressor who was on top of Mazloum, into custody; to (2) separating the two men and asking them questions to ascertain who was responsible; to (3) notifying Nightclub personnel and calling for uniformed police, as MPD regulations required (*see* Trial Ex. 11). But rather than take any of these options, these officers—who had been drinking and who felt some loyalty to the Nightclub—intervened on the side of the bouncer and targeted Mazloum *despite* having no evidence that he was culpable. Notably, the jury made no finding that Mazloum was engaged in *criminal* conduct before the officers' intervention, much less that the officers actually saw such criminal conduct occur before arriving at the incident, where they found Mazloum pinned by Persons. The evidence and interrogatory answers thus support the conclusion that the first *Graham* factor weighs heavily in favor of Mazloum. As this Court indicated at the summary judgment phase of the case, since it would be clear to any reasonable officer under such circumstances that Mazloum had not committed any crime, such an officer would be hard pressed to believe that *any* force against Mazloum was justified.

The interrogatory answers also support the second *Graham* factor, which is whether the plaintiff posed an "immediate threat" to the safety of the defendant and others. *See Graham*, 490 U.S. at 396. The jury found that, before their intervention, Mazloum was not a "threat to the safety of the off-duty officers." (Question 5). The jury also determined that, before the officers'

30

intervention, Mazloum was not a "threat to the safety of other persons at the FUR Nightclub," and added, in its own words, "except insofar as he and Mr. Persons were scuffling." (Question 6). The jury thus indicated that Mazloum was a "threat" only in the limited sense that he was involved in a physical altercation (although Mazloum was on the receiving end of that altercation) that might have been disruptive and caused harm to other club patrons (although there is no evidence that this in fact occurred). Any "threat" Mazloum posed to the massive Persons was, as the evidence showed, nonexistent; taken in the light most favorable to Mazloum, and in the absence of a contrary jury finding, the evidence was that Mazloum was *face down* and that he *never swung at Persons*. In these circumstances, no reasonable officer could believe that Mazloum posed a threat, "immediate" or otherwise, to Persons.

With regard to the third *Graham* factor, the District oddly makes much of the jury's finding (admitted by Mazloum throughout the litigation) that Mazloum "resisted the off-duty officers' attempts to remove him from the FUR Nightclub" (Question 9). As recognized by this Court and *DeGraff*, 120 F.3d at 302, Mazloum's understandable resistance to the officers' excessive force cannot be treated as a justification for the initial application of force. The jury's finding that Mazloum behaved in an "intoxicated and disorderly manner" towards the officers must be interpreted in the same vein. There is no evidence that the defendant officers reasonably believed that Mazloum was intoxicated and disorderly when they first applied force to him upon seeing him pinned down—no one at the Nightclub asked for help in dealing with an intoxicated patron, for example. And, particularly by the time that Mazloum was handcuffed, a reasonable jury could certainly reject the self-serving testimony of the much-larger defendant officers that Mazloum was resisting in such a way (even if "disorderly") that there was a real risk that he would harm one of the officers or otherwise break free. Thus, the jury's "resistance" and

"disorderly" findings should not be interpreted to mean more than that Mazloum legitimately resisted excessive force.

Regardless of all of the above, there is one particular interrogatory response that should be dispositive on claims of qualified immunity. With respect to the questions asking whether, after Mazloum was handcuffed, Ramirez punched Mazloum (Question 12), kicked Mazloum (Question 13), and slammed Mazloum's head, the jury provided a single joint answer: **"For 12, 13, 14, we find that Mr. Ramirez was overly aggressive with Mr. Mazloum and Mr. Ramirez employed excessive force against Mr. Mazloum."** This answer is best interpreted to mean that the jurors unanimously found that (1) at least *some* act or acts of physical violence occurred (*e.g.*, a punch, kick, head slam), even if the jury could not agree unanimously on precisely which ones, and (2) such acts, either by themselves or combined with Ramirez' other relevant conduct, were objectively disproportionate to the circumstances.[24] This interpretation best explains the jury's general verdict, since these violent acts were emphasized to the jury as the primary basis for Ramirez' liability and for an award of punitive damages. Once Mazloum was handcuffed and surrounded by multiple officers, it would have been clear to a reasonable officer in Ramirez' position that even a single such act of violence would have been unnecessary and excessive. *See Jones v. Buchanan*, 325 F.3d 520, 529, 534 (4th Cir. 2003) (denying qualified immunity and citing numerous cases showing that at least as early as the year 1999, it was clearly established that using rough force against a handcuffed plaintiff is unconstitutional, even where the plaintiff has engaged in criminal activity or had resisted arrest).

---

[24] Thus, the jury might have simply answered "yes" if there was a single question listing these acts in the disjunctive or if there were a question asking more generally whether Ramirez engaged in a punctuated act of violence towards Mazloum while he was handcuffed.

Ramirez self-servingly treats the jury's joint answer as though it unanimously answered "no" to Questions 12, 13, and 14. That view is unwarranted, but also flies in the face of the fact that the jury found that Ramirez **did** employ excessive force. The Court's response to the jury's first note instructed that "all special interrogatories that the jury can unanimously answer with a 'yes' or 'no' should be so answered." (Docket Entry # 201). The jurors plainly did not answer each of these questions "no." It is reasonable to conclude that the jury merely could not answer each of the questions unanimously, and therefore found a different way to answer the thrust of these three interrogatories in the required unanimous fashion. Because Ramirez' interpretation of these three interrogatory answers is unreasonable and designed to torpedo—rather than harmonize—the verdict, it should be rejected.[25]

## II.    THE COURT SHOULD DENY RAMIREZ' RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE UNLAWFUL ARREST CLAIM.

### A.    Legal Standards Governing Unlawful Arrest.

"It is well established that an arrest without probable cause violates the Fourth Amendment." *Edwards v. Okie Dokie, Inc.*, 473 F. Supp. 2d 31, 42 (D.D.C. 2007). "Probable cause for an arrest exists, if at the time of the arrest 'the facts and circumstances within [the officers'] knowledge and of which they had *reasonably trustworthy information* were sufficient to warrant a *prudent* man in believing' that a crime was committed.'" *Lyles v. Micenko*, 468 F. Supp. 2d 68, 73 (D.D.C. 2006*) (emphasis added); United States v. Wesley*, 293 F.3d 541, 545-

---

[25] Another option would be to treat the punching, kicking, slamming issues as unresolved, and thus view those issues in the light most favorable to Mazloum, *see Hudson*, 517 F. Supp. 2d at 51 (in the absence of interrogatory responses, taking the evidence in the light most favorable to plaintiff in assessing qualified immunity). Regardless, even if the jury's answers to these questions were treated as "no," qualified immunity should still not apply. Given that it would be clear to a reasonable officer that Mazloum did not commit any criminal conduct, and that no force was therefore warranted at all, it follows that the jury might have construed other evidence of Ramirez' physical conduct toward Mazloum not addressed in the interrogatories as excessive—such as his rough handcuffing of Mazloum, his decision to keep the handcuffs on Mazloum while outside, and his admitted "sweeping" of Mazloum's legs (which could have been viewed by the jury as violent and excessive but not a literal "kick").

546 (D.C. Cir. 2002) (probable cause assessed from standpoint of reasonable, prudent person).[26]

As the jury was properly instructed: "To determine whether Mr. Ramirez unlawfully arrested the plaintiff, you must determine whether all the officers involved collectively had probable cause to arrest the plaintiff. . . . You should assess whether the officers had information that would lead a reasonable person who possesses the same official expertise as the off-duty officers here to conclude that the person being arrested had committed or was about to commit a crime." Jury Instructions, at 45.

Although it is true that probable cause negates liability for unlawful arrest, *see* Dist. Mem. at 12, Ramirez is incorrect in stating that an officer may avoid liability when he shows that he "reasonably believed, in good faith, that his conduct toward the plaintiff was lawful," *id.* The latter defense is recognized in the common law of false arrest under D.C. law, *see, e.g.*, *District of Columbia v. Murphy*, 631 A.2d 34, 36 (D.C. 1993), but not under the Fourth Amendment and Section 1983.

Ramirez faces a particularly heaving burden in claiming that Mazloum's unlawful arrest claim should not have gone to the jury. "The question of probable cause . . . is a factually intensive one. Thus, 'in general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.'" *Burr v. Burns*, 439 F. Supp. 2d 779, 786 (S.D. Ohio 2006).[27]

---

[26] *See also Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979) ("Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested]'").

[27] *See also Chelios*, 2008 WL 746842, at 4 (legally sufficient evidence for unlawful arrest exists where "there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them."); *Murphy*, 631 at 39 ("Certainly the District's evidence at trial could have supported a determination by the jury that the officers had probable cause to arrest Murphy…. But, as the trial court correctly ruled, the evidence was too equivocal to support a judicial determination that no reasonable juror could find otherwise.").

**B.    There Was Legally Sufficient Evidence in the Trial Record For A Reasonable Jury To Find That Ramirez Engaged In Unlawful Arrest In Violation of the Fourth Amendment.**

Taking the evidence in the light most favorable to Mazloum, there was more than sufficient evidence at trial to permit a reasonable jury to find that Ramirez—like the other officers—arrested Mazloum without probable cause.[28]  The officers collectively knew only that Mazloum was pinned to the ground under the massive Persons, and was face down, struggling to get free.  No one had asked them to investigate Mazloum; no one had pointed him out as a problem; none of them knew of anything he had done within the Nightclub before they encountered him, and in fact they admitted to lack such knowledge.  And it is an undisputed fact that at no point during the entire incident, even once Mazloum was handcuffed, did the officers ask any questions to support their supposed "split second" belief that Mazloum was committing crimes.  *See Barham*, 338 F. Supp. 2d at 61-62 (patently unreasonable for officer to approve the arrest without "asking essential questions").

A reasonable jury could readily conclude from the above facts that no "prudent" officers faced with such a situation would believe that they possessed sufficiently "reasonably trustworthy information," *Lyles*, 468 F. Supp. 2d at 73, to conclude that *Mazloum* was assaulting Persons, much less committing any other crime.  Indeed, a reasonable jury could find that these officers (who all admit to having been drinking inside the Nightclub, and were familiar with

---

[28] As a threshold issue, a reasonable jury could find—and Ramirez does not dispute—that he and his fellow defendants arrested Mazloum.  *See, e.g., Beran v. U.S.,* 1992 WL 182261, at *6 (D.D.C. 1992) ("[The agent] opened plaintiff's door and grasped him in an attempt to pull him from the car. The court holds that the arrest occurred at this point….[He] was not 'arrested' until the physical force was applied."); *United States v. Barber,* 557 F.2d 628, 631-632 (8th Cir. 1977) (restriction of freedom of movement and failure to ask investigatory questions indicates arrest rather than *Terry* stop); *Burr,* 439 F. Supp. 2d at 786-787 (S.D. Oh. 2006) (whether detention qualified as an arrest was for jury to decide).  Far from engaging in "investigation," Modlin grabbed Mazloum while he was pinned under Persons, and he and Phillips restrained Mazloum and forced him against his will to the tunnel staircase, where he was restrained by all four officers and ultimately handcuffed by Ramirez and Schneider.  Mazloum's custody persisted outside the club, where he remained handcuffed and guarded by Ramirez.

FUR and its management) simply chose—without evidence and without inquiry—to join forces with the bouncer of a club where they enjoyed VIP treatment.

Ramirez' brief runs from these damaging facts and for good reason: It is difficult to fathom how any officer could reasonably believe that the victim of an assault was the lawbreaker who deserved to be arrested. Instead, Ramirez argues in blunderbuss fashion that "probable cause existed for Plaintiff's arrest for a number of crimes, including assault and battery upon Defendant Persons, disorderly conduct, and trespass." Dist. Mem. at 12. Ramirez adds in support of this argument, that Persons had the "authority to remove patrons from the club" and that Persons testified that he decided to remove Plaintiff because he was improperly on the stage. *Id.*[29]

Ramirez failed to raise such arguments in its Rule 50(a) motion at the close of plaintiff's evidence, and should therefore be barred from doing so now.[30] In any event, these arguments (which, as with most of Ramirez' fact assertions, rely completely on evidence offered by the defendants, with inferences tilted completely in his favor) fly in the face of Rule 50(b), which requires the court to view the evidence in the light most favorable to ***Mazloum***. Viewed in that

---

[29] Ramirez also cites various special interrogatory answers in support of his argument that he and his fellow officers had probable cause. As explained above, the jury's actual fact findings are not relevant to a Rule 50(b) analysis.

[30] Claims of legal insufficiency not raised in a Rule 50(a) motion are waived for purposes of a post-verdict Rule 50(b) motion. *See, e.g., Whelan v. Abell* 48 F.3d 1247, 1251 (D.C. Cir. 1995) (holding that the "'precise claim'" made in a Rule 50(b) motion must have been made in a Rule 50(a) motion and concluding that, "as Rule 50(b) limits a post-verdict motion for judgment as a matter of law to a 'renewal' of the pre-verdict motion, we agree that defendants thereby waived that theory as a basis for judgment as a matter of law.") (citation omitted). In his oral Rule 50(a) motion, Ramirez argued that the unlawful arrest claim failed because there was no arrest (and/or that the Plaintiff never alleged that in the lawsuit)—an argument, incidentally, that it has now abandoned. He *did not* argue that there was probable cause for the arrest as a matter of law, and he certainly did not specify the various crimes he now believes were supported by probable cause. Consistent with this approach, Ramirez failed to propose jury instructions regarding the elements of these various claims, making it difficult indeed for a jury to evaluate facts as to whether probable cause existed to support any of them. Ramirez should therefore not be permitted to argue for the first time here that probable cause existed as a matter of law. *Cf. Fogarty v. Gallegos* 523 F.3d 1147, 1156 (10th Cir. 2008) (declining in a section 1983 case to consider additional crimes raised for the first to defeat an unlawful arrest claim).

light, a reasonable jury could find that, as Mazloum testified, *Persons assaulted him*, not vice versa, and that this assault was not preceded by any provocation or conversation (such as Persons instructing Mazloum to leave and Mazloum refusing to do so).  Reasonable officers seeing Persons pinning Mazloum could hardly conjecture that Mazloum had committed any of the crimes now alleged.

Nor is judgment as a matter of law warranted on the theory that a reasonable jury could *only* conclude that the officers had probable cause to believe that Mazloum was engaging in "disorderly conduct."[31]  Again, prior to the officers' intervention, a reasonable jury could readily conclude that the officers knew only that Persons was pinning down Mazloum and that Mazloum was resisting this—not that Mazloum was engaging in an assault or in "disorderly conduct" against Persons.[32]

Most importantly, even assuming Mazloum engaged in "disorderly conduct" towards the officers (as criminally defined, which is quite unlikely given his justification for acting), such conduct occurred *after* the officers' arrest of Mazloum, and thus cannot be cited to support that arrest.  As noted earlier, an officer who assaults and detains a citizen without cause will not be freed from liability for that initial violation because the citizen responds by resisting that attack. *Washington v. United States*, 414 F.2d 1119, 1122 (D.C. Cir. 1969) ("information subsequently obtained cannot fill the gap if probable cause is lacking"); *Lyles*, 468 F. Supp. 2d at 73 (probable cause depends on the information known to the officers "at the time of the arrest"); *see also*

---

[31] Although it is his burden in asserting probable cause to justify a warrantless arrest, Ramirez never sets forth or explains the elements of the various crimes he believes Mazloum committed.

[32] While Persons was a bouncer, it would not be reasonable for the officers in question to assume, without additional evidence or inquiry, that because Persons was restraining Mazloum, Mazloum likely had done something wrong. And such an assumption would certainly not provide *probable cause* to arrest Mazloum for any particular crime, nor would it justify the excessive force used here.  Indeed, credible third-party witnesses such as Officer Acosta (the uniformed officer who ultimately did conduct some kind of investigation, however incomplete) testified that the police are trained to assume that a person restrained may well be a victim of violence—not the perpetrator.

*DeGraff,* 120 F.3d at 302 (holding that attempts to free oneself *after* the use of force in question has occurred are not relevant to the inquiry concerning the officer's initiation of force).

### C.     Ramirez Is Not Entitled To Qualified Immunity For Unlawful Arrest.

The District's arguments for qualified immunity as to unlawful arrest are similarly unpersuasive. "In the context of an unlawful arrest our analysis is simple, for '[t]he law was and is unambiguous: a government official must have probable cause to arrest an individual.'" *Fogarty v. Gallegos*, 523 F.3d 1147, 1158-1159 (10th Cir. 2008); *see also Bloom v. Luis*, 198 F. Supp. 2d 141, 150 (D. Conn. 2002) ("[I]f a factfinder was to conclude that an arrest . . . was not supported by probable cause, then Officer Luis would not be able to assert a defense of qualified immunity…"). If, as must be assumed on a Rule 50(b) motion for qualified immunity, the first and only thing the officers saw was that Persons was assaulting, or at least holding down, Mazloum, it would be "clear" or "apparent" to any reasonable officer, *see Saucier*, 553 U.S. at 201; *Creighton*, 483 U.S. at 640, that probable cause did not exist to arrest Mazloum. On these stark facts, no zone of deference—whether provided by the probable cause standard itself or by qualified immunity—could be invoked to immunize Ramirez.

Once again, Ramirez hopes to ground a defense of immunity on the basis of his and his fellow officers' "good faith" belief that Mazloum committed a crime. But such inherently subjective factual allegations (which rely on what Ramirez and his co-defendant officers thought at the time) are ***irrelevant,*** because both probable cause and qualified immunity are defined by objective standards. If a reasonable officer would believe, based on objective facts, that he lacked probable cause to arrest, then the arrest at issue is unlawful and there is no immunity— even if the officer in question had a genuine, indeed profound, "good faith" belief in the

lawfulness of his conduct.  *See Lyles,* 468 F. Supp. 2d at 73 (probable cause determined from standpoint of reasonable officer); *Saucier*, 533 U.S. at 202 (same for qualified immunity).

Ramirez' qualified immunity defense to unlawful arrest is also (again) dependent on his cherry-picking and aggressive interpretation of the special interrogatory answers.  That effort is unsuccessful.  Indeed, several of the special interrogatories strongly support a finding that Mazloum's arrest was without probable cause, including that, before the officers' intervention, they did not witness the start of the incident (Question 4); that Mazloum was pinned to the ground by Persons (Question 3); and that it was Persons who initiated the physical contact with Mazloum (Question 2).  By contrast, as explained at length in the excessive force section, unless they are purposefully construed in a manner to undermine the general verdict, the remaining answers do not establish that the officers possessed probable cause of criminal conduct on Mazloum's part *prior* to arresting him.  It would accordingly be quite clear to any reasonable officer that the arrest of Mazloum was unlawful, thus making qualified immunity improper.

## III.    THE JURY'S PUNITIVE DAMAGES AWARD AGAINST RAMIREZ IS SUPPORTED BY AMPLE EVIDENCE

"Under District of Columbia law, punitive damages are properly awarded where the act of the defendant is accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 52 (D.D.C. 2003) (citations omitted).  "Proof of these elements may be inferred from the acts of the defendant and from circumstantial evidence.  The issue is ordinarily one for the trier of fact." *Id.*

Evidence that suffices to establish an intentional violation of protected civil rights also may suffice to permit a jury to award punitive damages under Sections 1981 or 1983, provided

the jury, in its discretionary moral judgment, finds that the conduct merits a punitive award. *Barbour v. Merrill*, 48 F. 3d 1270, 1277 (D.C. Cir. 1995); *Jones v. Rivers*, 732 F.Supp. 176, 178 (D.D.C. 1990) (holding that punitive damages may be awarded in § 1983 actions and can be an appropriate means of punishing discriminatory conduct and deterring defendants from future racially discriminatory actions).[33]    In other words, the "willful disregard of the plaintiff's rights" that entitles a plaintiff to punitive damages is practically intertwined with the underlying claim when it is based on an intentional civil rights violation.

Taking the facts in the light most favorable to Mazloum, there was sufficient evidence for a jury to find that Ramirez's conduct in violating Mazloum's constitutional rights was egregious and inappropriate enough to warrant the imposition of a punitive award.  Ramirez's conduct was egregious and unwarranted in roughly handcuffing Mazloum when he had done nothing wrong; violently striking him while he was handcuffed and defenseless; continuing to do violence to Mazloum and keeping him in continued custody without asking him a single investigative question; laughing at Mazloum and telling him to "shut up" in reaction to his plight outside; and, the following day, taking steps to suppress evidence of his wrongdoing by calling FUR management and expressing worry about surveillance tapes upon seeing that Mazloum was exercising his right to complain.  Taken together or individually, these factors amply support a reasonable jury's award of punitive damages.

The jury heard Ramirez's testimony and evaluated his demeanor.  It had the opportunity to weigh his version of events against those of other witnesses.  And it reasonably concluded that Ramirez's blind, knee-jerk intervention and subsequent use of excessive force against Mazloum

---

[33] *See also Gordon v. Norman*, 788 F.2d 1194 (6th Cir. 1986); *Herrera v. Las Vegas Metropolitan Police Dep't.*, 298 F. Supp. 2d 1043 (D. Nev. 2004).

constituted willful and egregious misconduct.  In effect, Ramirez (and his co-defendant officers) took over what would normally be an exclusive function of the Nightclub to manage the conduct of its patrons, resulting in the detention of and physical assault against a man of Lebanese heritage without so much as a warning or bona fide provocation.  There was ample evidence presented at trial from which a jury could reasonably conclude that Ramirez's conduct was not merely inadvertent or grossly negligent, but was purposeful, malicious, and a chilling abuse of power.  Accordingly, there are no grounds for disturbing the jury's finding that punitive damages against Ramirez were appropriate.

## IV.  THE OFF-DUTY OFFICERS CANNOT OBTAIN, LET ALONE SEEK, JUDGMENT AS A MATTER OF LAW BECAUSE THIS COURT LACKS JURISDICTION OVER THE RELEVANT CLAIMS DUE TO THE PENDING APPEAL

The law is clear that the filing of an appeal, including an interlocutory appeal, "confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case pending on appeal."  *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam); *see also United States v. DeFries*, 129 F.3d 1293, 1302-1303 (D.C. Cir. 1997); *Building Indus. Ass'n. of Ca. v. Babbitt*, 70 F. Supp. 2d 1, 2 (D.D.C. 1999).  Accordingly, this Court cannot at this juncture hear *any* motion at all with respect to the appealed Section 1983 claims which, at the request of the very same defendants who now ask this Court to resolve the same claims, were stayed several months ago.

Indeed, this Court has already recognized that it lacks jurisdiction over these claims.  During the pre-trial hearing in this case, the District of Columbia indicated that it might attempt to do just as it has in fact done—to move for post-trial relief on the 1983 claims against the Off-Duty Officers.  This Court properly noted in response, "You can't move for posttrial relief from

me because you're in the Court of Appeals. I don't have the jurisdiction to give you posttrial relief." *See* Exhibit 1 (Excerpt of Tr. 13:16-18, Pre-Trial Conference, Mar. 31, 2008).

The very Federal Rule under which the Off-Duty Officers move also prohibits the relief they seek. Rule 50(a)(1) requires that "a party has been *fully heard on an issue during a jury trial* and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," before a motion for judgment as a matter of law can be obtained. Fed. R. Civ. P. 50(a)(1) (emphasis added). Clearly, no trial has taken place with respect to these claims, and therefore there can be no basis to find for the defendants on the appealed Section 1983 claims. If that were not enough of a bar, Rule 50(a)(2) plainly contemplates the bringing of a motion for judgment as a matter of law in the first instance "*before* the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2) (emphasis added). The Off-Duty Officers have made no such motion (nor could they have done so). Thus, the Off-Duty Officers' motion is both procedurally and jurisdictionally improper.

Likely aware that they cannot ignore the continued existence of the appeal of the Court's resolution of their summary judgment motion seeking dismissal of the Section 1983 claims, the Off-Duty Officers, in a footnote, attempt to justify their motion by stating that their appellate counsel have filed a motion to hold briefing of the appeal in abeyance pending the time when this Court "indicates a willingness to grant their post-trial motion" suggesting that they are seeking some form of an advisory opinion from this Court. Dist. Mem. at 1 n.1. Putting aside the "chicken or the egg" quality of this argument (as it rests on this Court first deciding that it will rule on stayed claims before the appeal goes forward, and signaling as much to the D.C. Circuit, so that the appeal can be stayed—thereby allowing the Court to rule on this motion!), the

premise of the abeyance motion is itself improper, and has been opposed by Plaintiff in the D.C. Circuit.

This is because the defendants based the relief sought in their motion on a single case, *Smith v. Pollin*, 194 F.2d 349, 350 (D.C. Cir. 1952), that is wholly, facially inapposite.  In *Smith,* the D.C. Circuit allowed a litigant to seek a motion for a new trial under Rule 60(b) (relief from a final judgment, order or proceeding on the basis of newly discovered evidence), despite a pendent appeal that otherwise stayed the district court resolution of the claims at issue, due to newly-discovered evidence.  Here, by contrast, the only thing "newly-discovered" are *the results* of the trial of those claims that were not stayed.  Indeed, the *Smith* holding has not been extended to cover Rule 50 post-verdict motions.  *See, e.g., United States  v. Cisneros,* 26 F. Supp. 2d 24, 58 (D.D.C. 1998) (opinion denying reconsideration) (Sporkin, J.) (observing that the D.C. Circuit "has not indicated a willingness to expand *Smith* beyond cases involving motions for new trials based on newly-discovered evidence").[34]

When the appealed Section 1983 claims return to this Court for adjudication and are properly again before the District Court, Plaintiff will address the merits of the Off-Duty Officers' arguments that the Section 1983 claims against them should be dismissed due to findings reached during the trial of the Section 1983 claim against Ramirez.  Of course, at that time, the Plaintiff will likely point out the obvious fact that *the 1983 claims have not been tried* against the three Off-Duty Officers.  As such, the fact findings from the recent trial have limited bearing on the untried 1983 claims, and certainly cannot be used to prevail as a matter of law on

---

[34] In *Cisneros*, the defendant moved for reconsideration of the court's denial of several pretrial motions two days after filing his notice of appeal on the same claims in the D.C. Circuit.  The district court held that it lacked jurisdiction over the motion for reconsideration and explicitly rejected the argument that *Smith* was applicable, reasoning that "[t]he considerations involved in granting a motion for a new trial based on newly-discovered evidence differ in significant respects from those involved in considering a motion for reconsideration of a pre-trial motion."  *Cisneros,* 26 F. Supp. 2d at 58.

the claims after losing summary judgment on them in the fall of 2007. And it is also the case that liability against the Off-Duty Officers could be premised on legal theories not raised in the trial of the claim against Ramirez. *See, e.g., Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 7 (D.D.C. 2006) ("'[u]nder the bystander theory of liability an officer is held responsible for a constitutional violation if he: (1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act'") (quoting *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 72 (D.D.C. 2005)).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Defendants' Motion for Judgment as a Matter of Law be denied in its entirety. Due to the importance of the issues raised in the post-verdict briefing, Plaintiff requests oral argument.

Dated:  June 20, 2008

/s/ Susan Huhta
Susan Huhta (Bar No. 453478)
Warren R. Kaplan (Bar No. 034470)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW, Suite 400
Washington, D.C.  20036
Ph: (202) 319-1000
Fax: (202) 319-1010
Sue_Huhta@washlaw.org
Warren_Kaplan@washlaw.org

David Gonen (Bar No. 500094)
Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW
Suite 700 East Lobby
Washington, D.C.  20007
Ph: (202) 625-3500
Fax: (202) 298-7570
David.Gonen@kattenlaw.com

Attorneys for Plaintiff Emile Mazloum

44